1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Markus H. Meier, D.C. Bar No. 459715
Alden F. Abbott, D.C. Bar No. 938688
Bradley S. Albert, Md. Bar
Armine E. Black, N.Y. Bar
Daniel W. Butrymowicz, N.Y. Bar
Rebecca L. Egeland, D.C. Bar No. 489645
Elizabeth R. Hilder, D.C. Bar No. 940296
D. Bruce Hoffman, D.C. Bar No. 495385
Gail F. Levine, D.C. Bar No. 454727
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
(202) 326-3759; (202) 326-3384 (fax)
*mmeier@ftc.gov*

*Attorneys for Amicus Curiae Federal Trade Commission*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| STALEY, *et al.* | Case No. 3:19-cv-02573-EMC |
| Plaintiffs, | |
| v. | ***AMICUS CURIAE* BRIEF OF THE FEDERAL TRADE COMMISSION** |
| GILEAD SCIENCES, INC., *et al.* | |
| Defendants. | Hearing:    Jan. 16, 2020 |
| | Time:       9:00 a.m. |
| | Courtroom: 5 – 17th Floor |
| | Judge:      Honorable Edward M. Chen |

**TABLE OF CONTENTS**

Interest of the FTC ................................................................................................ 2

I.      Market definition is a tool to analyze the particular anticompetitive effects alleged ......... 2

II.     Defining different product markets to assess different theories of harm is neither
        "contradictory" nor legally deficient ................................................................. 6

III.    Conclusion ....................................................................................................... 11

1

**TABLE OF AUTHORITIES**

2

3

**Cases**

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)......................................................................................................... 1

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962)......................................................................................................... 5

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992)......................................................................................................... 2

*FTC v. Indiana Fed'n of Dentists*,
    476 U.S. 447 (1986).................................................................................................... 3, 4

*FTC v. Staples, Inc.*,
    970 F. Supp. 1066 (D.D.C. 1997)................................................................................. 5

*FTC v. Sysco Corp.*,
    113 F. Supp. 3d 1 (D.D.C. 2015)................................................................................. 5

*FTC v. Whole Foods Mkt., Inc.*,
    548 F.3d 1028 (D.C. Cir. 2008).................................................................................... 5

*Gen. Indus. Corp. v. Hartz Mountain Corp.*,
    810 F.2d 795 (8th Cir. 2004)........................................................................................ 4

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*,
    386 F.3d 485 (2d Cir. 2004)............................................................................... 3, 4, 10

*Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*,
    723 F.3d 1019 (9th Cir. 2013) ..................................................................................... 3

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ................................................................................... 10

*In re Aggrenox Antitrust Litig.*,
    199 F. Supp. 3d 668 (D. Conn. 2016)......................................................................... 9

*In re Impax Labs.*,
    Dkt. No. 9373 (Fed. Trade Comm'n June 7, 2019) ...................................................... 9

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    467 F. Supp. 2d 74 (D.D.C. 2006)............................................................................. 10

*In re Nexium (Esomeprazole) Antitrust Litig.*,
    968 F. Supp. 2d 367 (D. Mass. 2013)......................................................................... 9

*In re Novartis AG & GlaxoSmithKline*,
    Dkt. No. C-4510 (Fed. Trade Comm'n Apr. 8, 2015) .................................................. 8

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*In re Owens-Illinois, Inc.*,
  115 F.T.C. 179 (Feb. 26, 1992) ............................................................. 7

*In re Prestige Brand Holdings, Inc. & Insight Pharm. Corp.*,
  Dkt. No. 4487 (Fed. Trade Comm'n Oct. 14, 2014)................................ 8

*In re Sanofi-Synthelabo & Aventis*,
  Dkt. No. C-4112 (Fed. Trade Comm'n Sept. 24, 2014) ......................... 9

*Kaplan v. Burroughs Corp.*,
  611 F.2d 286 (9th Cir. 1979) ................................................................. 4

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
  275 F.3d 762 (9th Cir. 2001) ................................................................. 3

