Heather M. Burke (SBN 284100)
Jeremy K. Ostrander (SBN 233489)
**WHITE & CASE** LLP
3000 El Camino Real
2 Palo Alto Square, Suite 900
Palo Alto, CA  94306-2109
Telephone: (650) 213-0300
Facsimile: (650) 213-8158
hburke@whitecase.com
jostrander@whitecase.com

Attorneys for Defendants Gilead Sciences, Inc.,
Gilead Holdings, LLC, Gilead Sciences, LLC,
and Gilead Sciences Ireland UC

DANIEL B. ASIMOW (SBN 165661)
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone: 415.471.3100
Facsimile: 415.471.3400
Email: daniel.asimow@arnoldporter.com

Attorneys for Defendants
BRISTOL-MYERS SQUIBB COMPANY &
E. R. SQUIBB & SONS, L.L.C.

PAUL J. RIEHLE (SBN 115199)
Paul.Riehle@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
Four Embarcadero Center, 27th Floor
San Francisco, CA 94111-4180
Telephone: (415) 591-7500
Facsimile: (415) 591-7510

Attorneys for Defendants
JANSSEN R&D IRELAND,
JANSSEN PRODUCTS, LP, and
JOHNSON & JOHNSON

*Additional Counsel for Defendants Listed on
Signature Page*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| STALEY, *et al.*,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>GILEAD SCIENCES, INC., *et al.*,<br><br>　　　　　　Defendants. | Case No. 3:19-cv-02573-EMC<br><br>**DEFENDANTS' NOTICE OF MOTION, MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT, AND MEMORANDUM IN SUPPORT THEREOF**<br><br>Hrg:　　　June 25, 2020<br>Time:　　 1:30 p.m.<br>Ctrm:　　 5 – 17th Floor<br>Judge:　　Honorable Edward M. Chen |

1

## <u>NOTICE OF MOTION AND MOTION TO DISMISS</u>

2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:  PLEASE TAKE NOTICE

3 that on Thursday, June 25, 2020 at 1:30 p.m., or as soon thereafter as this matter may be heard, in the

4 United States District Court for the Northern District of California, located at 450 Golden Gate Avenue,

5 San Francisco, CA 94102-3489, in Courtroom 5 on the 17th Floor, before the Honorable Edward M.

6 Chen, Defendants Gilead Sciences, Inc., Gilead Holdings, LLC, Gilead Sciences, LLC, and Gilead

7 Sciences Ireland UC (collectively, "Gilead"), Bristol-Myers Squibb Company and E. R. Squibb &

8 Sons, LLC (collectively, "BMS"), and Janssen R&D Ireland, Janssen Products, LP, and Johnson &

9 Johnson (collectively, "Janssen") (all together, "Defendants") will move the Court for an order

10 dismissing, with prejudice, certain claims and allegations against Defendants under Rule 12(b)(6) of

11 the Federal Rules of Civil Procedure.  The Motion is based on this Notice of Motion and Motion to

12 Dismiss, the Memorandum of Points and Authorities, the Request for Judicial Notice, the Declaration

13 of Heather M. Burke ("Burke Decl."), all other pleadings and papers on file in this action, any other

14 such matters upon which the Court may take judicial notice, the arguments of counsel, and any other

15 matter the Court may properly consider.

16

## <u>RELIEF SOUGHT</u>

17

Defendants seek dismissal, with prejudice, of the claims and allegations against them identified

18 in the accompanying Memorandum of Points and Authorities under Rule 12(b)(6) for failure to state a

19 claim upon which relief can be granted.

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION AND MOTION TO DISMISS....................................................................i

RELIEF SOUGHT...........................................................................................................................i

TABLE OF AUTHORITIES...........................................................................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES.................................................................1

ARGUMENT...................................................................................................................................1

I.     THE AMENDED COMPLAINT FAILS TO CURE THE INADEQUATELY
       ALLEGED "CART PRODUCT MARKET" ...................................................................1

II.    THE AMENDED COMPLAINT FAILS TO CURE THE INADEQUATELY
       ALLEGED CONSPIRACY-TO-MONOPOLIZE CLAIMS .................................................4

III.   THE AMENDED COMPLAINT FAILS TO CURE THE INADEQUATELY
       ALLEGED ANTITRUST-INJURY THEORY THAT BMS AND JANSSEN
       WOULD HAVE CHALLENGED GILEAD'S UNEXPIRED PATENTS.......................11

IV.    THE AMENDED COMPLAINT FAILS TO PLAUSIBLY ALLEGE THAT THE
       ATRIPLA AGREEMENT CONTAINS A "NO-GENERICS RESTRAINT" .................14

V.     THE AMENDED COMPLAINT'S NEW PATENT-TERM-EXTENSION
       ALLEGATIONS FAIL TO STATE A CLAIM ...............................................................17

VI.    THE AMENDED COMPLAINT'S NEW ROYALTY-PAYMENT
       ALLEGATIONS FAIL TO STATE A CLAIM ...............................................................19

VII.   THIS COURT SHOULD DEFINITIVELY HOLD THAT THE SO-CALLED "NO-
       GENERICS RESTRAINTS" ARE SUBJECT TO THE RULE OF REASON .................22

CONCLUSION..............................................................................................................................25

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

## CASES

4

*In re Actos End Payor Antitrust Litig.*,
  2015 U.S. Dist. LEXIS 127748 (S.D.N.Y. Sept. 22, 2015), *aff'd in part, vacated
  in part on different grounds*, 848 F.3d 89 (2d Cir. 2017) .......................................... 6, 7

5

6

*Addamax Corp. v. Open Software Found.*,
  152 F.3d 48 (1st Cir. 1998) ............................................................................................ 24

7

8

*Apple Inc. v. Psystar Corp.*,
  586 F. Supp. 2d 1190 (N.D. Cal. 2008) .......................................................................... 4

9

10

*Ashcroft v. Iqbal*,
  556 U.S. 622 (2009) ........................................................................................................ 3

11

*Axis, S.p.A. v. Micafil, Inc.*,
  870 F.2d 1105 (6th Cir. 1989) ...................................................................................... 11

12

13

*Beco Dairy Automation, Inc. v. Global Tech Sys., Inc.*,
  104 F. Supp. 3d 1023 (E.D. Cal. 2015) ........................................................................ 22

14

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................. passim

15

16

*Brulotte v. Thys Co.*,
  379 U.S. 29 (1964) ............................................................................................. 19, 20, 21

17

18

*Cascades Comput. Innovation LLC v. RPX Corp.*,
  2013 U.S. Dist. LEXIS 10526 (N.D. Cal. Jan. 24, 2013) ............................................... 9

19

20

*Centocor, Inc. v. Genentech, Inc., et al.*,
  No. 2:08-cv-03573 (C.D. Cal. filed May 30, 2008) ..................................................... 12

21

*City of Columbia v. Omni Outdoor Advert., Inc.*,
  499 U.S. 365 (1991) ...................................................................................................... 18

22

23

*E. R. Presidents Conference v. Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961) ...................................................................................................... 17

24

25

*In re Elevator Antitrust Litig.*,
  502 F.3d 47 (2d Cir. 2007) ............................................................................................. 7

26

*Freeman v. San Diego Ass'n of Realtors*,
  322 F.3d 1133 (9th Cir. 2003) ....................................................................................... 8

27

28

- ii -

*In re German Auto Mfrs. Antitrust Litig.*,
  2020 U.S. Dist. LEXIS 57625 (N.D. Cal. Mar. 31, 2020).....................................................1, 23

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018) ...............................................................................................1

*Jones v. Micron Tech., Inc.*,
  400 F. Supp. 3d 897 (N.D. Cal. 2019) ....................................................................................8

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008) ..............................................................................................13

*Kimble v. Marvel Entm't, LLC*,
  135 S. Ct. 2401 (2015)...................................................................................19, 20, 21, 22

*Kottle v. Nw. Kidney Ctrs.*,
  146 F.3d 1056 (9th Cir. 1998) ..............................................................................................18

*Magnetar Techs. Corp. v. Intamin, Ltd.*,
  801 F.3d 1150 (9th Cir. 2015) ................................................................................................5

*MedImmune, Inc. v. Genentech, Inc.*,
  2003 U.S. Dist. LEXIS 23443 (C.D. Cal. Dec. 24, 2003) ............................................................18

*In re Microsoft Corp. Antitrust Litig.*,
  127 F. Supp. 2d 728 (D. Md. 2001), *aff'd sub nom. Dickson v. Microsoft Corp.*,
  309 F.3d 193 (4th Cir. 2002) ...............................................................................................10

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) ................................................................................................6

*Northbay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*,
  2017 U.S. Dist. LEXIS 206663 (N.D. Cal. Dec. 7, 2017).............................................................5

*NSS Labs, Inc. v. Symantec Corp.*,
  2019 U.S. Dist. LEXIS 136742 (N.D. Cal. Aug. 13, 2019) .........................................................23

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
  967 F. Supp. 2d 1347 (N.D. Cal. 2013)....................................................................................23

*Portney v. CIBA Vision Corp.*,
  593 F. Supp. 2d 1120 (C.D. Cal. 2008) ...................................................................................22

*Princo Corp. v. ITC*,
  616 F.3d 1318 (Fed. Cir. 2010) (en banc) ...............................................................................24

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ..................................................................................................8

*Sanders v. Brown*,
  504 F.3d 903 (9th Cir. 2007) ...........................................................................................18, 19

