DURIE TANGRI LLP
DARALYN J. DURIE (SBN 169825)
ddurie@durietangri.com
217 Leidesdorff Street
San Francisco, CA 94111
Telephone: (415) 362-6666
Facsimile: (415) 236-6300

HILLIARD & SHADOWEN LLP
STEVE D. SHADOWEN (*pro hac vice*)
steve@hilliardshadowenlaw.com
1135 W. 6th Street, Suite 125
Austin, TX 78703
Telephone: (855) 344-3298
Facsimile: (361) 882-3015

HAGENS BERMAN SOBOL SHAPIRO LLP
STEVE W. BERMAN (*pro hac vice*)
steve@hbsslaw.com
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

*Interim Co-Lead Counsel for End-Payor Plaintiffs*

(Additional Counsel Listed on Signature Page)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PETER STALEY, et al. | Case No. 3:19-cv-02573-EMC |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| GILEAD SCIENCES, INC., et al. | Date:   July 16, 2020 |
| Defendants. | Time:   1:30 p.m. |
| | Ctrm:   5-17th Floor |
| | Judge:  Honorable Edward M. Chen |

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................................1

II.  BACKGROUND ..................................................................................................................2

III. LEGAL STANDARDS .......................................................................................................3

IV.  DISCUSSION ......................................................................................................................4

 A. The Court Already Held That the Atripla Agreement Plausibly Contains a No-Generics Restraint ....................................................................................................4

 B. The Court Already Upheld Plaintiffs' Claims Based on Gilead's Collaboration Agreements with BMS and Janssen, Which Include Post-Patent Expiration Royalty Provisions ...................................................................................................7

 C. The Court Correctly Deferred Deciding What Level of Antitrust Scrutiny to Apply, Though a Per Se or Quick Look Approach is Appropriate in This Case ................8

 D. Defendants' Narrow Arguments Concerning Antitrust Injury Are Unavailing and, Even if Credited, Would Not Result in Dismissal .............................................11

 E. Plaintiffs Adequately Allege Market Power in the Properly Defined cART Market ........13

 F. Plaintiffs' Conspiracy-to-Monopolize Claims Based on the Broader cART Market Are Sufficiently Pled ..........................................................................................16

 G. Plaintiffs' Allegations Relating to the TAF Patent Term Extension Are Not Subject to Dismissal Under *Noerr-Pennington* ...................................................................19

  1. Gilead's Obtaining Extra PTE *Because* It Delayed TAF Is a Perversion of the Statute....................................................................................................20

  2. *Noerr* Does Not Apply Because the Role of the PTO and FDA Is Ministerial ..............................................................................................21

  3. Even if Gilead's PTE Conduct Alone Would Otherwise Be Protected by *Noerr*, the Conduct Is Actionable as an Integral Part of Gilead's Unlawful Scheme ................................................................................................23

V.   CONCLUSION ..................................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*,
  No. C95-03577-DLJ, 2008 WL 4647384 (N.D. Cal. Oct. 20, 2008) ...................................21

*Allen-Myland, Inc. v. IBM Corp.*,
  33 F.3d 194 (3d Cir. 1994)................................................................................................14

*Allflex USA, Inc. v. Avid Identification Sys., Inc.*,
  No. 5:06-CV-01109-MRP, 2010 WL 11405130 (C.D. Cal. Feb. 16, 2010)........................24

*American Tobacco Co. v. United States*,
  328 U.S. 781 (1946)...........................................................................................................19

*Amphastar Pharms. Inc. v. Momenta Pharms., Inc.*,
  850 F.3d 52 (1st Cir. 2017)...............................................................................................24

*Apple, Inc. v. Samsung Elecs. Co.*,
  No. 11-CV-01846-LHK, 2012 WL 2571719 (N.D. Cal. June 30, 2012) ...........................24

*Arista Networks, Inc. v. Cisco Sys. Inc.*,
  No. 16-cv-00923, ECF No. 281 (N.D. Cal. May 21, 2018)................................................24

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).............................................................................................................3

*In re ATM Fee Antitrust Litig.*,
  554 F. Supp. 2d 1003 (N.D. Cal. 2008) ...............................................................................9

*BBL, Inc. v. City of Angola*,
  809 F.3d 317 (7th Cir. 2015) ...............................................................................................3

*Brennan v. Concord EFS, Inc.*,
  369 F. Supp. 2d 1127 (N.D. Cal. 2005) ...............................................................................9

*Brulotte v. Thys Co.*,
  379 U.S. 29 (1964).............................................................................................................10

*In re Buspirone Patent Litig.*,
  185 F. Supp. 2d 363 (S.D. N.Y. 2002).................................................................................22

*Cal. Dental Ass'n v. F.T.C.*,
  526 U.S. 756 (1999)........................................................................................................9, 10

*Cal. Energy Co. v. S. Cal. Edison, Co.*,
  No. C 91-0319-JPV, 1992 WL 330263 (N.D. Cal. Sep. 22, 1992) ...................................24

ii

*Capella Photonics, Inc. v. Cisco Sys., Inc.*,
   77 F. Supp. 3d 850 (N.D. Cal. 2014) (Chen, J.) ...................................................................4

*Church & Dwight Co., Inc. v. Mayer Labs., Inc.*,
   No. C-10-4429 EMC, 2011 WL 1225912 (N.D. Cal. Apr. 1, 2011) (Chen, J.)......................18

*In re Cipro Cases I & II*,
   348 P.3d 845 (Cal. 2015) .....................................................................................................12

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*,
   690 F.2d 1240 (9th Cir. 1982) ........................................................................................23, 25

*Croixland Props. Ltd. P'ship v. Corcoran*,
   174 F.3d 213 (D.C. Cir. 1999) ...............................................................................................4

*F.T.C. v. Actavis*,
   570 U.S. 136 (2013) .............................................................................................................12

*F.T.C. v. Indiana Fed'n of Dentists*,
   476 U.S. 447 (1986)..........................................................................................................9, 10

*F.T.C. v. Nudge, LLC*,
   430 F. Supp. 3d 1230 (D. Utah 2019) .....................................................................................3

*In re Facebook PPC Advertising Litig.*,
   709 F. Supp. 2d 762 (N.D. Cal. 2010) .....................................................................................4

*Fallay v. San Francisco City & Cty.*,
   No. C 08-2261 CRB, 2016 WL 888901 (N.D. Cal. Mar. 8, 2016).......................................3, 5

*Fleer Corp. v. Topps Chewing Gum, Inc.*,
   658 F.2d 139 (3d Cir. 1981)..................................................................................................19

*In re Flonase Antitrust Litig.*,
   798 F. Supp. 2d 619 (E.D. Pa. 2011) .....................................................................................13

*F.T.C. v. Sysco Corp.*,
   113 F. Supp. 3d 1 (D. D.C. 2015) ..........................................................................................15

*Funai Electric Co. v. LSI Corp.*,
   No. 16-CV-01210-BLF, 2017 WL 1133513 (N.D. Cal. Mar. 27, 2017)..................................24

*Gough v. Rossmoor Corp.*,
   585 F.2d 381 (9th Cir. 1978) .................................................................................................19

*Handguards, Inc. v. Ethicon, Inc.*,
   601 F.2d 986 (9th Cir. 1979) .................................................................................................24

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*,
   627 F.2d 919 (9th Cir. 1980) .................................................................................................19

iii

*Hynix Semiconductor Inc. v. Rambus Inc.*,
   527 F. Supp. 2d 1084 (N.D. Cal. 2007) ........................................................................24, 25

*In re IBM Peripherals EDP Devices Antitrust Litig.*,
   481 F. Supp. 965 (N.D. Cal. 1979), *aff'd*, 698 F.2d 1377 (9th Cir. 1983) ...........................14

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ..........................................................................................15, 16

*Int'l Constr. Prod. LLC v. Caterpillar Inc.*,
   419 F. Supp. 3d 791 (D. Del. 2019).........................................................................................9

*Int'l Travel Arrangers, Inc. v. W. Airlines, Inc.*,
   623 F.2d 1255 (8th Cir. 1980) ...............................................................................................18

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ...............................................................................................12

*Killian Pest Control, Inc. v. Hometeam Pest Defense, Inc.*,
   No. 14_CV-05239-VC, 2015 WL 13385918 (N.D. Cal. Dec. 21, 2015) ...............................24

*Kimble v. Marvel Entm't, LLC*,
   576 U.S. 446, 135 S. Ct. 2401 (2015).....................................................................................10

*Kona Enters., Inc. v. Estate of Bishop*,
   229 F.3d 877 (9th Cir. 2000) ...................................................................................................3

*In re: Lantus Direct Purchaser Antitrust Litig.*,
   950 F.3d 1 (1st Cir. 2020)........................................................................................................22

*In re: Lipitor Antitrust Litig.*,
   868 F.3d 231 (3d Cir. 2017)....................................................................................................22

*Litton Sys., Inc. v. AT&T Co.*,
   700 F.2d 785 (2d Cir. 1983)....................................................................................................22

*In re Loestrin 24 Antitrust Litig.*,
   261 F. Supp. 3d 307 (D.R.I. 2017)..........................................................................................12

*Merck & Co. v. Hi-Tech Pharmacal Co.*,
   482 F.3d 1317 (Fed. Cir. 2007)...............................................................................................23

*In re Microsoft Corp. Antitrust Litig.*,
   127 F. Supp. 2d 728 (D. Md. 2001), *aff'd sub nom Dickson v. Microsoft Corp.*, 309
   F.3d 193 (4th Cir. 2002) .........................................................................................................19

*Microsoft Mobile Inc. v. Interdigital, Inc.*,
   No. CV 15-723-RGA, 2016 WL 1464545 (D. Del. Apr. 13, 2016) .......................................24

iv

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
  933 F.3d 1136 (9th Cir. 2019) ........................................................................................... 19

*NCAA v. Bd. of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984) ............................................................................................................. 11

*Newcal Indus., Inc. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ........................................................................................... 16

*Ohio v. Am. Express Co.*,
  — U.S. — 138 S. Ct. 2274, 2285 (2018) ........................................................................... 15

*In re Opana ER Antitrust Litig.*,
  162 F. Supp. 3d 704 (N.D. Ill. 2016) ................................................................................ 12

*Organon Inc. v. Mylan Pharms., Inc.*,
  293 F. Supp. 2d 453 (D.N.J. 2003) .................................................................................... 22

*Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*,
  No. 2:16-CV-09127, 2018 WL 735978, at *5 (N.D. Cal. Feb. 6, 2018) ........................... 16

*Phonetele, Inc. v. AT&T Co.*,
  664 F.2d 716 (9th Cir. 1981) ............................................................................................. 22

*In re Polygram Holding, Inc.*,
  136 F.T.C. 310 (2003), *aff'd* 416 F.3d 29 (D.C. Cir. 2005) ............................................ 11

*Polygram Holding, Inc. v. F.T.C.*,
  416 F.3d 29 (D.C. Cir. 2005), (2003) .................................................................................. 9

