1
2
3
4                    UNITED STATES DISTRICT COURT
5                  NORTHERN DISTRICT OF CALIFORNIA
6
7    PETER STALEY, et al.,                Case No.  19-cv-02573-EMC
8                  Plaintiffs,
9          v.
                                          ORDER GRANTING IN PART AND
10   GILEAD SCIENCES, INC., et al.,       DENYING IN PART DEFENDANTS'
                                          MOTION TO DISMISS FIRST
11                 Defendants.            AMENDED CONSOLIDATED CLASS
                                          ACTION COMPLAINT
12
                                          Docket No. 313
13
14
15          In the instant action, Plaintiffs allege that Defendants (Gilead, BMS, and Janssen) have

16   violated antitrust law because of, *inter alia*, (1) agreements Defendants entered into that contain

17   "No-Generics Restraints," (2) Gilead's inclusion of "most favored entry" clauses in its settlement

18   agreements with a generic manufacturer (Teva), and (3) the way Gilead commercialized of one of

19   its key drugs (TAF).

20          Previously, the Court granted in part and denied in part Defendants' motion to dismiss

21   Plaintiffs' original complaint.  Plaintiffs were given leave to amend to cure the deficiencies and

22   Plaintiffs thus filed a first amended consolidated class action complaint ("FACC").  Defendants

23   now move to dismiss the FACC.  According to Defendants, Plaintiffs have not cured the

24   deficiencies identified by the Court.  Defendants also argue that new theories of liability tendered

25   by Plaintiffs are not viable.

26          Having considered the parties' briefs and accompanying submissions, as well as the oral

27   argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part Defendants' motion

28   to dismiss.

United States District Court
Northern District of California

# I.    FACTUAL & PROCEDURAL BACKGROUND

Plaintiffs assert violations of federal and state antitrust law as well as state consumer protection law.  All claims are based on the three categories of anticompetitive conduct identified above, as well as two new categories of anticompetitive conduct (*e.g.*, Gilead's obtaining a patent term extension on a TAF-related patent).  In addition, all claims are predicated on a broad product market (*i.e.*, the cART product market) and narrower product markets contained therein (*i.e.*, a market for a brand drug and its generic equivalent).

The specific causes of action are as follows.

- **Counts 1 and 4 (against all Defendants):** Conspiracy to monopolize in violation of §§ 1 and 2 of the Sherman Act (Count 1) and in violation of state antitrust law (Count 4).

- **Counts 2 and 5 (against Gilead and BMS):** Conspiracy to monopolize in violation of §§ 1 and 2 of the Sherman Act (Count 2) and in violation of state antitrust law (Count 5).

- **Counts 14 and 15 (against Gilead and BMS):** Conspiracy in violation of § 1 of the Sherman Act (Count 14) and in violation of state antitrust law (Count 15).

- **Counts 3 and 6 (against Gilead and Janssen):** Conspiracy to monopolize in violation of §§ 1 and 2 of the Sherman Act (Count 3) and in violation of state antitrust law (Count 6).

- **Counts 12 and 13 (against Gilead and Janssen):** Conspiracy in violation of § 1 of the Sherman Act (Count 12) and in violation of state antitrust law (Count 13).

- **Counts 7 and 8 (against Gilead):** Monopolization in violation of § 2 of the Sherman Act (Count 7) and in violation of state antitrust law (Count 8).

- **Counts 9 and 10 (against Gilead):** Attempted monopolization in violation of § 2 of the Sherman Act (Count 9) and in violation of state antitrust law (Count 10).

- **Count 11 (against all Defendants):** Violation of state consumer protection law.  (This claim includes allegations that Defendants concealed the existence and nature of the alleged conspiracy between Gilead and the other defendants.)

# II.    DISCUSSION

A.    Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain

2

1 statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A

2 complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil

3 Procedure 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss

4 after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic*

5 *Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must

6 . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765

7 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true

8 and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St.*

9 *Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a

10 complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient

11 allegations of underlying facts to give fair notice and to enable the opposing party to defend itself

12 effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted). "A claim has facial

13 plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

14 inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The

15 plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

16 possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

17 B.     Defendants' Arguments

18        In their motion to dismiss, Defendants raise seven arguments.

19        (1) Plaintiffs have failed to adequately allege that the Atripla Agreement between

20            Gilead and BMS contains a No-Generics Restraint.

21        (2) Plaintiffs have failed to adequately allege a cART product market.

22        (3) Plaintiffs have failed to adequately allege an overarching conspiracy involving all

23            Defendants, or even just bilateral conspiracies (*i.e.*, between (a) Gilead and BMS

24            and (b) Gilead and Janssen).

25        (4) Plaintiffs have failed to adequately allege an antitrust injury based on the theory

26            that untainted competitors in BMS and Janssen's positions would have challenged

27            Gilead's unexpired patents.

28        (5) Plaintiffs have failed to adequately allege a new liability theory based on BMS

1    and/or Janssen paying royalties to Gilead even after its patents had expired.

2         (6) Plaintiffs have failed to adequately allege a new liability theory based on Gilead's

3              obtaining a patent term extension from the PTO on a TAF-related patent.

4         (7) The Court should hold now that the No-Generics Restraints are subject to the rule

5              of reason (*i.e.*, they are not per se invalid).

6         Each of these arguments is addressed below.  The Court acknowledges Plaintiffs'

7    contention that some of the arguments are procedurally improper – *e.g.*, the arguments should

8    have been raised in a motion to reconsider or in a motion to strike, and not in a second 12(b)(6)

9    motion.  The Court nonetheless addresses all of Defendants' arguments.

10   C.   <u>No-Generics Restraint in Atripla Agreement</u>

11        In December 2004, Gilead and BMS entered into the Atripla Agreement.  Atripla is the

12   brand version of the FDC made up of (1) TDF/FTC (Gilead's drugs) and (2) EFV (BMS's drug).

13   According to Plaintiffs, the Atripla Agreement was for the benefit of Gilead – *i.e.*, to protect its

14   vulnerable NRTIs (TDF and FTC).  Defendants argue that the Court should dismiss all claims to

15   the extent they are based on the Atripla Agreement because that agreement does not actually

16   contain a No-Generics Restraint.

17        In their prior motion to dismiss, Defendants presented the same argument.  The Court

18   rejected the argument, holding that there was a provision in the agreement (§ 2.9(a)) that was

19   plausibly a No-Generics Restraint.  *See* Docket No. 273 (Order at 23-24) (finding that there was

20   ambiguity in the contract and that the ambiguity could not be resolved at the 12(b)(6) phase of

21   proceedings).  In the pending motion, Defendants effectively ask the Court to reconsider this prior

22   ruling.  They rely in large part on a recent order in which the Court held that an agreement

23   between Gilead and Japan Tobacco did not plausibly contain a No-Generics Restraint.  *See*

24   *generally* Docket No. 293 (order).

25        Plaintiffs object to Defendants' argument because they did not file a motion to reconsider

26   (or more precisely, a motion for leave to file a motion for reconsideration).  *See generally* Civ.

27   L.R. 7-9.  While the Court is not without any sympathy for this argument, it will nevertheless

28   consider the merits of Defendants' position, particularly because it could be raised later through a

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1    12(c) motion for judgment on the pleadings.  It is better to address Defendants' position now

2    rather than later, especially as both parties have addressed the merits in their papers.

3            Regarding the merits, the Court reaffirms its earlier ruling that § 2.9(a) is plausibly a No-

4    Generics Restraint.

5            First, the Atripla Agreement is sufficiently different from the Gilead/Japan Tobacco

6    Agreement that the Court's earlier order on the Gilead/Japan Tobacco Agreement does not dictate

7    a favorable conclusion for Defendants here.

8            Second, Defendants' argument that § 2.9(a) does not contain a No-Generics Restraint turns

9    on what the meaning of "Combination Product" is.  Section 2.9(a) provides as follows:

> For the avoidance of doubt, nothing in this Agreement . . . shall be
> deemed to restrict or prohibit either Member Party or any of its
> Affiliates from . . . developing, manufacturing and commercializing
> combination products (**other than the Combination Product**) for
> the treatment of HIV infection or otherwise, including, without
> limitation, any product containing such Party's Single Agent
> Product(s) and/or Double Agent Product.

14   Atripla Agmt. § 2.9(a) (emphasis added).  According to Defendants, "Combination Product" refers

15   only to the brand version of the FDC known as Atripla; in other words, the agreement simply

16   prevents Gilead or BMS from making Atripla on its own *outside* the context of the joint venture.

