1
2
3
4                    UNITED STATES DISTRICT COURT
5                   NORTHERN DISTRICT OF CALIFORNIA
6

<table>
<tr><td>

7    STALEY, et al.,

8                        Plaintiffs,

9         v.

10   GILEAD SCIENCES, INC., et al.,

11                       Defendants.
</td><td>

Case No.  19-cv-02573-EMC

**RELATED TO**

Case No.  20-cv-06961-EMC
Case No.  20-cv-06793-EMC
</td></tr>
<tr><td>

12   AND RELATED ACTIONS

13

14   KPH HEALTHCARE SERVICES, INC. v.
     GILEAD SCIENCES, INC., et al.,

15

16   FWK HOLDINGS, LLC, v. GILEAD
     SCIENCES, INC., et al.
</td><td>

**PUBLIC RE-FILING**

**ORDER DENYING DEFENDANTS'
MOTION TO COMPEL
ARBITRATION, AND GRANTING IN
PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS**

Docket Nos. 460-461
</td></tr>
</table>

18

19        The above-referenced case (No. C-19-2573) has been designated the lead case in several

20   related and coordinated antitrust actions.  The pleadings in the various actions are based on the

21   same underlying allegations – in essence, that manufacturers of certain HIV drugs conspired

22   together to restrain trade.  The plaintiffs in the actions differ slightly: in the lead *Staley* case, the

23   plaintiffs are indirect purchasers of HIV drugs; in the *KPH* and *FWK* actions (Nos. C-20-6961

24   EMC, C-20-6793 EMC), the plaintiffs represent direct purchasers of such drugs.  The defendants

25   in the actions also differ slightly.  The defendants in the *Staley* action are the Gilead entities

26   ("Gilead"), the BMS entities ("BMS"), and the Janssen entities ("Janssen").  The defendants in the

27   *KPH* and *FWK* actions are Gilead and BMS only.  However, consistent with the *Staley* case, the

28   *KPH* and *FWK* complaints still contain many allegations asserting that Janssen is a member of the

United States District Court
Northern District of California

antitrust conspiracy.

Currently pending before the Court are motions relevant to the direct purchaser cases, *KPH* and *FWK*.  The pending motions are: (1) Gilead and BMS's motion to compel arbitration and (2) Gilead and BMS's motion to dismiss.  Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby conditionally **DENIES** the motion to compel arbitration.  As for the motion to dismiss, it is **GRANTED** in part and **DENIED** in part.

## I.   DEFENDANTS' MOTION TO COMPEL ARBITRATION

The plaintiffs in the direct purchaser cases are KPH and FWK.  As an initial matter, the Court notes that KPH and FWK are not themselves direct purchasers of HIV drugs; that is, they did not directly purchase such drugs from the defendants in the cases, Gilead and BMS.  However, KPH and FWK have brought suit as "direct purchasers" because companies who did directly purchase HIV drugs from Gilead and BMS – McKesson and Kerr, respectively – assigned their legal claims to KPH and FWK.[1]

Gilead and BMS have moved to compel arbitration with respect to all antitrust claims asserted by KPH and FWK (as assignees of McKesson and Kerr).  In their motion, Gilead and BMS do not argue that *they* have agreements with McKesson and Kerr that contain arbitration clauses.  Rather, Gilead and BMS note that McKesson and Kerr have agreements with JOM (a Janssen affiliate) that contain arbitration clauses.  The agreements are distribution agreements in which McKesson and Kerr are designated nonexclusive authorized distributors of certain Janssen/JOM drugs.  According to Gilead and BMS, although they are not signatories to the JOM Agreements, they are still able to rely on the arbitration provisions contained therein and compel KPH and FWK (as McKesson and Kerr's assignees) to arbitration based on an equitable estoppel theory.

A.   Delegation to Arbitrator

As an initial matter, the Court must address whether it, or an arbitrator instead, should

---

[1] For purposes of the pending motion, Defendants have not challenged the assignment made by McKesson to KPH or the assignment made by Kerr to FWK.

United States District Court
Northern District of California

United States District Court
Northern District of California

decide whether Gilead and BMS, as nonsignatories, can rely on an equitable estoppel theory to compel arbitration. Gilead and BMS contend that the arbitrator, and not the Court, has the authority to decide this issue. According to Gilead and BMS, the arbitrator decides whether they can compel KPH and FWK to arbitration because (1) the agreements that JOM had with McKesson and Kerr incorporate the AAA's Commercial Arbitration Rules and (2) the AAA Rules include a provision that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." AAA Comm. Arb. R-7(a) (available at https://adr.org/sites/default/files/Commercial%20Rules.pdf). In other words, Gilead and BMS contend that the incorporation of the AAA Rules create agreements to delegate "gateway" issues of arbitrability to the arbitrator. *See generally Oracle Am., Inc. v. Myriad Group A.G.*, 724 F.3d 1069, 1074-75 (9th Cir. 2013) (agreeing with the "prevailing view that incorporation of the [AAA] rules is clear and unmistakable evidence that the parties agreed the arbitrator would decide arbitrability").

The Court rejects Defendants' argument in light of *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122 (9th Cir. 2013). In *Kramer*, the plaintiffs were owners of Toyota Prius cars who had purchased their cars from Toyota dealerships. When they purchased their cars, they did so on credit by entering into purchase agreements with the dealerships. The purchase agreements contained arbitration provisions. The plaintiffs filed a class action against Toyota (not the dealerships), asserting that they experienced defects in their anti-lock brake systems ("ABS"). *See id.* at 1124. In response, Toyota argued, *inter alia*, that the action should be compelled to arbitration. The district court denied the motion to compel arbitration. Of note, the district court "found that Toyota, as a nonsignatory to the Purchase Agreements between Plaintiffs and Dealerships, could not compel arbitration." *Id.* at 1125-26.

On appeal, Toyota asserted that the issue of whether Toyota had a right to compel arbitration should have been decided by an arbitrator, and not the district court. According to Toyota, "because the Purchase Agreements expressly provide that the arbitrator shall decide issues of interpretation, scope, and applicability of the arbitration provision, the arbitrator should decide

the issue of whether a nonsignatory may compel Plaintiffs to arbitrate." *Id.* at 1127.  The Ninth

Circuit disagreed.

The court noted first that

> "whether parties have agreed to 'submi[t] a particular dispute to arbitration' is typically an '"issue for judicial  determination."'  "It is similarly well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide."  As explained in *First Options of Chicago, Inc. v. Kaplan*, [514 U.S. 938 (1995)] "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so."

*Id.*

The Ninth Circuit then held that the arbitration clauses in the purchase agreements did

> not contain clear and unmistakable evidence that Plaintiffs and Toyota agreed to arbitrate arbitrability.  While Plaintiffs may have agreed to arbitrate arbitrability in a dispute with the Dealerships, the terms of the arbitration clauses are expressly limited to Plaintiffs and the Dealerships.  For example, Scholten's arbitration clause states that "[e]ither you or we may choose to have any dispute between you and us decided by arbitration."  The language of the contracts thus evidences Plaintiffs' intent to arbitrate arbitrability with the Dealerships and no one else.  The Dealerships are not a party to this action.  Given the absence of clear and unmistakable evidence that Plaintiffs *agreed to arbitrate arbitrability with nonsignatories*, the district court had the authority to decide whether the instant dispute is arbitrable.

*Id.* (emphasis added); *see also id.* at 1128 (underscoring that "the arbitration clause is limited to claims between 'you and us' – i.e. Plaintiffs and the Dealerships"); *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1045 (9th Cir. 2009) (noting that "[t]he arbitration agreement is premised on a disagreement between Wells Fargo and the borrower[;] [i]n the absence of such a disagreement, the arbitration provision does not apply [and therefore] any disagreement between the borrower and a third party, such as [the defendant], is simply not within the scope of the arbitration agreement, even if it is related in some attenuated way to 'account, loans, services or agreements' subject to the arbitration provision").[2]

---

[2] District court decisions within the Ninth Circuit are in accord with *Kramer* and *Mundi*.  *See, e.g.*:

- *Soto v. Am. Honda Motor Co.*, 946 F Supp. 2d 949, 952-54 (N.D. Cal. 2012) (Illston, J.) (rejecting defendant's argument that the issue of whether it could compel arbitration as a

United States District Court
Northern District of California

In the instant case, the arbitration provision in the McKesson-JOM Agreement similarly contains clear-cut language evidencing an intent to arbitrate disputes between the signatories only. Section 4.16 of the McKesson-JOM Agreement provides in relevant part as follows:

> (a) In the event of a dispute *arising between the parties* regarding this Agreement and prior to commencement of escalated action set forth below, the parties shall attempt in good faith to amicably resolve such dispute by good faith settlement discussions between appropriate members of management of each party . . . . In the event the above settlement discussions are ineffective, any controversy or claim arising out of or relating to this Agreement between the parties (including without limitation any controversy or claim relating to this Agreement involving the parent company, subsidiaries, or affiliates under common control of the Company or the Distributor (a "Dispute")), shall first be submitted to mediation according to the *Commercial Mediation Procedures* of the American Arbitration Association ("AAA") (see www.adr.org). Such mediation shall be attended *on behalf of each party* for at least one (1) session by a senior business person with authority to resolve the Dispute. . . .
>
> (b) Any Dispute that cannot be resolved by mediation within ten (10) days after the mediation (*unless the parties agree* to extend that period) shall be resolved by arbitration in accordance with the Commercial Arbitration Rules of the AAA ("AAA Rules"; see www.adr.org) and the Federal Arbitration Act, 9 U.S.C. § 1 et seq. . . .

McKesson-JOM Agreement § 4.16 (emphasis added).

The arbitration provision in the Kerr-JOM Agreement contains slightly different language.

---

third-party nonsignatory had to be decided by the arbitrator; stating that "the threshold issue of whether the delegation clause is even applicable to a certain party must be decided by the Court" because "[t]he provisions granting authority to the arbitrator to decide issues of scope are by definition are only applicable to the parties of the agreement" – arbitration clause covered "'[a]ny claim or dispute . . . between you or us'").

