Christopher T. Holding (pro hac vice)
Jordan Bock (SBN 321477)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Telephone: (617) 570-1000
Facsimile: (617) 523-1231
CHolding@goodwinlaw.com
JBock@goodwinlaw.com

Ariel Rogers (SBN 316910)
GOODWIN PROCTER LLP
601 Marshall Street
Redwood City, CA 94063
Telephone: (650) 752-3100
Facsimile: (650) 853-1038
ARogers@goodwinlaw.com

Brian T. Burgess (pro hac vice)
GOODWIN PROCTER LLP
1900 N Street N.W.
Washington, DC 20036
Telephone: (202) 346-4000
Facsimile: (202) 346-4444
BBurgess@goodwinlaw.com

*Attorneys for Defendant*
*Teva Pharmaceuticals USA, Inc.*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| STALEY, *et al.*,<br><br>                     Plaintiffs,<br><br>     v.<br><br>GILEAD SCIENCES, INC., *et al.*,<br><br>                     Defendants. | Case No. 3:19-cv-02573-EMC<br><br>**TEVA'S NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO RULE 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE**<br><br>Hrg:      March 24, 2022<br>Time:     1:30 p.m.<br>Ctrm:     5-17th Floor<br>Judge:    Honorable Edward M. Chen |
| THIS DOCUMENT RELATES TO:<br><br>3:21-cv-09620, 3:21-cv-09632, 3:21-cv-09642,<br>3:21-3:21-cv-09648, 3:21-cv-09644 | |

1

## **NOTICE OF MOTION AND MOTION TO DISMISS**

2    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE NOTICE that

3 on March 24, 2022 at 1:30 p.m., or as soon thereafter as this matter may be heard, in the United States

4 District Court for the Northern District of California, located at 450 Golden Gate Avenue, San

5 Francisco, CA 94102-3489, in Courtroom 5 on the 17th Floor, before the Honorable Edward M. Chen,

6 Defendant Teva Pharmaceuticals USA, Inc. ( "Teva" or "Defendant") will move the Court for an order

7 dismissing, with prejudice, certain claims and allegations against Defendant under Rule 12(b)(6) of the

8 Federal Rules of Civil Procedure.

9

## **RELIEF SOUGHT**

10    Defendant seeks dismissal, with prejudice, of claims and allegations against it by Plaintiffs Blue

11 Cross and Blue Shield of Florida, Inc. and Health Options, Inc. (collectively, "BCBS Fla."), Blue Cross

12 and Blue Shield of South Carolina and BlueChoice HealthPlan of South Carolina, Inc. (collectively,

13 "BCBS S.C."), Centene Corporation ("Centene"), Humana Inc. ("Humana"), and Triple-S Salud, Inc.

14 ("Triple-S") (collectively "Individual Health Plan Plaintiffs" or "IHPPs") under Rule 12(b)(6) for

15 failure to state a claim upon which relief can be granted.

16

17

18

19

20

21

22

23

24

25

26

27

28

TEVA'S NOTICE OF MOTION AND MOTION TO DISMIS
CASE NO: 3:19-CV-02573-EMC

1

**TABLE OF CONTENTS**

2

**Page(s)**

3    INTRODUCTION ...................................................................................................................1

4    STATEMENT OF FACTS / PROCEDURAL BACKGROUND ..................................................4

5    LEGAL STANDARD ............................................................................................................4

6    ARGUMENT .......................................................................................................................6

7    I.    PLAINTIFFS' CLAIMS CHALLENGING THE GILEAD-TEVA 2014
          AGREEMENT SHOULD BE DISMISSED ...............................................................6

8

9          A.    Facts Relevant to IHPPs' Challenge to the 2014 Agreement ...................6

10         B.    Plaintiffs' Reverse Payment Theory Contradicts the Plain Language of the
                 Settlement Provision on Which they Rely ...........................................10

11               1.    Plaintiffs' "Exclusivity" Premise is Wrong .............................10

12               2.    Plaintiffs' "Disincentive" Theory is Implausible .....................12

13               3.    Plaintiffs Do Not and Cannot Plausibly Plead a "Profit Sacrifice" by
                       Gilead.........................................................................15

14    II.   PLAINTIFFS' CLAIMS CHALLENGING THE 2013 AGREEMENT SHOULD
          BE DISMISSED .............................................................................................17

15

16         A.    Facts Relevant to the 2013 Agreement ..............................................18

17         B.    Plaintiffs' "Pay for Delay" Theory is Economically Irrational Because it
                 Alleges that Teva Accepted a Payment That Made it Worse Off than Earlier

18               Entry .......................................................................................20

19    CONCLUSION.....................................................................................................23

20

21

22

23

24

25

26

27

28

- ii -

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*,
  141 F.3d 947 (9th Cir. 1998) ......................................................................5

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 554 (2007)...............................................................4, 11, 17, 20

*Cascades Comput. Innovation LLC v. RPX Corp.*,
  2013 WL 316023 (N.D. Cal. Jan. 24, 2013) ...............................................5

*FTC v. Actavis*,
  570 U.S. 136 (2013)..........................................................................*passim*

*In re Gilead Scis. Sec. Lit.*,
  536 F.3d 1049 (9th Cir. 2008) ....................................................................4

*In re Glumetza Antitrust Litig.*,
  2021 WL 1817092 (N.D. Cal. May 6, 2021) .............................................14

*In the Matter of Impax Laboratories, Inc.*,
  2019 FTC LEXIS 25 (F.T.C. Mar. 28, 2019) ............................................15

*In re Intuniv Antitrust Litig.*,
  496 F. Supp. 3d 639 (D. Mass. Oct. 9, 2020) ...........................................15

*In re Intuniv Antitrust Litigation*,
  2020 WL 5995326 (D. Mass. Oct. 9, 2020) ..............................................23

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008) ....................................................................5

*King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp. (In re Lamictal Antitrust Litig.)*,
  791 F.3d 388 (3d Cir. 2015) .....................................................................15

*In re Loestrin 24 Fe Antitrust Litigation*,
  261 F. Supp. 3d 307 (D.R.I. 2017)......................................................14, 15

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)...................................................................................22

*Mogan v. Sacks, Ricketts & Case LLP*,
  2022 WL 94927 (N.D. Cal. Jan. 10, 2022)..................................................8

*In re Namenda Indirect Purchaser Antitrust Litig.*,
  2021 WL 2403727 (S.D.N.Y. June 11, 2021) ...........................................14

*In re Nexium (Esomeprazole) Antitrust Litig.*,
   842 F.3d 34 (1st Cir. 2016)............................................................................9, 22, 23

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018)............................................................................................5

*Reveal Chat Holdco LLC v. Facebook Inc.*,
   2021 WL 1615349 (N.D. Cal. April 26, 2021)......................................................4

*Sanders v. Brown*,
   504 F.3d 903 (9th Cir. 2007) ............................................................................4, 23

*Sprewell v. Golden State Warriors*,
   266 F.3d 979 (9th Cir. 2001) ..................................................................................5

*Staley v. Gilead Sci., Inc.*,
   446 F. Supp. 3d 578 (2020) ..........................................................................*passim*

*Verizon Comms. Inc. v. Trinko*,
   540 U.S. 398 (2004)................................................................................................5

*In re Wellbutrin XL Antitrust Litig.*,
   868 F.3d 163-69 (3d Cir. 2017) ............................................................................22

*William O. Gilley Enters., Inc. v. Atl. Richfield Co.*,
   588 F.3d 659 (9th Cir. 2009) ..................................................................................5

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*,
   2021 WL 3612497 (N.D. Cal. Aug. 13, 2021) .....................................................14

**Statutes**

21 U.S.C. § 355(j)(5)(D)(i)(IV) .................................................................................7, 18

35 U.S.C. § 271(e) .........................................................................................................19

**Other Authorities**

Aaron Edlin, Scott Hemphill, Herbert Hovenkamp, & Carl Shapiro, *The Actavis
   Inference: Theory and Practice*, 67 RUTGERS L. REV. 585, 594 (2015)............15

FDA Guidance for Industry, 180-Day Exclusivity: Questions and Answers (January
   2017) .......................................................................................................7, 10, 18, 19

Keith M. Drake & Thomas G. McGuire, *Generic Entry Before the Agreed-Upon
   Date in Pharmaceutical Patent Settlements*, J. of Competition Law and Econ.
   16(2), 188-219 (2020)...........................................................................................13

1

## **INTRODUCTION**

2

The complaints filed by the Individual Health Plan Plaintiffs ("IHPPs")[1] challenge two

3

settlement agreements entered between Teva and Defendants Gilead Sciences, Inc., Gilead

4

Holdings, LLC, Gilead Sciences, LLC, and Gilead Sciences Ireland UC (collectively, "Gilead") to

5

resolve their patent disputes related to Teva's plans to market generic versions of certain Gilead

6

medications used to treat HIV.  The first agreement (the "2013 Agreement") was entered in

7

February 2013 to settle litigation brought by Gilead related to its patents for tenofovir disoproxil

8

fumarate (TDF), the active ingredient in Viread®.  The second agreement (the "2014 Agreement")

9

was entered in April 2014 to resolve patent litigation for emtricitabine (or "FTC"), which is a

10

component in Gilead's Truvada® and Atripla® products.  The complaints fail to plausibly allege

11

that either of these agreements violate any law, or that they improperly delayed generic competition,

12

and therefore the complaints should be dismissed in their entirety.

