1  DURIE TANGRI LLP
   DARALYN J. DURIE (SBN 169825)
2  ddurie@durietangri.com
   217 Leidesdorff Street
3  San Francisco, CA 94111
   Telephone: (415) 362-6666
4

5  HILLIARD & SHADOWEN LLP
   STEVE D. SHADOWEN (*pro hac vice*)
6  steve@hilliardshadowenlaw.com
   1135 W. 6th Street, Suite 125
7  Austin, TX 78703
   Telephone: (855) 344-3298
8

9  HAGENS BERMAN SOBOL SHAPIRO LLP
   STEVE W. BERMAN (*pro hac vice*)
10 steve@hbsslaw.com
   1301 Second Avenue, Suite 2000
11 Seattle, WA 98101
   Telephone: (206) 623-7292
12

13 *Interim Co-Lead Counsel for End-Payor Plaintiffs*

14 (Additional Counsel Listed on Signature Page)

15

16                 **IN THE UNITED STATES DISTRICT COURT**
                **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
17                      **SAN FRANCISCO DIVISION**

18                                              | Case No. 3:19-cv-02573-EMC (Master Docket)

19 PETER STALEY, et al.,

20                            Plaintiffs,         **PLAINTIFFS PETER STALEY AND
                                                 MICHAEL SNIPE'S OPPOSITION TO
21        v.                                     DEFENDANTS' MOTION TO DISMISS
                                                 THEIR COMPLAINTS**
22 GILEAD SCIENCES, INC., et al.,

23                            Defendants.         Date:   March 24, 2022
                                                 Time:   1:30 p.m.
24                                               Ctrm:   5-17th Floor
                                                 Judge:  Honorable Edward M. Chen

25

26

27

28
   _____

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   STATEMENT OF FACTS .....................................................................................2

    A.    The Allegations in the Complaint Regarding Plaintiffs' cART Drug Purchases Are True. ...................................................................................................................3

    B.    Defendants Misrepresent Plaintiffs' Testimony Regarding the Likelihood of Their Purchasing One of Defendants' cART Drugs in the Future. ................................6

    C.    Plaintiffs Did Not "Hide" the Truth of Their cART Drug Purchases from Defendants. ....................................................................................................................7

III.  LEGAL STANDARD............................................................................................10

IV.   ARGUMENT ........................................................................................................12

    A.    Defendants' Motion to Dismiss Is Not Jurisdictional But Rather Is a Challenge to Plaintiffs' *Statutory* Standing............................................................................12

    B.    Plaintiffs Have Article III Standing. ........................................................................14

        1.    The Complaint's Unchallenged Allegations Support Standing Based on Plaintiffs' Purchases of Non-Defendant Drugs......................................................14

        2.    The Likelihood that Plaintiffs Will Purchase Defendants' Drugs in the Future Provides an Additional Basis for Standing...............................................18

    C.    Plaintiffs Also Have Statutory Standing. ..........................................................19

V.    CONCLUSION......................................................................................................22

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*In re Abbott Labs. Norvir Anti-Trust Litig.*,
    No. C 04-1511 CW, 2007 WL 1689899 (N.D. Cal. June 11, 2007)....................................................15

6

*Allstate Ins. Co. v. Auto Glass America, LLC*,
    No. 6:18-cv-2184-Orl-41LRH, 2020 WL 6064607 (M.D. Fla. July 13, 2020)...................................11

7

8

*Amarel v. Connell*,
    102 F.3d 1494 (9th Cir. 1997) .......................................................................................................13

9

*Animal Legal Def. Fund v. United States Dep't of Agric.*,
    935 F.3d 858 (9th Cir. 2019) .........................................................................................................11

11

*In re Arizona Dairy Products Litig.*,
    627 F. Supp. 233 (D. Ariz. 1985) ..................................................................................................20

12

*Ass'n of Public Agency Customers v. Bonneville Power Admin.*,
    733 F.3d 939 (9th Cir. 2013) .........................................................................................................17

14

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983)..........................................................................................................13, 14, 21

16

*Augustine v. United States*,
    704 F.2d 1074 (9th Cir. 1983) .......................................................................................................12

17

*Barbour v. Haley*,
    471 F.3d 1222 (11th Cir. 2006) .....................................................................................................13

19

*In re Beef Indus. Antitrust Litig.*,
    600 F.2d 1148 (5th Cir. 1979) .......................................................................................................20

21

*Bennett v. Spear*,
    520 U.S. 154 (1997)..................................................................................................................11, 14

22

*Block v. Meese*,
    793 F.2d 1303 (D.C. Cir. 1986) ....................................................................................................10

24

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic.*,
    152 F.3d 588 (7th Cir. 1998) .........................................................................................................18

26

*Boardman v. Pacific Seafood Group*,
    822 F. 3d 1011 (9th Cir. 2016) ................................................................................................18, 21

27

*Boardman v. Pacific Seafood Group*,
    No. 1:15-108-CL, 2015 WL 13357739 (D. Or. March 6, 2015) .....................................................21

i

*Bubar v. Ampco Foods, Inc.*,
    752 F.2d 445 (9th Cir. 1985) ........................................................................................21

*Cal. Dental Ass'n v. Cal. Dental Hygienists' Ass'n*,
    222 Cal. App. 3d 49 (1990) ..........................................................................................22

*Cal. v. Am. Stores Co.*,
    495 U.S. 271 (1990) ...............................................................................................18, 21

*Canyon County v. Syngenta Seeds, Inc.*,
    519 F.3d 969 (9th Cir. 2008) ........................................................................................13

*Cargill, Inc. v. Monfort of Colo., Inc.*,
    479 U.S. 104 (1986) ......................................................................................................21

*Carpenters Indus. Council v. Zinke*,
    854 F.3d 1 (D.C. Cir. 2017) ..........................................................................................10

*In re: Cathode Ray Tube (CRT) Antitrust Litig*,
    No. C-07-5944-JST, 2016 WL 6246736 (N.D. Cal. Oct. 26, 2016) ......................15, 20

*Cellular Plus, Inc. v. Superior Court*,
    14 Cal. App. 4th 1224 (1993) .......................................................................................22

*Cetacean Cmty. v. Bush*,
    386 F.3d 1169 (9th Cir. 2004) ......................................................................................10

*Chavez v. Wal-Mart Stores Inc.*,
    No. CV-13-6429-GHK, 2014 WL 12591672 (C.D. Cal. Nov. 14, 2014) .........................5

*In re Citric Acid Antitrust Litig.*,
    145 F. Supp. 2d 1152 (N.D. Cal. 2001) ........................................................................20

*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*,
    691 F.2d 1335 (9th Cir. 1982) ................................................................................passim

*Cottle v. Plaid Inc.*,
    536 F. Supp. 3d 461 (N.D. Cal. 2021) ..........................................................................10

*County of San Mateo v. CSL Ltd.*,
    No. 10-CV-05686-JSC, 2014 WL 4100602 (N.D. Cal. Aug. 20, 2014) .........................20

*Czyzewski v. Jevic Holding Corp.*,
    137 S. Ct. 973 (2017) ....................................................................................................10

*Davis v. Fed. Election Comm'n*,
    554 U.S. 724 (2008) ......................................................................................................10

*Dept. of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ..................................................................................................10

ii

*Doe 1 v. Mayorkas*,
530 F. Supp. 3d 893 (N.D. Cal. 2021) ...................................................................11, 12

*In re Domestic Drywall Antitrust Litig.*,
MDL No. 13-2437, 2019 WL 4918675 (E.D. Pa. Oct. 3, 2019) .....................................20

*Dreier v. United States*,
106 F.3d 844 (9th Cir.1996) .........................................................................................11, 12

*In re Facebook Privacy Litig.*,
791 F. Supp. 2d 705 (N.D. Cal. 2011) ........................................................................11, 12

*In re: Flash Memory Antitrust Litig.*,
No. C 07-0086 SBA, 2010 WL2332081 (June 9, 2010)....................................................15

*Garabet v. Autonomous Techs. Corp.*,
116 F. Supp. 2d 1159 (C.D. Cal. 2000) ...........................................................14, 20, 22

*Gelboim v. Bank of Am. Corp.*,
823 F.3d 759 (2d Cir. 2016)............................................................................................13

*Goda v. Abbott Labs.*,
No. 01445-96, 1997 WL 156541 (D.C. Super. Ct. Feb. 3, 1997)..................................15, 16

*Hartig Drug Co. v. Senju Pharm. Co.*,
836 F.3d 261 (3d Cir. 2016)............................................................................................13

*Hawaii v. Standard Oil Co.*,
405 U.S. 251 (1972)........................................................................................................21

*In re High Fructose Corn Syrup Antitrust Litig.*,
295 F.3d 651 (7th Cir. 2002) .........................................................................................15

*Johnson v. Jew*,
No. 20-cv-08457-EJD, 2021 WL 3621828 (N.D. Cal. Aug. 16, 2021)...........................11

*Leite v. Crane Co.*,
749 F.3d 1117 (9th Cir. 2014) ........................................................................................11

*Levitt v. Yelp! Inc.*,
No. C-10-1321 EMC, 2011 WL 5079526 (N.D. Cal. Oct. 26, 2011)...........................11, 12

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)........................................................................................................13

*Loeb Industries, Inc. v. Sumitomo Corp.*,
306 F.3d 469 (7th Cir. 2002) .........................................................................................13

*In re Loestrin 24 Fe Antitrust Litig.*,
MDL No. 13-2472-WES-PAS, 2019 WL 3214257 (D. R.I. July 2, 2019).........................20

iii

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
    998 F. 2d 1144 (3d Cir. 1993)................................................................................17, 20

*Lucas Automotive Eng., Inc. v. Bridgestone/Firestone, Inc.*,
    140 F.3d 1228 (9th Cir. 1998) ...........................................................................18, 21, 22

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)........................................................................................................11

*McGarry & McGarry, LLC v. Bankruptcy Management Solutions, Inc.*,
    937 F.3d 1056 (7th Cir. 2019) .......................................................................................13

*In re Microsoft Corp. Antitrust Litig.*,
    127 F. Supp. 2d 702 (D. Md. 2001) ...............................................................................17

