UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STALEY, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>GILEAD SCIENCES, INC., et al.,<br><br>    Defendants. | Case No. 19-cv-02573-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS**<br><br>Docket Nos. 836, 838 |

Currently pending before the Court are two motions to dismiss – one filed by Teva and the other by Gilead. Both Teva and Gilead challenge the complaint filed by United HealthCare Services, Inc. ("UHS") in Case No. C-21-9202 EMC. The motions overlap in content. Having considered the parties' briefs as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part each motion to dismiss.

## I.     FACTUAL & PROCEDURAL BACKGROUND

UHS is a Minnesota corporation with its principal place of business in Minnesota. *See* Compl. ¶ 20. As alleged in the operative complaint, UHS "engages in servicing prescription drug managed care programs provided to members and beneficiaries under insurance plans offered by UHS's subsidiaries and affiliates, which, together, constitute the largest single health insurance carrier and services provider in the United States, and serve some 70 million individual insureds." Compl. ¶ 21. Essentially, it pays for pharmaceutical drugs used by its insureds.

UHS brings suit on its own behalf as an end-payor plaintiff ("EPP"). *See* Compl. ¶ 21 (alleging that USC is "contractually responsible for . . . payments . . . for branded and generic cART drugs dispensed to UnitedHealthcare Insureds during the relevant time period").

1    In addition, UHS brings suit as a direct purchaser plaintiff ("DPP") because it has been
2    assigned rights by a third party. *See* Compl. ¶¶ 23-24 (alleging that USC is an assignee of
3    OptumRx which has "purchased both branded and generic cART drugs directly from Defendants
4    and/or their co-conspirators"; adding that Cardinal Health assigned certain rights it had to
5    OptumRx which OptumRx then assigned to UHS).

    Like the other EPPs and DPPs, UHS brings federal antitrust claims as well as claims based on state antitrust law and state consumer protection law.

## II.   DISCUSSION

A.   Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

B.   Teva's Motion to Dismiss: Statute of Limitations

Teva has moved to dismiss part of the federal antitrust claims – specifically those based on

injuries that occurred outside the four-year limitations period.  Teva notes that, UHS, like the *Walgreen* and *CVS* Plaintiffs, sought to include injuries outside the period on the basis of *American Pipe* tolling, even though Teva was not named as a defendant in the earlier-filed KPH/FWK suits.

In response, UHS essentially states that it accepts the Court's ruling in the *Walgreen* and *CVS* cases will apply here (though it is preserving its position for appeal).  *See* Docket No. 818 (order granting Teva's motion to dismiss as to the *Walgreen* and *CVS* Plaintiffs).  Accordingly, the Court grants Teva's motion to dismiss with respect to the statute of limitations.  Specifically, claims based on purchases made prior to October 19, 2017 are barred.[1]

C. <u>Teva and Gilead's Motion to Dismiss: State Antitrust and/or Consumer Protection Claims</u>

Both Teva and Gilead have moved to dismiss certain EPP claims based on state antitrust law and/or state consumer protection law.  Specifically, they move to dismiss parts of Count 11.

Count 11 is an *alternative* claim to Count 10.

- Count 10 is a claim for violation of the Minnesota antitrust law (conspiracies to restrain trade and monopolization).  The claim is one for damages brought by UHS as an EPP.

- Count 11 is a claim for violation of "various state antitrust and consumer protection laws" (conspiracies to restrain trade and monopolization).  It is pled "in the alternative to Count Ten, in the event that the Court disagrees that all of UHS's end-payor based statutory claims for damages and/or monetary relief for payments for drugs dispensed to UnitedHealthcare Insureds (to the extent made indirectly) are governed by Minnesota law."  Compl ¶ 450.

Teva and Gilead have moved to dismiss Count 11 to the extent it is based on the following state laws:

- Massachusetts (Mass. Gen. L. Ch. 93A);
- Utah (Utah Code Ann. § 76-10-911);

---

[1] UHS filed its complaint on October 19, 2021.

