UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STALEY, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>GILEAD SCIENCES, INC., et al.,<br><br>　　　　Defendants. | Case No. 19-cv-02573-EMC<br><br>**ORDER DENYING DEFENDANTS' MOTION TO DISMISS, AND DENYING BCBSA'S MOTION TO STRIKE**<br><br>Docket Nos. 860, 894 |

　　　　The End-Payor Plaintiffs ("EPPs") have filed an antitrust class action against, *inter alia*, Gilead and Janssen. The EPPs' operative complaint is located at Docket No. 788 (first amended consolidated class action complaint or "FAC"). Addendum B of the FAC reflects that one of the named EPPs is Blue Cross Blue Shield Association ("BCBSA"). Per the addendum, BCBSA is "a national association of 35 [now 34] independent and locally operated Blue Cross Blue Shield . . . companies" (also known as the "Local Blues"). FAC ¶ B1. However, BCBSA asserts claims in this litigation on its own behalf "as the carrier of the Service Benefit Plan, one of the Federal Employee Health Benefit Plans." FAC ¶ B2. According to BCBSA, it "purchased and/or provided reimbursement for some or all of the purchase price" for the drugs at issue "at supracompetitive prices during the Class Period" in a number of different states. FAC ¶ B3.

　　　　Currently pending before the Court is a motion to dismiss filed by Gilead and Janssen ("Moving Defendants"). According to Moving Defendants, BCBSA lacks standing to bring claims because it is not a "true" purchaser – *i.e.*, it did not use its own funds to buy any drugs and/or, even if it did, it was ultimately reimbursed for those purchases by the federal government. Moving Defendants characterize BCBSA as simply a financial intermediary, comparable to, *e.g.*, a

1  pharmacy benefits manager.  Having considered the parties' briefs and accompanying
2  submissions, as well as the oral argument of counsel, the Court **DENIES** the motion to dismiss.
3  The Court also **DENIES** BCBSA's motion to strike which is related to the motion to dismiss.

**I.    FACTUAL & PROCEDURAL BACKGROUND**

A. <u>BCBSA's Evidence</u>

In support of its contention that it does have standing to sue, BCBSA relies primarily on its interrogatory responses, *see* Barnes Decl., Ex. B (interrogatory responses), and two declarations from its Assistant General Counsel, Brendan Stuhan.  (One declaration was filed in conjunction with the opposition to the pending motion.  The other declaration was filed in support of the EPPs' earlier motion to amend to add BCBSA as a named plaintiff to the litigation.  *See* Docket No. 746-4 (Prior Stuhan Decl.).  The Court shall hereinafter refer to the latter declaration as the "Prior Stuhan Declaration.")  These documents reflect the following.

BCBSA is a national association of 35 (now 34) independent, community-based, and locally operated Blue Cross Blue Shield companies (*i.e.*, Local Blues).  *See* Stuhan Decl. ¶ 2.  BCBSA is also the carrier[1] of the Blue Cross and Blue Shield Service Benefit Plan, also known as the Federal Employee Program ("FEP").  *See* Prior Stuhan Decl. ¶ 2.  The terms of the FEP and BCBSA's role and responsibilities as the carrier of the FEP are governed by statute and regulations, as well as by a contract between BCBSA and the federal Office of Personnel Management ("OPM").  *See* Barnes Decl., Ex. B (Rog Resp. at 13).

Under the OPM contract, "BCBSA handles the overall program."  Barnes Decl., Ex. B (Rog Resp. at 13).  However, the actual administration of benefits and underwriting are split between the Local Blues and BCBSA.  While the Local Blues administer *medical* benefits in their individual localities, BCBSA administers the *pharmaceutical* benefits itself (with the help of a pharmacy benefits manager ("PBM")).  *See* Barnes Decl., Ex. B (Rog Resp. at 13).  Similarly, the Local Blues

underwrite the *medical* benefit component of the Federal Employee

---

[1] The term "carrier" is used in the Prior Stuhan Declaration and in the OPM contract between OPM and BCBSA.

