UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STALEY, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>GILEAD SCIENCES, INC., et al.,<br><br>    Defendants. | Case No. 19-cv-02573-EMC<br><br>REDACTED<br><s>FILED UNDER SEAL</s><br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS CLAIMS OF PLAINTIFFS STALEY AND SNIPE**<br><br>Docket No. 877 |

    Currently pending before the Court is a motion to dismiss filed by Gilead and Janssen (collectively, "Defendants"). Defendants argue that all claims asserted by two of the named end-payor plaintiffs ("EPPs") – Peter Staley and Michael Snipe – should be dismissed because they lack standing to seek relief. Based on the motion for class certification, the EPPs do not seek to have either Mr. Staley or Mr. Snipe be a class representative any longer. However, the two still have individual claims. Defendants argue that the individual claims should be dismissed because Mr. Staley and Mr. Snipe have testified that did not purchase any of Defendants' drugs during the relevant time period.[1] Defendants also assert that each individual has indicated he has no intent to purchase any of Defendants' drugs in the future.

    In assessing Defendants' arguments, the Court bears in mind that, as acknowledged in the opposition brief, Mr. Staley and Mr. Snipe are only seeking injunctive relief at this point. They are not seeking damages. Having considered the parties' briefs and accompanying submissions, as

---

[1] In their papers, the parties snipe at each other with respect to whether it was clear from the pleadings and/or discovery responses whether Mr. Staley and Mr. Snipe purchased any of Defendants' drugs during the relevant time period. For purposes of the pending motion, this disagreement is largely immaterial.

well as the oral argument of counsel, the Court hereby **GRANTS** Defendants' motion.[2]

## I.   FACTUAL & PROCEDURAL BACKGROUND

A.   FAC

For purposes of the pending motion, below are the most relevant factual allegations in the operative first amended complaint ("FAC").

Antiretrovirals are a class of drugs that target HIV. Modern antiretroviral drug regimens are made up of a combination, or cocktail, or drugs. The antiretroviral cocktails are known as cART regimens. *See* FAC ¶ 2. "The term 'cART drugs' refers to all antiretroviral drugs used in the treatment of HIV as part of a combination therapy." FAC ¶ 392.

Per the EPPs, there are "two types of markets [that] are relevant [in the litigation]: (a) the market for each of Viread, Emtriva, Tybost, Vemlidy, Truvada, Descovy, Atripla, Complera, Odefsey, Stribild, Genvoya, Reyataz, Evotaz, Prezista, Prezcobix, Edurant, and Symtuza and its AB-rated generic equivalent; and (b) the cART Market." FAC ¶ 386.

The first market is really a number of markets, with each market being made up one of cART drug. *See* FAC ¶ 389 (asserting that "[a] relevant market for evaluating [Defendants'] conduct is the market for each of [the] products and its AB-rated generic equivalent"). Each of these drugs is manufactured by a defendant(s).

The second market is a single market but is made up of a number of cART drugs.

> The cART drugs that comprise the cART Market include Agenerase, Aptivus, Atripla, Biktarvy, Cimduo, Combivir, Complera, Crixivan, Delstrigo, Descovy, Dovato, Edurant, Emtriva, Epivir, Epzicom, Evotaz, Fortovase, Fuzeon, Genvoya, Hivid, Intelence, Invirase, Isentress, Juluca, Kaletra, Lexiva, Norvir, Odefsey, Odefsey, Pifeltro, Prezcobix, Prezista, Rescriptor, Retrovir, Retrovir Iv Inf, Reyataz, Selzentry, Stribild, Sustiva, Symfi, Symtuza, Temixys, Tivicay, Triumeq, Trizivir, Trogarzo, Truvada, Tybost, Videx, Viracept, Viramune, Viread, Vitekta, Zerit, Ziagen, and their AB-rated generic substitutes.