*NCAA v. Bd. of Regents of the Univ. of Okla.*,
  468 U.S. 85 (1984).................................................................................. 2

*Newcal Indus., Inc. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ............................................................... 3

*Olin Corp. v. FTC*,
  986 F.2d 1295 (9th Cir. 1993) ........................................................... 5, 6

*Oltz v. St. Peter's Cmty. Hosp.*,
  861 F.2d 1440 (9th Cir. 1988) ........................................................... 3, 4

*Pac. Coast Agr. Export Ass'n v. Sunkist Growers, Inc.*,
  526 F.2d 1196 (9th Cir. 1975) ............................................................... 5

*Reazin v. Blue Cross Blue Shield of Kan., Inc.*,
  899 F.2d 951 (9th Cir. 1990) ................................................................. 2

*Safeway Inc. v. Abbott Labs.*,
  761 F. Supp. 2d 874 (N.D. Cal. 2011) ................................................ 3, 9

*Siegler v. Sorrento Therapeutics, Inc.*,
  No. 3:18-cv-01681-GPC-NLS, 2019 WL 3532294 (S.D. Cal. Aug. 2, 2019)...................... 10

*SmithKline Corp. v. Eli Lilly & Co.*,
  575 F.2d 1056 (3d Cir. 1978)................................................................. 9

*Spindler v. Johnson & Johnson Corp.*,
  No. C 10–01414 JSW, 2011 WL 12557884 (N.D. Cal. Aug. 1, 2011) .................................... 4

*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
  778 F.3d 775 (9th Cir. 2015) ................................................................. 3

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
  546 F.3d 991 (9th Cir. 2008) ................................................................. 3

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
  875 F.2d 1369 (9th Cir. 1989) ........................................................... 3, 5

*U.S. Healthcare, Inc. v. Healthsource, Inc.*,
    986 F.2d 589 (1st Cir. 1993) ................................................................................ 1

*United Food & Commercial Workers Local 1776 & Participating Emp'rs Health &
    Welfare Fund v. Teikoku Pharma USA* (*"Lidoderm"*),
    296 F. Supp. 3d 1142 (N.D. Cal. 2017) ................................................................ 3, 9

*United States v. Continental Can Co.*,
    378 U.S. 441 (1964) ............................................................................................. 7

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ............................................................................................. 5

*United States v. Philadelphia Nat'l Bank*,
    374 U.S. 321 (1963) ............................................................................................. 8

*United States v. Phillipsburg Nat'l Bank & Trust Co.*,
    399 U.S. 350 (1970) ............................................................................................. 8

**Statutes**
15 U.S.C. §§ 41-58 ..................................................................................................... 2

**Other Authorities**
David Glasner & Sean P. Sullivan, *The Logic of Market Definition* 6 (Univ. Iowa Legal
    Studies Research Paper No. 2018-14), ANTITRUST L.J. (forthcoming) .............................. 4, 5

Dennis W. Carlton, *Revising the Horizontal Merger Guidelines*,
    J. COMP. LAW & ECON. 619 (2010) ...................................................................... 4

Phillip Areeda, *Market Definition and Horizontal Restraints*,
    52 ANTITRUST L.J. 553 (1983) .............................................................................. 4

Richard A. Posner & Frank H. Easterbrook, *Antitrust: Cases, Economic Notes and
    Other Materials* (2d ed. 1981) ............................................................................. 7

Steven C. Salop, *The First Principles Approach to Antitrust, Kodak, and Antitrust at the
    Millennium*, 68 ANTITRUST L.J. 187 (2000) ......................................................... 4

U.S. Dep't of Justice & Fed. Trade Comm'n,
    *Horizontal Merger Guidelines* (2010) .................................................................. 3

**Treatises**
Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (online edition) .................................... 6

1    In this case, the plaintiffs allege various forms of anticompetitive conduct by several

2    manufacturers of branded HIV medications. The complaint alleges that this conduct harmed

3    competition in two general ways: preventing competition from cheaper generic versions of each

4    respective branded product; and reducing competition among branded products in a class of HIV

5    therapies, leading to overall higher prices. Defendants have filed separate motions to dismiss.