*Schor v. Abbott Labs.*,
    457 F.3d 608 (7th Cir. 2006) .................................................................................3

*Sessions Tank Liners v. Joor Mfg.*,
    17 F.3d 295 (9th Cir. 1994) ..................................................................................17

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
    2010 U.S. Dist. LEXIS 92236 (E.D. Cal. Sept. 3, 2010)........................................9

*Syufy Enters. v. Am. Multicinema, Inc.*,
    793 F.2d 990 (9th Cir. 1986) ...............................................................................7, 8

*Tessera, Inc. v. Toshiba Corp.*,
    2019 U.S. Dist. LEXIS 184355 (N.D. Cal. Oct. 22, 2019) ...................................21

*United Mine Workers v. Pennington*,
    381 U.S. 657 (1965)..........................................................................................17, 19

*United States v. Bazaarvoice, Inc.*,
    2014 U.S. Dist. LEXIS 3284 (N.D. Cal. Jan. 8, 2014) ...........................................4

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)..............................................................................................25

*In re Wellbutrin XL Antitrust Litig.*,
    868 F.3d 132 (3d Cir. 2017) .................................................................................13

**STATUTES**

35 U.S.C. § 282(a) .........................................................................................................13

**MISCELLANEOUS**

Areeda & Hovenkamp, *Antitrust Law* (4th ed. 2019)...............................................3, 24

Gilead Scis., Inc., Form 10-Q, Ex. 10.57 (Nov. 5, 2009) ...............................................8

Orange Book, FDA, "Patent and Exclusivity for: N021937" (Atripla),
    https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=00
    1&Appl_No=021937&Appl_type=N ....................................................................21

Orange Book, FDA, "Patent and Exclusivity for: N202123" (Complera),
    https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=00
    1&Appl_No=202123&Appl_type=N ....................................................................14

U.S. DOJ (Antitrust Division) & FTC, Joint Antitrust Statement Regarding COVID-
    19 (Mar. 2020), https://www.justice.gov/atr/joint-antitrust-statement-regarding-
    covid-19 .................................................................................................................25

**MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiffs' First Amended Consolidated Class Action Complaint (ECF No. 304, "Amended Complaint") fails to cure the deficiencies this Court identified in its March 3, 2020 Order (ECF No. 273, "Order").  The Amended Complaint also adds wholly new allegations that are similarly deficient.  This Court should dismiss the Amended Complaint to the extent it suffers from either type of deficiency.

**ARGUMENT**

**I.      THE AMENDED COMPLAINT FAILS TO CURE THE INADEQUATELY ALLEGED "CART PRODUCT MARKET"**

In the March 3 Order, this Court held that Plaintiffs' Corrected Consolidated Class Action Complaint (ECF No. 118, "CAC") had not adequately pleaded a "cART product market," concluding that it was "not clear from the CAC what exactly the cART product market is" or "how there is reasonable interchangeability of use with respect to different cART drugs."  Order at 48:27-49:4.  The Court dismissed all antitrust claims based on the "cART market," with leave to amend.  *Id*. at 49:9-11.  While Plaintiffs' Amended Complaint now itemizes which "cART drugs" are included in the alleged "cART product market" (Am. Compl. ¶ 392), that itemization only confirms that there is *not* reasonable interchangeability of use with respect to those different "cART drugs."  The "cART product market" accordingly fails as a matter of law.  *See, e.g.*, *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121 (9th Cir. 2018) (affirming dismissal of antitrust claims premised on product market that was "artificial, and contorted to meet . . . litigation needs"); *In re German Auto Mfrs. Antitrust Litig.*, 2020 U.S. Dist. LEXIS 57625, at *37-40 (N.D. Cal. Mar. 31, 2020) (applying *Hicks* and dismissing antitrust claims for failure to properly plead product market).

The Amended Complaint identifies a disparate group of fifty-five "cART drugs," plus "their AB-rated generic substitutes," that purportedly "comprise the cART Market."  Am. Compl. ¶ 392.  This alleged "cART market" is not limited to substitute products that are reasonably interchangeable with one another.  Instead, it indiscriminately lumps together treatments of different classes despite their varying functions within an HIV regimen.  It includes not only standalone products, but also fixed-dose-combination products ("FDCs"), some but not all of which constitute single-tablet regimens

- 1 -

1    ("STRs") as complete HIV-treatment therapies.  This hodgepodge of products is hopelessly ad hoc and

2    overbroad, as well as inconsistent with other aspects of the Amended Complaint, and cannot constitute

3    a plausible antitrust product market.

4         The Amended Complaint acknowledges that products used to treat HIV fall within discrete

5    therapeutic "classes," including NRTIs, third agents, and pharmacokinetic enhancers (or "boosters").

6    *See, e.g.*, *id.* ¶ 66 (describing "boosters" as "another class of drugs" sometimes used in cART regimens

7    in addition to NRTIs and third agents); *id.* ¶ 68 (describing APIs based on "Class of Drug"); *id.* ¶ 69

8    (describing HIV products by their constituent class(es) of drug(s)).  Far from being substitutes, these

9    discrete classes are alleged to be complements.  *See, e.g.*, *id.* ¶ 2 ("Modern antiretroviral drug regimens

10   comprise a combination or 'cocktail' of drugs, most often consisting of two . . . NRTIs . . . taken with

11   at least one antiretroviral drug of another class, such as an integrase inhibitor, commonly referred to as

12   'third agents.'"); *id.* ¶ 58 ("A modern cART regimen most often consists of two drugs of the

13   nucleotide/nucleoside analogue reverse transcriptase inhibitor ('NRTI') class—often referred to as an

14   'NRTI backbone'—taken with a third agent of another class.  For example, all 'first line' regimens that

15   the United States government recommends for treatment-naïve patients, i.e., those not previously

16   treated for HIV, consist of two NRTIs (either (i) Tenofovir with emtricitabine or lamivudine or

17   (ii) abacavir with emtricitabine or lamivudine) taken with a third agent of the integrase strand transfer

18   inhibitor ('INSTI') class, specifically dolutegravir, bictegravir, or raltegravir.").

19        Other allegations in the Amended Complaint expressly confirm that products in one therapeutic

20   class are not reasonably interchangeable with products in another therapeutic class.  For example, the

21   alleged "cART market," *id.* ¶ 392, includes Gilead's Tybost® product, a standalone booster containing

22   cobicistat (or "COBI"), *id.* ¶ 69.  The Amended Complaint alleges that boosters "are drugs that are not

23   taken for their anti-HIV properties, but rather for their ability to inhibit the breakdown of some third

24   agents."  *Id.* ¶ 66; *see also id.* ¶ 67.  Boosters obviously are not substitutable for treatments taken for

25   their "anti-HIV properties," such as NRTIs and third agents.  *See id.* ¶¶ 58-59, 66.

26        The Amended Complaint's alleged "cART market" also includes treatments within the same

27   therapeutic class that are not substitutable for one another.  For example, the Amended Complaint

28   alleges: "Tenofovir is almost always used alongside another NRTI, specifically either lamivudine

- 2 -

('3TC') or emtricitabine ('FTC')." *Id.* ¶ 62; *see also id.* ¶ 409 ("Doctors and patients using a cART regimen almost always choose two NRTIs.  For very substantial medical reasons, doctors and patients overwhelmingly choose Tenofovir as one of those two NRTIs.").  While the Amended Complaint alleges that "3TC and FTC are remarkably similar" and "can be used interchangeably" (*id.* ¶ 63; *see also id.* ¶ 99), it does not (and could not) allege that either component is substitutable for Tenofovir.  Yet the alleged "cART market" includes Gilead's Viread® (standalone TDF) alongside ViiV's Epivir® (standalone 3TC), and Gilead's Emtriva® (standalone FTC), as well as their AB-rated generics.  *Id.* ¶ 392.  The Amended Complaint also alleges that third agents falling into different therapeutic categories are included in the "cART market":  BMS's Reyataz® and Janssen's Prezista® are protease inhibitors; Janssen's Edurant® is a non-nucleoside reverse transcriptase inhibitor; and ViiV's Tivicay® is an integrase strand transfer inhibitor.  *Id.* ¶¶ 68, 69, 417, 419, 421.

The Amended Complaint does not and cannot allege that all treatments in all classes are reasonably substitutable for one another.  *See id.* ¶¶ 404-423 (describing each therapeutic class of products used to treat HIV, including the different role played by each type of product).  The Amended Complaint's broad allegation that "[f]rom a clinical perspective, the antiretroviral drugs used in a cART regimen are reasonably interchangeable with respect to their use" (*id.* ¶ 394) is conclusory and contradicted by the Amended Complaint's factual allegations, discussed above; as such, the allegation is not entitled to a presumption of truth.  *Twombly*, 550 U.S. at 555-57; *Iqbal*, 556 U.S. at 680-81.