*Proveris Scientific Corp. v. Innovasystems, Inc.*,
  536 F.3d 1256 (Fed. Cir. 2008) ......................................................................................... 21

*Safeway Inc. v. Abbot Labs*,
  761 F. Supp. 2d 874 (N.D. Cal. 2011) ............................................................................... 15

*Schering Corp. v. Mylan Pharms., Inc.*,
  No. 09-6383 JLL, 2011 WL 1885709 (D. N.J. May 17, 2011) ........................................ 23

*Science Prods. Co. v. Chevron Chem. Co.*,
  384 F. Supp. 793 (N.D. Ill. 1974) ..................................................................................... 15

*Sessions Tank Liners, Inc. v. Joor Mfg., Inc.*,
  17 F.3d 295 (9th Cir. 1994) ............................................................................................... 24

*Sitzer v. Nat'l Ass'n of Realtors*,
  420 F. Supp. 3d 903 (W.D. Mo. 2019) ................................................................................ 9

*SocialApps, LLC v. Zynga, Inc.*,
  No. 4:11-CV-04910 YGR, 2012 WL 381216 (N.D. Cal. Feb. 6, 2012) ......................... 4, 8

v

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
    No. 14-md-2503, 2018 WL 563144 (D. Mass., Jan. 25, 2018) ...........................................12, 13

*Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of R.I.*,
    No. 13-405 S, 997 F. Supp. 2d 142 (D.R.I. 2014) ...........................................................11

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 555 (1931) ...................................................................................................13

*Talking Yellow Pages, Inc. v. Pacific Telesis Grp.*,
    972 F.2d 1343 (9th Cir. 1992) ...................................................................................19

*Thompson v. Paul*,
    657 F. Supp. 2d 1113 (D. Ariz. 2009) .........................................................................4

*U.S. v. Oracle Corp.*,
    331 F. Supp. 2d 1098 (N.D. Cal. 2004) ......................................................................15

*United States v. Cont'l Can Co.*,
    378 U.S. 441 (1964).............................................................................................14, 15

*United States v. eBay, Inc.*,
    968 F. Supp. 2d 1030 (N.D. Cal. 2013) .......................................................................9

*United States v. Hughes Tool Co.*,
    415 F. Supp. 637 (C.D. Cal. 1976) .............................................................................16

*Ward v. Apple Inc.*,
    791 F.3d 1041 (9th Cir. 2015) ...................................................................................18

*In re Wholesale Grocery Prod. Antitrust Litig.*,
    752 F.3d 728 (8th Cir. 2014) .......................................................................................9

*Zenith Elecs., LLC v. Septre, Inc.*,
    No. 14-05150 JAK, 2015 WL 12765633 (C.D. Cal. Feb. 5, 2015).....................................24

*In re Zetia (Ezetimibe) Antitrust Litig.*,
    400 F. Supp. 3d 418 (E.D. Va. 2019) ...............................................................7, 12, 18

**Statutes**

35 U.S.C. § 156.................................................................................................21, 23

**Other Authorities**

Alan D. Lourie, *Patent Term Restoration: History, Summary, and Appraisal*, 40 Food
    Drug Cosm. L. J. 351, 356 (1985) ..............................................................................21

Areeda & Hovenkamp, *Antitrust Law* (4th ed. 2019)..............................................................14

5 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 1382 (3d ed. 2016).....................8

vi

H.R. Rep. No. 98-857 (1984), reprinted in 1984 U.S.C.C.A.N. 2647.........................................................23

Health & Human Servs, FDA, 67 Fed. Reg. 65358-02 (Oct. 24, 2002)....................................................23

Jaime F. Cardenas-Navia, *Thirty Years of Flawed Incentives: An Empirical and Economic
    Analysis of Hatch-Waxman Patent-Term Restoration*, 29 Berkley Tech. L.J. 1301
    (2015)...................................................................................................................................................23

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS /
CASE NO. 3:19-CV-02573-EMC

# I.   INTRODUCTION

The bulk of Defendants' renewed motion to dismiss is not actually a Rule 12(b)(6) motion, but rather some combination of (1) a time-barred and procedurally improper motion for reconsideration of issues the Court already decided and (2) a non-meritorious motion to strike additional allegations supporting legal claims that the Court has already deemed sufficient to withstand a motion to dismiss.  A second motion to dismiss under Rule 12(b)(6) is not a vehicle to re-litigate issues already raised and decided in connection with a prior motion. The standard for reconsideration is high, and it requires the prompt filing of a separate motion after the original ruling—a standard that Defendants cannot meet and a motion they have not made.  In addition, a Rule 12(b)(6) motion cannot be used to dismiss *allegations* supporting a claim that has already been upheld.  That type of challenge must be made by way of a motion to strike under Rule 12(f), another demanding standard that Defendants haven't attempted to satisfy.

Defendants' arguments that the Atripla Agreement doesn't have a No-Generics Restraint, that "new" royalty payment allegations in exchange for the No-Generics Restraints aren't anticompetitive, that Plaintiffs have not shown antitrust injury, and that the Court should apply the rule of reason are in reality nothing more than efforts to get a second bite at the apple.  The Court ruled against Defendants on every one of those points in denying their motions to dismiss.  Defendants cannot—indeed, do not even try to—justify their untimely motion for reconsideration, much less meet the high standard to get the relief they seek.  In addition, Defendants' arguments on the Atripla Agreement, the royalty payment allegations, and the patent term extension Gilead obtained by delaying TAF are improper efforts to object to additional facts pled in support of claims the Court has already upheld.  While we explain below why each of those arguments should once again fail on the merits, the Court does not need to reach those merits at all because the arguments are procedurally improper.

There are only a few genuinely new things in Defendants' motion that might even legitimately be considered on a motion to dismiss: the expanded allegations explaining the cART market, the conspiracy to monopolize claims, and the *Noerr-Pennington* challenge to the patent term extension allegations.  But none of those arguments justify dismissal.  The *Noerr* argument fails for the simple reason that the patent term extensions wasn't a discretionary agency decision subject to *Noerr* immunity and because, even if

1    *Noerr* immunity applied, the allegations still stand as part of an overall scheme to monopolize and as

2    evidence of harm from that scheme.  Defendants' challenges to market definition and conspiracy-to-

3    monopolize allegations are nothing more than a sufficiency-of-the-evidence challenge.  Defendants think

4    the facts will ultimately show they did not conspire with Gilead, or that the market is narrower than what

5    Plaintiffs have pled.  They might ultimately be right, though we think they aren't.  But they certainly

6    can't prevail on a motion to dismiss merely because they disagree with the detailed factual allegations in

7    the complaint.

8    **II.     BACKGROUND**

9           In its March 3, 2020 Order, this Court upheld the majority of Plaintiffs' complaint. The Court

10   denied Defendants' motions to dismiss "[t]he claims based on the No-Generics Restraints in the

11   Gilead/BMS agreements and the Gilead/Janssen agreements."  ECF No. 273 ("Order") at 85.  The Court

12   specifically rejected Gilead and BMS's challenge to the sufficiency of Plaintiffs' allegations regarding

13   the Atripla Agreement, finding that the challenged agreement plausibly contains a No-Generics Restraint

14   and declining Defendants' invitation to resolve disputed, ambiguous contract terms in their favor on a

15   motion to dismiss.  *See id.* at 23-26.  The Court also rejected Defendants' lead argument that the No-

16   Generics Restraints are "per se *valid* under the ancillary restraints doctrine" and deferred for a later stage

17   in the litigation the merits of this defense and the mode of analysis.  *See id.* at 19-22, 46-47 n.30.

18          The Court granted Plaintiffs leave to amend as to certain discrete elements of the allowed

19   claims.  For example, it allowed amendment to provide a more definite statement as to one theory of

20   antitrust injury—that an untainted competitor in the position of Janssen or BMS would have challenged

21   Gilead's patents prior to their expiry—but noted that this theory would not be dispositive as Plaintiffs

22   had other, independently sufficient injury allegations.  *Id.* at 38.  Although the Court rejected Defendants'

23   argument that Plaintiffs had failed to plead sufficiently narrow submarkets, the Court dismissed claims

24   based on a broader cART market, granting Plaintiffs leave to amend to provide more detailed allegations

25   regarding the contours of that broader market.  *Id.* at 48-49.  The Court dismissed Plaintiffs' conspiracy-

26   to-monopolize claims primarily because they were based on the cART market but also granted leave to

27   amend regarding the allegations that BMS and Janssen were knowing participants in Gilead's

28   monopolization scheme.  *Id.* at 15-16.

Plaintiffs amended the complaint to address the Court's concerns.  The First Amended Complaint ("FAC") includes two other relevant amendments made with the Court's leave.  ECF No. 303 (granting unopposed motion for leave to amend).  First, the FAC includes additional allegations in support of Plaintiffs' sufficiently pleaded claims based on Gilead's agreements with its coconspirators, including that the collaboration agreements contain post-patent expiration royalty provisions.  ECF No. 347 ("FAC") ¶¶ 104-167.  Second, the FAC includes new allegations of anticompetitive conduct in connection with Gilead's delay in developing TAF based on the company's recent acquisition of a patent term extension.  *Id.* ¶¶ 348-370.  The patent term extension allegations are the only truly new allegations in the complaint.

## III.   LEGAL STANDARDS

Rule 12(b)(6) permits a defendant to seek dismissal if the complaint lacks factual allegations sufficient to state a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  It doesn't allow a defendant to seek reconsideration of prior orders each time a complaint is amended.  Although a party may seek reconsideration if Local Rule 7-9(b)'s procedural requirements are satisfied,[1] reconsideration is an "extraordinary remedy" that will not be granted unless the Court is "presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law."  *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000).  Even if that procedural burden is met, "[a] motion for reconsideration is not to be used as a means to reargue a case or to ask a court to rethink a decision it has made."  *Fallay v. San Francisco City & Cty.*, No. C 08-2261 CRB, 2016 WL 888901, at *1 (N.D. Cal. Mar. 8, 2016).

Rule 12(b)(6) also cannot be used to challenge *allegations* supporting a claim, particularly if the court has already determined that the complaint is well-pleaded.  This is because "[a] motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief."  *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015).  "In other words, courts may not dismiss only some of the claim's allegations if the claim otherwise survives."  *F.T.C. v. Nudge, LLC*, 430 F. Supp. 3d

---

[1] Under Local Rule 7-9, a party seeking reconsideration of an interlocutory order must request leave of the court, "specifically show[ing] reasonable diligence in bringing the motion" and identifying one of three limited grounds for reconsideration.  *See* Civ. L.R. 7-9(a), (b)(1)-(3).

1230, 1246 (D. Utah 2019).  Further, allegations supporting one theory cannot be the basis of a motion to

dismiss if there is a different theory in the same claim sufficient to withstand that motion.  *See Croixland*

*Props. Ltd. P'ship v. Corcoran*, 174 F.3d 213, 218 (D.C. Cir. 1999) ("[A] complaint may contain

alternative theories, and if one of the theories can survive a Rule 12(b)(6) motion, the district court

cannot dismiss the complaint.").