17   In contrast, Plaintiffs assert that "Combination Product" could be a FDC that includes generic

18   components (*i.e.*, generic versions of Gilead's drugs TDF and FTC) – and therefore § 2.9(a) is

19   plausibly a No-Generics Restraint.  As noted above, the basic question is whether it is plausible

20   that "Combination Product" could refer to a FDC made up in part of generic components.

21           Plaintiffs have made a sufficient showing that "Combination Product" could be a FDC

22   made up in part of generic components.  First, "Combination Product" is not expressly defined as

23   a FDC made up of Gilead's brand drugs and BMS's brand drug.  Instead, "Combination Product"

24   is defined in § 1.50 of the agreement as "the fixed-dose co-formulated product *developed pursuant*

25   *to this Agreement*, containing as its only active pharmaceutical ingredients per single daily dose,

26   300 mg TDF, 200 mg FTC and 600 mg EFV."  Atripla Agmt. § 1.50 (emphasis added).

27           Second, the Recitals shed some light as to what is the FDC "developed pursuant to this

28   Agreement":

5

> WHEREAS, Gilead as developed and is marketing a *proprietary* [NRTI], Viread® (known under the generic name of [TDF], a *proprietary* [NRTI], Emtriva® (known under the generic name of [FTC], and a fixed dose co-formulated product containing TDF and FTC as its only active pharmaceutical ingredients, Truvada®, for the treatment of HIV infection in adults;
>
> WHEREAS, BMS has developed and is marketing a *proprietary* [NNRTI], Sustiva® (known under the generic name of [EFV] for the treatment of HIV infection in adults;
>
> WHEREAS, Gilead and BMS desire to develop and commercialize in the United States, through a joint venture entity, a fixed-dose, co-formulated combination product containing TDF, FTC and EFV as its only active pharmaceutical ingredients; . . . .

Atripla Agmt., Recitals; *see also* Atripla Agmt. §§ 1.94, 1.202 (defining "FTC" and "TDF" as having the meaning set forth in the Recitals).  Notably, the first two Recitals refer to "proprietary" drugs (with certain generic names), but the third Recital does *not* use the term "proprietary" and defines "combination product" by reference to generic names only.  It is therefore plausible that "Combination Product" could be made up of nonproprietary – *i.e.*, generic – components.

Third, "Combination Product" is used in one of the termination provisions in the Atripla Agreement in such a way that the term could cover a FDC including generic components.  That provision is § 14.6(b).  For context, the Court discusses first § 14.5 of the agreement.  Section 14.5 provides:

> Either Member Party (the "Continuing Member Party") may terminate this Agreement by notice to the other Member Party (the "Terminated Member Party") in the event that there is the Launch in the Territory of at least one (1) Generic Version[1] of all of the Single Agent Products (or the Double Agent Product) of the Terminated Member Party (a "Generic Version Launch") and the Continuing Member Party delivers notice of termination within thirty (30) days after the Generic Version Launch.

---

[1] "Generic Version" is defined as follows:

> [W]ith respect to the Combination Product or a Single Agent Product or Double Agent Product, a product containing the same active ingredients as the Combination Product or the Single Agent Product or Double Agent Product, as the case may be, with those being the only active pharmaceutical ingredients in such product, and which product is approved in the United States under an [ANDA].

Atripla Agmt. § 1.96.

United States District Court
Northern District of California

Atripla Agmt. § 14.5.

Section 14.6(b) then goes on to describe what happens when there is termination pursuant to § 14.5.

> Upon termination of this Agreement pursuant to Section 14.5, the JV shall not be dissolved and the following terms and conditions shall apply:
>
> (i)   (A) The license grants and Rights of Reference in Section 6 from the Terminated Member Party to the JV shall survive . . . .
>
> (ii)  The Continuing Member Party shall pay or cause the JV to pay to the Terminated Party . . . , with respect to the period from the effective date of such termination through the third anniversary thereof, an amount determined pursuant to the following formula . . . .
>
> (iii) The Terminated Member Party, at its own election . . . , shall . . . **either** (A) enable the Continuing Member Party to Manufacture quantities of EFV or TDF and FTC, as the case may be, in bulk active pharmaceutical ingredient form for use in the Combination Product . . . , in which event the Terminated Member Party shall . . . automatically be deemed to grant a royalty-free, non-exclusive license to the Continuing Member Party (or its Third Party designee. . . . ) under the Terminated Member Party's Patents . . . for the sole purpose of using such ingredient(s) in the Manufacture of the Combination Product . . . ; **or** (B) continue to supply to the JV (or its designee) on a non-exclusive basis such quantities of EFV or TDF and FTC, as the case may be, in bulk active pharmaceutical ingredient form, as such Continuing Member Party may request for the Manufacture of the Combination Product . . . at a transfer price of such supply equal to ███████████ of the Cost of Goods. . . .
>
> (iv)  The name of the JV shall be changed to remove the name of the Terminated Member Party, and the Continuing Member Party shall not, and shall cause the JV not to, include the Trademark or name of the Terminated Member Party on the labeling, packaging and advertising materials of the Combination Product, or otherwise in connection with the JV's business with respect to the Combination Product.

Atripla Agmt. § 14.6(b)(iii).

Plaintiffs interpret § 14.6(b)(iii) as

> requir[ing] the terminated party to either supply its (now available generically) component(s) to the surviving party at a generic-level price **or** grant a royalty-free patent license to the surviving party "or

> its Third Party designee" to enable them "to [m]anufacture quantities of [the component(s)] in bulk active pharmaceutical ingredient form for use in the [m]anufacture of the Combination Product."  Atripla Agreement §14.6(b)(iii).

Opp'n at 6-7 n.3 (emphasis added).  Plaintiffs also interpret the latter option as effectively allowing the Continuing Member Party to make a generic version of the Terminated Member Party's drug (*i.e.*, as a component to use in the FDC).  *Cf., e.g.*, Atripla Agreement § 14.6(vii) & Annex F (providing that, upon termination, "[t]he JV shall immediately discontinue use of the Terminated Member Party's Trademarks, and the license granted by the Terminated Member Party to the JV to use the Terminated Member Party's Trademarks shall immediately revert to the Terminated Member Party"; Gilead's licensed trademarks include Truvada (TDF/FTC), Viread (TDF), and Emtriva (FTC)).  Under these interpretations, Plaintiffs contend that, because § 14.6(b) still refers to "Combination Product" even after termination – when the Continuing Member Party can use generic components – "Combination Product" necessarily can be made up of either brand or generic components.  *See also* Opp'n at 7 ("[T]he whole purpose of the termination-upon-generic-availability provisions is to permit the surviving party to market the FDC with generic components.").

At the hearing, Defendants did not provide a satisfactory response to Plaintiffs' position.  Post-hearing, Defendants submitted a letter arguing that

> [s]ection 14.6(b)(iii) addresses sales by the joint venture after termination of one of the members and contemplates that either the terminated member will continue to supply its active pharmaceutical ingredient ("API") to the continuing member or will assist the continuing member (or a designated third party) in manufacturing the API itself.  The Combination Product the joint venture would sell in these circumstances remains the product approved under the NDA, *i.e.*, a brand pharmaceutical product.

Docket No. 382 (Defs.' Letter at 2).  But if the continuing member manufactures the API itself, it would arguably be making a generic (*i.e.*, to use as a component of the FDC); if so, that would support Plaintiffs' position.  Although Defendants may disagree, *see, e.g.*, Reply at 9 (arguing that "the 'Combination Product' might include an API procured at generic-level prices, but it would still be the branded Atripla product created under the joint venture's NDA – not a generic product approved under an ANDA"), there is at least ambiguity, and that ambiguity makes disposition at

8

the 12(b)(6) phase improper where Plaintiffs' interpretation of the Atripla Agreement is plausible.

Defendants protest still that it is not plausible that "Combination Product" could mean anything but branded Atripla; in support, Defendants cite to provisions in the Atripla Agreement that refer to getting an NDA for the "Combination Product" (and not an ANDA, which is what a generic product would require).  *See, e.g.*, Atripla Agreement § 3.2(a) (providing that Gilead "shall have primary responsibility for the development of the Combination Product and the conduct of any clinical trials and bioequivalence studies required for obtaining approval of an NDA").  But Defendants do not cite any authority that a FDC made up of BMS's branded drug and generic versions of Gilead's drugs could not go through the NDA process.  In both their reply brief and their post-hearing letter, Defendants cited 21 C.F.R. § 314.101(d)(3), but that provision does not clearly provide that a FDC made up of both brand and generic components would go through the ANDA process.  *See* 21 C.F.R. § 314.101(d)(3) (providing as follows: "NDA or ANDA deficiencies.  FDA may refuse to file an NDA or may not consider an ANDA to be received if any of the following applies: . . . (9) The NDA is submitted as a 505(b)(2) application for a drug that is a duplicate of a listed drug and is eligible for approval under section 505(j) of the Federal Food, Drug, and Cosmetic Act").[2]

Defendants also argue that the Atripla Agreement makes a distinction between "Combination Product" and the "Generic Version" of the "Combination Product" (also known as "Generic Version Combination Product"), and therefore "Combination Product" must mean branded Atripla only.  *See* Atripla Agmt. § 1.96 (providing that "'Generic Version' shall mean, with respect to the Combination Product . . . , a product containing the same active ingredients as the Combination Product . . . , with those being the only active pharmaceutical ingredients in such product, and which product is approved in the United States under an [ANDA]"); Atripla Agmt. § 11.3(a) (providing that  "Gilead shall have the sole right and option . . . to respond to any

---

[2] The Court also notes that Plaintiffs disagree as to what would be the proper means by which, *e.g.*, BMS would have obtained approval of a FDC containing its brand drug and generic versions of Gilead's drugs.  *See* Docket No. 383 (Pls.' Letter at 2) (asserting that, "[a]s the continuing member, BMS could have switched API suppliers for TDF and FTC by filing a supplement to the NDA without needing to file an ANDA").