- *Lomeli v. Midland Funding, LLC*, No. 19-CV-01141-LHK, 2019 U.S. Dist. LEXIS 166151, at *3, 24 (N.D. Cal. Sep. 26, 2019) (agreeing with *Soto*; arbitration clause covered "'any claim, dispute, or controversy between you and us'").

- *Aliff v. Vervent, Inc.*, No. 20-cv-00697-DMS-AHG, 2020 U.S. Dist. LEXIS 175778, at *22-23 (S.D. Cal. Sep. 24, 2020) (noting that "[t]he Loan Agreements' arbitration provisions are limited to disputes which may be submitted to arbitration 'at my or your election' – i.e., at either the election of Plaintiffs or DBTCA as Liberty Bank's assignee[;] [t]hey do not provide that a third party may elect to submit a loan-related dispute to arbitration," and therefore there was no clear and unmistakable evidence that plaintiffs and a nonsignatory agreed to arbitrate arbitrability).

United States District Court
Northern District of California

Section 4.21 of the agreement provides as follows:

> (a)    Any controversy or claim arising out of or relating to this Agreement (including without limitation any controversy or claim relating to this Agreement involving the parent company, subsidiaries, or affiliates under common control of the Company or the Distributor (a "Dispute")), shall first be submitted to mediation according to the Commercial Mediation Procedures of the American Arbitration Association ("AAA") (see www.adr.org).  Such mediation shall be attended on behalf of each party for at least one session by a senior business person with authority to resolve the Dispute. . . .

> (b)    Any Dispute that cannot be resolved by mediation within 45 days of notice by one party to the other of the existence of a Dispute (unless the parties agree to extend that period) shall be resolved by arbitration in accordance with the Commercial Arbitration Rules of the AAA ("AAA Rules"; see www.adr.org) and the Federal Arbitration Act, 9 U.S.C. § 1 et seq.

Kerr-JOM Agreement § 4.21.  Although § 4.21 contains slightly different language, the italicized language indicates the arbitration obligation is binding on *parties* to the agreement; the agreement does not state that the obligations and rights thereunder extend to a nonsignatory.  At the very least, there is ambiguity as to whether Kerr agreed to arbitrate arbitrability with a nonsignatory (instead of just the signatory JOM).  *Kramer* demands that there be "clear and unmistakable evidence" that a signatory agreed to arbitrate arbitrability with a nonsignatory.  *See Kramer*, 705 F.3d at 1127 ("'[T]he law treats silence or ambiguity about the question '*who* (primarily) should decide arbitrability' differently from the way it treats silence or ambiguity about the question 'whether a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement' – for in respect to this latter question the law reverses the presumption.'") (emphasis in original).

In their papers, Gilead and BMS acknowledge *Kramer* but argue that it is distinguishable. Defendants also suggest that *Portland GE v. Liberty Mutual Insurance Co.*, 862 F.3d 981 (9th Cir. 2017) [hereinafter "*PGE*"], is more on point.  *See* Reply at 3 (also citing decisions from circuit courts outside the Ninth Circuit).  Neither argument is persuasive.

According to Defendants, *Kramer* is distinguishable because the arbitration provision in that case "did not incorporate the AAA rules," which has a broader delegation clause compared to

the delegation clause in *Kramer*.  Under the AAA Rules, "'[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.'"  Reply at 3.  In contrast, the delegation clause in *Kramer* "appl[ied] only 'to any claim or dispute about the interpretation and scope of this Arbitration Clause' and 'any claim or dispute about whether a claim or dispute should be determined by arbitration.'"  Reply at 3.  But *Kramer* did not turn on the narrowness or breadth of the delegation clause.  As indicated above, *Kramer* turned on the language in the arbitration provision evidencing that arbitrable disputes were disputes between "you and us" – *i.e.*, the signatories to the agreement and not to any nonsignatory.  In other words, the key in *Kramer* is not the breadth of the scope of the arbitration agreement, but *who* is bound thereby.

As for *PGE*, the Ninth Circuit did hold that an arbitrator, and not the district court, should have decided the arbitrability issue but that holding was based on a unique and specific set of facts.  The case involved three related contracts.

    (1) A Construction Contract in which Portland General Electric Company ("PGE") hired a Contractor to build a power plant.  This agreement mentioned arbitration in passing, but did not require it.

    (2) A Performance Bond which the Contractor was required to obtain under the Construction Contract.  The Bond was issued by the Sureties to PGE.  The Bond was silent as to arbitration.

    (3) A Guaranty which the Contractor was also required to obtain under the Construction Contract – specifically, from its parent company.  The Guarantor issued the Guaranty to PGE.  The Guaranty included an arbitration provision.  Under the Guaranty, the Guarantor and PGE agreed to submit disputes in connection with the Guaranty to binding arbitration.  The Guaranty also specified that, once an arbitration is commenced, "'either Party may implead any other person or entity (with such person or entity's consent) . . . provided such claim arises out of or in connection with an agreement with a Subcontractor or this

1   Guaranty.'"   *Id.* at 984.

2   A dispute arose when PGE declared the Contractor in default and terminated the

3   Construction Contract.  The Guarantor initiated an arbitration, naming PGE as the respondent and

4   the Contractor as an impleaded party.  The Guarantor then sought to include the Sureties in the

5   arbitration as well.  The Sureties consented to the arbitration and requested relief similar to that

6   requested by the Guarantor.  *See id.*  Subsequently, PGE filed a suit in federal court against the

7   Sureties.  "PGE sought a preliminary injunction prohibiting the Sureties from arbitrating their

8   claims against PGE, claiming that [the Guarantor] had improperly impleaded the Sureties."  *Id.*

9   PGE also sought relief from the arbitrator, asserting that the arbitration was an effort to drag into

10   arbitration claims that PGE, the Sureties, and the Contractor had agreed to litigate and not

11   arbitrate.

12   The district court held that it, and not an arbitrator, should decide the issue of arbitrability

13   – *i.e.*, whether the impleader provision in the Guaranty should extend to the resolution of PGE's

14   dispute with the Sureties.  On appeal, the Ninth Circuit disagreed.  There was a clear and

15   unmistakable delegation of authority to an arbitrator because the Guaranty had a provision that the

16   ICC Rules would apply and the ICC Rules specified that the arbitrator would decide questions of

17   arbitrability.  The Ninth Circuit acknowledged PGE's argument that it had a contract with the

18   Sureties – *i.e.*, the Bond – and the Bond did not contain an arbitration clause.  But that fact did not

19   detract from the fact that the *Guaranty* still contained an arbitration clause, and one that allowed

20   for impleader.  Accordingly:

21   > Whether [the Guarantor] properly joined the Sureties to the
    > arbitration pursuant to the Guaranty and the ICC Rules, whether the
22   > Sureties' claim against PGE meets the Guaranty's test of "aris[ing]
    > out of or in connection with an agreement with a Subcontractor or
23   > [the] Guaranty," and whether PGE has therefore agreed to arbitrate
    > its dispute against the Sureties, are questions of the scope of the
24   > arbitration agreement in the Guaranty, delegated to the arbitrators.

25   *Id.* at 985-86.

26   *PGE* is clearly distinguishable.  The arbitration in *PGE* arose because of the arbitration

27   provision in the Guaranty, and the arbitration was initiated by a signatory (the Guarantor) against

28   another signatory (PGE).  Whether a nonsignatory (the Sureties) could also invoke arbitration

United States District Court
Northern District of California

8

turned on the impleader provision in the Guaranty.  The unique relationships of the parties and the relationship of the impleading provision to the arbitration clause in the Guaranty in *PGE* are not at issue in the instant case.  Moreover, nothing in *PGE* indicates it intended to overrule *Kramer*.

Gilead and BMS protest that other courts – including circuit courts – have held that an arbitrator, and not a court, should decide the issue of arbitrability.  *See* Mot. at 6-7 (citing, *e.g.*, *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842 (6th Cir. 2020)[3]); *see also* Docket No. 542 (motion for leave to file statement of recent decision) (referring to *In re Intuniv Antitrust Litig.*, No. 1:16-cv-12653-ADB, 2021 U.S. Dist. LEXIS 26012 (D. Mass. Jan. 29, 2021)).[4]  They are correct, and some of these cases arguably have facts closer to the instant case than to *PGE*.  But these cases are not binding on this Court.  *Kramer* is.  The Court therefore, and not an arbitrator, shall adjudicate Defendants' equitable estoppel argument.

**B.**     <u>Choice of Law</u>

Having decided the issue above in favor of KPH and FWK, the Court now turns to the issue of what state law the Court should apply in deciding whether the Defendants can compel arbitration.  *See Kramer*, 705 F.3d at 1128 (stating that the "Supreme Court has held that a litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement"); *see also In re Carrier IQ, Inc. Consumer Privacy Litig.*, No. C-12-md-2330 EMC, 2014 U.S. Dist. LEXIS 42624, at *33 (N.D. Cal. Mar. 28, 2014) (noting that, "[a]fter the Supreme Court's decision in *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009), it is clear that state law, and not federal law, determines the applicability of equitable estoppel in the arbitration context").

---

[3] In *Blanton*, the plaintiff was a former employee of a Domino's franchise.  He filed a class action against Domino's, "alleging that the company's franchise agreement violated federal antitrust law as well as state law."  *Blanton*, 962 F.3d at 844.  Domino's moved to compel arbitration based on an arbitration agreement that the plaintiff had entered into with the Domino's franchise.  The Sixth Circuit held that an arbitrator should have decided the issue of whether Domino's, as a nonsignatory, could compel arbitration – citing the incorporation of the AAA Rules in the arbitration agreement between the plaintiff and the Domino's franchise.  *See id.* at 846 (stating that incorporation of the AAA rules if clear and unmistakable evidence that the parties agreed to arbitrate arbitrability).

[4] The Court grants Defendants' motion for leave to file a statement of recent decision.