13

On their face, neither agreement contains any transfer of value from Gilead to Teva—a

14

fundamental requirement for a plaintiff to bring a "reverse payment" claim challenging a patent

15

settlement under *FTC v. Actavis*, 570 U.S. 136 (2013).  But the IHPPs nonetheless allege that both

16

agreements were unlawful "pay for delay" settlements.  As to the 2014 Agreement, the IHPPs rely

17

entirely on its so-called "most favored entry plus" (or MFEP) clause, which, under limited

18

19

20

21

22

23

24

25

26

27

28

---

[1] IHPPs filed a set of five complaints against Teva on December 13 and 14, 2021.  *See* Compl., *Centene Corporation v. Teva Pharmaceuticals USA, Inc.*, 3:21-cv-09648 (N.D. Cal. Dec. 14, 2021) ("Teva Centene Compl."); Compl., *Humana Inc. v. Teva Pharmaceuticals USA, Inc.*, 3:21-cv-09620 (N.D. Cal. Dec. 13, 2021) ("Teva Humana Compl."); Compl., *Blue Cross & Blue Shield of Florida v. Teva Pharmaceuticals USA, Inc.*, 3:21-cv-09632 (N.D. Cal. Dec. 14, 2021) ("Teva BCBS Fla. Compl."); Compl., *Blue Cross & Blue Shield of South Carolina v. Teva Pharmaceuticals USA, Inc.*, 3:21-cv-09644 (N.D. Cal. Dec. 14, 2021) ("Teva BCBS S.C. Compl."); Compl., *Triple-S Salud, Inc. v. Teva Pharmaceuticals USA, Inc.*, 3:21-cv-09642 (N.D. Cal. Dec. 14, 2021) ("Teva Triple-S Compl.").  Contemporaneously, these five IHPPs, along with Aetna, Inc. and Health Care Service Corporation, filed a set of largely analogous complaints against co-defendants Gilead, BMS, and Janssen.  *See* Compl., *Blue Cross and Blue Shield of Florida, Inc. v. Gilead Sciences, Inc.*, No.3:21-cv-09622 (N.D. Cal. Dec. 13, 2021); Compl., *Blue Cross and Blue Shield of South Carolina, Inc. v. Gilead Sciences, Inc. v. Gilead Sciences, Inc.*, No. 3:21-cv-09645 (N.D. Cal. Dec. 14, 2021); Compl., *Health Care Service Corporation, a Mutual Legal Reserve Company v. Gilead Sciences, Inc.*, No. 3:21-cv-09646 (N.D. Cal. Dec. 14, 2021); Compl., *Centene Corp. v. Gilead Sciences, Inc.*, No. 3:21-cv-09634 (N.D. Cal. Dec. 14, 2021); Compl., *Humana Inc. v. Gilead Sciences, Inc.*, No. 3:21-cv-09621 (N.D. Cal. Dec. 13, 2021); Compl., *Triple-S Salud, Inc., v. Gilead Sciences, Inc.*, No. 3:21-cv-09647 (N.D. Cal. Dec. 14, 2021).

circumstances, would allow Teva to accelerate the launch of its generic Truvada and Atripla products before the 2020 entry date agreed to in the settlement.  The IHPPs allege that this early entry provision was anticompetitive because it supposedly (1) "restore[d]" regulatory exclusivity, and (2) reduced the incentive of other generic applicants to pursue their own patent challenges against Gilead by taking away the chance that they might beat Teva to the market.  Compl. ¶¶ 48, 116.[2]

As to the 2013 Agreement, the IHPPs not only challenge its MFEP provision, but also allege that Gilead made a secret commitment not to launch its own authorized generic ("AG") version of Viread.  *Id.* ¶¶ 104-06.  This theory has no basis in the plain language of the 2013 Agreement itself (which the complaints admit was amended in response to objections by the Federal Trade Commission to *remove* exactly such a provision).  *Id.* ¶ 107.  Further, this allegation is contradicted by the contemporaneous representations by Gilead and Teva in court at the time of the settlement, which the complaints document.  *Id.* ¶¶ 104-06.  Nevertheless, Plaintiffs allege that the value provided by the supposed secret no-AG agreement induced Teva to accept a later entry date for its generic version of Viread (in December 2017, six weeks before the relevant patents expired).  But neither of these challenges to the Gilead-Teva patent settlements plausibly allege that Gilead made a reverse payment to Teva that unlawfully delayed generic competition.  Rather, when the actual language of the challenged agreements is considered in combination with undisputed facts about Teva's FDA regulatory status for these products, the only plausible inference to draw is that the agreements had no negative impact on generic competition and were thus entirely lawful.

First, the IHPPs' arguments attacking the MFEP provision are flatly contradicted by the clause's unambiguous language.  Contrary to the IHPPs' bald assertion, the MFEP provision did *not* prevent other later-filing generic companies from beating Teva to the market if they continue to litigate against Gilead—█████████████████████████████████████████

████████████████████████████  *See* p. 9, *infra*.[3]  Nor is it plausible that this provision

_____

[2] For simplicity, this motion uses the paragraph numbers in the Complaint in *Centene Corp. v. Teva*, C.A. No. 3:21-cv-9648; the paragraph numbers in the other complaints against Teva differ, if at all, by no more than 5 paragraphs.  The allegations in the other IHPP complaints against Gilead are substantively identical, though the paragraph numbering is again different in some instances.

[3] In an earlier decision in related class litigation, this Court denied a motion to dismiss an antitrust

deterred later generic filers from continuing their respective patent fights.  To the contrary,

Plaintiffs allege (correctly) that Teva had forfeited any regulatory exclusivity that it held on generic

Truvada and Atripla, meaning that the FDA could grant final approval to competing generic

applications *without* waiting for Teva to launch.  And Teva had no right under the 2014 Agreement

███████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████   The IHPPs'

challenges to the 2014 Agreement are thus built on a flawed foundation, requiring dismissal of their

claims.

Second, the IHPPs' challenges to the 2013 Agreement should also be dismissed because

their core "pay for delay" theory is premised on economic irrationality.  It fails *Twombly*'s

plausibility requirement.  As alleged by Plaintiffs, Teva would have made substantially more money

by litigating and launching a generic of Viread earlier than December 2017 without any payment

from Gilead than it did by settling and accepting the December 2017 entry date with terms that

Plaintiffs characterize as "payments."  Indeed, by agreeing to a December 2017 launch date (shortly

before the relevant TDF patents expired), Teva lost the ability to monetize most of the 180-day

regulatory exclusivity that the FDA had awarded to Teva for its generic version of Viread.  (In

contrast to the situation with Truvada and Atripla, Teva did not forfeit its exclusivity on its generic

version of Viread, and there are no allegations to the contrary.)  An earlier launch that let Teva use

its full 180 days of FDA-granted marketing exclusivity would have allowed Teva to earn

substantially more money than it did under the 2013 Agreement—*even if* the 2013 Agreement

provided the "payments" to Teva that IHPPs allege.  Under these circumstances, it is implausible

---

challenge to the 2014 Agreement, relying on the *Staley* Plaintiffs' similar characterization of the
MFEP clause as put forward by the Plaintiffs here.  *See Staley v. Gilead Sci., Inc.*, 446 F. Supp. 3d
578, 609-12 (2020).  Teva is not a party to that case, and therefore did not have an opportunity to
explain that the reverse payment theory proffered rests on a misreading of the MFEP clause.  In
particular, as here, the *Staley* Plaintiffs argued that the provision "was essentially 'resurrect[ing]
ANDA exclusivity" and "insulated Teva from the … risk that one or more of the several subsequent
filers lined up behind it would enter on or before the agreed-upon entry dates," including "by
succeeding in their own lawsuits."  *Id.* at 610 (quoting Opp'n at 8); *see id.* at 612 ("[A] MFEP
clause guarantees a second filer that it will be in a *worse* position compared to the first filer even
where there is no ANDA exclusivity.").  But as noted above and discussed in detail below, that
position contradicts the plain language of the clause.  Teva and Gilead thus respectfully submit that
the Court should revisit the issue in these new actions.

that Teva would have agreed to "delay" its entry date on Viread in exchange for what Plaintiffs speculate was the purported payment from Gilead.