*Mid-West Paper Products Co. v. Continental Group, Inc.*,
    596 F.2d 573 (3d Cir. 1979)..............................................................................19, 20, 21, 22

*In re Modafinil Antitrust Litig.*,
    837 F.3d 238 (3d Cir. 2016)............................................................................................20

*Morrison v. Trivita, Inc.*,
    No. 12-CV-1387 BEN (BLM), 2013 WL 1148070 (S.D. Cal. Mar. 29, 2013) ...................16

*In re Multidistrict Vehicle Air Pollution M.D.L. No 31*,
    481 F.2d 122 (9th Cir. 1973) .........................................................................................17

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
    435 U.S. 679 (1978).........................................................................................................17

*In re Nexium Antitrust Litig.*,
    777 F.3d 9 (1st Cir. 2015) ..............................................................................................16

*Oliver v. SD-3C LLC*,
    No. 11-cv-01260-JSW, 2016 WL 5950345 (N.D. Cal. Sep. 30, 2016) ..............................15

*Optronic Techs., Inc. v. Ningbo Sunny Elect. Co.*,
    No. 5:16-cv-06370-EJD, 2020 WL 1812257 (N.D. Cal. Apr. 9, 2020) ........................17, 18

*Oregon Laborers-Employee Health & Welfare Trust Fund v. Philip Morris Inc.*,
    185 F.3d 957 (9th Cir. 1999) .........................................................................................21

*Pollock v. Citrus Assocs. of N.Y. Cotton Exch., Inc.*,
    512 F. Supp. 711 (D.C. N.Y. 1981) ................................................................................20

*Preminger v. Peake*,
    552 F.3d 757 (9th Cir. 2008) .........................................................................................10

*In re Ranbaxy Generic Drug Application Antitrust Litig.*,
    MDL No. 19-md-02878-NMG, 2021 WL 5493675 (D. Mass. Nov. 22, 2021) ...................18

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS PETER STALEY AND MICHAEL SNIPE
Case No. 3:19-cv-02573-EMC

*Rejoice! Coffee Co. v. Hartford Fin. Servs. Group, Inc.*,
　No. 20-cv-06789-EMC, 2021 WL 5879118 (N.D. Cal. Dec. 9, 2021)................................12

*Renee v. Duncan*,
　686 F.3d 1002 (9th Cir. 2012) ........................................................................................10

*Safe Air for Everyone v. Meyer*,
　373 F.3d 1035 (9th Cir. 2004) ....................................................................................10, 11

*Save Our Heritage, Inc. v. F.A.A.*,
　269 F.3d 49 (1st Cir. 2001)................................................................................................11

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
　No. 1:12-md-2343, 2014 WL 2002887 (E.D. Tenn. May 15, 2014)..............................20

*Sundance Land Corp. v. Community First Federal Savings & Loan Ass'n*,
　840 F.2d 653 (9th Cir. 1988)........................................................................................4, 21

*Susan B. Anthony List v. Driehaus*,
　573 U.S. 149 (2014)..........................................................................................................19

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
　No. C 09-4997 SI, 2012 WL 6708866 (N.D. Cal. Dec. 26, 2012) ....................................20

*United States Gypsum Co. v. Indiana Gas Co., Inc.*,
　350 F.3d 623 (7th Cir. 2003) ............................................................................................20

*United States v. Anthem, Inc.*,
　855 F.3d 345 (D.C. Cir. 2017) ..........................................................................................17

*United States v. Microsoft Corp.*,
　253 F.3d 34 (D.C. Cir. 2001) ............................................................................................17

*United States v. Students Challenging Regulatory Agency Procs. (SCRAP)*,
　412 U.S. 669 (1973)..........................................................................................................10

*United States v. W.T. Grant Co.*,
　345 U.S. 629 (1953)..........................................................................................................18

*Utah v. Evans*,
　536 U.S. 452 (2002)....................................................................................................10, 19

*Van v. LLR, Inc.*,
　962 F.3d 1160 (9th Cir. 2020) ..........................................................................................10

*Wall Products Co. v. Nat'l Gypsum Co.*,
　357 F. Supp. 832 (N.D. Cal. 1973) ..................................................................................20

*In re Warfarin Sodium Antitrust Litig.*,
　212 F.R.D. 231 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004) ..............................15

v

*Warth v. Seldin*,
    422 U.S. 490 (1975) .................................................................................................12

*Whaley v. Pac. Seafood Group*,
    No. 1:10-CV-3057-PA, 2012 WL 13047314 (D. Or. Jan. 31, 2012) ..............................20, 21

*In re Zappos.com, Inc.*,
    888 F.3d 1020 (9th Cir. 2018) ...................................................................................19

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969) ...........................................................................................18, 21

**Rules**

Fed. R. Civ. P. 12(b) ..................................................................................1, 11, 13, 22

Fed. R. Civ. P. 56 ...................................................................................................1

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ...........................................................................5

Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
    Principles and Their Application* (4th ed. 2014) ...............................................................21

# I.    INTRODUCTION

Plaintiffs Peter Staley and Michael Snipe ("Plaintiffs") are two individual plaintiffs—no longer proposed as class representatives—who purchase cART drugs and seek injunctive relief against Defendants. Plaintiffs allege that Defendants' ongoing unlawful conduct adversely affects the prices and quality of the cART drugs they take.[1]  The Complaint alleges that each of Mr. Staley and Mr. Snipe purchases one or more "cART drugs," FAC ¶¶ 19, 29, a term that the Complaint defines to include the drugs that they take, *id.* ¶ 392. Many of the cART drugs defined in the Complaint are produced by the Defendants, but many are not. Mr. Staley and Mr. Snipe purchase those that are not.

The Complaint alleges that Defendants' conduct harms the purchasers of *all* cART drugs, regardless of who produces them. Specifically, "Defendants' unlawful monopolization of the cART Market caused the price of every drug in the market to be higher than it would have absent that conduct." FAC ¶ 427.[2]  The adverse price effect is accompanied by an adverse effect on innovation, again regardless of whether the Defendants produce the cART drug: Defendants' unlawful conduct has "had a disastrous effect on innovation in this vitally important market," including "suppress[ing] innovation by Gilead's competitors." FAC ¶ 190; *see also* FAC ¶¶ 15, 189-193.

Notwithstanding the Complaint's plain allegations of injury, causation, and redressability, Defendants Gilead and Janssen move to dismiss Plaintiffs' claims for lack of subject matter jurisdiction under Rule 12(b)(1) (ECF 877) ("Mtn."), claiming Plaintiffs lack standing under Article III.  Defendants' motion is deeply flawed and their arguments are largely a distraction.

First, the motion is procedurally improper; in substance it challenges Mr. Staley's and Mr. Snipe's statutory standing to bring an antitrust claim under an "umbrella" harm theory, a matter for a Rule 12(b)(6) or a Rule 56 motion, not for a Rule 12(b)(1) motion directed to jurisdiction.

Second, Defendants' "factual" recitation constructs a straw argument that Defendants purport to defeat by pointing out that neither Mr. Staley nor Mr. Snipe took Defendants' drugs during the relevant

---

[1] First Am. Consol. Class Action Compl. ("FAC"), ECF No. 788 (Dec. 15, 2021).

[2] *See also, e.g.,* FAC ¶ 427 ("Given Gilead's dominance of the cART market, the monopoly prices on its products had the predictable effect of causing its competitors to raise prices on their cART drugs"); *id.* ¶ 428 ("The result of Defendant's unlawful conduct has been extraordinary price inflation in the cART market as a whole").

period. That fact is true but irrelevant to Defendants' motion. Defendants contend that the Complaint misled them by suggesting that Mr. Staley and Mr. Snipe took Defendants' drugs. Not so. The Complaint defines cART drugs explicitly, and Plaintiffs took drugs within that definition, as discovery responses served long ago confirm.

Third, Defendants' legal arguments are similarly inapposite. Plaintiffs plainly allege harm sufficient to sustain their standing under Article III. Defendants' procedurally improper argument that Plaintiffs fail to state a valid antitrust claim is based on case law interpreting and applying the indirect purchaser rule of *Illinois Brick*. That rule does not apply to the injunctive relief Plaintiffs seek, nor does it apply to claims brought under state laws that do not follow *Illinois Brick*.

The Complaint alleges that the prices of the drugs that Plaintiffs take are inflated by Defendants' unlawful conduct, and it seeks to remedy that inflation while spurring the innovation that Defendants' anticompetitive conduct impedes. These allegations provide ample basis for both constitutional and statutory standing. Defendants' motion should be denied.[3]

## II.   STATEMENT OF FACTS

Defendants' statement of facts is almost entirely irrelevant to their motion which is grounded in the uncontested fact that neither Mr. Staley nor Mr. Snipe took Defendants' drugs during the relevant period. That fact does not defeat their standing, as explained below. But because Defendants hurl baseless accusations of distortions and falsehoods at Mr. Staley, Mr. Snipe, and their counsel, Plaintiffs are compelled to respond in some detail to set the record straight. It is Defendants that distort and misrepresent the facts here. The Complaint accurately alleges that Mr. Staley and Mr. Snipe purchased cART drugs during the relevant period.[4] And, although it is unnecessary to establish standing, the Complaint also alleges that there is a substantial probability that they will purchase one of Defendants' products in

---

[3] The Court previously granted Janssen's motion to dismiss all plaintiffs' claims against it for monopolization of the cART market. ECF No. 388, at 13-16.  Plaintiffs Staley and Snipe are amenable to entering a suitable stipulation with Janssen acknowledging that the ruling precludes all remaining claims that they have against Janssen, but preserving the issue for appeal. Janssen has never requested such a stipulation, instead demanding that Plaintiffs dismiss all of their claims with prejudice.

[4] FAC ¶ 456 (defining class period as "May 14, 2015 through and until the anticompetitive effects of Defendants' unlawful conduct cease").

the future. Neither the Plaintiffs nor their counsel hid from Defendants the fact that the cART drugs

Plaintiffs purchased were not manufactured by Defendants. This fact was evident early in the discovery

process.