3

- Indiana (Ind. Code § 24-5-0.5-1);
- Kansas (Kan. Stat. § 50-623);
- Louisiana (La. Rev. Stat. Ann. § 51:1401);
- Mississippi (Miss. Code Ann. § 75-24-1);
- Pennsylvania (73 Pa. Stat. Ann. § 201-1); and
- Vermont (9 Vt. § 2451).

For many of these state laws, Teva and Gilead make the same basic argument – *i.e.*, that the statutes are intended to protect consumers or consumer transactions and, here, UHS did not purchase the drugs at issue for consumer purposes, but rather for commercial purposes, because UHS did not purchase the drugs for its own use but rather for the use of someone else (its insureds).

The Court addresses each specific statute below. However, as a general observation, it notes that Defendants' position is problematic in that Defendants ignore the remedial purpose behind the statutes which, as a general matter, supports a liberal construction and/or application of the laws. For example:

- Indiana. *See* Ind. Code § 24-5-0.5-1 (providing that the statute "shall be liberally construed and applied to promote its purposes and policies" such as protecting consumers from deceptive and unconscionable sales acts and encouraging the development of fair consumer sales practices); *see also Kesling v. Hubler Nissan, Inc.*, 997 N.E.2d 327, 332 (Ind. 2013) ("The DCSA is a remedial statute and 'shall be liberally construed and applied to promote its purposes and policies' of protecting consumers from deceptive or unconscionable sales practices.").
- Louisiana. *See Jones v. Ams. Ins. Co.*, 226 So. 3d 537, 544 (La. Ct. App. 2017) (noting that the language of the statute has a "broad sweep"); *Roustabouts, Inc. v. Hamer*, 447 So. 2d 543, 548 (La. Ct. App. 1984) (stating that "'[t]he substantive prohibition of the [statute] is broad'").
- Pennsylvania. *See Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637, 646 (Pa. 2021) (noting emphatically that the statute is remedial in nature and "'is to be construed liberally with the

4

object of preventing unfair or deceptive practices'").

It is important that the Court bear in mind this liberal approach because Defendants' construction of these statutes is at odds with their broad remedial purpose. Defendants elevate form over substance. Under Defendants' position, the ultimate end user of the drug, the insured, cannot bring suit for any alleged misconduct because she did not pay for the drug herself but neither could the insurer, who pays for that drug on behalf of the insured. Under Defendants' position, *neither* end payor can enforce the consumer protection law, a result hardly consistent with the remedial purpose of the act which specially enables suits by end payors.

        1.      <u>Indiana</u>

Under Indiana law (the Indiana Deceptive Consumer Sales Act ("ICDSA")), "[a] supplier may not commit an unfair, abuse, or deceptive act, omission, or practice in connection with a consumer transaction." Ind. Code § 24-5-0.5-3(a).

> "Consumer transaction" means a sale, lease, assignment, award by chance, or other disposition of an item of personal property, real property, a service, or an intangible . . . to a person for purposes that are primarily personal, familial, charitable, agricultural, or household, or a solicitation to supply any of these things.

*Id.* § 24-5-0.5-2(a)(1). "'Person' means an individual, corporation, the state of Indiana or its subdivisions or agencies, business trust, estate, trust, partnership, association, nonprofit corporation or organization, or cooperative or any other legal entity." *Id.* § 24-5-0.5-2(a)(2). "A person relying upon an uncured or incurable deceptive act may bring an action for the damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater." *Id.* § 24-5-0.5-4(a).

As noted above, Defendants argue that the Indiana claim should be dismissed because UHS made purchases of the drugs for someone else (its insureds) and not for itself; in other words, UHS made the purchases for commercial purposes, and not consumer purposes.

The Court does not agree. Case law weighs against Defendants' argument. For example, in *In re Bextra & Celebrex Marketing Sales Practices & Product Liability Litigation*, 495 F. Supp. 2d 1027 (N.D. Cal. 2007), Judge Breyer first pointed out that "[t]he Indiana TPPs qualify as a 'person' [since] the Act defines 'person' as an individual, corporation, . . . or other legal entity'"

before turning to "[t]he difficult question [of] whether they suffered damages 'as a consumer.'" *Id.* at 1036-37. He ultimately concluded as follows: "As defendants have not demonstrated that their sale of Celebrex and Bextra to the TPPs for the patients' personal use does not qualify as a consumer transaction as a matter of law, the Court must give plaintiffs leave to assert claims under the Indiana Act." *Id.* at 1037.