1
2
>   Plan and BCBSA underwrites the *pharmacy* benefit.  The BCBS
>   Plans are not involved in the pharmacy benefit portion of the Federal
>   Employee Plan, except in limited and irrelevant circumstances
>   concerning in-patient hospital claims.

3   Barnes Decl., Ex. B (Rog Resp. at 13) (emphasis added).

4         With respect to underwriting, the federal government and federal employees pay the FEP

5   premiums.  The premiums are then collected and forwarded to "a specially-created fund in the

6   U.S. Treasury" (hereinafter the "U.S. Treasury Fund").  Barnes Decl., Ex. B (Rog Resp. at 14).

7   Within the U.S. Treasury Fund, a special Letter of Credit Account ("LOCA") for the FEP has been

8   set up.  The majority of premium payments is made available in the LOCA for withdrawal by

9   BCBSA and the Local Blues "to pay for allowable health benefit costs and administrative

10  expenses."  Barnes Decl., Ex. B (Rog Resp. at 14).  A small portion of the premium payments is

11  set aside in a contingency reserve; the contingency reserve is maintained within the U.S. Treasury

12  Fund but is separate from the LOCA.  *See* Barnes Decl., Ex. B (Rog Resp. at 14).

13        "When an FEP beneficiary presents a covered prescription, [BCBSA] pays its pharmacy

14  benefits manager for the covered portion of that prescription *from its own funds in its own name*,"

15  and "[o]nly later . . . reconcile[s] the financial aspects of that payment with OPM [*i.e.*, gets

16  reimbursement from OPM]."  Prior Stuhan Decl. ¶ 10 (emphasis added); *see also* Barnes Decl.,

17  Ex. B (Rog Resp. at 15) (stating that "BCBSA makes funds available to the PBM for any claims

18  submitted by retail pharmacies on behalf of FEP members" and, "[n]early simultaneously in most

19  instances, BCBSA requests an aggregate drawdown from the LOCA to reimburse BCBSA for the

20  aggregate payments it has made in that period, including any funding provided to the PBM for

21  pharmacy payments made by the PBM on behalf of the FEP").

22
23
24
25
>   OPM's regular reimbursements to BCBSA for BCBSA's purchase
>   of pharmaceutical products are not broken down on a per-product
>   basis but instead are regular payments for thousands, if not more, of
>   bundled drug claims. . . . [D]uring the Relevant Period, there has not
>   been a situation where the funds available to BCBSA from OPM
>   were completely depleted.

26  Barnes Decl., Ex. B (Rog Resp. at 24).

27        That being said,

28  
>   OPM is not required to make available for the FEP anything more

> than the premiums collected for each enrollee in the FEP, plus the administrative expenses and service charge agreed to in the contract. To the extent that the premiums charged by BCBSA and collected by OPM do not cover the health benefits payments required for enrollees of the Federal Employee Plan, BCBSA and/or the 35 [Local Blues] are *responsible for any overages*. . . . BCBSA does not receive reimbursement from OPM for any overages. In other words, BCBSA and the [Local Blues] administering the FEP *carry insurance risk* in that they must pay for the health benefits and expenses if all the funds associated with the FEP in the U.S. Treasury Fund are exhausted . . . .

Barnes Decl., Ex. B (Rog Resp. at 14-15) (emphasis added).

"To the extent that the health benefits payments required under the FEP do not exhaust the funds provided by OPM in the form of premiums and administrative expenses, OPM retains any extra" – not BCBSA. Barnes Decl., Ex. B (Rog Resp. at 15). BCBSA makes money only because, under the contract with OPM, OPM pays BCBSA a service charge. *See* Barnes Decl., Ex. B (Rog Resp. at 16). "The service charge represents the only profit that BCBSA can make in connection with the [FEP]." Barnes Decl., Ex. B (Rog Resp. at 16).