FAC ¶ 392. Notably, many of these drugs are manufactured by Defendants but not all are – *e.g.*,

---

[2] As a general matter, briefing in this case has been exemplary to date. The Court, however, notes that Mr. Staley and Mr. Snipe's brief, although only 22 pages in length, includes 77 footnotes – a number of which are lengthy. This practice is not helpful to the Court, and the Court expects that it will not be repeated in future filings.

2

1    ▮, Isentress, Selzentry, and Viramune are not manufactured by any defendant(s).  *See*

2    Opp'n at 3.  According to the EPPs, these drugs are in the same market because, "[f]rom a clinical

3    perspective, the antiretroviral drugs used in a cART regime are reasonably interchangeable with

4    respect to their use.  Although different types of antiretrovirals target different steps in the HIV

5    life cycle, all of them are used to prevent successful reproduction of the HIV virus."  FAC ¶ 394

6    (adding that, "[i]n treating HIV, doctors and patients choose among the drugs that comprise the

7    cART market").  The EPPs take the position that Gilead dominates the cART market because it

8    controls many of the viable alternatives in the market (*i.e.*, it "sells not one but a portfolio of

9    cART products").  FAC ¶ 398.

10   The EPPs also assert that "[t]he net prices of *all* branded cART drugs are far more than

11   10% higher than they would have been absent Defendants' unlawful conduct."  FAC ¶ 425

12   (emphasis added).

> 427.  Other branded cART drugs, not sold by these Defendants, have followed the Defendants' cART drugs up in price. Given Gilead's dominance of the cART market, the monopoly prices on its products had the predictable effect of causing its competitors to raise prices on their cART drugs. For example, from July 2011 to October 2017, Gilead raised its price on Complera by 45%. During that same period, ViiV Healthcare raised the price of Selzentry (a CCR5 coreceptor antagonist) by 47%. Likewise, until it encountered generic competition Boehringer Ingelheim's NNRTI, Viramune XR, similarly followed Gilead's price increases up in lockstep. In fact, Defendants' unlawful monopolization of the cART market caused the price of every drug in the market to be substantially higher than it would have been absent that conduct.
>
> 428.  The result of Defendant's unlawful conduct has been extraordinary price inflation in the cART market as a whole.
> . . .

23   FAC ¶¶ 427-28.

24   With respect to Mr. Staley and Mr. Snipe specifically, the EPPs allege as follows:

25   • Mr. Staley resides in Pennsylvania.  *See* FAC ¶ 19.  "Mr. Staley purchased and/or

26   paid for some or all of the purchase price for one or more of brand Viread, Emtriva,

27   Truvada, Atripla, Complera, Stribild, Odefsey, Genvoya, Descovy, Vemlidy,

28   Reyataz, Evotaz, Prezista, Prezcobix, Edurant, Symtuza, Tybost, *or other cART*

3

   *drugs other than for re-sale . . . at supracompetitive prices during the Class Period and has thereby been injured.* In addition, there is a substantial probability that Mr. Staley will in the future purchase one or more of these *products manufactured by the Defendants*, and he has purchased and/or intends to purchase generic versions of those drugs, other than for re-sale, once they become available." FAC ¶ 19 (emphasis added).

- Mr. Snipe resides in New York. *See* FAC ¶ 29. The same basic allegation above is made for Mr. Snipe in ¶ 29 of the FAC.

The EPPs also indicate that all EPPs, including but not limited to Mr. Staley and Mr. Snipe, have suffered harm because "Defendants' anticompetitive conduct has . . . stifled innovation, causing tens of thousands of people living with HIV to needlessly suffer debilitating side effects from inferior products." FAC ¶ 15; *see also* FAC ¶¶ 189-95 (discussing "[r]educed innovation by Gilead's competitors" as well as by Gilead).

B.   <u>Discovery Related to Mr. Staley and Mr. Snipe</u>

The EPPs initiated their suit on May 14, 2019. *See* Docket No. 1 (complaint). Thus, the class period starts on May 14, 2015. *See* FAC ¶ 456.

Discovery taken from Mr. Staley and Mr. Snipe reflects as follows.