6    The Federal Trade Commission (FTC) submits this *amicus* brief to assist the Court's

7    consideration of an important legal issue raised by Gilead's motion concerning relevant market

8    definition in antitrust cases: whether there can be only one relevant market for a set of products,

9    regardless of the alleged competitive harm. *See* Gilead's Mot. Dismiss 31-33, ECF No. 143. The

10   FTC takes no position on the ultimate disposition of Gilead's motion or the sufficiency of the

11   plaintiffs' factual allegations under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

12   As one court of appeals has observed, the key to understanding relevant market definition

13   is "remembering to ask . . . what is the antitrust question in this case that market definition aims

14   to answer?" *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 598 (1st Cir. 1993). Here,

15   the corrected consolidated complaint alleges that "at least two types of markets are relevant" to

16   answering the antitrust question in this case, because the challenged conduct "impair[ed]

17   competition in multiple ways." Corrected Consolidated Compl. ¶¶ 376-77, ECF No. 118. Gilead,

18   however, argues that alleging different product markets for different types of alleged harm is

19   improper as a matter of law: "Such contradictory and vacillating market definitions" are "legally

20   deficient under controlling law." ECF No. 143 at 5. It claims that "the pharmaceutical products at

21   issue either are substitutable for one another, or they are not, and they cannot plausibly be both."

22   ECF No. 143 at 32. Gilead thus appears to assert that there is only one relevant market,

23   regardless of how its allegedly multi-faceted conduct may have impaired competition. ECF No.

24   143 at 32.

25   This erroneous argument reflects two common misconceptions about market definition:

26   first, that market definition is a freestanding inquiry separate from an examination of

27   anticompetitive effects; second, and closely related, that there is always a single antitrust market

28

1

for a given class of goods. In fact, market definition is merely an analytical tool to aid in assessing whether a challenged agreement or action has the potential for genuine anticompetitive effects. Antitrust law has long recognized the economic reality that competition exists in degrees, and that broader or narrower product markets may be appropriate depending on the action and associated effects being scrutinized. Thus, when multiple types of anticompetitive harm are alleged (as here), multiple markets may be relevant.

**Interest of the FTC**

The FTC's mission is protecting consumers and safeguarding vigorous competition in the marketplace. *See* 15 U.S.C. §§ 41-58. As an independent agency with over 100 years of experience enforcing the U.S. antitrust laws, the FTC has developed expertise investigating and litigating anticompetitive mergers and conduct cases. The FTC has primary responsibility for federal antitrust law enforcement across a wide range of industries, including the pharmaceutical industry.[1] The FTC has a strong interest in ensuring the proper application of legal and economic principles underlying the antitrust analysis of relevant market definition. Erroneous application of these principles may impede the FTC's law enforcement mission.

**I.    Market definition is a tool to analyze the particular anticompetitive effects alleged**

In antitrust cases, courts assess a defendant's market power to determine whether the alleged conduct has the ability to harm competition. Market power is "the ability to raise prices above those that would be charged in a competitive market." *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 109 n.38 (1984) (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 27 n.46 (1984)).[2] Direct evidence that a firm has raised prices above the competitive

---

[1] For a summary of the FTC's antitrust actions in the pharmaceutical industry, *see* Overview of FTC Antitrust Actions in Pharmaceutical Services and Products (2019), https://www.ftc.gov/system/files/attachments/competition-policy-guidance/overview_pharma_june_2019.pdf.

[2] Claims of monopolization require proof of monopoly power, which the Supreme Court has described as "something greater than market power under §1 [of the Sherman Act]." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992). *See also Reazin v. Blue Cross Blue Shield of Kan., Inc.*, 899 F.2d 951, 967 (9th Cir. 1990) ("[M]onopoly power is commonly thought of as 'substantial market power.'" (citing 3 Phillip E. Areeda & Donald F. Turner, *Antitrust Law* ¶ 801 (1978))).

level can prove market power,[3] but typically courts assess market power indirectly by defining a relevant antitrust market and then drawing inferences from the firm's share of that market. *See, e.g.*, *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008).