This Court has already acknowledged that the "outer boundaries of a product market" are determined by "reasonable interchangeability of use" or "cross-elasticity of demand."  Order at 47:1-5 (quoting *Newcal Indus. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008)).  The Amended Complaint's "cART market" far exceeds these "outer boundaries."  By including complements as well as substitutes, *see, e.g.*, *Schor v. Abbott Labs.*, 457 F.3d 608, 612 (7th Cir. 2006) ("[R]itonavir [RTV] and other protease inhibitors are complements, not substitutes, given the bad side effects when ritonavir is used alone."), the alleged market violates black-letter antitrust law.  *See* Areeda & Hovenkamp, *Antitrust Law*, ¶ 565a (4th ed. 2019) ("Substitutes are goods that can replace one another and thus 'compete' for the user's purchase . . . .  By contrast, complements are goods that are most efficiently made or used together. . . .  It should be clear that a relevant market consists only of goods that are

- 3 -

1  reasonably close *substitutes* for one another."); *see also United States v. Bazaarvoice, Inc.*, 2014 U.S.
2  Dist. LEXIS 3284, at *91-92 (N.D. Cal. Jan. 8, 2014) (holding substitutes, but not complements, to be
3  in product market).

4      So overbroad is the Amended Complaint's "cART market" that it for the first time extends to
5  "cART drugs" prescribed and purchased for treatment not of HIV, but of Hepatitis B, such as Gilead's
6  Viread, Am. Compl. ¶¶ 431, 456—and perhaps even to Gilead's Vemlidy®, which is FDA-approved
7  *solely* for treatment of Hepatitis B.  *Id.* ¶¶ 256-259, 448.  These allegations, too, stretch the "cART
8  market" far beyond reasonable interchangeability of use.

9      Finally, in alleging the narrower product markets consisting only of brand products and their
10  AB-rated generics, the Amended Complaint makes factual allegations foreclosing any suggestion that
11  there is meaningful cross-elasticity of demand among the products in the broader purported "cART
12  market":  "none of the brand drugs exhibits significant, positive cross-elasticity of demand with respect
13  to price with any product other than AB-rated generic versions of the brand drugs."  Am. Compl. ¶ 372;
14  *see also id.* ¶¶ 379-381 (alleging insignificant cross-elasticity of demand); *Apple Inc. v. Psystar Corp.*,
15  586 F. Supp. 2d 1190, 1200 (N.D. Cal. 2008) (dismissing antitrust claim where plaintiffs' factual
16  allegations concerning a product market were internally contradictory).

17      In summary, the re-pleaded "cART market" fails to cure the deficiencies identified in this
18  Court's March 3 Order.  The Amended Complaint's alleged "cART market" contains far more than
19  products that are reasonably substitutable for one another.  Accordingly, this Court should again
20  dismiss all antitrust claims based on the alleged "cART market."

21  **II.     THE AMENDED COMPLAINT FAILS TO CURE THE INADEQUATELY**
22  **        ALLEGED CONSPIRACY-TO-MONOPOLIZE CLAIMS**

23      In its March 3 Order, this Court dismissed the CAC's "overarching" conspiracy claims not only
24  because the "cART product market" was inadequately pleaded, but also because "Plaintiffs ha[d] failed
25  to adequately allege that each non-Gilead defendant knew of its connection to a conspiracy to restrain
26  trade in or monopolize that broader product market."  Order at 15:3-6, 15:20-25 (citing CAC ¶¶ 442,
27  451).  While Plaintiffs have largely dropped the label "overarching" from the conspiracy-to-
28  monopolize claims in the Amended Complaint, the same substantive deficiencies this Court identified

- 4 -

in the March 3 Order remain.  Instead of curing the flaws in their original conspiracy-to-monopolize claims, Plaintiffs have not only re-pleaded the original claims (now in Counts One and Four) but have added four new *bilateral* conspiracy-to-monopolize claims (in Counts Two, Three, Five, and Six). These new claims suffer from the same problem: in attempting to establish a conspiracy, they allege nothing more than Janssen's and BMS's participation in individual collaboration agreements with Gilead.  Each of these new counts must be dismissed for this independent reason as well.

To state a claim for conspiracy to monopolize, a complaint must allege "(1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury." *Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1158 n.2 (9th Cir. 2015).  The Amended Complaint fails to plead facts supporting these elements.  As the Court noted when dismissing the "overarching" conspiracy counts in the CAC, Plaintiffs have *admitted* that BMS and Janssen were "each acting separately, and *not acting collectively*, with Gilead." Order at 14:24-25 (citing Pls.' Opp'n (ECF. No. 179) at 44) (emphasis added).  That has not changed.  Once again, the only actions attributed to BMS and Janssen in the Amended Complaint are separately entering into agreements to combine their components with Gilead's to make new FDCs. "It is not enough to plead that defendants had agreements with each other generally—the defendants must have agreed and conspired to *monopolize*." *Northbay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 2017 U.S. Dist. LEXIS 206663, at *14 (N.D. Cal. Dec. 7, 2017) (emphasis added). The Amended Complaint alleges nothing to tie all of the agreements together or to connect either BMS or Janssen to a scheme to help Gilead monopolize a broader market.  All six conspiracy-to-monopolize counts (Counts One through Six) fail as a result.

### A.   Plaintiffs' Allegations Do Not Give Rise to an Inference that Any Conspiracy to Monopolize Existed

Plaintiffs do not allege any direct evidence of an agreement among all three Defendants to help Gilead maintain its monopoly in the so-called "cART market."  They allege no meetings or communications among Defendants to discuss any such scheme or how it would be carried out. Instead, they suggest that such an agreement can be inferred, largely from the fact that BMS and Janssen entered into similarly structured agreements to combine different products to make different FDCs at

different times.  Am. Compl. ¶¶ 165-167.  But even if BMS and Janssen were competitors in a properly defined market, what the Amended Complaint alleges is at most parallel conduct, which by itself is not unlawful.  Because it is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market," parallel conduct alone does not give rise to a plausible conspiracy claim.  *Twombly*, 550 U.S. at 554 (acknowledging that parallel behavior may result not from conspiracy but from independent responses to common stimuli (such as the U.S. government's encouragement of collaborations here)); *see* Gilead Press Release at 2 (Dec. 2004), Annex L to Atripla Agreement (ECF No. 144-3) (quoting Tommy Thompson, Secretary of U.S. Department of Health and Human Services:  "I am pleased to see the collaboration and efforts of Bristol-Myers Squibb and Gilead.").  Like most courts, the Ninth Circuit "distinguishe[s] permissible parallel conduct from impermissible conspiracy by looking for certain 'plus factors,'" defined as "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015).  The Court will find no "plus factors" in the Amended Complaint. There are no factual allegations anywhere that BMS and Janssen, when entering into the collaboration agreements, acted in any way other than in their own economic self-interests.  No grand scheme to help Gilead maintain a monopoly in a so-called "cART market" can be inferred in the absence of such allegations.

The Amended Complaint relies almost entirely on alleged similarities in the provisions of the individual collaboration agreements, negotiated and ratified at different times over a span of seven years.  But this, too, is not suggestive of conspiracy.  In *Musical Instruments*, plaintiffs argued that an overarching conspiracy could be inferred from multiple manufacturers' adoption of similar policies over several years.  *See id.* at 1189.  The Ninth Circuit, affirming dismissal of the complaint, held that "[a]llegations of such slow adoption of similar policies does not raise the specter of collusion," concluding that, at most, the similarity in terms demanded by a common customer was "a hallmark of independent parallel conduct—not collusion."  *Id*. at 1196.  Likewise, in *In re Actos End Payor Antitrust Litigation*, the court held that alleged coconspirators' entry into separate agreements containing similar terms with a common defendant established "at most" "parallel or interdependent

- 6 -

conduct." *In re Actos End Payor Antitrust Litig.*, 2015 U.S. Dist. LEXIS 127748, at \*77-78 (S.D.N.Y. Sept. 22, 2015), *aff'd in part, vacated in part on different grounds*, 848 F.3d 89 (2d Cir. 2017). This was not enough to suggest an overarching conspiracy to monopolize where "Plaintiffs ha[d] not, for instance, plausibly alleged that the agreements were against Defendants' self-interest." *Id.* at \*78; *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) ("Similar contract terms can reflect similar bargaining power and commercial goals (not to mention boilerplate).").

Plaintiffs' failure to allege that BMS's and Janssen's separate collaboration agreements were financially disadvantageous is fatal to all six conspiracy-to-monopolize claims. Without such allegations, all that BMS and Janssen are accused of is parallel conduct, which "stops short of the line between possibility and plausibility of entitlement to relief." *Twombly*, 550 U.S. at 557 (internal quotation marks omitted).

### B. The Amended Complaint Does Not Allege that BMS or Janssen Knew that Their Collaborations Were Part of a Monopolistic Scheme

A plausible conspiracy-to-monopolize claim would also require factual allegations to support an inference that BMS and Janssen shared with Gilead a common goal: maintaining Gilead's alleged monopoly power in the broader "cART market." When dismissing these claims in the CAC, this Court held that "Plaintiffs have failed to adequately allege that each non-Gilead defendant knew of its connection to a conspiracy to restrain trade in or monopolize that broader product market." Order at 15:22-23; *see also id.* at 16:2-5 (it must be "show[n] that the defendant's connection to the conspiracy is knowledgeable," which means the defendant was aware of "the unlawful object toward which the agreement [was] directed" (quoting *United States v. Grasso*, 724 F.3d 1077, 1086 (9th Cir. 2013))). The Ninth Circuit confirmed such a requirement in rejecting similar claims in *Syufy Enterprises v. American Multicinema, Inc.*, 793 F.2d 990, 1000 (9th Cir. 1986), where plaintiffs tried to construct a "single grand" conspiracy to monopolize out of six separate bilateral license agreements. The Ninth Circuit held that conspiracy-to-monopolize claims could not be sustained absent evidence that the licensors knew about and shared the licensee's goal of monopolizing the market. *Id.* at 1000-01. The court reasoned that "a supplier who licenses a product to another does not join the licensee in a conspiracy to monopolize merely because the licensee turns around and exploits the license for its own

monopolistic purposes," given the lack of any "authority that a Section 2 conspiracy may be established without some showing that more than one of the alleged co-conspirators had at least some awareness that the underlying conduct was anticompetitive or monopolistic." *Id.*

All that Plaintiffs have done in attempting to cure this deficiency is to add assertions that "[e]ach of BMS and Janssen carefully monitors sales in the cART market and the contractual arrangements between and among participants in that market" and that BMS and Janssen each "knew from Gilead's public SEC filings that Gilead had entered into a No-Generics Restraint with" the other.  Am. Compl. ¶¶ 484-485, 487.  These allegations fall well short of the mark, as they do not "allege that each non-Gilead defendant knew of its connection to a conspiracy to restrain trade in or monopolize that broader product market."  Order at 15:22-23.