Any objection to those allegations must instead be styled as a motion to strike.  *See SocialApps,*

*LLC v. Zynga, Inc.*, No. 4:11-CV-04910 YGR, 2012 WL 381216, at *2 (N.D. Cal. Feb. 6, 2012);

*Thompson v. Paul*, 657 F.Supp.2d 1113, 1129 (D. Ariz. 2009).  And motions to strike are quite limited.

Rule 12(f) authorizes courts to strike "any redundant, immaterial, impertinent, or scandalous matter," but

such a motion "generally will not be granted unless it is clear that the matter to be stricken could not have

any possible bearing on the subject matter of the litigation."  *In re Facebook PPC Advertising Litig.*, 709

F. Supp. 2d 762, 773 (N.D. Cal. 2010).  "Motions to strike are regarded with disfavor because of the

limited importance of pleadings in federal practice and because they are often used solely to delay

proceedings."  *Capella Photonics, Inc. v. Cisco Sys., Inc.*, 77 F. Supp. 3d 850, 858 (N.D. Cal. 2014)

(Chen, J.).

IV.     DISCUSSION

A.     **The Court Already Held That the Atripla Agreement Plausibly Contains a No-Generics Restraint**

Plaintiffs allege that Gilead and BMS violated Section 1 of the Sherman Act and state antitrust

analogues through two horizontal agreements that include No-Generics Restraints: the Atripla Agreement

and the Evotaz Agreement.  FAC ¶¶ 104-128, 610-624.  Defendants moved to dismiss these claims and

lost.  Order at 31.  They are now asking the Court to reconsider its decision in the guise of a Rule

12(b)(6) motion, arguing that language in the Atripla Agreement is similar to that in the Japan Tobacco

("JT") exclusive license.  *See* ECF No. 313 ("Mot.") at 14-17.  Defendants' argument is procedurally

improper and substantively meritless.

The Court should reject Defendants' argument as a threshold matter because it is actually a time-

barred and inappropriate request for reconsideration, not a motion pursuant to Rule 12(b)(6).  It is not

based on newly discovery evidence about the Atripla Agreement, an intervening change in law, or any

4

1    other basis for reconsideration.  If Defendants believed the Court committed clear error in finding that

2    Plaintiffs' allegations regarding the Atripla Agreement are sufficient to state a plausible claim for relief,

3    they should have promptly moved for leave to file a motion for reconsideration.  And even if Defendants

4    had complied with Local Rule 7-9, a motion for reconsideration should not "be used as a means to

5    reargue a case or to ask a court to rethink a decision it has made," which is exactly what Defendants are

6    doing here.  *See Fallay*, 2016 WL 888901, at *1.

7          Assuming this Court were to reach the merits of Defendants' reconsideration motion, it shouldn't

8    change its mind.  While Plaintiffs respectfully disagree with the Court's ruling that the JT Agreement is

9    unambiguous and cannot plausibly be read to restrain generic competition, that exclusive license is not

10   the same as the Atripla Agreement.

11         As an initial matter, a dispositive issue for the Court was its finding that the non-compete

12   provisions in the JT Agreement were limited to Japan and therefore could not have anticompetitive effect

13   in the U.S. market.  ECF No. 293 ("JT Order") at 5-8.  The Atripla Agreement undisputedly applies to

14   the U.S. market.  More importantly, Defendants argued, and the Court found persuasive, that the JT

15   Agreement could not be deemed an unreasonable restraint on trade "because the agreement provided that

16   [JT] could terminate the agreement at will and without a penalty."  *Id.* at 11 n.3.  In contrast, the Atripla

17   Agreement *does restrict* the parties' ability to terminate their collaboration and imposes penalties for

18   doing so.  In particular, Gilead or BMS could terminate the agreement if generic versions of the other

19   party's components became available, but the terminating party was required to pay a substantial penalty

20   comprising three years of additional royalty payments.  ECF No. 143-2 ("Atripla Agreement") §§ 14.5,

21   14.6(b).  Plaintiffs have always alleged that these termination provisions are anticompetitive and

22   demonstrate that the Atripla Agreement restrains generic competition.  *See* ECF No. 118 ("Compl.") ¶¶

23   123-126.  Defendants notably do not seek to re-litigate this issue.

24         There are many other dispositive differences between the JT Agreement, as construed by this

25   Court, and the Atripla Agreement.  Most fundamentally, this Court held that the JT Agreement did not

26   restrain JT from making any FDC with generic versions of the Gilead components.  JT Order at 8.  It

27   instead merely prohibited JT from using "Licensed Products"—the products that JT licensed from

28   Gilead—in combination with other components.  That is, the Court construed the term "Licensed

5

Product" to mean only the products that JT licensed from Gilead; it did not include generic versions of those products that JT acquired from others. *Id.* This was "made clear" by the definition of "Licensed Product," which defined the relevant components as ones as to which Gilead had gained approval through an NDA. *Id.*

The Atripla Agreement is starkly different. It did not merely prohibit BMS from making other FDCs with components that it licensed from Gilead; it expressly prohibited BMS from making the "Combination Product" other than pursuant to the terms of the collaboration agreement. It permitted each party to commercialize "any product containing such Party's [components] … *other than the Combination Product.*" Atripla Agreement § 2.9(a) (emphasis added). And the Agreement did *not* define "Combination Product" as comprising only brand components (those made pursuant to an NDA, as in the JT Agreement), but instead expressly defined the "Combination Product" by reference to the components' generic names. *Id.* §§ 1.94, 1.202 and first Recital on p. 1.[2] Defendants reach for an analogy to the JT Agreement by asserting that the Atripla Agreement contemplated that the parties would seek approval of the Combination Product under the NDA process. Mot. at 16. But seeking an NDA for the "Combination Product" is not at all the same as defining that product as comprising only components approved through the NDA process—an FDC could be comprised entirely of generic components yet be approved via an NDA. When Defendants made the same argument in the first motion to dismiss, the Court disagreed. ECF No. 218 at 4. "[T]o the extent 'Combination Product' has any ambiguity, that ambiguity cannot be resolved at the 12(b)(6) phase of proceedings." Order at 24. Nothing in the Court's analysis of the JT Agreement or Defendants' new arguments change that conclusion.

Other provisions of the Atripla Agreement confirm this interpretation. The agreement provides that, once a party's component(s) become available as a generic, the other party can continue to make the FDC with those generics. Atripla Agreement §§ 14.5, 14.6(b)(iii).[3] Yet the agreement continues to

---

[2] Unlike the JT agreement (*see* JT Order at 9), the BMS collaboration agreement referred to the parties' components by both their brand names and their generic names, but defined the "Combination Product" by reference to the latter. And, dispositively, the BMS collaboration agreement did not define the FDC as comprising only components for which Gilead obtained an NDA.

[3] Specifically, the agreement required the terminated party to either supply its (now available generically) component(s) to the surviving party at a generic-level price or grant a royalty-free patent license to the surviving party "or its Third Party designee" to enable them "to [m]anufacture quantities of [the component(s)] in bulk active pharmaceutical ingredient form for use in the [m]anufacture of the

repeatedly refer to the FDC as the "Combination Product."  The penalty provision (requiring post-termination royalty payments to the terminated party) refers to a generic-component-containing product as the "Combination Product." *Id*. § 14.6(b)(ii).  So do the provisions regarding labelling (*id*. § 14.6(b)(i)), those regarding supply/manufacturing (*id*. § 14.6(b)(iii)), and those regarding changes to the collaboration's name (*id*. § 14.6(b)(iv)).

More broadly, the whole purpose of the termination-upon-generic-availability provisions is to permit the surviving party to market the FDC with generic components; until terminated, the agreement prohibited that marketing. Indeed, if the agreement had defined "Combination Product" to comprise only brand components, there would have been no need for the agreement, before termination, to expressly prohibit the parties from making the product outside the collaboration.  A party would have had no ability to make the product with the other's branded components without that party's permission.

In short, the Atripla Agreement's plain terms—the definition of "Combination Product," the express prohibition on making that product outside the collaboration, and numerous post-generic-availability provisions—support the Court's considered conclusion that Plaintiffs plausibly allege that the agreement contains a No-Generics Restraint.  This is plainly sufficient on a motion to dismiss. *See, e.g.*, *In re Zetia (Ezetimibe) Antitrust Litig*., 400 F. Supp. 3d 418, 427–28 (E.D. Va. 2019) (the agreement "must be viewed in the light most favorable to the Plaintiffs and all reasonable inferences from it must be drawn in the Plaintiffs' favor").

### B. The Court Already Upheld Plaintiffs' Claims Based on Gilead's Collaboration Agreements with BMS and Janssen, Which Include Post-Patent Expiration Royalty Provisions

Defendants next challenge *allegations* added to the FAC identifying additional post-patent expiration royalty provisions in Gilead's collaboration agreements with BMS and Janssen.  Mot. at 19-22.  But Defendants are not seeking to dismiss any *claim* on this basis, nor could they.  There is no new cause of action for unlawful royalty payments.  Defendants accordingly cannot use Rule 12(b)(6) to seek

---

Combination Product."  Atripla Agreement §14.6(b)(iii).  The latter option refers to the surviving party making (or having a third party make on its behalf) and using in the Combination Product generic versions of the component(s), i.e., those made pursuant to an ANDA.  Yet whichever option the terminated party chose—itself supplying the bulk API at generic-level prices, or granting a license to the surviving party to make it pursuant to an ANDA—the agreement continues to repeatedly refer to the FDC as the "Combination Product."

dismissal of *allegations* supporting well-pleaded claims; rather, this type of challenge must be brought by way of a motion to strike. *See SocialApps*, 2012 WL 381216, at *2. Defendants do not seek this relief in the alternative, nor could they possibly demonstrate that the post-patent expiration royalty allegations are "redundant, immaterial, impertinent, or scandalous" under Rule 12(f). Plaintiffs do not allege that the newly added contract terms are independently actionable antitrust violations. Rather, the new allegations lend support to Plaintiffs' existing claims already held sufficient. The post-expiration royalty payments are part of the contractual scheme to restrain generic competition and further Gilead's market dominance. *See* Compl. ¶ 178; ECF No. 179 ("Plfs.' Opp. to MTDs") at 3-6, 19-20, 42-43; Jan. 16, 2020 Hrg. Tr. at 8:20-10:9, 56:20-57:16, 69:22-60, 71:11. There is no basis to strike the allegations regarding additional post-expiration royalty provisions.[4]

###  C.   The Court Correctly Deferred Deciding What Level of Antitrust Scrutiny to Apply, Though a Per Se or Quick Look Approach is Appropriate in This Case

Defendants ask the Court to "definitively hold" that the No-Generics Restraints are subject to the rule of reason and cannot be condemned as per se violations of the antitrust laws. Mot. at 24-25. This argument should be rejected for two reasons: (1) the Court already determined that it would be premature to decide which mode of analysis applies to the Restraints on a motion to dismiss; and (2) even if the Court is inclined to reconsider that decision now, the appropriate analytical framework is not full-blown rule of reason analysis, but per se illegality, or at worst an abbreviated, "quick look" approach that— when applied properly with the benefit of fact discovery—will lead to a finding that the No-Generics Restraints violate the antitrust laws.