1    Infringement . . . with respect to any Gilead Patent by appropriate steps, including without

2    limitation, by filing an infringement suit or taking other similar action"; "'other similar action'

3    shall include, without limitation, responses to paragraph (iv) certification . . . resulting from an

4    attempt to market a Generic Version Combination Product"). The problem for Defendants is that,

5    arguably, "Generic Version Combination Product" is a FDC made up *entirely* of generic

6    components. It is not clear what a FDC made up of both brand and generic components – *e.g.*,

7    brand EFV but generic TDF/FTC – would be considered. Furthermore, as noted above, it is not

8    clear whether a product made of brand and generic components would go through the NDA or

9    ANDA route.

10       Accordingly, § 2.9(a) of the Atripla Agreement is plausibly a No-Generics Restraint. The

11   agreement is ambiguous as to whether "Combination Product" simply means branded Atripla or

12   could include a FDC made up of some generic components.

13   D.    cART Product Market

14       A product market "encompass[es] the product at issue as well as all economic substitutes

15   for the product." *Newcal Indus. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008). "'The

16   outer boundaries of a product market are determined by the reasonable interchangeability of use *or*

17   the cross-elasticity of demand between the product itself and substitutes for it.'" *Id.* (emphasis

18   added). "Elasticity of demand is a concept used to signify the relationship between changes in

19   price and responsive changes in demand." *United States v. LSL Biotechnologies*, 379 F.3d 672,

20   697 (9th Cir. 2004); *see also Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 469 (1992)

21   (indicating that cross-elasticity of demand refers to "the extent to which consumers will change

22   their consumption of one product in response to a price change in another.").

23       In its prior order, the Court addressed the issue of product market. Plaintiffs had "pointed

24   to two product markets: (1) the broader market for cART drugs generally and (2) a narrower

25   market for each brand drug (standalone or FDC) and its AB-rated generic equivalent." Docket

26   No. 273 (Order at 47). The Court rejected Defendants' argument that it was "not permissible for

27   Plaintiffs to base their antitrust claims on two different product markets," Docket No. 273 (Order

28   at 47), but agreed with Defendants that that Plaintiffs had failed to adequately plead "what exactly

United States District Court
Northern District of California

the cART product market is" – *e.g.*, "how there is reasonable interchangeability of use with respect to different cART drugs."  Docket No. 273 (Order at 49).  In their pending motion, Defendants argue that Plaintiffs have still failed, in the FACC, to make adequate allegations in support of a cART product market.

In the FACC, Plaintiffs define the cART product market as the market for "cART drugs" or "drugs used in the cART regimen."  FACC ¶¶ 391-92.  cART drugs covers "all antiretroviral drugs used in the treatment of HIV as part of a combination therapy."  FACC ¶ 392.  Such drugs can be standalone (*e.g.*, TDF (brand name Viread) and FTC (brand name Emtriva)) or can be in a FDC (*e.g.*, TDF/FTC (brand name Truvada) and TDF/FTC/EFV (brand name Atripla)).  *See* FACC ¶ 392 (noting that APIs "used to treat HIV may be available in standalone form and/or as fixed-dose combinations").

Defendants attack the product market defined by Plaintiffs largely on the ground of substitutability.  For example, Defendants argue that TDF (a NRTI) cannot be substituted for EFV (a third agent) because they are in different therapeutic classes, *see* FACC ¶ 403 (noting that different kinds of "antiretroviral agents attack the HIV virus at different stages of its lifecycle"), and the drugs are actually complements for one another in the treatment of HIIV (*i.e.*, a FDC is usually made up of NRTIs plus a third agent).[3]  Defendants also contend that even drugs within

_____

[3] "Substitutes are goods that can replace one another and thus 'compete' for the user's purchase" whereas "complements are goods that are most efficiently made or used together."  Areeda & Hovenkamp, Antitrust Law ¶ 565a.

> When two goods are in the same relevant market – that is, substitutes . . . – a price increase in one typically occasions a price increase in the other.  For example, if coal and natural gas are in the same market, a reduction in coal output will increase the demand for natural gas, thus causing its price to increase, as well as the coal price.  Indeed, the entire concept of a 'market' includes the notion that the prices of the goods in the market tend to be uniform, or to rise and fall together.

> In contrast, when goods are complements in demand, their prices tend to move in opposite directions.  For example, gasoline and automobiles are complements, because a driver needs both.  A significant output reduction and price increase in gasoline will cause less driving, which will reduce the demand for cars, causing a price decrease there.

*Id.*

United States District Court
Northern District of California

1   the *same* therapeutic class cannot be substituted for one another; for example, both TDF and FTC

2   are in the same therapeutic class (NRTIs) but, as alleged in the FACC, they are typically used

3   together and thus are complements.  Finally, Defendants maintain, a standalone drug such as TDF

4   cannot be used as a substitute for a FDC such as Atripla.  (Indeed, TDF is a component of

5   Atripla.)  Thus, Defendants contend, the product market as defined by Plaintiffs is simply too

6   broad.

7           While Defendants' position is not without force, at this early juncture, the Court, mindful

8   of the fact that the definition of the relevant market is generally one for the jury, cannot say that a

9   broad cART product market is implausible.  *Cf. Image Tech. Servs. v. Eastman Kodak Co.*, 125

10  F.3d 1195, 1203 (9th Cir. 1997) (noting that "what constitutes a relevant market is a factual

11  determination for the jury"); *see also Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001)

12  (stating that, "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to

13  grant motions to dismiss for failure to plead a relevant product market").  It is plausible that a jury

14  could find a cART product market based on commercial realities.  *See, e.g.*, *United States v.*

15  *Grinnell Corp.*, 384 U.S. 563, 572 (1966) (stating that "[w]e see no barrier to combining in a

16  single market a number of different products or services where that combination reflects

17  commercial realities"); *United States v. Cont'l Can Co.*, 378 U.S. 441, 457 (stating that, "[s]ince

18  the purpose of delineating a line of commerce is to provide an adequate basis for measuring the

19  effects of a given acquisition, its contours must, as nearly as possible, conform to competitive

20  reality"; here, there was an "area of effective competition between" the metal and glass container

21  industry).  Commercial realities, as alleged by Plaintiffs, include the following:

22          • "From a clinical perspective, . . . [a]lthough different types of antiretrovirals target

23              different steps in the HIV life cycle, all of them are used to prevent successful

24              reproduction of the HIV virus."  FACC ¶ 394; *see also* FACC ¶ 402 (alleging that

25              the U.S. Department of Health and Human Services has Guidelines for the

26              treatment of HIV which illustrate the interchangeability of use of different types of

27              cART drugs).

28          • cART drugs sometimes may be complements for one another but other times may

United States District Court
Northern District of California

1    be substitutes.  *See* FACC ¶ 402 (alleging that the HHS Guidelines have

2    recommended regimens that include NRTIs and third agents together, as well as

3    regimens that include third agents and no NRTIs – *i.e.*, NRTIs and third agents

4    sometimes are complements but other times may be substitutes).

5    • There is price competition among cART drugs, albeit weak.  *See* FACC ¶ 395; *see*

6    *also* FACC ¶ 397 (indicating that, at competitive prices, two drugs may be weak

7    substitutes for one another but, if one company raises its drug's prices to high

8    levels, this may induce a consumer to substitute away from that drug in favor of a

9    different drug).[4]

10   The issue of the relevant market here is complex and multidimensional.  The Court

11   therefore holds that Plaintiffs have adequately alleged a cART product market for 12(b)(6)

12   purposes.