United States District Court
Northern District of California

Defendants argue that Delaware and/or New Jersey law should apply because "the signatories [to the McKesson-JOM and Kerr-JOM Agreements] as well as Gilead and BMS are either 'organized and existing under the laws of the State of Delaware' or 'the State of New Jersey.'"[5] Mot. at 9. Defendants also argue that Delaware and/or New Jersey law should apply because "the relevant state law set forth in the [McKesson-JOM and Kerr-JOM] Distribution Agreements is Delaware and New Jersey law, respectively." Mot. at 9; *see also* McKesson-JOM Agreement § 4.16(c) (providing that "[t]he arbitrator must interpret any dispute arising out of or relating to this Agreement in accordance with the laws of Delaware, without giving effect to its choice of law principles"); McKesson-JOM Agreement § 4.21(c) (containing the same language but invoking the laws of New Jersey). According to Defendants, under both Delaware and New Jersey law, if there is an agreement that contains an arbitration clause, a nonsignatory can compel a signatory of the agreement to arbitration under an equitable estoppel theory.

In response, Plaintiffs argue that Defendants failed to conduct a choice-of-law analysis. In *In re Henson*, 869 F.3d 1052 (9th Cir. 2017), the Ninth Circuit held that "[t]he district court erred by applying New York law based on the Customer Agreement's choice-of-law provision. 'A choice-of-law clause, like an arbitration clause, is a contractual right and generally may not be invoked by one who is not a party to the contract in which it appears,'" and therefore, "we apply the choice-of-law principles of the forum state." *Id.* at 1059. Hence, in the case at bar, the choice-of-law provisions in the JOM Agreements cannot be invoked by Gilead and BMS. Instead, the Court must apply a choice-of-law analysis *de novo* in accordance with applicable law.

Plaintiffs argue:

> Under California's choice-of-law analysis, other states' laws will apply only if Defendants show, among other things, that the equitable estoppel laws of those states materially differ from the equitable estoppel law of California. Otherwise, California law will apply. Defendants have not met this burden, as they have not compared California's law with the laws of Delaware or New Jersey.

Opp'n at 5; *see also Henson*, 869 F.3d at 1059-60 (noting that, under California choice-of-law

---

[5] Defendants admit that Kerr was incorporated in Michigan (and had a principal place of business there as well) but note that Kerr has now ceased operations.

principles, defendant had to show, *inter alia*, that California and New York law materially differed; "[o]therwise, we apply California law"). Plaintiffs add, however, that California law and Delaware law do not materially differ on the issue of equitable estoppel; "[t]his, together with Defendant[s'] statement that the equitable estoppel laws of Delaware and New Jersey are similar, show the equitable estoppel laws of all three states are materially similar, so California law should apply." Opp'n at 6.

In reply, Defendants dispute Plaintiffs' claim that is no material difference with respect to the laws of California, Delaware, and New Jersey. Defendants also contend that (1) Delaware and New Jersey have an interest in having their own laws apply because "McKesson, Janssen, Gilead, and BMS are all Delaware and/or New Jersey corporations" and that (2) "California has less of an interest [because] there are no California residents as plaintiffs and no California consumers would be a part of the purported direct-purchaser class." Reply at 9.

For purposes of this order, the Court need not definitively decide which state's law should apply. Even if there are differences among the laws of California, Delaware, and New Jersey, they are materially identical for purposes of resolving the issue at bar. For example:

- Under California law, equitable estoppel applies in two circumstances: (1) "'when the signatory to a written agreement containing an arbitration clause "must rely on the terms of the written agreement in asserting [its] claims" against the nonsignatory,'" and (2) "when a signatory alleges interdependent and concerted misconduct" by a signatory and nonsignatory and "the claims against the nonsignatory are founded in and inextricably bound up with the obligations imposed by the agreement containing the arbitration clause" (*i.e.*, "the allegations of interdependent misconduct must be founded in or intimately connected with the obligations of the underlying agreement").[6] *Goldman v. KPMG, LLP*, 173 Cal.

---

[6] Plaintiffs have suggested that there is reliance on the terms of a written agreement only where a claim asserts a violation of a duty or obligation imposed by the agreement. *See* Opp'n at 13. In support, they cite *Murphy v. DirecTV, Inc.*, 724 F.3d 1218 (9th Cir. 2013), where the Ninth Circuit stated: "[i]n California, equitable estoppel is inapplicable where a plaintiff's 'allegations reveal no claim of any violation of any duty, obligation, term or condition imposed by the . . . agreements.'" *Id.* at 1230. But the *Murphy* court was quoting from the state court decision in *Goldman* and,

United States District Court
Northern District of California

United States District Court
Northern District of California

1    App. 4th 209, 218-19 (2009) (emphasis omitted).

2    • Delaware law provides as follows: "'First, equitable estoppel applies when the

3    signatory to a written agreement containing an arbitration clause must rely on the

4    terms of the written agreement in asserting its claims against the nonsignatory. . . .

5    Second, application of equitable estoppel is warranted when the signatory to the

6    contract containing an arbitration clause raises allegations of substantially

7    interdependent and concerted misconduct by both the nonsignatory and one or

8    more of the signatories to the contract.'" *Wilcox & Fetzer, Ltd. v. Corbett &*

9    *Wilcox*, No. 2037-N, 2006 Del. Ch. LEXIS 155, at \*16-17 (Ch. Aug. 22, 2006)

10   (quoting *Grigson v. Creative Artists Agency*, 210 F.3d 524, 527 (5th Cir. 2000),

11   which in turn quotes from *MS Dealer Serv Corp. v. Franklin*, 177 F.3d 942, 947

12   (11th Cir. 1999)).  Although Defendants suggest that, with respect to the second

13   situation above, Delaware law is less "stringent" compared to California law, Reply

14   at 9 – *i.e.*, because there is no additional language that the allegations of the

15   interdependent misconduct must be founded in or intimately connected with the

16   obligations of the underlying agreement – that is not clearly the case.  As indicated

17   above, Delaware law follows the Eleventh Circuit case *MS Dealer*.  And as the

18   California court in *Goldman* explained: "*MS Dealer* – both in its facts and in the

19   court's analysis – establishes . . . that mere allegations of collusive behavior

20   between signatories and nonsignatories to a contract are not enough to compel

21   arbitration between parties who have not agreed to arbitrate: those allegations of

22   collusive behavior must also establish that the plaintiff's claims against the

23   nonsignatory are '"intimately founded in and intertwined with the obligations

24

─────────────────────────

25   while *Goldman* did use this language, *Goldman* also noted more broadly that equitable estoppel
     "prevent[s] a party from using the terms or obligations as the basis for his claims against a

26   nonsignatory, while at the same time refusing to arbitrate with the nonsignatory under another
     clause of that same agreement."  *Goldman*, 173 Cal. App. 4th at 221; *see also id.* at 230 (noting

27   that "[plaintiff's] allegations reveal no claim of any violation of any duty, obligation, term or
     condition imposed by the operating agreements[,] *[n]or is there any claim founded in or even*

28   *tangentially related to* any duty, obligation, term or condition imposed by the operating
     agreements") (emphasis added).

imposed by the [contract containing the arbitration clause." " *Goldman*, 173 Cal. App. 4th at 223 (quoting *MS Dealer*, 177 F.3d at 948).

- Finally, under New Jersey law, a nonsignatory defendant's ability to compel a signatory plaintiff to arbitration may take into account the connection between the claims at issue, the arbitration agreement, and the parties, but "the intertwinement of the parties and claims in a dispute, viewed in isolation, is insufficient to warrant application of equitable estoppel." *Hirsch v. Amper Fin. Servs., LLC*, 215 N.J. 174, 179 (2013); *see also id.* at 193 (stating that "the doctrine of equitable estoppel does not apply absent proof that a party detrimentally rely on another party's conduct"); *Sicily by Car S.p.A. v. Hertz Glob. Holdings, Inc.*, No. 14-6113 (SRC), 2015 U.S. Dist. LEXIS 65751, at *11-12 (D.N.J. May 20, 2015) (noting that, under *Hirsch*, there must be a showing of detrimental reliance).

The common thread among California, Delaware, and New Jersey law is that, in order for equitable estoppel to apply, there must be some kind of relationship between the claims at issue and the contract containing the arbitration clause. This is imminently reasonable given the underlying purposes of equitable estoppel – *i.e.*, "if a plaintiff relies on the terms of an agreement to *assert* his or her claims against a nonsignatory defendant, the plaintiff may be equitably estopped from *repudiating* the arbitration clause of that very agreement. In other words, a signatory to an agreement with an arbitration clause cannot have it both ways." *Goldman*, 173 Cal. App. 4th at 220 (internal quotation marks omitted; emphasis omitted); *see also Carrier IQ*, 2014 U.S. Dist. LEXIS 42624, at *40 (noting that "[t]he doctrine of equitable estoppel is . . . predicated on the unfairness of allowing a party to rely on part of a contract in asserting a claim while, at the same time, disavowing another part of the same contract"). Similarly, if the claims are founded in and inextricably bound up with the obligations imposed by the agreement containing the arbitration clause, it is fair to permit the non-party subject to those claims to invoke the arbitration provision. In short, a party seeking the benefits of the contract must also accept the burdens of that contract. That is the essence of equitable estoppel.

In the instant case, the Court's resolution of the motion to compel arbitration turns on this

United States District Court
Northern District of California

1    common thread.