Because Plaintiffs have failed to plausibly allege that either the 2013 Agreement or the 2014 Agreement included reverse payments that unlawfully delayed generic entry, their claims should be dismissed in full.  Additionally, Teva joins in arguments in the motion to dismiss filed today by Gilead, BMS, and Janssen, which equally apply to IHPP's claims against Teva.[4]

## STATEMENT OF FACTS / PROCEDURAL BACKGROUND

These cases are brought by five IHPPs against Teva challenging patent settlements that Teva entered with Gilead in 2013 and 2014 respectively, to resolve patent litigation between the two companies.  The facts relevant to each challenged agreement are set forth below in the argument section pertaining to that respective agreement.[5]

The allegations brought in these five substantively identical actions closely track "reverse payment" allegations brought by the putative indirect purchaser class in the ongoing *Staley* litigation.[6]  As noted, p. 3 n. 3, *supra*, Teva is not a party in that action and therefore did not participate in motion to dismiss briefing.  Teva accordingly takes this opportunity to address the legal insufficiency of the allegations presented, as well as to correct misimpressions about the 2013 and 2014 Agreements that were left from the *Staley* briefing.

## LEGAL STANDARD

A complaint "is properly dismissed if it fails to plead 'enough facts to state a claim to relief that is plausible on its face.'"  *In re Gilead Scis. Sec. Lit.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  In reviewing the adequacy of a complaint under Rule 12, a court is required to draw all *reasonable* inferences in a plaintiff's favor.  "Conclusory allegations and unreasonable inferences, however, are insufficient to defeat a motion to dismiss."  *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007); *see also Reveal Chat Holdco*

---

[4] Teva has filed an accompanying Request for Judicial Notice requesting that the Court take judicial notice of the exhibits discussed below.
[5] Given the Court's familiarity with this dispute from *Staley* and related litigation, Teva includes only those facts relevant to the specific arguments presented here.
[6] The putative class plaintiffs (for both director purchasers and EPPs) originally challenged the 2013 Agreement but dropped any claim relating to that Agreement when they filed their class certification papers.  *See* ECF No. 692 at 2.

- 4 -

*LLC v. Facebook Inc.*, 2021 WL 1615349, at *3 (N.D. Cal. April 26, 2021) (dismissing antitrust complaint under these principles). Nor is the court required to accept "allegations that contradict matters properly subject to judicial notice." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

To be viable, allegations supporting an antitrust claim, such as the reverse-payment claim at issue here, "must make economic sense." *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998). "On a motion to dismiss in an antitrust case, a court must determine whether an antitrust claim is 'plausible' in light of basic economic principles." *William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009). Plaintiffs "must plead not just ultimate facts (such as a conspiracy), but evidentiary facts which, if true, will prove … [a conspiracy] which actually injures competition." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008). "When the facts alleged in a complaint demonstrate that the alleged conspiracy makes no economic sense, the claim must be dismissed." *Cascades Comput. Innovation LLC v. RPX Corp.*, 2013 WL 316023, at *11 (N.D. Cal. Jan. 24, 2013) (citing *Adaptive Power*, 141 F.3d at 952).

To state a claim for alleged generic delay, it is not enough for the plaintiff merely to allege that a patent settlement included certain terms that benefit the generic manufacturer. In *Actavis*, the Supreme Court held only that a reverse payment may "sometimes" cause unjustified anticompetitive effects. *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 156 (2013). And the Court specifically rejected application of the "quick look" doctrine, which would have allowed anticompetitive effects to be presumed from a reverse payment, instead holding that the antitrust plaintiff must proceed under the rule of reason. *Id.* at 159. Under that test, plaintiffs bear the burden of pleading an actual anticompetitive effect in the first instance. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) ("[P]laintiff has the initial burden to prove that the challenged restraint has a substantive anticompetitive effect that harms consumers in the relevant market."). Here, that means Plaintiffs must properly allege sufficient facts from which it is plausible to infer that any purported reverse payment actually caused a delay in generic entry.

In reviewing the plausibility of plaintiffs' allegations, the Court also must account for the

effects of the governing regulatory structure.  *Verizon Comms. Inc. v. Trinko*, 540 U.S. 398, 411 (2004).  Here, that principle requires the Court to pay specific attention to the consequences of the FDA's award of 180-day exclusivity to the first generic filer, which (all agree) Teva held for Viread but forfeited for Truvada and Atripla.

**ARGUMENT**

## I.   PLAINTIFFS' CLAIMS CHALLENGING THE GILEAD-TEVA 2014 AGREEMENT SHOULD BE DISMISSED

As discussed above, Plaintiffs' challenges to the 2014 Agreement settling patent litigation related to Truvada and Atripla rests on the Agreement's inclusion of a MFEP clause.  According to Plaintiffs' conclusory allegations, the MFEP clause provided Teva with a guaranteed right to be the first generic on the market—an effective restoration of the regulatory exclusivity it had forfeited. *See* Compl. ¶¶ 116, 170.  But the MFEP clause conferred no such right; instead, it permitted ███

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

Once Plaintiffs' mischaracterization of the MFEP clause are corrected, their antitrust challenge to the 2014 Agreement falls away.  Taking the actual terms of the clause into account, there is (and can be) no plausible allegation that the settlement conferred valuable exclusivity to Teva or improperly deterred other generic manufacturers from continuing the fight to enter the market. Moreover, Plaintiffs' claim is especially weak because, in contrast to reverse-payment theories that other courts have found legally viable, Plaintiffs fail to plausibly allege that Gilead made a net profit sacrifice when it agreed to the challenged provision.  Because Plaintiffs cannot plausibly allege either an actual "payment" by Gilead or interference with generic competition, the claim that the 2014 Agreement somehow delayed generic entry should be dismissed.

### A.  Facts Relevant to IHPPs' Challenge to the 2014 Agreement

On September 26, 2008, Teva filed Abbreviated New Drug Applications ("ANDAs") with the FDA seeking approval to manufacture and sell generic versions of Truvada and Atripla.  Compl. ¶ 129.  At the time, Gilead had patents listed in the Orange Book for those products claiming the

emtricitabine (or "FTC") component of those products; the FTC patents expired on May 4, 2021 and September 9, 2021, along with associated regulatory exclusivities. *Id.* ¶ 130. Teva's ANDA included Paragraph IV certifications to those FTC patents. *Id.* ¶ 129. Teva was the first-filer for generic Truvada and generic Atripla, but numerous other drug companies also filed ANDAs for those products. *Id.* ¶¶ 131, 134. Gilead filed patent infringement actions against Teva based on those ANDAs. *Id.* ¶ 149.

Teva's only defense in the patent litigation was to assert that Gilead's FTC patents were invalid; Teva had no non-infringement defense. *Id.* ¶ 152. Plaintiffs allege that Gilead's patents in the Truvada/Atripla trial were "weak," such that Teva was likely to prevail if the case had proceeded to judgment, and that "other generic manufacturers" were "well aware of the inherent weaknesses of the FTC patents." *Id.* ¶¶ 150, 161. (As required in the Rule 12(b)(6) posture, Teva accepts Plaintiffs' allegations in the Complaints, including the conclusory allegations about the purported "weakness" of Gilead's patents, solely for purposes of this motion.)