**A.      The Allegations in the Complaint Regarding Plaintiffs' cART Drug Purchases Are True.**

The Complaint alleges that Mr. Staley and Mr. Snipe purchased cART drugs during the relevant

period,[5] a fact borne out in discovery. The Complaint defines "cART drugs" and lists all 55 of them,

some of which are made or controlled by Defendants, and many of which are not.  FAC ¶ 392.  Among

the latter specifically identified drugs are █████████, Isentress, Selzentry, and Viramune.  *Id.*  Mr. Staley's

discovery responses show that he has been on the same three-drug regimen—Isentress, Selzentry, and

Viramune (or its generic equivalent, nevirapine)—since 2009.[6]  He produced pharmacy and insurance

records reflecting purchases for those drugs made during the relevant period.[7] ██████████████████

████████████████████████████████████████████████████

██████████████████████████████████████ Ps.' Int. Resp. at 11. ████████████████

████████████████████████████████.[8]

Defendants contend that the Complaint lied about the drugs that Mr. Staley and Mr. Snipe had

taken. The premise of that contention is Defendants' false assertion that "all six versions of [the EPPs']

complaints alleged that Mr. Staley and Mr. Snipe had purchased *Defendants' products* or generic ver-

sions thereof since May 14, 2015 . . . ." Mtn. 1 (emphasis added). But the Complaint is clear that

Plaintiffs purchased the listed specific drugs to which Defendants point "*or other cART drugs*." *See*

---

[5] The Complaint alleges that each of Mr. Snipe and Mr. Staley "purchased and/or paid for some or all of the purchase price for one or more of brand Viread, Emtriva, Truvada, Atripla, Complera, Stribild, Odefsey, Genvoya, Descovy, Vemlidy, Reyataz, Evotaz, Prezista, Prezcobix, Edurant, Symtuza, Tybost, ***or other cART drugs*** other than for re-sale . . . at supracompetitive prices during the Class Period and has thereby been injured." FAC ¶¶ 19, 29 (emphasis added); *see also* Compl., ECF No. 1, ¶ 18 (same); Consol. Class Action Compl., ECF No. 96, ¶¶ 18, 27 (same); Corrected Consol. Class Action Compl., ECF No. 118 ¶¶ 18, 27 (same); First Am. Consol. Class Action Compl., ECF No. 304, ¶¶ 19, 29 (same); First Am. Consol. Class Action Compl., ECF No. 347, ¶¶ 19, 29 (same).

[6] *See* Decl. of Tina Miranda (Feb. 28, 2022) ("Miranda Decl."), Ex. 1, Individual Plfs.' Resps. and Objs. to Defs.' First Set of Ints. at 11 (Mar. 22, 2021) ("Ps.' Int. Resp.").

[7] Burke Decl., Ex. H, Purchase Records of Peter Staley ("Staley Purchase Records").

[8] *See* Burke Decl., Ex. I, Purchase Records of Michael Snipe ("Snipe Purchase Records").

1    *supra* n. 5. Defendants acknowledge this language, but assert without explanation that "tacking on 'or

2    other cART drugs' at the end of that list" is misleading. Mtn. 4.[9] It obviously is not misleading. Nor

3    could Defendants credibly claim to have in fact been misled. They themselves repeatedly defined

4    "cART drugs" throughout this litigation to include products others than those manufactured by Defend-

5    ants, including those purchased by Mr. Staley and Mr. Snipe.[10] And just days after filing their motion,

6    Defendants demanded that new plaintiffs produce discovery with respect to the full list.[11]

7         Defendants also assert that this allegation is false as it relates to Mr. Snipe because "he *never*

8

9   [9] Defendants baldly assert that "the only relevant purchases in this litigation, under both the class certifi-
cation motion and the operative complaint, are purchases of a subset of Defendants' products (or their

10   generic equivalents) on or after May 14, 2015." Mtn. 2. That contention is wrong twice over. *First*, De-
fendants' contention conflates the class plaintiffs' narrowing of their relevant market with their

11   narrowing of the class definition. The Complaint alleges a relevant market of all cART drugs "and nar-
rower markets therein." FAC ¶ 479. In connection with class certification, the class plaintiffs submitted

12   an expert report that defined a narrower *relevant market* of "cART Foundation Drugs," comprising 23
specifically identified drugs, many of which the Defendants do not produce. *See* Decl. of W. Henry Hut-

13   tinger in Supp. of Motion for Class Cert., Ex. 1, Expert Report of Prof. Thomas G. McGuire ("McGuire
Class Cert. Rep."), ECF 694-3, p. 135, Table 6, ¶ 198. So Defendants are plainly wrong when they assert

14   that only their drugs are relevant to the class plaintiffs' claims. The class plaintiffs also narrowed the
*class definition* to include only persons or entities who purchased or paid for at least one cART Founda-

15   tion drug produced by the Defendants. Memorandum of Points and Authorities in Support of End-Payor
Plaintiffs' Motion for Class Certification and Appointment of Class counsel, ECF No. 694-1, at 12 &

16   n.36. That class seeks only injunctive relief, so it was not necessary to include the purchasers of all cART
Foundation drugs in the class. But all of those drugs are in a relevant market and thus obviously remain

17   relevant to the class plaintiffs' claims. *Second*, these two non-class Plaintiffs are not bound by the class
plaintiffs' definition of the class or of the relevant market. As demonstrated below, these Plaintiffs have

18   standing even if they ultimately adopt only the relevant market defined by Professor McGuire.

19   [10] This is evident in Defendants' requests for discovery to Individual Plaintiffs, their subsequent discov-
ery correspondence, and their briefing to the Court. *See* Miranda Decl., Ex. 3, Ds.' First Set of Requests

20   for Production to Ind. Ps. at 2 (Dec. 6, 2019) (defining the term "cART Products" to refer to "any poten-
tially FDA-approvable or FDA-approved pharmaceutical product, including FDCs and Standalone

21   Products, that can be used as part of a cART regimen for the treatment or prevention of HIV" and includ-
ing a list that included ███████ Isentress, Selzentry, and Viramune.); Miranda Decl., Ex. 4, Ds.' First

22   Set of Ints. to Ind. Ps. at 2 (Feb. 12, 2021) (same); Miranda Decl. Ex. 5, Ds.' First Set of Requests for
Admission to Ind. Ps. at 1-2 (Apr. 20, 2021) (same); Burke Decl., Ex. A, ECF 877-3, Dec. 18, 2020 Os-

23   trander Ltr. at 2 (emphasizing that Individual Plaintiffs' agreement to produce records for "all cART
products" was not limited to "just records for purchases of products manufactured by Defendants"); Aug.

24   13, 2020 Jnt. Ltr. Br. at 2, ECF No 403 (recognizing that the cART drug market included "at least 54 dif-
ferent pharmaceuticals and their AB-rated generic substitutes").

25

26   [11] *See* Miranda Decl., Ex. 2, Defs.' Sec. Set of Ints. to Blue Cross Blue Shield Assoc. (Feb. 17, 2022)
(requesting information related to "cART products" defined to include more than 50 enumerated cART

27   drugs including those taken by Mr. Snipe and Mr. Staley).

28

1   paid for *any* HIV medications." Mtn. 1 (emphasis in original); *see also id.* at 4.  But the Complaint al-

2   leges that the Complaint Mr. Snipe "*purchased . . . or paid for*" his cART medications. *See supra* n. 5. ████████

3   ███████████████████████████████████████████████████████████

4   ████████████.[12] There is nothing false about the allegation that Mr. Snipe "purchased" his cART

5   medications. The definition of "purchase" under the Complaint is broad, covering "purchased" in poten-

6   tial contradistinction to "paid for."  Indeed, Black's Law Dictionary defines "purchase" as "the

7   acquisition of an interest in real or personal property by sale, discount, negotiation, mortgage, pledge,

8   lien, issue or re-issue, gift, or any other voluntary transaction." Black's Law Dictionary (11th ed. 2019).

9       Defendants cite Mr. Snipe's deposition testimony, where they got him to agree with their charac-

10  terization that he did not "purchase" the drugs.  Mtn. 8.  That an experienced attorney got such

11  testimony from a lay witness[13] after speciously conflating out-of-pocket expenditures with "purchase" is

12  neither surprising nor determinative.[14]  Defendants misled Mr. Snipe by using a more restrictive defini-

13  tion of "purchase" than they themselves have used throughout this litigation.[15] Nor is Mr. Snipe's

14  admission that he was not financially damaged inconsistent with his being "injured" on account of his

15  purchases, as set forth below.  What matters on this motion is whether his acquiring the product—

16  whether or not denominated a "purchase"—gives him standing to pursue his claims.  It clearly does. *See*

17  *infra* n. 48.

18

19

20  [12] Miranda Decl., Ex. 6, Tr. of Deposition of Michael Snipe (Oct. 11, 2021) ("Snipe Dep. Tr.") 26:9-27:1,
    47:13-48:20, 89:8-12; 93:16-95:11; 99:8-25, 115:5-120:13.

21  [13] Mr. Snipe is a dance instructor, working toward a master's degree in behavioral science, and without
    any experience in parsing distinctions in legal documents. Snipe Dep. Tr. 17:23-19:24. Also, contrary to

22  Defendants' suggestion (Mtn. 11), Mr. Snipe is not an HIV activist.  He is a person who adamantly be-

23  lieves that remedying "Gilead's collusion with other companies in keeping the generic drugs off the
    market" will "help me and many other people," and that "someone  needs to stand up to these guys." *Id*.

24  Snipe Dep. Tr. 51:20-52:1.

25  [14] *See Chavez v. Wal-Mart Stores Inc*., No. CV-13-6429-GHK (PJWx), 2014 WL 12591672, at *4 (C.D.
    Cal. Nov. 14, 2014) ("while the definition of 'purchase' may be susceptible to a precise legal meaning in

26  a given context, like a statute, a non-lawyer's use of the term is not necessarily so precise.").

27  [15]  *See, e.g.,* Burke Decl. Ex. A, Dec. 18, 2020 Ostrander Ltr. The lawyer expressly equated "purchase"
    with "paying for," then asked a compound question that conflated them, and then finally tripped the trap

28  by using only "purchase" in the question. Snipe Dep. 109:19—110:20.