The district court in *In re Actiq Sales & Marketing Practices Litigation*, 790 F. Supp. 2d 313 (E.D. Pa. 2011), reached a similar conclusion relying on Judge Breyer's decision in *Bextra*.

> [T]he Court will construe the term "consumer" in accordance with Indiana law, requiring that terms be construed "in their plain, or ordinary and usual, sense." Ind. Code § 1-1-4-1(1). As a result, this Court finds third party payor Plaintiff ICWF [a union welfare fund] falls squarely within the ordinary definition of "consumer," which means "one that utilizes economic goods." In this case, Plaintiff ICWF uses economic goods, namely drugs such as Actiq, to provide prescription reimbursements for treatment of its members and beneficiaries. . . . Under this ordinary definition, it matters not that Plaintiff ICWF itself did not physically consume or use the drug Actiq.
>
> The Court also disagrees with the Defendant's position that ICWF fails to satisfy the IDCSA provision requiring that the consumer use Actiq for personal, familial, charitable, agricultural, or household purposes. *In re Bextra/Celebrex Mktg. Sales Practices & Prods. Liab. Litig.*, 495 F. Supp. 2d 1027 (N.D. Cal. 2007) addressed an analogous situation, where plaintiffs, Indiana third party payors brought suit against pharmaceutical companies under the IDCSA for plaintiffs' reimbursement of prescriptions of Celebrex and Bextra. The *In re Bextra* court found that under the IDCSA, "a sale to a corporation 'for purposes that are primarily personal' qualifies as a consumer transaction within the meaning of the statute." *Id.* at 1036.
>
> The Court finds that contrary to Defendant's contention, the IDCSA does not require a direct transaction between the plaintiff and the defendant involving the sale of goods primarily for personal, family, charitable, agricultural, or household purposes. To the contrary, it requires only that the plaintiff's damages arise from defendant's provision of such goods. Plainly stated, there is no mandate under the IDCSA that the plaintiff must be the consumer who purchased the goods primarily for personal purposes.
>
> Plaintiff is a valid consumer for purposes of the IDCSA, as its use of Actiq, through its payment for prescriptions of its members and beneficiaries, fits squarely within the ordinary meaning of the term "consume." Plaintiff's payments for the drug arose from the sales of Actiq to its members and beneficiaries for the treatment of illnesses, with such transactions qualifying as consumer transactions for personal purposes under the IDCSA." *Id.*

1    *Id.* at 325-26; *see also Sheet Metal Workers Loc. No. 20 Welfare & Benefit Fund v. CVS Health*

2    *Corp.*, 221 F. Supp. 3d 227, 233 (D.R.I. 2016) ("find[ing] that TPPs can qualify as consumers

3    under the IDCSA[:] [1] if the intent of the statute was to bar anyone from bringing a claim who

4    did not actually use the product themselves, that could have easily been made clear," [2]

5    "'consumer transaction' was specifically defined to include corporations, and there is no

6    indication that definition would not include a scenario like this one where the party making the

7    payment is not the end-user," and [3] "the IDCSA states that '[t]his chapter shall be liberally

8    construed and applied to promote its purposes and policies,' which include 'protect[ing]

9    consumers from suppliers who commit deceptive and unconscionable sales acts' and

10   'encourag[ing] the development of fair consumer sales practices'").

11       Defendants argue that the three cases cited above are distinguishable because the plaintiffs

12   in those cases were union health and welfare funds whereas "UHS is a for-profit corporation."