BCBSA has understood the terms of its contract with OPM "to permit, and in fact require, [it] to assert claims for recovery on behalf of the FEP when warranted." Prior Stuhan Decl. ¶ 4. "Consistent with this role and understanding," BCBSA "has submitted claims for recovery in more than two dozen pharmaceutical class action settlements" since 1996. Prior Stuhan Decl. ¶ 7. In addition, BCBSA is currently a class representative in another pharmaceutical antitrust matter, *see* Prior Stuhan Decl. ¶ 5 (citing *In re Xyrem Antitrust Litigation*, No. 20-MD-02966 LHK (N.D. Cal.)), and previously served as a lead plaintiff in a case against a pharmaceutical company (alleging that the company engaged in an unlawful scheme that induced insurers to pay billions for adulterated and illegally marketed drugs) that settled in 2019. *See* Prior Stuhan Decl. ¶ 6. Furthermore, BCBSA is a member of a claimants/creditors committee in two different bankruptcy matters (in New York and Delaware). *See* Prior Stuhan Decl. ¶ 5. "Each time [BCBSA] makes any recovery on behalf of the FEP, including through litigation and claims made in class settlements, [BCBSA] must and does report such recovery to OPM." Prior Stuhan Decl. ¶ 8.

///

///

4

B. Moving Defendants' Evidence

In turn, Moving Defendants primarily rely on the following evidence to support their position that BCBSA lacks standing: (1) statements made by BCBSA in other proceedings and (2) positions taken by one of BCBSA's counsel here (Hilliard & Shadowen) in other proceedings. Moving Defendants contend that this evidence shows that BCBSA bears no risk (at most, Local Blues do) and functions essentially as a financial intermediary.

With respect to (1), Moving Defendants cite to (a) a case in which BCBSA was a defendant and (b) an arbitration in which BCBSA was not a party but was somehow involved. *See* Stuhan Decl. ¶ 4.

- The case is *Fero v. Excellus Health Plan Inc.*, No. C-15-6569 EAW-JJM (W.D.N.Y.). *Fero* concerned a data breach in which a Local Blue (Excellus) was hacked. Excellus was one of the defendants, as was BCBSA. In opposition to the plaintiffs' motion for class certification, BCBSA stated that it "is not itself an insurance company, is not licensed as such, and does not insure any of the Plaintiffs or putative Federal GBL § 349 Damages Class members. On the other hand, the Plans, including Excellus, are responsible for providing health insurance coverage to federal employees who elect to participate in the FEP." *Fero*, No. C-15-6569 EAW-JJM (Docket No. 414) (Opp'n at 2-3); *see also Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090, 1100 (10th Cir. 2015) (stating that "BCBSA does not have skin in the game; it does not underwrite the risk in the insurance coverage" but rather "merely acts as a facilitator for OPM"); *In re BCBS Antitrust Litig.*, 308 F. Supp. 3d 1241, 1250 (N.D. Ala. 2018) (stating that "the Blue Plans are 36 independent companies and each company sells insurance" and that BCBSA "itself does not underwrite any insurance policies").
- The arbitration is related to a medical claim dispute. *See* Stuhan Decl. ¶ 2; Barnes Decl. ¶ 11. BCBSA was not a defendant but submitted a declaration – hereinafter

5

referred to as the "Holladay Declaration"[2] – in which the BCBSA employee stated, *inter alia*, that, under the OPM contract, the Local Blues "underwrite the Service Benefit Plan and administer benefits thereunder in their individual localities" and that "[a] judgment in this case related to any Service Benefit Plan employees . . . would be paid from the LOCA." Holladay Decl. ¶¶ 4, 7. The Holladay Declaration also states that the Local Blues "carry insurance risk in that they must pay for health benefits and expenses if all of the funds associated with the Service Benefit Plan in the U.S. Treasury Fund are exhausted . . . . But unless and until that happens, the federal government's funds are the only funds at stake. Because of the substantial contingency reserve and special reserve balances in the U.S. Treasury Fund, the [Local Blues'] insurance risk was not triggered at any time between 2010 to the present (and for many years before that)" and "[i]t would take enormous additional costs – in the billions of dollars – in one of those years for the [Local Blues'] insurance risk to be triggered." Holladay Decl. ¶ 10.