- **Mr. Staley.**
  o Since 2010, Mr. Staley's drug regimen does not involve drugs manufactured by Defendants (or generics thereof). *See* Burke Decl., Ex. C (Staley Depo. at 27, 36, 41) (indicating that his current regimen since 2010 consists of the following drugs: Isentress, Selzentry, Viramune); Burke Decl., Ex. E (responses to RFA Nos. 34 and 37) (admitting that the only cART drugs purchased during the class period were Isentress, Selzentry, and nevirapine[3] and that no cART drugs manufactured by Defendants were purchased); Burke Decl., Ex. G (at page 11 of responses to interrogatories,

---

[3] Nevirapine is the generic equivalent of Viramune. *See* Opp'n at 3.

4

stating that, "[i]n 2009, Mr. Staley was prescribed a regimen of Isentress, Selzentry, and Viramune, which remains his prescription today").

- He is satisfied with his current regimen and intends to stick to it, although he is "very mindful of wanting something better," "[e]ither a cure or a very long-acting, totally new drug[]." Burke Decl., Ex. C (Staley Depo. at 36) (noting that current regimen is "a handful of pills and taking it twice a day" which is "a pain in the ass"); Burke Decl., Ex. C (Staley Depo. at 45) (stating that he has no "current plan" to switch his regimen but he "keep[s] looking at the stuff that's coming out every year as possibilities"); Burke Decl., Ex. C (Staley Depo. at 53) (stating that he "look[s] at the state of AIDS research and new drugs as they come along and constantly in my head thinking, you know, should I consider something easier"); Burke Decl., Ex. C (Staley Depo. at 208) (stating that he does not "see something immediately better on the horizon, something I can take once for six months or once for two months"; "there aren't any clear advantages to switch at this point"). Also, "if some reason [he] need[ed] to switch regimens, [he] would relook at all of the drugs." Burke Decl., Ex. C (Staley Depo. at 44). He is resistant to most nucleoside analogues, *see* Burke Decl., Ex. C (Staley Depo. at 40-41) – which, per Defendants, are products that the FAC focuses on. *See* Reply at 3 (asserting that "Mr. Staley has developed resistance to nucleoside and nucleotide analogues, known as 'NRTIs,' the class of antivirals in which Defendants' challenged products fall"). However, he would "probably do another resistance test . . . to see where [his] resistance profile has moved in ten years. Based on that, that could open up – reopen possibilities." Burke Decl., Ex. C (Staley Depo. at 44).

- **Mr. Snipe.**
  - Mr. Snipe has not been prescribed any of Defendants' drugs, or generic versions thereof, during the class period. *See* Burke Decl., Ex. D (Snipe

5

|   |   |
|---|---|
| 1 | Depo. at 63-64) (stating that, since 5/14/205, the only HIV medication he |
| 2 | has taken is ▮▮▮▮; he has not taken any drug manufactured by |
| 3 | Defendants); *see also* Burke Decl., Ex. E (responses to RFA. Nos. 27 and |
| 4 | 31) (admitting that ▮▮▮▮ was the only drug used during the class period |
| 5 | and that Mr. Snipe did not use a cART product manufactured by Defendants |
| 6 | during the class period); Burke Decl., Ex. F (at page 11 of responses to |
| 7 | interrogatories, stating that, "[i]n or about 2015, [Mr. Snipe] was prescribed |
| 8 | ▮▮▮▮, which remains his prescription today").[4] In addition, he has not |
| 9 | paid for any HIV drugs, whether manufactured by Defendants or others. |
| 10 | *See* Burke Decl., Ex. D (Snipe Depo. at 63, 110, 128, 132, 135). |

- Mr. Snipe does not have plans to ▮▮▮▮. *See* Burke Decl., Ex. D (Snipe Depo. at 64-65) (in response to question asking if he has "any plans to switch from ▮▮▮▮ to a different HIV therapy," stating ▮▮▮▮). Whether he would switch would depend on ▮▮▮▮. *See* Burke Decl., Ex. D (Snipe Depo. at 129).