Market definition seeks "to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004). This exercise involves more than simply identifying functional substitutes—i.e., those products that can be used for the same purpose. *United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA* ("*Lidoderm*"), 296 F. Supp. 3d 1142, 1171-72 (N.D. Cal. 2017) (collecting cases). Instead, "a product market is typically defined to include the pool of goods or services that qualify as *economic substitutes* because they enjoy reasonable interchangeability of use and cross-elasticity of demand." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989) (emphasis added) (citing *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988) and *Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 994 (9th Cir. 1986)).[4] The "determination of what constitutes the relevant product market hinges, therefore, on a determination of those products to which consumers will turn, given reasonable variations in price." *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762, 767 (9th Cir. 2001).[5]

---

[3] *See, e.g., FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986) ("[P]roof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power." (quoting 7 Phillip E. Areeda, Antitrust Law ¶ 1511 (1986)); *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1448 (9th Cir. 1988) (same); *Safeway Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874, 887 (N.D. Cal. 2011) (finding that plaintiffs created a triable issue of fact whether Abbott had monopoly power in the market for boosted PI HIV drugs with sufficient evidence of direct effects).

[4] The federal antitrust agencies and courts often use the "hypothetical monopolist" test to determine which products are reasonably interchangeable with a product sold by a defendant and should therefore be included in a relevant antitrust market. *See, e.g.*, *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015); *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1002 (9th Cir. 2008); U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 4.1 (2010).

[5] *See also Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1025 (9th Cir. 2013) ("[P]roducts must be reasonably interchangeable, such that there is cross-elasticity of demand." (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962))); *Spindler v. Johnson & Johnson Corp.*, No. C 10–01414 JSW, 2011 WL 12557884, at *2 (N.D. Cal. Aug. 1,

3

Market definition, however, is not an end itself; "it merely aids in the search for competitive injury." *Oltz*, 861 F.2d at 1448. Antitrust law speaks of defining the "relevant" market because market definition "provides the context against which to measure the competitive effects of an agreement." *Geneva Pharm.*, 386 F.3d at 496 (citing *Copperweld v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984)). A firm without market power will not be able to harm competition successfully, and market power thus "distinguishes the antitrust violation from the ordinary business tort." *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979).

Thus, as the Supreme Court has explained, the purpose of defining a relevant market "is to determine whether an arrangement has the potential for genuine adverse effects on competition." *Indiana Fed'n of Dentists*, 476 U.S. at 460-61; *see also Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 805 (8th Cir. 2004) ("It is initially important to keep in mind that '[m]arket definition is not a jurisdictional prerequisite, or an issue having its own significance under the statute; it is merely an aid for determining whether power exists.'" (quoting Lawrence A. Sullivan, ANTITRUST 41 (1977)) (alteration in original)); Phillip Areeda, *Market Definition and Horizontal Restraints*, 52 ANTITRUST L.J. 553, 553 (1983) ("In the law school classroom, I am repeatedly disappointed that my students leap into market definition without first specifying the particular legal question that the tribunal hopes to answer through market definition."). Antitrust economics likewise teaches that markets are defined with reference to alleged anticompetitive effects at issue in the particular case.[6]

---

2011) ("[P]roducts may be considered 'reasonably interchangeable,' where there is cross-elasticity of demand, *i.e.* if customers would switch to alternatives in response to a price increase in the alleged monopolist's product." (quoting *Rebel Oil, Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995))).