No inference of conspiracy can be drawn from companies' general awareness of others' performance and collaborations.  *See Jones v. Micron Tech., Inc.*, 400 F. Supp. 3d 897, 919-20 (N.D. Cal. 2019) ("Defendants' behavior and statements are consistent with lawful conscious parallelism.").  And any suggestion that BMS, which collaborated with Gilead in 2004 to make Atripla, the very first STR, knew from *later* SEC filings that third parties had joined with Gilead in a monopolistic scheme is simply implausible.  It was equally impossible for BMS to discern "from Gilead's public SEC filings that Gilead had entered into a No-Generics Restraint with Janssen in 2009" (Am. Compl. ¶ 485) when it was seeking a license from Gilead to make Evotaz because key provisions of the alleged "No-Generics Restraint" were redacted in Gilead's public filing.  Complera Agreement (ECF No. 144-11) § 17.2(a); *see* Gilead Scis., Inc., Form 10-Q, Ex. 10.57 at 89 (Nov. 5, 2009), Burke Decl. Ex. A.

### C.   The Amended Complaint Does Not Allege Each Defendant's Specific Intent to Monopolize

Finally, the Amended Complaint fails to allege the requisite element of specific intent to monopolize.  *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1154 (9th Cir. 2003) (specific intent is a required element for a Section 2 claim of conspiracy to monopolize); *accord Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1437 n.8 (9th Cir. 1995) (conspiracy to monopolize requires showing not only the existence of a conspiracy, but also that each defendant joined it with a "*specific intent to conspire to monopolize*; it is not enough to show that [the alleged coconspirators] merely

- 8 -

agreed to go along" with one defendant's scheme (emphasis added)). "Conclusory and superficial" allegations of specific intent will not suffice. *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 2010 U.S. Dist. LEXIS 92236, at *83 (E.D. Cal. Sept. 3, 2010). Tellingly, while the monopolization claims against Gilead alone assert, albeit in conclusory terms, that *Gilead* acted "[w]ith the specific intent to achieve a monopoly" (Am. Compl. ¶¶ 568, 576), none of the six conspiracy-to-monopolize counts alleges in even conclusory terms that *BMS* and *Janssen* did so. This alone requires dismissal of Plaintiffs' claims.

The Amended Complaint's effort to explain how BMS and Janssen benefitted from Gilead's collaborations with others only underscores its failure to allege specific intent. In the March 3 Order, the Court noted that "Plaintiffs do not allege that a non-Gilead Defendant got any benefit out of the agreements that Gilead had with the other non-Gilead Defendants." Order at 15 n.11. There are still no factual allegations whatsoever about how BMS benefitted from Janssen collaborating with Gilead or vice versa. To the contrary, Plaintiffs acknowledge that the FDCs formed by Gilead's agreements with BMS and Janssen *directly compete*; accepting this proposition as true means that BMS and Janssen's interests were in conflict with one another with respect to the other's collaborations with Gilead. *See* Am. Compl. ¶ 126 (Gilead joined with Janssen to market products "that compete against Atripla," and "thereafter concentrated its marketing efforts in promoting those products rather than Atripla"). One cannot infer from these facts that BMS or Janssen had the specific intent to help their common collaborator strengthen its own position in a "cART market." Indeed, the notion that BMS or Janssen would have agreed to help another company improve its competitive position is illogical, and "[w]here the facts alleged in the complaint demonstrate that an alleged conspiracy makes no economic sense, the claim must be dismissed." *Cascades Comput. Innovation LLC v. RPX Corp.*, 2013 U.S. Dist. LEXIS 10526, at *38 (N.D. Cal. Jan. 24, 2013) (citing *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998)).

### D. The Amended Complaint's New Claims of a Conspiracy to Monopolize Between Gilead and Either BMS or Janssen Suffer from the Same Deficiencies

Perhaps acknowledging the weakness of their overarching conspiracy claim against all Defendants, Plaintiffs newly allege separate *bilateral* conspiracies to monopolize. Count Two alleges

- 9 -

that Gilead and BMS separately conspired to help Gilead monopolize the "cART market" in violation of the Sherman Act (Am. Compl. ¶¶ 492-502); Count Three makes the same claim with respect to Gilead and Janssen (*id.* ¶¶ 503-514).  Plaintiffs repeat these claims under state law in Counts Five (*id.* ¶¶ 525-536) and Six (*id.* ¶¶ 537-547).  These narrower counts fare no better than Counts One and Four.

These claims, like the broader ones, lack any allegations that BMS and Janssen acted contrary to their independent business interests, or that either had the specific intent to help Gilead monopolize a broader market.  To establish these smaller conspiracies, Plaintiffs would still need to allege and prove that "[D]efendants stepped back and concluded that maintaining [Gilead's] monopol[y] was a goal that they themselves desired to accomplish."  *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 728, 731 (D. Md. 2001), *aff'd sub nom. Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002). Plaintiffs fail to allege facts that would support a finding that either BMS or Janssen knowingly entered into the agreements for that specific purpose, and, absent anything to suggest that any of the collaborations were not in their economic self-interest, no conspiracy to monopolize can be inferred.

On the contrary, it is indisputable that neither BMS nor Janssen could have created the FDCs without Gilead's products, and it was obviously in each company's self-interest—not to mention in the interests of patients—to enter into agreements allowing each to make new products that neither could make on its own.  The Amended Complaint admits as much:  "Plaintiffs do not contend that creating or marketing FDCs, as such, is anticompetitive."  Am. Compl. ¶ 95.  Moreover, if one party's entry into a collaboration agreement could so easily be cast as participation in a counterparty's scheme to monopolize a market, despite the absence of facts suggesting that purpose, it would have a profound effect on collaboration and innovation.  The first party would be unlikely to agree to combine its products with those of the other to create new products, even where doing so served its self-interest and the new invention was unquestionably beneficial for consumers.

In sum, just like the earlier "overarching" conspiracy claims, Plaintiffs' new bilateral conspiracy-to-monopolize claims fail to plead "enough facts to state a claim to relief that is plausible on its face," and they therefore must be dismissed under *Twombly*.  550 U.S. at 570.

1    **III.    THE AMENDED COMPLAINT FAILS TO CURE THE INADEQUATELY**

2    **ALLEGED ANTITRUST-INJURY THEORY THAT BMS AND JANSSEN WOULD**

3    **HAVE CHALLENGED GILEAD'S UNEXPIRED PATENTS**

4    As the Court explained in its March 3 Order, Plaintiffs allegedly suffered antitrust injury (i.e.,

5    overcharges) because, "absent the No-Generics Restraints, the other defendants would want to make

6    competing FDCs" and thereby compete with Gilead.  Order at 37:13-14.  Plaintiffs assert two theories

7    in support of how this would have occurred:  but for the "No-Generics Restraints," Janssen and BMS—

8    who would then be so-called "untainted competitors"—would have (i) made competing FDCs "once

9    the generic versions of Gilead's vulnerable drugs became available (*i.e.*, once the patents protecting

10   the drugs expired)" or (ii) "would actually have challenged Gilead's patents prior to their expiration

11   dates."  *Id.* at 37:13-15, 38:7.  The difference between the two theories of antitrust injury is one of

12   timing: the first focuses on the period *after* expiration of Gilead's patents and the second on the period

13   *before*.  The Court found "not without force" Defendants' contention that the second theory was

14   speculative, but granted Plaintiffs leave to provide a more definite statement regarding that theory.  *Id.*

15   at 38:9-12.  Despite Plaintiffs' new allegations (*see* Am. Compl. ¶¶ 185-186), their theory remains

16   hopelessly speculative and implausible.

17   ***Prezcobix, Symtuza, Odefsey, and Evotaz***

18   Importantly, Plaintiffs' first theory of antitrust injury—that BMS and Janssen would have made

19   competing FDCs once the patents on Gilead's products expired—has no application to Prezcobix,

20   Symtuza, Odefsey, and Evotaz.  At least one unexpired Gilead patent on COBI or TAF would continue

21   to block entry by Janssen or BMS, even absent the ancillary restraints in the pertinent collaboration

22   agreements.  *See* Am. Compl. ¶ 119 (COBI patents do not expire until 2029), *id.* ¶¶ 279-280 (TAF

23   patents do not expire until 2032; Plaintiffs contend generic entry should not occur until May 2023); *see*

24   *also Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1107 (6th Cir. 1989) (affirming dismissal for failure

25   to allege antitrust injury, concluding "[t]he patents were an impenetrable barrier to the plaintiff's

26   entry").  The viability of any claim of antitrust injury conditioned on ancillary restraints that will not

27   be effective for years is purely speculative.  Plaintiffs can only guess at what treatments will be part of

28   a cART regimen years from now, particularly in light of continuing innovation in HIV treatments that

- 11 -

they themselves acknowledge. *See, e.g.*, Am. Compl. ¶ 69 (table of products discussed in the Amended Complaint showing eight new drugs approved by the FDA in the last six years).