First, the Court correctly determined that "at this juncture of the proceedings" it would be premature to decide the appropriate level of antitrust scrutiny. *See* Order at 22, 46-47 n.30. While determining the mode of analysis is a question of law, "underpinning that purely legal decision are numerous factual questions." *In re Wholesale Grocery Prod. Antitrust Litig.*, 752 F.3d 728, 733–34 (8th

---

[4] And even if Defendants could satisfy Rule 12(f)'s exacting standard, Plaintiffs' antitrust claims would remain in the case in the exact same form as the Court previously deemed sufficient to withstand Defendants' first round of motions to dismiss. That is why motions to strike are disfavored and often considered "purely cosmetic" or "time wasters." 5 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 1382 (3d ed. 2016).

Cir. 2014).  On a motion to dismiss, "the court simply cannot determine with certainty the nature of the restraint, and by extension, the level of analysis to apply," *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1039-40 (N.D. Cal. 2013).[5]  Nothing has changed in the intervening three months that would support a different approach.  Nor have Defendants met the procedural requirements for a motion for reconsideration.

Defendants are transparently seeking to re-litigate their ancillarity defense in a successive motion to dismiss.  *See* Mot. at 23-24.  They previously argued that the No-Generics Restraints are immune from antitrust scrutiny because the Court should rule as a matter of law that the restraints are ancillary to legitimate joint ventures.  The Court rejected that argument.  Order at 22.  Now they are arguing that the No-Generics Restraints should be evaluated under the rule of reason because the Court should rule as a matter of law that the restraints are ancillary to legitimate joint ventures.  It is the same argument and it should be rejected for the same reasons.  "[T]he court cannot hold that the agreement is ancillary simply because [defendant] posits that it is.  The court must instead make that determination based on factual evidence relating to the agreement's formation and character." *eBay,* 968 F. Supp. 2d at 1039; *Brennan v. Concord EFS, Inc.*, 369 F. Supp. 2d 1127, 1133 (N.D. Cal. 2005) (ancillarity is "quintessentially" a fact question).  This Court did not need to rule on the correct level of scrutiny to reject Defendants' argument for absolute immunity in the original motion to dismiss, and it need not do so now.

Were the Court inclined to the decide the appropriate level of antitrust scrutiny now, it should hold the No-Generics Restraints illegal per se, or at worst hold that they are subject to "quick look" analysis.  *See, e.g.*, *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999); *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986); *Polygram Holding, Inc. v. F.T.C.*, 416 F.3d 29, 35 (D.C. Cir. 2005), *affirming* 136 F.T.C. 310, 344-52 (2003).

The No-Generics Restraints are express non-compete agreements among horizontal competitors.  This type of plainly anticompetitive agreement is one as to which "no elaborate industry analysis is

---

[5] The cases are legion in finding that this determination should await fact discovery.  *See* Plfs.' Opp. to MTDs at 26 n.8; *accord Int'l Constr. Prod. LLC v. Caterpillar Inc.*, 419 F. Supp. 3d 791, 807 (D. Del. 2019); *Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903, 913 n.3 (W.D. Mo. 2019).  Defendants refer the Court to its citation of *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003 (N.D. Cal. 2008), for the proposition that "whether a restraint should be governed by the per se rule or the Rule of Reason is a question of law often appropriate for resolution at the motion-to-dismiss stage."  Mot. at 23.  Notably, that decision was made on a motion for partial summary judgment.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS /
CASE NO. 3:19-CV-02573-EMC

required to demonstrate [its] anticompetitive character." *Indiana Fed'n*, 476 U.S. at 459 (quoting *Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)); *see also Cal. Dental*, 526 U.S. at 769-71.  Moreover, Gilead employed these restraints to prevent its collaborators from making competing FDCs using generic versions of Gilead's drugs *even after the patents protecting those drugs expired*, in exchange sharing the proceeds of that unlawful agreement.  Although patent law grants patentees a limited monopoly through the right to exclude competitors, those legally sanctioned restraints end when the patent expires.  The No-Generics Restraints break this compact, violating the foundational rule that agreements effectively extending the term of a patent are per se illegal.  *See Kimble v. Marvel Entm't, LLC*, 576 U.S. 446, ___, 135 S. Ct. 2401, 2413 (2015) (reaffirming "categorical principle that all patents, and all benefits from them, must end when their terms expire").  Plaintiffs believe those agreements are illegal per se under the antitrust laws, just as *Kimble* and *Brulotte v. Thys Co.*, 379 U.S. 29 (1964), hold they are illegal per se under the patent laws.  But at a minimum there should be no dispute that these naked horizontal agreements to impede generic competition are inherently suspect.

Defendants do not argue that the Restraints are facially above board.  Instead, they have come forward with what they claim are procompetitive justifications, namely that the Restraints are ancillary to legitimate joint ventures and necessary to prevent "free riding."  As Plaintiffs explained the last time Defendants made this very argument, eliminating generic competition is *anticompetitive*, not a legitimate procompetitive justification that can protect an agreement not to compete among horizontal competitors. *See* Plfs.' Opp. to MTDs at 26-27.  An inherently suspect restraint with no permissible justifications is unlawful.  But even if the Court thought a desire to eliminate free riding might qualify as a procompetitive justification, evaluating whether a suspect restraint is in fact sufficiently justified to take it out of per se condemnation is exactly what the quick look test is designed for.  If the justifications are meritorious, there is a rule of reason case to balance them against the harm the agreements provide.  But if they aren't, the case collapses to a per se case and there is no need to proceed with elaborate market definition and market power analysis.  *See Indiana Fed'n*, 476 U.S. at 459.

If this Court is to decide what legal standard to apply right now, Defendants' arguments don't justify applying the rule of reason.  Procompetitive justifications, unless uncontested, are not appropriately considered on a motion to dismiss.  *See, e.g.*, *NCAA v. Bd. of Regents of Univ. of Okla.*, 468

U.S. 85, 113 (1984) (defendants bear "a heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free market"); *Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of R.I.*, No. 13-405 S, 997 F. Supp. 2d 142, 152 (D.R.I. 2014) ("the existence of a business justification is not properly determined on a motion to dismiss"). At most, Defendants' purported procompetitive justifications justify quick look review.[6] All this should await factual development.

### D. Defendants' Narrow Arguments Concerning Antitrust Injury Are Unavailing and, Even if Credited, Would Not Result in Dismissal

Plaintiffs allege several theories of antitrust injury. In their renewed motion, Defendants raise no arguments against the antitrust injury theories previously upheld by the Court, conceding that the Court has already upheld the claims based on the No-Generics Restraints as having caused at least some form of antitrust injury. *See* Order at 36-38. Indeed, of the three "main" theories discussed by the Court, it only questioned one—that an untainted competitor in the position of Janssen or BMS would actually have challenged Gilead's patents prior to their expiration dates. *Id.* at 38. And in granting leave to amend as to that one theory, the Court specifically noted that Defendants' argument "even if credited, . . . would not result in dismissal." *Id.* As a result, even if Defendants were right in every respect, that would not justify dismissal of any cause of action.

In any event, Defendants are wrong. They begin by attacking as "purely speculative" the allegations that an untainted competitor in the position of BMS or Janssen would have any incentive to make FDCs that compete with Prezcobix, Symtuza, Odefsy, or Evotaz even in the absence of the No-Generics Restraints. But the Court already rejected Defendants' general "too speculative" arguments. *Id.* at 37. Defendants do not offer any reason to reconsider that decision. They instead make the same rejected argument as to new drugs, attacking Plaintiffs' allegations specifically as to Janssen or BMS's incentivizes to challenge the Gilead patents on COBI and TAF. The Defendants cite *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008), for the proposition that a plaintiff must allege

---

[6] This was the approach taken by the FTC in *In re Polygram Holding, Inc.*, 136 F.T.C. 310 (2003), *aff'd* 416 F.3d 29 (D.C. Cir. 2005) (applying quick look review to joint venture that marketed joint product by agreeing not to discount or promote competing versions of that product, and finding after a quick look that the agreement not to compete with the joint venture was unlawful).

evidentiary facts sufficient to prove the patents at issue are invalid.  Mot. at 13.  *Kendall* does not require proof of invalidity; if it did, it would be overruled by the Supreme Court's contrary holding in *F.T.C. v. Actavis*, 570 U.S. 136, 159-60 (2013).  *Kendall* does hold that a plaintiff cannot simply allege the ultimate conclusion, but rather must allege the underlying evidentiary facts to support the conspiracy.  But Plaintiffs have done so here by plausibly alleging that Defendants would have been motivated to challenge Gilead's patents if they weren't paid not to do so.

There is nothing implausible in the notion that brand-owning companies might challenge patents when it is in their interest to do so.  The Complaint alleges examples of just such competition elsewhere in the pharmaceutical industry.  *See* FAC ¶ 185.  Nor is it implausible that BMS and Janssen would replace a more expensive Gilead component with a cheaper generic component in their drugs once that cheaper component became available.  To the contrary, that is exactly what we would expect a reasonable company in their position to do—unless, that is, it was paid to keep exclusively using the patented drug even after the patent expires.  Indeed, it is hard otherwise to understand why Gilead would have agreed to share its profits or pay hundreds of millions of dollars to those companies, as the Complaint alleges (and the contracts prove) happened here.  *See id.* ¶¶ 169-186.

We don't know whether the COBI and TAF patents would ultimately be held invalid.  But that's not the right question.  Plaintiffs do not have to show that the patents were invalid to prove that delayed generic entry is anticompetitive.  *See Actavis*, 570 U.S. at 159-60.  What Plaintiffs do allege is that but for the agreement to share profits in exchange for avoiding any such challenge, BMS and Janssen would be motivated to investigate those patents and challenge them if possible.  An untainted competitor in their position might invalidate those patents.  Even if it couldn't, it might well use the threat of a plausible challenge to the patents to negotiate an earlier entry date.[7]  And all Plaintiffs seek in this part of the case is for the Court to invalidate the anticompetitive No-Generics Restraints and give Gilead's collaborators the opportunity to bring such a challenge.

---

[7] Accordingly, courts routinely deny motions to dismiss without inquiring into patent validity. *See, e.g., United Food & Commercial Workers Local 1776,* 74 F. Supp. 3d 1052, 1072 (N.D. Cal. 2014); *In re Zetia*, 400 F. Supp. 3d at 431; *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig*., No. 14-md-2503, 2018 WL 563144 (D. Mass., Jan. 25, 2018); *In re Loestrin 24 Antitrust Litig*., 261 F. Supp. 3d 307, 332 (D.R.I. 2017); *In re Opana ER Antitrust Litig*., 162 F. Supp. 3d 704, 720 (N.D. Ill. 2016). Indeed, plaintiffs can show causation on this ground "even when the patent is likely valid." *In re Cipro Cases I & II*, 348 P.3d 845, 853, 870 n.19, 873 (Cal. 2015) (denying summary judgment on causation).