13   E.    Overarching Conspiracy and/or Bilateral Conspiracies

14   In its prior order, the Court noted that Plaintiffs were asserting an overarching conspiracy–

15   *i.e.*, one involving all three Defendants.  It dismissed that claim but gave Plaintiffs leave to amend.

16   In the FACC, Plaintiffs continue to assert an overarching conspiracy but also make clear that they

17   believe, at the very least, that there were two bilateral conspiracies (*i.e.*, between (1) Gilead and

18   BMS and (2) Gilead and Janssen).  In the pending motion, Defendants assert that Plaintiffs have

19   failed to adequately allege either an overarching conspiracy or any bilateral conspiracy.

20   1.    Overarching Conspiracy

21   As a preliminary matter, the Court notes that, in their brief, Plaintiffs state they "need not

22   allege that the conspiracy to monopolize the cART market included all three Defendants."  Opp'n

23   at 18.  To the extent Plaintiffs make this statement in connection with the overarching conspiracy

24   theory, the Court rejects it.  While an overarching conspiracy need not have involved interaction

25   _____

26   [4] Because of these and other allegations on price competition, the Court rejects Defendants'
     contention that it is necessarily inconsistent for Plaintiffs to claim both a broad cART product

27   market and narrower brand drug/generic equivalent product markets.  In other words, it is not
     inconsistent for Plaintiffs to argue that: (1) at competitive prices, a substitute for a brand drug

28   would usually be only its generic equivalent (a narrow market), *see* FACC ¶ 372, but (2) there can
     still be some weak price competition among different brand drugs (the broader market).

between BMS and Janssen, and while BMS and Janssen need not have known the other

specifically was a part of the overarching conspiracy, BMS and Janssen must each have had an

understanding about the nature of the conspiracy and its scope – which would include that there

was more than just a bilateral conspiracy between it and Gilead (*i.e.*, that there was another co-

conspirator, even if the identity of the co-conspirator was not known).   *Cf., e.g.*, *United States v.*

*Downing*, 297 F.3d 52, 57 (2d Cir. 2002) (criminal conspiracy to commit wire fraud and security

fraud) ("The government may prove [the conspiracy's] existence by circumstantial evidence,

provided such evidence establishes beyond a reasonable doubt the defendants' knowledge of '*the*

*essential nature of the plan* and their connections with it.'  The government need not prove that

the defendants knew the details of the conspiratorial scheme or the identities of all of the

conspirators.") (emphasis added).  As the Seventh Circuit outlined in *United States v. Briscoe*, 896

F.2d 1476 (7th Cir. 1990):

> The government may establish a defendant's knowing participation
> in a single conspiracy by offering evidence that: [the] parties to the
> agreement were *aware that others were participating in the scheme*.
> The coconspirators must have knowingly embraced a common
> criminal objective. . . . However, there is no requirement that the
> participants in the plan personally know the individuals involved . . .
> [as] long as the conspiracy continues and its goal is to achieve a
> common objective.

*Id.* at 1505 (emphasis added; internal quotation marks omitted).

Plaintiffs assert that they have alleged that BMS and Janssen each knew that it was part of

a larger operation involving more than just it and Gilead.  More specifically, there are allegations

in the FACC that BMS and Janssen were each aware that the other had entered into an agreement

with Gilead that contained a No-Generics Restraint.  Plaintiffs allege:

> Most of these agreements were publicly filed or described in filings
> by Gilead with the Securities and Exchange Commission, including
> the 2004 agreement with BMS . . . and the 2009 agreement with
> Janssen.  Before entering into agreements with Gilead, BMS and
> Janssen scrutinized the publicly available Gilead agreements with
> competitors.  Thus, when entering into one or more of their unlawful
> agreements with Gilead, both BMS and Janssen were aware that
> Gilead had used No-Generics Restraints and post-patent-expiration
> royalty provisions with other competitors, including in nearly
> identical language.

United States District Court
Northern District of California

14

1   FACC ¶ 167; *see also* Opp'n at 17 (noting that "BMS knew in 2011 (when entering into the

2   Evotaz restraint) that Janssen had entered into a No-Generics Restraint with Gilead"; similarly,

3   "Janssen knew in 2009 (when entering into the Complera restraint) that BMS had entered into a

4   No-Generics Restraint with Gilead regarding Atripla").

5          In response, Defendants argue that, at best, Plaintiffs have simply alleged parallel conduct

6   – and that parallel conduct, without more, "fails to bespeak unlawful agreement." *Twombly*, 550

7   U.S. at 556; *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th

8   Cir. 2015) (noting that, "[i]n an interdependent market, competitors base their actions in part on

9   the anticipated reactions of their competitors[,] [a]nd because of this mutual awareness, two firms

10  may arrive at identical decisions independently, as they are cognizant of – and reacting to – similar

11  market pressures[;] [i]n other words, competitors' behavior may be consciously parallel").

12         The Court agrees with Defendants that there is a fundamental flaw with Plaintiffs'

13  position.  Plaintiffs have failed to show how, *e.g.*, BMS would benefit from an overarching

14  conspiracy involving all three Defendants (as opposed to, *e.g.*, the bilateral conspiracy between it

15  and Gilead alone), and therefore it cannot reasonably be inferred that BMS agreed to an

16  overarching conspiracy.  As explained in *Briscoe*,

17         the government may establish that a defendant knowingly became a
18         member of a single narcotics conspiracy if each [defendant retailer]
       knew, or had reason to know, that other retailers were involved with
       the . . . organization in a broad project for the smuggling,
19         distribution and retail sale of narcotics, and had reason to believe
       that their own benefits derived from the operation were probably
20         *dependent upon the success of the entire venture*. . . .

21  *Briscoe*, 896 F.2d at 1505 (emphasis added).  Similarly, in *United States v. Bibbero*, 749 F.2d 581

22  (9th Cir. 1984), the Ninth Circuit noted:

23         We believe that the jury reasonably could have found that Bibbero
       was a member of the overall conspiracy. . . . Bibbero helped to plan
24         the fifth and sixth smuggling operations and acted as a supplier and
       distributor of the marijuana.  Bibbero's responsibilities placed him at
25         the core of the conspiracy during these two operations.  From his
       position of responsibility, Bibbero undoubtedly understood the full
26         scope of the conspiracy while he was a participant and must have
       realized that his own profits from the enterprise were *dependent*
27         *upon the success of each off-loading operation.*

28  *Id.* at 588 (emphasis added).  The same is true with respect to Janssen.  In short, the complaint

fails to allege how BMS benefitted from the agreement between Janssen and Gilead, and how Janssen benefitted from the agreement between BMS and Gilead. The complaint thus fails to allege an overarching conspiracy. Mere knowledge that Gilead was entering into parallel bilateral deals with others is not enough to show BMS and Janssen had a stake in the overarching enterprise.

The Court therefore dismisses Counts 1 and 4 in their entireties, which assert an overarching conspiracy, as well as part of Count 11 (*i.e.*, to the extent that claim is predicated on an overarching conspiracy). The dismissal is with prejudice as the Court gave Plaintiffs an opportunity to cure the deficiency but Plaintiffs were unable to do so.

2.    Bilateral Conspiracies

Defendants argue that not only have Plaintiffs failed to allege an overarching conspiracy, but they have also failed to allege bilateral conspiracies – *i.e.*, between (1) BMS and Gilead and (2) Janssen and Gilead. According to Defendants, the bilateral conspiracy theory is flawed because Plaintiffs have not alleged that "BMS and Janssen acted contrary to their independent business interests." Mot. at 10. But whether BMS and Janssen acted contrary to their independent business interests is relevant to the issue of whether there is more than parallel conduct, *see In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 321-22 (3d Cir. 2010) (noting that one factor that would indicate a conspiracy, and not just parallel conduct, is "evidence that the defendant acted contrary to its interests"). In any event, even if Plaintiffs had to allege that BMS and Janssen acted contrary to their independent business interests, Plaintiffs have done so – *i.e.*, ordinarily, one would expect BMS and Janssen would have an interest in being able to make generic versions of Gilead's drugs once the patents on those drugs expired or were invalidated; but under the agreements, they were restrained from doing so.

F.    Antitrust Injury: Untainted Competitors' Challenge of Gilead's Unexpired Patents

"[A]ntitrust injury consists of four elements: '(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent.'" *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013). In its prior order, the Court addressed Defendants' contention that the antitrust injury

claimed by Plaintiffs was too speculative.  The Court rejected the argument in part, explaining as follows:

> [A] reasonable jury could infer that, absent the No-Generics Restraints, the other defendants would want to make competing FDCs once the generic versions of Gilead's vulnerable drugs became available (*i.e.*, once the patents protecting the drugs expired); that would be in their own self-interest.  In this regard, it is notable that, when generic TDF became available in December 2017 (generic FTC will not become available until September 2020), BMS *did* come up with a competing FDC because its No-Generics Restraint with Gilead did not bar it from making a competing FDC that was *comparable* to the FDC covered by the joint venture agreement.  Furthermore, Plaintiffs fairly make the point that, "if the conspirators were not likely to have marketed competing versions of the products, Defendants would have had no reason to include the No-Generics Restraint.