2    C.    Plaintiffs' Disavowal

3            According to Gilead and BMS, Plaintiffs' antitrust claims against them rely on, are

4    founded in, and/or are connected with the McKesson-JOM and Kerr-JOM Agreements because, in

5    their antitrust claims, Plaintiffs are asserting (1) there was a conspiracy to restrain trade involving

6    not only Gilead and BMS but also Janssen and (2) the McKesson-JOM and Kerr-JOM

7    Agreements were a part of that conspiracy, requiring Plaintiffs to pay supracompetitive prices for

8    Gilead/Janssen HIV drugs (such as Edurant, Prezista, Prezcobix, and Symtuza).[7]  Defendants

9    highlight, in particular, Count 3 in the KPH and FWK complaints, in which Plaintiffs expressly

10   allege that there was an illegal agreement to restrain trade between Gilead and Janssen and that, as

11   a result, Plaintiffs paid more than they would have for Gilead/Janssen HIV drugs such as Edurant,

12   Prezista, Prezcobix, and Symtuza.  *See, e.g.*, KPH Compl. ¶¶ 459, 461.

13           But notably, Plaintiffs are not suing Gilead and BMS directly on terms contained in the

14   JOM Agreements.  Rather, the main anticompetitive conduct for which Plaintiffs are suing Gilead

15   and BMS is based on terms contained in the "joint venture" agreements between Gilead and BMS

16   – *i.e.*, the No Generics Restraints.  Moreover, the mere fact that Plaintiffs allege a conspiracy to

17   restrain trade among Gilead, BMS, and Janssen alone is insufficient to invoke equitable estoppel

18   because the JOM Agreements containing the arbitration provisions are not a part of the core

19   conduct comprising the conspiracy; JOM's distribution agreements with McKesson and Kerr do

20   not call for conspiratorial acts.  *Compare, e.g.*, *Coal. for ICANN Transparency, Inc. v. VeriSign,*

21   *Inc.*, 611 F.3d 495 (9th Cir. 2010) (antitrust case where plaintiff claimed that VeriSign and

22   ICANN contracts were anticompetitive because, *e.g.*, they contained a presumptive renewal

23   provision).  Rather, the only relationship of the JOM distribution agreements with the alleged

24   conspiracy is that the high prices of the drugs sold under JOM's distribution agreements are the

25   *result* of the conspiracy.  Given these circumstances, one could argue that Plaintiffs are not relying

26

27   _____

28   [7] In support of their position, Defendants have cited, *inter alia*, *MS Dealer*, 177 F.3d at 942; *JLM Industries, Inc. v. Stolt-Nielsen SA*, 387 F.3d 163 (2d Cir. 2004); and *In re Apple & AT&TM Antitrust Litig.*, 826 F. Supp. 2d 1168 (N.D. Cal. 2011).

United States District Court
Northern District of California

1   on the JOM Agreements to state their substantive claims against Gilead and BMS;  at most, the

2   agreements inform the magnitude of damages, not substantive liability (*i.e.*, the merits of their

3   legal claims).

4        The Court, however, need not resolve the precise contours of equitable estoppel here

5   because, at the hearing, Plaintiffs clarified (upon being pressed by the Court) that they were

6   disavowing any claim to damages based on purchases that McKesson and Kerr made under the

7   agreements they had with JOM.  In light of Plaintiffs' disavowal, the Court finds that any

8   discernable principle which might animate equitable estoppel does not lie here – *i.e.*, Gilead and

9   BMS cannot claim any unfairness from Plaintiffs trying to *avoid* obligations under the McKesson-

10  JOM and Kerr-JOM Agreements (*i.e.*, arbitration) if Plaintiffs are not even *asserting* damages

11  based on the agreements in the first place.  Thus, Defendants' motion to compel arbitration must

12  be rejected.

13       That being said, because Plaintiffs' complaints, as currently pled, do not clearly and

14  expressly make the disavowal that Plaintiffs did at the hearing, the Court shall, at this juncture,

15  *conditionally* deny the motion to compel arbitration.  The denial is conditioned on KPH and FWK

16  amending their complaints so as to clearly and expressly disavow any claim to damages based on

17  the purchases that McKesson made under the McKesson-JOM Agreement and that Kerr made

18  under the Kerr-JOM Agreement.  The amended complaint shall be filed within thirty (30) days

19  from the date of this order.

20            **II.**     **DEFENDANTS' MOTION TO DISMISS**

21       Because the Court is conditionally denying Defendants' motion to compel arbitration, it

22  must adjudicate Defendants' motion to dismiss.  In the motion to dismiss, Defendants contend that

23  dismissal is appropriate based on (1) lack of subject matter jurisdiction and (2) failure to state a

24  claim for relief.

25  A.    <u>Motion to Dismiss for Lack of Subject Matter Jurisdiction</u>

26       Defendants' motion to dismiss for lack of subject matter jurisdiction is based on the

27  contention that Plaintiffs' antitrust claims are not ripe.  Specifically, Defendants argue that the

28  claims are not ripe because (1) Plaintiffs' antitrust claims are based on assignments of interests

from McKesson and Kerr and (2) McKesson and Kerr had agreements with Defendants which contained provisions requiring them to participate in a dispute resolution process before they could file suit.

        1.   <u>Legal Standard</u>

Because Defendants are challenging subject matter jurisdiction, Federal Rule of Civil Procedure 12(b)(1) governs.  Where a defendant brings a motion to dismiss under Rule 12(b)(1), it can make a facial attack or a factual attack.  *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).  Here, Defendants have made a factual attack because they are relying on evidence outside the four corners of the complaint (such as the agreements that McKesson and Kerr had with Defendants).  Where a factual motion to dismiss is made and only written materials are submitted for the court's consideration, a plaintiff need only establish a prima facie case of jurisdiction.  *See Societe de Conditionnement en Aluminum v. Hunter Eng'g Co.*, 655 F.2d 938, 942 (9th Cir. 1985).

        2.   <u>Agreements</u>

In support of their ripeness argument, Defendants have provided copies of the agreements they had with McKesson and/or Kerr.  These agreements, according to Defendants, contain terms that required a dispute resolution process to be exhausted first before Plaintiffs could bring their antitrust claims to Court for resolution.  For example:

- Exhibit B to the Burke Declaration is an agreement between McKesson and Gilead, in which McKesson is appointed a nonexclusive authorized distributor of certain drugs.  Section 19(a) of the agreement provides in relevant part: "The Parties shall attempt to settle any dispute, controversy or claim (each a 'Dispute') between them **arising out of or relating** to this Agreement amicably through discussion among representatives from each Party responsible that are responsible for the day-to-day management of the Agreement.  If such efforts fail to resolve the Dispute, the Parties shall attempt to settle the Dispute amicably through discussion among executive officers from each Party.  In the event a Dispute remains unresolved ███████████████ Days from inception, the Parties shall be free to pursue whatever remedy at law is available to them in accordance with this Agreement"

(emphasis added).  California law governs the agreement (§ 19(a)).

- Exhibit D to the Burke Declaration is an agreement between McKesson and BMS in which McKesson is appointed a nonexclusive authorized distributor of certain drugs.  Section 15.10.1 of the agreement provides: "In the event of any dispute or claim **arising out of or relating to** this Agreement, or to the breach, termination, or validity of this Agreement, such dispute or claim shall be resolved as follows: the executive officers of both Parties shall meet to attempt to resolve such disputes or claims by good faith negotiations.  If the Executive Officers cannot resolve such dispute or claim within ███████████ after a Party requests such a meeting, then each Party reserves its right to any and all remedies available under law or equity" (emphasis added).  New York law governs the agreement (§ 15.1).

- Exhibit F to the Burke Declaration is an agreement between Kerr and BMS in which Kerr is appointed a nonexclusive authorized distributor of certain drugs.  The agreement contains the same basic § 15.10.1 as above.  New York law also governs (§ 15.1).[8]

3.    "arising out of or relating to"

As indicated by the above, the relevant agreements require the dispute resolution process to be used where there is a dispute "arising out of or relating to" the agreement.  The phrase "arising out of or relating to" is broad in nature.  Given the broad language, the Court agrees with Gilead and BMS that the antitrust claims brought by Plaintiff are subject to dispute resolution.  The claims – at the very least – relate to the agreements because Plaintiffs are asserting the distribution agreements with Gilead and/or BMS required McKesson and/or Kerr to pay supracompetitive prices for the HIV drugs.

Support for Defendants' position comes from, *e.g.*, *In re Remicade (Direct Purchaser) Antitrust Litigation*, 938 F.3d 515 (3d Cir. 2019) – even though the court applied New Jersey law, and not California and New York law.  In *Remicade*, the plaintiff was a direct purchaser of certain

---

[8] Defendants have not provided a copy of any agreement between Kerr and *Gilead*.

United States District Court
Northern District of California

pharmaceutical drugs.  It sued the drug manufacturer for antitrust violations.  The question for the Third Circuit was whether the plaintiff's antitrust claims had to be compelled to arbitration.  The parties had entered into a Distribution Agreement which had an arbitration clause.  Under that clause, the parties agreed to arbitrate all claims "arising out of or relating to" the Distribution Agreement.  The Third Circuit noted that, under New Jersey law, the phrase "arising out of or relating to" is broad in nature.  *See id.* at 523.  It held that the plaintiff's antitrust claims did arise out of or relate to the Distribution Agreement because "the gravamen of [the] complaint is that [defendant's] anticompetitive Plan 'enabled [it] to sell its branded [drug] at artificially inflated prices,' and the only 'inflated price[]' that could have caused [plaintiff's] injury was the price it paid [defendant] for [the drug], i.e., the WAC or list price provided in the Agreement." *Id.* at 524.  Thus, the antitrust claims were "'undeniably intertwined' with the [Distribution] Agreement because 'it is the fact of [plaintiff's] entry into the [Agreement] containing the allegedly inflated price . . . that gives rise to the claimed injury.'" *Id.*[9]

Other cases that support Defendants include *KPH Healthcare Services, Inc. v. Mylan N.V.*, 2020 U.S. Dist. LEXIS 106808 (D. Kan. June 18, 2020), and *In re TFT-LCD (Flat Panel) Antitrust Litigation*, No. M 07-1827 SI, 2011 U.S. Dist. LEXIS 72389 (N.D. Cal. July 6, 2011).

In *KPH*, the plaintiff was (as here) KPH.  It filed an antitrust suit against, *inter alia*, Mylan, a company that manufactured and sold EpiPens.  KPH was not a direct purchaser of EpiPens itself but had been assigned direct purchaser rights by McKesson (as here).  McKesson and Mylan had a Distribution Agreement that contained a mandatory ADR provision: "'In the event of any dispute between the parties arising out of the existence, validity, construction, performance, or breach of this Agreement, either party shall give the other written notice of the dispute and the parties shall meet and attempt to resolve the dispute information.'" *KPH*, 2020 U.S. Dist. LEXIS 106808, at *4.  The court held (applying Delaware law) that the phrase "arising out of" was broad in scope.  *See id.* at *7-8.  It then agreed with Mylan that KPH's antitrust claims fell within the broad scope.