As the first-filer for generic Truvada and generic Atripla, Teva ordinarily would have been entitled to 180-day marketing exclusivity, but Teva failed to obtain tentative approval on each ANDA within 30 months of filing its ANDA and FDA ultimately determined that Teva therefore had forfeited its 180-day exclusivity. Compl. ¶ 169; *see* 21 U.S.C. § 355(j)(5)(D)(i)(IV) (failure to obtain tentative approval within 30 months is a potential forfeiture event that can lead to forfeiture of exclusivity). Due to Teva's forfeiture, its ANDA posed no regulatory bar to the approval of any other ANDA; subsequent filers would not need to wait 180 days from Teva's launch to obtain final approval of their ANDAs once FDA had made a formal forfeiture determination. *See* FDA Guidance for Industry, 180-Day Exclusivity: Questions and Answers (January 2017), at Q43. And, at a minimum, the risk that Teva had forfeited was known: in the course of the litigation, Gilead and Teva submitted a joint letter on the public docket in which Gilead noted that Teva may have forfeited its first-filer exclusivity for generic Truvada by failing to obtain tentative approval within 30 months. *See Gilead Sciences, Inc. v. Teva Pharms. USA, Inc.*, Case No. 1:10-cv-1796 (S.D.N.Y. Aug. 4, 2011), ECF No. 43 at 3 (Holding Decl., Ex. F).

The patent case proceeded through trial in October 2013. *Id.* ¶ 151. On the eve of closing

arguments, the parties reached a settlement in principle, which became embodied in a settlement

agreement executed on April 25, 2014.  *Id.* ¶ 162.  Pursuant to that agreement (*i.e.*, the 2014

Agreement), Teva received a license to enter the market with its generic Truvada and Atripla

products no later September 30, 2020, and earlier in certain circumstances.  The license applies to

both the FTC patents expiring in 2021 and to certain new combination patents that Gilead had

obtained in 2013 and 2014, which do not expire until 2024.  *See* Declaration of Christopher T.

Holding ("Holding Decl."), Ex. A (Section 1.1, ████████████████████████████████████

████████████████████████; Holding Decl., Ex. B (FDA Orange Book entry for Truvada

showing listing of '397 patent and expiration date of January 13, 2024); Holding Decl., Ex. C (FDA

Orange Book entry for Atripla showing the same).

      Plaintiffs allege that Teva agreed to "delay" entering with generic Truvada and Atripla until

September 2020 in exchange for receiving from Gilead "the guarantee of 180 days of exclusivity"

for those products via the MFEP clause that it had otherwise forfeited.  Compl. ¶ 170; *see also id.*

¶ 116 (alleging that "MFEP clauses … ensure the first filer's exclusivity for a set period of time").

According to Plaintiffs, MFEP clauses "dramatically reduce a later filer's incentive to challenge the

patents, because they ensure the first filer's exclusivity for a set period of time," *id.* ¶ 116, which

was "of particular importance to Teva" because it had forfeited its 180-day exclusivity, *id.* ¶ 170.

While Teva's forfeiture would otherwise have given a subsequent filer an opportunity to "enjoy a

substantial period of *de facto* exclusivity in the generic sector of the market," Plaintiffs allege that

the MFEP clause "eliminate[d] that possibility."  *Id.* ¶ 116.  Plaintiffs further allege in conclusory

terms that the MFEP clause in the 2014 settlement "dissuaded second filers from continuing to

litigate" their own patent cases against Gilead, and thus "provided Teva with assurances of 180-day

exclusivity that it was not entitled to by statute or regulation."  *Id.* ¶¶ 169-70.  According to

Plaintiffs, absent the MFEP clause, "Teva and subsequent filers would have entered the market

sooner than they did."  *Id.* ¶ 173.

      The Complaints never quote the actual language of the 2014 Agreement, but necessarily

incorporate it by reference.  *See, e.g.*, *Mogan v. Sacks, Ricketts & Case LLP*, 2022 WL 94927, at *1

(N.D. Cal. Jan. 10, 2022).  The agreement grants certain licenses to Teva that become effective as of

1    the "License Effective Date."  Holding Decl., Ex. A (Sections 1.1; 3.1).  The License Effective Date

2    is defined as ████████████████████████████████████████████████████████████

3    The so-called MFEP provision is subsection (iv) of the definition and states that Teva will be

4    licensed to enter:

5    ███████████████████████████████████████████████████████████████

6    ███████████████████████████████████████████████████████████████

7    ███████████████████████████████████████████████████████████████

8    ███████████████████████████████████████████████████████████████

     *See* Holding Decl., Ex. A (emphasis added).

9            This clause therefore applies only if Gilead ████████████████████ prior to

10   September 2021. ████████████████████████████████████████████████

11   ███████████████████████████████████████████  The License

12   Effective Date definition also provides that Teva ████████████████████████████

13   ████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████████

16   ███████[7]  But by its plain terms, the Agreement does *not* provide any acceleration rights to Teva if

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████

19   ████████████████████  *See, e.g.*, *In re Nexium (Esomeprazole) Antitrust Litig.*, 842

20   F.3d 34, 40-41 (1st Cir. 2016) (describing an "at risk" launch).  Indeed, neither the License

21   Effective Date definition, nor any other provision in the 2014 Agreement ████████████████

22   ████████████████████████████████  Likewise, no provision in the 2014

23   ────────────────────

24   [7] Although it is not entirely clear, this two-clause provision may be what Plaintiffs intend to
     reference when they allege that the 2014 Agreement contained a "most-favored entry" or MFE (as
25   opposed to MFEP) provision, which they allege allowed Teva to enter the market "if any
     subsequent generic ANDA filer succeeds in entering the market before the agreed-upon date for the
26   first filer." Compl. ¶ 114. But, again, █████████████████████████████████████████
     ██████████████████████████████████████████ including after a district court
27   win.  Plaintiffs' allegations regarding an MFE clause (which assert that Teva had a right to launch
     date parity) are thus subsumed by their claims based on the MFEP (which assert that Teva had right
28   to launch first) and they fail for the same reason: Plaintiffs' allegations regarding Teva's
     acceleration rights are contradicted by the plain language of the Agreement.

Agreement accelerates Teva's launch date ██████████████████████████████

██████████████████████████████████████████████

### B. Plaintiffs' Reverse Payment Theory Contradicts the Plain Language of the Settlement Provision on Which they Rely

#### 1. Plaintiffs' "Exclusivity" Premise is Wrong

Everything about Plaintiffs' theory challenging the 2014 Agreement—and the reasoning applied by the Court in the *Staley* decision regarding that agreement—hinges on the premise that the 2014 Agreement restored to Teva by contract the 180-day exclusivity that Teva had forfeited as a regulatory matter. Plaintiffs' theory that the MFEP operated as a "payment" to Teva—inducing Teva to delay its entry—depends on the allegation that Teva received exclusivity from the agreement, and thus the opportunity to earn higher profits from selling for a period without competition from other ANDAs. Plaintiffs' theory that the MFEP dis-incentivized subsequent ANDA filers from continuing to challenge Gilead's patents depends on the same premise: that Teva's exclusivity was restored by contract, thus preventing any other ANDA filer from being able to enter the market ahead of Teva. According to Plaintiffs, preventing subsequent filers from having a chance to beat Teva to the market would have undermined their financial incentive to continue the patent fight against Gilead.

But the plain terms of the 2014 Agreement, coupled with Teva's forfeiture of its 180-day regulatory exclusivity (Compl. ¶ 169), show that Plaintiffs' conclusory assertion that the 2014 Agreement "restored" Teva's forfeited exclusivity is simply wrong. Thus, even if some type of MFEP clause could theoretically support a reverse-payment claim in another case, the specific terms at issue here do not, given Teva's forfeiture of regulatory exclusivity. Plaintiffs' reverse-payment allegations regarding the 2014 Agreement therefore fail to state a claim on which relief can be granted, and Plaintiffs plead no other theory of liability resulting from that agreement. As a result, all claims regarding the 2014 Agreement should be dismissed.