**B.    Defendants Misrepresent Plaintiffs' Testimony Regarding the Likelihood of Their Purchasing One of Defendants' cART Drugs in the Future.**

In addition to truthfully alleging that these Plaintiffs currently purchase a cART drug, the Complaint also alleges that there is a "substantial probability" that they will in the future purchase a cART drug produced by a Defendant. FAC ¶¶ 19, 29.  As demonstrated below, these Plaintiffs have Article III and statutory standing based on their current purchases, so the Complaint's additional allegations about the future are not determinative of this motion. But Plaintiffs nevertheless want to set the record straight.

Defendants assert that both Mr. Staley and ████████████████████████████ ██████████████████████████, thus rendering the Complaint's additional allegation false. *See* Mtn. 1, 3, 5, 6-7, 10. This was not their testimony. ████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████

Instead, Mr. Staley testified that he "keep[s] looking at the stuff that's coming out every year as possibilities." Miranda Decl., Ex. 7, Tr. of Deposition of Peter Staley (Dec. 3, 2021) ("Staley Dep. Tr.") 45:3-5. When Defendants' counsel pointedly asked Mr. Staley about taking Gilead drugs in the future—implying that he would not—Mr. Staley responded, "I wouldn't say that . . . . [I]f for some reason I need to switch regimens, I would relook at all of the drugs." *Id*. at 43:18-449:15. When pushed by counsel about his resistance profile, Mr. Staley responded, "Yeah, I would probably do another resistance test. I'd do a structured treatment interruption, a resistance test, to see where my resistance profile has moved in ten years. Based on that, that could open up—reopen possibilities." *Id*. at 44:17-22.

And despite counsel's attempts to get Mr. Snipe to concede that he was not likely to take one of Defendants' cART drugs in the future, ████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████." *Id*. 122:17-123:4.

1       The facts simply do not support Defendants' assertions that the allegations in the Complaint con-

2   cerning Mr. Snipe and Mr. Staley's cART drug purchases are false.

3   **C.      Plaintiffs Did Not "Hide" the Truth of Their cART Drug Purchases from Defendants.**

4       Defendants' assertion that "it was only after nearly two years of diligent inquiry" that they were

5   able to "confirm[] their growing suspicion that neither Mr. Staley nor Mr. Snipe had purchased *any* of

6   Defendant's products" Mtn. 3-4, is specious, as is their accusation that Plaintiffs were attempting to mis-

7   lead Defendants. Plaintiffs produced timely and accurate discovery responses that forthrightly revealed

8   their drug purchases.

9       Initially, Defendants assert that it was not until "[a]fter two years of fact discovery" that they

10  were "first alerted [by Mr. Snipe's and Mr. Staley's written discovery responses] to the possibility that

11  neither of these Plaintiffs had purchased any of Defendants' products during the relevant period." Mtn.

12  4. Defendants' statement is patently false. Defendants served their First Set of Requests for Production

13  to Individual Plaintiffs on December 6, 2019. Miranda Decl, Ex. 3. Plaintiffs produced their purchase

14  records two months later. *See* Burke Decl., Exs. H, I. ███████████████████████████████

15  ████████████████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████. *Id*., Ex. I. ██████████████████████

17  ████████████████████████████████████████████████████. *Id*. ████

18  ████████████████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████████████████

20  ████████████████████████

21      Mr. Staley's initial production contained purchase records from January 2017 through July 2019,

22  showing a consistent regimen of Isentress, Selzentry, and nevirapine (generic Viramune).  *Id*, Ex. H.

23  Although Mr. Staley's initial production of purchase records was not complete, he also produced a 2014

24  email indicating that be began this treatment regimen in 2010. Miranda Decl., Ex. 8. This email and the

25  absence of records showing any purchases by Mr. Staley of a cART product manufactured by Defend-

26  ants during the relevant period was enough to alert counsel to the fact that none existed. Following

27  additional document productions in September and October 2020, Defendants sent a single letter

28

regarding what they perceived as deficiencies in those productions. Burke Decl, Ex. A, Dec. 18, 2020 Ostrander Ltr.

Regardless, any questions Defendants might have had regarding Plaintiffs' purchases were unequivocally answered by their prompt responses to Defendants' First Set of Interrogatories to Individual Plaintiffs in March 2021.[16]  Mr. Staley referred Defendants to his previously produced documents and additionally stated, "In 2009, [he] was prescribed a regimen of Isentress, Selzentry, and Viramunme, which remains his prescription today." Ps.' Int. Resp. at 11. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████

Plaintiffs reaffirmed these purchases yet again in their timely responses to Defendants' requests for admission. Burke Decl., Ex. E. ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████. at 10, 11.  Mr. Staley similarly admitted that 1) "the only cART Products [he] purchased . . .  during the Class Period were Isentress, Selzentry, and nevirapine;" and 2) "during the Class Period [he] did not purchase . . .  a cART Product manufactured by any of the Defendants." *Id.* at 11, 12.

Defendants' assertion that they could not be certain whether Mr. Staley and Mr. Snipe purchased any of their products during the class period because "other statements in the interrogatory responses, which Defendants later confirmed were false, appeared to contradict these admissions," Mtn. 5, is clearly contrived.  As Defendants concede, Mr. Staley's and Mr. Snipe's admissions regarding their cART drug purchases during the class period were consistent with the purchase records they produced. Mtn. 5. These admissions were also consistent with their interrogatory responses regarding what cART

---

[16] Defendants served their First Set of Interrogatories to Individual Plaintiffs on Mr. Staley and Mr. Snipe on February 12, 2021, *see* Miranda Decl Ex. 4, and Mr. Staley and Mr. Snipe responded on March 22, 2021. *Id.*, Ex. 1.

drug they were prescribed during the class period.  There was no hiding the ball.

Defendants note that Mr. Staley's interrogatory response stated that ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██.[17] In none of Defendants' correspondence regarding purported deficiencies in plaintiffs' purchase

records[18] did they ever draw this error to Plaintiffs' attention or ask for any clarification.

Defendants seem to assert that Mr. Snipe's interrogatory response ███████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████

Defendants also falsely imply that they were required to take Plaintiffs' depositions in order to

"learn[] the truth" about Plaintiffs' purchases. *See* Mtn. 5. But the truth was already clear. Moreover,

Defendants deposed *all* of the plaintiffs—as defendants do in all pharmaceutical antitrust cases—and the

questioning of Mr. Snipe and Mr. Staley included a wide range of topics unrelated to their purchases.

In summary: Plaintiffs' timely responses to document requests truthfully revealed their drug pur-

chases; their timely responses to interrogatories truthfully confirmed the same, and so did their timely

and truthful responses to requests for admission. Affirming these facts did not, as Defendants assert,

---

[17] Miranda Decl., Ex. 9.

[18] *See, e.g.*, Burke Decl., Ex. B, Aug. 27, 2021 Ostrander Ltr.; Nov. 5, 2021 Jnt. Ltr. Br., Ex. N, ECF No. 716-3, July 29, 2021 Ostrander Ltr.; *Id.*, Ex. S, Oct. 1, 2021 Ostrander Ltr.

require them to engage in "motion practice over discovery disputes,"[19] or "exchange . . . nearly 50 let-ters concerning discovery deficiencies." Mtn. 3.[20]

### III.   LEGAL STANDARD

"To have standing, a plaintiff must 'present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a fa-vorable ruling.'"[21] "'[A] loss of even a small amount of money is ordinarily an injury.'"[22] Indeed, "'an identifiable trifle is sufficient to establish standing.'"[23] The "fairly traceable" prong "'requires no more than *de facto* causality.'"[24] And redressability requires only "'a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'"[25]

"Because standing is a jurisdictional issue, it is properly addressed under a Rule 12(b)(1)

---

[19] Defendants (Mtn. 3) cite the Joint Letter Briefs filed with the Court on June 9, 2021, ECF No. 621-1, and November 5, 2021, ECF No. 717, but they addressed discovery issues wholly unrelated to the iden-tity of the drugs that these Plaintiffs purchased.

[20] With the exception of the December 18, 2021 letter, the remaining correspondence from Defendants regarding alleged deficiencies in the Individual Plaintiffs' production were sent *after* the Plaintiffs' Inter-rogatory Responses confirming that neither Mr. Staley nor Mr. Snipe purchased cART drugs from Defendants during the class period. As with the Joint Letter Briefs, *see supra* n. 19, these letters ad-dressed Defendants' discovery concerns with respect to all Individual Plaintiffs, not just Mr. Staley and Mr. Snipe. Indeed, not once in all these letters did Defendants raise concerns about the "conflicting" in-terrogatory responses they claim kept them from discovering the "truth" about Mr. Snipe's and Mr. Staley's purchases. We note, moreover, that the "nearly 50 letters" exchanged between the parties to ad-dress Defendant's concerns with the Individual Plaintiffs' discovery responses is about one tenth of the more than 500 letters exchanged by the parties addressing the deficiencies in the Defendants' discovery responses.

[21] *Dept. of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008)).

[22] *Van v. LLR, Inc.*, 962 F.3d 1160, 1162 (9th Cir. 2020) (quoting *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017)). Even "'[a] dollar of economic harm is still an injury-in-fact for standing pur-poses.'" *Id.* (quoting *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5, (D.C. Cir. 2017)).

[23] *Preminger v. Peake*, 552 F.3d 757, 763 (9th Cir. 2008) (quoting *United States v. Students Challenging Regulatory Agency Procs. (SCRAP)*, 412 U.S. 669, 689 n.14 (1973)) (cleaned up).

[24] *Dept. of Commerce*, 139 S. Ct. at 2566 (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.)).

[25] *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012) (quoting *Utah v. Evans,* 536 U.S. 452, 464 (2002)).

---

motion."[26]  "A Rule 12(b)(1) jurisdictional attack may be facial or factual."[27] "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."[28] The Court "resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction."[29] Indeed, as to standing, the Supreme Court has explained that, "'[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.'"[30] A plaintiff's burden is "relatively modest at this stage of the litigation."[31] Except for "cases where the claim of impact is so specious or patently implausible that a threshold standing objection might be appropriate, . . . the likelihood and extent of impact are properly addressed in connection with the merits."[32]

As explained below, to the extent that Defendants' motion to dismiss is legitimately jurisdictional, it is a facial attack on the pleadings, which invokes the traditional 12(b)(6) standard.  Moreover, even if part of the motion can be characterized as factual,[33] "in the absence of a full-fledged evidentiary hearing, disputes in the facts pertinent to subject-matter [jurisdiction] are viewed in the light most

---

[26] *Cottle v. Plaid Inc.*, 536 F. Supp. 3d 461, 474 (N.D. Cal. 2021) (citing *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004)).