13   Teva Reply at 5. Thus, Defendants contend that UHS made drug purchases for commercial

14   purposes, comparable to that in *DL3Properties, LLC v. Morris Invest, LLC*, No. 1:19-cv-02667-

15   SEB-TAB, 2020 U.S. Dist. LEXIS 1773234, at *20 (S.D. Ind. Sept. 28, 2020) (concluding that,

16   where plaintiff-company purchased two single-family homes from defendants to be used as rental

17   properties, *i.e.*, investment properties, there was no consumer transaction). But the distinction

18   made by Defendants is overly formalistic. Even though a union health and welfare fund is a

19   nonprofit entity by nature, it functions like an insurer – *i.e.*, just like UHS. And in one of its prior

20   orders, the Court considered a similar argument (regarding D.C. law) and rejected it:

21           Although an insurer who purchases a pharmaceutical product does
             not make that purchase for its own use, its role is located on the
22           retail side of the transaction given that *it is essentially acting as a
             proxy for its insured.* Absent legislative history indicating that
23           "consumer" as used in the statutes means an individual or business
             purchasing for his, her, or its use only, the Court does not limit
24           application of the statutes as argued by Gilead.

25   *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 638 (N.D. Cal. 2020) (emphasis added).

26       The motion to dismiss the Indiana claim is denied.

27       2.     Louisiana

28       Under Louisiana law (the Unfair Trade Practices and Consumer Protection Law or

"LUTPA"), "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." La. Rev. Stat. Ann. § 51:1405(A). "Any person who suffers any ascertainable loss of money . . . as a result of the use or employment by another person of an unfair or deceptive method, act, or practice declared unlawful by R.S. 51:1405, may bring an action individually . . . to recover actual damages." *Id.* § 51:1409(A). "'Person' means a natural person, corporation, trust, partnership, incorporated or unincorporated association, and any other legal entity."[2] *Id.* § 51:1402(8).

Defendants argue that the Louisiana claim should be dismissed because, even though § 51:1409 refers to "any person" bringing suit, many courts (including some lower state appellate courts and the Fifth Circuit) have narrowly construed the statute – "'limiting relief to individual consumers or business competitors.'" Mot. at 9; *see also Dorsey v. N. Life Ins. Co.*, No. 04-0342, 2005 U.S. Dist. LEXIS 17742, at *39-40 (E.D. La. Aug. 12, 2005) (noting that "[s]ome Louisiana Courts of Appeal have interpreted the statute narrowly and held that standing to assert a LUTPA claim is restricted to business competitors and direct consumers [while] other Louisiana Courts of Appeal have read the statue broadly stating that business competitors and consumers are not the exclusive classes of persons who may bring a LUTPA claim"; adding that the Fifth Circuit follows the narrow interpretation).

In response, UHS points out that much of the authority on which Defendants rely predates a Louisiana Supreme Court decision from 2010. *See Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc.*, 35 So. 3d 1053 (2010). In *Cheramie*, the Louisiana Supreme Court was presented with the issue of whether a plaintiff has standing to bring a claim under the LUTPA if the plaintiff is neither a director competitor nor a consumer. *See id.* at 1056-57. The Court noted:

> [T]he legislation contains no language that would clearly and expressly bar a "person" (such as the individual and the corporation that are the plaintiffs herein) from bringing an action for unfair trade practices. To the contrary, LUTPA grants a right of action to any

---

[2] Section 51:1409(A) refers to "person" and not "consumer," even though the latter term is used elsewhere in the statutory scheme. *See* La. Rev. Stat. Ann. § 51:1402 (defining "consumer" as "any person who uses, purchases, or leases goods or services" and "consumer transaction as "any transaction involving trade or commerce to a natural person, the subject of which transaction is primarily intended for personal, family, or household use").

8

> person, natural or juridical, who suffers an ascertainable loss as a result of another person's use of unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. Although business consumers and competitors are included in the group afforded this private right of action, they are not its exclusive members.

*Id.* at 57.

It appears, however, that this part of *Cheramie* represented only a plurality decision. Of the seven justices, one did not participate (Kimball, J.), *see id.* at 1054 n.1; one agreed with the result but expressly believed that the plaintiffs did not have standing under the LUTPA (Johnson, J.), *see id.* at 1063; one simply concurred in the result (Knoll, J.), *see id.* at 1065; and one concurred in the result and stated that the discussion of standing was dicta (Guidry, J.). *See id.*; *see also Baba Lodging, LLC v. Wyndham Worldwide Operations, Inc.*, No. 10-1750, 2012 U.S. Dist. LEXIS 36891, at *10 & n.2 (W.D. La. Mar. 19, 2012) (counting the justices and stating that "*Cheramie*, therefore, does not represent a holding of the majority of the Louisiana Supreme Court and does not have binding effect on Louisiana state courts or this Court").