BCBSA contends that Moving Defendants have taken its statements above out of context. *See, e.g.*, Opp'n at 12-13 & n.36 (arguing that the Holladay Declaration concerns medical benefits, for which the Local Blues are responsible, and not pharmaceutical benefits, for which BCBSA is responsible; also arguing, with respect to *Fero*, that "BCBSA does not need to be an 'insurance company' to have absorbed drug cost risk and it does underwrite the FEP's pharmaceutical benefit").

---

[2] Previously, the Court provisionally sealed the Holladay Declaration. Now that the hearing on the motion to dismiss has concluded, the Court finds that there is no basis to seal the declaration. There is no apparent prejudice to BCBSA for the information to become public. The declaration contains information similar to that contained in BCBSA's discovery responses. Accordingly, the Court orders Moving Defendants to publicly file a copy of the declaration within three court days.

To the extent BCBSA has moved to strike the declaration (*i.e.*, because BCBSA did not formally produce the declaration as part this suit and did so only as an informal compromise), the motion is denied. The Court does not find BCBSA's analogy to Federal Rule of Evidence 408 persuasive. And as a practical matter, the interest of justice supports the Court having have the full facts regarding BCBSA and its relationship with the FEP before it.

With respect to (2), Moving Defendants cite to several pharmaceutical antitrust cases in which Hilliard & Shadowen was one of the firms representing the plaintiffs. In those cases, Hillard & Shadowen took the position that, *e.g.*, intermediaries such as PBMs, as well as third-party administrators ("TPAs") and administrative services only entities ("ASOs"),[3] could not be class members because they did not bear any risk and thus could not have been injured.[4] Moving Defendants add that this position is consistent with the class certification position that EPPs have taken in the instant case. *See* Mot. at 2 (arguing that EPPS have "defined their classes to include entities that ultimately pay patients' prescription costs, while excluding all financial intermediaries" such as PBMs, TPAs, and ASOs).

## II. DISCUSSION

A. Legal Standard

A motion to dismiss for lack of standing is brought pursuant to Federal Rule of Civil Procedure 12(b)(1). *See Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010) (noting that, "[b]ecause standing and ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised in a Rule 12(b)(1) motion to dismiss"). Such a motion can be facial in nature or factual. *See Pride v. Correa*, 719 F.3d 1130, 1139 (9th Cir. 2013). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their

---

[3] *See* Mot. at 2 (noting that TPAs "manage prescription drug programs for their clients (self-funded employers)" and that ASOs "provide claims administration services and access to pharmacy networks to their clients (self-funded employers)").

[4] The three cases are as follows:

- *In re Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168 (D. Mass. 2013). The EPPs argued that PBMs were not part of the putative class: "PBMs are 'mere conduits' for TPP payments to pharmacies, and as financial intermediaries, are not a part of the putative class." *Id.* at 179.
- *In re Niaspan Antitrust Litig.*, MDL No. 2460, 2021 U.S. Dist. LEXIS 154992 (E.D. Pa. Aug. 17, 2021). The EPPs did "not dispute that ASOs and TPAs are not in the proposed class." *Id.* at *17.
- *In re Loestrin 24 Fe Antitrust Litig.*, 410 F. Supp. 3d 352 (D.R.I. 2019). The defendants in the case argued that "PBMs bear some of the risk of drug prices and thus would have absorbed part of the TPPs' injury, rendering some TPPs uninjured," but the EPPs disagreed. *Id.* at 405. The EPPs argued that "[a] PBM's role is not as 'the ultimate payor of prescription benefits, but rather it acts as an intermediary to facilitate payment for prescription drugs.'" *Id.*

7

face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air For Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Here, Moving Defendants are making a factual attack.