## II. DISCUSSION

### A. Legal Standard

A motion to dismiss for lack of standing is brought pursuant to Federal Rule of Civil Procedure 12(b)(1). *See Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010) (noting that, "[b]ecause standing and ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised in a Rule 12(b)(1) motion to dismiss"). Such a motion can be facial in nature or factual. *See Pride v. Correa*, 719 F.3d 1130, 1139 (9th Cir. 2013). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air*

---

[4] It appears that Mr. Snipe used Atripla (a Gilead drug) back in 2014 and 2015 – but ended his use of the drug before the class period (which starts on 5/14/2015). *See* Opp'n at 3, 7.

6

*For Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

> In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment. The court need not presume the truthfulness of the plaintiff's allegations. "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction."

*Id.* However, where a factual motion to dismiss is made and only written materials are submitted for the court's consideration (*i.e.*, no full-on hearing is held), a plaintiff need only establish a prima facie case of jurisdiction. *See Societe de Conditionnement en Aluminum v. Hunter Eng'g Co.*, 655 F.2d 938, 942 (9th Cir. 1985); *cf. Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285-86 (9th Cir. 1977) (adopting that approach where personal jurisdiction is at issue). In other words, a plaintiff need only submit written materials "to demonstrate facts which support a finding of jurisdiction in order to avoid a motion to dismiss." *Id.* at 1285.

At the hearing, the parties disagreed as to whether Defendants have launched a facial or factual attack on Mr. Staley and Mr. Snipe's standing. It is clear that the challenge here is factual in nature. In their opening motion, Defendants submitted evidence to the Court beyond the operative pleading – *e.g.*, deposition testimony and discovery responses from the individual plaintiffs. Therefore, Mr. Staley and Mr. Snipe were obligated to "furnish affidavits or other evidence necessary to satisfy [their] burden of establishing [standing]." *Safe Air*, 373 F.3d at 1039. Because no evidentiary hearing was requested or held – *i.e.*, only written materials were provided – Mr. Staley and Mr. Snipe's burden was to establish only a prima facie case of standing. However, for the reasons discussed below, even with that more liberal standard, Mr. Staley and Mr. Snipe have not made the required showing.

B. <u>Elements of Standing</u>

For Article III standing, a plaintiff must show: (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of (*i.e.*, traceability), and (3) a likelihood that the injury will be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "[A] plaintiff must demonstrate standing separately for

7

each form of relief sought," *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 185 (2000), "whether it be injunctive relief, damages or civil penalties." *Bates v. UPS*, 511 F.3d 974, 985 (9th Cir. 2007).

As noted above, in the instant case, Mr. Staley and Mr. Snipe seek injunctive relief only. They claim standing to seek injunctive relief based on three different theories:

(1) Mr. Staley and Mr. Snipe have in the past bought cART drugs from non-defendant companies and will continue to do so in the future. Defendants' anticompetitive conduct not only boosts the prices of their own drugs but has also led to the non-defendant companies increasing the prices of their drugs. If Defendants' conduct is enjoined, this will have an impact on how the non-defendant companies price their drugs.

(2) Mr. Staley and Mr. Snipe may buy Defendants' drugs (or generics thereof) in the future.

(3) Mr. Staley and Mr. Snipe are likely to suffer in the future because Defendants' anticompetitive conduct stifles innovation.

According to Defendants, the individual plaintiffs have failed to show that they have standing under any of these theories.

C. <u>Non-Defendant Companies' Drugs</u>

As noted above, Mr. Staley and Mr. Snipe's first theory is that, unless Defendants' anticompetitive conduct is enjoined, the non-defendant companies from whom they purchase their cART drugs will continue to charge high prices in "lockstep" with Defendants.[5] In response, Defendants argue that this theory should be rejected because it is entirely speculative in nature. That is, it is speculative for the individual plaintiffs to claim that it is Defendants' conduct that is responsible for the allegedly high prices charged by the non-defendant companies. Defendants

---

[5] In *Illinois Brick Co. v. Illinois* 431 U.S. 720 (1977), the Supreme Court "established a bright-line rule that . . . bars suits by indirect purchasers," but only with respect to damages. *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019) (emphasis omitted); *see also Pecover v. Elecs. Arts Inc.*, 633 F. Supp. 2d 976, 980 (N.D. Cal. 2009) (noting that "[a]pportionment challenges and duplicative recovery simply do not come into play in suits seeking injunctive relief and thus *Illinois Brick* does not apply").