[6] *See, e.g.*, Steven C. Salop, *The First Principles Approach to Antitrust, Kodak, and Antitrust at the Millennium*, 68 ANTITRUST L.J. 187, 189 (2000) ("It is impossible to evaluate market power accurately without understanding the conduct and effect claims at issue and analyzing market power in the context of those claims."); David Glasner & Sean P. Sullivan, *The Logic of Market Definition* 6 (Univ. Iowa Legal Studies Research Paper No. 2018-14), https://sean-p-sullivan.com/attachments/papers/2020_lmd.pdf, ANTITRUST L.J. (forthcoming) ("In antitrust, markets are defined around specific theories of anticompetitive harm."); Dennis W. Carlton, *Revising the Horizontal Merger Guidelines*, J. COMP. LAW & ECON. 619, 625-26 (2010) ("Analyses of competitive effects and market definition/market concentration are complementary and should not be viewed as substitutes.").

1     Because antitrust markets are merely analytical devices to assess the alleged

2  anticompetitive effects, they do not necessarily conform to intuition.[7] Indeed, some relevant

3  markets that courts have recognized may appear counter-intuitive. *See, e.g.*, *Pac. Coast Agr.*

4  *Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1203 (9th Cir. 1975) (relevant market was

5  "the distribution of oranges grown in Arizona and California for export to Hong Kong"); *FTC v.*

6  *Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1039-42 (D.C. Cir. 2008) (relevant market was

7  "premium natural and organic supermarkets"); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 48

8  (D.D.C. 2015) (a relevant market was "broadline foodservice distribution to national

9  customers"); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1080 (D.D.C. 1997) (relevant market was

10  "the sale of consumable office supplies through office supply superstores"). Clearly, the products

11  in these cases competed to some degree in broader spheres as well, but that fact did not preclude

12  defining more narrow relevant antitrust markets when assessing the specific alleged

13  anticompetitive effects at issue.

14     Indeed, the Supreme Court long ago explained that "within [a] broad market, well-

15  defined submarkets may exist which, in themselves, constitute product markets for antitrust

16  purposes." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).[8] As the Ninth Circuit

17  observed in *Olin Corp. v. FTC*, "every market that encompasses less than all products is, in a

18  sense, a submarket." 986 F.2d 1295, 1299 (9th Cir. 1993). "Whatever term is used—market,

19  submarket, relevant product market—the analysis is the same." *Staples,* 970 F. Supp. at 1080

20  n.11. In each case, the goal is to "recognize competition where, in fact, competition exists."

21  *Brown Shoe*, 370 U.S. at 326. Thus, there may be, for example "(1) a market for shoes generally

22  in that a hypothetical cartel of all shoe manufacturers could raise prices substantially, and

23

24  ───────────────
[7] *See, e.g.*, Glasner & Sullivan, *supra* note 6, at 6-7 (describing "the natural market fallacy" as
25  one of three common misconceptions about relevant market definition, in addition to "the
independent market fallacy" and "the single market fallacy").
26  [8] *Brown Shoe*'s teachings apply in both merger and non-merger antitrust cases. *United States v.*
*Grinnell Corp.*, 384 U.S. 563, 572-73 (1966) ("In § 2 cases under the Sherman Act, as in § 7
27  cases under the Clayton Act . . . there may be submarkets that are separate economic entities."
(citing *Brown Shoe*, 370 U.S. at 325)); *Thurman Indus.,* 875 F.2d at 1375 n.1. (same (citing
28  *Greyhound Comput. Corp. v. Int'l Bus. Machs. Corp.*, 559 F.2d 488, 494 n.1 (9th Cir. 1977))).

simultaneously (2) a market for HQMS [high-quality men's shoes], in that a hypothetical cartel of its producers could raise its prices substantially." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 533 (online edition). Depending on the alleged anticompetitive effects, "each may be relevant to the consideration of some antitrust violation." *Id.*

## II. Defining different product markets to assess different theories of harm is neither "contradictory" nor legally deficient

Gilead attacks the relevant product markets alleged in the complaint on the ground that they are "contradictory" and that "the pharmaceutical products at issue either are substitutable for one another, or they are not, and they cannot plausibly be both." Gilead's Mot. Dismiss, ECF No. 143 at 33. But, as discussed above, it is simply not the case that only one relevant antitrust market is cognizable for any given product or set of products. To the contrary, across many different industries, courts have repeatedly recognized that multiple different relevant markets or submarkets may exist for a single class of products or services depending on the alleged anticompetitive harm.