With respect to these four FDCs, Plaintiffs thus must resort to their second theory of antitrust injury, already once found lacking by the Court, that BMS and Janssen would have entered into collaboration agreements with Gilead that omitted the so-called "No Generics Restraints," and, while the collaborations were in effect, would have challenged Gilead's COBI and TAF patents prior to expiration. The Amended Complaint even goes so far as to hypothesize that such challenges would be brought immediately upon launch of the collaboration FDC products, such that the joint venture partners would be simultaneously cooperating to promote a new product and litigating patent challenges against each other over the patents that covered that same drug. *Id.* ¶ 149. In support of this idea, the Amended Complaint alleges that Janssen and BMS "regularly chanllenge [sic] their competitors' patents when it makes business sense to do so," citing a suit 12 years ago by "Janssen subsidiary Centocor" challenging Genentech's patents "in order to avoid paying royalties on sales of Remicade." *Id.* ¶ 185 (otherwise citing only "a recent wave of litigation under the Biologics Price Competition and Innovation Act of 2009," even though that statute has no application to the HIV treatments at issue here); *see Centocor, Inc. v. Genentech, Inc., et al.*, No. 2:08-cv-03573 (C.D. Cal. filed May 30, 2008) (a brand manufacturer terminating a sublicense for a patent and seeking to avoid further royalty payments). Putting aside that the sole cited example did not involve suing a joint venture partner over the validity of patents while simultaneously cooperating with that same partner in marketing a product premised on those patents, the key phrase in that allegation is "when it makes business sense." Nowhere in the Amended Complaint have Plaintiffs made factual allegations plausibly explaining why it would have made business sense for Janssen or BMS to challenge the Gilead patents covering COBI or TAF.

It makes no business sense to sue a joint venture partner in order to wrest away the right to sell an identical or nearly identical product in competition with the joint venture that has just been entered. No patent holder would again collaborate with the firm under such circumstances, and the possibility of creating life-saving treatments developed through such collaborations would vanish.

Furthermore, it does not make sense to spend "approximately $6 to 10 million" (Am. Compl.

¶ 186)—or any money—challenging a patent unless there is a reasonable chance of prevailing. Because "[a] patent shall be presumed valid," 35 U.S.C. § 282(a), Plaintiffs must allege evidentiary facts that the patents covering the pertinent components of each FDC are invalid to demonstrate antitrust injury as to the ancillary restraint in the agreement to develop that FDC.  *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) (a plaintiff must allege "evidentiary facts which, if true, will prove" the elements of the claim).  If the patents protecting an FDC are valid, Plaintiffs have suffered no antitrust injury allegedly caused by the ancillary restraints at issue for that FDC.  *See, e.g.*, *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132, 165 (3d Cir. 2017) (affirming order granting motion to dismiss:  "After all, if the launch were stopped because it was illegal, then the Appellants' injury (if it could still be called that) would be caused not by the settlement but by the patent laws prohibiting the launch.").

In the March 3 Order, the Court appears to have found that Plaintiffs had sufficiently alleged that Gilead's *TDF* and *FTC* patents were vulnerable based on multiple patent challenges that had been levied by generic manufacturers.  *See* Order at 9-11 (describing patent litigation challenges); *id.* at 42 n.29 (inferring vulnerability of patents from multiple challenges, while acknowledging absence of factual allegations to explain alleged weakness).  In contrast, the Amended Complaint lacks any allegations of weakness or reference to any challenges as to Gilead's patents covering *COBI* or *TAF* (one or both of which is used in Prezcobix, Symtuza, Odefsey, and Evotaz).  The absence of such allegations renders implausible and speculative any antitrust-injury theory based on BMS and Janssen initiating pre-expiration challenges to those Gilead patents.

Similarly, to the extent Plaintiffs contend that *Gilead* might have challenged patents held by BMS or Janssen (*see, e.g.*, Am. Compl. ¶¶ 162, 471), the assertion is equally implausible.  Plaintiffs make no allegation that Gilead has ever challenged a competitor's patents, and likewise offer no allegation that the relevant patents on Janssen's RPV or BMS's ATV were vulnerable to challenge. Plaintiffs' allegations that Janssen's DRV patents, which are protected until 2024 and 2026, "are invalid and can be easily designed around" are entirely conclusory.  *Id.* ¶ 162.

### *Atripla*

The first theory of injury, premised on what the parties were restrained from doing after

1   Gilead's patent expired, also does not apply to Atripla, but for a different reason: as the Court's Order
2   noted, "when generic TDF became available in December 2017 . . . , BMS *did* come up with a
3   competing FDC" through a licensing arrangement with Mylan.   Order at 37:18-20 (emphasis in
4   original).   No delay is alleged with regard to this competing FDC; to the contrary, the Amended
5   Complaint acknowledges that BMS licensed Mylan to produce the competing product "when generic
6   TDF became available."   Am. Compl. ¶ 127.   There can be no antitrust claim based on a theory of
7   injury when the operative complaint admits that the very injury in question did not occur.

8          Plaintiffs' second theory of antitrust injury as applied to Atripla—i.e., that BMS would have
9   collaborated with Gilead to create Atripla, but also would have sued to invalidate Gilead's patents
10   before they expired—is implausible.   After all, "success" in such patent litigation, under this theory,
11   would only have enabled BMS to invest in the development of a generic equivalent of its own joint-
12   venture products—products that it was contractually obligated to promote.   *See* Atripla Agreement
13   (ECF No. 144-3) §§ 1.58, 3.5, 5.1(a), 5.2(c).   The Amended Complaint is lacking in any allegations
14   about why that would be an attractive economic prospect.

15          *Complera*

16          Finally, as to Complera, both of Plaintiffs' theories of antitrust injury ignore their admission
17   that Janssen is the holder of a combination patent for that FDC, which does not expire until 2025.   *See*
18   Am. Compl. ¶ 146 ("Janssen, not Gilead, owns the patents covering an FDC comprising
19   TDF/FTC/RPV"); Orange Book, FDA, "Patent and Exclusivity for: N202123" (Complera),
20   https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=001&Appl_No=20212
21   3&Appl_type=N, Burke Decl. Ex. B (listing U.S. Patent No. 8,841,310, a combination patent for
22   Complera, with an expiration date of December 9, 2025).   The claim that Janssen would create a generic
23   version of Complera prior to 2025, when it holds an unexpired combination patent on the FDC itself
24   until then, is simply implausible and should be dismissed on that basis.   *Twombly*, 550 U.S. at 570.

25   **IV.     THE AMENDED COMPLAINT FAILS TO PLAUSIBLY ALLEGE THAT THE**
26   **ATRIPLA AGREEMENT CONTAINS A "NO-GENERICS RESTRAINT"**

27          In its March 3 Order, this Court considered Section 2.9(a) of the Atripla Agreement—which
28   clarifies, "for the avoidance of doubt," that nothing shall prevent the parties from

- 14 -

"developing . . . combination products (other than the Combination Product)"—and concluded that the provision "is plausibly a No-Generics Restraint." Order at 23:22. In reaching that conclusion, the Court stated: "'Combination Product' is not clearly defined in the agreement as brand or generic TDF/FTC/EFV." *Id.* at 24:4-5. Plaintiffs apparently recognize that this Court's detailed and more recent analysis addressing the July 2003 Gilead/Japan Tobacco Agreement strongly suggests that "Combination Product" is limited to branded Atripla, not generic versions. Order Denying Pls.' Mot. to Reconsider & Mot. for Leave to Amend at 8-11 (Mar. 31, 2020) (ECF No. 293, "JT Order"). In an effort to avert this concern, Plaintiffs added to the Amended Complaint a new allegation to shore up their interpretation of the Atripla Agreement. *See* Am. Compl. ¶ 109 (adding allegation quoting Section 2.9(a): "BMS was only permitted to develop . . . FDCs 'other than the Combination product,' *that is, an FDC comprising brand or generic TDF, FTC, and EFV.*" (emphasis added)). But that new allegation cannot override this Court's reasoning in the JT Order; under the reasoning of that Order, Section 2.9(a) of the Atripla Agreement cannot plausibly be considered a "No-Generics Restraint."

As Plaintiffs argued in their motion for reconsideration, "the language of the No-Generics Restraint [in the 2003 JT Agreement] is essentially identical to that found in agreements with other defendants," including in the Atripla Agreement. *See* Pls.' Mot. for Reconsideration at 1:17-21, 3:22-24 (Mar. 4, 2020) (ECF No. 276-4). That is indeed the case. Like the term "Licensed Product" in the 2003 Gilead/JT Agreement, the term "Combination Product" in the Atripla Agreement is defined and used in such a way that it cannot plausibly include a generic version. Once "Combination Product" is understood to refer only to the *brand version* of the FDC, Plaintiffs' argument that Section 2.9(a) is a "No-Generics Restraint" falls away, and with it any basis for proceeding on the claim that the Atripla Agreement is anticompetitive.