Defendants also attempt to revisit the notion of whether the No-Generics Restraints caused injury as to Atripla, claiming that BMS was allowed some limited freedom to compete under the agreement. But the current complaint, like the original, specifically alleges that the No-Generics Restraint prevented BMS from bringing a true generic competitor to Atripla to the market.  Compl. ¶¶ 129-130, 140; FAC ¶¶ 115-116, 127.  The "comparable" product that BMS allowed Mylan to bring to the market (containing 3TC instead of the FTC found in Atripla) was not A/B rated to, and therefore not a generic substitute for, Atripla.[8]  That factual allegation suffices to show antitrust injury for purposes of this motion, as indeed this Court has already held.

Causation is a fact-intensive and context-dependent issue that is best left "for the jury to be determined as a fact."  *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 566 (1931); *see also In re Solodyn*, 2018 WL 563144, at *13; *In re Flonase Antitrust Litig.*, 798 F. Supp. 2d 619, 627 (E.D. Pa. 2011).  This Court need not resolve these antitrust injury questions at all, since it has already held that Defendants' challenges are not sufficient to strike down any claim.  But if it does, it should recognize that Plaintiffs have pled sufficient facts to survive a motion to dismiss on the question of whether generic challenges would have occurred but for Gilead's effort to buy them off.

**E.      Plaintiffs Adequately Allege Market Power in the Properly Defined cART Market**

In its Order, the Court recognized that "it is not unreasonable for Plaintiffs to have identified two different product markets because they have claimed harm to competition in two different ways."  Order at 48.  Specifically, Plaintiffs allege harm in narrow markets defined by a given brand drug and its generic equivalents, where other brand drugs are not sufficiently interchangeable to drive down the prices on the given drug like generics do.  And Plaintiffs allege harm in a broader cART market, where the drugs *are* sufficiently interchangeable such that high prices on Gilead's cART drugs drive up prices within the entire market.  The FAC alleges that the prices of *all* branded cART drugs are far more than 10% higher than they would have been absent Defendants' unlawful conduct.  FAC ¶¶ 425, 427 (alleging that non-Gilead participants in market "followed Gilead's price increases up in lockstep").

---

[8] *See, e.g.,* Compl., ¶¶ 174-176 (explaining how lack of substitutability causes harm to consumers); *see also* Order at 36-37 (plaintiffs adequately allege injury from the No-Generics Restraint's effect on a patient's ability to obtain stand-alone components of an FDC).

The Court rejected Defendants' argument that Plaintiffs had failed sufficiently to plead narrow submarkets,[9] but dismissed the claim of a broader cART market because "it is not clear . . . what exactly the cART product market is," and raised the following questions: (1) "how [is] there . . . reasonable interchangeability of use with respect to different cART drugs," (2) "which cART drugs are included and which are not," and (3) "[i]s that market limited to those which contain a Gilead product or does it extend to all cART drugs"? Order at 48-49.  The FAC adds ten pages of allegations explaining the cART market, answering the Court's questions, and further demonstrating Gilead's dominance of the market. *See* FAC ¶¶ 394, 401-423 (explaining different classes or types of antiretroviral drugs and how doctors choose combinations of drugs from those classes or types that target different steps in the HIV life cycle); *id.* ¶ 392 (identifying specific drugs in the cART market, which include non-Gilead drugs).[10]

Defendants contend that the cART market cannot be a relevant product market because some of the drugs are complements to one another rather than substitutes.  However, there is no "black-letter antitrust law" that complements may not be part of a relevant market.  Mot. at 3.  On the contrary, it is obvious that, for example, left loafers and right dress shoes are not directly interchangeable, but may both be in a relevant market for pairs of shoes.  Courts and commentators recognize that complements may be in a relevant product market when they are *partial* substitutes for the product.[11]  Here, although a cART

---

[9] This should dispose of Defendants' rehash of their argument that the allegations of limited cross-elasticity as to brand products contradicts the existence of a broader market.  Plaintiffs allege that "[a]t *competitive prices*, none of the brand drugs exhibits significant, positive cross-elasticity of demand with respect to price with any product other than AB-rated generic versions of the brand drugs." FAC ¶ 372. Defendants omit the italicized qualification in quoting this allegation.  *See* Mot. at 4.  As the FAC explains, "[t]he fact that . . . price competition [between brand cART drugs] is *limited* means that each of the brand cART drugs has market power (is priced above the level that a generic version of the drug would generate); the fact that *some* price competition exists means that brand cART drug prices would be even higher without it."  FAC ¶ 396; *see, e.g., United States v. Cont'l Can Co.*, 378 U.S. 441, 455 (1964) (finding relevant market that included glass containers and metal cans "though the interchangeability of use may not be so complete and the cross elasticity of demand not so immediate" as in a merger between two glass producers); ECF No. 180-1 ("FTC Amicus Brief") at 6-11.

[10] Gilead's share of the cART market in 2019 was 73%, including 80% of prescriptions containing NRTIs, 71% of NNRTIs, 55% of INSTIs, 65% of PIs, and 78% of STRs. *Id.* ¶ 437.

[11] *See* Areeda & Hovenkamp, *Antitrust Law* (4th ed. 2019) at ¶ 565b; *e.g., Allen-Myland, Inc. v. IBM Corp.*, 33 F.3d 194, 207 (3d Cir. 1994) (peripherals and software may be in a relevant market with mainframe computers if there is some degree of interchangeability); *In re IBM Peripherals EDP Devices Antitrust Litig.*, 481 F. Supp. 965, 977-78 (N.D. Cal. 1979) (peripheral and software suppliers should be included with mainframes in computer systems market), *aff'd*, 698 F.2d 1377 (9th Cir. 1983); *see also*

---

drug is a complement when used together with cART drugs of a different class making up a particular combination therapy or FDC, it is also a partial substitute for alternative, reasonably interchangeable, combination therapies or FDCs.  For example, the booster Cobicistat, which is used to increase the effectiveness of certain third agents, is a partial substitute for other third agents that do not need a booster and for combination drugs or therapies that use a different booster.[12]

More generally, "courts should 'combine different products or services into a 'single market' when 'that combination reflects commercial realities.'"  *Ohio v. Am. Express Co.*, — U.S. — 138 S. Ct. 2274, 2285 (2018) ("*Amex*") (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)).  In *Amex*, the Supreme Court held that two sides of a credit-card platform, each of which serves different customers (cardholders and merchants) but works together to supply a single "product" (transactions), should be combined in a single relevant market in order to assess the competitive effects of the restraint at issue.  *Id.* at 2287.  And in *Kodak*, the Ninth Circuit upheld a monopolization verdict against Kodak based on a relevant market comprising all Kodak photocopier parts—even though *no* two parts were interchangeable—in light of the "commercial realities faced by" service competitors and consumers. *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1203-05 (9th Cir. 1997) ("groups of non-

---

*U.S. v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1106, 1159-60 (N.D. Cal. 2004) (providers of specialized enterprise software for one use should be included in market for software for different uses, where such software is generally sold in bundles); *Science Prods. Co. v. Chevron Chem. Co.*, 384 F. Supp. 793, 797 (N.D. Ill. 1974) ("It is apparent that the lawn and garden chemical market includes a variety of products which are complementary rather than directly interchangeable or directly competitive with each other."). To be sure, *some* degree of interchangeability may be insufficient when the question is whether a partial substitute should be included in a narrow market whereby the "competition in one product effectively constrains prices of the other product to the competitive level." Areeda & Hovenkamp, at ¶ 565b n.8. But how much interchangeability is enough is ultimately a fact question.

[12] *See* FAC ¶¶ 66-67 (describing boosters), ¶ 161 (noting that booster RTV, instead of COBI, could be used in combination with DRV to compete with Prezcobix [DRV-COBI], which could be used with generic TDF and 3TC to compete with Symtuza [TAF-FTC-DRV-COBI]); *cf. Safeway Inc. v. Abbot Labs*, 761 F. Supp. 2d 874, 888 (N.D. Cal. 2011) (noting that "boosted PI submarket [may] exist[] within a broader HIV therapy market").  Thus, it is irrelevant that boosters *alone* do not have anti-HIV properties.  Nor is there any problem including drugs in the cART market that are also used for non-HIV purposes.  *See, e.g., Cont'l Can*, 378 U.S. at 457 (defining relevant market to be glass and metal containers with several different end uses); *cf. F.T.C. v. Sysco Corp.*, 113 F. Supp. 3d 1, 38-39 (D.D.C. 2015) (product market may be segmented by use where a hypothetical monopolist could price discriminate against targeted customer groups).

interchangeable products and services may be aggregated to form a single relevant market").[13]

Where, as here, the market is characterized by combinations of therapies and fixed-dose combination drugs, a relevant market that includes all of those components plainly reflects commercial realities.[14]  In short, the FAC's allegations of a cART product market cure the deficiencies identified by the Court and adequately allege a relevant market in which the anticompetitive effects of Defendants' conduct should be analyzed.  *See Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) (since "market definition depends on a factual inquiry into the commercial realities faced by consumers," dismissal appropriate only if "it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect") (internal quotation marks omitted).

## F.   Plaintiffs' Conspiracy-to-Monopolize Claims Based on the Broader cART Market Are Sufficiently Pled

The Court dismissed Plaintiffs' conspiracy-to-monopolize claims principally because the original complaint had failed to adequately allege the existence of the broader cART market.  *See* Order at 15. But the Court also concluded that the complaint had failed to "adequately allege that each non-Gilead defendant knew of its connection to a conspiracy to restrain trade in or monopolize that broader product market," *id*., and suggested that the Plaintiffs must allege that "'the defendant was aware of the unlawful object toward which the agreement [was] directed,'" *id*. at 16 (quoting *United States v. Grasso*, 724 F.3d 1077, 1086 (9th Cir. 2013)). The FAC does not suffer from either of those defects.

Regarding Defendants' knowledge of the conspiracy to monopolize the cART market, the FAC alleges that each of BMS and Janssen knew, when entering into one or more the No-Generics Restraints

---

[13] *See also Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc*., No. 2:16-CV-09127 ODW(JPRx), 2018 WL 735978, at *5 (N.D. Cal. Feb. 6, 2018) ("That the specific types of end-user packaging Plaintiff identifies are not substitutes for each other does not render the product market unsustainable due to the commercial realities of the aerospace sealant market."); *United States v. Hughes Tool Co.*, 415 F. Supp. 637, 640 (C.D. Cal. 1976) ("tools which operate as a group in the performance of [a] function" should be included in relevant market).