Docket No. 273 (Order at 37-38) (emphasis in original).

The Court, however, found more persuasive Defendants' assertion that "it is speculative for Plaintiffs to assert that untainted competitors in BMS . . . and Janssen's positions would actually have challenged Gilead's patents prior to their expiration dates (*e.g.*, instead of waiting for the TDF patents to expire in December 2017)."  Docket No. 273 (Order at 38).  The Court stated that this argument was "not without force" but, because it appeared to be an "alternative position on antitrust injury" only – *i.e.*, "even if credited," there would not be a dismissal – the Court simply gave Plaintiffs leave to provide a more definite statement in support of that specific theory.  Docket No. 273 (Order at 38).

In the FACC, Plaintiffs have provided new allegations to support the alternative theory that untainted competitors in BMS and Janssen's positions would have challenged Gilead's patents. *See, e.g.*, FACC ¶¶ 185-86.  Defendants argue that the allegations are still insufficient.

For example, Defendants contend that Plaintiffs have not adequately alleged antitrust injury based on the Gilead drugs that contain TAF and COBI (*i.e.*, Prezcobix, Symtuza, Odefsey, and Evotaz).  Plaintiffs' basic theory is that BMS and/or Janssen would have made more money selling a FDC using generic versions of these drugs, and therefore they would have challenged the patents protecting Gilead's drugs.  According to Defendants, Plaintiffs' position assumes that the patents protecting Gilead's drugs were relatively weak, but the FACC lacks allegations to support

the relative weakness of the patents.  Defendants point out that, although there are allegations that

generic manufacturers challenged TDF and FTC, there are no allegations that generic

manufacturers challenged TAF and COBI.  Defendants maintain that, without some indication that

the patents protecting TAF and COBI are in fact weak, then it would make little sense for BMS

and/or Janssen to spend some $6-10 million on patent litigation.  *See* FACC ¶ 186 (alleging that

"[t]he cost of litigating similar patent infringement actions is approximately $6 to $10 million

from complaint to verdict," which is "minimal" considering "the substantial gains that [*e.g.*]

Janssen would have realized by launching into a $600 million market for Complera four years

before the expiration of Gilead's patents").

Defendants also argue that, for the FDC Complera, it is questionable whether Janssen

would have challenged the Gilead drugs used in the FDC (*i.e.*, TDF and FTC) because *Janssen*

held the patent for Complera.

Finally, Defendants contend that BMS and/or Janssen would not have challenged Gilead's

patents because they were partnering with Gilead to make FDCs using Gilead's patented drugs.  In

other words, BMS and/or Janssen had no incentive to sue their partner/collaborator/joint venture.

Although the Court is not unsympathetic to Defendants' arguments, they simply

underscore that there are questions of fact that cannot be decided at the 12(b)(6) phase of

proceedings.  For instance, the prospect of large gains from earlier entry into the market might

well have led BMS or Janssen to challenge, *inter alia*, the TAF and COBI patents (or at least

threaten to challenge the patents), regardless of whether the patents would ultimately be held valid

and regardless of any partnership with Gilead.  Also, for the FDC Complera, even if Janssen held

the patent for the drug, this does not mean that Janssen would not have had an incentive to

challenge Gilead's drugs used in the FDC; it is not clear that Janssen would not have wanted to

sell a version of Complera made up of its brand drug and generic versions of Gilead's brand drugs.

Plaintiffs have alleged a plausible claim of antitrust injury for purposes of Rule 12(b)(6).

G.     Payment of Royalties After Patent Expiration

In its prior order, the Court noted that Plaintiffs were challenging the No-Generics

Restraints in the agreements at issue because, "as alleged, the restraints effectively protect

United States District Court
Northern District of California

Gilead's NRTIs by precluding the other drug manufacturers from selling FDCs that incorporate generic versions of Gilead's NRTIs *even after the patents protecting the NRTIs expire*."  Docket No. 273 (Order at 8) (emphasis in original).  Defendants argue that, in the operative complaint as now pled, Plaintiffs have added on to this liability theory – *i.e.*, pleading that the agreements include provisions requiring "the payment of royalties 'even after Gilead's patents had expired or were invalidated.'"  Mot. at 19.  For example, Plaintiffs allege in the FACC that:

- "[A]greements to continue paying royalties after a patent is no longer effective are per se unlawful."  FACC ¶ 122.
- "[A]greements to continue paying royalties after a patent is no longer effective, especially in the circumstances here, are per se unlawful and anticompetitive."  FACC ¶ 139.
- "Gilead's agreements with its coconspirators also feature nearly identical provisions requiring royalty payments even if the parties' patents have expired or are invalidated in a legal proceeding."  FACC ¶ 166.

Defendants note that "[t]hese allegations are . . . added as an element in every antitrust claim asserted in the amended complaint."  Mot. at 19.  For example, in Count 1, Plaintiffs assert a conspiracy to monopolize claim in violation of §§ 1 and 2 of the Sherman Act and identify as part of the anticompetitive conduct "[e]ntering into and abiding by the illegal post-paten-expiration royalty provisions."  FACC ¶ 481.  This conduct is called out separate from the conduct of "[e]ntering into and abiding by the illegal No-Generics Restraints."  FACC ¶ 481.

In their motion to dismiss, Defendants argue that, to the extent the claims are based on post-patent expiration royalty payments, they should be dismissed for various reasons.  In response, Plaintiffs contend that Defendants' argument is procedurally improper.  According to Plaintiffs, Defendants should have filed a motion to strike the allegations related to the post-patent expiration royalty payments, and not a motion to dismiss, because Plaintiffs are not "alleg[ing] that the newly added contract terms are independently actionable antitrust violations.  Rather, the new allegations lend support to Plaintiffs' existing claims already held sufficient."  Opp'n at 8; *see also* Opp'n at 8 n.4. (adding that, even if the Court were to grant the motion to strike, "Plaintiffs'

19

antitrust claims would remain in the case in the exact same form as the Court previously deemed sufficient to withstand Defendants' first round of motions to dismiss").

Plaintiffs' procedural argument is not persuasive.  Often, a plaintiff asserts a single cause of action that is predicated on more than one liability theory, and a court eliminates one theory through a motion to dismiss. *Cf. Consumer Sols. Reo, LLC v. Hillery*, 658 F. Supp. 2d 1002, 1020 (N.D. Cal. 2009) ("The proper medium for challenging the sufficiency of factual allegations in a complaint is through Rule 12(b)(6) not Rule 12(f)."). And notably, the Ninth Circuit has indicated that, where a defendant contends damages are precluded as a matter of law, such an argument should not be raised through a Rule 12(f) motion to strike but rather through as 12(b)(6) or even summary judgment. *See Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010) (noting that "Handi-Craft argues that Whittlestone's claim for lost profits and consequential damages should be stricken from the complaint, because such damages are precluded as a matter of law"; "Handi-Craft's 12(f) motion was really an attempt to have certain portions of Whittlestone's complaint dismissed or to obtain summary judgment against Whittlestone as to those portions of the suit – actions better suited for a Rule 12(b)(6) motion or a Rule 56 motion, not a Rule 12(f) motion."). The Court, therefore, concludes that Defendants have properly challenged the new liability theory through a motion to dismiss.

As for the merits of Defendants' motion to dismiss, here, Plaintiffs have failed to provide any substantive argument in response. Plaintiffs simply argue that "[t]he post-expiration royalty payments are part of the contractual scheme to restrain generic competition and further Gilead's market dominance" and that, even if the Court were to strike the allegations, their "antitrust claims would remain in the case in the exact same form as the Court previously deemed sufficient to withstand Defendants' first round of motions to dismiss." Opp'n at 8 & n.4. Because of the lack of a substantive opposition, the Court grants with prejudice the motion to dismiss the new liability theory – *i.e.*, the theory based on alleged payment of royalties after patent expiration.

H.     Patent Term Extension

In the FACC, Plaintiffs have also set forth another new liability theory, one related to Gilead obtaining a PTE for one of its patents (the '791 patent) related to TAF. The FACC

United States District Court
Northern District of California

1    contains the following allegations related to this new liability theory.

2        •   PTE is provided for by 35 U.S.C. § 156(c).  Section 156(c) provides in relevant part

3           that "[t]he term of a patent eligible for extension . . . shall be extended by the time

4           equal to the regulatory review period for the approved product which period occurs

5           after the date the patent is issued, except that – (1) each period of the regulatory

6           review period shall be reduced by any period determined under subsection

7           (d)(2)(B) during which the applicant for the patent extension did not act with due

8           diligence during such period of the regulatory review period."  35 U.S.C. § 156(c).