---

[9] The breadth accorded to "arising out of or related to" language, for purposes of determining the parties' obligations to each other, stands in contrast to the more rigorous "founded in and inextricably bound up" test for equitable estoppel applicable to nonsignatories discussed *supra*.

United States District Court
Northern District of California

> [H]ere, plaintiff alleges that defendants' anticompetitive conduct allowed them to sell and forced plaintiff to pay for EpiPens at supracompetitive prices.  Those purchases are the transactions giving rise to the antitrust claims, and the parties' Agreement refers to them several times.  And, while the Agreement never sets the price that McKesson pays Mylan for EpiPens, the Agreement refers to McKesson's purchases of pharmaceutical products as ones made *under the Agreement*.  See Doc. 41 at 4 (Agreement ¶ II.a.) (defining "Net Purchases" as "*the total volume of McKesson's purchases of Products under this Agreement* during the applicable month valued at the then-current WAC less the value of any Inventory Appreciation." (emphasis added)).
>
> The Agreement also imposes certain purchasing obligations on McKesson.  It requires McKesson "only [to] purchase Mylan Specialty's Products directly from Mylan."  *Id.* at 3 (Agreement ¶ I.d.v.).  Also, the Agreement obligates McKesson to maintain certain inventory levels for Mylan Specialty's products.  *Id.* at 2-3 (Agreement ¶ I.d.i.).
>
> All of these purchases by McKesson – made "*under this Agreement*" – provide the foundation for plaintiff's antitrust claims. Id. at 4 (Agreement ¶ II.a.) (emphasis added).  Thus, the court finds, plaintiff's antitrust claims here "touch on contract rights or contract performance," and thus require the court to apply the broad ADR clause in the Agreement.

*Id.* at *13-14 (emphasis in original).

In *TFT-LCD*, the plaintiff asserted a global price-fixing conspiracy by suppliers of LCD panels.  The plaintiff had a purchase agreement with the defendant which contained an arbitration clause.  The arbitration clause provided for arbitration of "'[a]ny disputes related to this Agreement or its enforcement.'"  *TFT-LCD*, 2011 U.S. Dist. LEXIS 72389, at *29.  Judge Illston agreed with the defendant that the antitrust claims should be compelled to arbitration.

> Under the Ninth Circuit's reasoning [in *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716 (9th Cir. 1999), the language "related to" must be read broadly, to encompass any matter that touches the contractual relationship between the parties.  This must include matters that, while not arising directly under the contractual relationship, are nevertheless related to it.  Nokia's antitrust claims, while existing outside of the parties' contractual relationship, nevertheless relate to the parties' relationship.  *See, e.g.*, FAC, ¶7 ("Defendants' [sic] . . . raised the prices of LCDs and LCD Products above the price that would have prevailed in a competitive market.  During the Conspiracy Period, Nokia . . . purchased [LCD-related] Products . . . Nokia suffered damages as a result . . . .").  *All of the purchases at issue in this case were made under the PPA [Product Purchase Agreement]*.  Nokia's current unfair competition and antitrust claims therefore "touch matters" addressed by the agreement and are sufficiently related to be covered under the agreement's broad language.

United States District Court
Northern District of California

*TFT-LCD*, 2011 U.S. Dist. LEXIS 72389, at *34-35 (emphasis added); *see also Simula*, 175 F.3d at 721 (construing the phrase "arising in connection with" broadly as other courts have done; the phrase "reaches every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract").

In their papers, Plaintiffs cite *E. & J. Gallo Winery & Encana Energy Services, Inc.*, 388 F. Supp. 2d 1148, 1161-63 (E.D. Cal. 2005), to support their contention that the antitrust claims do not relate to the agreements at issue. *See* Opp'n to MTC at 22.[10] However, *Gallo* is not dispositive. The issue in *Gallo* was the court should dismiss the plaintiff's claims of anticompetitive conduct because of a forum selection clause contained in an agreement between the parties. *Gallo* arguably has some reasoning that supports Plaintiffs; specifically, the court determined that the forum selection clause was not applicable since the plaintiff's antitrust-type claims did not arise out of the agreement. *See id.* at 1161-63 (acknowledging that plaintiff's losses were suffered as a result of the gas it purchased through a purchase agreement with a defendant but still concluding that the "wrongs alleged have nothing at all to do with the agreement" – the alleged "anticompetitive behavior . . . occurred entirely outside the scope of the simple gas supply Agreement"). But the court also offered an independent reason as to why it would not enforce the forum selection clause – *i.e.*, because the defendants had waived the right to assert the clause – and indicated that this reason was even "'more persuasive[].'" *Id.* at 1161; *see also id.* at 1163 (stating that "[t]he waiver . . . is even more applicable today"). In light of that independent reason, *Gallo* is of limited persuasive value.

Plaintiffs also try to create a factual dispute as to whether the parties intended that antitrust claims would be covered by the dispute resolution process. They have submitted a declaration from a McKesson employee stating that:

> McKesson does not deem the antitrust claims asserted in the present lawsuit to constitute a dispute or claim arising out or relating to the Agreements. It is, and has at all relevant times (including during the negotiations of the Agreement), been McKesson's understanding and intent that any dispute resolution provision in the Agreements is

---

[10] Plaintiffs' argument here is contained in their opposition to the motion to compel arbitration, not their opposition to the motion to dismiss.

1

> limited to disputes regarding the performance of the Agreements.
> McKesson never contemplated that antitrust claims regarding a
> manufacturers' conduct related to the entry of generic drugs (drugs
> that are not covered by Agreements) would trigger the dispute
> resolution provisions of the Agreements or would otherwise be
> governed by the Agreements. This is particularly true where, as
> there, the present lawsuit is not premised on an alleged breach of the
> Agreements or conduct covered by the Agreements.

Loudenberg Decl. ¶ 5. But, as Defendants argue on reply, the Court need not consider the

Loudenberg Declaration because, "under both California and New York law, a court will not

consider extrinsic evidence regarding the interpretation of a contract unless there is a relevant

ambiguity in the contractual language itself." Reply at 4. The Court finds no ambiguity in the

relevant contracts.

> 4.    Compliance with Dispute Resolution Process

Having concluded that the antitrust claims are subject to the dispute resolution provisions

in the relevant agreements, the Court now considers whether there was compliance with those

provisions before Plaintiffs initiated suit.

As an initial matter, the Court finds that McKesson and Kerr were required to participate in

the process, and not KPH and FWK. The fact that McKesson and Kerr assigned their antitrust

*claims* to KPH and FWK does not mean that McKesson and Kerr's contractual *obligations* were

thereby assigned as well – particularly because the agreements between Defendants and

McKesson/Kerr contained nonassignment provisions.[11]  *See New York v. AU Optronics Corp. (In*

*re TFT-LCD (Flat Panel) Antitrust Litig.)*, Nos. M 07-1827 SI, 1827, 2011 U.S. Dist. LEXIS

---

[11] The following are representative nonassignment provisions:

- "This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns. Neither Party shall assign this Agreement to any third party without the prior written consent of the other Party, whether by operation of law or otherwise, and any purported assignment lacking such consent shall be of no effect." Burke Decl., Ex. B (McKesson-Gilead Agreement § 19(f)); *see also* Burke Decl., Ex. C (McKesson-BMS-Gilead Agreement § 19(f)).

- "Neither Party shall assign, subcontract or otherwise transfer this Agreement or any interest herein or right or obligation hereunder without the prior written consent of the other Party including and any such purported assignment, transfer or attempt to assign or transfer any interest herein or right or obligation hereunder shall be void and of no effect." Burke Decl., Ex. D (McKesson-BMS Agreement § 10.1); *see also* Burke Decl., Ex. F (Kerr-BMS Agreement § 10.1).

88723, at *27-28 (N.D. Cal. Aug. 9, 2011) (noting that, "'a contract term prohibiting assignment of "the contract" bars . . . the delegation to an assignee of the performance by the assignor of a duty or condition'").  The Court also notes that Defendants and McKesson/Kerr may well have had good reasons for not wanting compliance with the dispute resolution process to be delegable or assignable – *i.e.*, because the companies had a continuing business relationship.

As to whether McKesson and Kerr sufficiently participated in the dispute resolution process, the Court finds that the evidence of record does not adequately establish participation.  For instance, for Kerr, FWK candidly admitted at the hearing that there was no real attempt to have Kerr participate in any dispute resolution process.[12]  As for McKesson, participation of its outside legal counsel was not sufficient to satisfy the dispute resolution process, *see, e.g.*, Burke Decl., Ex. T (email exchange) (reflecting participation by outside counsel for McKesson); participation of a McKesson businessperson was required by the relevant agreements.

That being said, the Court finds that the failure of McKesson and Kerr to comply with the dispute resolution process does not require dismissal of Plaintiffs' claims.  At this juncture of the proceedings, Defendants are not challenging the validity of the assignments from McKesson and Kerr to KPH and FWK.  Thus, even if McKesson and Kerr must engage in the dispute resolution process,[13] there is nothing to indicate that that process would dispose of KPH and FWK's claims.  As McKesson noted to Defendants, neither McKesson nor Kerr is capable of settling KPH and FWK's claims.  In short, the Court finds that it would be a futile exercise to require McKesson and Kerr's compliance before Plaintiffs' may proceed with their claims.  *Cf. Gueyffier v. Ann Summers, Ltd.*, 43 Cal. 4th 1179, 1186 (2008) (noting that "California law allows for equitable excusal of contractual conditions causing forfeiture in certain circumstances, including

---

[12] In its papers and at the hearing, FWK never argued that participation by Kerr would have been impossible because it is no longer in business.  Indeed, at the hearing, FWK indicated that there is still a Kerr representative who could have engaged in the dispute resolution process.