A simple example illustrates the flaw in Plaintiffs' claim. Assume that a subsequent filer continued to litigate its patent dispute with Gilead after Teva had settled. As a regulatory matter, Teva's forfeiture means that its ANDA would not have blocked FDA approval of the subsequent

1   filer's ANDA—once the 30-month patent litigation stay expired, the subsequent filer could secure

2   final approval and would be free to launch.  *See* FDA Guidance for Industry, 180-Day Exclusivity:

3   Questions and Answers (January 2017), at Q42.  Once a subsequent filer secured FDA approval, it

4   could have started marketing its products without permission from Gilead (*e.g.*, after expiration of

5   the 30-month stay, defeating a preliminary injunction motion, or winning on the merits in district

6   court).  By its terms, the 2014 Agreement would have neither stopped that generic competitor from

7   launching nor accelerated Teva's own approval.  Thus, if the competitor had received final approval

8   and launched in 2018, for example, Teva would still have been stuck on the sidelines until

9   September 30, 2020 (the default license entry date), letting the subsequent filer sell without

10  competition from Teva for a significant period and potentially having the market to itself for some

11  time.  In other words, contrary to Plaintiffs' conclusory allegations (e.g., Compl. ¶ 116), a

12  subsequent filer who continued to litigate *could* beat Teva to market and get *de facto* exclusivity.

13          As this example shows, not only does the 2014 Agreement fail to ensure that Teva would be

14  first in line to sell its generic Truvada and Atripla products—it does not even guarantee parity with

15  other ANDA filers.  *Cf. Staley*, 446 F. Supp. 3d at 612 (relying on plaintiffs' mistaken argument

16  that the "MFEP clause guarantees a second filer … will be in a *worse* position compared to the first

17  filer even where there is no ANDA exclusivity" and stating that a clause that merely "guaranteed

18  *equality*"—which this clause also does not confer, *see* p. 9, *supra*—"is not as clear a deterrent to a

19  second filer").  Plaintiffs never address the actual terms of the agreement in proffering their contrary

20  theory; they simply rely on conclusory allegations that are contrary to the agreement's terms and

21  thus should not be credited.  By contrast, if Teva had retained its 180-day exclusivity, or if it were

22  true that exclusivity had been "restored" by the 2014 Agreement as Plaintiffs allege, then Teva

23  *would* have been able to launch ahead of other ANDA filers and guaranteed a period of exclusivity.

24  But those predicate facts indisputably do not exist here.  There is simply no way, therefore, that

25  Plaintiffs' *conclusion* that the agreement restored Teva's exclusivity comports with the actual *facts*.

26  Plaintiff have not (and cannot) plead *facts* making it plausible that the agreement restored Teva's

27  exclusivity, and the *conclusions* they plead do not satisfy *Twombly*.[8]

28

---

[8] As another example, assume a subsequent filer continues to litigate with Gilead, prevails in the

1   The Complaint therefore fails to plausibly allege facts supporting a reverse payment.

2   Without restored exclusivity, the 2014 Agreement does not guarantee that Teva would achieve

3   higher earnings by being able to sell without competition from other ANDAs.  To the contrary,

4   notwithstanding the agreement, Teva faced the very real prospect of selling either alongside other

5   ANDA applicants, or even coming to market after them—a consequence of Teva's forfeiture that

6   the MFEP clause does not disturb.  This mischaracterization of the MFEP clause alone dooms

7   Plaintiffs claim, as Plaintiffs do not even purport to allege that Teva received a reverse payment

8   other than through its "restored exclusivity" theory.

9                           2.      **Plaintiffs' "Disincentive" Theory is Implausible**

10  The lack of plausible allegations about "restored exclusivity" also undermines the

11  plausibility of Plaintiffs' allegation that the 2014 Agreement dis-incentivized other ANDA filers

12  from continuing to challenge Gilead's patents.  Under Plaintiffs' theory, the purported disincentive

13  springs from the way that the MFEP supposedly prevented other filers from coming to market ahead

14  of Teva in order to obtain *de facto* exclusivity.  But because, as shown above, the agreement's plain

15  terms, do *not* block other filers from beating Teva to the market, Plaintiffs' theory does not hold up.

16  Indeed, if anything, the facts alleged in the Complaint show that subsequent ANDA filers

17  would have had powerful incentives *in favor of* continuing to litigate their challenges to Gilead's

18  patents.  First, Plaintiffs allege that a generic manufacturer that was able to enter first with generic

19  Truvada and Atripla stood to gain access to a market worth up to $1.5 billion.  Compl. ¶ 173.

20  Second, Teva's forfeiture removed any regulatory block to approval before the first filer could

21  launch.  Third, as set out above, the 2014 Agreement did not prevent a subsequent filer from

22  Federal Circuit, and waits to launch until that time.  In that scenario, too, the 2014 Agreement does
23  not give Teva any exclusivity or guarantee that Teva could launch ahead of other ANDAs.  Instead,
    both would be able to launch as the same time: the subsequent filer because Gilead would have no
    basis to stop it, and Teva because ███████████████████████████████████████
24  ████████████████████████████████████████████████████.  In this scenario, too, Teva gets
25  no exclusivity, and the second filer gets at least equality of entry with Teva.  *See* 446 F. Supp. 3d at
    612 (reserving decision on whether an MFE alone would be a reserve payment and noting that it
26  creates less of a deterrent to second filers).  By contrast, if Teva had retained its exclusivity, and
    Teva had started selling its product within 75 days of the Federal Circuit's decision, the FDA would
27  not be allowed to approve any other ANDA until 180 days after Teva had launched.  This, then, is
    another example of how the terms of the 2014 Agreement do not "restore" to Teva by contract the
28  regulatory exclusivity it had forfeited.

launching before Teva, leaving open the possibility that the subsequent filer would have the generic market to itself.  In those circumstances—and assuming, as Plaintiffs allege, that Gilead's patents were "weak" and "susceptible to invalidity challenges" (*id.* ¶ 133) —there is no plausible argument that subsequent ANDA filers lacked a strong incentive to litigate challenges to Gilead's patents in an effort to leapfrog Teva and thus reap higher earnings from being first to market.

Consistent with those incentives, industry experience demonstrates that where, as here, the first-filer has forfeited its regulatory 180-day exclusivity, subsequent filers frequently do challenge brand companies' patents, and secure earlier generic entry, *even when* the first-filer has entered into a settlement agreement containing acceleration clauses.  *See* Keith M. Drake & Thomas G. McGuire,[9] *Generic Entry Before the Agreed-Upon Date in Pharmaceutical Patent Settlements*, J. of Competition Law and Econ. 16(2), 188-219 (2020).  Three recent real world examples bear out later filers' incentive to continue to press the patent litigation.  First, in the case involving the drug Cubicin®, Teva was the first-filer and settled with the patent owner Cubist for an entry date of December 24, 2017, subject to certain acceleration provisions.  Teva forfeited exclusivity by failing to obtain tentative approval within 30 months of its ANDA submission.  A later filer, Hospira, successfully litigated its patent challenge to judgment, opening the market to generic entry on September 15, 2016.  *See id.* at 209-210.  Namenda XR® is a second example.  As to Namenda XR, first-filer Amneal forfeited exclusivity and Teva, a later filer, successfully invalidated the patents, allowing generic entry to occur in 2018.  Teva's 2018 entry date was nearly two years earlier than the entry date in Amneal's settlement with the branded company, which included an acceleration provision.  *Id.* at 211.  A third example is the Entocort® patent litigation.  There, a later filer, Mylan[10] continued to challenge the listed patents even after the first-filer entered into a settlement with the brand company, and Mylan obtained a ruling of non-infringement from the district court.  *Id.* at 217.  Because the first-filer had forfeited its exclusivity, Mylan obtained final FDA approval and launched at risk (before conclusion of an appeal) several months before the entry date in the first-filer's settlement with the brand company.  *Id.*

---

[9] Dr. McGuire is a lead expert for the class plaintiffs in the related *Staley* action.
[10] Mylan is one of the later filers for generic Truvada and Atripla.

1    The annual brand sales of these three products—Cubicin, Namenda XR and Entocort—at

2    the time the generics entered was $1.2 billion, $936 million, and $350 million, respectively. *Id.* at

3    202. That is just a fraction of the size of the brand markets for Truvada and Atripla. *See* p. 12,

4    *supra*. Examples like these three confirm that it is not merely a theoretical possibility that

5    subsequent ANDA filers will challenge a brand company's patents and create earlier generic entry

6    despite the acceleration clause in a first-filer's settlement when, as here, the first-filer has forfeited

7    its exclusivity.