[27] *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

[28] *Id.*

[29] *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

[30] *Bennett v. Spear*, 520 U.S. 154, 168 (1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)) (other internal quote marks omitted; cleaned up); *Animal Legal Def. Fund v. United States Dep't of Agric.*, 935 F.3d 858, 866 (9th Cir. 2019) (same).

[31] *Bennett*, 520 U.S. at 171.

[32] *Save Our Heritage, Inc. v. F.A.A.*, 269 F.3d 49, 56 (1st Cir. 2001).

[33] *See Johnson v. Jew*, No. 20-cv-08457-EJD, 2021 WL 3621828 (N.D. Cal. Aug. 16, 2021) (combined facial and factual attack invokes standard relevant to each); *Allstate Ins. Co. v. Auto Glass America, LLC*, No. 6:18-cv-2184-Orl-41LRH, 2020 WL 6064607, at *2 (M.D. Fla. July 13, 2020) (rejecting argument that "because they have asserted a Rule 12(b)(1) factual attack to Plaintiffs' Complaint, the Court must apply the legal standard for a properly supported factual attack to all of Defendants' arguments").

1    favorable to the opposing party."[34] In that event, "[t]he disputed facts related to subject-matter jurisdic-

2    tion should be treated in the same way as one would adjudicate a motion for summary judgment."[35]

3    Moreover, insofar as any factual dispute implicates facts that are or may be the subject of expert testi-

4    mony on the merits (such as the effect of Defendants' conduct on the price, quality, and innovation of

5    the cART drugs that Plaintiffs currently purchase), the Court should defer consideration at least until ex-

6    pert reports are submitted.[36]

## IV.    ARGUMENT

### A.    Defendants' Motion to Dismiss Is Not Jurisdictional But Rather Is a Challenge to Plaintiffs' *Statutory* Standing.

Defendants' motion to dismiss is predicated on their contention that "purchasers of products

made by non-Defendant, non-conspiring manufacturers *have no valid antitrust claims*." Mtn. 12 (citing

*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig.*, 691 F.2d 1335, 1341 (9th

Cir. 1982) ("*Petroleum Products*")) (emphasis in original). According to Defendants, a plaintiff has no

antitrust standing where a defendant's unlawful conduct allegedly raised the prices of the products of

non-defendants purchased by a plaintiff by creating a "price umbrella." *Id.* at 12-13.  As explained fur-

ther below, there is not even a rule against plaintiffs seeking *damages* pursuant to an umbrella theory

under the Clayton Act or the Cartwright Act. And plaintiffs clearly do have statutory standing to seek

*injunctive relief*—the relief sought by these two Plaintiffs here (*see* Staley Dep. Tr. 203:21-204:5)—un-

der those statutes pursuant to an umbrella theory. In any event, Defendants' umbrella argument is not a

---

[34] *Doe 1 v. Mayorkas*, 530 F. Supp. 3d 893, 903 (N.D. Cal. 2021); *Levitt v. Yelp! Inc.*, No. C-10-1321 EMC, 2011 WL 5079526, at *2 (N.D. Cal. Oct. 26, 2011), *aff'd*, 765 F.3d 1123 (9th Cir. 2014); *In re Facebook Privacy Litig.*, 791 F. Supp. 2d 705, 710 (N.D. Cal. 2011) (citing *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir.1996)).

[35] *Doe 1*, 530 F. Supp. 3d at 903; *Levitt*, 2011 WL 5079526, at *2; *Facebook*, 791 F. Supp. 2d at 710 (citing *Dreier*, 106 F.3d at 847).

[36] *See Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983) ("[W]here the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits, the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or at trial."); *see also Rejoice! Coffee Co. v. Hartford Fin. Servs. Group, Inc.*, No. 20-cv-06789-EMC, 2021 WL 5879118, at *3 (N.D. Cal. Dec. 9, 2021) (whether challenge is facial or factual, "'it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing'" (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975))).

jurisdictional argument at all, but rather one of statutory standing or proximate cause, and therefore not appropriate for a 12(b)(1) motion. For that reason alone, the motion should be denied.[37]

As the Supreme Court has explained, "[p]roximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct."[38] More specifically, the requirements for statutory standing under the Clayton Act, set forth in cases like *Associated General Contractors,*[39] are *not* jurisdictional.[40] Accordingly, antitrust plaintiffs like Mr. Staley and Mr. Snape easily have Article III standing based on purchases from non-defendants, whereas the statutory standing question raises additional issues.[41] The cases limiting umbrella standing under

---

[37] While a defendant can raise a statutory-standing argument on a 12(b)(6) motion, the time for such a motion is long past. Moreover, courts "repeatedly caution[] against allowing a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction to be turned into an attack on the merits" under Rule 12(b)(6) because "the standards governing the two rules differ markedly, as Rule 12(b)(6) provides greater procedural safeguards for plaintiffs than does Rule 12(b)(1)." *Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 272 n.14 (3d Cir. 2016).

[38] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014); *see also Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 974 n. 7 (9th Cir. 2008) ("'For purposes of satisfying Article III's causation requirement, we are concerned with something less than the concept of proximate cause.'") (quoting *Barbour v. Haley*, 471 F.3d 1222, 1226 (11th Cir. 2006). The Seventh Circuit has aptly "noted [its] concern with the term 'antitrust standing' because of its potential for confusion with Article III standing. The latter, of course, is a necessary requirement for a justiciable case or controversy. The former, on the other hand, concerns a different issue: which plaintiffs may bring the cause of action." *McGarry & McGarry, LLC v. Bankruptcy Management Solutions, Inc.*, 937 F.3d 1056, 1063 (7th Cir. 2019); *see also Hartig*, 836 F.3d at 269-270 (explaining that "Article III standing and antitrust standing" are "distinct" concepts and that the *Illinois Brick* rule concerns only the latter).

[39] *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983) ("*AGC*") (noting that "the focus of the doctrine of 'antitrust standing' is somewhat different from that of standing as a constitutional doctrine" and that "[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action").

[40] *Lexmark*, 572 U.S. at 126-27; *see also Canyon County*, 519 F.3d at 974 n. 7 (Article III causation requirement is "less rigorous" than RICO's antitrust-based statutory standing or proximate cause requirement).

[41] *See, e.g., Loeb Industries, Inc. v. Sumitomo Corp.,* 306 F.3d 469, 480-81, 489 (7th Cir. 2002) (noting that purchasers of copper in cash market paid an inflated price for copper, making their "their Article III standing . . . secure" to challenge price fixing in futures market, and holding that purchasers in cash market also had statutory standing given that "'defendants' manipulations [in futures market] directly and predictably had an impact on [the cash] price'" (quoting *Amarel v. Connell*, 102 F.3d 1494, 1512 (9th Cir. 1997))); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 770, 778 (2d Cir. 2016) (finding Article III standing "easily satisfied" by allegations of harm with respect to umbrella purchases, but antitrust standing was "[l]ess clear").

---

13

Section 4 of the Clayton Act, like *Petroleum Products*, do so on the basis of statutory standing, as even Defendants' parentheticals confirm.[42] Defendants have cited no case, nor are Plaintiffs aware of any case, finding the absence of Article III standing in the face of well-pled allegations of umbrella harm.

**B.     Plaintiffs Have Article III Standing.**

**1.     The Complaint's Unchallenged Allegations Support Standing Based on Plaintiffs' Purchases of Non-Defendant Drugs.**

Plaintiffs have "met their burden—which is relatively modest at this stage of the litigation—of alleging that their injury is 'fairly traceable' [to Defendants' wrongful conduct] and that it will 'likely' be redressed" if the wrongful conduct is enjoined.[43] The Complaint alleges that Defendants' unlawful conduct resulted in the artificial inflation of the prices of the drugs that Mr. Staley and Mr. Snipe purchased. Specifically, the Complaint alleges that Gilead used exclusionary means to obtain and maintain monopoly power in the cART market, which enabled it to increase the price of cART drugs by far more than 10%. FAC ¶¶ 425, 549-553. "Given Gilead's dominance of the cART Market, the monopoly prices on its products had the predictable effect of causing its competitors to raise prices on their cART drugs." FAC ¶ 427. Indeed, the Complaint alleges that "Defendants' unlawful monopolization of the cART market caused the price of every drug in the market to be substantially higher than it would have absent that conduct." *Id.*[44] The Complaint gives as examples the pricing of two of the drugs taken by Mr. Staley. "[F]rom July 2011 to October 2017, Gilead raised its price on Complera by 45%. During that same time period, ViiV Healthcare raised the price of Selzentry . . . by 47%. Likewise, until it encountered generic competition Boehringer Ingelheim[] . . . similarly followed Gilead's price increases up in lockstep. *Id.*

In its strictly facial "challenge," Defendants try to simply wish away these allegations, asserting that "neither Mr. Staley nor ███████████████████████████████████████████

---

[42] *See* Mtn. 13 (citing cases' reliance on *AGC*); *see also Garabet v. Autonomous Techs. Corp.*, 116 F. Supp. 2d 1159, 1169 (C.D. Cal. 2000) (relying on *AGC*).

[43] *Bennett,* 520 U.S. at 171.

[44] The Complaint alleges that "[t]he result of Defendant's unlawful conduct has been extraordinary price inflation in the cART market as a whole," noting that prices had increased by 34% between 2012 and 2018. FAC ¶ 428.