That being said, many courts have still found *Cheramie* instructive and thus rendered decisions favorable to the plaintiffs. *See, e.g.*, *Caldwell Wholesale Co., L.L.C. v. R.J. Reynolds Tobacco Co.*, No. 17-0200, 2018 U.S. Dist. LEXIS 81080, at *14-16 (W.D. La. May 11, 2018) (noting that, although not binding, the case is instructive; adding that, "following *Cheramie*, Louisiana appellate courts, and a number of federal district courts, have followed the plurality opinion and found that private parties have a right of action under the LUTPA").

In its reply brief, Teva cites two post-*Cheramie* cases that did not follow the plurality decision. *See* Teva Reply at 8 (citing *Baba Lodging*, 2012 U.S. Dist. LEXIS 36891, and *Swoboda v. Manders*, No. 14-19-SCR, 2015 U.S. Dist. LEXIS 164870 (M.D. La. Dec. 9, 2015)). But notably, the courts who issued those decisions (favorable to Defendants in the instant case) both subsequently rejected these holdings. *See Caldwell*, 2018 U.S. Dist. LEXIS 81080, at *14-15 ("find[ing] that its previous decision [in *Baba*] based on pre-*Cheramie* Fifth Circuit precedent regarding standing ignored the 'bedrock principles of *Erie v. Tompkins*, 304 U.S. 64 (1938), which require a federal court sitting in diversity to apply the law of the state as declared by its legislature

or the state's highest court'"; "'the proper inquiry is not whether *Cheramie* is controlling . . . but rather how the decision factors into the *Erie* "guess" that this Court must make when applying state law'"); *Swoboda v. Manders*, No. 14-19-EWD, 2016 U.S. Dist. LEXIS 53377, at *17-18 (M.D. La. Apr. 21, 2016) (stating the same and thus granting plaintiff's motion for reconsideration).

The Court denies motion to dismiss the Louisiana claim.

3. Mississippi

Under Mississippi law, "[u]nfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce are prohibited," Miss. Code Ann. § 75-24-5(1), and

> any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by the seller, lessor, manufacturer or producer of a method, act or practice prohibited by Section 75-24-5 may bring an action at law . . . .

*Id.* § 75-24-15(1). "'Person' means natural persons, corporations, trusts, partnerships, incorporated and unincorporated associations, and any other legal entity." *Id.* § 75-24-3(a). "In any private action brought under this chapter, the plaintiff must have first made a reasonable attempt to resolve any claim through an informal dispute settlement program approved by the Attorney General." *Id.* § 75-24-15(2).

According to Defendants, the Mississippi claim should be dismissed for two reasons: (1) UHS has filed to allege that it tried to resolve its claim through the AG informal dispute settlement program, *see* Teva Mot. at 9 n.9, and (2) "a business may not bring a claim under [the statute]." Teva Mot. at 9.

On (1), UHS suggests that the Court need not address the argument because it was raised in a footnote only. *See* Opp'n at 11. But ultimately "UHS acknowledges that if the Court decides to reach the claim now, it might determine that such requirements need to be satisfied pre-suit even for claims pled in the alternative, where UHS has not alleged such pre-suit settlement efforts." Opp'n at 11. Based on UHS's comments, the Court dismisses the claim, but without

10

prejudice (*i.e.*, so that UHS may satisfy the pre-suit requirement).