> In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment. The court need not presume the truthfulness of the plaintiff's allegations. "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction."

*Id.* However, where a factual motion to dismiss is made and only written materials are submitted for the court's consideration (*i.e.*, no full-on hearing is held), a plaintiff need only establish a *prima facie case* of jurisdiction. *See Societe de Conditionnement en Aluminum v. Hunter Eng'g Co.*, 655 F.2d 938, 942 (9th Cir. 1985); *cf. Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285-86 (9th Cir. 1977) (adopting that approach where personal jurisdiction is at issue). In other words, a plaintiff need only submit written materials "to demonstrate facts which support a finding of jurisdiction in order to avoid a motion to dismiss."[5] *Id.* at 1285. The Ninth Circuit has held that in the context of a motion to dismiss for lack of personal jurisdiction, "[w]here not directly controverted, plaintiff's version of the facts is taken as true[;] [l]ikewise, 'conflicts between the facts contained in the parties' affidavits must be resolved in [plaintiffs'] favor for purposes of deciding whether a prima facie case for personal jurisdiction exists.'" *Doe v. Unocal Corp.*, 248

---

[5] In *Data Disc*, the Ninth Circuit added:

> If a plaintiff make[s] such a showing, . . . it does not necessarily mean that he may then go to trial on the merits. If the pleadings and other submitted materials raise issues of credibility or disputed questions of fact with regard to jurisdiction, the district court has the discretion to take evidence at a preliminary hearing in order to resolve the contested issues. In this situation, where plaintiff is put to his full proof, plaintiff must establish the jurisdictional facts by a preponderance of the evidence, just as he would have to do at trial.

*Data Disc*, 557 F.2d at 1285.

1   F.3d 915, 922 (9th Cir. 2001); *see also Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996)
2   ("consider[ing] items outside the pleading that were considered by the district court in ruling on
3   the 12(b)(1) motion, but resolv[ing] all disputes of fact in favor of the non-movant"; adding that
4   "the standard . . . is similar to the summary judgment standard").

B.   Standing

For Article III standing, a plaintiff must show: (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of (*i.e.*, traceability), and (3) a likelihood that the injury will be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Notably, "a plaintiff must demonstrate standing separately for each form of relief sought," *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 185 (2000) – "whether it be injunctive relief, damages or civil penalties." *Bates v. UPS*, 511 F.3d 974, 985 (9th Cir. 2007).

BCBSA claims past injury on the basis that it has, in the past, paid for the drugs at issue at supracompetitive prices. Implicitly, it seeks injunctive relief because it will continue to pay the supracompetitive prices in the future.

C.   Local Blues v. BCBSA

The first dispute between the parties is whether it is BCBSA who pays for drugs (at the outset) or whether it is the Local Blues. As noted above, BCBSA has substantial sworn evidence that it is responsible for (*i.e.*, administers and underwrites) pharmaceutical benefits whereas the Local Blues are responsible for medical benefits. BCBSA has provided verified interrogatory responses to back up this claim. In response, Moving Defendants argue, in effect, that this is a litigation-crafted position, which is inconsistent with statements that BCBSA has taken in other proceedings (*e.g.*, the Holladay Declaration) as well as the Plan Participation Agreement.

The Court does not find the Holladay Declaration dispositive. As indicated above, BCBSA has explained that the declaration was addressing only medical benefits and not pharmaceutical benefits.

As for the Plan Participation Agreement, § 1 addresses "Functions of the [BCBSA]." Section 1.8 specifies that BCBSA shall

> [p]erform central administrative services for FEP directly or through an agent, including but not limited to:
>
> . . . .
>
> (e) execution of contracts on behalf of Participating Plans [*i.e.*, Local Blues] with vendors that are providing health care services or supplies or other administrative services for the [FEP] on a national basis, including a mail order prescription drug benefit and a national retail prescription drug program.