8

1    add that the causation matter becomes even more complicated where there is multi-tier
2    distribution, as here. *See, e.g.*, Reply at 5 ("What the Opposition conveniently omits is that
3    Plaintiffs also must prove that the entire distribution chain of non-conspirator wholesalers,
4    retailers, PBMs, and insurers chose to set the prices of the non-Defendant products that Mr. Staley
5    took due to Defendants' conduct . . . .").
6         In support of their position, Defendants cite *In re Coordinated Pretrial Proceedings in*
7    *Petroleum Products Antitrust Litigation*, 691 F.2d 1335 (9th Cir. 1982). In *Petroleum Products*,
8    the Ninth Circuit addressed several antitrust cases brought against oil companies. The plaintiffs
9    alleged that the oil companies had combined and conspired to raise or stabilize the prices of
10   refined petroleum products in violation of §§ 1 and 2 of the Sherman Act. *See id.* at 1337. On
11   appeal, the Ninth Circuit addressed the plaintiffs' asserted right to damages

> under an "umbrella" theory of liability. Plaintiffs contend that defendants' successful price-fixing conspiracy created a "price umbrella" under which non-conspiring competitors of the defendants raised their gasoline prices to an artificial level at or near the fixed price. Since defendants are allegedly responsible for creating a market situation where conduct of this nature is possible, plaintiffs argue that defendants should be held responsible for damages resulting from their competitors' higher prices.
>
> The umbrella theory is essentially a consequential damages theory. It seeks to hold price-fixers liable for harm allegedly flowing from the illegal conduct even though the price-fixing defendants received none of the illegal gains and were uninvolved in their competitors' pricing decisions.

*Id.* at 1338-39.

Looking to *Illinois Brick*, the Ninth Circuit held that the held that the plaintiffs' umbrella claim was not viable.

> [We] have little hesitancy in concluding that the limitations recognized in *Illinois Brick* bar umbrella claims in the context of the multi-tiered distribution chain alleged here. First, to the extent that plaintiffs seek recovery for overcharges for gasoline originally purchased from defendants by independent refiners, the overcharge to plaintiffs may simply result from a pass-on of the original unlawfully inflated price. If so, it falls squarely within *Illinois Brick*. Even if plaintiffs were somehow able to prove that there was no pass-on, and that the inflated prices in the non-conspirators' distribution chain were the independent result of an umbrella effect, the danger of double recovery condemned by *Illinois Brick* would

9

> remain. The independent refiners would still have an enforceable claim for damages against the defendants for the entire unlawful overcharge to them, without reduction for damages suffered by plaintiffs. The result, if plaintiffs were to succeed here, would be liability of the defendants twice for the effects of the same overcharge.
>
> The second reason that plaintiffs' claims are barred by *Illinois Brick*, wholly apart from the problems of pass-on and double recovery, is that they are unacceptably speculative and complex. Thus, any umbrella claims plaintiffs may assert for damages based on those purchases of gasoline not acquired originally from the defendants also must fail. A major theme in *Illinois Brick* is that the "feasibility and consequences of implementing particular damages theories may, in certain limited circumstances, be considered in determining who is entitled to prosecute an action brought under § 4." Although we recognize that the "difficulty of ascertainment [should not be] confused with a right of recovery," we nevertheless must consider whether "a claim rests at bottom on some abstract conception or speculative measure of harm."
>
> Under an umbrella theory, the result of any attempt to ascertain with reasonable probability whether the non-conspirators' prices resulted from the defendants' purported price-fixing conspiracy or from numerous other pricing considerations would be speculative to some degree. When the fact of a multi-tiered distribution system is imposed upon the above complex set of variables, the obstacles to intelligent inquiry become nearly insurmountable. The causal effect of each pricing decision would have to be pursued through the chain of distribution. Not only would we be required to speculate that plaintiffs were injured solely as the result of umbrella pricing, but also we would be required to sanction complex judicial inquiry into the pricing decisions of sellers remote from plaintiffs. We decline to do either, and accordingly hold that under the facts of this case, application of an umbrella theory is unwarranted.