Indeed, in *Olin Corp. v. FTC*, the Ninth Circuit expressly rejected an argument that recognizing multiple markets is inherently contradictory. 986 F.2d 1295, 1297 (9th Cir. 1993). *Olin* examined a pool sanitizer manufacturer's purchase of a competitor's assets. *Id.* at 1296. The parties produced two dry pool sanitizers (ISOS and CAL/HYPO). *Id.* They stipulated that there was a relevant product market limited only to ISOS sanitizers, but disagreed whether there was also a broader "dry sanitizers" market comprised of both ISOS and CAL/HYPO. *Id.* at 1297. Much like Gilead, Olin contended that "the existence of a relevant ISOS-only market precludes a broader dry sanitizers market" because "it is inconsistent to recognize a larger, dry sanitizers market once a relevant ISOS-only market has been identified." *Id.* at 1301. The Ninth Circuit disagreed. It held that "[r]ecognizing ISOS as a submarket of the dry sanitizers market is not inherently contradictory with recognizing a dry sanitizers market" because "[w]ithin one market there may exist additional submarkets relevant for antitrust purposes." *Id.* at 1299, 1301 (first

citing *United States v. Aluminum Co. of Am.*, 377 U.S. 271, 274-77 (1964); and then citing *RSR Corp. v. FTC*, 602 F.2d 1317, 1320 (9th Cir. 1979)).

The Supreme Court's decision in *United States v. Continental Can Co.*, 378 U.S. 441 (1964), reflects the same principle. In that case, the Court found that glass and metal containers was the relevant product market in which to assess the merger of a metal can producer with a glass bottle manufacturer. *Id.* at 457. Applying the teachings of *Brown Shoe*, however, the Court noted that "a broader product market made up of metal, glass and other competing containers does not necessarily negative the existence of submarkets of cans, glass, plastic or cans and glass together." *Id.* at 457-58 (citing *Brown Shoe*, 370 U.S. at 325). Indeed, as Judges Posner and Easterbrook later explained, "if the merger had been between two manufacturers of cans (or of bottles), the Court would surely have held that cans (or bottles) were an appropriate 'submarket' in which to appraise the effects of the merger."[9]

This prediction was borne out in the FTC's subsequent decision in *In re Owens-Illinois, Inc.*, 115 F.T.C. 179 (Feb. 26, 1992). That case involved a merger of two leading glass manufactures (one of which had been involved in *Continental Can*).[10] The merging parties contended that the relevant product market consisted of "all rigid containers" (glass, plastic, metal, and paper). *Id.* at 294. The Commission disagreed, noting that "the [*Continental Can*] Court twice suggested that in evaluating the likely competitive effects of different combinations, narrower markets might be appropriate." *Id.* at 302. Accordingly, the Commission found six submarkets for glass containers, defined by their end-use. *Id.* at 305-19 (concluding that glass containers for six end-uses—jams and jellies, mayonnaise, pickles, wine coolers, wine, and baby food and baby juice—constituted relevant product markets).

The Supreme Court has likewise recognized that there are potentially relevant product markets for both "clusters" of banking services and for the individual services that comprise

---

[9] Richard A. Posner & Frank H. Easterbrook, *Antitrust: Cases, Economic Notes and Other Materials* 366-67 (2d ed. 1981).
[10] After the Supreme Court held the *Continental Can* merger unlawful, Continental Can divested Hazel-Atlas's plants to Brockway Glass Company, a respondent in *Owens-Illinois*.

7

1   those clusters. In *United States v. Philadelphia National Bank*, the Court held that the antitrust

2   market was "commercial banking," which it defined as a "cluster of products (various kinds of

3   credit) and services (such as checking accounts and trust administration)" provided by large

4   financial institutions. 374 U.S. 321, 356 (1963). The Court reached this conclusion even though

5   it acknowledged that commercial banks competed to some degree with other institutions for

6   some of the services within the cluster. *Id.* ("For example, commercial banks compete with

7   small-loan companies in the personal loan market.").