First, if "Combination Product" does refer to a generic version, that generic version must be one that is "developed pursuant" to the Atripla Agreement. That is because "Combination Product" is defined in Section 1.50 as "the fixed-dose co-formulated product *developed pursuant to this Agreement* containing, as its only active pharmaceutical *ingredients* per single daily dose, 300 mg *TDF*, 200 mg *FTC* and 600 mg *EFV*." Atripla Agreement § 1.50 (all emphases added). But the stated purpose of the Atripla Agreement was to make an FDC, the "Combination Product," comprised of the parties'

- 15 -

"proprietary" TDF, FTC, and EFV.  *See, e.g.*, *id.* Recital Two ("WHEREAS, BMS has developed . . . a proprietary non-nucleoside reverse transcriptase inhibitor, Sustiva® (known under the generic name of efavirenz ('EFV')) for the treatment of HIV infection in adults"); *id.* § 1.80; *id.* § 1.50.   A "proprietary" product is not a "generic" product and, as the Court made clear in the JT Order, "'generic names' are different from 'generic versions.'"  JT Order at 9:13-14.

Second, the Atripla Agreement's use of the defined term "Generic Version" elsewhere in the agreement erases any doubt that the definition of "Combination Product" is limited to branded Atripla. The Amended Complaint explains that NDAs are filed for approval of branded products, whereas ANDAs are filed for the approval of generic products.  *See* Am. Compl. ¶¶ 70, 73; JT Order at 8:18-25 (finding that reference to an NDA in the definition of "Licensed Product" precluded the product definition from including generic versions); *id.* at 9:8-9 ("[A] Licensed Product is a Product for which Gilead has filed an MAA/NDA—i.e., an MAA/NDA is a requirement.").   The Atripla Agreement makes clear that the "Combination Product" developed and commercialized pursuant to the Atripla Agreement required approval of an NDA—not an ANDA.  *See, e.g.*, Atripla Agreement § 3.2(a) (providing that "Gilead . . . shall have primary responsibility for the development of the Combination Product and the conduct of any clinical trials and bioequivalence studies required for obtaining approval of an *NDA for the Combination Product*." (emphasis added)); *id.* § 3.4(a) (contemplating "approval of the Combination Product . . . under an NDA"); *id.* § 14.3 (permitting either party to terminate the agreement if an NDA for the Combination Product was not filed and approved by certain dates); *see also id.* §§ 4.1, 4.2, 5.11(c).

In contrast, "Generic Version" is defined as "with respect to the Combination Product . . . a product containing the same active pharmaceutical *ingredients* as the Combination Product . . . [and] approved in the United States *under an Abbreviated New Drug Application (i.e., an ANDA)*."  *See id.* § 1.96 (emphasis added).  Nowhere in the Atripla Agreement did the parties contemplate creating a "Generic Version" of Atripla.  Both the allegations of the Amended Complaint and the plain definitions in the Atripla Agreement underscore that, just as in the 2003 JT Agreement, "there is a difference between" the Combination Product and a Generic Version "even though both have the same active *ingredients*."  *See* JT Order at 10:10-12 (emphasis added).

- 16 -

1    When taken together and "evaluated in context," JT Order at 7:3-4, these provisions establish

2    that Section 2.9(a) is not plausibly a "No-Generics Restraint."  At best, Section 2.9(a)'s clarification

3    that nothing in the Agreement restricts the parties from using their own components for FDCs other

4    than the Combination Product is merely a backstop to the license grants in Section 6—provided only

5    "for the avoidance of doubt"—because those license grants do not authorize Gilead or BMS to make

6    the branded Combination Product independently in the first place. *See* JT Order at 7:25-8:1 ("JT agreed

7    not to do something that the license (under Section 6.1) did not expressly permit JT to do.").

8    In sum, the Combination Product to which the parties referred in the Atripla Agreement was

9    branded—and *only* branded—Atripla.  Nothing in the Atripla Agreement restricted the parties from

10   creating a generic version of Atripla outside of the venture.  As such, and in line with the JT Order, the

11   Court should find that the Atripla Agreement did not contain a so-called "No-Generics Restraint" and

12   dismiss Plaintiffs' claims to the extent they rely on allegations that it did.

13   **V.    THE AMENDED COMPLAINT'S NEW PATENT-TERM-EXTENSION**

14   **ALLEGATIONS FAIL TO STATE A CLAIM**

15   The Amended Complaint incorporates into every monopolization count (i.e., Counts One

16   through Ten) new allegations concerning Gilead's successful petition to the Patent and Trademark

17   Office ("PTO") for a patent-term extension ("PTE") on the '791 TAF patent (Am. Compl. ¶¶ 348-370),

18   but those allegations fail to state a claim.  Gilead's successful petitioning is immune from antitrust

19   scrutiny under the venerable *Noerr-Pennington* doctrine.  *See E. R. Presidents Conference v. Noerr*

20   *Motor Freight, Inc.*, 365 U.S. 127, 135-36 (1961) ("[W]here a restraint upon trade or monopolization

21   is the result of valid governmental action, as opposed to private action, no violation of the Act can be

22   made out."); *see also United Mine Workers v. Pennington*, 381 U.S. 657, 669-672 (1965) ("*Noerr*

23   shields from the Sherman Act a concerted effort to influence public officials regardless of intent or

24   purpose.").

25   The Ninth Circuit has expressed the *Noerr-Pennington* doctrine as follows:  "Where a restraint

26   upon trade or monopolization is the result of valid governmental action, as opposed to private action,

27   those urging the governmental action enjoy absolute immunity from antitrust liability for the

28   anticompetitive restraint." *Sessions Tank Liners v. Joor Mfg.*, 17 F.3d 295, 301 (9th Cir. 1994) (quoting

- 17 -

*Allied Tube & Conduit Corp. v. Indian Head*, 486 U.S. 492, 499 (1988); *Noerr*, 365 U.S. at 136)). The Ninth Circuit has confirmed that this "absolute immunity" extends to petitions to all government agencies. *See, e.g.*, *Sanders v. Brown*, 504 F.3d 903, 912 (9th Cir. 2007) ("*Noerr-Pennington* immunity protects petitions to all departments of the government." (citing *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972))); *MedImmune, Inc. v. Genentech, Inc.*, 2003 U.S. Dist. LEXIS 23443, at *25 (C.D. Cal. Dec. 24, 2003) ("The parties agree that attempts to obtain the issuance of a patent from the PTO are ordinarily covered by *Noerr-Pennington*."); *see also Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1059 (9th Cir. 1998) (*Noerr-Pennington* immunizes "lobbying or advocacy before any branch of either federal or state government"). The Amended Complaint alleges harm from the PTO's granting of Gilead's PTE petition (Am. Compl. ¶¶ 348-370); accordingly, *Noerr-Pennington*'s "absolute immunity" applies.

Although the Amended Complaint colorfully alleges that Gilead's supposed regulatory strategy was a "perversion" and "gross abuse" of the PTE process (Am. Compl. ¶¶ 348, 350, 367), such allegations do not undermine Gilead's antitrust immunity here. *Noerr-Pennington* has a sham exception, but it is narrow and irrelevant here, as the exception "encompasses situations in which persons use the governmental process—*as opposed to the outcome of that process*—as an anticompetitive weapon." *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991) (emphasis added); *see also id.* ("A 'sham' situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all, not one who genuinely seeks to achieve his governmental result, but does so through improper means. A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay."); *Kottle*, 146 F.3d at 1062-63 (affirming dismissal of claims under Sections 1 and 2 of the Sherman Act, and state analogues, for failure to state a claim where petitioning activity toward administrative agency was not frivolous). Here, the Amended Complaint alleges harm not from any frivolous petitioning by Gilead (which, after all, was successful), but from the PTO's granting of Gilead's petition for a PTE.

Plaintiffs' allegations of anticompetitive intent are also legally irrelevant. Courts have roundly rejected allegations of anticompetitive intent to prop up claims that, like those here, would otherwise

- 18 -

1   be immune from antitrust scrutiny.  *See Pennington*, 381 U.S. at 669 ("[T]he legality of the conduct

2   'was not at all affected by any anticompetitive purpose it may have had.' . . .  Nothing could be clearer

3   from the Court's opinion [in *Noerr*] than that anticompetitive purpose did not illegalize the conduct

4   there involved.") (quoting *Noerr*, 365 U.S. at 138, 140); *see also Sanders*, 504 F.3d at 912 ("[P]rivate

5   actors are immune from antitrust liability for petitioning the government, even when the private actors'

6   motives are anticompetitive.").  The new PTE allegations thus fail.