[14] Defining a "cluster market" that includes non-interchangeable products is also appropriate to streamline litigation where the conduct and market considerations are similar across a range of products within the cluster.  *See Kodak*, 125 F.3d at 1205-06.  Here, plaintiffs have alleged that Gilead has monopolized and conspired to monopolize the cART market and "narrower markets therein," *see, e.g.,* FAC ¶ 551, but disaggregating the markets into particular classes of cART drugs or dozens of combination or partial combination drug therapies is unnecessary and unduly burdensome where the "anticompetitive conduct at issue transcend[s] individual products." 125 F.3d at 1205.

with Gilead, that:

- *Gilead had or was seeking monopoly power in the cART market*.  They knew that Tenofovir was a critical backbone of cART therapies; TDF had a limited patent life; and Gilead's strategy was to protect its components from competition by relying on the other manufacturers' stronger patents, all in an effort to obtain and maintain a monopoly in the cART market.  FAC ¶ 483.

- *Each of the other had entered into No-Generics Restraints with Gilead*.  BMS knew in 2011 (when entering into the Evotaz restraint) that Janssen had entered into a No-Generics Restraint with Gilead.  *Id*. ¶ 485.  Janssen knew in 2009 (when entering into the Complera restraint) that BMS had entered into a No-Generics Restraint with Gilead regarding Atripla.  *Id*. ¶ 487.  When entering into additional No-Generics Restraints in 2014, Janssen also knew that Gilead was using anticompetitive tactics to switch sales from TDF-based to TAF-based products.  *Id*. ¶ 488.

- *The No-Generics Restraints allowed Gilead to dominate the cART market.*  They knew that Gilead had more than 70% of the cART market, *id.* ¶¶ 484-485, 487, 488, and that collectively the No-Generics Restraints allowed Gilead to tie up more than 75% of sales of NRTIs, 50% of sales of third agents, and 70% of sales of all cART drugs, *id.* ¶¶ 485, 488.

The FAC also plausibly alleges why each of BMS and Janssen conspired with Gilead to monopolize that market: Gilead *paid them* for their participation (via the collaboration agreements' royalty and other provisions).  *Id.* ¶ 170.  And it alleges the monopolization also caused increased prices of all cART drugs, including BMS and Janssen cART drugs.  *Id.* ¶¶ 170, 179, 425-427.  Those defendants also benefitted from Gilead's moving prescriptions from its standalone products to the FDCs, with a resulting increase in sales of the BMS and Janssen components.  Gilead reciprocally agreed to shield BMS and Janssen components from generic competition, and Janssen benefited from increased sales of its components resulting from Gilead's degrading of standalone TAF.  *Id.* ¶¶ 486, 489.

Defendants' challenges to these allegations fail.  Defendants first argue that mere parallel conduct and similar restraints are insufficient to infer a conspiracy *between BMS and Janssen* to help Gilead monopolize the market.  Mot. at 5-7.  But the FAC does not (and never did) allege any such agreement.  It instead alleges that each of BMS and Janssen *conspired with Gilead* to monopolize the market.  BMS and Janssen are jointly and severally liable with Gilead for monopolizing the cART market not because

17

they conspired with each other to monopolize it, but because they each conspired with Gilead to do so.

Contrary to Defendants' contention (Mot. at 5), Plaintiffs need not allege that the conspiracy to monopolize the cART market included all three Defendants. *Church & Dwight Co., Inc. v. Mayer Labs., Inc.*, No. C-10-4429 EMC, 2011 WL 1225912, at *7, *14 (N.D. Cal. Apr. 1, 2011) (Chen, J.) (denying motion to dismiss conspiracy-to-monopolize claim where the exclusionary conduct was a series of agreements between the monopolist supplier and multiple retailers, none of which retailers conspired among themselves); *see also Int'l Travel Arrangers, Inc. v. W. Airlines, Inc.*, 623 F.2d 1255 (8th Cir. 1980); *In re Suboxone* (*Buprenorphine Hydrochloride & Naloxone*); *Antitrust Litig.*, No. 13-MD-2445, 2017 WL 4910673, at *8-9 (E.D. Pa. Oct. 30, 2017); *accord Ward v. Apple Inc.*, 791 F.3d 1041, 1044 (9th Cir. 2015) (assuming viability of claim that Apple conspired with ATTM, through exclusivity agreement, to help ATTM maintain a monopoly in iPhone voice and data services market). Janssen (or BMS) is jointly liable with Gilead for monopolizing the cART market if the jury concludes, as the FAC alleges, that Janssen (or BMS) knew that its FDC-specific agreements with Gilead helped it to monopolize the broader cART market and willingly participated in that effort. As summarized above, the FAC alleges exactly that. Regardless, the FAC also alleges that each of BMS and Janssen in fact knew when entering into at least one of its No-Generics Restraints that the other had likewise entered into such a restraint. FAC ¶¶ 485-488.[15]

Contrary to Defendants' contention (Mot. at 9), the FAC also adequately alleges that each of Janssen and BMS acted with specific intent to monopolize. *See* FAC ¶¶ 482; 483 ("Each of BMS and Janssen knew that Gilead was seeking to obtain and maintain monopoly power in the cART market" and "consciously committed to the monopolization"); *see, e.g.*, *In re Nat'l Football League's Sunday Ticket*

---

[15] BMS tries to dispute the truth of this factual allegation by pointing to the 2009 public version of the Janssen/Gilead Complera agreement and asserting that "key provisions … were redacted" from it. Mot. at 8. But the core No-Generics Restraint was not redacted; it expressly prohibits Janssen from making an AB-rated version of the product. ECF No. 313-2, Burke Decl., Ex. A, § 17.2(a) ("[Janssen] will not import, sell or offer to sell, … the Combination Product other than pursuant to this Agreement"). Indeed, that public version was the basis for Plaintiffs' original, accurate (and legally sufficient) allegation that the Complera agreement includes a No-Generics Restraint. Compl. ¶ 145. The "key clause" that Defendants say was redacted from the agreement was just the additional proviso that the restraint also extends beyond AB-rated products to "comparable" products—those containing 3TC rather than FTC. *See* Burke Decl., Ex. A § 17.2(a)(ii)(B). Even if BMS did not deduce from the redacted agreement the *full reach* of the restraint, Defendants' exhibit confirms, rather than negates, BMS's knowledge that the Complera agreement contained a No-Generics Restraint at least with respect to AB-rated generic competition.

*Antitrust Litig.*, 933 F.3d 1136, 1159 (9th Cir. 2019) (reversing dismissal of a conspiracy-to-monopolize claim because "the complaint adequately alleges that the … agreements were designed to maintain market power, which is sufficient to allege defendants' specific intent").  Even if it had not done so, proof of intent can be inferred from the fact that the conspirator engaged in conduct likely to create or maintain the monopoly.   *See, e.g.*, *Talking Yellow Pages, Inc. v. Pacific Telesis Grp.*, 972 F.2d 1343 (9th Cir. 1992); *Thurman Indus., Inc. v. Pay'n Pak Stores, Inc.*, 875 F.2d 1369, 1378 (9th Cir. 1989); *Gough v. Rossmoor Corp.*, 585 F.2d 381, 390 (9th Cir. 1978); *accord American Tobacco Co. v. United States,* 328 U.S. 781, 809 (1946) ("Where the conspiracy is proved, as here, from the evidence of the action taken in concert by the parties to it, it is all the more convincing proof of an intent to exercise the power of exclusion acquired through that conspiracy.").  Indeed, "[s]pecific intent to monopolize will normally be proved by inference from conduct."  *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627 F.2d 919, 926 (9th Cir. 1980).  And the existence of market power fortifies the inference of specific intent from the anticompetitive conduct.  *Id.* at 927 (reversing conspiracy-to-monopolize claim where plaintiff alleged substantial market power and exclusionary conduct likely to maintain that power); *see also Fleer Corp. v. Topps Chewing Gum, Inc.,* 658 F.2d 139, 154 (3d Cir. 1981).

Defendants erroneously rely on *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 728, 731 (D. Md. 2001), *aff'd sub nom. Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002), where the complaint alleged that Microsoft's *customers* conspired with it to monopolize the market and thereby *raise its prices to themselves*.  The court held that the customers did not share Microsoft's goal of monopolizing the market, but rather (like all other Microsoft customers) merely accepted the terms that Microsoft forced on them.  *Id.* at 731-732.  Here, in contrast, the FAC alleges that Gilead and its horizontal competitors conspired to monopolize the cART market and share the monopoly profits that it generated.  FAC ¶¶ 486, 489.

### G. Plaintiffs' Allegations Relating to the TAF Patent Term Extension Are Not Subject to Dismissal Under *Noerr-Pennington*

The FAC adds new allegations of anticompetitive conduct in connection with Gilead's delay in developing TAF, namely Gilead's obtaining a patent term extension ("PTE") on a patent covering TAF.  *See* FAC ¶¶ 348-370.  After the original complaint was filed, the U.S. Patent and Trademark Office

19

("PTO") approved Gilead's application for PTE of approximately three years, extending its '791 TAF patent on Genvoya, a TAF-based FDC, from May 2022 to April 2025.  *Id.* ¶ 353.  The FAC alleges that this extension, which the PTO was powerless to deny, was a perversion of the Hatch-Waxman Act's PTE provisions and an integral part of Gilead's anticompetitive scheme to protect and extend its Tenofovir franchise and monopolize the cART market.  *Id.* ¶¶ 357-58.

Had Gilead not intentionally delayed the development and approval of TAF, Gilead would have obtained FDA approval of its first TAF-based product no later than January 2010 (rather than November 2015) and been eligible for only about one year of PTE.  FAC ¶ 359 & n.1.  In that event, the last of its principal TAF patents would expire in May 2023 rather than April 2025.  *Id.*  Delaying TAF made no economic sense by itself; even with the extra PTE, Gilead sacrificed 3.5 years of patent-protected sales of TAF.  *Id.* ¶¶ 359, 360.  But particularly with the extra PTE, delay did make sense as part of Gilead's scheme to extend its monopoly, transition its Tenofovir franchise from TDF-based to TAF-based products, and maximize the *combined* period of market exclusivity for Gilead Tenofovir-based products.  *Id*. ¶ 363.

Gilead's argument that its anticompetitive "delay and extend" tactic is protected by the *Noerr-Pennington* doctrine is wrong for two reasons.  First, the conduct is not protected by *Noerr* under the well-recognized exception for petitioning that seeks ministerial rather than discretionary action from the government.  Second, there is no immunity for petitioning conduct that is an integral part of a larger overall scheme to restrain trade.  Indeed, Plaintiffs do not challenge the lawfulness of Gilead's PTE extension as such; rather, they challenge the *extra* PTE that Gilead obtained as a consequence of its anticompetitive scheme.[16]

### 1.    Gilead's Obtaining Extra PTE *Because* It Delayed TAF Is a Perversion of the Statute

Congress included PTE as part of the Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch Waxman Act") in order to remedy the distortion that "the early years of the patent term were spent obtaining premarket approval for the patented invention rather than generating profits."