9        •   "Congress designed PTE to benefit pharmaceutical manufacturers who encounter

10          delays in getting their products to market as a result of government-imposed

11          hurdles."  FACC ¶ 348.

12        •   "PTE extends the period of a pharmaceutical patent's term in order to compensate

13          for a portion of the patent term that the patentee lost – the period in which it was

14          not able to market the patent-protected product – while the product was in clinical

15          development and/or awaiting FDA approval."  FACC ¶ 355.

16        •   "The patentee is entitled to PTE only for the time it loses in the development and

17          the approval process *after the patent has issued*.  35 U.S.C. § 156(c)."  FACC ¶ 366

18          (emphasis in original).  "In calculating whether and to what extent the applicant is

19          entitled to PTE, the agencies consider and adjust for any time in which the

20          applicant failed to exercise due diligence only to the extent that the lack of

21          diligence occurred *after the patent issued*.  35 U.S.C. § 156(c)(1).  The agencies

22          have no statutory or regulatory authority, and therefore cannot and do not exercise

23          any discretion, to refuse or reduce PTE for the period of time that the applicant

24          intentionally delayed development/approval before the patent issued."  FAC ¶ 356

25          (emphasis in original); *see also* FACC ¶ 13.

26        •   Gilead's patents protecting TAF are: '791, '788, '065, and '769.  *See* FACC ¶ 281.

27          The '791 patent is one of the two principal patents on TAF.  *See* FACC ¶ 351.

28        •   On December 14, 2015, Gilead filed for a PTE under 35 U.S.C. § 156 for the '791

and '788 patents.  *See* FACC ¶ 352 (adding that "[t]he regulations permit the applicant to request PTE for multiple patents on the same drug, but the PTO will grant PTE for only one").

- "Absent PTE, the '788 Patent and '791 Patent would expire on February 2, 2022 and *May 7, 2022*, respectively.  On February 19, 2020, the PTO made a final determination that the '791 Patent was eligible for PTE of 1,076 days, extending that patent to *April 17, 2025*."  FACC ¶ 353 (emphasis added).

- "[I]f Gilead had not intentionally delayed its development/approval of TAF, Gilead would have obtained FDA approval of its first TAF-based product, Genvoya in January 2010 . . . . In those circumstances, the latest of Gilead's principal TAF patents, *with PTE* would have expired in *February 2023*."  FAC ¶ 359 (emphasis added).  ("Gilead would have been eligible for only a year of PTE on the '791 patent . . . ."  FACC at 81 n.1.  Thus, the patent term would have been extended by one year only from 2022, *see* FACC ¶ 282, to 2023.)

- Gilead's intentional delay with respect to TAF plus the PTE it obtained resulted in protection for the '791 patent until April 2025, instead of February 2023.  *See* FACC ¶ 359 (chart).

- Gilead's intentional "TAF delay increased the *combined* period of time in which Gilead *Tenofovir*-based (TDF *or* TAF) products would be both on the market and protected by *either* the TDF or the TAF patents.  With the intentional delay in developing/approving TAF, that combined period of time, with PTE, will be 23.5 years (October 2001[5] to April 2025).  Without the intentional delay (the first marketing of a TAF-based product occurring in January 2010[6]), the combined

---

[5] In 2001, Gilead began marketing TDF.  *See* FACC ¶ 3.  The approval date for TDF was October 26, 2001.  *See* FACC ¶ 69.

[6] If Gilead had not intentionally delayed its development/approval of TAF, then it would have obtained FDA approval of its first TAF-based product (Genvoya) in January 2010.  *See* FACC ¶ 359.  With Gilead's intentional delay, the FDA did not actually approve Genvoya until November 5, 2015.  *See* FACC ¶ 69.

United States District Court
Northern District of California

period of time, with PTE, would have been 21.3 years (October 2001 to February 2023)."  FACC ¶ 363 (emphasis in original).  The difference is 2.2 years.

- "The delay enabled Gilead to withhold TAF from the market until the very last moment, ensuring that it maximized the *combined* period of market exclusivity for TDF/TAF, even though it considerably shortened the period of time for TAF considered alone."  FACC ¶ 364 (emphasis in original).

In their motion to dismiss, Defendants argue that, to the extent Plaintiffs' causes of action are based on Gilead's obtaining a PTE for the '791 patent, the causes of action must be dismissed under the *Noerr-Pennington* doctrine.  Plaintiffs argue that the *Noerr-Pennington* doctrine argument

> is wrong for two reasons.  First, the conduct is not protected by *Noerr[-Pennington]* under the well-recognized exception for petitioning that seeks ministerial rather than discretionary action from the government.  Second, there is no immunity for petitioning conduct that is an integral part of a larger overall scheme to restrain trade.

Opp'n at 20.  Neither argument is persuasive.

### 1.   Ministerial v. Discretionary

"Under the *Noerr-Pennington* doctrine, 'those who petition government for redress are generally immune from antitrust liability.'  The doctrine immunizes petitions directed at any branch of government, including the executive, legislative, judicial and administrative agencies." *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1092 (9th Cir. 2000); *see also Sosa v. DirecTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006) (noting that the "doctrine derives from the First Amendment's guarantee of 'the right of the people . . . to petition the Government for a redress of grievances'[;] [u]nder the . . . doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct").  As indicated above, Plaintiffs' first argument is that the *Noerr-Pennington* doctrine is not applicable to the instant case because Gilead was not truly "petitioning" the PTO for relief; that is, Gilead was not asking the PTO to make some kind of discretionary decision but rather was simply requesting that the PTO take a ministerial action.

The main case on which Plaintiffs rely in support of their position is *In re Buspirone Patent & Antitrust Litigation*, 185 F. Supp. 2d 363 (S.D.N.Y. 2002). *Buspirone* concerned Bristol-Myers's patent "covering the use of buspirone for the treatment of anxiety." *Id.* at 365. The plaintiffs were generic drug manufacturers, consumers, and others who sued Bristol-Myers, claiming, *inter alia*, that it attempted to extend and/or did extend an unlawful monopoly over buspirone products. *See id.* at 365-66. Bristol-Myers moved to dismiss the antitrust claims to the extent they were based on its "conduct in listing the '365 Patent in the Orange Book."[7] *Id.* at 367. Bristol-Myers argued that this conduct was essentially petitioning activity protected by the *Noerr-Pennington* doctrine – *i.e.*, Bristol-Myers was asking the FDA for "governmental action, specifically, . . . to publish the information submitted to it in the Orange Book." *Id.* at 369.

The district court disagreed. It explained that,

> in deciding whether a particular type of conduct is petitioning activity for *Noerr-Pennington* purposes, it is critical to distinguish between activities in which the government acts or renders a decision only after an independent review of the merits of a petition and activities in which the government acts in a merely ministerial or non-discretionary capacity in direct reliance on the representations made by private parties. One of the reasons for extending *Noerr-Pennington* immunity to acts through which private parties seek to influence governmental decisions in the first class of cases is that these private parties can often only obtain the anticompetitive effects in question by first convincing the

---

[7]

> To facilitate the approval of generic drugs as soon as patents allow, the Hatch-Waxman Amendments and FDA regulations direct brand manufacturers to file information about their patents. The statute mandates that a brand submit in its NDA "the patent number and the expiration date of any patent which claims the drug for which the [brand] submitted the [NDA] or which claims a method of using such drug." §355(b)(1). And the regulations issued under that statute require that, once an NDA is approved, the brand provide a description of any method-of-use patent it holds. *See* 21 CFR §§314.53(c)(2)(ii)(P)(3), (e) (2011). That description is known as a use code, and the brand submits it on FDA Form 3542. As later discussed, the FDA does not attempt to verify the accuracy of the use codes that brand manufacturers supply. It simply publishes the codes, along with the corresponding patent numbers and expiration dates, in a fat, brightly hued volume called the Orange Book (less colorfully but more officially denominated Approved Drug Products With Therapeutic Equivalence Evaluations).

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 405-06 (2012).

United States District Court
Northern District of California

government of the merits of their views and by obtaining a valid and
independent governmental decision, which intervenes between the
private parties' actions and these anticompetitive results.  *See Noerr*,
365 U.S. at 136-37.  Another reason is that it would raise important
First Amendment concerns if citizens affected by these kinds of
governmental decisions were unable freely to inform the
government as to their views and wishes concerning what the
government should decide.  *See id.* at 137-38.  *Hence, conduct
aimed at persuading the government of a position or expressing
views in these kinds of circumstances is generally considered
petitioning activity for Noerr-Pennington purposes and is
immunized.*

[In contrast,] the *Noerr-Pennington* doctrine is not applicable to
conduct through which private parties seek to achieve
anticompetitive aims by making representations to the government
in circumstances where the government does not perform any
independent review of the validity of the statements, does not make
or issue any intervening judgment and instead acts in direct reliance
on the private party's representations.