[13] Defendants may have claims against McKesson and Kerr in spite of the assignment to Plaintiffs.  *See, e.g.*, Scarpulla Decl., Ex. 6 (letter) (BMS arguing that, "even if McKesson does not control the claim, BMS does not agree that there is no practical purpose to the meeting" because "BMS expects McKesson to indemnify it both for its expenses incurred in moving to dismiss the KPH complaint as well as for any future expenses incurred in defending against KPH's claims").

United States District Court
Northern District of California

circumstances making performance futile"); *Cornell Glasgow, LLC v. La Grange Props., LLC*, No. N11C-05-016-JRS CCLD, 2012 Del. Super. LEXIS 546, at *47 (Super. Ct. Dec. 7, 2012) (stating that "[t]he contractual obligation to provide pre-suit notice and opportunity to cure may be excused where such notice would be futile in achieving its intended purpose[;] [o]ur Courts generally have recognized that '[t]he law does not require a futile act'"); *see also* Rest. 2d of Contracts § 271 (providing that "[i]mpracticability excuses the non-occurrence of a condition if the occurrence of the condition is not a material part of the agreed exchange and forfeiture would otherwise result").

The Court thus denies Defendants' motion to dismiss for lack of subject matter jurisdiction.

B.   Motion to Dismiss for Failure to State a Claim for Relief

The Court next turns to Defendants' motion to dismiss for failure to state a claim for relief. Defendants present three arguments: (1) FWK's claims are barred in their entirety, and KPH's claims in part, by the statute of limitations; (2) Plaintiffs' patent-extension claims should be dismissed just as the indirect purchasers' patent-extension claims were dismissed; and (3) Plaintiffs' claims based post-patent-expiration royalties should be dismissed, just as the indirect purchasers' post-patent-expiration claims were dismissed.

1.   Statute of Limitations

FWK filed its lawsuit against Gilead and BMS on September 29, 2020.  KPH filed its lawsuit against the same on October 6, 2020.[14]  There is a four-year statute of limitations on antitrust claims.  *See Hexcell Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1059-60 (9th Cir. 2012) (stating that "[a]ntitrust actions must be commenced within four years from the date when the causes of action accrue"; citing 15 U.S.C. § 15b); *Pace Indus., Inc. v. Three Phx. Co.*, 813 F.2d 234, 236 (9th Cir. 1987) (stating that "[t]he Sherman Antitrust Act requires a person to sue within four years to enforce a cause of action claiming treble damages for antitrust injury"; also citing §

---

[14] KPH did have an earlier lawsuit against Gilead, BMS, Janssen, and Japan Tobacco, but it voluntarily dismissed that suit.  *See KPH Healthcare Servs., Inc. v. Gilead Holdings, LLC*, No. C-20-0880 EMC (N.D. Cal.) (filed on February 5, 2020 and voluntarily dismissed on June 23, 2020).

United States District Court
Northern District of California

15b).  Therefore, Defendants argue that, at best, Plaintiffs can bring claims based on conduct that took place on or after September 29 and October 6, 2016, respectively.  According to Defendants, because Kerr (FWK's assignor) ceased operations in June 2016, FWK has no claim for relief that falls within the limitations period.  Defendants also argue that KPH cannot seek relief for any conduct prior to October 6, 2016.

In their complaints, Plaintiffs initially took the position that they could seek relief for conduct that reached as far back as December 2004.  *See* KPH Compl. ¶ 1 (alleging a class period that starts on December 17, 2004); FWK Compl. ¶ 1 (same).  However, Defendants argued in their motion to dismiss that – based on Plaintiffs' own allegations – the No-Generics Restraints had been "public for over a decade."  Mot. at 17; *see also* KPH Compl. ¶ 168 (alleging that "[m]ost of these agreements [containing the No-Generics Restraints] were publicly filed or described in filings by Gilead with the [SEC], including the 2004 [Atripla] agreement with BMS, the 2005 agreement with Japan Tobacco, and the 2009 [Complera] agreement with Janssen" and that, "[b]efore entering into agreements with Gilead, BMS and Janssen scrutinized the publicly available Gilead agreements with competitors").  In response, Plaintiffs

> concede[d] that their damages should not reach back to 2004.  Acknowledging that the 2004, 2005, and 2009 agreements between Defendants and non-party co-conspirators were public, KPH and FWK will not pursue damages before *October 2011*, the date of Gilead and BMS's non-public joint venture agreement relating to Evotaz.

Opp'n at 15 (emphasis added).  In reply, Defendants argue that neither KPH nor FWK can reach back to October 2011.

       a.    Statute of Limitations Defense

In evaluating whether Plaintiffs can reach beyond the limitations period (September 2016 for FWK and October 2016 for KPH), the Court first bears in mind that the statute of limitations is an affirmative defense.  "[A] plaintiff[] ordinarily need not 'plead on the subject of an anticipated affirmative defense,'" but, "[w]hen an affirmative defense is obvious on the face of a complaint, . . . a defendant can raise that defense in a motion to dismiss."  *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 902 (9th Cir. 2013).  Here, the statute-of-limitations defense is obvious on the face

United States District Court
Northern District of California

of the complaint as Plaintiffs initially sought to bring in conduct back from 2004, and now from 2011, even though that would be well beyond the four-year limitations period.  The fact that Plaintiffs included in their complaints allegations in support of tolling the statute of limitations, *see, e.g.*, KPH Compl. ¶ 413, is essentially a concession that there is a facial time bar (at least in part).

> b.   <u>Discovery Rule v. Fraudulent Concealment</u>

The Court next considers what is Plaintiffs' theory for going beyond the limitations period. In their complaints, Plaintiffs invoked fraudulent concealment.  *See, e.g.*, KPH Compl. ¶ 414 (alleging that "Defendants took active steps to conceal their unlawful activities").  Plaintiffs also refer to fraudulent concealment in their opposition brief.  *See* Opp'n at 9.  However, for the first time, they also refer to the discovery rule as a basis for tolling the statute of limitations (or rather delayed accrual of the statute of limitations[15]).  *See* Opp'n at 11.

Because Plaintiffs never mentioned the discovery rule in their complaints, they are not permitted to rely on it now.  Moreover, contrary to what Plaintiffs suggest, antitrust claims are *not* subject to the discovery rule.  In *In re Animation Workers Antitrust Litigation*, 87 F. Supp. 3d 1195 (N.D. Cal. 2015), Judge Koh expressly addressed whether the discovery rule applies in antitrust cases.  The plaintiffs argued for a discovery rule, and the defendants for an injury rule. Judge Koh agreed with the defendants.

> Under controlling Supreme Court and Ninth Circuit authority, Plaintiffs' antitrust claims began to accrue at the time of injury.
>
> Generally, [an antitrust cause] of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business. . . . This much is plain from the treble-damage statute itself. . . . [E]ach time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act.

---

[15] *See Hexcel*, 681 F.3d at 1062 (noting that "the accrual doctrine for a discovery rule is conceptually distinct from the equitable tolling doctrine in fraudulent concealment cases"; "under the federal common law discovery rule, 'a claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action'").

United States District Court
Northern District of California

1

> *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971); *see also* P. Areeda and H. Hovencamp, Antitrust Law ¶ 320a-b.  As the Ninth Circuit explained in *Beneficial Standard Life Insurance Co. v. Madariaga*, 851 F.2d 271, 274-75 (9th Cir. 1988), "In [antitrust] actions governed by 15 U.S.C. § 15b, the plaintiff's knowledge is generally irrelevant to accrual, which is determined according to the date on which injury occurs."

*Id.* at 1208-09.

Judge Koh acknowledged that "[p]laintiffs may be correct in a hypertechnical sense that Defendants cite no Ninth Circuit authority explicitly 'rejecting' the discovery rule for antitrust claims, but that appears to be a function of the fact that the Ninth Circuit has consistently interpreted 15 U.S.C. § 15b as requiring an injury rule since 1950."  *Id.* at 1209.  Judge Koh also acknowledged that "the Seventh Circuit may have applied the discovery rule to antitrust claims in *In re Copper Antitrust Litigation*, 436 F.3d 782 (7th Cir. 2006), but "the overwhelming majority of Circuits have explicitly held that antitrust claims are subject to a pure injury rule, not a discovery rule."  *Id.* at 1210 (citing cases from the Second, Third, Fourth, Fifth, Sixth, Eighth, Tenth, and D.C. Circuits).  Finally, Judge Koh acknowledged Judge Orrick's opinion where he had applied the discovery rule, but pointed out that, there, "the parties *did not dispute* that the discovery rule applied to Sherman Act claims, and [Judge Orrick] therefore did not have the benefit of briefing on the question."  *Id.* (emphasis in original).[16]  The Court agrees with Judge Koh.

c.    Elements of Fraudulent Concealment

Because Plaintiffs cannot invoke the discovery rule, the Court turns to fraudulent concealment as a basis for equitable tolling.

> "[The plaintiff] carries the burden of pleading and proving fraudulent concealment; it must plead facts showing that [the defendant] affirmatively misled it, *and* that [the plaintiff] had neither actual nor constructive knowledge of the facts giving rise to its claim despite its diligence in trying to uncover those facts."  "A fraudulent concealment defense requires a showing *both* that the defendant used fraudulent means to keep the plaintiff unaware of his cause of action, *and* also that the plaintiff was, in fact, ignorant of

---

[16] In a subsequent opinion, *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044 (N.D. Cal. 2016) (Koh, J.), Judge Koh clarified that an antitrust claim accrues when the defendant engages in anticompetitive conduct.  *See id.* at 1065.  Judge Koh noted that, although she referred to an injury rule in *Animation Workers*, that case did not address the issue of "whether accrual began at the time of injury or the time of the alleged anticompetitive conduct."  *Id.* at 1066.

> the existence of his cause of action."
>
> If a defendant proves that the plaintiff had actual or constructive knowledge of the facts giving rise to the claim, the doctrine of fraudulent concealment does not apply.  "The plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to the discovery of the fraud."  It is enough that the plaintiff "should have been alerted to facts that, following duly diligent inquiry, could have advised it of its claim."