8    The facts of this case also distinguish it from other cases in which courts have denied

9    dispositive motions in actions alleging that certain acceleration clauses qualified as reverse

10    payments. In each such case, either (1) the first-filer had not forfeited its exclusivity (creating a

11    potential settlement "bottleneck" to other ANDAs), or (2) the agreement included a term

12    conspicuously absent from the 2014 Agreement, which allowed for acceleration based on an

13    *unlicensed* earlier launch. *See, e.g., In re Glumetza Antitrust Litig.,* 2021 WL 1817092, at *14-*15

14    (N.D. Cal. May 6, 2021) (first-filer had not forfeited its exclusivity); *In re Loestrin 24 Fe Antitrust*

15    *Litigation*, 261 F. Supp. 3d 307, 333-34 (D.R.I. 2017) (acceleration based on unlicensed earlier

16    launch); *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 2021 WL 3612497, *8-9 (N.D. Cal. Aug.

17    13, 2021) (same); *In re Namenda Indirect Purchaser Antitrust Litig.*, 2021 WL 2403727, *26

18    (S.D.N.Y. June 11, 2021) (same). In such circumstances, the allegation that an MFEP clause

19    delayed generic competition is potentially more plausible. By contrast, in this case, where Teva *did*

20    forfeit its regulatory exclusivity and the 2014 Agreement *did not* allow Teva to accelerate its launch

21    if another ANDA filer launched at risk, the factual predicates supporting reverse-payment

22    allegations are simply absent. Other than this Court's earlier ruling in *Staley*, Teva is aware of no

23    case that has held that an accelerator, or even a purported MFEP, can constitute a reverse payment

24    on facts comparable to those at issue here. And as explained above, this Court's earlier decision

25    was based on the *Staley* Plaintiffs' mischaracterization of the MFEP's plain language.

26    In sum, when the actual terms of the 2014 Agreement are properly understood, there is no

27    plausible allegation here that Gilead provided Teva with a reverse payment that had the purpose and

28    effect of delaying generic entry.

- 14 -

1

### 3. Plaintiffs Do Not and Cannot Plausibly Plead a "Profit Sacrifice" by Gilead

2

3

Finally, Plaintiffs' MFEP-based challenge to the 2014 settlement fails for another reason:

4

Plaintiffs do not and cannot plausibly plead that Gilead *sacrificed any profits* when it agreed to the

MFEP clause. As a result, there is no actionable reverse payment alleged here.

5

It is well-established that for a plaintiff to plausibly plead and prove the existence of a

6

reverse payment, it must show that the patent owner made some form of profit sacrifice. *See, e.g.,*

7

*King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp. (In re Lamictal Antitrust Litig.)*, 791

8

F.3d 388, 405 (3d Cir. 2015) ("the source of the benefit to the claimed infringer [must be]

9

something costly to the patentee"); *In re Loestrin 24 Fe Antitrust Litig.*, 261 F. Supp. 3d 307, 332

10

(D.R.I. 2017) ("The text of *Actavis* suggests that the Court should consider both [the perspective of

11

the patentee and alleged infringer] in considering an alleged unlawful reverse payment."); *In re*

12

*Intuniv Antitrust Litig.*, 496 F. Supp. 3d 639, 660-661 (D. Mass. 2020) ("Under the Supreme

13

Court's holding in *Actavis*, if a brand company agrees to sacrifice some of its profits and transfer

14

them to a generic as part of a settlement agreement, the Court may infer that the unexplained

15

payment was given in exchange for the generic delaying entry."); *In the Matter of Impax*

16

*Laboratories, Inc.*, 2019 FTC LEXIS 25, at *56 (F.T.C. Mar. 28, 2019) (considering the alleged

17

payment from both parties' perspective, including considering the "revenues [the patentee] forwent"

18

by virtue of making the payment); Aaron Edlin, Scott Hemphill, Herbert Hovenkamp, & Carl

19

Shapiro, *The Actavis Inference: Theory and Practice*, 67 RUTGERS L. REV. 585, 594 (2015) ("for

20

noncash reverse payments, the courts should seek to measure the dollar value *sacrificed* by the

21

patent holder as a result of the agreement it reached with the alleged infringer") (emphasis added).

22

Absent a net sacrifice of profits by a patent owner, there is no basis to infer patent weakness, or that

23

the patent owner would have agreed to allow the generic to enter on a date earlier than the date in

24

the challenged settlement. *See Actavis*, 570 U.S. at 154, 156 (patentee's willingness to sacrifice

25

profits provides potential for inference of patent weakness). After all, if a settlement term is

26

costless to the brand manufacturer, then there is no reason to view the inclusion of that term as

27

signaling anything about the relevant strength of the parties' positions in the underlying patent

28

litigation. Moreover, there is nothing "unusual" about a settlement that involves no transfer of

1   value from the brand manufacturer to the alleged infringer, and thus no basis to trigger potential

2   antitrust scrutiny of a settlement under *Actavis*.  *See id.* at 147, 158 (describing a reverse payment as

3   an "unusual" type of settlement that warrants antitrust scrutiny, while also insisting that parties are

4   allowed "as in other industries" to enter settlements without reverse payments in order to avoid

5   risking antitrust liability).

6          Here, the Complaints describe the alleged benefit to Teva of the MFEP clause.  As explained

7   above, the alleged benefit relies on a clear misreading of the clause.  But even if that theory were

8   credited, the Complaints contain no allegations that could even remotely be construed as plausibly

9   describing a net sacrifice by Gilead by agreeing to the MFEP clause.  Nor could they plead one.

10  Under Plaintiffs' theory, the very purpose and effect of the MFEP was to ensure an outcome in

11  which only one generic—Teva—would enter on September 30, 2020, with all other generics

12  following 6 months later.  By agreeing with Teva not to license other generics to enter until after

13  Teva, Gilead sacrificed nothing at all.  Indeed, as Plaintiffs allege, Gilead stood only to gain from

14  such an arrangement: according to Plaintiffs, with only one generic entrant erosion of a brand

15  company's market share typically is substantially slower than if multiple generics enter at the same

16  time.  There is simply no plausible basis to infer any sacrifice of profits by Gilead from such an

17  arrangement.

18         In *Staley*, the Court suggested that plaintiffs can move forward with an *Actavis* claim even

19  without alleging a profit sacrifice by the brand manufacturer based on the theory that "*Actavis* did

20  not preclude a patent settlement from being anticompetitive in the absence of a reverse payment *if*

21  *there were other circumstances*" that poses potential anti-competitive concern.  *Staley*, 446 F. Supp.

22  3d at 611 (citing *Actavis*, 570 U.S. at 158).  Teva respectfully submits that the Court's reasoning

23  was mistaken.  As noted, p. 15, *supra*,  numerous courts and commentators have recognized that a

24  profit sacrifice by the brand is an essential element of an *Actavis* claim—indeed, the existence of a

25  large, reverse payment is the entire predicate under *Actavis* for an inference that a patent settlement

26  that allows generic competition before patent expiry might nonetheless be anticompetitive.  *See*

27  *Actavis*, 570 U.S. at 153-54.  Teva is not aware of any other decisions accepting an *Actavis*

28  challenge without a reverse payment.  The passage in *Actavis* cited by the Court in *Staley*, 446 F.

1    Supp. 3d at 611 (citing *Actavis*, 570 U.S. at 158), does not endorse such a theory; to the contrary,

2    the Supreme Court recognized "the desirability" of patent settlements and insisted that

3    pharmaceutical companies could settle litigation "as in other industries" without "risk[ing] antitrust

4    liability" so long as they settled "in other ways"—*i.e.*, without an "unjustified reverse payment."

5    *Actavis*, 570 U.S. at 158.

6        In any event, the other "indicators of anti-competitiveness" on which the Court relied,

7    *Staley*, 446 F. Supp. 3d at 611-12, rest on the *Staley* plaintiffs' mischaracterizations.  For example,

8    the Court pointed to the plaintiffs' allegation that the MFEP clause "[r]esurrected" regulatory

9    exclusivity, *id.* at 612, but, as discussed, the plain language of that clause undercuts Plaintiffs'

10   theory.  The Court also noted that Teva's negotiated entry date was "quite late"— "only a year

11   before the patent expiration date" for the 2014 Agreement.  *Id.* at 612.  But this statement is

12   factually incorrect: the settlement licensed combination patents covering both Truvada and Atripla

13   that do not expire until 2024, meaning that the settlement allowed entry three years before overall

14   patent expiry.  *See* p. 8, *supra*.  More generally, absent an alleged reverse payment, there is no basis

15   to infer anticompetitive behavior from the entry date itself—it could simply reflect an objective

16   assessment of strength of the patents.  And absent a reverse payment, there is no plausible basis to

17   treat the MFEP clause as a "surrogate" for patent weakness, or to draw an inference that if the

18   parties had not agreed to include the MFEP clause in the settlement, Gilead would have agreed to

19   allow Teva on the market any earlier than September 30, 2020.