1    █████████████████████████████████████████████████.” Mtn. 14. Moreover, there is nothing

2    inconsistent with the Complaint's allegation of "lockstep" price increases and the fact that brand phar-

3    maceutical companies compete to some extent, including by challenging each other's patents. *Id.* (citing

4    FAC ¶ 185).[45]  Nor are Plaintiffs required to plead specifically that "████████████████ made

5    pricing decisions based on Defendants' pricing," *id.* at 13, although the allegations do support such an

6    inference.[46] The only case cited by Defendants that even addresses an umbrella-like theory under Article

7    III is *Oliver v. SD-3C LLC*, but in that case, unlike here, plaintiffs did not allege that they paid higher

8    prices as a result of the defendants' unlawful conduct.[47]

9        Finally, Mr. Snipe is injured in connection with his purchases even though he incurred no out-of-

10   pocket cost. While Mr. Snipe's copays were covered by insurance ████████████████), *see supra* at 5,

11   he at least suffers a threatened injury because of the risk that his insurance coverage could change.

12   Moreover, caselaw provides that a consumer's purchase of a drug that is subject to an overcharge is in-

13   jured even if he or she incurs no out-of-pocket cost.[48]

14

15   [45] Even cartels compete on non-price terms. *See, e.g., In re High Fructose Corn Syrup Antitrust Litig.*,
     295 F.3d 651, 660 (7th Cir. 2002) (Posner, J.).

16   [46] *See In re: Cathode Ray Tube (CRT) Antitrust Litig,* No. C-07-5944-JST, 2016 WL 6246736, at *7
17   (N.D. Cal. Oct. 26, 2016) ("It is a rare supplier that can set its prices without considering its competitors'
     prices (and, in the face of the potential for raising its prices, one with no regard for its return on capi-
18   tal).").

19   [47] *Oliver v. SD-3C LLC*, No. 11-cv-01260-JSW, 2016 WL 5950345 (N.D. Cal. Sep. 30, 2016).  In *Oliver*,
     the issue was whether the plaintiffs had Article III standing with respect to purchases made from defend-
20   ants under a theory that defendants had unlawfully raised their rivals' costs. Notably, the court did "not
     hold that no plaintiff could ever allege standing based on purchases from a defendant who had inflated its
21   own prices after raising its rivals' costs," and explained that whether "such a modified 'umbrella theory'
     could confer *antitrust* standing" was a "separate question." *Id.* at *10 & n. 5 (emphasis added).  Defend-
22   ants cite *In re: Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL2332081 (June 9, 2010),
23   but that case had nothing to do with umbrella harm, and the court dismissed with prejudice a claim by an
     individual who did not purchase a class product because, unlike here, counsel failed to articulate any ba-
24   sis for not doing so. *See id.* at *18 n.16.

25   [48] *See, e.g., Goda v. Abbott Labs.*, No. 01445-96, 1997 WL 156541, at *9 (D.C. Super. Ct. Feb. 3, 1997)
     ("It is true, as defendants argue, that a consumer with a managed care plan or insurance policy calling
26   upon him to make a fixed co-payment feels no pinch when drug companies hike prices and the retailers
     pass-on to the plan or the carrier. But there is nevertheless an injury as a result of a wrong."); *In re Abbott*
27   *Labs. Norvir Anti-Trust Litig.,* No. C 04-1511 CW, 2007 WL 1689899, at *3–4 (N.D. Cal. June 11,
     2007) (finding plaintiff with fixed co-pay had legally cognizable injury based, in part, citing *Goda*, 1997

28

Moreover, Plaintiffs allege additional injury that independently establishes their Article III standing, namely that Gilead's monopolization has resulted in a harm to innovation and denied them the opportunity to purchase superior cART drugs. "Defendants' anticompetitive conduct has . . . stifled innovation, causing tens of thousands of people living with HIV to needlessly suffer debilitating side effects from inferior products." FAC ¶ 15. For instance, "[t]he unlawful restraints . . . prohibited competing manufacturers from gaining access to the pharmaceutical compounds needed to formulate new, innovative, superior, and substantially less expensive treatments—precluding the development and marketing of more than two dozen specifically identifiable HIV treatments."[49] And the unlawful conduct "also dampened Gilead's own incentive to innovate," by "substantially diminishing the competitive pressures that force manufacturers to introduce better products sooner.[50] "This reality" is reflected in the fact that "Gilead has one of the worst innovation track records of any major pharmaceutical manufacturer anywhere in the world." FAC ¶ 195. Mr. Staley and Mr. Snipe have alleged continuing harm to

WL 156541, at *9-10); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 259 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004) (refusing to exclude fixed co-pay consumers from distribution of the settlement fund because, even if they did not suffer damages, "they arguably have a claim for injunctive or other equitable relief" and "could sue defendant for damages by invoking the 'collateral source' doctrine") (citing *Goda*, 1997 WL 156541); *see also Morrison v. Trivita, Inc.,* No. 12-CV-1387 BEN (BLM), 2013 WL 1148070, at *3 (S.D. Cal. Mar. 29, 2013) (finding Article III standing where consumer used someone else's credit card to make purchase); *see generally In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir. 2015) (finding injury "even if [a] class member suffers no damage" because "antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset.").

[49] FAC ¶ 15; *see also id.* ¶¶ 189-193 (detailing the way in which the No-Generics Restraints reduced innovation by Gilead's competitors). The specifically identified excluded drugs include the type of drug that Mr. Snipe takes (NRTIs, *see infra* at 19) and the type of at least one of the drugs that Mr. Staley takes (an NNRTI, *see id.*).

[50] FAC ¶ 194; *see id.* ("The No-Generics Restraints shielded Gilead from [ordinary] competitive pressures, with predictable consequences: Gilead produced markedly inferior products and chose to delay introducing improved products until it had wrung as much profit as possible out of the substandard ones."); *see also id* ¶ 441 (absent unlawful conduct "Defendants would have marketed better products sooner").

them from the stifling of innovation,[51] which is a well-recognized type of antitrust harm.[52]  "Since businesses compete through both lower prices and superior performance, a firm's stifling of innovative products would cause antitrust injury."[53]

Defendants contend that Plaintiffs lack standing to seek injunctive relief because they have no current plan to switch to any of Defendants' products. Mtn. 15. Not so. They have standing to seek to enjoin Defendants' *continuing* exclusionary conduct (and secure other relief to restore competitive conditions)[54] to redress harm incurred on their *current* purchases.[55] Consistent with constitutional standing, plaintiffs under Section 16 of the Clayton Act may obtain injunctive relief to redress "a significant threat

---

[51] *See, e.g.,* FAC ¶ 446 ("Defendants' unlawful conduct has harmed Plaintiffs . . . and deprived them of the benefits of competition, and unless enjoined will further harm them by, among other things . . . [c]ausing Defendants to refrain from marketing superior FDCs, thereby denying to Plaintiffs . . . the benefits of those products").  And Mr. Staley detailed in his deposition how the lack of innovation due to Defendants' anticompetitive conduct harms him and other HIV patients. *See* Staley Dep. Tr. 128:1-129:1; 204:23-208:7.

[52] *See, e.g., United States v. Anthem, Inc.,* 855 F.3d 345, 361 (D.C. Cir. 2017) ("threat to innovation is anticompetitive in its own right").

[53] *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702, 711 (D. Md. 2001) (citing *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F. 2d 1144, 1168 (3d Cir. 1993)).  Although it found antitrust injury, the *Microsoft* court held that plaintiffs lacked statutory standing to seek *damages* from such harm. *Id. See also In re Multidistrict Vehicle Air Pollution M.D.L. No 31*, 481 F.2d 122, 129-31 (9th Cir. 1973) (holding that farmers had standing under Section 16 of the Clayton Act to challenge agreement among car manufacturers to restrict competition "in the research, development, manufacture and installation of motor vehicle air pollution equipment").

[54] *See* FAC ¶ 625.D (prayer for injunctive relief). Antitrust courts have broad discretion to fashion injunctive relief.  *See Optronic Techs., Inc. v. Ningbo Sunny Elect. Co.*, No. 5:16-cv-06370-EJD, 2020 WL 1812257, at *6 (N.D. Cal. Apr. 9, 2020). "The Supreme Court instructs 'that a remedies decree in an antitrust case must seek to unfetter a market from anticompetitive conduct, to terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future.'" *Id.* (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 103 (D.C. Cir. 2001)) (internal quotations omitted). "Thus, it is 'entirely appropriate' for a court to order an injunction 'beyond a simple proscription against the precise conduct previously pursued.'" *Id.* (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 698 (1978)).

[55] *See Ass'n of Public Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 954 (9th Cir. 2013) (plaintiff satisfied the redressability requirement "for the same reasons it has satisfied the 'fairly traceable' causation requirement," as the court would "invalidate" the wrongful conduct and, "as a result, it could no longer be the source of any economic harm to" the plaintiff)  It follows that because Defendants' monopolization has boosted prices, then restoring competition will reduce their ability to increase prices in the future, and the "lockstep" high pricing of non-defendants' drugs will also be reduced.

of injury from … a *contemporary violation likely to continue or recur*."[56] "Where a violation of law has

already been established, injunctive relief should be granted if 'there exists some cognizable danger of

recurrent violation.'"[57] That is exactly what Mr. Staley and Mr. Snipe allege. FAC ¶¶ 16, 467-477 (On-

going and Future Harm). As "customer[s] in a market controlled by a monopolist,"[58] they have standing

to seek equitable relief under Section 16 to enjoin Gilead's conduct that enables it to "control prices and

output, and exclude competition."[59]

### 2.    The Likelihood that Plaintiffs Will Purchase Defendants' Drugs in the Future Provides an Additional Basis for Standing.

Plaintiffs have constitutional standing to seek injunctive relief based on their current purchases

even if they were unlikely to purchase any of Defendants' drugs in the future. Accordingly, the Court

need not make any factual determination as to that likelihood. But there is in fact a "significant probabil-

ity" that Mr. Staley and Mr. Snipe *will* take one of Defendants' drugs, thus establishing a "substantial

---

[56] *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130-132 (1969) (injunction warranted where "there was nothing indicating that this clear violation of the antitrust laws had terminated or that the threat to [plaintiff] inherent in the conduct would cease in the foreseeable future"); *see also Cal. v. Am. Stores Co.*, 495 U.S. 271, 282 n.8 (1990) ("[T]he evident import of Congress' reference to 'threat-ened loss or damage' is not to constrict the availability of injunctive remedies against violations that have already begun or occurred, but rather to expand their availability against harms that are as yet unreal-ized.").