Defendants argue that the dismissal should be *with* prejudice because of their argument in (2) – *i.e.*, a business cannot bring a claim under the statute. In support of this argument, Defendants cite *Medison America, Inc. v. Preferred Medical Systems LLC*, 357 F. App'x 656 (6th Cir. 2009). In *Medison*, the plaintiff was a subsidiary of a company that manufactured ultrasound equipment. The company sold the ultrasound equipment wholesale to dealers who then resold the equipment to medical providers. The plaintiff was a competitor of GM, which manufactured ultrasound equipment and sold the equipment through its own representatives. One of GM's representatives allegedly told prospective customers that the plaintiff was in bankruptcy and thus could not service its ultrasound equipment. The plaintiff thus brought suit, with one of its claims being a violation of Mississippi consumer protection law. The Sixth Circuit held:

> Private actions under that statute can be brought only by a "person who purchases or leases goods or services primarily for personal, family, or household purposes and thereby suffers any ascertainable loss of money or property" as a result of the alleged disparagement. Miss. Code Ann. § 75-24-15. Medison is not such a person – it is a business – so this claim fails.

*Id.* at 663.

But Defendants' reliance on *Medison* is not persuasive. The result in *Medison* makes sense. The plaintiff-company was a purchaser of ultrasound equipment, and it did so for resale of the equipment to dealers – for ultimate resale to end-user medical providers. The instant case is distinguishable because UHS here is an insurer, standing in as a proxy for the end-user, not as an independent buyer in the business of reselling the product as a retailer or distributor.

Furthermore, *Medison* is problematic in that it fails to recognize that "person" is defined in the statute in broad fashion – *including* businesses. The statute does not necessarily preclude a business purchasing a good primarily for someone else's personal use.

Accordingly, the Court dismisses the Mississippi claim *without* prejudice only (*i.e.*, because there has not been exhaustion of the informal settlement process).

    4.    Pennsylvania

Under Pennsylvania law (the "Unfair Trade Practices and Consumer Protection Law"

11

1 ("CPL")), "[u]nfair methods of competition and unfair or deceptive acts or practices . . . are hereby

2 declared unlawful." 73 Pa. Stat. Ann. § 201-3(a).

> Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($ 100), whichever is greater.

7 *Id.* § 201-9.2(a). "'Person' means natural persons, corporations, trusts, partnerships, incorporated

8 or unincorporated associations, and any other legal entities." *Id.* § 201-2(2).

9 Defendants argue that the Pennsylvania claim should be dismissed because "[c]laims

10 stemming from 'purchases made for business reasons' are 'not actionable' under this provision."

11 Teva Mot. at 10. In support, they cite *Balderston v. Medtronic Sofamor Danek, Inc.*, 285 F.3d 238

12 (3d Cir. 2002). In *Balderston*, the plaintiff was a doctor who sued the manufacturer of a medical

13 device known as a bone screw. According to the plaintiff, the defendant misrepresented the FDA

14 approval status of its screws. *See id.* at 239. The Third Circuit held first that the doctor had no

15 standing to sue under the CPL because he was not a "purchaser" under the statute. *See id.* at 242;

16 *see also id.* at 240-41 & n.6 (noting that plaintiff acknowledged he did not purchase the screws

17 himself and that his patients instead purchased the screws). The court then upheld the lower

18 court's alternative ground for dismissal – *i.e.*, that the claim was not viable because any purchase

19 made by the doctor was primarily for business purposes as part of his medical practice and not for

20 personal, family, or household use. *See id.* at 242.

> In construing claims under the CPL, Pennsylvania courts have distinguished purchases made for business reasons, which are not actionable, from those made for "personal, family or household use." Dr. Balderston suggests his purchase qualifies, because he "purchased" the screws for his patients' "personal use." But we have uncovered no Pennsylvania decision finding actionable a *non-representative* plaintiff's claim based on others' "personal uses." Dr. Balderston employed the screws only in his medical practice. His alleged losses were not "personal," but affected only his medical practice. Therefore, he lacks standing under the CPL.

27 *Id.* (emphasis added).

28 But notably, *Balderston* made the point that the doctor was not acting as the representative

12

1    of his patients. The doctor purchased the screws as part of *his* medical service. He was not acting
2    as a proxy for the insured. Thus, the doctor's reliance "on two cases allowing plaintiffs acting in
3    representative capacities to pursue claims under the CPL" was unavailing. *Id.* (citing *Kane & Son*
4    *Profit Sharing Trust v. Mar. Midland Bank*, No. 95-7058, 1996 U.S. Dist. LEXIS 3101 (E.D. Pa.
5    Mar. 11, 1996); and *Valley Forge Towers S. Condo. Ass'n v. Ron-Ike Foam Insulators, Inc.*, 393
6    Pa. Super. 339 (1990)).