Stuhan Decl., Ex. A (PPA § 1.8(e)). Section 2 addresses "Functions of the Plan." Section 2.3 provides that the Local Blue shall "[u]nderwrite and administer FEP benefits, in accordance with the terms of the [OPM] Contract and in the manner set forth herein, as assigned pursuant to Schedule A." Stuhan Decl., Ex. A (PPA § 2.1).

Given the language above, Moving Defendants do have a basis for contending that the Local Blues are responsible for both medical and pharmaceutical benefits; however, the language of the agreement is not crystal clear – *i.e.*, there is some ambiguity. At this juncture, the ambiguous language of the Plan Participation Agreement is not dispositive. Given BCBSA's verified interrogatory responses, BCBSA has, for purposes of this motion, laid out a prima facie case to support its position that it – and not the Local Blues – administers and underwrites the pharmaceutical benefits.

D.   OPM v. BCBSA

Moving Defendants argue that, even if it is BCBSA who administers and underwrites the pharmaceutical benefits (or at least, there is a prima facie showing of such), they are still entitled to dismissal because BCBSA is ultimately nothing more than a financial intermediary – *i.e.*, it does not pay for the drugs itself and any payment it has made has always been fully reimbursed by OPM.

To the extent Moving Defendants contend that BCBSA does not pay for any drugs itself, BCBSA has established a prima facie case that it does. As noted above, the prior Stuhan Declaration expressly noted as follows: "When an FEP beneficiary presents a covered prescription, [BCBSA] pays its pharmacy benefits manager for the covered portion of that prescription *from its own funds in its own name*," and "[o]nly later . . . reconcile[s] the financial

10

aspects of that payment with OPM [*i.e.*, gets reimbursement from OPM]." Prior Stuhan Decl. ¶ 10 (emphasis added). BCBSA's interrogatory responses are consistent with the prior Stuhan Declaration. *See* Barnes Decl., Ex. B (Rog Resp. at 15) (stating that "BCBSA makes funds available to the PBM for any claims submitted by retail pharmacies on behalf of FEP members" and, "[n]early simultaneously in most instances, BCBSA requests an aggregate drawdown from the LOCA to reimburse BCBSA for the aggregate payments it has made in that period, including any funding provided to the PBM for pharmacy payments made by the PBM on behalf of the FEP"). And nothing in the OPM contract squarely contradicts either the prior Stuhan Declaration or the interrogatory responses. *See, e.g.*, Burke Decl., Ex. B (OPM Contract § 3.1(a)) (contract simply provides that "OPM will pay to the Carrier, in full settlement of its obligations under this contract . . . the subscription charges received for the Plan by the Employees Health Benefits Fund . . .").

Finally, the Court takes into account BCBSA's position, as reflected in its interrogatory responses, that, based on § 3.1(a) of the OPM contract, OPM does bear some insurance risk, which distinguishes it from a mere financial intermediary. As noted above, BCBSA states in its interrogatory responses that,

> [t]o the extent that the premiums charged by BCBSA and collected by OPM do not cover the health benefits payments required for enrollees of the Federal Employee Plan, *BCBSA and/or the 35 [Local Blues] are responsible for any overages*. . . . BCBSA does not receive reimbursement from OPM for any overages. In other words, BCBSA and the [Local Blues] administering the FEP carry insurance risk in that they must pay for the health benefits and expenses if all the funds associated with the FEP in the U.S. Treasury Fund are exhausted . . . .

Barnes Decl., Ex. B (Rog Resp. at 14-15) (emphasis added). The fact that, "during the Relevant Period, there has not been a situation where the funds available to BCBSA from OPM were completely depleted," Barnes Decl., Ex. B (Rog Resp. at 24), does not mean that BCBSA is merely a financial intermediary without insurance risk.