*Id.* at 1340-41.

Mr. Staley and Mr. Snipe seek to distinguish *Petroleum Products* because the case did not address Article III standing but rather statutory (or antitrust) standing. Defendants acknowledge this distinction but maintain that *Petroleum Products* is nevertheless instructive because of the traceability and concreteness requirements for Article III standing. *See* Reply at 12 ("The Ninth Circuit's holding [in *Petroleum Products*] that umbrella claims are 'necessarily conjectural and speculative in nature,' and that the question of 'whether the non-conspirators' prices resulted from the defendants' purported price-fixing conspiracy or from numerous other pricing considerations would be speculative to some degree,' address issues relevant to Article III's 'traceability' and 'concreteness' requirements.").

10

For purposes of the pending motion, although the reasoning of *Petroleum Products* appears persuasive, the Court need not resolve the issue of whether *Petroleum Products* should serve as a bar to Mr. Staley and Mr. Snipe's umbrella claim, which seeks injunctive relief and not damages as a remedy. Even assuming *Petroleum Products* is not a bar,[6] Defendants have pointed out an independent problem with the individual plaintiffs' ability to seek injunctive relief. Standing for injunctive relief turns on whether Mr. Staley and/or Mr. Snipe is threatened with a future injury. Specifically, "[a] plaintiff threatened with future injury has standing to sue if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *McGee v. S-L Snacks Nat'l*, 982 F.3d 700, 709 (9th Cir. 2020) (internal quotation marks omitted). Neither individual plaintiff has met this standard.

For example, Mr. Snipe admits that, in the past, he has not paid for any cART drug at all, whether manufactured by Defendants or any other company. Furthermore, there is no other indication that he would be likely to pay for a cART drug in the future.

Mr. Snipe argues it should not matter that he has never paid for his cART drugs. He invokes the collateral source doctrine to argue that, once there was an overcharge, he was necessarily injured, even if someone else – *i.e.*, Medicaid – ultimately paid for the cost of the drugs. But even if the collateral source doctrine has applicability in the antitrust context (a matter that Defendants dispute), the doctrine is implicitly predicated on the plaintiff having an obligation to pay in the first instance. In other words, if the plaintiff does have an obligation to pay, then it is fair to say that the plaintiff has been injured regardless of a collateral source covering the loss. *See In re SuperValu, Inc., Customer Data Sec. Breach Litig.*, No. 14-MD-2586 ADM/TNL, 2018 U.S. Dist. LEXIS 36944, at *33-34 (D. Minn. Mar. 7, 2018) (noting that plaintiff "invokes the collateral source rule to argue that even if his loss was covered by a collateral source such as his financial institution, he is entitled to recover damages from Defendants" but, "[h]ere, [plaintiff]

---

[6] Mr. Staley and Mr. Snipes have asserted that *Petroleum Products* is not a bar because causation is not the same thing as traceability, with the latter being more forgiving in nature. Furthermore, even if the Court were to consider the issue of causation only, establishing a causal link is arguably less complicated where injunctive relief only is sought (as here) as opposed to damages, *i.e.*, because it is the fact of injury and not any dollar amount that is important.

11

has not alleged that he had an obligation to pay the charge").[7]  Notably, even the authority on which Mr. Snipe relies seems to agree with this view, deeming "Mediciaid recipients . . . *uninjured* consumers" (and thus excluding them from the class under consideration).  *Goda v. Abbott Labs.*, No. 01145-96, 1997 D.C. Super. LEXIS 69, at *24 (D.C. Super. Ct. Feb. 3, 1997) (emphasis added).