8       Seven years later, in *United States v. Phillipsburg National Bank & Trust Co.*, the

9   Supreme Court again made clear that the existence of an overall cluster market for commercial

10  banking services did not preclude the existence of other, narrower markets for the individualized

11  financial services within that cluster. 399 U.S. 350, 360 (1970). The Court explained that

12  "submarkets [for the individualized financial services] . . . would be clearly relevant, for

13  example, in analyzing the effect on competition of a merger between a commercial bank and

14  another type of financial institution," but were "not a basis for the disregard of a broader line of

15  commerce that has economic significance." *Id.* (citing *Brown Shoe*, 370 U.S. at 326). In other

16  words, the smaller financial markets identified by the district court may have been relevant

17  markets for analyzing different conduct involving different alleged competitive effects, but were

18  not relevant to the alleged harm at issue.

19      Courts have also recognized the possibility of co-existing broad and narrow relevant

20  markets for pharmaceuticals. For example, the relevant market might consist of an entire

21  therapeutic class of drugs when the anticompetitive effects are likely to manifest among that

22  entire class, such as in a merger between two branded manufacturers. *See, e.g.*, *In re Novartis AG*

23  *& GlaxoSmithKline*, Dkt. No. C-4510 (Fed. Trade Comm'n Apr. 8, 2015) (Novartis's proposed

24  acquisition of GlaxoSmithKline's cancer portfolio required divestiture of Novartis's

25  development-stage BRAF and MEK inhibitor drugs); *In re Prestige Brand Holdings, Inc. &*

26  *Insight Pharm. Corp.*, Dkt. No. 4487 (Fed. Trade Comm'n Oct. 14, 2014) (proposed merger

27  required maker of Dramamine to divest Bonine to preserve competition in over-the-counter

28

motion sickness drugs); *In re Sanofi-Synthelabo & Aventis*, Dkt. No. C-4112 (Fed. Trade Comm'n Sept. 24, 2014) (proposed merger required divestiture of Arixtra because consolidation with Lovenox would have reduced competition in the relevant market of Factor Xa inhibitors).

In other circumstances, the relevant market might be limited to only a subset of a therapeutic class. In *Safeway Inc. v. Abbott Laboratories*, plaintiffs alleged monopolization of the market for "boosted protease inhibitors (PIs) used to treat HIV." 761 F. Supp. 2d 874, 884-85 (N.D. Cal. 2011). Defendants argued that this market definition was overly narrow, because another class of HIV therapies—non-nucleoside reverse transcriptase inhibitors (NNRTIs)—are functionally comparable to boosted PIs. *Id.* at 888. The court held that "this similarity does not preclude Plaintiffs' definition of the boosted market for antitrust purposes," noting that the availability of "several HIV therapies, including NNRTIs and boosted PIs . . . is not inconsistent with Plaintiffs' definition of a boosted PI submarket that exists within a broader HIV therapy market." *Id.* Similarly, in *SmithKline Corp. v. Eli Lilly & Co.*, the Third Circuit acknowledged "a certain degree of interchangeability among all antibiotics," but limited the relevant market to cephalosporin antibiotics because they were sufficiently differentiated from other antibiotics such that Lilly's conduct to maintain dominance over them could have anticompetitive effects. 575 F.2d 1056, 1064-65 (3d Cir. 1978).