7   **VI.    THE AMENDED COMPLAINT'S NEW ROYALTY-PAYMENT ALLEGATIONS**

8   **FAIL TO STATE A CLAIM**

9         Plaintiffs have added to the Amended Complaint a number of new allegations related to the

10  payment of royalties "even after Gilead's patents had expired or were invalidated."  Am. Compl. ¶ 110

11  (as to Atripla agreement); *see also id.* ¶ 122 (as to Evotaz, alleging provision to be "per se unlawful"),

12  ¶ 139 (as to Complera, alleging provision to be "per se unlawful"), ¶ 143 (as to Odefsey), ¶ 159 (as to

13  Symtuza and Prezcobix), ¶ 166 (generally).  These allegations are then added as an element in every

14  antitrust claim asserted in the Amended Complaint.  *Id.* ¶¶ 481, 495, 506, 518, 529, 540, 553, 562, 570,

15  578, 596, 603, 611, 618.  Plaintiffs previewed this argument in opposing Defendants' initial motions

16  to dismiss by citing *Brulotte v. Thys Co.*, 379 U.S. 29 (1964), and *Kimble v. Marvel Entertainment,*

17  *LLC*, 135 S. Ct. 2401 (2015), for the proposition that a patent license cannot charge royalties beyond

18  the patent's term.  Pls.' Opp'n at 18-20.  Plaintiffs' new effort at claiming the payment provisions in

19  Defendants' collaboration agreements are per se antitrust violations fails for at least three reasons.

20        First, neither of the cases relied upon by Plaintiffs was an antitrust case, as the U.S. Supreme

21  Court took care to emphasize in *Kimble*.  In *Brulotte*, the Court applied a standard of per se patent

22  misuse to a license agreement between the inventor of a patented hop-picking machine and farmers for

23  their use of the machine, with royalty payments due after the last patent used in the machine had

24  expired.  *See* 379 U.S. at 31-32.  Fifty years later, in *Kimble*, the Court had to decide whether to apply

25  the same per se patent misuse standard to a settlement agreement that provided for payment of a royalty

26  after the expiration of the sole patent at issue in the underlying litigation.  *See* 135 S. Ct. at 2405-06.

27  In deciding against the petitioner Kimble, the Court acknowledged the "broad scholarly consensus"

28  about the potential pro-competitive effects of post-expiration royalties, but it drew a material distinction

between patent cases and antitrust cases, observing: "If *Brulotte* were an antitrust rather than a patent case, we might answer both questions as Kimble would like." *Id.* at 2412. Thus, even if the payment provisions were found to constitute patent misuse, it would not automatically follow that they constituted antitrust violations.

Second, and in any event, none of the collaboration agreements at issue run afoul of *Brulotte* or *Kimble*. Most of the collaboration agreements are business arrangements involving, in part, cross-licensing to generate new products. Again, *Kimble* is instructive: "*Brulotte* poses no bar to business arrangements other than royalties—all kinds of joint ventures, for example—that enable parties to share the risks and rewards of commercializing an invention." *Kimble*, 135 S. Ct. at 2408. That is precisely what Defendants' agreements do here—share in the risks and rewards of product development and regulatory approval.

Third, even if the collaboration agreements were construed as narrow patent licenses, the Amended Complaint has not plausibly alleged that they force a licensee to pay more royalties after patent expiration. With regard to Atripla, the Amended Complaint acknowledges that Agreement allowed BMS to terminate Gilead's participation in the joint venture if generic TDF and FTC became available, but contends that if BMS did terminate Gilead in those circumstances, BMS "would be required to pay a substantial penalty to Gilead, comprising three years of additional royalty payments even after Gilead's patents had expired or were invalidated." Am. Compl. ¶ 110. Plaintiffs misconstrue the plain language of the Atripla Agreement. Under the Atripla Agreement, BMS and Gilead each granted royalty-free sublicenses to the joint venture and, in return, the joint venture granted each of BMS and Gilead a license to use any intellectual property resulting from their collaboration. *Id.* ¶ 105; Atripla Agreement §§ 6.1, 6.2. The Atripla Agreement allowed either party to terminate the other party's participation in the joint venture within 30 days of the launch of a generic version of that other party's component product(s). Atripla Agreement § 14.5. In that scenario, the joint venture would still operate, with the continuing party retaining the right to sell Atripla and assuming the obligation to pay the terminated party a fee based on declining annual percentages of Atripla's net sales for a period of three years. *Id.* § 14.6(b). In December 2017, as Plaintiffs acknowledge, *Gilead* exercised its right to terminate *BMS*, upon entry of generic Sustiva; consequently, *Gilead* was obligated to pay *BMS* the fee

- 20 -

that BMS was entitled to as the terminated party.  Am. Compl. ¶ 128.  Those payments, which were based on net sales of Atripla (Atripla Agreement § 7.1), not on any specific patent belonging to BMS, are entirely lawful and in no way barred by *Brulotte* and *Kimble*.

Plaintiffs similarly allege that provisions in the Odefsey Agreement are unlawful because the agreement—including the alleged "obligation to pay royalties"—"expires on a product-by-product basis, at the later of (1) the expiration of the last of Janssen's patents providing exclusivity for the product or (2) the ten-year anniversary of marketing the product (a post-patent-expiration royalty provision)."  Am. Compl. ¶ 143.  When read in its entirety, however, the Odefsey Agreement does not provide for post-patent-expiration royalty payments such as those deemed unlawful in *Brulotte*.  In the Odefsey Agreement, Janssen granted Gilead royalty-free licenses to "Janssen Technology" relating to RPV.  *See* Odefsey Agreement § 9.1.1.  Janssen did not owe Gilead royalties on Gilead patents because Gilead did not license Janssen any Gilead patents in the Odefsey Agreement.  Furthermore, the payments under the Odefsey Agreement are in the nature of supply payments and revenue-sharing payments.  *See id.* § 10.1, Annex M-1 (setting forth description of "Monthly Payment Term" payable by Gilead to Janssen); *see also* Am. Compl. ¶ 142 (explaining that Janssen and Gilead "share revenues based on the ratio of the net selling prices of the party's component(s), subject to certain restrictions and adjustments," e.g., for Janssen's supply of RPV to Gilead).

Furthermore, even if any of the payments made by Defendants were analogous to royalty payments in a standalone licensing agreement, they would not run afoul of the rather narrow rule of *Brulotte* and *Kimble*.  As the Supreme Court recognized in *Kimble*, even in claims of patent misuse involving straight licensing arrangements, the per se standard has been narrowly applied.  Thus, "[u]nder *Brulotte*, royalties may run until the latest-running patent covered in the parties' agreement expires."  *Kimble*, 135 S. Ct. at 2408 (citing *Brulotte*, 379 U.S. at 30); *see also Tessera, Inc. v. Toshiba Corp.*, 2019 U.S. Dist. LEXIS 184355, at *16 (N.D. Cal. Oct. 22, 2019) ("[W]hether a product incorporates 'one patent or a dozen, the ability to exact royalties runs *to the last of the patents* providing *monopoly* protection.'") (quoting *Zila, Inc. v. Tinnell*, 502 F.3d 1014, 1026 (9th Cir. 2007)).  By way of example, for Atripla, the last-running patents were obtained by the joint venture after it was formed and prior to BMS's termination.  *See* Orange Book, FDA, "Patent and Exclusivity for: N021937"

(Atripla), https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=001&Appl_No=021937&Appl_type=N, Burke Decl. Ex. C (listing U.S. Patent Nos. 8,598,185 (Atripla formulation patent; issued 12/03/2013; expires 04/28/2029); 9,018,192 (Atripla method of treatment patent; issued 04/28/2015; expires 06/13/2026); and 9,545,414 (Atripla formulation and method of treatment patent; issued 01/17/17; expires 06/13/2026)).

Likewise, even if royalties are paid after the expiration of the last of the patents incorporated into a product, such "royalties are allowable so long as tied to a non-patent right—even when closely related to a patent." *Kimble*, 135 S. Ct. at 2408 (citing 3 Milgrim on Licensing § 18.07, at 18-16 to 18-17); *Portney v. CIBA Vision Corp.*, 593 F. Supp. 2d 1120, 1125 (C.D. Cal. 2008) (allowing for payment obligations to survive when based on royalties for the use of intellectual property other than patents that had expired). Here, Plaintiffs ignore that payments made pursuant to the terms of the agreements are tied to sales of the jointly developed FDC, not to the underlying patents. Am. Compl. ¶ 121 ("Under the [Atripla] agreement, BMS sets the price of the FDC for sales in the United States and pays a royalty to Gilead based on sales."). Plaintiffs also ignore, with respect to Atripla, that the joint venture obtained non-patent intellectual property rights covering joint know-how and trademarks. Atripla Agreement §§ 1.137; 1.208; 11.1(c); 11.5(c). As such, those payments did not extend the life of any particular patents in a manner that could be considered patent misuse condemned as per se unlawful. *See Beco Dairy Automation, Inc. v. Global Tech Sys., Inc.*, 104 F. Supp. 3d 1023, 1039 (E.D. Cal. 2015) (citing *Monsanto Co. v. McFarling*, 363 F.3d 1336, 1341 (Fed. Cir. 2004)) ("[W]here a plaintiff does not allege an activity that is patent misuse *per se*, a 'rule of reason' analysis applies.").

In sum, Plaintiffs have failed to state a claim based on the payments made by Defendants under their respective collaboration agreements, on a theory of per se patent misuse or otherwise. Each antitrust claim should be dismissed to the extent it relies upon the alleged payment of royalties after patent expiration.

## VII.   THIS COURT SHOULD DEFINITIVELY HOLD THAT THE SO-CALLED "NO-GENERICS RESTRAINTS" ARE SUBJECT TO THE RULE OF REASON

In its March 3 Order, this Court rejected Defendants' argument that ancillary restraints, such as the so-called "No-Generic Restraints," are effectively per se *valid* under the Supreme Court's decision

- 22 -

in *Dagher*.  Order at 19:11.  In its analysis, this Court acknowledged that ancillary restraints are subject to the Rule of Reason (*id.* at 20:7-21:15), but stopped just short of definitively holding that the so-called "No-Generic Restraints" are subject to the Rule of Reason:  "The No-Generics Restraints are not per se legal.  They are subject to review under, at the very least, the rule of reason."  *Id.* at 22:20-21; *see also id.* at 46 n.30 ("at this juncture of the proceedings, the Court has not made any conclusion as to whether the per se illegal rule applies").  This Court should now make a determination that the Rule of Reason applies, as doing so will have a substantial effect on determining the course of future proceedings in this case, including the scope of discovery, expert opinions, summary-judgment motions, and trial.