---

[16] In its motion, Gilead does not dispute that without *Noerr* immunity, its manipulation of the timing of its PTE application would violate the Sherman Act.

*Proveris Scientific Corp. v. Innovasystems, Inc.*, 536 F.3d 1256, 1260-61 (Fed. Cir. 2008) (citing *Eli Lilly & Co. v. Medtronic Inc.*, 496 U.S. 661, 669 (1990)).  The statute extends the period of a pharmaceutical patent's term for a portion of the patent term that the patentee loses, through no fault of its own, while its drug is in clinical development and/or awaiting FDA approval and "is unable to reap a profit for the patent holder."  *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, No. C95-03577-DLJ, 2008 WL 4647384, at *4 (N.D. Cal. Oct. 20, 2008).

Congress limited the eligible regulatory review period to the period after the patent issues in order to limit drug patent terms.  35 U.S.C. § 156(c); *see* Alan D. Lourie, *Patent Term Restoration: History, Summary, and Appraisal*, 40 Food Drug Cosm. L. J. 351, 356 (1985).  And Congress excluded from consideration any part of the regulatory review period during which the applicant "did not act with due diligence," 35 U.S.C. § 156(c)(1), to "ensure that a drug developer does not delay development of a product based on the assurance that any loss of patent life resulting from his dilatory activity would later be restored by statute."  Lourie at 356.  But Gilead took advantage of an unintended loophole in the Act that enables an applicant to obtain *more* PTE by delaying the testing and approval phase until after the patent issues.[17]  With its TDF-based monopoly protected by unlawful No-Generics Restraints, Gilead could afford to hold TAF for its line-extension strategy.  *See* FAC ¶ 357.  And by delaying the testing phase until after the patents issued, it could use the extra PTE to extend TAF's patent life and ensure that the line-extension strategy would be profitable.

### 2. *Noerr* Does Not Apply Because the Role of the PTO and FDA Is Ministerial

Gilead's obtaining *more* PTE by delaying the regulatory process flouts the intent of Congress.  But the PTO had no choice but to grant Gilead's PTE application.  Neither the PTO nor the FDA (which determines the applicable regulatory review period) has authority to consider whether a lack of diligence during the period before the patent issued warrants a reduction in the PTE to which the applicant is otherwise entitled.  *See* 35 U.S.C. § 156(c)(1); FAC ¶ 356.

The *Noerr* doctrine does not protect this regulatory abuse from the otherwise governing antitrust law.  It is well settled that "petitions" seeking merely ministerial or non-discretionary action from the

---

[17] Gilead delayed reactivating the process for seeking approval for TAF until September 28, 2010, which was the exact date that the PTO issued the second of its TAF patents.  FAC ¶ 366.

government are not immunized by the *Noerr-Pennington* doctrine.  *See In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 369 (S.D.N.Y. 2002) ("in deciding whether a particular type of conduct is petitioning activity for *Noerr-Pennington* purposes, it is critical to distinguish between activities in which the government acts or renders a decision only after an independent review of the merits of a petition and activities in which the government acts in a merely ministerial or non-discretionary capacity"); *Organon Inc. v. Mylan Pharms., Inc.*, 293 F. Supp. 2d 453, 458 (D.N.J. 2003) ("*Noerr Pennington* immunity will not extend to activities that do not petition the government to make an independent decision on the merits and where the government acts in merely a ministerial fashion."); *see generally* Enforcement Perspectives on the *Noerr-Pennington* Doctrine: An FTC Staff Report 18-22 (2006) ("FTC *Noerr* Report") (discussing case law endorsing ministerial exception and taking "the view that protected petitioning involves an effort to induce some exercise of governmental discretion or judgment").

Following this principle, courts have held that a brand drug manufacturer's "request" to the FDA to list a patent in the Orange Book is not protected by *Noerr* because "the FDA's actions are non-discretionary and do not reflect any decision as to the validity of the representations in an Orange Book listing."  *Buspirone*, 185 F. Supp. 2d at 371; *Organon*, 293 F. Supp. 2d at 458-59 ("not an independent governmental determination"); *see also In re: Lantus Direct Purchaser Antitrust Litig.*, 950 F.3d 1, 12 (1st Cir. 2020) (holding that improper Orange Book listing may violate Section 2 even if the resulting patent litigation is not a sham; regulation provides no immunity).  And this is true even though "[t]he FDA does have a limited process for allowing parties to dispute the accuracy or relevance of patent information submitted to the FDA and listed in the Orange Book."  *Buspirone*, 185 F. Supp. 2d at 371.  Likewise, courts have held that tariff filings submitted to regulators are not protected by *Noerr* when the filings are not substantively approved by the regulators.[18]

Here, too, the role of the PTO and the FDA in considering an application for patent term

---

[18] *See, e.g., Litton Sys., Inc. v. AT&T Co.*, 700 F.2d 785, 806-809 (2d Cir. 1983) (interface tariff not immune even though the FCC allowed it to go into effect and ultimately set it aside; "[t]he decision to impose and maintain the interface tariff was made in the AT&T boardroom, not at the FCC"); FTC *Noerr* Report at 19 n.81 (collecting tariff filing cases); *cf. Phonetele, Inc. v. AT&T Co.*, 664 F.2d 716, 736 & n.52 (9th Cir. 1981) (same conduct as *Litton*; no state action immunity when state agency passively accepts a public utility's tariff); *see also In re: Lipitor Antitrust Litig.*, 868 F.3d 231, 264-66 (3d Cir. 2017) (judicial approval of consent decree not protected by *Noerr*; "[p]assive government approval is insufficient").

extension does not involve the exercise of discretion, but rather is ministerial.  The statute provides that the patent term "shall be extended" up to five years if certain conditions are met.  35 U.S.C. § 156(a); *see Merck & Co. v. Hi-Tech Pharmacal Co.*, 482 F.3d 1317, 1322 (Fed. Cir. 2007) ("use of the word 'shall' indicates that if the enumerated list of requirements is met, the patent term is entitled to be extended").  The PTO's inquiry under § 156 is limited to "ministerial questions, like whether the patent has expired, whether previous terms extensions have been granted, and the extent to which the product was subject to regulatory review prior to its commercial marketing or use."  *Schering Corp. v. Mylan Pharms., Inc.*, No. 09-6383 JLL, 2011 WL 1885709, at *4 (D.N.J. May 17, 2011); *see also* H.R. Rep. 98-857(I), at 43 (1984), 1984 U.S.C.C.A.N. 2647, 2676 ("the Committee expects that most reviews would be ministerial in nature").  The FDA's role in determining the applicable regulatory review period is also ministerial.  *See* Dept. of Health & Human Servs, FDA, 67 Fed. Reg. 65358-02 (Oct. 24, 2002) (describing FDA's function as "straightforward" and "ministerial").[19]  Given the PTO and FDA's lack of discretion in the matter, Gilead's application for PTE is not protected by *Noerr*.

### 3. Even if Gilead's PTE Conduct Alone Would Otherwise Be Protected by *Noerr*, the Conduct Is Actionable as an Integral Part of Gilead's Unlawful Scheme

"'It is well-settled that First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute.'"  *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1263 (9th Cir. 1982) (quoting *Cal. Motor Trans. Co. v. Trucking Unlimited*, 404 U.S. 508, 514 (1971)).  Thus, the Ninth Circuit has held that when "petitioning activity is but a part of a larger overall scheme to restrain trade, there is no overall immunity."  *Id.* at 1263 (holding that "general antitrust principles" applied to protests before the ICC made in furtherance of

---

[19] *See also* 67 Fed. Reg. at 65358-02 ("Our role is not to probe a drug's investigational course and determine at what point in that course emerges the 'approved human drug product.' To do so would be to insert into a purely ministerial function an arbitrary element of uncertainty that would clearly subvert the purpose of the statute.").  To be sure, an FDA due diligence determination (regarding conduct *after* patent issuance), which can only be triggered by a third party petition, may involve the exercise of discretion, but it made no such determination here and rarely, if ever, does so.  *See* Jaime F. Cardenas-Navia, *Thirty Years of Flawed Incentives: An Empirical and Economic Analysis of Hatch-Waxman Patent-Term Restoration*, 29 Berkley Tech. L.J. 1301, 1359 (2015) ("Since Hatch-Waxman's enactment in 1984, three due diligence petitions have been filed" and "no determination on due diligence has ever been made").

an unlawful scheme).[20]  Numerous courts in this district and elsewhere have held that otherwise-protected petitioning "can be part of an unlawful anticompetitive scheme" if it is "causally connected to [other] anticompetitive harms."  *Hynix Semiconductor Inc. v. Rambus Inc.*, 527 F. Supp. 2d 1084, 1097 (N.D. Cal. 2007).[21]  And even if petitioning activity that is part of an overall scheme were not a permissible basis for antitrust liability, other courts hold that an antitrust plaintiff may obtain damages for the harm inflicted by petitioning activity when such harm is caused by other unlawful anticompetitive conduct.[22]

Here, the FAC alleges that Gilead's conduct in obtaining extra PTE was an integral part of its unlawful anticompetitive scheme to monopolize.  That scheme included Gilead's use of unlawful tactics to protect TDF from generic competition, which enabled it to shelve the commercialization of TAF so that it could be used as a line extension when generic TDF competitors eventually entered, as well as

---

[20] *See also Handguards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 994 (9th Cir. 1979) (otherwise-protected enforcement of a patent may give rise to liability if the suit "'was brought in furtherance of and as an integral part of a plan to violate the antitrust laws,'" quoting *Rex Chainbelt Inc. v. Harco Prods., Inc.*, 512 F.2d 993, 1006 (9th Cir. 1975)); *Killian Pest Control, Inc. v. Hometeam Pest Defense, Inc.*, No. 14-CV-05239-VC, 2015 WL 13385918, at *4 (N.D. Cal. Dec. 21, 2015) ("litigation that would normally be protected under *Noerr-Pennington* (because it is not objectively baseless) may still give rise to an antitrust claim if the litigation is part of a larger plot by the defendant to violate antitrust laws"); *Allflex USA, Inc. v. Avid Identification Sys., Inc.*, No. 5:06-CV-01109-MRP, 2010 WL 11405130, at *13 (C.D. Cal. Feb. 16, 2010) ("scheme [to monopolize] can be premised on infringement suits brought as an integral part of a plan to violate the antitrust laws"); *Cal. Energy Co. v. S. Cal. Edison, Co.*, No. C 91-0319-JPV, 1992 WL 330263, at *3 (N.D. Cal. Sep. 22, 1992) (noting that petitioning activity "could be used to establish elements of an antitrust conspiracy claim when the petitioning activity was but a part of a larger overall scheme to restrain trade").