*Id.* at 369-70 (emphasis added).

The district court found guidance in the Second Circuit's analysis in *Litton Systems, Inc. v.
AT&T Co.*, 700 F.2d 785 (2d Cir. 1983).  There,

the Second Circuit held that AT&T's filing of an interface tariff with
the Federal Communications Commission ('FCC'), which required
telephone customers to connect equipment purchased from AT&T's
competitors to the telephone system only through the use of a device
designed by AT&T, was not petitioning activity for *Noerr-
Pennington* purposes[,] . . . even though AT&T was required by law
to file its tariff with the FCC in order for the tariff to take effect.

*Buspirone*, 185 F. Supp. 2d at 370.  This was because "AT&T was able to extend its monopoly
over the telephone equipment market simply by filing the tariff, and without first obtaining any
FCC determination as to the legal validity of the tariff."  *Id.* at 371.  The FCC allowed the tariff to
take effect immediately and specifically noted that, in doing so, it was not giving approval to the
tariff.  *See id.* at 370-71.  Accordingly, "'AT&T's power to exclude . . . competitors from the
telephone terminal equipment market resulted not from the FCC's regulatory authority but from
AT&T's exclusive control of the telephone network.'"  *Id.* at 371.

The district court concluded that,

[f]or many of the same reasons that tariff filings are not acts of
petitioning, Bristol-Myers's activities in listing the '365 Patent in the
Orange Book are not acts of petitioning.  Pioneer drug companies
are required by law to submit in their NDAs information regarding
any patent that "claims the drug for which the applicant submitted

25

1

2

3

4

5

6

7

8

> the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(1). Moreover, 21 U.S.C. § 355(c)(2) states that "if the holder of an approved application could not file patent information [in its NDA application] because no patent had been issued when an application was filed or approved, the holder shall file such information under this subsection not later than thirty days after the date the patent involved is issued." In either case, however, the FDA is required by law to publish the information in the Orange Book. *See* 21 U.S.C. §§ 355(b)(1) & (c)(2) ("Upon submission of patent information under [these] subsection[s], the Secretary shall publish it."). Hence, the FDA's actions are non-discretionary and do not reflect any decision as to the validity of the representations in an Orange Book listing.

9    *Id.*

10    The district court acknowledged that the FDA did have a "process for allowing parties to

11    dispute the accuracy or relevance of patent information submitted to the FDA and listed in the

12    Orange Book," but this process was very limited in nature. *Id.* A party questioning the accuracy

13    or relevance of patent information could write to the FDA, and the FDA would then "request that

14    the applicant confirm the information," but nothing more would happen beyond this. *Id.* at 372.

15    "[T]he FDA regulations are clear that 'unless the application holder withdraws or amends its

16    patent information in response to the FDA's request [for confirmation or clarification], the agency

17    will not change the patent information in the list.'" *Id.*

18    At least one other court has followed the holding in *Buspirone*. *See Organon Inc. v. Mylan*

19    *Pharm., Inc.*, 293 F. Supp. 2d 453, 458-59 (D.N.J. 2003) ("find[ing] that filing a patent for listing

20    in the Orange Book is not 'petitioning activity' within the meaning of the *Noerr-Pennington*

21    doctrine because the FDA's action in listing Organon's '099 patent in the Orange Book was not an

22    independent governmental determination, but rather a purely ministerial function[;] [i]n accepting

23    Organon's request to list the '099 patent, the FDA relies directly upon representations made by

24    Organon without conducting an independent investigation into the basis for such a listing").

25    Although *Buspirone* and *Organon* provide an accurate framework of analysis, the instant

26    case is different from *Buspirone* and *Organon* because there is different conduct at issue here –

27    there is not a request to list a patent in the Orange Book but rather a request to get a PTE. The

28    question here is whether a request for a PTE implicates only a ministerial decision by the

United States District Court
Northern District of California

government (in which case the request for relief would not be petitioning activity) or whether a request for a PTE implicates a discretionary decision (in which case the request for relief would be petitioning activity).

In making this determination, the Court evaluates first the text of 35 U.S.C. § 156, which governs PTEs.

- An application for a PTE must be submitted. *See* 35 U.S.C. § 156(a)(3). The application must be submitted "in accordance with the requirements of paragraphs (1) through (4) of subsection (d)." *Id.*

- Under § 156(d)(1), the application must contain, *inter alia*, "[1] information to enable the Director to determine under subsections (a) and (b) the eligibility of a patent for extension and the rights that will be derived from the extension and [2] information to enable the Director and the Secretary of Health and Human Services or the Secretary of Agriculture to determine the period of the extension under subsection (g)." *Id.* § 156(d)(1)(C).

- Under § 156(d)(1), the application must also contain "a brief description of the activities undertaken by the applicant during the applicable regulatory review period with respect to the approved product and the significant dates applicable to such activities." *Id.* § 156(d)(1)(D).

- Under § 156(d)(2), after receiving the application, "the Secretary . . . shall review the dates contained in the application pursuant to paragraph (1)(C) [see above] and determine the applicable regulatory review period, shall notify the Director of the determination, and shall publish in the Federal Register a notice of such determination." *Id.* § 156(d)(2)(A); *see also* 21 C.F.R. § 60.20(a) (providing that "FDA will consult its records and experts to verify the dates contained in the application and to determine the length of the product's regulatory review period").

- Also under § 156(d)(2), "*[i]f* a petition is submitted to the Secretary . . . upon which it may reasonably be determined that the applicant did not act with due

diligence[8] during the applicable regulatory review period, the Secretary . . . shall . . . determine if the applicant acted with due diligence during the applicable regulatory period." *Id.* § 156(d)(2)(B)(i) (emphasis added).  The Secretary "shall notify the Director of the determination and shall publish in the Federal Register a notice of such determination together with the factual and legal basis for such determination.  Any interested person may request [that] the Secretary . . . hold an informal hearing on the determination." *Id.* § 156(d)(2)(B)(ii).  The Secretary "shall provide notice of the hearing to the owner of the patent involved and to any interested person and provide the owner and any interested person an opportunity to participate in the hearing." *Id.*  The Secretary shall then "affirm or revise the determination which was the subject of the hearing and shall notify the Director of any revision of the determination and shall publish any such revision in the Federal Register." *Id.*

- Finally, under § 156(d)(4), "[a]n application for [a PTE] is subject to the disclosure requirements prescribed by the Director." *Id.* § 156(d)(4); *see also* 37 C.F.R. § 1.765 (addressing duty of disclosure in PTE proceedings; "[a] duty of candor and good faith toward the [PTO] and the Secretary of Health and Human Services or the Secretary of Agriculture rests on the patent owner or its agent," and "[a]ll such individuals who are aware, or become aware, of material information adverse to a determination of entitlement to the extension sought, which has not been previously made of record in the [PTE] proceeding must bring such information to the attention of the [PTO] or the Secretary").

Defendants argue that the above process as described above must be deemed discretionary: it is not a brief process, and it involves decisions requiring judgment, both on the length of the regulatory review period and on whether the applicant has exercised due diligence.  Defendants

---

[8] Due diligence is defined in § 156(d)(3) – "that degree of attention, continuous directed effort, and timeliness as may reasonably be expected from, and are ordinarily exercised by, a person during a regulatory review period."  35 U.S.C. § 156(d)(3).

1    underscore that, with respect to the '791 patent at issue in the instant case, the PTE process took

2    over four years, and, even though Gilead asked for a PTE of 1,116 days, it received only 1,076.

3    *See* Reply at 11-12.

4         Although arguably a close call, the Court agrees with Defendants.  Judgment and

5    discretion are sufficiently involved to render this protected petitioning activity.  Plaintiffs'

6    arguments to the contrary are not compelling.  For example, Plaintiffs emphasize that, in §

7    156(e)(1), the statute provides that [a] determination that a patent is eligible for extension may be

8    made by the Director *solely on the basis of the representations contained in the application* for the

9    extension."  35 U.S.C. § 156(e)(1) (emphasis added).  Although this language does suggest that

10   the government need not delve deeply in its PTE evaluation, Defendants fairly point out that the

11   text of the statute provides that a PTE "*may* be made . . . solely on the basis of the representations"

12   in the application.  *Id.* (emphasis added).  This indicates that the government is not precluded from

13   taking a "deeper dive"; it can exercise its judgment on what to do and thus is not just making a pro

14   forma decision.  Also, the fact that Gilead did not get all of the days it requested underscores there

15   is not just a pro forma decision.