*Hexcel*, 681 F.3d at 1060 (emphasis omitted and added); *see also Conmar Corp. v. Mitsui & Co.*, 858 F.2d 499, 503-04 (9th Cir. 1988) (stating that a plaintiff cannot rely on ignorance and instead must show that the defendant fraudulently concealed the existence of the cause of action such that the plaintiff, "'acting as a reasonable person, did not know of its existence'").

i.    <u>Affirmative Concealment</u>

In the instant case, Defendants' initial argument is that Plaintiffs have failed to adequately plead affirmative concealment.  *See also id.* (underscoring that that passive concealment is not sufficient to toll the statute of limitations "unless the defendant had a fiduciary duty to disclose information to the plaintiff"); *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1198-99 (N.D. Cal. 2015) (indicating that "passive silence" is one kind of passive concealment; also indicating that conclusory allegations of a "'secret conspiracy'" are not enough "to show more than mere passive concealment").  The Court agrees with Defendants.  In their complaints, Plaintiffs have failed to make nonconclusory allegations of active concealment by Defendants.  For example, in ¶ 414 of its complaint, KPH makes only conclusory allegations:

> At all times relevant to this Complaint, Defendants took active steps to conceal their unlawful activities alleged herein.  For example, and without limitation, Defendants concealed their efforts to exclude generic competition through the use of No-Generics Restraints and the assertion and prosecution of invalid patents.  Defendants further concealed their efforts to obtain and maintain a monopoly and to engage in an active scheme to conceal, including by, without limitation, creating artificial price differences and participating in regulatory gaming.

KPH Compl. ¶ 414.  Similarly, in ¶ 420, KPH alleges: "The affirmative acts of Defendants alleged herein were wrongfully concealed and carried out in a manner that precluded detection."  KPH Compl. ¶ 420.

27

1    Plaintiffs try to bypass this problem of conclusory allegations by claiming that, "[b]y their

2   very nature, Defendants' anticompetitive conspiracy and active scheme were inherently self-

3   concealing." KPH Compl. ¶ 421. The Fourth Circuit has given some context for what is meant by

4   "self-concealing."

5           In recent years, federal courts have developed different standards for
            determining whether antitrust plaintiffs have satisfied the first
6           element of this test. These are denominated the "self-concealing"
            standard, the "separate and apart" standard, and the intermediate,
7           "affirmative acts" standard. Pursuant to the self-concealing
            standard, a plaintiff satisfies the first element merely by proving that
8           a self[-]concealing antitrust violation has occurred. At the opposite
            end of the spectrum is the separate and apart standard in which a
9           plaintiff is required to provide evidence, separate and apart from the
            acts of concealment involved in the defendants' antitrust violation,
10          that the defendants affirmatively acted to conceal the plaintiff's
            claim. Finally, under the intermediate standard, a plaintiff must
11          prove that the defendants affirmatively acted to conceal their
            antitrust violations, but the plaintiff's proof may include acts of
12          concealment involved in the antitrust violation itself.

13  *Supermarket of Marlinton v. Meadow Gold Dairies*, 71 F.3d 119, 122 (4th Cir. 1995); *see also id.*

14  at 126 (ultimately adopting the intermediate standard). On the self-concealing standard, the

15  Fourth Circuit noted that it "is only even arguably proper when deception or concealment is a

16  necessary element of the antitrust violation, i.e., when the antitrust violation is truly self[-

17  ]concealing." *Id.* at 123. The court added that not all antitrust conspiracies are self-concealing;

18  this would include price-fixing as it is not "inevitably deceptive or concealing." *Id.*

19          The problem for Plaintiffs is that the Ninth Circuit has expressly rejected the argument that

20  a defendant's acts constitute fraudulent concealment because they are "by nature self-concealing.

21  We require more. A plaintiff alleging fraudulent concealment must establish that its failure to

22  have notice of its claim was the result of affirmative conduct by the defendant." *Conmar*, 858

23  F.2d at 505 (acknowledging that other circuit courts do not agree). And in any event, Plaintiffs

24  have failed to show that deception or concealment is a necessary element of the anticompetitive

25  conduct alleged herein. For example, there is no dispute that certain No-Generics Restraints were

26  publicly disclosed in filings that Gilead made with the SEC in 2005, 2009, and 2015. *See* Burke

27  Decl., Exs. U-W (Gilead's annual report for 2005, quarterly report for 2009, and annual report for

28  2015). Under *Conmar*, Plaintiffs must allege affirmative conduct by Defendants. Plaintiffs have

United States District Court
Northern District of California

1    not done so.

2        The Court therefore concludes that dismissal of both FWK's pre-September 2016 claims

3    and KPH's pre-October 2016 claims is warranted.  Even though the statute of limitations is an

4    affirmative defense, there is an obvious limitations problem with Plaintiffs' complaint (as

5    Plaintiffs seek relief based on conduct that begins in 2011) and Plaintiffs have failed to adequately

6    plead affirmative concealment to get around the limitations problem.

7                    ii.    Actual or Constructive Knowledge

8        Defendants suggest that dismissal of the claims above should be with prejudice because it

9    is implausible that Plaintiffs can allege affirmative concealment.  According to Defendants,

10   affirmative concealment is implausible because the anticompetitive conduct alleged by Plaintiffs

11   was not hidden but rather was public in nature.

12       As an initial matter, the Court notes that the "public" nature of the anticompetitive conduct

13   goes more to the issue of when Plaintiffs knew or, with reasonable diligence, should have known

14   of the anticompetitive conduct.  *See Conmar*, 858 F.2d at 503-04 (stating that a plaintiff must

15   show that the defendant fraudulently concealed the existence of the cause of action such that the

16   plaintiff, "'acting as a reasonable person, did not know of its existence'"); *cf. Ward v.*

17   *Westinghouse Can.*, 32 F.3d 1405, 1407 (9th Cir. 1994) (stating that, "under [California's] delayed

18   discovery rule, the statute begins to run when a reasonable person in the plaintiff's position is on

19   'inquiry notice' of 'potential wrongdoing'").  That being said, Defendants have pointed to a

20   number of facts that point to Plaintiffs having constructive knowledge of the alleged

21   anticompetitive conduct well before the limitations period.

22       The alleged anticompetitive conduct generally falls into three categories: (1) the No-

23   Generics Restraints; (2) the settlement agreements with Teva that contained "most favored entry"

24   and "most favored entry plus" provisions; and (3) the means by which Gilead developed and

25   commercialized TAF (*i.e.*, steps taken to make TDF-based FDCs less desirable and steps taken to

26   ensure that TAF standalone would not be used in conjunction with other standalone drugs in place

27   of a TAF-based FDC).

28       On (1), Defendants note out that the No-Generics Restraints in the 2004, 2005, 2009, and

United States District Court
Northern District of California

1    2015 agreements (between Gilead and BMS, Japan Tobacco, and Janssen) were all publicly

2    disclosed in SEC filings.  Only two agreements from 2011 and 2014 were not publicly disclosed in

3    an SEC filing.

4           On (2) and (3), Defendants assert that the alleged misconduct was implicated in *AIDS*

5    *Healthcare Foundation, Inc. v. Gilead Sciences, Inc.*, No. C-16-0443 WHA (N.D. Cal.)

6    [hereinafter *AHF*].  The original complaint in *AHF*, filed on January 26, 2016, contained

7    allegations about how Gilead developed and commercialized TAF.  *See, e.g.*, *AHF*, No. C-16-0443

8    WHA (Docket No. 1) (in ¶ 4, alleging that "Gilead did not conduct clinical trials in humans using

9    TAF until 2011 despite presenting test tube and animal data on the use of TAF ten years earlier"

10   and that, "[b]y waiting to take TAF to clinical trial just years prior to TDF's patent expiration

11   (December 2017), Gilead was able to extend patent protection on Tenofovir by six years"; also, in

12   ¶ 7, alleging that Gilead "refus[ed] to make TAF available as a standalone drug . . . [to] keep[]

13   TAF drugs off the market for years").  There were also allegations in the *AHF* complaint that

14   "Gilead was able to delay generic entry to reaching settlements with," *e.g.*, Teva.  *AHF*, No. C-16-

15   0443 WHA (Docket No. 1) (*AHF* Compl. at 9 n.11).  Defendants underscore that the *AHF* lawsuit

16   was the subject of various news articles, *see* Mot. at 21 (citing articles published in early to mid-

17   2016 in the Los Angeles Times and the New York Times).  Moreover, even before the *AHF* suit

18   was filed in 2016, the alleged anticompetitive conduct in (2) and (3) was publicized.  For example,

19   per Plaintiffs' complaints:

20        • "The first MFE appeared on November 27, 2012 in an interim agreement between

21           Gilead and Teva, in which Teva agreed that it would not enter the market with

22           Viread [TDF] or Truvada [TDF/FTC] while the TDF patent litigation was pending,

23           until the earlier of (i) various events in the patent litigation (e.g., a finding of

24           invalidity), or (ii) a second-filer entered the market.  *Gilead and Teva put this MFE*

25           *in the public record, so all of the second-filers knew that any final agreement*

26           *between Gilead and Teva was also very likely to include an MFE.*"  KPH Compl. ¶

27           305 (emphasis added).

28        • "*At an investor conference in March 2011*, Kevin Young, the executive vice

president of Gilead's commercial operations, admitted that in 2004 Gilead 'didn't

bring TAF through development because at that time we were launching Truvada,

launching Atripla."  KPH Compl. ¶ 200 (emphasis added).