20   **II.  PLAINTIFFS' CLAIMS CHALLENGING THE 2013 AGREEMENT SHOULD BE DISMISSED**

21       The Court should also dismiss Plaintiffs' claims challenging the 2013 Agreement concerning

22   the TDF patent litigation between Teva and Gilead.  As described above, Plaintiffs allege that Gilead

23   and Teva entered into a "pay for delay" agreement concerning Teva's generic version of Viread;

24   according to Plaintiffs, Gilead made certain reverse payments to Teva, which prompted Teva to "delay"

25   its launch of a generic version of Viread until December 15, 2017.  But even at the pleading stage,

26   Plaintiffs' theory of delay must be rejected as implausible because it makes no economic sense and is

27   not plausible under *Twombly*.

28

- 17 -

### A. Facts Relevant to the 2013 Agreement

Gilead had four patents on its Viread product, which were set to expire on January 25, 2018 (with pediatric exclusivity).[11] Compl. ¶ 90.  On or about July 1, 2009, Teva filed a substantially complete ANDA for generic version of Viread containing Paragraph IV certifications to Gilead's TDF patents.  Teva was the first company to do so.[12]  *Id.* ¶¶ 93-95.

As the first company to file an ANDA for Viread with a Paragraph IV certification, Teva was entitled to a regulatory exclusivity under the Hatch-Waxman Act, which, absent forfeiture, would bar FDA from approving any other ANDA for generic Viread until 180 days after Teva started selling its generic version of Viread.  *Id.* ¶ 95.  To retain the exclusivity, the first-filer must generally obtain tentative approval of its ANDA within 30 months of submission.  *Id.* ¶ 48; *see* 21 U.S.C. § 355(j)(5)(D)(i)(IV).  Teva met that requirement: FDA granted tentative approval to Teva's ANDA for its generic version of Viread on December 23, 2011.  Compl. ¶ 98.  Thus, as of December 2011, Teva had secured—and knew it had secured—its eligibility to the 180-day exclusivity.  The FDA's final approval letter for Teva's ANDA further confirmed Teva's eligibility for this regulatory exclusivity.

The Complaint alleges that 180-day exclusivity is "lucrative" and "extremely valuable" to generic companies.  Compl. ¶¶ 39, 95.  "The vast majority of generic drug profits occur during the 180-day exclusivity period."  *Id.* ¶ 95.  But the regulatory exclusivity stops once the relevant brand patents expire.  *See* FDA Guidance for Industry, 180-Day Exclusivity: Questions and Answers (January 2017), at Q14 ("180-day exclusivity does not extend beyond the life of the patent").  Therefore, a first-filer that launches with fewer than 180 days left before patent expiry gives up some of what Plaintiffs assert is an "extremely valuable" exclusivity period.

Upon receipt of Teva's Paragraph IV certifications, Gilead filed patent litigation against Teva.  Teva did not dispute infringement of Gilead's patents, but rather relied entirely on a defense

---

[11] Technically, the patents expired in July 2017, and a regulatory exclusivity associated with the patents ran to January 25, 2018, but that distinction does not matter for any purpose relevant to this motion.

[12] The evidence will show that, when Teva originally filed its ANDA in 2009, it did *not* include Paragraph IV certifications; Teva amended the ANDA adding them in 2010.  Nonetheless, Teva was the first-filer with Paragraph IV certifications, as Plaintiffs allege.

that the TDF patents were invalid as obvious—a defense on which Teva bore the burden by clear and convincing evidence.  Compl. ¶ 97.  The case was scheduled for a bench trial beginning on February 20, 2013.  *Id.* ¶ 98.  On February 6, 2013, just two weeks before trial, Teva requested leave to substitute a new expert witness on its key obviousness defense, because a recent decision by the Federal Circuit in an unrelated matter had found that Teva's existing expert had "prevaricat[ed]" in his testimony.  *Gilead Sciences, Inc. v. Teva Pharms. USA, Inc.*, Case No.  1:10-cv-1796 (S.D.N.Y. Feb. 6, 2013), ECF No. 116 at 1 (court order discussing Teva's letter) (Holding Decl., Ex. E).  Teva insisted that substitution was needed to avoid "fundamental unfairness."  *Id.* The court denied Teva's request the same day, as it found "no support for substitution of an expert because that expert's veracity has been called into question."  *Id.*  The court also reasoned that substitution would unfairly prejudice Gilead because the expert testimony at issue was "crucial to a key dispute in this action – whether the compounds claimed in the asserted patents and the methods of treatment using that compound would have been obvious to a person of ordinary skill in the art." *Id.* at 2.

With opening arguments only days away, therefore, Teva faced the prospect of going to trial with a compromised expert on the "key" issue of Teva's obviousness defense.  *Id.*  Had Teva proceeded to trial and lost, the court would have issued an injunction keeping Teva off the market until late January 2018.  *See* 35 U.S.C. § 271(e).  A loss, and the resulting injunction, would have caused Teva to lose the benefit of its first-filer exclusivity entirely.  *See* FDA Guidance for Industry, 180-Day Exclusivity: Questions and Answers (January 2017), at Q28 ("[F]orfeiture under this provision occurs when the ANDA applicant loses related patent litigation and amends its ANDA to include a paragraph III certification[.]").

On February 19, the day before trial was to start, Teva and Gilead informed the court that they had reached a settlement in principle.  The agreement allowed Teva to launch its generic version of Viread no later than December 15, 2017—six weeks prior to expiration of the TDF patents.  Compl. ¶ 100.  With that date, Teva would and did give up 138 days (more than 75%) of the 180-day exclusivity to which it was otherwise entitled.  The exclusivity lapsed on January 26, 2018, when Teva had been on the market for only 42 days, and on that same date FDA approved

1    numerous other ANDAs for generic Viread, allowing them to sell in competition to Teva. *See, e.g.*,

2    Holding Decl., Ex. D (Letter from Vincent Sansone, Deputy Director, Office of Regulatory

3    Operations, Office of Generic Drugs, Center for Drug Evaluation and Research (Jan. 26, 2018)

4    (approving Aurobindo Pharma's ANDA for generic Viread)).

5         Plaintiffs allege that the 2013 Agreement between Gilead and Teva contains two forms of

6    reverse payments:  an agreement that Gilead would not sell an authorized generic (AG) version of

7    Viread during the six weeks of Teva's regulatory exclusivity that would remain (a so-called "No-

8    AG" agreement), and acceleration provisions just like the 2014 Agreement.  Compl. ¶¶ 107, 114.

9    Plaintiffs allege, in conclusory fashion, that "Gilead agreed to pay, and Teva agreed to receive,

10   substantial consideration in exchange for Teva's agreement to delay bringing a generic version of

11   Viread to market." *Id.* ¶ 223.  They assert that the "purposes and effects" of the purported reverse

12   payments were to induce Teva to delay its entry.  *Id*.  And they allege that the purported reverse

13   payments had this inducement effect because they purportedly were "worth substantially more than

14   what Teva could have earned if it had prevailed in the patent litigation and come to market with a

15   generic Viread in competition with Gilead's AG." *Id.*  Aside from these conclusory allegations,

16   which merely recite the elements of the claims, Plaintiffs plead no *facts* to support their "pay for

17   delay" inference.

18         **B.    Plaintiffs' "Pay for Delay" Theory is Economically Irrational Because it Alleges
           that Teva Accepted a Payment That Made it Worse Off than Earlier Entry**

19         The Complaint does not plead facts sufficient to support a plausible inference that Teva

20   agreed to delay entry of its generic version of Viread because of any purported payments received

21   from Gilead to settle the TDF litigation.  That omission alone supports dismissal.  *Twombly*, 550

22   U.S. 554, 570 (2007); *see also In re Bystolic Antitrust Litig.,* No. (NO. 20-CV-10087), 2022 WL

23   323945, at *18-*26 (S.D.N.Y. Feb. 2, 2022) (dismissing reverse payment claims where the

24   underlying factual allegations that reverse payments occurred were conclusory).  But here,

25   Plaintiffs' allegations are not merely lacking in detail; rather, the factual allegations they do make

26   show that their theory of delay is implausible.  Plaintiffs' own allegations show that it would have

27   been economically irrational for Teva to accept the "reverse payments" alleged by Plaintiffs in

28   exchange for delaying its entry date to December 15, 2017, since the loss of over 75% of the value

of its first-filer exclusivity (due to the timing of patent expiry) far exceeds the value of the alleged reverse payments—even accepting all of Plaintiffs' valuations. As a result, all of Plaintiffs' claims premised in the Gilead-Teva 2013 Agreement should be dismissed.