[57] *Optronic Techs.,* 2020 WL 1812257, at *1 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)).

[58] For purposes of class certification, the EPP class plaintiffs identified a "cART Foundation drug" mar-ket, which is a narrower market than the "cART Market'" identified in the Complaint. *See supra* n. 9. Mr. Snipe's current drug is within that narrower market.  While Mr. Staley's purchases are not within the "cART Foundation drug" market, he is not bound by the class's market definition, particularly since the Complaint is the operative pleading for purposes of this motion. *See id.*  In any event, umbrella theories of harm apply beyond the relevant market at least with respect to injunctive relief (*see infra* at 20-22), and even customers outside "the" relevant market can have standing to recover damages—and *a fortiori* injunctive relief— from a monopolist. *See, e.g.*, *In re Ranbaxy Generic Drug Application Antitrust Litig.*, MDL No. 19-md-02878-NMG, 2021 WL 5493675, at *7-*8 (D. Mass. Nov. 22, 2021).

[59] *Lucas Automotive Eng., Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1236-37 (9th Cir. 1998) (violation of Section 7 of the Clayton Act); *see Boardman v. Pacific Seafood Group*, 822 F. 3d 1011, 1023 (9th Cir. 2016) (holding that creation of monopsony warranted injunctive relief under Section 16 because "[a] lessening of competition constitutes an irreparable injury under our case law"); *see also Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic.*, 152 F.3d 588, 591-92 (7th Cir. 1998) (Posner, J.) (district court erred in denying customer an injunction to enjoin supplier's market divi-sion agreement even in the absence of proof that customer paid higher prices or was entitled to damages).

risk that the harm [with respect to those drugs] will occur."[60]

Defendants say that Mr. Staley cannot take a Defendant drug in the future because he has devel-oped resistance to NRTIs. Mtn. 15. But Defendants also dominate other, non-NRTI categories of HIV drugs, including those taken by Mr. Staley.  He currently takes Isentress, an integrase inhibitor; Gilead makes integrase inhibitor Elvitegravir and has a 55% share of that drug class. FAC ¶ 419.  Mr. Staley also currently takes generic Virimune, an NNRTI; Defendants make NNRTIs Efavirenz and Rilpivirine and have a greater than 77% share of that drug class.  *Id.* ¶ 417.  By sheer numbers, there is a significant probability that Mr. Staley will take one or more of Defendants' drugs in the future.  The same is true for Mr. Snipe, ███████████████████ in a market in which Gilead has more than an 80% share.  *Id.* ¶ 437.

Moreover, Mr. Staley and Mr. Snipe may well take a Defendant drug that is not currently on the market. As set forth above, Mr. Staley looks at new drugs as they become available and ████████ ████████████████████████. *See supra* at 6, 7. Importantly, the likelihood that they will take a new drug manufactured by one of the Defendants would be significantly increased if an in-junction issued to constrain Defendants' anticompetitive conduct (and restore competitive conditions) that otherwise impairs Defendants' development of new products that would be superior to the ones that Plaintiffs are currently taking.[61]

## C.    Plaintiffs Also Have Statutory Standing.

 The Court need not and should not consider Defendants' procedurally improper argument that Plaintiffs lack statutory standing.  However, if the Court were to reach that issue, umbrella-standing rules plainly would not preclude Plaintiffs' standing to seek injunctive relief under the Clayton Act or the Cartwright Act.  The Ninth Circuit in *Petroleum Products*, following the Third Circuit in *Mid-West*

---

[60] *In re Zappos.com, Inc.*, 888 F.3d 1020, 1024 (9th Cir. 2018) ("A plaintiff threatened with future injury has standing to sue 'if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014))).

[61] *See Utah v. Evans*, 536 U.S. at 464 (finding standing where practical consequence of change in legal status "would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered").

*Paper*,[62] held that *Illinois Brick* bars downstream purchasers from obtaining umbrella *damages* under

Section 4 of the Clayton Act in a price-fixing case.[63] Even as to *damages* under the Clayton Act that

holding is narrow. Numerous courts in this Circuit hold that there is no *per se* rule against umbrella

damages under the Clayton Act.[64] Moreover, courts have held that indirect purchasers have standing to

obtain umbrella damages under the Cartwright Act, reasoning that *Illinois Brick* does not apply to the

Cartwright Act and that an umbrella theory "is not inherently speculative."[65] And the Third Circuit held

that *Mid-West Paper* did not extend to damage claims based on monopolistic *exclusion*, rather than con-

spiracy.[66] Other Circuits also allow umbrella damages.[67]

More significantly, umbrella harm provides a basis for *injunctive relief* under Section 16 of the

Clayton Act, as to which the requirements for standing are "less stringent than those under [S]ection 4 of

---

[62] *Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573 (3d Cir. 1979).

[63] *Petroleum Products*, 691 F.2d at 1339-41.

[64] *See, e.g.*, *In re: Cathode Ray Tube (CRT) Antitrust Litig,* No. C-07-5944-JST, 2016 WL 6246736, at *6 (N.D. Cal. Oct. 26, 2016) (explaining that "[s]uccessful cartels increase the *market price* for a price-fixed good, not just their own price," and rejecting the reasoning in *Garabet,* 116 F. Supp. 2d 1159, cited by Defendants, as "based on a flawed understanding of price theory"); *Whaley v. Pac. Seafood Group*, No. 1:10-CV-3057-PA, 2012 WL 13047314, at *4 (D. Or. Jan. 31, 2012); *In re Arizona Dairy Products Litig.*, 627 F. Supp. 233, 237 (D. Ariz. 1985); *Wall Products Co. v. Nat'l Gypsum Co.*, 357 F. Supp. 832, 840 (N.D. Cal. 1973).  In addition to *Garabet*, Defendants cite *In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152, 1155 (N.D. Cal. 2001), but that case followed the same flawed reasoning as *Garabet*.

[65] *County of San Mateo v. CSL Ltd.,* No. 10-CV-05686-JSC, 2014 WL 4100602, at *3 (N.D. Cal. Aug. 20, 2014) (citing, among other things, *Pollock v. Citrus Assocs. of N.Y. Cotton Exch., Inc.*, 512 F. Supp. 711, 719 n.9 (D.C. N.Y. 1981), which stated: "In a market in which supply is restricted, prices move up naturally pursuant to basic laws of supply and demand."); *see also In re Domestic Drywall Antitrust Litig.*, MDL No. 13-2437, 2019 WL 4918675, at *10, *11  (E.D. Pa. Oct. 3, 2019) (holding that umbrella damages are available under the Cartwright Act and noting that "the judicial landscape does not reveal 'general hostility' towards umbrella damages, as Defendants claim"). Defendants cite *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 09-4997 SI, 2012 WL 6708866, at *7 (N.D. Cal. Dec. 26, 2012), which is a minority approach predicated on the flawed reasoning that *Petroleum Products* should apply because no state court had held that umbrella damages were available under California law.

[66] *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 265 (3d Cir. 2016); *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1167-69 (3d Cir. 1993); *see also In re Loestrin 24 Fe Antitrust Litig.*, MDL No. 13-2472-WES-PAS, 2019 WL 3214257, at *10 n. 15 (D. R.I. July 2, 2019) (specifically rejecting reasoning of *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 1:12-md-2343, 2014 WL 2002887, at *8 (E.D. Tenn. May 15, 2014), cited by Defendants).

[67] *See United States Gypsum Co. v. Indiana Gas Co., Inc.*, 350 F.3d 623, 627 (7th Cir. 2003); *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1171 n. 24 (5th Cir. 1979).

the Clayton Act."[68] "Section 16 has been applied more expansively, both because its language is less restrictive than that of § 4, and because the injunctive remedy is a more flexible and adaptable tool for enforcing the antitrust laws than the damage remedy."[69]  It is well settled that "a party too remote for damages might be granted an injunction"[70] because, among other things, there is no concern with duplicative recovery or that "other parties . . . have been more directly injured."[71]

Accordingly, in *Boardman v. Pacific Seafood Group*, No. 1:15-108-CL, 2015 WL 13357739 (D. Or. March 6, 2015), the district court preliminarily enjoined a merger of two seafood processors under Section 16 of the Clayton Act on the theory that the merger would reduce the prices paid to fishermen for certain types of fish in certain markets on the West Coast.  Defendants argued that plaintiffs lacked standing because the fishermen did not actually sell to either of the merging parties and did not operate in the same seafood markets. *Id.* at *2. Relying on an umbrella theory, plaintiffs countered that they pleaded "antitrust [injury] because other seafood processors [to whom they sold] follow defendants' lead on prices." *Id*. at 3. Having previously addressed the issue, the court "assume[d] the umbrella theory of antitrust injury is viable" and granted a preliminary injunction.[72] The Ninth Circuit affirmed.[73]

The Ninth Circuit in *Petroleum Products* and the Third Circuit in *Mid-West Paper* relied on

---

[68] *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 449 n.2 (9th Cir. 1985); *accord Sundance Land Corp. v. Community First Federal Savings & Loan Ass'n*, 840 F.2d 653, 661 (9th Cir. 1988); *see Midwest Paper*, 596 F.2d at 591 ("the test for standing under § 16 has been framed in terms of a proximate cause standard that is 'less constrained' than that under § 4"); *see also Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 (1986) (noting differences that "affect the nature of the injury cognizable under each section").

[69] *Mid-West Paper*, 596 F.2d at 591 n. 73 (citing *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 260-61 (1972), and *Zenith Radio*, 395 U.S. at 131); *see also Cal. v. Am. Stores Co.*, 495 U.S. at 284 ("We have recognized when construing § 16 that it was enacted 'not merely to provide private relief, but . . . to serve as well the high purpose of enforcing the antitrust laws.'" (quoting *Zenith Radio,* 395 U.S. at 130-31)).

[70] *Lucas*, 140 F.3d at 1234.

[71] *Sundance Land*, 840 F.2d at 661; *see Oregon Laborers-Employee Health & Welfare Trust Fund v. Philip Morris Inc.*, 185 F.3d 957, 966 (9th Cir. 1999) (*AGC* remoteness factors not necessarily applicable to injunctions); *accord Cargill*, 479 U.S. at 111 n. 6; *see generally* Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 335 (4th ed. 2014) ("greater latitude may be allowed in the equity suit" to satisfy causation requirement, citing, *inter alia*, absence of concern with multiple or duplicative suits).