7    Here, UHS relies on those same two cases allowing suit, as well as a third. *See Sheet*
8    *Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380,
9    422 (E.D. Pa. 2010) (noting that "plaintiff welfare benefit plans purchased or reimbursed their
10   plan members for purchases of Wellbutrin SR for the members' personal use[;] [o]ther courts that
11   have interpreted the ambit of the act have done so broadly, allowing legal entities to assert claims
12   on behalf of personal users"); *Kane*, 1996 U.S. Dist. LEXIS 3101, at *8-9 (rejecting defendant's
13   argument that employee benefit plan's purchase of securities, on behalf of its beneficiaries, was
14   not for personal use; pointing out that CPL should be interpreted broadly to effectuate remedial
15   purpose); *Valley Forge*, 393 Pa. Super. at 354-55 (stating that, "[w]hen a condominium
16   association acts in its representative capacity on behalf of unit owners, it is the purpose of the unit
17   owners' purchases which controls for the purposes of the primary purpose restriction of 73 P.S. §
18   201-9.2"; "giving the Condominium Association the benefit of all facts pled and all favorable
19   inferences reasonably derivable therefrom, the roof was purchased 'primarily for personal, family,
20   or household purposes' within the meaning of those words in the Pa.U.T.P.C.P.L.").

21   In reply, Defendants argue that *Kane* and *Valley Forge* are distinguishable because "UHS
22   is suing on its own behalf; it is not 'the legal representative' of its insureds, nor is it 'pursuing this
23   litigation' on their behalf." Teva Reply at 4. As for *Sheet Metal Workers*, Defendants criticize the
24   case as being inconsistent with *Balderston*. *See* Teva Reply at 4.

25   Although Defendants' argument here is not entirely lacking in merit, the Court is not
26   persuaded. Although *Balderston*, *Kane*, and *Valley Forge* invoke a representative-type
27   relationship, they do not require that the plaintiff be a legal representative per se. Indeed,
28   imposing such a requirement would be inconsistent with a liberal construction of the Pennsylvania

13

United States District Court
Northern District of California

statute. Given the functional relationship between an insurer and its insured in which the insurer in effect stands in for the insured to pay for the pharmaceutical, UHS has standing to bring a claim under the CPL because it has paid for drugs on behalf of its insureds and functions as their proxy.

Accordingly, the Court denies the motion to dismiss the Pennsylvania claim.[3]

5. Utah Law

The Court previously ruled on EPP claims brought under Utah law (Utah Code Ann. § 76-10-911). It noted as follows:

> The Utah code provides in relevant part that "[a] person who is a citizen of this state or a resident of this state and who is injured or is threatened with injury in his business or property by a violation of the Utah Antitrust Act may bring an action for injunctive relief and damages, regardless of whether the person dealt directly or indirectly with the defendant." Utah Code Ann. § 76-10-3109(1)(a). Gilead underscores that "[t]he Utah Antitrust Act permits damages claims by indirect purchasers only if they are citizens or residents of the state," but here "[n]o Plaintiffs are alleged to meet this description." Gilead Mot. at 36.

*Staley*, 446 F. Supp. 3d at 629. The Court indicated agreement with Gilead that the Utah statute provides a remedy for only citizens or residents of the state. *See id.*

According to Teva and Gilead, because UHS is incorporated in Minnesota, it cannot recover under Utah law. *See* Teva Mot. at 8.