At the hearing, Moving Defendants suggested that the account from which BCBSA makes payments is comparable to an escrow account – *i.e.*, that BCBSA may manage the account but it does so on behalf of the federal government and BCBSA does not put any of its own money into

11

the account to pay for the drugs. However, Moving Defendants have not offered any specific evidence to support its position (*i.e.*, showing that the BCBSA does not initially put up its own money).[6] In any event, given the Prior Stuhan Declaration and sworn interrogatory answers, even if challenged factually by Defendants, BCBSA has made out a prima facie case sufficient to survive the instant motion based on the applicable legal standard discussed above.

To the extent Moving Defendants protest that BCBSA cannot claim to have suffered any injury because it has always been reimbursed in full by OPM, the Court rejects the argument that entitlement to reimbursement negates the fact of injury for standing purposes. Several courts have implicitly found Defendants' position unavailing. For example, in *In re Nexium Antitrust Litigation*, 777 F.3d 9 (1st Cir. 2015), the First Circuit noted (in addressing the issue of antitrust injury):

> "Paying an overcharge caused by the alleged anticompetitive conduct on a single purchase suffices to show . . . impact or fact of damage."
>
> . . . [D]efendants incorrectly assume that if a class member offsets an overcharge through later savings attributable to the same or related transaction, there is no injury. *But antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset. See Adams v. Mills*, 286 U.S. 397, 407 (1932) ("In contemplation of law the claim for damages arose at the time the extra charge was paid. Neither the fact of subsequent reimbursement by the plaintiffs from funds of the shippers nor the disposition which may hereafter be made of the damages recovered is of any concern to the wrongdoers." (citations omitted)); *see also Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 n.14 (1972) ("[C]ourts will not go beyond the fact of this injury to determine whether the victim of the overcharge has partially recouped . . . ."). Here, if a class member is overcharged, there is an injury, even if that class member suffers no damages.

*Id.* at 27 (emphasis added). *See also Laron, Inc. v. Constr. Res. Servs.*, No. CV-07-00151-PCT-

---

[6] As indicated above, the OPM contract does not seem to shed any light on this matter. *See generally* Burke Decl., Ex. B (OPM Contract § 3.1 *et seq.*). For example, even if, under the contract, BCBSA has an obligation to "invest and reinvest all FEHB funds on hand that are in excess of the funds needed to promptly discharge the obligations incurred under this contract" and "[a]ll investment income earned on FEHB funds shall be credited to the Special Reserve on behalf of the FEHBP," Burke Decl., Ex. B (OPM Contract § 3.4(a)-(b)), that does not address the issue of whether BCBSA has an account from which it uses its own money to pay for drugs in the first instance (*i.e.*, before seeking reimbursement from OPM). Similarly, that BCBSA is required under the contract not to co-mingle FEHB funds with funds from other sources does not mean it does not have an account from which it uses its own money to pay for drugs in the first instance.

1  NVW, 2007 U.S. Dist. LEXIS 112190, at *11 (D. Ariz. Nov. 5, 2007) (stating that plaintiff

2  "suffered a direct injury, regardless of whether it later passed that injury on").

3        In *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758 (2010), the California Supreme Court made

4  the connection to standing more explicit.

> While Manufacturers argue that ultimately Pharmacies suffered no compensable loss because they were able to mitigate fully any injury by passing on the overcharges, this argument conflates the issue of standing with the issue of the remedies to which a party may be entitled. That a party may ultimately be unable to prove a right to damages (or, here, restitution) does not demonstrate that it lacks standing to argue for its entitlement to them. (*See Southern Pac. Co. v. Darnell-Taenzer Co.*, supra, 245 U.S. at p. 534 ["The plaintiffs suffered losses … when they [over]paid. Their claim accrued at once in the theory of the law and it does not inquire into later events."]; *Adams v. Mills*, supra, 286 U.S. at p. 407 ["In contemplation of law the claim for damages arose at the time the extra charge was paid," notwithstanding any subsequent reimbursement].) The doctrine of mitigation, where it applies, is a limitation on liability for damages, not a basis for extinguishing standing. (*See Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1066 ["'The rule of [mitigation of damages] comes into play after a legal wrong has occurred, but while some damages may still be averted . . . .'" (quoting Prosser & Keeton, Torts (5th ed. 1984) § 65, p. 458)].) This is so because mitigation, while it might diminish a party's recovery, does not diminish the party's interest in proving it is entitled to recovery.

*Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 789 (2010).

      Likewise, the Sixth Circuit also, in effect, made the connection to standing/mootness.

> Does the injury suffered by such a person vanish if he is able to recoup the illegal overcharge by passing it on to his own customers? The answer is not difficult, at least insofar as the constitutional aspect of the question is concerned. Just such an issue was present in *Southern Pacific Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531 (1918), and in that case Mr. Justice Holmes – speaking this time for a unanimous Supreme Court – said in effect that the plaintiff who has subsequently passed on the overcharge to his customers is no more deprived of standing to sue than is the claimant whose loss happens to be covered by insurance. *Id.* at 534.

*Cty. of Oakland v. Detroit*, 866 F.2d 839, 845-46 (6th Cir. 1989).[7]

---

[7] The Court acknowledges that, in *County of Oakland*, the Sixth Circuit also found guidance from the Supreme Court's decision in *Bacchus Imports v. Dias*, 468 U.S. 263 (1984).

      The plaintiffs in *Dias* were wholesalers who sought to challenge the

13

### III.    CONCLUSION

Based on the evidence of record, the Court finds that BCBSA has established a prima facie case that it, and not the Local Blues, pays for the drugs at issue and that it pays for the drugs out of its own funds as an initial matter (even if later reimbursed by OPM) and is subject to some

///

///

///

///

///

///

---

constitutionality of an excise tax imposed by the State of Hawaii on wholesale sales of liquor.  The plaintiff wholesalers added the full amount of the tax to the full amount of the wholesale prices; the plaintiffs' customers, who were licensed retailers, were charged the wholesale price plus tax.  The state argued that the wholesalers had no standing to challenge the tax because they had not shown that the tax inflicted any "economic injury" on the wholesalers.  The Supreme Court rejected this argument out of hand, declaring that the plaintiff wholesalers "plainly" had standing to challenge the tax. *Id.* at 267.  (The basis of the challenge was that certain locally produced liquors had been exempted from the tax, with the result that the tax arguably discriminated against interstate commerce.)

The *Dias* court gave two reasons for concluding that the plaintiff wholesalers had shown an injury sufficient to give them standing to contest the constitutionality of Hawaii's tax.  In the first place, the Court pointed out,

"the wholesalers are . . . liable for the tax.  Although they may pass it on to their customers, and attempt to do so, they must return the tax to the State whether or not their customers pay their bills." *Id.*

"Furthermore," the Court said,

"even if the tax is completely and successfully passed on, it increases the price of [the wholesalers'] products as compared to the exempted beverages, and the wholesalers are surely entitled to litigate whether the discriminatory tax has had an adverse competitive impact on their business." *Id.*

*Cty. of Oakland*, 866 F.2d at 846.  Arguably, *Dias* presents a situation where there is a basis to doubt the plaintiff could be made whole.  Nonetheless, *County of Oakland*'s rationale (quoting *Southern Pacific*) is not confined to that factual scenario.

14

insurance risk.  It is not simply a financial intermediary.[8]  Accordingly, the Court denies Moving Defendants' motion to dismiss for lack of standing.[9]

This order disposes of Docket Nos. 860 and 894.

**IT IS SO ORDERED**.

Dated: March 14, 2022

_____
EDWARD M. CHEN
United States District Judge

---

[8] Based on the Court's analysis above, it need not consider whether BCBSA can, in essence, bring a claim on behalf of OPM or the FEP (whether under the statutory/regulatory scheme, under the OPM contract, or as a matter of practice with the OPM).

[9] The Court's holding is limited to whether BCBSA has established a prima facie case of standing in the context of this motion.  The Court has not addressed whether at some other stage, it could find BCBSA has not established standing by, *e.g.*, a preponderance of the evidence.