Mr. Snipe protests that, even though his current insurance situation means that he does not make any payments now, "his insurance coverage could change" in the future.  Opp'n at 15.  But for standing purposes, future injury cannot be speculative in nature.  As noted above, a threatened future injury must be certainly impending or there must be a substantial risk of future injury.  *See McGee*, 982 F.3d at 709.

As for Mr. Staley, he also cannot claim standing for injunctive relief because, even though he has made copayments in the past, he no longer does so for two of the three drugs he takes: since January 2020, he has been a part of patient assistance programs run by the manufacturers of those drugs.  *See* Reply at 4; Burke Decl., Ex. G (at page 11, stating in interrogatory response that, "[b]eginning in January 2020, [Mr. Staley] enrolled in coupon programs with Merck and ViiV"); *see also* Burke Decl., Ex. H (Mr. Staley's prescription records from 1/1/2017 to 12/28/2019).  There is no indication that he is obligated to make any payments as part of those programs; nor is there any indication that his participation in those programs is likely to end or change in the near future.  Therefore, Mr. Staley is effectively in the same position as Mr. Snipe; he has not demonstrated an obligation to pay.  As for the third drug, it appears that Mr. Staley does make

---

[7] *See also Cont'l 332 Fund, LLC v. Albertelli*, 317 F. Supp. 3d 1124, 1145 (M.D. Fla. 2018) (noting that "Defendants cite no authority to suggest the court should look to recovery from a third-party when determining whether Plaintiffs have suffered an injury in fact[;] [t]hat type of recovery is typically addressed by the collateral source rule"); *Gillespie v. Travelscape LLC*, No. C13-0622 RSM, 2014 U.S. Dist. LEXIS 119148, at *6 (W.D. Wash. Aug. 26, 2014) (stating that "the collateral source rule is inapplicable where a plaintiff cannot plead that he or she has suffered the damages sought"; in other words, the collateral source doctrine "'applies only to preserve an award of damages and does not affect a party's standing to litigate a claim'"); *cf. Williamson v. Genentech, Inc.*, No. 19-cv-01840-JSC, 2020 U.S. Dist. LEXIS 46999, at *16 (N.D. Cal. Mar. 18, 2020) (noting that "'[t]he term "injured person" in the context of the collateral source rule connotes one who has sustained personal injuries or property damage at the hands of a tortfeasor'[;] [t]he rule does not apply where a person cannot plead he suffered the damages for which recovery is sought [and] [i]t is thus unsurprising that no court has used the collateral source rule to find Article III standing").

12

1   copayments but (as Defendants contend), because he is buying a *generic* version of the drug, he
2   cannot have been injured. *See* Reply at 4 (noting that Mr. Staley's payment for a generic drug
3   "directly defeats Plaintiffs' suggestion that [he] could have been monetarily injured because he
4   purchased brand products instead of generic ones").[8]

Accordingly, both Mr. Staley and Mr. Snipe lack standing to seek injunctive relief based on their "price umbrella" theory. Assuming such a theory is viable where a plaintiff seeks injunctive relief only, as opposed to damages, Mr. Staley and Mr. Snipe have failed to provide evidence of at least a substantial risk that the harm will occur. There is no indication, *e.g.*, that, in the near future, they will be obligated to pay for any non-defendant brand cART drugs.

D.  Defendants' Drugs

Mr. Staley and Mr. Snipe's second theory of standing – *i.e.*, that they intend to buy Defendants' drugs in the future – also lacks merit. The deposition testimony from each does not suggest that either one has a sufficiently concrete plan to buy any drug from Defendants in the future. Indeed, the fact that Mr. Staley is resistant to most nucleoside analogues, which are the main drugs at issue in this case, weighs heavily against standing, notwithstanding Mr. Staley's testimony that he would do a resistance test in the future to see if his resistance profile has changed. As for Mr. Snipe, even if he follows his doctor's recommendations, there is nothing to indicate that his doctor is contemplating moving him over to a different regimen.