Where anticompetitive effects are alleged to result from conduct excluding lower-cost generic versions of a given drug, the relevant market is frequently even more limited, consisting of only the brand and generic versions of that product. *See, e.g.*, *Lidoderm*, 296 F. Supp. 3d. at 1176 (defining a market for 5% lidocaine patches, i.e., Lidoderm and its generic equivalents); *In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 668, 668 (D. Conn. 2016) ("The existence of a broader market that imposed some price constraints on Aggrenox—but without approximating the more competitive market that developed after generic entry—has no bearing on any issue in this case."); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 389 (D. Mass. 2013) (concluding that the relevant market consisted of the brand and generic alone); *In re Impax Labs.*, Dkt. No. 9373 (Fed. Trade Comm'n June 7, 2019) at 26 (defining the relevant antitrust

9

product market as branded and generic oxymorphone ER, noting "in most cases arising in the [pharmaceutical reverse payment] context, a brand and its generics will constitute the relevant market").

Indeed, even a product market limited to generic versions of a particular branded drug may be a relevant market in which to analyze alleged anticompetitive effects. In *Geneva Pharm. Tech. Corp. v. Barr Labs.*, a manufacturer of a generic warfarin sodium product alleged that Barr, the manufacturer of another warfarin sodium generic had locked up a critical source of supply and thereby excluded it from the market. 386 F.3d at 485. The Second Circuit found that "once Barr entered the market, the market became segmented so that Coumadin [the brand-name warfarin sodium product] and Barr each had smaller, distinct customer groups," and that Barr could charge higher prices for its generic product if it excluded its generic competitor. *Id.* at 500. Thus, the relevant market was appropriately limited to generic warfarin sodium, excluding the branded version of the same product. *Id.*; *see also In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 74, 82 (D.D.C. 2006) (relevant antitrust market was generic Lorazepam and Clorazepate tablets).

As these cases demonstrate, the relevant product market may vary considerably, depending on the alleged anticompetitive effects at issue. And if there are multiple theories of harm in the same case, as here, the case may implicate multiple relevant markets. In such cases, the court's task is to assess each alleged market on its merits. The two cases Gilead relies upon in its motion to dismiss are not to the contrary. Neither *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018), nor *Siegler v. Sorrento Therapeutics, Inc.*, No. 3:18-cv-01681-GPC-NLS, 2019 WL 3532294 (S.D. Cal. Aug. 2, 2019), dismissed antitrust claims merely because plaintiffs alleged multiple product markets. Rather, in both instances, the court found that plaintiffs failed to plead sufficient facts to support any of their alleged relevant markets.[11] Antitrust plaintiffs frequently

---

[11] *Hicks*, 897 F.3d at 1121-23 (holding that golf caddies did not allege facts that would make it plausible to find that "in-play" advertising was not "reasonably interchangeable" with other methods of advertising to golf fans); *Siegler*, 2019 WL 3532294, at *15-16 (holding that plaintiff failed to offer any allegations regarding reasonable interchangeability for either of her two proposed markets, and admitted that one of her proposed product markets did not exist).

plead broad relevant markets and narrower relevant markets within, and courts assess each alleged relevant market individually to analyze the corresponding alleged anticompetitive effects. Such pleading is not inherently contradictory. The linchpin for market definition is properly defining a market in which alleged anticompetitive effects can be assessed. Gilead cites no case that holds as a matter of law that there can never be more than one well-pleaded product market relevant to assessing all the alleged anticompetitive harm.

## III.   Conclusion

The FTC takes no position on whether the complaint contains sufficient facts supporting the alleged product markets in this case to satisfy the plausibility standard applicable at the motion to dismiss stage. But an argument that alleging multiple relevant markets is impermissible as a matter of law is, the FTC submits, contrary to both the underlying purpose of market definition and the weight of case law.

Dated: October 25, 2019           Respectfully submitted,

D. BRUCE HOFFMAN
*Director, Bureau of Competition*

GAIL F. LEVINE
*Deputy Director, Bureau of Competition*

ALDEN F. ABBOTT
*General Counsel, Federal Trade Commission*

*/s Markus H. Meier*
MARKUS H. MEIER
BRADLEY S. ALBERT
ARMINE E. BLACK
DANIEL W. BUTRYMOWICZ
REBECCA L. EGELAND
ELIZABETH R. HILDER
*Bureau of Competition*

*Attorneys for Amicus Curiae Federal Trade Commission*