In arguing that the so-called "No-Generics Restraints" were reasonable as a matter of law under *Dagher*, Defendants did not intend to dissuade the Court from finding, at the very least, that those alleged restraints are governed by the Rule of Reason.  *See, e.g.*, Gilead Mem. (ECF No. 143) at 3:22-24 ("The law is settled that such restraints are analyzed under the rule of reason and that, if reasonably ancillary to the procompetitive purposes of the venture, are 'valid' as a matter of law."), 19:24-21:10 (same); Gilead Reply Mem. (ECF No. 216) at 2:21-3:11 (same); Janssen Mem. (ECF No. 159) at 8:20-10:5 ("each of the collaboration agreements is subject to analysis under the Rule of Reason"); Janssen Reply Mem. (ECF No. 217) at 4:17-5:26 (same).

As the Court noted in its March 3 Order, whether a restraint should be governed by the per se rule or the Rule of Reason is a question of law often appropriate for resolution at the motion-to-dismiss stage.  *See* Order at 18:7-19:2 (citing *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1010 (N.D. Cal. 2008), *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir. 2004)); *see also NSS Labs, Inc. v. Symantec Corp.*, 2019 U.S. Dist. LEXIS 136742, at *24 (N.D. Cal. Aug. 13, 2019) (dismissing per se claims on Rule 12 posture); *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 967 F. Supp. 2d 1347, 1357 (N.D. Cal. 2013) (same); *German Auto Mfrs.*, 2012 U.S. Dist. LEXIS 57625, at *36-37 (same).

The Court also observed in its March 3 Order that *Dagher* did not "displace[] the prior law—as articulated in the Supreme Court and lower courts—that the rule of reason applies to ancillary restraints."  *See* Order at 20:7-12 (citing *Nat'l Soc'y of Prof. Eng'rs v. United States*, 435 U.S. 679,

- 23 -

689 (1978); *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188-89 (7th Cir. 1985); *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1395 (9th Cir. 1984)).  As this Court also observed, "post-*Dagher*, the Supreme Court has indicated that the rule of reason continues to apply to ancillary restraints."  Order at 20:28-21:4 (citing *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 203 (2010)).  And, as this Court added, "lower courts have continued to apply the rule of reason to such restraints."  Order at 21:7-8 (citing *Princo*, 616 F.3d at 1336; *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 339 n.7 (2d Cir. 2008) (Sotomayor, J., concurring)).  Notably, in opposing Defendants' motions to dismiss, Plaintiffs acknowledged repeatedly and at length that the standard for testing the legality of ancillary restraints is the Rule of Reason.  *See* Pls.' Opp'n at 23-24 & n.6.

An agreement by joint venturers not to compete against a jointly developed product is a quintessential ancillary restraint.  *See, e.g.*, *Princo Corp. v. ITC*, 616 F.3d 1318, 1336 (Fed. Cir. 2010) (en banc) ("The 'ancillary restraints' that are often important to collaborative ventures, such as agreements between the collaborators not to compete against their joint venture, are also assessed under the rule of reason." (citing *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 214, 223-30 (D.C. Cir. 1986); *Polk Bros*, 776 F.2d at 189)); Areeda & Hovenkamp, *Antitrust Law*, ¶ 2115 (agreements between firms engaged in joint innovation not to innovate in the same area outside the context of the joint venture "are to be regarded as ancillary rather than naked restraints and are thus subject to the usual proof of power and anticompetitive effects").  Such agreements "provide[] assurance that the resources invested by one joint venturer will not be undermined or competitively exploited to the sole benefit of the other" and thus encourage innovators to jointly develop products they might not otherwise be able to develop.  *Princo Corp.*, 616 F.3d at 1339.

Here, there are no plausible allegations that agreements to develop FDCs were a "complete sham," as the First Circuit put it in describing the rare joint ventures that might be subject to per se treatment.  *See Addamax Corp. v. Open Software Found.*, 152 F.3d 48, 52 (1st Cir. 1998) ("[j]oint venture enterprises . . . , unless they amount to complete shams, are rarely susceptible to per se treatment").  To the contrary, the ventures were entered—with the encouragement of the federal government during "one of the deadliest human pandemics in history" (Am. Compl. ¶ 52)—for the

purpose of developing treatments that Plaintiffs admit have benefitted patients. *Id.* ¶¶ 65, 95. Indeed, as the Court will recall, when BMS and Gilead entered into a joint venture to create Atripla pursuant to the first agreement at issue in this case, U.S. Secretary of Health and Human Services Tommy Thompson applauded the collaboration: "This partnership to create a fixed-dose combination of three HIV medications represents an important advance in our collective effort to deliver simplified therapy for people living with HIV." Gilead Press Release at 2 (Dec. 2004), Annex L to Atripla Agreement (ECF No. 144-3); *see* Am. Compl. ¶ 95 ("Plaintiffs do not contend that creating or marketing FDCs, as such, is anticompetitive.").

Finally, confirmation from this Court that the so-called "No-Generics Restraints" are governed by the Rule of Reason would be fully in accord with the encouragement given by the federal antitrust authorities to "firms, including competitors," to collaborate—including to "develop new products" to battle the ongoing pandemic currently confronting the world. *See* U.S. DOJ (Antitrust Division) & FTC, Joint Antitrust Statement Regarding COVID-19 (Mar. 2020), https://www.justice.gov/atr/joint-antitrust-statement-regarding-covid-19 ("As a general matter, the Agencies have stated that when firms collaborate on research and development this 'efficiency-enhancing integration of economic activity' is typically procompetitive."); *see also Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004) (expressing concern that overreaching antitrust enforcement may "chill the very conduct the antitrust laws are designed to protect" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986))).

## CONCLUSION

For all the foregoing reasons, both re-pleaded and new allegations in the Amended Complaint fail to state a claim upon which relief can be granted. Accordingly, the claims that are based on those allegations should be dismissed with prejudice.

Dated:   May 4, 2020

Respectfully submitted,

WHITE & CASE LLP

By:   */s/ Heather M. Burke*
Heather M. Burke (SBN 284100)
Jeremy K. Ostrander (SBN 233489)

- 25 -

**WHITE & CASE**LLP
3000 El Camino Real
2 Palo Alto Square, Suite 900
Palo Alto, CA  94306-2109
Telephone:  (650) 213-0300
Facsimile: (650) 213-8158
hburke@whitecase.com
jostrander@whitecase.com

Christopher M. Curran (*pro hac vice*)
Peter J. Carney (*pro hac vice*)
**WHITE & CASE**LLP
701 Thirteenth Street, NW
Washington, District of Columbia 20005-3807
Telephone:  (202) 626-3600
Facsimile: (202) 639-9355
ccurran@whitecase.com
pcarney@whitecase.com

Heather K. McDevitt (*pro hac vice*)
Bryan D. Gant (*pro hac vice*)
Kristen O'Shaughnessy (*pro hac vice*)
**WHITE & CASE**LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
hmcdevitt@whitecase.com
bgant@whitecase.com
kristen.oshaughnessy@whitecase.com

Attorneys for Defendants Gilead Sciences, Inc.,
Gilead Holdings, LLC, Gilead Sciences, LLC, and
Gilead Sciences Ireland UC

*/s/ Paul J. Riehle*
PAUL J. RIEHLE (SBN 115199)
Paul.Riehle@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
Four Embarcadero Center, 27th Floor
San Francisco, CA 94111-4180
Telephone: (415) 591-7500
Facsimile: (415) 591-7510

PAUL H. SAINT-ANTOINE (*pro hac vice*)
Paul.Saint-Antoine@faegredrinker.com
JOANNE C. LEWERS (*pro hac vice*)
Joanne.Lewers@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
One Logan Square, Ste. 2000
Philadelphia, PA 19103
Telephone: (215) 988-2990

Attorneys for Defendants
JANSSEN R&D IRELAND,
JANSSEN PRODUCTS, LP, and

- 26 -

1

JOHNSON & JOHNSON

2

*/s/ Daniel B. Asimow*
DANIEL B. ASIMOW (SBN 165661)
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone: 415.471.3100
Facsimile: 415.471.3400
Email: daniel.asimow@arnoldporter.com

3

4

5

6

LAURA S. SHORES (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Telephone: 202.942.5000
Facsimile: 202.942.4999
Email: laura.shores@arnoldporter.com

7

8

9

10

Attorneys for Defendants
BRISTOL-MYERS SQUIBB COMPANY &
E. R. SQUIBB & SONS, L.L.C.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' NOTICE OF MOTION, MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED
CLASS ACTION COMPLAINT, AND MEMORANDUM IN SUPPORT THEREOF
CASE NO: 3:19-CV-02573-EMC

## **FILER'S ATTESTATION**

Pursuant to Civil L.R. 5-1(i)(3) of the Northern District of California, regarding signatures, I, Heather M. Burke, attest that concurrence in the filing of this document has been obtained.

Executed:      May 4, 2020              _/s/_                   _Heather M. Burke_
                                        Heather M. Burke