[21] *See Arista Networks, Inc. v. Cisco Sys. Inc.*, No. 16-cv-00923, ECF No. 281, at 17 (N.D. Cal. May 21, 2018) ("persuaded by the reasoning of *Hynix*," and holding that non-sham litigation could be actionable as part of scheme to monopolize); *Funai Electric Co. v. LSI Corp.*, No. 16-CV-01210-BLF, 2017 WL 1133513, at *6 (N.D. Cal. Mar. 27, 2017) (noting *Hynix*'s "exhaustive survey of relevant authority," and holding that non-sham petition to the International Trade Commission could be part of overall anticompetitive scheme); *Microsoft Mobile Inc. v. Interdigital, Inc.*, No. CV 15-723-RGA, 2016 WL 1464545, *3 (D. Del. Apr. 13, 2016) ("reasoning in *Hynix* [is] persuasive"); *Zenith Elecs., LLC v. Septre, Inc.*, No. 14-05150 JAK, 2015 WL 12765633, at *6 & n.2 (C.D. Cal. Feb. 5, 2015); *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 2571719, at *27 (N.D. Cal. June 30, 2012).

[22] *See, e.g.*, *Amphastar Pharms. Inc. v. Momenta Pharms., Inc.*, 850 F.3d 52, 58 (1st Cir. 2017) (holding that *Noerr* does not prevent plaintiff from obtaining damages resulting from a *Noerr*-protected injunction when the antitrust violation is a material cause of the injunction).  *Sessions Tank Liners, Inc. v. Joor Mfg., Inc.*, 17 F.3d 295 (9th Cir. 1994), is not to the contrary.  *Sessions* merely holds that injuries that "flowed directly from government action" are not recoverable in the absence of "independent marketplace harm."  *Id.* at 299.

24

Gilead's use of unlawful tactics to switch patients from TDF- to TAF-based FDCs as part of the line extension.  Under the *Clipper Exxpress* line of cases, Gilead's petitioning conduct may be included as part of Plaintiffs' claim that Gilead's overall scheme violates Section 2 of the Sherman Act—a claim this Court has already held sufficient even without this extra evidence.  As in *Hynix*, "other aspects of the scheme independently produce[d] anticompetitive harms," 527 F. Supp. 2d at 1097, including Gilead's anticompetitive tactics to delay commercializing TAF.  *See, e.g.*, FAC ¶¶ 213-214, 369-370 (delay and switch enabled Gilead to thwart generic competition, caused deaths, and prevented Plaintiffs from obtaining superior products at similar prices).  And as in *Hynix*, the causal connection to the other anticompetitive conduct is clear because the petitioning conduct (obtaining the extra PTE) was critically important to the success of Gilead's line-extension strategy.  *See id.* ¶ 349 ("obtaining PTE on the TAF patents was essential to make the [delay-and-switch] tactic work for Gilead"); *cf. Hynix*, 527 F. Supp. 2d at 1098 (Rambus's scheme "ineffective without the threat of litigation").  In sum, even if Gilead's PTE regulatory abuse were protected by *Noerr*, Plaintiffs' allegations are sufficient to include that conduct as part of its overall scheme to monopolize.  And even if none of that were true, this Court has the power to reject the extra PTE as a remedy for harm caused by Gilead's other anticompetitive conduct.

## V.    CONCLUSION

For these reasons, Defendants' renewed motion to dismiss should be denied in its entirety.

Dated:  June 2, 2020                                    HILLIARD & SHADOWEN LLP

By:   */s/ Steve D. Shadowen*
STEVE D. SHADOWEN (*pro hac vice*)
steve@hilliardshadowenlaw.com
RICHARD BRUNELL (*pro hac vice*)
rbrunell@hilliardshadowenlaw.com
MATTHEW C. WEINER (*pro hac vice*)
matt@hilliardshadowenlaw.com
FRAZAR W. THOMAS (*pro hac vice*)
fraz@hilliardshadowenlaw.com
1135 W. 6th Street, Suite 125
Austin, TX 78703
Telephone:  (855) 344-3298
Facsimile:  (361) 882-3015

1   DARALYN J. DURIE (SBN 169825)
    ddurie@durietangri.com
2   MARK A. LEMLEY (SBN 155830)
    mlemley@durietangri.com
3   DAVID McGOWAN (SBN 154289)
    dmcgowan@durietangri.com
4   LAURA E. MILLER (SBN 271713)
    lmiller@durietangri.com
5   ADITYA V. KAMDAR (SBN 324567)
    akamdar@durietangri.com
6   217 Leidesdorff Street
    San Francisco, CA 94111
7   Telephone:  (415) 362-6666
    Facsimile:  (415) 236-6300
8
    DURIE TANGRI LLP
9   W. HENRY HUTTINGER (SBN 312843)
    hhuttinger@durietangri.com
10  953 East 3rd Street
    Los Angeles, California 90013
11  Telephone: (213) 992-4422
    Facsimile:  (415) 236-6300
12
    HAGENS BERMAN SOBOL SHAPIRO LLP
13  STEVE W. BERMAN (*pro hac vice*)
    steve@hbsslaw.com
14  1301 Second Avenue, Suite 2000
    Seattle, WA 98101
15  Telephone: (206) 623-7292
    Facsimile: (206) 623-0594
16
    HAGENS BERMAN SOBOL SHAPIRO LLP
17  THOMAS M. SOBOL (*pro hac vice*)
    tom@hbsslaw.com
18  KRISTEN A. JOHNSON (*pro hac vice* pending)
    kristenj@hbsslaw.com
19  GREGORY T. ARNOLD (*pro hac vice*)
    grega@hbsslaw.com
20  55 Cambridge Parkway, Suite 301
    Cambridge, MA 02142
21  Telephone: (617) 482-3700
    Facsimile: (617) 482-3003
22
    *Interim Co-Lead Counsel for End-Payor Plaintiffs*
23
    RADICE LAW FIRM, P.C.
24  JOHN RADICE (*pro hac vice*)
    jradice@radicelawfirm.com
25  DAN RUBENSTEIN (*pro hac vice*)
    drubenstein@radicelawfirm.com
26  475 Wall Street
    Princeton, NJ 08540
27  Telephone: (646) 245-8502
    Facsimile: (609) 385-0745
28

26

SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
JAYNE A. GOLDSTEIN (*pro hac vice*)
jgoldstein@sfmslaw.com
1625 North Commerce Parkway, Suite 320
Fort Lauderdale, FL  33326
Telephone: (954) 515-0123
Facsimile: (866) 300-7367

SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
NATALIE FINKELMAN BENNETT (*pro hac vice*)
nfinkelman@sfmslaw.com
MICHAEL OLS (*pro hac vice*)
mols@sfmslaw.com
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (610) 891-9880
Facsimile: (866) 300-7367

SPERLING & SLATER, P.C.
PAUL E. SLATER (*pro hac vice*)
pes@sperling-law.com
EAMON P. KELLY (*pro hac vice*)
ekelly@sperling-law.com
ALBERTO RODRIGUEZ (*pro hac vice*)
arodriguez@sperling-law.com
DAVID P. GERMAINE (*pro hac vice*)
dgermaine@sperling-law.com
55 West Monroe, Suite 3200
Chicago, IL 60603
Telephone: (312) 641-3200
Facsimile: (312) 641-6492

LOCKRIDGE GRINDAL NAUEN PLLP
HEIDI M. SILTON
hmsilton@locklaw.com
KAREN H. RIEBEL (*pro hac vice*)
khriebel@locklaw.com
JESSICA N. SERVAIS (*pro hac vice*)
jnservais@locklaw.com
100 Washington Ave. S., Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

PRITZKER LEVINE LLP
ELIZABETH C. PRITZKER (SBN 146267)
ecp@pritzkerlevine.com
JONATHAN K. LEVINE (SBN 220289)
jkl@pritzkerlevine.com
BETHANY CARACUZZO (SBN 190687)
bc@pritzkerlevine.com
180 Grand Avenue, Suite 1390
Oakland, CA 94612
Telephone: (415) 692-0772
Facsimile: (415) 366-6110

27

1   GUSTAFSON GLUEK PLLC
    DANIEL C. HEDLUND (*pro hac vice* pending)
2   dhedlund@gustafsongluek.com
    MICHELLE J. LOOBY (*pro hac vice* pending)
3   mlooby@gustafsongluek.com
    120 South 6th Street, Suite 2600
4   Minneapolis, MN 55402
    Telephone: (612) 333-8844
5   Facsimile: (612) 339-6622

6   GLANCY PRONGAY & MURRAY
    KEVIN F. RUF (SBN 136901)
7   kruf@glancylaw.com
    LIONEL Z. GLANCY (SBN 134180)
8   lglancy@glancylaw.com
    1925 Century Park East, Suite 2100
9   Los Angeles, CA 90067
    Telephone: (310) 201-9150
10  Facsimile: (310) 201-9160

11  GLANCY PRONGAY & MURRAY
    LEE ALBERT (*pro hac vice* pending)
12  lalbert@glancylaw.com
    BRIAN P. MURRAY (*pro hac vice* pending)
13  bmurray@glancylaw.com
    GREGORY B. LINKH (*pro hac vice* pending)
14  glinkh@glancylaw.com
    BRIAN D. BROOKS (*pro hac vice*)
15  bbrooks@glancylaw.com
    230 Park Avenue, Suite 530
16  New York, NY 10169
    Telephone: (212) 682-5340
17  Facsimile: (212) 884-0988

18  NUSSBAUM LAW GROUP, P.C.
    LINDA P. NUSSBAUM (*pro hac vice*)
19  lnussbaum@nussbaumpc.com
    BART D. COHEN (*pro hac vice* pending)
20  bcohen@nussbaumpc.com
    1211 Avenue of the Americas, 40th Floor
21  New York, NY 10036
    Telephone: (917) 438-9189
22
    SPECTOR ROSEMAN & KODROFF P.C.
23  EUGENE SPECTOR (*pro hac vice* pending)
    espector@srkattorneys.com
24  JEFFREY KODROFF (*pro hac vice* pending)
    jkodroff@srkattorneys.com
25  WILLIAM CALDES (*pro hac vice* pending)
    bcaldes@srkattorneys.com
26  JEFFREY SPECTOR (*pro hac vice* pending)
    jspector@srkattorneys.com
27  2001 Market Street, Suite 3420
    Philadelphia, Pennsylvania 19103
28  Telephone: (215) 496-0300
    Facsimile: (215) 496-6611

28

*Counsel for End-Payor Plaintiffs*

1

**FILER'S ATTESTATION**

2

     Pursuant to Local Rule 5-1(i)(3) of the Northern District of California, regarding signatures, I, W.

3

Henry Huttinger, attest that concurrence in the filing of this document has been obtained.

4

Dated: June 2, 2020                                          */s/ W. Henry Huttinger*

5

                                                       W. HENRY HUTTINGER

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS /
CASE NO. 3:19-CV-02573-EMC

1

**<u>CERTIFICATE OF SERVICE</u>**

2

     I hereby certify that on June 2, 2020 the within document was filed with the Clerk of the Court

3

using CM/ECF which will send notification of such filing to the attorneys of record in this case.

4

                          */s/ W. Henry Huttinger*

5

                          W. HENRY HUTTINGER

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS /
CASE NO. 3:19-CV-02573-EMC