16        Plaintiffs point out that there is legislative history for § 156 that provides as follows:

17             While the Commissioner would be responsible for evaluating the
               applicant's determination regarding the patents listed in the
18             application, the Committee expects that most reviews would be
               *ministerial in nature*.  Since the applicant is under a duty to disclose
19             all relevant information (see Section 156(d)(4)), the application
               should be so well documented that a substantive review by the
20             Commissioner would usually not be necessary.

21   H.R. Rep. No. 98-857 (1984), *available at* 1984 WL 37416 (emphasis added).  But the use of the

22   word "ministerial" here does not automatically mean that a request for a PTE implicates only

23   nonpetitioning activity, as there is nothing to indicate that Congress was considering *Noerr-*

24   *Pennington* immunity in making this statement.  The point that Congress was making here seemed

25   to be related to the duty of disclosure would prevent against fraud.  *See Schering Corp. v. Mylan*

26   *Pharms., Inc.*, No. 09-6383 (JLL), 2011 U.S. Dist. LEXIS 53602, at *11-12 (D.N.J. May 17,

27   2011) ("Congress expected the term extension process to be an 'administratively simple'

28   proceeding, in which the 'determination as to whether a patent is eligible for extension . . . may be

United States District Court
Northern District of California

made solely on the basis of the representations made in the application for extension,' such that 'a final determination to refuse a patent term extension because of fraud or a violation of the duty of disclosure is expected to be rare.'  Rules for Extension of Patent Term, 52 Fed. Reg. at 9392."). Furthermore, the statement above notes that "*most* reviews would be ministerial"; it therefore contemplates that there will be some instances in which there is "substantive review."  H.R. Rep. No. 98-857 (emphasis added).

Finally, the Court notes it is fair to characterize the PTE process as discretionary in nature because § 156 expressly contemplates that, in some cases, there will need to be a due diligence evaluation.  Plaintiffs argue that the due diligence issue should be given little consideration because it "can only be triggered by a third party petition" and a due diligence determination is "rarely" ever made – including here.  Opp'n at 23 n.19 (emphasis in original).  But even if a due diligence review is not part and parcel of every PTE consideration, that does not mean that it can be segmented away from the larger process.  In any event, due diligence issues aside, there is still some discretion on the part of the government because there is no guarantee that an applicant's requested PTE will be granted, particularly in full – as was the case with Gilead's PTE request for the '791 patent.

2.    Petitioning Conduct Part of Larger Overall Scheme

Plaintiffs argue that, even if the Court were to find PTE a discretionary matter (*i.e.*, involving petitioning conduct), "there is no immunity for petitioning conduct that is an integral part of a larger overall scheme to restrain trade."  Opp'n at 20.  Plaintiffs rely here on Judge Whyte's *Hynix* decision.  *See Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084 (N.D. Cal. 2007)

In *Hynix*, Rambus was a member of a SSO (standard-setting organization) and allegedly used its membership in the SSO to discover how a particular standard was developing and then drafted patent claims to cover the standard.  "Once the industry became 'locked in' to the DRAM standard, Rambus sprang the 'patent trap' and demanded royalties," and further "backed up its royalty demands with infringement litigation."  *Id.* at 1089.  Hynix subsequently brought an antitrust claim based on Rambus's "'overall course of conduct' – including [its] patent litigation."

30

*Id.*

Before Judge Whyte, Rambus argued that, "because its use of the courts to enforce its patents is protected petitioning activity pursuant to the *Noerr-Pennington* doctrine . . . , Hynix could not claim its litigation expenses as damages." *Id.* at 1086.  Judge Whyte ultimately disagreed.

He noted that there were "three possible approaches to whether patent litigation can be an anticompetitive act in violation of the antitrust laws." *Id.* at 1091.

- Under the first approach (the Second Circuit's "absolute bar"), "only frivolous patents can be anticompetitive and part of an unlawful scheme." *Id.* at 1091-92.

- Under the second approach (labeled the "*Kobe* claim") – and at "the opposite end of the spectrum" – even nonfrivolous patent litigation can be anticompetitive if part of a broader anticompetitive scheme (*i.e.*, "brought in conjunction with other antitrust misconduct"). *Id.* at 1092-94.

- The third approach was a middle ground between the first two approaches.  *See id.* at 1094.  Under the third approach, "good faith litigation" could be "unlawful if done as part of an anticompetitive scheme" but, in order to get litigation costs as part of the damages for the antitrust violation, there must be "an explicit linkage between [the] antitrust violation and the litigation" – *i.e.*, a causal connection.  *Id.* at 1095.

Judge Whyte endorsed the third approach, explaining as follows:

> The jurisprudence contains a debate between the need to keep courts open for good faith litigation and a desire to prevent "smothering" and "aggressive weapon" patent litigation.  At one end is [the] *Kobe* court's "smothering" reasoning, which appears unconcerned that its hypothetical "potential competitor" was an infringer with no legal right to be competing in the product market. . . . Taken as a whole, the *Kobe* decision represents hostility to patent rights inconsistent with a modern understanding of intellectual property and competition law.  On the other hand, the Second Circuit's position would allow litigation brought to further anticompetitive schemes to go unchecked. . . .
>
> With these considerations in mind, the court believes that the Federal Circuit and the Supreme Court would recognize some "scheme" antitrust allegations that include constitutionally protected

> litigation within the "overall course of conduct," but only those in which the patent litigation is "causally connected" to anticompetitive harms. . . . The court concludes that before otherwise protected litigation can be a part of an "anticompetitive scheme" claim, the court must first find that the other aspects of the scheme independently produce anticompetitive harms. Once this step has been established, the court should ask whether the accused patent litigation was causally connected to these anticompetitive harms. If yes, an antitrust plaintiff may then include good faith patent litigation as part of the anticompetitive scheme.

*Id.* at 1096-97. He added: "[W]here the patent litigation is used to further the harm caused under a 'more traditional antitrust theory,' a plaintiff should be allowed a full recovery." *Id.* at 1097.

Although Plaintiffs have invoked *Hynix*, it does not have applicability to the instant case (as opposed to the *Intel* case that was recently before the Court[9]). *Hynix* focuses on the exercise of market power through litigation. Here, there was not the exercise of market power through litigation – *e.g.*, relying on a patent to bring patent infringement cases; rather, what is at issue is (allegedly) the use of the government process – *i.e.*, the PTE – to *get* market power.

Accordingly, the Court grants Defendants' motion to dismiss Plaintiffs' new liability theory based on the PTE. The dismissal is with prejudice. Plaintiffs have not articulated any other means by which they could avoid *Noerr-Pennington* immunity here, and thus amendment would be futile.

I.    Rule of Reason

Finally, Defendants argue that the Court should make a ruling now that the No-Generics Restraints should be evaluated under the rule of reason, and not under the per se illegal rule (or the quick-look rule). The Court declines to do so. Defendants seem to be asking the Court to make a determination that specific conduct of a legitimate joint venture be evaluated under the rule of reason. But it would be premature for the Court to address this issue when Plaintiffs have contested the legitimacy of the joint venture in the first place. *See* Docket No. 273 (Order at 18) (noting Plaintiffs' argument that there is a factual question as to whether the joint ventures were legitimate).[10] The Court is wary of making what would amount to an advisory opinion at this

---

[9] *See generally Intel Corp. v. Fortress Investment Group LLC*, No. C-19-7651 (N.D. Cal.) (Docket No. 190) (order on motion to dismiss).

[10] The Court acknowledges that the creation of a joint venture is, in fact, evaluated under the rule

United States District Court
Northern District of California

juncture.

### III.   <u>CONCLUSION</u>

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss. Specifically, the Court grants the motion to dismiss on the following:

- The overarching conspiracy claims (*i.e.*, Counts 1 and 4 in their entireties and part of Count 11).
- The claims based on the alleged payment of royalties after patent expiration.
- The claims based on the PTE for the TAF-related patent.

The above dismissals are with prejudice. The motion to dismiss is otherwise denied.

The Court directs the Clerk of the Court to temporarily file the entirety of this order under seal. The parties are ordered to meet and confer to determine which parts, if any, of this order should remain under seal. The parties shall report back on the issue of sealing within a week of the date of this order.

This order disposes of Docket No. 313.


**IT IS SO ORDERED**.


Dated: July 24, 2020


_____
EDWARD M. CHEN
United States District Judge

---

of reason. *See* Docket No. 273 (Order at 17); *see also Texaco Inc. v. Dagher*, 547 U.S. 1, 6 n.1 (2006). However, no party seems to contest this point – *i.e.*, this is not where Defendants are asking for the Court to make a determination.