Although Defendants' position on constructive knowledge certainly has appeal, the fact that information was public does not automatically mean that a plaintiff should be deemed to have constructive knowledge.  *Cf. Conmar*, 858 F.2d at 505 (acknowledging that, "'when the claim is one of concealment and the very facts allegedly concealed are available in public records, the argument that the plaintiffs should, as a matter of law, be held to constructive knowledge of their cause of action is much stronger'").  As Plaintiffs note, equitable tolling is generally a fact intensive inquiry.  *See In re Cal. Bail Bond Antitrust Litig.*, No. 19-cv-00717-JST, 2020 U.S. Dist. LEXIS 92836, at *59 (N.D. Cal. Apr. 13, 2020) (noting that, "because resolving tolling disputes is a fact-intensive process, statute of limitations defenses 'may not be raised by motion to dismiss' unless they include 'no disputed issues of fact'").  At this early juncture, the Court is not in a position to say how well publicized, *e.g.*, the No-Generics Restraints were or how well publicized the *AHF* lawsuit was.  Thus, the Court cannot hold that it would be impossible for Plaintiffs to show they cannot be charged with knowledge of the alleged anticompetitive conduct well before the limitations period.  *Cf. Conmar*, 858 F.3d at 503 (acknowledging that information was mentioned in a few news articles but "[c]ases refusing to toll the statute of limitations for fraudulent concealment have required more to find *as a matter of law* that sufficient facts were available to put the plaintiff on notice of his or her claims") (emphasis added).

On the other hand, the Court does find implausible Plaintiffs' claim that they could not could not have discovered the anticompetitive conduct at issue "until on or about May 14, 2019," KPH Compl. ¶ 418, which is the date that the *Staley* plaintiffs (the indirect purchasers) filed the lead case (*i.e.*, No. C-19-2573 EMC).  In order for the *Staley* plaintiffs to file their suit on May 14, 2019, they had to have been on inquiry notice earlier.  Plaintiffs have not explained why the same would not be true for themselves.  Moreover, Plaintiffs cannot rest on conclusory allegations that they could not have known of the anticompetitive conduct until the *Staley* plaintiffs filed suit.  *See Rutledge v. Bos. Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978) (stating that

United States District Court
Northern District of California

plaintiff "cannot rely upon conclusory statements to avoid the bar of limitations[;] [h]e must plead with particularity the circumstances surrounding the concealment *and state facts showing his due diligence in trying to uncover the facts*") (emphasis); *cf. Wood v. Carpenter*, 101 U.S. 135, 143 (1879) (stating that "[t]he circumstances of the discovery must be fully stated and proved, and the delay which has occurred must be shown to be consistent with the requisite diligence.").

Accordingly, although the Court rejects Defendants' argument above (*i.e.*, it cannot say as a matter of law that Plaintiffs could not have a viable claim of fraudulent concealment), Plaintiffs' complaints as presently pled are deficient – not only because Plaintiffs allege in conclusory terms that Defendants affirmatively concealed their misconduct but also because Plaintiffs allege in conclusory terms that they could not have discovered the anticompetitive conduct at issue until May 14, 2019. The Court shall give Plaintiffs an opportunity to amend to address the limitations problem. In the amended pleading, Plaintiffs must provide specificity regarding Defendants' affirmative concealment, Plaintiffs' due diligence in trying to uncover the facts, and why the publicly available facts are not sufficient to establish constructive knowledge.

### 2. Patent-Extension Claims

Both parties agree that Plaintiffs' complaint sets forth a theory of liability – related to Gilead obtaining a patent term extension ("PTE") for one of its TAF-related patents – that the Court dismissed in reviewing the indirect purchasers' antitrust claims. Defendants argue that, because the claim was dismissed as to the indirect purchasers, the Court should do the same for Plaintiffs as direct purchasers.

Defendants are correct. The Court dismissed the indirect purchasers' claims because they were barred by the *Noerr-Pennington* doctrine (*i.e.*, Gilead's request for a PTE was petitioning activities). The analysis is no different for Plaintiffs' direct purchaser claims. Furthermore, in their opposition, Plaintiffs do not make any attempt to explain how they can get around *Noerr-Pennington* immunity. Plaintiffs cite to Supreme Court cases indicating that, as a matter of patent law, the payment of royalties after a patent has expired is per se unlawful. *See also Kimble v. Marvel Entm't, LLC*, 576 U.S. 446, 452 (2015) (noting that, in *Brulotte v. Thys Co.*, 379 U.S. 29 (1964), the Supreme Court found an agreement between an inventor and farmers to whom he had

licensed the use of his patented machine unlawful per se "to the extent it provided for the payment of royalties 'accru[ing] after the last of the patents incorporated into the machines had expired'"). But that argument misses the point: Gilead obtained a PTE; thus, there was no expiration of the patent.

### 3. Claims Based on Post-Patent-Expiration Royalties

Similar to above, Defendants argue that the Court previously dismissed the indirect purchasers' claims based on the payment of post-patent-expiration royalties and that, therefore, the Court should do the same for Plaintiffs as direct purchasers. Here, the analysis is somewhat different because, although the Court did dismiss the indirect purchasers' claims, it did so because Plaintiffs had failed to provide a substantive response to Defendants' argument that the claims lacked merit:

> As for the merits of Defendants' motion to dismiss, here, Plaintiffs have failed to provide any substantive argument in response. Plaintiffs simply argue that "[t]he post-expiration royalty payments are part of the contractual scheme to restrain generic competition and further Gilead's market dominance" and that, even if the Court were to strike the allegations, their "antitrust claims would remain in the case in the exact same form as the Court previously deemed sufficient to withstand Defendants' first round of motions to dismiss." Opp'n at 8 & n.4. Because of the lack of a substantive opposition, the Court grants with prejudice the motion to dismiss the new liability theory – *i.e.*, the theory based on alleged payment of royalties after patent expiration.

*Staley v. Gilead Scis., Inc.*, No. 19-cv-02573-EMC, 2020 U.S. Dist. LEXIS 167071, at *43-44 (N.D. Cal. July 24, 2020).

Implicitly recognizing such, Defendants have, in their reply, raised the same arguments that they did in challenging the indirect purchasers' claims on the merits. The Court need not address all of the arguments because Plaintiffs' claims can be dismissed for the first reason alone. That is, Plaintiffs take the position that the payment of royalties after patent expiration is per se unlawful: "In *Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446, 463 (2015), the Supreme Court affirmed the 'categorical principle that all patents, and all benefits from them, must end when their terms expire.'" Opp'n at 21. The problem for Plaintiffs is that the Supreme Court held that there was per se illegality as a matter of *patent law* only. Moreover, the Court indicated that what

constitutes patent misuse per se under patent law does not automatically translate to per se illegality for purposes of antitrust law. *See id.* at 462-63 ("The patent laws – unlike the Sherman Act – do not aim to maximize competition (to a large extent, the opposite). And the patent term – unlike the 'restraint of trade' standard – provides an all-encompassing bright-line rule, rather than calling for practice-specific analysis. So in deciding whether post-expiration royalties comport with patent law, *Brulotte* did not undertake to assess that practice's likely competitive effects."). Therefore, Plaintiffs cannot simply rely on the fact of post-patent-expiration royalties in and of itself to establish an antitrust violation.

The only issue remaining here is whether the Court should permit Plaintiffs to amend on this claim. Because Defendants challenged the same claim in the context of the indirect purchasers' suit, and Plaintiffs have not done anything to defend the claim other than rely on *Kimble* and *Brulotte*, the Court dismisses the claim with prejudice.

C.    Motion to Strike

Finally, Defendants move to strike FWK's request for a jury trial. (Defendants do not contest KPH's request for a jury trial.) Defendants' motion is predicated on a term contained in the relevant Kerr-BMS agreement. That term (§ 15.3) provides in relevant part as follows: "Waiver of Jury Trial. Each Party hereto hereby waives to the fullest extent permitted by applicable Law, any right it may have to a trial by jury in respect of any litigation directly or indirectly arising out of, under, or in connection with this Agreement or any transaction contemplated thereby." Burke Decl., Ex. F (§ 15.3) (governed by New York law).

In response, FWK argues that "there is a strong presumption against the waiver of [the] fundamental right" to a jury trial, and, here, "the Kerr Purchase Agreement does not contemplate federal antitrust causes of action and therefore does not limit FWK to a bench trial or, as previously discussed, by pre-suit ADR requirements, in this lawsuit." Opp'n at 22. Although there is a presumption against a jury trial, § 15.3 above does use broad language: "arising out of, under, or in connection with." Given that broad language, the Court holds that the antitrust claims are covered by the waiver of the jury trial – *i.e.*, the antitrust claims are connected with the purchase agreement between Kerr and BMS because the supracompetitive prices paid by Kerr

34

1   were based on the terms of the agreement.

2          There is, however, one wrinkle here.  The agreement with the jury waiver is between Kerr

3   and BMS only.  No agreement between Kerr and Gilead has been provided.  Therefore, FWK's

4   claims against Gilead are not subject to the jury waiver, at least not at this point in the

5   proceedings.

6                                    **III.**      **CONCLUSION**

7          For the foregoing reasons, the Court rules as follows.

8          •   Defendants' motion to compel arbitration is conditionally denied.  Plaintiffs are

9              required to file an amended complaint as provided above.

10         •   Defendants' motion to dismiss for lack of subject matter jurisdiction is denied.

11         •   Defendants' motion to dismiss for failure to state a claim for relief is granted.  The

12             patent-extension claim is dismissed with prejudice; so too is the claim for post-

13             patent-expiration royalties.  All of FWK's remaining antitrust claims are dismissed

14             without prejudice based on the statute of limitations and FWK's failure to

15             adequately allege a fraudulent concealment theory.  Similarly, KPH's pre-October

16             2016 claims are dismissed without prejudice based on the statute of limitations and

17             KPH's failure to adequately allege a fraudulent concealment theory.  FWK and

18             KPH have leave to amend to address the limitations problem only.  In amending,

19             Plaintiff must address the deficiencies discussed above.

20         •   Plaintiffs shall have five weeks to file amended complaints.  Defendants shall

21             thereafter have five weeks to file a response to the complaints.

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

United States District Court
Northern District of California

35

1    At this juncture  the Court instructs the Clerk of the Court to file this order  in its entirety

2    under seal.  The Court orders the parties to meet and confer to determine which portions of this

3    order may be publicly filed (consistent with the Court's prior sealing orders).  The parties shall

4    jointly file their request to file under seal within a week of the date of this order.

5    This order disposes of Docket Nos. 460 and 461.

6

7    **IT IS SO ORDERED.**

8

9    Dated: March 8, 2021

10

11

12    EDWARD M. CHEN
     United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
orthern District of California