Plaintiffs allege that, if Teva had launched on December 15, 2017 and sold for six weeks without any competition from an authorized generic sold by Gilead, then "Teva would expect revenues over $50 million." Compl. ¶ 109; *see also id.* ¶ 126 ($7.9 million per week, which is $47.4 million over six weeks). By contrast, they allege, if Teva had sold during the same six-week period while competing with an AG sold by Gilead, "Teva would only earn revenues of approximately $28 million." *Id.* ¶ 111. From there, Plaintiffs allege that "Gilead's launch of an AG would thus cost Teva over $20 million in revenues during the six-week exclusivity period." *Id.*. But even accepting those calculations for purposes of this motion, they fail to support a plausible claim of "pay for delay," because they ignore the impact of the entry date for Teva's FDA-granted 180-day exclusivity. For Plaintiffs' claim to make economic sense, Plaintiffs must plausibly allege that Teva would have expected to earn more under the license from the settlement than Teva would have earned by launching earlier without the alleged payments (and thus subject to potential competition from Gilead launching an AG version of Viread). After all, it would make no sense for Teva to accept a later entry date in exchange for terms that left it worse off. But that is exactly what Plaintiffs' own allegations show: Teva would have earned much more from an earlier entry date on Viread, even if Teva had to compete against an AG by Gilead, because Teva would have been able to reap the full benefit if its 180-day exclusivity against other ANDA filers. Those benefits far outstrip the value Teva received from a truncated six-week exclusivity period as the sole generic version of Viread on the market (even without AG competition).

As set forth above, p. 19, supra, Teva's acceptance in the settlement agreement of the December 15, 2017 launch date for its generic version of Viread automatically cut down Teva's 180-day exclusivity window by more than 75%, since that exclusivity lapsed by operation of law once Gilead's patents expired on January 26, 2018. As noted, Plaintiffs allege that Teva would have earned $28 million during a six-week period of selling against an AG but no other generics. *Id.* By contrast, if Teva had not settled and had entered earlier—as Plaintiffs allege Teva could

have done—then Teva would have had a full six months (180 days) of exclusivity instead of six weeks. In that scenario, and using Plaintiffs' own allegations, Teva would have earned approximately $112 million during the 180-day window: $28 million times 4.[13]

Thus, according to their own math, Plaintiffs allege that Teva voluntarily agreed to forego earning $112 million during just the 180-day exclusivity period in exchange for an opportunity to earn just $50 million by accepting the later entry date. Put another way, Plaintiffs necessarily allege that Teva voluntarily agreed to throw away more than $60 million dollars when it accepted the December 15, 2017 entry date under the settlement license in exchange for other consideration, such as the purported no-AG agreement. That proposition is self-evidently nonsensical. It defies economic logic and basic common sense to argue that a company in Teva's position would accept a "payment" for delay that left it worse off by more than $60 million. The only plausible inference is that Teva instead accepted the December 2017 date because it had no ability to enter earlier, so it took what Gilead was willing to offer.

Without an ability to plausibly allege delay, Plaintiffs have no claim, because they have no basis to establish that they were actually injured by the challenged settlement provisions, as private plaintiffs must do both as a matter of Article III standing and under substantive law. *See, e.g.*, *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 163-69 (3d Cir. 2017); *In re Nexium Antitrust Litig.*, 842 F.3d 34, 59 (1st Cir. 2016); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-61 (1992). And although some courts have held that the existence of a large and unexplained reverse payment may support an inference that the payment led to delayed generic entry, *see, e.g., Nexium*, 842 F.3d at 59-60, those cases do not save Plaintiffs' claim here. At most, any such inference is permissive; the existence of a reverse payment does not compel a finding of delay, and a fact-finder may reasonably find that, even if a reverse payment was made, generic entry was not delayed. *See, e.g*

---

[13] Of course, if Teva had lost the patent litigation, it would have lost this $112 million, but that possibility runs contrary to Plaintiffs' theory that Gilead's patents "were weak and likely to be invalidated." Compl. ¶ 91. But even if Teva had discounted the value of its exclusivity somewhat based on patent risk, Plaintiffs' "pay for delay" theory remains economically implausible. For example, if the value of Teva's exclusivity were discounted by 50% on the theory that the odds of success in the patent case were 50-50, it would be worth $56 million—which is *still* more than Teva allegedly earned by virtue of Gilead's "payment" including a secret no-AG. *See* p. 12, *supra*. Again, it is economically implausible that Teva delayed its generic entry in exchange for a "payment" that left it worse off.

1    *id.* (affirming jury verdict for defendants, despite finding that the agreement contained a large and

2    unexplained reverse payment, because the jury concluded that the brand company would not have

3    agreed to an earlier entry date in any event and thus the payment did not delay entry); *In re Intuniv*

4    *Antitrust Litigation*, 2020 WL 5995326, at *21 (D. Mass. Oct. 9, 2020) (precluding plaintiffs'

5    expert from testifying that if there was a reverse payment, generic entry must have been delayed).

6    Under Rule 12, where it makes no economic sense for Teva to have agreed to delay generic entry

7    for a purported "reverse payment"—based on a supposed no-AG agreement that does not appear in

8    any provision of the parties' settlement—Plaintiffs have failed plausibly to allege a viable *Actavis*

9    claim.  *Sanders*, 504 F.3d at 910.

10   A "pay for delay" claim is not viable unless there are plausible allegations that the generic

11   company agreed to delay its entry date in exchange for something more (a payment) than it could

12   have received without the agreement—a brand company self-evidently cannot "pay" a generic

13   company if that generic company does not receive some value out of the exchange.  But, taking

14   Plaintiffs' own allegations at face value, they assert here that Teva voluntarily agreed to delay its

15   launch in return for getting substantially less.  Plaintiffs' assertion makes no economic sense and is

16   utterly implausible.  Therefore, because Plaintiffs have not pled facts plausibly showing that any

17   purported reverse payment actually induced delay in generic entry, Plaintiffs' claim challenging the

18   2013 Agreement should be dismissed under Rule 12(b)(6).[14]

19                                      **<u>CONCLUSION</u>**

20   For all of the foregoing reasons, the claims of the Individual Health Plan Plaintiffs should be

21   dismissed and with prejudice.

22

23

24

25

26

---

27   [14] As noted above, *see supra*, p. 4, in the event the Court does not grant Teva's motion to dismiss,
     Teva joins the arguments raised in the motion to dismiss filed today by defendants Gilead, BMS,
28   and Janssen.

Respectfully submitted,

Dated:   February 16, 2022        GOODWIN PROCTER LLP

By:   */s/ Christopher T. Holding*
Christopher T. Holding (*pro hac vice*)
Jordan Bock (SBN 321477)
100 Northern Avenue
Boston, MA 02210
Telephone: (617) 570-1000
Facsimile: (617) 523-1231
CHolding@goodwinlaw.com
JBock@goodwinlaw.com

Brian T. Burgess (*pro hac vice*)
GOODWIN PROCTER LLP
1900 N Street N.W.
Washington, DC 20036
Telephone: (202) 346-4000
Facsimile: (202) 346-4444
BBurgess@goodwinlaw.com

Ariel Rogers (SBN 316910)
GOODWIN PROCTER LLP
601 Marshall Street
Redwood City, CA 94063
Telephone: (650) 752-3100
Facsimile: (650) 853-1038
ARogers@goodwinlaw.com

*Attorneys for Defendant*
*Teva Pharmaceuticals USA, Inc.*

1

## **CERTIFICATE OF SERVICE**

2

     I hereby certify that on February 16, 2022, the within document was filed with the Clerk of the

3

Court using CM/ECF, which will send notification of such filing to the attorneys of record in this case.

4

5

Executed:     February 16, 2022            */s/  Christopher T. Holding*

                                       Christopher T. Holding

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TEVA'S NOTICE OF MOTION AND MOTION TO DISMISS
CASE NO: 3:19-CV-02573-EMC