[72] *Id.*  The court had previously held in its class certification order that umbrella standing was viable. *See Whaley*, 2012 WL 13047314, at *4.

[73] *Boardman*, 822 F.3d at 1023.

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS PETER STALEY AND MICHAEL SNIPE
Case No. 3:19-cv-02573-EMC

1   *Illinois Brick* to deny claims for damages, but both courts have held that *Illinois Brick* does not bar

2   claims for injunctive relief under Section 16.[74]  So those cases plainly do not support denying the availa-

3   bility of injunctive relief to remedy Plaintiffs' umbrella harm here.[75]  With respect to the Cartwright Act,

4   the availability of damages for umbrella harm *a fortiori* means that injunctive relief is also available un-

5   der that Act.[76] None of the cases cited by Defendants hold that a plaintiff lacks standing to seek

6   injunctive relief to remedy umbrella harm.[77]

7                                   **V.    CONCLUSION**

8          For the foregoing reasons, Defendants' Motion to Dismiss under Rule 12(b)(1) should be denied.

---

[74] *See Lucas*, 140 F.3d at 1235; *Mid-West Paper*, 596 F.2d at 594 (for purposes of § 16, indirect pur-
chaser's injury is "proximately caused by the price-fixers' violations"). The Third Circuit in *Mid-West
Paper* explained that "in contrast to the treble damage action, a claim for injunctive relief does not pre-
sent the countervailing considerations such as the risk of duplicative or ruinous recoveries and the spectre
of a trial burdened with complex and conjectural economic analyses that the Supreme Court emphasized
when limiting the availability of treble damages." *Mid-West Paper*, 596 F.2d at 590.

[75] To be sure, the Third Circuit in *Mid-West Paper* expressly declined to address whether umbrella plain-
tiffs had standing to obtain injunctive relief under § 16. 596 F.2d at 590 n.63 (noting that question was
immaterial because plaintiff in question was entitled to injunctive relief on other grounds and the issue
had not been briefed).

[76] California courts recognize that the scope of "antitrust injury" under the Cartwright Act is "broader"
than under the Clayton Act, *Cellular Plus, Inc. v. Superior Court*, 14 Cal. App. 4th 1224, 1234 (1993),
and may apply a forgiving standard for injunctive relief, *see, e.g., Cal. Dental Ass'n v. Cal. Dental Hy-
gienists' Ass'n*, 222 Cal. App. 3d 49, 61 (1990) (adopting lax rule for association standing to seek
injunctive relief where individual members are injured, which may be established "by presumption or
inference").

[77] Only one of the umbrella cases even addressed injunctive relief, *Garabet*, 116 F. Supp. 2d 1159. In that
case, the court did not rule on the standing question, but noted that plaintiffs "[m]ay [l]ack [s]tanding
[u]nder Section 16" where, "although this case is now at the summary judgment step, the Court has little
evidence of whether [the non-defendant's] prices even went up." *Id.* at 1169-70. At the motion to dismiss
stage, as here, that fact is well pled. Moreover, as noted above, the *Garabet* court's reasoning as to um-
brella damages has been criticized as deeply flawed. *See supra* n. 64.

Dated: February 28, 2022                    Respectfully submitted,

                                            HILLIARD & SHADOWEN LLP

                                      By: */s/ Steve D. Shadowen*

                                            STEVE D. SHADOWEN (*pro hac vice*)
                                            steve@hilliardshadowenlaw.com
                                            RICHARD BRUNELL (*pro hac vice*)
                                            rbrunell@hilliardshadowenlaw.com
                                            NICHOLAS WILLIAM SHADOWEN (*pro hac vice*)
                                            nshadowen@hilliardshadowenlaw.com
                                            TINA JOANN MIRANDA (*pro hac vice*)
                                            tmiranda@hilliardshadowenlaw.com
                                            MATTHEW C. WEINER (*pro hac vice*)
                                            matt@hilliardshadowenlaw.com
                                            1135 W. 6th Street, Suite 125
                                            Austin, TX 78703
                                            Telephone: (855) 344-3298

                                            DARALYN J. DURIE (SBN 169825)
                                            ddurie@durietangri.com
                                            MARK A. LEMLEY (SBN 155830)
                                            mlemley@durietangri.com
                                            DAVID McGOWAN (SBN 154289)
                                            dmcgowan@durietangri.com
                                            EUGENE NOVIKOV (SBN 257849)
                                            enovikov@durietangri.com
                                            ADITYA V. KAMDAR (SBN 324567)
                                            akamdar@durietangri.com
                                            217 Leidesdorff Street
                                            San Francisco, CA 94111
                                            Telephone: (415) 362-6666

                                            DURIE TANGRI LLP
                                            ALLYSON R. BENNETT (SBN 302090)
                                            abennett@durietangri.com
                                            W. HENRY HUTTINGER (SBN 312843)
                                            hhuttinger@durietangri.com
                                            953 East 3rd Street
                                            Los Angeles, California 90013
                                            Telephone: (213) 992-4422

                                            HAGENS BERMAN SOBOL SHAPIRO LLP
                                            STEVE W. BERMAN (*pro hac vice*)
                                            steve@hbsslaw.com
                                            1301 Second Avenue, Suite 2000
                                            Seattle, WA 98101

23

Telephone: (206) 623-7292

HAGENS BERMAN SOBOL SHAPIRO LLP
THOMAS M. SOBOL (*pro hac vice*)
tom@hbsslaw.com
GREGORY T. ARNOLD (*pro hac vice*)
grega@hbsslaw.com
ABBYE R. K. OGNIBENE (SBN 311112)
abbyeo@hbsslaw.com
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Telephone: (617) 482-3700

*Interim Co-Lead Counsel for End-Payor Plaintiffs*

KESSLER TOPAZ MELTZER & CHECK, LLP
JOSEPH H. MELTZER (*pro hac vice*)
jmeltzer@ktmc.com
TERENCE S. ZIEGLER
tziegler@ktmc.com
DONNA S. MOFFA (*pro hac vice*)
dmoffa@ktmc.com
JORDAN E. JACOBSON (*pro hac vice*)
jjacobson@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706

SPECTOR ROSEMAN & KODROFF P.C.
JEFFREY L. KODROFF (*pro hac vice*)
jkodroff@srkattorneys.com
DIANA J. ZINSER (*pro hac vice*)
dzinser@srkattorneys.com
2001 Market Street, Suite 3420
Philadelphia, Pennsylvania 19103
Telephone: (215) 496-0300

MILLER SHAH LLP
JAYNE A. GOLDSTEIN (*pro hac vice*)
jagoldstein@millershah.com
1625 North Commerce Parkway, Suite 320
Fort Lauderdale, FL 33326
Telephone: (954) 515-0123

MILLER SHAH LLP
NATALIE FINKELMAN BENNETT (*pro hac vice*)
nfinkelman@millershah.com
1845 Walnut Street, Suite 806

24

Philadelphia, PA 19103
Telephone: (610) 891-9880

SPERLING & SLATER, P.C.
PAUL E. SLATER (*pro hac vice*)
pes@sperling-law.com
JOHN P. BJORK (*pro hac vice*)
jbjork@sperling-law.com
EAMON P. KELLY (*pro hac vice*)
ekelly@sperling-law.com
ALBERTO RODRIGUEZ (*pro hac vice*)
arodriguez@sperling-law.com
DAVID P. GERMAINE (*pro hac vice*)
dgermaine@sperling-law.com
55 West Monroe, Suite 3200
Chicago, IL 60603
Telephone: (312) 641-3200

LOCKRIDGE GRINDAL NAUEN PLLP
HEIDI M. SILTON
hmsilton@locklaw.com
KAREN H. RIEBEL (*pro hac vice*)
khriebel@locklaw.com
JESSICA N. SERVAIS (*pro hac vice*)
jnservais@locklaw.com
100 Washington Ave. S., Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900

PRITZKER LEVINE LLP
ELIZABETH C. PRITZKER (SBN 146267)
ecp@pritzkerlevine.com
JONATHAN K. LEVINE (SBN 220289)
jkl@pritzkerlevine.com
BETHANY CARACUZZO (SBN 190687)
bc@pritzkerlevine.com
180 Grand Avenue, Suite 1390
Oakland, CA 94612
Telephone: (415) 692-0772

GLANCY PRONGAY & MURRAY
KEVIN F. RUF (SBN 136901)
kruf@glancylaw.com
LIONEL Z. GLANCY (SBN 134180)
lglancy@glancylaw.com
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150

25

GLANCY PRONGAY & MURRAY
LEE ALBERT (*pro hac vice*)
lalbert@glancylaw.com
BRIAN D. BROOKS (*pro hac vice*)
bbrooks@glancylaw.com
230 Park Avenue, Suite 530
New York, NY 10169
Telephone: (212) 682-5340

NUSSBAUM LAW GROUP, P.C.
LINDA P. NUSSBAUM (*pro hac vice*)
lnussbaum@nussbaumpc.com
BART D. COHEN (*pro hac vice*)
bcohen@nussbaumpc.com
PETER E. MORAN (*pro hac vice*)
pmoran@nussbaumpc.com
1211 Avenue of the Americas, 40th Floor
New York, NY 10036
Telephone: (917) 438-9189

RADICE LAW FIRM, P.C.
JOHN RADICE (*pro hac vice*)
jradice@radicelawfirm.com
DAN RUBENSTEIN (*pro hac vice*)
drubenstein@radicelawfirm.com
475 Wall Street
Princeton, NJ 08540
Telephone: (646) 245-8502

*Counsel for End-Payor Plaintiffs*

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS PETER STALEY AND MICHAEL SNIPE
Case No. 3:19-cv-02573-EMC

1

## **CERTIFICATE OF SERVICE**

2          I hereby certify that on February 28, 2022 the within document was filed with the Clerk of the

3     Court using CM/ECF which will send notification of such filing to the attorneys of record in this case.

4                                                                          */s/ Steve D. Shadowen*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS PETER STALEY AND MICHAEL SNIPE
CASE NO. 3:19-CV-02573-EMC