In response, UHS notes that it "has obtained assignments from the UnitedHealthcare Plans, including UnitedHealthcare of Utah, Inc." Opp'n at 5; *see also* Compl. ¶ 26 (alleging that "UHS is the proper entity to pursue all forms of relief but, "out of an abundance of caution, and to assure the Court that there is no potential for any duplicative indirect purchaser/payor recovery, UHS has obtained assignments from the UnitedHealthcare Plans, conveying to UHS any claims and rights to recoveries they may have in connection with the matters alleged in this Complaint"). UHS adds: "Defendants ignore UHS's allegations relating to UnitedHealthcare of Utah, Inc., as well as the prospect that UHS's claims cover payments made for drugs dispensed to UnitedHealthcare

---

[3] The Court notes that, in their reply brief, Defendants raised a new argument that was not presented in their opening briefs (even though it could have been). *See* Teva Reply at 4-5 (arguing, in effect, that UHS failed to clearly allege that it purchased drugs). Because it was not raised until reply, the Court does not address it.

14

insureds in the State of Utah." Opp'n at 5.

To the extent UHS asserts it has a Utah claim because it paid for drugs dispensed to insureds in Utah, the Court does not agree. The Utah law specifies that the person *who is injured* must be a citizen or resident of the state. Here, UHS is claiming injury; UHS is not a citizen or a resident of Utah.

However, the Court agrees with UHS that it is entitled to seek relief as an assignee of UnitedHealthcare of Utah. UnitedHealthCare of Utah is the injured person, and it appears to be a citizen or resident of Utah. The fact that it has assigned its rights to UHS should not change matters; UHS is simply standing in the shoes of UnitedHealthcare of Utah. The Court notes that, in their reply, Defendants do not make much of an argument to contest this point. *See* Teva Reply at 3 (stating that, "[t]o the extent UHS intends to assert claims under Utah law solely in its capacity as an assignee of a Utah resident, . . . Teva agrees that resolution of this issue may be more appropriate after discovery related to UHS's alleged assignments"); Gilead Joinder at 1 (agreeing with Teva). As UHS points out, Judge Koh recently issued a decision favoring its position.

> United . . . has asserted claims of its UnitedHealthcare Plans affiliate assignors, including "UnitedHealthcare of Utah, Inc." Opp'n at 34 (citing UHS ¶ 10, Ex. A). Defendants do not argue that this Utah assignor-plaintiff would be inadequate. Reply at 20. Thus, United's claim under Utah law may proceed.

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*, No. 20-MD-02966-LHK, 2021 U.S. Dist. LEXIS 153343, at *145-46 (N.D. Cal. Aug. 13, 2021).

The Court, therefore, grants in part and denies in part the motion to dismiss the Utah claim. The motion to dismiss is denied to the extent the Utah claim is based on rights belonging to UnitedHealthCare of Utah and assigned to UHS. The motion to dismiss the Utah claim is otherwise granted.

6. Massachusetts, Kansas, and Vermont Law

UHS recognizes that the Court previously addressed the viability of EPP claims under:

- Massachusetts law (Mass. Gen. L. Ch. 93A), *see Staley*, 446 F. Supp. 3d at 630-33.
- Kansas law (Kan. Stat. § 50-623), *see id.* at 639; and

15

- Vermont law (9 Vt. § 2451). *See id.* at 641-42.

UHS essentially agrees to be bound by the Court's rulings. *See* Opp'n at 12. Accordingly, the Count 11 claim based on the above-identified state laws is dismissed.

### III.  CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the motions to dismiss. Specifically, the Court rules as follows:

- Teva's motion to dismiss the federal antitrust claims based on purchases made prior to October 19, 2017, is granted.
- The motion to dismiss Count 11 to the extent the alternative claim is based on Massachusetts, Kansas, and/or Vermont law is granted. The dismissal is with prejudice (in light of the Court's prior order on the same claims brought by the *Staley* EPPs).
- The motion to dismiss Count 11 to the extent the alternative claim is based on Utah law is granted in part. The claim survives only to the extent UHS has been assigned rights by UnitedHealthcare of Utah.
- The motion to dismiss Count 11 to the extent the alternative claim is based on Mississippi law is granted. The dismissal is without prejudice (*i.e.*, UHS will need to exhaust with the AG before reasserting the claim).
- The motion to dismiss Count 11 to the extent the alternative claim is based on Indiana, Louisiana, and/or Pennsylvania law is denied.

This order disposes of Docket Nos. 836 and 838.

**IT IS SO ORDERED**.

Dated: March 8, 2022

_____
EDWARD M. CHEN
United States District Judge

16