In the opposition brief, Mr. Staley and Mr. Snipe contend still that, "[b]y sheer numbers, there is a significant probability that [they] will take one or more of Defendants' drugs in the future." Opp'n at 19. For example,

> [Mr. Staley] currently takes Isentress, an integrase inhibitor; Gilead makes integrase inhibitor Elvitegravir and has a 55% share of that drug class. FAC ¶ 419. Mr. Staley also currently takes generic Virimune, an NNRTI; Defendants make NNRTIs Efavirenz and Rilpivirine and have a greater than 77% share of that drug class. *Id.* ¶ 417. . . . Mr. Snipe . . . takes a drug with an NRTI [nucleoside/nucleotide analogue] in a market in which Gilead has more than an 80% share. *Id.* ¶ 437.

---

[8] It also is unclear whether only the branded versions of the non-defendant companies' drugs (not generics) are allegedly in "lockstep" with Defendants' drugs in terms of price.

13

1    Opp'n at 19. These allegations make it possible that Mr. Staley and Mr. Snipe could take a Gilead
2    drug in the future. But at this point, that possibility is still too remote and not sufficiently concrete
3    for purposes of standing to obtain injunctive relief.

4    E.    <u>Innovation</u>

5    Finally, in the third theory of standing for injunctive relief, Mr. Staley and Mr. Snipe assert
6    that they will suffer future injury because Defendants' anticompetitive conduct has impeded
7    innovation. In the FAC, Mr. Staley and Mr. Snipe refer to (1) reduced innovation by Gilead's
8    competitors and (2) reduced innovation by Gilead. *See* FAC ¶ 188 *et seq.*

9    Like the theories above, this theory is also problematic. With respect to reduced
10   innovation by Gilead's competitors, the FAC contains allegations that "Defendants' conduct has
11   prevented competitors from developing dozens of specifically identifiable FDCs," FAC ¶ 191 –
12   *i.e.*, drugs using generic versions of Defendants' drugs (*e.g.*, generic TDF, generic FTC, etc.). *See*
13   FAC ¶ 192. The problem here is that, as discussed above, there is no indication that either
14   individual plaintiff intends to take Defendants' drugs in the future or generic versions thereof.

15   As for reduced innovation by Gilead, the FAC contains allegations about what Gilead has
16   done *in the past* – *e.g.*, particularly with respect to TAF and TAF products. *See* FAC ¶ 194 *et seq.*
17   But there is no specificity about what innovation Gilead will not undertake in the future. At the
18   hearing, Mr. Staley and Mr. Snipe stated that the EPPs have an expert who will opine on reduced
19   innovation. But Mr. Staley and Mr. Snipe did not offer any evidence from that expert in support
20   of their opposition here. Although the Court will not foreclose the EPPs from relying on their
21   expert in the future, Mr. Staley and Mr. Snipe here were obligated to provide evidence in support
22   of their claim of reduced innovation by Gilead – or at least point to allegations in the FAC to
23   support their claim of reduced innovation. They have done neither. Furthermore, the injury from
24   the future lack of innovation is not sufficiently concrete and imminent to confer standing.

25   ///
26   ///
27   ///
28   ///

## III. CONCLUSION

For the foregoing reasons, the Court dismisses the individual claims for injunctive relief brought by Mr. Staley and Mr. Snipe.[9] The dismissal is with prejudice.

As a temporary matter, the Court files the entirety of this order under seal. The Court orders the parties to meet and confer to determine which parts of the order should be filed under seal. Within a week of the date of this order, the parties shall file a joint stipulation regarding sealing.

This order disposes of Docket No. 877.

**IT IS SO ORDERED**.

Dated: April 11, 2022

EDWARD M. CHEN
United States District Judge

---

[9] The Court notes that Mr. Staley's and Mr. Snipes's claims add little to the extensive and comprehensive claims asserted by multiple parties in the related cases presently before the Court.