1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6
7

STALEY, et al.,

Case No. 19-cv-02573-EMC

8

Plaintiffs,

**FILED UNDER SEAL**

9

v.

10

GILEAD SCIENCES, INC., et al.,

11

Defendants.

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTIONS TO DISMISS INDIVIDUAL
HEALTH PLAN PLAINTIFFS'
CLAIMS**

12

Docket Nos. 889, 891

13
14
15

Currently pending before the Court are motions related to the complaints filed by the

16

Individual Health Plan Plaintiffs ("IHPPs"). The IHPPs are seven health insurers: (1) Aetna; (2)

17

BCBS Fla.; (3) BCBS S.C.; (4) Centene; (5) HCSC; (6) Humana; and (7) Triple-S. Each has

18

brought an individual action. There are a total of twelve lawsuits. All seven IHPPs have sued

19

Gilead, BMS, and Janssen (collectively, "Brand Defendants"). Five of the IHPPs have also sued

20

Teva (*i.e.*, BCBS Fla., BCBS S.C., Centene, Humana, and Triple-S). Both the Brand Defendants

21

and Teva have moved to dismiss all or some of the complaints. The Brand Defendants have

22

joined Teva's motion to dismiss, to the extent applicable, and vice-versa.

23

Having considered the parties' briefs and accompanying submissions, as well as the oral

24

argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part the two motions.

25

This ruling applies to all of the IHPPs, except for Aetna. For Aetna, as the Court has granted the

26

motion to remand, the motions to dismiss are denied without prejudice (*i.e.*, the Brand Defendants

27

and Teva will need to seek relief from the state court).

28

United States District Court
Northern District of California

## I.     **LEGAL STANDARDS**

The motions to dismiss have been brought pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1).

A.     Rule 12(b)(6)

Under Rule 12(b)(6), a defendant may move to dismiss a cause of action for failure to state a claim for relief.  To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

B.     Rule 12(b)(1)

Under Rule 12(b)(1), a defendant may move to dismiss a case based on lack of subject matter jurisdiction.  This includes standing.  *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) ("Because standing . . . pertain[s] to a federal court's subject-matter jurisdiction under Article III, [it is] properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), not Rule 12(b)(6).").  "A Rule 12(b)(1) jurisdictional attack may be facial or factual in nature.  In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air For Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

United States District Court
Northern District of California

**II.**     **TEVA'S MOTION TO DISMISS**[1]

A.     IHPPs' Complaints

For the five cases against Teva, the Court uses the Centene complaint as a representative complaint (No. C-21-9648 EMC).  The relevant allegations against Teva are as follows.

1.     180-Day Exclusivity for First ANDA Filer

A drug manufacturer gets FDA approval for its drug by filing a new drug application ("NDA").  *See* Centene Compl. ¶ 28.  "A drug that receives NDA approval may be entitled to regulatory exclusivity for a limited period of time – in other words, the FDA cannot approve any generic drug applications during this period."  Centene Compl. ¶ 31.

"When a branded drug's regulatory exclusivity is about to expire, a manufacturer seeking approval to sell a generic version of a branded drug may file an Abbreviated New Drug Application ('ANDA')."  Centene Compl. ¶ 32.  In the ANDA, the generic manufacturer may make, *inter alia*, what is known as a Paragraph IV certification – *i.e.*, that the patent for the brand drug is invalid or will not be infringed on.  *See* Centene Compl. ¶ 37.

If a generic manufacturer files a Paragraph IV certification, a brand manufacturer can delay FDA approval of the ANDA by suing the generic manufacturer for patent infringement.  *See* Centene Compl. ¶ 38.  "[I]f the brand manufacturer files suit within 45 days, then the FDA is automatically barred from granting approval to the generic manufacturer's ANDA 'until the earlier of (a) the passage of 30 months, or (b) the issuance of a decision by a court that the patent is invalid or not infringed.'"  *Staley v. Gilead Scis., Inc.*, 446 F. Supp. 3d 578, 585 (N.D. Cal. 2020) (noting that, "if the brand manufacturer files suit within 45 days, then the FDA is automatically barred from granting approval to the generic manufacturer's ANDA 'until the earlier of (a) the passage of 30 months, or (b) the issuance of a decision by a court that the patent is invalid or not infringed'").[2]  If no suit is filed, the FDA may proceed with evaluation of the ANDA.

---

[1] Teva has included a request for judicial notice as part of its motion to dismiss.  The IHPPs have objected in part to the request.  *See* Opp'n at 8 n.4.  The objection is largely moot, either because the evidence need not be considered to resolve the motion to dismiss or because the evidence has no prejudicial impact on the IHPPs' opposition to the motion to dismiss.

[2] It is possible that 30 months pass by without a decision by a court on infringement or invalidity.

A generic manufacturer has an incentive to make a Paragraph IV certification, even with the prospect of being sued, because, under the law,

> the first generic manufacturer to file an ANDA containing a paragraph IV certification typically gets 180 days of market exclusivity (unless a forfeiture event occurs . . . ).  This means that the first approved generic is the only available generic for at least six months, which effectively creates a duopoly between the brand company and the first-filing generic during this period.

Centene Compl. ¶ 39; *see also In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 741 (E.D. Pa. 2014) (stating that, "to encourage generic entry and to compensate ANDA filers for the expense and risk of a potential infringement lawsuit, federal law grants the first generic manufacturer to file a paragraph IV ANDA application (i.e., the 'first-filer') a 180-day period of exclusive marketing rights").  Notably, "'[t]he first-filing generic manufacturer is guaranteed [the 180-day] exclusivity period even if it settles litigation with a patent owner without resolving the invalidity or noninfringement issues.'"  *Staley*, 446 F. Supp. 3d at 585.

> The first generic applicant can help the brand manufacturer "game the system" by delaying not only its own market entry but also the market entry of all other generic manufacturers.  By agreeing not to begin marketing its generic drug, the first generic applicant delays the start of the 180-day period of generic market exclusivity.  This tactic is called exclusivity "parking."  It creates a bottleneck because later generic applicants cannot launch until the first generic applicant's 180-day exclusivity has elapsed or is forfeited.

Centene Compl. ¶ 42.

Congress has passed laws to try to

> make it more difficult for the brand and generic manufacturers to conspire to delay the start of the first filer's 180-day period of generic market exclusivity.  Specifically, the law now provides six mechanisms by which the first ANDA filers may forfeit their exclusivity rights, thus allowing second (or later) filers to enter the market before, or at the same time as, first filers.

---

Thus, the FDA could grant approval to a generic manufacturer, but the generic manufacturer would not yet know whether it could be held liable for infringement.

If the generic manufacturer decided to proceed with the launch of its generics even though the patent infringement suit was not yet resolved, the generic manufacturer would be launching "at risk."  At-risk launches are important because they inform one of Teva's arguments below.

4

United States District Court
Northern District of California

Centene Compl. ¶ 43.  For example, "under the 'failure to obtain tentative approval' provision, forfeiture occurs if the first ANDA applicant fails to obtain tentative approval from the FDA within 30 months of filing a substantially complete ANDA."  Centene Compl. ¶ 44.

But in spite of legal reform, brand and first-filing generic manufacturers have tried to structure their settlements to avoid the forfeiture provisions.  *See* Centene Compl. ¶ 47.

> For example, brand manufacturers can convince generic manufacturers to settle before the patents are held invalid, unenforceable, or not infringed.  The brand manufacturer prolongs its monopoly and the generic manufacturer keeps its 180-day exclusivity.  When that happens, in order to trigger forfeiture and gain access to the market, subsequent ANDA applicants (with no 180-day exclusivity to entice them) must obtain a judgment that all patents for which the first filing generic company filed paragraph IV certifications are invalid, unenforceable, or not infringed.

Centene Compl. ¶ 47.  The suit and settlement delays the start of the 180-day exclusivity and leaves other generic manufacturers at risk.

As another example,

> brand and generic manufacturers can structure their settlements to provide the generic with 180 days of *de facto* exclusivity even when it is likely that the generic has forfeited that exclusivity under one of the applicable . . . forfeiture provisions, *e.g.*, the failure to obtain tentative approval within 30 months of submitting a substantially complete ANDA.  The brand can provide such exclusivity by agreeing not to license any other generic to enter the market any earlier than six months after the generic that has forfeited exclusivity has entered.  Unless a subsequent generic is itself able to overcome applicable patent and regulatory exclusivities, such an agreement effectively restores the first generic filer's lost statutory exclusivity.

Centene Compl. ¶ 48.

2.   Authorized Generics ("AGs")

> The 180-day marketing exclusivity to which first filer generics may be entitled does not prevent a brand manufacturer from marketing its own generic alternative to the brand drug during that 180-day exclusivity period.  Such a generic is called an "authorized generic" and is chemically identical to the branded drug, but is sold as a generic product through either the brand manufacturer's subsidiary (if it has one) or through a third-party generic manufacturer.

Centene Compl. ¶ 53.  "As a practical matter, authorized generics are the only means by which brand manufacturers engage in price competition with manufacturers of AB-rated generic drugs."

5

Centene Compl. ¶ 56.  Thus, "a brand manufacturer's agreement not to launch an authorized generic has tremendous economic value to a generic manufacturer.  Brand manufacturers have used such agreements as a way to pay the first filer to delay entering the market."  Centene Compl. ¶ 57.

> As a means of compensating first-filing generic manufacturers, brand manufacturers prefer No-Authorized Generics agreements ("No-AG agreements") to cash payments because, in the case of No-AG agreements, a portion of the compensation is paid by purchasers of the drug in the form of higher generic drug prices.  The generic manufacturer receives not only the profits that the brand manufacturer would have made by launching an authorized generic in competition with the ANDA filer's product, but also the higher prices that result from the absence of that competition.  Thus, the payment to the generic manufacturer is shared between the brand manufacturer and the generic manufacturer's customers.

Centene Compl. ¶ 58.

### 3.    Relevant cART Drugs

For purposes of the pending motion, the relevant cART drugs at issue are as follows:

- Viread (TDF).  Gilead began marketing and selling Viread in 2001.  *See* Centene Compl. ¶ 59.

- Truvada (TDF/FTC).  Gilead began marketing and selling Truvada in 2004.  *See* Centene Compl. ¶ 63.

- Atripla (TDF/FTC/EFV).  Gilead and BMS combined their drugs (EFV is BMS's drug) to make Atripla, with Atripla going to market in or about 2006.  *See* Centene Compl. ¶¶ 67, 79.

### 4.    Teva's ANDAs

Teva is a generic manufacturer.  In 2008, Teva filed ANDAs to market and sell generic formulations of Truvada (TDF/FTC) and Atripla (TDF/FTC/EFV).  *See* Centene Compl. ¶ 128.  In 2009, Teva filed an ANDA to market and sell a generic formulation of Viread (TDF) (specifically, 300 mg tablets).  *See* Centene Compl. ¶ 93.

In the ANDAs, Teva included Paragraph IV certifications challenging the TDF patents, the FTC patents, and the EFV patents.  *See* Centene Compl. ¶¶ 14, 92-94, 129.  Teva was the first ANDA filer with Paragraph IV certifications, and therefore, absent forfeiture, Teva was entitled to

6

United States District Court
Northern District of California

the 180-day exclusivity discussed above.  *See* Centene Compl. ¶¶ 95, 131.

5.    Lawsuit and Settlement Related to Viread (TDF)

In response to Teva's Paragraph IV certification for the TDF patents, Gilead sued Teva. *See* Centene Compl. ¶¶ 14, 96.  Gilead did so even though it knew its patents were weak and likely to be invalidated.  *See, e.g.*, Centene Compl. ¶¶ 90-91, 97.

In February 2013, the day before trial, Gilead and Teva announced a settlement with respect to Viread (TDF).[3]  The settlement delayed the introduction of generic Viread for more than four years – specifically, to December 15, 2017, which was about six weeks before Gilead's TDF patents were set to expire.  *See* Centene Compl. ¶¶ 15, 100 *see also* Centene Compl. ¶¶ 78, 92 (alleging that the patents protecting TDF were set to expire in January 2018).  The IHPPs contend that, if the patent infringement case had gone to trial, Teva would likely have prevailed, and the patent would likely have been found invalid, such that Teva could then immediately have entered the market with its generic.  *See* Centene Compl. ¶ 91 (alleging that, "[k]nowing its patents were weak and likely to be invalidated, Gilead filed meritless patent infringement lawsuits against generic challengers of the TDF patents," and that "Gilead entered into settlement agreements with these challengers before issuance of a final court decision rendering the TDF patents invalid and/or not infringed," with the goal of "delay[ing] generic competition for multi-billion-dollar blockbuster drugs as long as possible").

Even though generic Viread would come to market before expiration of the TDF patents, Gilead still obtained a significant benefit.  The introduction of generic Viread was delayed – *i.e.*, absent the settlement, the TDF patents would have been invalidated and thus generic versions of the TDF drugs could have launched years earlier rather than close in time to the expiration date of the patents.  *See* Centene Compl. ¶ 17; *see also* Centene Compl. ¶ 74 (alleging that, absent Gilead and Teva's agreement, "generic TDF would have become available as early as 2014").

Teva also received value from the settlement agreement.  In exchange for the delayed

---

[3] The IHPPs note that, because TDF is also a component of Truvada (TDF/FTC) and Atripla (TDF/FTC/EFV), this settlement actually "addressed all of [these] products.  In other words, Gilead's settlement with Teva extended far beyond the specific TDF patent dispute being litigated . . . ."  Centene Compl. ¶ 101.

1  introduction of generic Viread, Teva was given multiple benefits.

2  • First, Gilead agreed that it would not launch its own authorized generic "at the

3  point of Teva's delayed generic entry." Centene Compl. ¶ 107. "This **No-AG**

4  **agreement** was . . . worth substantially more than what Teva could have earned if

5  it had prevailed in the patent litigation and come to market with a generic Viread in

6  competition with Gilead's AG." Centene Compl. ¶ 113 (emphasis added).

7  Initially, the parties had in their settlement agreement a clause providing that, if

8  Gilead were to launch an AG of its own, then it would give Teva a six weeks head

9  start on the AG. *See* Centene Compl. ¶ 104. However, the Federal Trade

10  Commission ("FTC") expressed concern about that clause. *See* Centene Compl. ¶¶

11  102-03 (noting that federal law requires parties to patent litigation settlement to

12  disclose the terms of the settlement to the FTC and DOJ). At a hearing before the

13  trial court, Gilead stated that the parties were removing that particular clause from

14  the settlement agreement. But Teva and Gilead did *not* disclose to the trial court

15  that they had implemented a new agreement "preventing Gilead from launching an

16  AG at the point of Teva's delayed generic entry. That secret agreement did not

17  become apparent until Gilead did *not* launch a competing AG when Teva launched

18  its generic on December 15, 2017, and Teva issued a press release announcing its

19  'exclusive' generic Viread [TDF] launch." Centene Compl. ¶ 107. "Gilead's

20  decision not to launch a competing AG defies rational business logic, as such a

21  move could have offset the expected generic erosion." Centene Compl. ¶ 112.

22  • Second, the settlement agreement included a most-favored entry ("**MFE**")

23  provision. *See* Centene Compl. ¶ 114. "MFE clauses provide that if any

24  subsequent generic ANDA filer succeeds in entering the market before the agreed-

25  upon date for the first filer, the first filer's entrance will be accelerated and it may

26  enter at the same time as that subsequent filer." Centene Compl. ¶ 114. A MFE

27  clause "dramatically reduce[s] a second filer's incentive to file an ANDA and

28  challenge the patents." Centene Compl. ¶ 114.

United States District Court
Northern District of California

8

- Third, the settlement agreement included a most-favored entry plus ("**MFEP**") provision. A MFEP clause "provide[s] that the brand manufacturer will not grant a license to any second (or subsequent) filer to enter the market until a defined period of time after the first filer enters. Like MFE clauses, MFEP clauses dramatically reduce a later filer's incentive to challenge the patents, because they ensure the first filer's exclusivity for a set period of time." Centene Compl. ¶ 116. Here, Gilead and Teva's settlement agreement provided Teva with six weeks of exclusivity. *See* Centene Compl. ¶ 118.

6.     <u>Lawsuit and Settlement Related to Truvada (TDF/FTC) and Atripla (TDF/FTC/EFV)</u>

Gilead also filed suit against Teva in response to Teva's Paragraph IV certification challenging Gilead's FTC patents. The lawsuit initially implicated Truvada (TDF/FTC) only; later, Gilead amended its complaint to add Atripla (TDF/FTC/EFV) to the action. *See* Centene Compl. ¶¶ 145, 147, 149. Gilead brought suit even though it knew the FTC patents were weak. *See* Centene Compl. ¶ 150.

The trial related to the FTC patents began in October 2013. *See* Centene Compl. ¶ 151. In February 2014, the day before closing arguments were to begin, Teva and Gilead announced a settlement. *See* Centene Compl. ¶¶ 16, 140, 162. The settlement delayed the introduction of generic Truvada (TDF/FTC) and generic Atripla (TDF/FTC/EFV) for about six years – specifically, until September 30, 2020, which was about one year before Gilead's FTC patents were set to expire. *See* Centene Compl. ¶ 16; *see also* Centene Compl. ¶¶ 78, 142 (alleging that the patents protecting FTC were set to expire in May 2021 and September 2021).

As above, Gilead benefited under the settlement agreement because it managed to delay the introduction of the generic drugs (*i.e.*, the FTC patents were likely to be invalidated which would lead to generic drugs being introduced into the market far earlier than the patent expiration dates). In exchange for the delayed introduction, Teva was given MFE and MFEP clauses. Under the MFEP clause, Teva was given six months of exclusivity as the only seller of generic Truvada and generic Atripla. *See* Centene Compl. ¶¶ 16, 163-64, 170. This contractual exclusivity was

United States District Court
Northern District of California

United States District Court
Northern District of California

particularly important because Teva had forfeited its 180-day exclusivity as the first filer for generic Truvada and may have forfeited such with respect to Atripla (*i.e.*, by "fail[ing] to obtain tentative FDA approval within 30 months of submitting its application").  Centene Compl. ¶ 169. In other words, the MFEP effectively allowed Teva to resurrect its 180-day exclusivity as the first filer.

B.    <u>Prior Order</u>

Previously, the Court adjudicated the MFE and MFEP claims brought by the End Payor Plaintiffs ("EPPs").  *See generally Staley*, 446 F. Supp. 3d at 578.  The Court allowed the claims to proceed.

In its order, the Court addressed, *inter alia*, Gilead's argument that

> the MFE and/or MFEP cannot be deemed anticompetitive when they do not represent "reverse payments" (from Gilead to Teva) in the first place; more specifically, they do not represent payments at all because "[Teva] received no compensation from but rather, [was] compensated only through the market when [it] began selling [its] generic product."

*Id.* at 611.  The Court acknowledged that

> the MFE and/or MFEP may not be a "payment" from Gilead to Teva in the sense that cash was not being taken out of Gilead's pocket and being given to Teva – or even in the sense that Gilead was giving up a benefit that it otherwise would have had for Teva's benefit.  *See, e.g.*, *King Drug*, 791 F.3d at 404-05 (stating that "no-AG [authorized generic] agreements are likely to present the same types of problems as reverse payments of cash" – *e.g.*, they "may be of great monetary value [to] the first-filing generic [manufacturer]" and "a brand[] [manufacturer's] commitment not to produce an authorized generic means that it must give up the valuable right to capture profits").

> But *Actavis* did not preclude a patent settlement agreement from being anticompetitive in the absence of a reverse payment *if there were other circumstances* that posed potential anti-competitive concern.  *See Actavis*, 570 U.S. at 158 (suggesting that patent litigation could be settled "by allowing the generic manufacturer to enter the patentee's market prior to the patent expiration, without the patentee paying the challenger to stay out prior to that point").  In the instant case, Plaintiffs have pointed to indicators of anti-competitiveness.  For instance, even though Teva was allowed to enter the market prior to the patent expiration dates, the entry date was, relatively speaking, quite late – *i.e.*, close in time to the patent expiration dates (in one case, only six weeks before the patent expiration date and, in the other case, only a year before the patent expiration date).  Thus, this gives rise to a concern that Teva was

10

induced to accept a late entry date (*i.e.*, giving up the right to pursue its challenge to the patent and earlier entry) in return for a significant benefit – even if that benefit did not come at Gilead's expense.

Another yellow flag is with respect to the MFEP clause specifically. The MFEP clause, in effect, gave Teva exclusivity for a period time (six weeks in one case and six months in another), but Plaintiffs have alleged that, "in the case of Truvada [TDF/FTC] (and possibly Atripla as well), . . . Teva had [already] forfeited" the 180-day ANDA Exclusivity "by failing to gain timely tentative approval from the FDA." Thus, the MFEP clause was essentially "resurrect[ing]" ANDA Exclusivity or at least some kind of exclusivity where it no longer applied. Resurrection of exclusivity could arguably be a significant deterrent to second filers.

*Id.* at 611-12 (emphasis in original).

C.    Law of the Case

Teva argues that, as a matter of law, the IHPPs' claims based on Teva's settlement agreements with Gilead are not viable – *i.e.*, the claims are not plausible in light of economic principles. *See William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009) ("On a motion to dismiss in an antitrust case, a court must determine whether an antitrust claim is 'plausible' in light of basic economic principles."); *see also Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998) ("Antitrust claims must make economic sense."). Teva acknowledges that the Court previously adjudicated the MFE/MFEP claims brought by the EPPs but points out that it was not a defendant in the EPPs' case. *See, e.g.*, *United States v. Maybusher*, 735 F.2d 366, 370 (9th Cir. 1984) (stating that "[t]he [law-of-the-case] doctrine typically applies to the same case when the parties in the subsequent proceeding were also the parties to the former appellate decision"). Teva also contends that the Court should consider Teva's argument because the Court's understanding of the settlement agreements was flawed – *i.e.*, because the Court was not presented with the actual language used in the MFE and MFEP provisions.

According to the IHPPs, the Court should not consider Teva's arguments as a procedural matter based on the law of the case.[4]

---

[4] As noted above, Gilead has joined Teva's motion to dismiss. As to Gilead, the issue is not really whether the law-of-the-case doctrine is a bar but rather whether the Court should reconsider its

> The law of the case doctrine provides that "a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." *U.S. v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (internal quotation and citation omitted); *U.S. v. Miller*, 822 F.2d 828, 832 (9th Cir. 1987) ("The rule is that the mandate of an appeals court precludes the district court on remand from reconsidering matters which were either expressly or implicitly disposed of upon appeal."). But a court may have discretion to depart from the law of the case if:
>
> 1) the first decision was clearly erroneous; 2) an intervening change in the law has occurred; 3) the evidence on remand is substantially different; 4) other changed circumstances exist; or 5) a manifest injustice would otherwise result.
>
> *Alexander*, 106 F.3d at 876 (emphasis added). A court's "failure to apply the doctrine of the law of the case absent one of the requisite conditions constitutes an abuse of discretion." *Id.* (citation omitted).

*United States v. Cuddy*, 147 F.3d 1111, 1114 (9th Cir. 1998) (emphasis omitted); *see also Gallardo v. Barr*, 968 F.3d 1053, 1069 (9th Cir. 2020) (stating that "'[t]he law of the case doctrine is subject to three exceptions that may arise when "(1) the decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial"'").

In spite of the law-of-the-case doctrine, the Court shall consider Teva's arguments presented in the motion to dismiss. First, the Court takes into account that the IHPPs' complaints are somewhat different from those the Court has previously considered. Most notably, the IHPPs criticize the settlement agreement related to Viread (TDF) on the basis that it contains an implicit No-AG agreement – *i.e.*, not just because the settlement agreement contains a MFE/MFEP provision. The Court has not yet been presented with any claim based on a No-AG agreement.

Second, even if the Court were to consider only the MFE/MFEP provision, the law of the case is not, as a general matter, a bar. In support of its position, Teva has provided a copy of the settlement agreement related to Truvada (TDF/FTC) and Atripla (TDF/FTC/EFV). Teva contends that the IHPPs' characterization of the settlement agreement does not comport with what the settlement agreement actually says. Up until this point in the litigation, the Court has never seen a

prior ruling.

United States District Court
Northern District of California

United States District Court
Northern District of California

copy of the Truvada/Atripla settlement agreement.  Thus, effectively, the Court is being provided with new evidence (concerning the "at risk" possibility).  Alternatively, the "manifest injustice" factor is implicated – *i.e.*, because, according to Teva, the IHPPs have not correctly represented what the settlement agreement says.  Finally, new evidence and manifest justice aside, the Ninth Circuit has noted that "[t]he law of the case doctrine does not *preclude* a court from reassessing its own legal rulings in the same case." *Askins v. United States Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018) (emphasis added; adding that the doctrine is "most clearly" applicable "where an issue has been decided by a higher court," in which case "the lower court is precluded from reconsidering the issue and abuses its discretion in doing so except in the limited circumstances the district court identified").

D.     Settlement Related to Truvada (TDF/FTC) and Atripla (TDF/FTC/EFV)

Teva argues first that the Court should dismiss all claims based on the settlement agreement related to Truvada (TDF/FTC) and Atripla (TDF/FTC/EFV)).  According to Teva, the face of the agreement establishes that there is nothing anticompetitive about it.

There is no dispute that the Truvada/Atripla settlement agreement is claimed to be anticompetitive because it contains a MFE/MFEP provision.  The IHPPs call out the MFEP provision as being particularly problematic because the provision allows for Teva's entry date to be accelerated by six months (ahead of other generic manufacturers) even though Teva had already forfeited its 180-day exclusivity as the first ANDA filer (at the very least for Truvada and possibly for Atripla as well).  In other words, the IHPPs take the position that the MFEP effectively resurrects the 180-day exclusivity.  The IHPPs maintain that, as a result, the MFEP serves as a disincentive for second ANDA filers to challenge the FTC patents.

1.     Text of MFEP

According to Teva, the IHPPs are incorrect that the MFEP provision resurrects the 180-day exclusivity.  Teva contends that, in fact, the Truvada/Atripla settlement agreement "left open to later filers viable, real-world options to come to market either ahead of or at least alongside Teva." Reply at 10.

In support of its position, Teva has provided a copy of the Truvada/Atripla settlement

13

United States District Court
Northern District of California

agreement for the Court to consider.  The copy can be found at Exhibit A to the Holding

Declaration.  *See* Docket No. 890-4 (settlement agreement).  The settlement agreement reflects

that Gilead gave Teva a license to the FTC patents (*i.e.*, so that Teva could make generic Truvada

(TDF/FTC) and generic Atripla (TFD/FTC/EFV)):

> Gilead . . . hereby grants . . . to Teva . . . a fully paid up, royalty free, non-exclusive license . . . (i) under the Licensed FTC Patents to make, have made, use, have used, [etc.] the Teva ANDA Products made pursuant to the Teva ANDAs and any FTC Generic Equivalent made pursuant to a Teva Regulatory Filing . . . upon and following the applicable License Effective Date.

Truvada/Atripla Sett. Agmt. § 3.1(a).

The license was given as of the License Effective Date, with that date being the date Teva

could introduce its generics into the market.  License Effective Date is defined as follows:

> "<u>License Effective Date</u>" means . . . the earliest to occur of the following dates:
>
> (i)    **September 30, 2020**;
>
> (ii)   the date on which a Final Court Decision is entered holding that each of the then-asserted unexpired patent claims included in the Licensed FTC Patents that were asserted against Teva in the Litigation is invalid or unenforceable.
>
> (iii)  the date on which all of the Licensed FTC Patents listed in the Orange Book, with respect to the Gilead Product or FTC Product, has been permanently abandoned or delisted from the Orange Book . . . ;
>
> (iv)   **with respect to Teva ANDA Product only, . . . to the extent that Gilead, any of its Affiliates, or a Third Party (under authorization from Gilead or its Affiliates . . . ) plans or is authorized to sell the relevant FTC Generic Equivalent in the Territory on a date that falls any time before September 10, 2021, the date that is six (6) months prior to (1) the sale thereof by Gilead or its Affiliates or (2) the earliest permitted sale thereof by such Third Party, in the Territory**; and
>
> (v)    with respect to Teva ANDA Product only, . . . to the extent that Gilead, any of its Affiliates, or a Third Party (under authorization from Gilead or its Affiliates . . . ) plans or is authorized to sell the relevant FTC Authorized Generic in the Territory on a date that falls at any time before September 10, 2021, the date such FTC Authorized Generic is first sold in the Territory.

United States District Court
Northern District of California

Truvada/Atripla Sett. Agmt. § 1.1 (emphasis added).

Clause (i) above sets the default date that Teva is permitted to introduce its generic drugs to the market: September 30, 2020 (about a year before the date of patent expiration).

Clause (iv) is the MFEP.  The date that Teva is permitted to introduce its generic drugs is accelerated under certain conditions.  Specifically, if Gilead is to sell generics before the patent expiration date or if a third party authorized by Gilead is to sell generics before the patent expiration date, then Teva's entry date is accelerated so that it can enter the generic market six months before Gilead or the authorized third party.

In its motion, Teva points out that it gets the six-month head start only there is *authorization* from Gilead to sell generics before the patent expiration date.  In other words, Teva does not get a head start if a generic manufacturer sells generics before the patent expiration date "at risk" – *i.e.*, without a license from Gilead.  Therefore, Teva asserts, the MFEP did not contractually restore the 180-day first filer exclusivity.

In fact, Teva contends, under the terms of the settlement agreement a generic manufacturer could enter the market ahead of Teva or at least at the same time as Teva.  Teva provides the following examples.

**Example No. 1.**  A generic manufacturer could enter the market ahead of Teva if it launched at risk:

- After Gilead and Teva settled, the second filer could continue to litigate with Gilead regarding the FTC patents.

- After 30 months (assuming the court had not issued a ruling in the patent litigation between Gilead and the second filer), the second filer could get final approval of its ANDA from the FDA because Teva had forfeited its 180-day first filer exclusivity.

- Once the FDA approve, the second filer could launch its generic at risk (*i.e.*, without authorization from Gilead).

- Because the launch was without authorization from Gilead, the MFEP would not be triggered and Teva could not get its entry date accelerated.

- "Thus, if the competitor had received final approval and launched in 2018, for

United States District Court
Northern District of California

1    example, Teva would still have been stuck on the sidelines until September 30,

2    2020 (the default license entry date), letting the subsequent filer sell without

3    competition from Teva for a significant period of time and potentially having the

4    market to itself for some time.  In other words, contrary to Plaintiffs' conclusory

5    allegations (e.g., Compl. ¶ 116), a subsequent filer who continued to litigate *could*

6    beat Teva to market and get *de facto* exclusivity.  [¶] As this example shows, not

7    only does the 2014 Agreement fail to ensure that Teva would be first in line to sell

8    its generic Truvada and Atripla products – it does not even guarantee parity with

9    other ANDA filers."  Mot. at 11.

10   **Example No. 2.**  Teva also gives an example where a generic manufacturer could, at the

11   very least, enter the market at the same time as Teva.

- After Gilead and Teva settled, the second filer could continue to litigate with
  Gilead regarding the FTC patents.

- The second filer could decide not to launch at risk but rather wait for a court
  decision in its favor (*e.g.*, from the Federal Circuit).

- After receiving a favorable decision from the Federal Circuit, the second filer could
  then launch.

- "[In this situation,] both [the subsequent filer and Teva] would be able to launch
  [at] the same time: the subsequent filer because Gilead would have no basis to stop
  it, and Teva because clause [(ii)] of the License Effective Date definition would
  accelerate Teva's license once the appellate decision became final.  In this scenario,
  too, Teva gets no exclusivity, and the second filer gets at least equality of entry
  with Teva."  Mot. at 11-12 n.8.

24   Teva emphasizes that its examples above are not just theoretical but rather realistic – *i.e.* it

25   "faced the very real prospect of selling alongside other ANDA applicants, or even coming to

26   market after them," Mot. at 12, based on two factors.

27   (1) Teva had forfeited its 180-day exclusivity, *see* Mot. at 13 (citing "[t]hree real world

28   examples" where the first filer forfeited its 180-day exclusivity and a second filer went

16

1         on to challenge the brand manufacturer's patents).

2      (2) Per the allegations in the complaints, there was a large financial incentive for second

3           filers to litigate their challenges to Gilead's patents.  *See* Mot. at 12 (noting that

4           "Plaintiffs allege that a generic manufacturer that was able to enter first with generic

5           Truvada and Atripla stood to gain access to a market worth up to $1.5 billion").

6      Based on the arguments above, Teva may well prevail at a trial on the merits.  However, at

7 this juncture, the Court may dismiss only if the IHPPs' claim is entirely implausible.  If questions

8 of fact are raised and a plausible legal claim is pled, dismissal at 12(b)(6) is not appropriate.  The

9 Court finds that there are questions of fact supporting a plausible claim that cannot be resolved at

10 this early stage.

11      For example, even though, in theory, a second filer could launch at risk (which would not

12 trigger the MFEP) or wait to launch until a favorable court decision (which would allow Teva to

13 accelerate under another clause), there is a question of fact as to whether it was realistic for either

14 of these scenarios to take place.  As the IHPPs point out, it is notable that no second filer went on

15 to launch at risk nor press forward with the challenge to the Gilead patents in the hope of getting a

16 favorable court ruling (notwithstanding the substantial value of the market).  If, as Teva argues,

17 there was a very real prospect that a second filer could launch ahead or at the same time as Teva,

18 then one would expect that at least one second filer would take one of those options.[5]  Teva

19 suggests that the second filers made strategic judgments and were not affected by the MFE/MFEP;

20 while that is entirely possible, that is a question of fact that must be resolved later.

21      Because there is a question of fact based on the above, the Court need not address the

22

23    ———————————

24 [5] At the hearing, Teva argued that what actually happened in the real world after the agreement
was reached is legally irrelevant.  *See also* Reply at 9 n.7 (arguing that the IHPPs' "reliance on the
post-settlement fact that no other generic actually litigated to judgment or launched at risk . . . is

25 improper").  Teva maintains that "[i]t is a basic antitrust principle that the impact of an agreement
on competition is assessed as of 'the time it was adopted.'"  *Impax Labs., Inc. v. FTC*, 994 F.3d

26 484, 496 (5th Cir. 2021).  The Court does not disagree with *Impax*.  However, that does not mean
that what happened post-settlement has no relevance to whether an agreement was anticompetitive

27 at the time it was adopted.  As discussed below, one of the main authorities on which Teva relies
indicates to the contrary.  And notably, in *Impax*, the Fifth Circuit was simply pointing out that the

28 "'reasonableness of a patent settlement agreement cannot be made to depend on an *ex post*
determination' *of [patent] validity or infringement*."  *Id.* (emphasis added).

United States District Court
Northern District of California

1    IHPPs' second argument – *i.e.*, that there were, in fact, several disincentives for a second filer to

2    launch at risk or to press on with litigation over the Gilead patents.  Out of an abundance of

3    caution, however, the Court considers the disincentives identified by the IHPPs.[6]

4           **Disincentives to launching at risk.**  According to the IHPPs, a second filer would have at

5    least two disincentives to launching at risk.

6           • First, if a second filer were to launch at risk (*i.e.*, without authorization from Gilead

7                and before a court decision ruling on the merits of the litigation related Gilead's

8                patents), it could later be found liable to Gilead for patent infringement.  This

9                potential liability was something to be taken seriously because the profits that

10               Gilead would make from its brand drugs would clearly be higher than the profits

11               the second filer would make from its generic drugs.  *See* Opp'n at 2, 11-12 (noting,

12               *inter alia*, that a "'brand's profits are lost at a high price while the generic's profits

13               are made at a lower price'") (quoting Keith M. Drake et al., *No Free Launch: At-*

14               *Risk Entry by Generic Drug Firms* 29 Nat'l Bur. of Econ. Rsch., Working Paper

15               No. 29131, at 6 (2021)).  The financial deterrent would be even greater because

16               Gilead's brand drugs here were its "blockbuster" drugs, with the FTC market worth

17               more than $1 billion.  "Not many generic companies can stomach the potential

18               liability for massive damages based on at-risk launch of a blockbuster drug."

19               Opp'n at 12.  The potential risks to a second filer appears existential.

20          • Second, if a second filer were to launch at risk, Gilead might well have the

21               incentive to sell authorized generics to compete with the second filer's generics.

22               And if Gilead were to compete with AGs, this would then trigger clause (v) of the

23               Truvada/Atripla settlement agreement – *i.e.*, Teva would be given an independent

24               reason to have its entry date accelerated.  *See* Truvada/Atripla Sett. Agmt. § 1.1(v)

25               (providing as one definition of "License Effective Date": "with respect to Teva

26

27    ─────────────────────
      [6] Teva asserts that the Court should not consider the disincentives at all because there are no
28    allegations of such disincentives in the complaints as pled.  The Court does not entirely agree.
      Some of the disincentives can fairly be inferred from the complaints, *i.e.*, even if not explicitly
      called out as disincentives in the pleadings.

ANDA Product only, . . . to the extent that Gilead, any of its Affiliates, or a Third Party (under authorization from Gilead or its Affiliates . . . ) plans or is authorized to sell the relevant FTC Authorized Generic in the Territory on a date that falls at any time before September 10, 2021, the date such FTC Authorized Generic is first sold in the Territory"). In other words, Teva would not be left on the sidelines.

**Disincentive to launching after a favorable court decision.** The IHPPs also contend that a second filer would have at least one disincentive from launching after a favorable court decision. According to the IHPPs, one of the grounds for challenging Gilead's patents would be invalidity (not just noninfringement). And if the court were to render a decision finding the patents invalid, then that would allow any and all generic manufacturers to enter the market. In other words, the second filer would not just be competing with Teva (who could enter the market under clause (ii) based on the favorable court decision) but rather would be competing with a host of generic manufacturers.

Teva, of course, attacks the plausibility of the disincentives. For example, Teva argues it is implausible that a second filer would be deterred from launching at risk because it could be held liable for massive sums if found to be liable for patent infringement. Teva points out that, according to the IHPPs, the FTC patents were clearly weak. Therefore, the patents would likely not be upheld and the second filer would not be subject to millions in liability. Although Teva makes a fair point and could well prevail on the merits, the Court cannot say at this early stage that there could be no such disincentive to a second filer. Even if Gilead's patents appeared weak, the risk of millions in liability could still be a deterrent, especially if coupled with other considerations.

Teva also argues it is implausible that a second filer would be deterred from launching at risk because of the prospect of competition from Gilead and Teva, or deterred from waiting for a favorable court ruling because of the prospect of competition from any and all generic manufacturers. Teva asserts that a second filer still has incentive to challenge a brand company's patents even if the second filer will not get "de facto exclusivity." *See* Reply at 7 ("The underlying premise – that later filers will only invest in litigation if they have an opportunity for

19

de facto exclusivity – is belied by industry experience, has been rejected by the courts, and is contrary to the observed behavior here [*i.e.*, Teva continued to litigate against Gilead up until trial even though it had forfeited its 180-day exclusivity].").  Teva fairly argues that a second filer cannot *always* be demotivated just because it will face competition.  But Teva is essentially asking the Court to make the decision that, as a matter of law, a second filer would not have been deterred here which is a determination that cannot be made at this early juncture in the proceedings.

That second filers have not been deterred in other situations is not dispositive.  Cases will always turn on the specific facts, and Teva has not pointed to a case that is clearly analogous to the case here.

As to Teva continuing to litigate against Gilead up until trial even though it had lost the 180-day first filer exclusivity, that is true.  Even though Teva had lost its exclusivity, it was still willing to litigate.  However, that is not dispositive because Teva's litigation was ahead of litigation involving second filers, so Teva still had the opportunity to extract a special settlement out of Gilead – and allegedly Teva did, *i.e.*, the MFEP.

Finally, to the extent Teva cites the recent decision from the Delaware court in *In re Sensipar Antitrust Litigation*, MDL No. 2895, 2022 U.S. Dist. LEXIS 43561 (D. Del. Mar. 11, 2022), the court there did address a claim based on an acceleration clause.  But it rejected that claim on a procedural ground – specifically, that the plaintiffs did not have permission to replead the claim.  *See id.* at *33-34 ("noting that "Plaintiffs were granted leave to replead only the portion of their Section 2 claims that survived the motions to dismiss: that Amgen paid Teva to induce Teva to remove Teva's generic product form the market and delay its entry").

Admittedly, the court did go on to comment about the merits of the claim, finding it implausible.  However, much the court's reasoning as to why the claim was implausible does not have applicability here.  For example, the court indicated that the acceleration clause was of little benefit to the settling generic manufacturer because, although the clause allowed the settling generic manufacturer to enter the market early if another generic manufacturer were to launch at risk, the settling manufacturer would do so at risk as well – *i.e.*, it still faced potential patent infringement damages.  *See id.* at *37.  Here, the MFEP accelerated Teva's *license* so Teva did not

United States District Court
Northern District of California

1   face any potential patent infringement damages at all.

2          Also, the *Sensipar* court stated that "[the] theory that the acceleration clause[] [running in

3   favor of the settling generic manufacturer] deterred the entry [of other generic manufacturers] is

4   further undermined by the lack of actual anticompetitive effects in the marketplace. . . . It is

5   undisputed that this alleged deterrence did not actually occur," and, "[i]nstead, four non-settling

6   generic manufacturers continued to challenge Amgen's patent through trial." *Id.* at *38-39.  Here,

7   as noted above, no second filer ended up launching at risk or persisting with patent litigation

8   against Gilead.

9          The only part of the *Sensipar* opinion that supports Teva is the court's statement that

10              [t]he lack of [actual] deterrence observed in the generic . . . market is
                consistent with the Court's prior conclusion that "ANDA filers
11              understand that other manufacturers of generic drugs may also file
                ANDAs seeking to market their own generic versions of branded
12              drugs, which (after FDA approval) compete not only with the
                branded drug but also with any ANDA filer's generic product."
13

14   *Id.* at *39.  But as noted above, here, there was – at least plausibly – deterrence to these second

15   filers.

16          Accordingly, even with the exact language of the MFEP clause in the Truvada/Atripla

17   settlement agreement, the IHPPs still have a plausible case that the MFEP was anticompetitive.

18          2.      Sacrifice of Profits by Gilead

19          In its motion, Teva makes a secondary argument as to why the claims related to the

20   Truvada/Atripla settlement agreement should be dismissed.  Specifically, Teva contends that, in

21   order for the IHPPs to have an actionable claim based on a MFEP, Gilead had to sacrifice some of

22   its profits to Teva.  Teva contends that,

23              [a]bsent a net sacrifice of profits by a patent owner, there is no basis
                to infer patent weakness, or that the patent owner would have agreed
24              to allow the generic to enter on a date earlier than the date in the
                challenged settlement.  After all, if a settlement term is costless to
25              the brand manufacturer, then there is no reason to view the inclusion
                of that term as signaling anything about the relevant strength of the
26              parties' positions in the underlying patent litigation.

27   Mot. at 15.

28          For this argument specifically, the IHPPs fairly assert that the law of the case should be a

bar.  The Court previously considered the legal issue of whether Gilead had to make some kind of "reverse payment" to Teva (*i.e.*, Gilead had to pay Teva to settle Gilead's own patent infringement case instead of Teva paying something to Gilead).

> Gilead protests still that the MFE and/or MFEP cannot be deemed anticompetitive when they do not represent "reverse payments" (from Gilead to Teva) in the first place; more specifically, they do not represent payments at all because "[Teva] received no compensation from [Gilead], but rather, [was] compensated only through the market when [it] began selling [its] generic product." *Actos*, 2015 U.S. Dist. LEXIS 127748, at *48.  It is true that the MFE and/or MFEP may not be a "payment" from Gilead to Teva in the sense that cash was not being taken out of Gilead's pocket and being given to Teva – or even in the sense that Gilead was giving up a benefit that it otherwise would have had for Teva's benefit.  *See, e.g.*, *King Drug*, 791 F.3d at 404-05 (stating that "no-AG [authorized generic] agreements are likely to present the same types of problems as reverse payments of cash" – e.g., they "may be of great monetary value [to] the first-filing generic [manufacturer]" and "a brand[] [manufacturer's] commitment not to produce an authorized generic means that it must give up the valuable right to capture profits").
>
> But Actavis did not preclude a patent settlement agreement from being anticompetitive in the absence of a reverse payment *if there were other circumstances* that posed potential anti-competitive concern.  *See Actavis*, 570 U.S. at 158 (suggesting that patent litigation could be settled "by allowing the generic manufacturer to enter the patentee's market prior to the patent expiration, without the patentee paying the challenger to stay out prior to that point").

*Staley*, 446 F. Supp. 3d at 611-12 (emphasis in original).

Furthermore, even if the Court had not addressed the legal issue, it is not clear why Gilead should have to give up some of its own profits in order for there to be anticompetitive conduct. Though Teva relies on *Actavis*, a reverse payment case, *see Actavis*, 570 U.S. at 147-48 (noting that "[t]he paragraph IV litigation in this case put the patent's validity at issue," and "[t]he parties' settlement ended that litigation[;] [t]he FTC alleges that in substance, the plaintiff agreed to pay the defendants many millions of dollars to stay out of its market, even though the defendants did not have any claim that the plaintiff was liable to them for damages," which is an "unusual" form of settlement), as stated above, *Actavis* does not preclude other conduct from being anticompetitive.

Faced with this problem, Teva contends that the Court's prior holding that there were other

United States District Court
Northern District of California

circumstances posing an antitrust concern was based on an incorrect understanding of the facts (which would be a way around the law-of-the-case doctrine). In its prior order, the Court found two indicators of anti-competitiveness:

- First, "even though Teva was allowed to enter the market prior to the patent expiration dates, the entry date was, relatively speaking, quite late – *i.e.*, close in time to the patent expiration dates ([*e.g.*,] only a year before the patent expiration date). Thus, this gives rise to a concern that Teva was induced to accept a late entry date (*i.e.*, giving up the right to pursue its challenge to the patent and earlier entry) in return for a significant benefit – even if that benefit did not come at Gilead's expense." *Id.* at 612.

- Second, the MFEP clause in the Truvada/Atripla agreement gave Teva six months of exclusivity even though Teva had forfeited its 180-day ANDA exclusivity. *See id.*; *see also* Opp'n at 16 (pointing out that "Teva could not have obtained the equivalent of the MFEs and MFEPs even if had won the patent cases" because Teva had forfeited its exclusivity with respect to Truvada and Atripla and "[a] patent-case victory on an invalidity theory . . . would have simply opened the door to other generics to enter alongside Teva").

On the first point, Teva does not dispute that, with respect to the FTC patents, Teva was allowed to introduce its generics into the market in September 2020 (*i.e.*, the default License Effective Date) and that the FTC patents expired in 2021. However, Teva argues that other related patents (also covered by the settlement agreement) had a later expiration date – not until 2024. *See* Mot. at 7 (noting that the license given to Teva "applies to both the FTC patents expiring in 2021 *and* to certain new combination patents that Gilead had obtained in 2013 and 2014, *which do not expire until 2024*") (emphasis added); Def.'s RJN, Exs. B-C (Orange Book listings for Truvada and Atripla) (showing 2024 patent expiration date). While this new evidence might lend some support to Teva, the fact still remains that the FTC patents had a 2021 expiration date.

On the second point, Teva is essentially rehashing its argument above – *i.e.*, that the contractual exclusivity was not equivalent to the 180-day exclusivity that Teva had forfeited. This

United States District Court
Northern District of California

1   argument, as discussed above, is not meritless but that does not mean that the IHPPs have failed to

2   lay out a plausible case of anticompetitive conduct.  Indeed, as the IHPPs point out, another

3   provision in the Truvada/Atripla settlement agreement suggests that the MFEP was intended to

4   substitute – at least to some extent – for regulatory exclusivity.  *See* Truvada/Atripla Sett. Agmt. §

5   4.2(c) ("Gilead . . . covenants . . . (iii) in any regulatory, judicial or other forum or before any

6   governmental entity, not to challenge or contest the first to file exclusivity under 21 U.S.C. §

7   355(f)(5)(B)(iv) . . . with respect to the Teva ANDAs; in each case, *except* [*inter alia*] (y) *as would*

8   *not have an adverse effect on Teva's 6-month early entry period*") (emphasis added).

9   E.    Settlement Related to Viread (TDF)

10          Teva challenges next the IHPPs' claim that the settlement agreement related to Viread

11   (TDF) is anticompetitive.

12          For the Viread settlement agreement, the IHPPs have asserted that the contract contains

13   anticompetitive MFE/MFEP clauses, *plus* an anticompetitive No-AG clause.  Because the IHPPs

14   have included allegations about a No-AG clause – allegations that were not part of, *e.g.*, the EPPs'

15   pleading – the law of the case is not a bar to the Court considering the Viread settlement

16   agreement anew.

17          According to Teva, the claim based on the settlement agreement is not plausible because,

18   based on the allegations in the IHPPs' complaints, it was not economically beneficial for Teva to

19   enter into the agreement.  As alleged in the complaints, Teva could enter the market with its

20   generics in December 2017, and the TDF patents would not expire until some six weeks later (in

21   January 2018).  Because (1) Gilead agreed that, during this six-week period, it would not sell any

22   authorized generic and (2) Teva had *not* forfeited its 180-day ANDA exclusivity, this meant that

23   Teva had six weeks of complete exclusivity – *i.e.*, it would be the only generic manufacturer

24   selling generics during that period.  Teva argues that the Court should compare (1) the value of

25   that six-week exclusivity (which included protection from any authorized generic) with (2) the

26   value of the 180-day ANDA exclusivity that Teva had *not* forfeited, although here there would be

27   no protection from an authorized generic.  (Under (2), Teva would be entering the market earlier

28   than December 2017 – *i.e.*, early enough to get the full benefit of its 180-day ANDA exclusivity.)

United States District Court
Northern District of California

According to Teva:

> Plaintiffs' own allegations show that it would have been
> economically irrational for Teva to accept the "reverse payments"
> alleged by Plaintiffs in exchange for delaying its entry date to
> December 15, 2017, since the loss of over 75% of the value of its
> first-filer exclusivity (due to the timing of patent expiry) far exceeds
> the value of the alleged reverse payments – even accepting all of
> Plaintiffs' valuations. . . . .

Mot. at 20-21.  Teva explains as follows:

- Per the express allegations in the IHPPs' complaints, Teva would get about **$50 million** from being the exclusive generic manufacturer for the six-week period. *See* Centene Compl. ¶ 109 ("Teva could expect revenues over $50 million during the six-week exclusivity period without a competing AG.").

- "Working backwards" from the IHPPs' complaints, one can deduce how much Teva would have gotten if it had entered the market earlier to get the full benefit of the 180-day exclusivity period, albeit with competition from an authorized generic. The complaints allege that, if Teva had had to compete with an authorized generic during the six-week exclusivity period, then it would earned less in revenue – about $28 million (assuming a certain discount for the generic compared to brand and a certain market share).  *See* Centene Compl. ¶ 111 ("[I]nstead of launching at a 10% discount to the brand and making over $50 million in revenues during the six-week exclusivity period, the first filer much launch at a greater discount to compete with the authorized generic.  Assuming Teva launched a 25% discount to the brand and maintained an average 30% market share during the six-week exclusivity period, Teva would only earn revenues of approximately $28 million during the six-week exclusivity period.").  If Teva would have earned $28 million for six weeks (*i.e.*, 42 days), then it would have earned more than **$112 million** for 180 days (*i.e.*, 42 days x 4 = 168 days, $28 million x 4 = $112 million).

According to Teva, it makes no economic sense that Teva would opt for the $50 million scenario over the $112 million scenario, and, therefore, "[t]he only plausible inference is that Teva accepted the December 2017 date because it had no ability to enter earlier, so it took what Gilead

25

1  was willing to offer." Mot. at 22. Teva acknowledges that the $112 million was not a sure thing –

2  *i.e.*, because it could have lost the patent litigation against Gilead – but counters that, according to

3  the IHPPs, the Gilead patents were clearly weak. Teva adds that, even if one were to discount the

4  $112 million to reflect some patent litigation risk, a 50% discount would still mean $56 million,

5  which is still more than the $50 million that Teva would get under the Viread settlement

6  agreement. *See* Mot. at 22 n.23.

7       In response, the IHPPs argue that Teva is simply raising questions of fact that should not

8  be resolved at the 12(b)(6) phase.

9           Fact discovery is likely to assist in showing the parties' chances in
           the underlying litigation, the parties' valuation of various clauses in
10          the 2013 [Viread Settlement] Agreement (based at least in part on
           the parties' 2013 expectations, not just the public numbers that the
11          IHPPs' Complaints rely on), and the parties' other considerations in
           entering the 2013 Agreement.
12

13  Opp'n at 23. The IHPPs also assert that

14          Teva's factual analysis of the IHPPs' allegations is, at best,
           incomplete. In particular, Teva seems to compare just two
15          scenarios: (1) the settlement it reached with Gilead (where Teva was
           granted six weeks of generic exclusivity [including against an
16          authorized generic], with (2) Teva winning the patent litigation
           (where Teva could have received six months as the first generic with
17          possible AG competition). However, in settling, Teva gave up a
           *chance* of winning the patent litigation (not the certainty of it, as
18          Teva's brief suggests) and gained the exclusive sales period without
           competition from a Gilead Authorized Generic.
19

20  Opp'n at 23-24 (emphasis added).

21       Similar to above, Teva raises valid points. *See, e.g.*, Reply at 14 (emphasizing that Teva

22  "gave up value by *shortening* the time during which it otherwise would have been entitled by

23  virtue of an independent regulatory exclusivity") (emphasis omitted and added). Nevertheless, as

24  above, there are questions of fact that cannot be resolved at this early stage – *e.g.*, (1) there would

25  have been some risk that Teva would not have prevailed in the patent litigation (*i.e.*, if it entered

26  the market earlier to get the full benefit of the 180-day first-filer exclusivity) and (2) it is not clear

27  what discount should have been given to account for that risk – or perhaps more appropriately,

28  what Gilead could have sought against Teva for Gilead's lost profits.

1    F.    <u>Summary</u>

2           For the foregoing reasons, Teva's motion to dismiss is denied.  To the extent Gilead has

3    joined the motion, Gilead is also denied relief.

4                    **III.    <u>BRAND DEFENDANTS' MOTION TO DISMISS</u>**

5    A.    <u>Standing for All State Law Claims</u>

6           Brand Defendants first make a facial attack on the IHPPs' standing to bring their state law

7    claims.  The IHPPs' state law claims are state law antitrust claims, state law consumer protection

8    claims, and state law unjust enrichment claims.  The state law antitrust claims are pled in the

9    alternative – *i.e.*, the IHPPs assert that Defendants' conduct violated California's Cartwright Act

10   but, if not, then their conduct violated the laws of multiple other states (including but not limited

11   to other California law).  *See* Opp'n at 7; *see also* Mot. at 6 n.9.

12          The parties agree that, in principle, the IHPPs would have standing to bring claims under

13   the laws of the states (1) where the IHPPs are located,[7] (2) where the IHPPs purchased the drugs at

14   issue, and/or (3) where the IHPPs reimbursed their members for purchases of the drugs at issue.

15   *See In re Capacitors Antitrust Litig.*, 154 F. Supp. 3d 918, 926-27 (N.D. Cal. 2015); *United Food*

16   *and Commercial Workers Local 1776 & Participating Employers Health and Welfare Fund v.*

17   *Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052 (N.D. Cal. 2014).  But the Brand Defendants

18   argue, in effect, that the IHPPs have not clearly alleged which states are at issue.

19          The Court rejects the Brand Defendants' argument.  The following are representative

20   allegations made by the IHPPs in their complaints:

21          •    "[W]hen any of Florida Blue's members filled a prescription of HIV drugs at a

22               third-party pharmacy, Florida Blue has paid a large share of the cost of those drugs.

23               For instance, . . . Florida Blue paid billions of dollars to third-party pharmacies for

24               HIV drugs dispensed to its members."  BCBS Fla. ¶ 35.

25          •    "By engaging in the foregoing conduct, Gilead intentionally and wrongfully

26               obtained and maintained monopoly power in the relevant market in violation of the

27   _____

28   [7] Defendants point out that the IHPPs are largely located in states that follow *Illinois Brick* – *i.e.*, its holding that indirect purchasers cannot bring claims for damages for violations of antitrust law.

1    following state laws: [listing statutes from about thirty states]."  BCBS Fla. ¶ 473
2    (Count VIII).

3    •   "Florida Blue has been harmed by paying artificially inflated, supracompetitive
4        prices for cART drugs dispensed to its members in these states and territories [*i.e.*,
5        those identified in ¶ 473] and suffered damages in an amount to be proven at trial."
6        BCBS Fla. Compl. ¶ 479 (Count VIII).

7    From these allegations, one can reasonably infer that, if the drugs at issue were dispensed to

8    members in specific states, then the IHPPs reimbursed their members in those states.

9    B.    Unjust Enrichment Claim

10           The Brand Defendants argue next that the state law unjust enrichment claims (Count XVI)

11    should be dismissed for failure to state a claim.  The Brand Defendants make two main arguments:

12    (1) the IHPPs have failed to plead that they have no adequate remedy at law, which is necessary

13    for them to seek equitable relief, and (2) the IHPPs have essentially lumped all the state law unjust

14    enrichment claims together, failing to take into account that the elements of such a claim can differ

15    depending on the state at issue.  For purposes of this order, the Court need only address the first

16    issue.

17           Relying on *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020), the Brand

18    Defendants assert that the IHPPs' unjust enrichment claim is deficient because they have failed to

19    plead they have no adequate remedy at law.  *See id.* at 844 (holding that a plaintiff "must establish

20    that she lacks an adequate remedy at law before securing equitable restitution for past harm under

21    the UCL and CLRA").  In considering this issue, the Court must bear in mind whether, under the

22    relevant state law, the state has repealed *Illinois Brick*.

23           1.    States Repealing *Illinois Brick*

24           If a state has repealed *Illinois Brick*, then an indirect purchaser (such as the IHPPs) *can* get

25    damages as a remedy for an antitrust violation.  This suggests that the IHPPs *do* have an adequate

26    remedy at law for Defendants' alleged anticompetitive conduct.

27           The IHPPs note, however, that a legal remedy may be inadequate if the equitable relief is

28    "more certain, prompt, or efficient than the legal remed[y]" requested.  *Anderson v. Apple Inc.*,

United States District Court
Northern District of California

28

1    500 F. Supp. 3d 993, 1009 (N.D. Cal. 2020) (Orrick, J.); *see also Am. Life Ins. Co. v. Stewart*, 300

2    U.S. 203, 214 (1937) (stating that "[a] remedy at law does not exclude one in equity unless it is

3    equally prompt and certain and in other ways efficient").  According to the IHPPs, here, equitable

4    relief is more certain, prompt, or efficient because

> the conduct needed to establish the elements for the claim for
> damages differs from the conduct needed to establish the claim for
> equitable relief.  As antitrust claims require proof of conduct beyond
> that necessary to establish a claim for unjust enrichment, IHPPs'
> claims for unjust enrichment should survive, as the less certain
> remedy at law of antitrust damages is not an adequate replacement
> for IHPPs' unjust enrichment claims.

9    Opp'n at 11.

10        The IHPPs are correct that, where a damages claim requires a more rigorous showing than

11   an equitable relief claim, some courts have recognized that the plaintiff lacks a remedy at law that

12   is equally prompt and certain as the equitable relief claim.  *See, e.g.*, *Coleman v. Mondelez Int'l

13   Inc.*, No. CV 20-8100 FMO (AFMx), 2021 U.S. Dist. LEXIS 139190, at *16 (C.D. Cal. July 26,

14   2021) (in case where plaintiff asserted false advertising based on the size of a box of candy,

15   holding that plaintiff adequately alleged no adequate remedy at law to support her claims for

16   restitution and equitable relief because, *inter alia*, she "alleges that she 'may be entitled to

17   restitution under the UCL, while not entitled to damages under other causes of action' [including

18   common law fraud] which may impose more stringent elements that plaintiff may ultimately not

19   be able to prove"); *Elgindy v. AGA Serv. Co.*, No. 20-cv-06304-JST, 2021 U.S. Dist. LEXIS

20   61269, at *48 (N.D. Cal. Mar. 29, 2021) (in case where plaintiffs challenged defendants' practice

21   of bundling noninsurance assistance fees with the sale of insurance policies, noting that "the

22   elements of a common-law fraud claim require proof of conduct beyond that which must be shown

23   to establish liability under the UCL and FAL" – *e.g.*, a UCL fraud claim does not require a

24   showing that the statement was false, that the party who made it knew it was false, or that the

25   plaintiff reasonably relied on the statement; "[t]hus, Plaintiffs have shown that they lack a remedy

26   at law that is 'equally prompt and certain' as their equitable claims").

27        But here, the IHPPs have not sufficiently shown *how* their antitrust/damages claim would

28   necessarily be more demanding than their unjust enrichment/equitable relief claim.  Notably, in

United States District Court
Northern District of California

one of the cases cited by the IHPPs, Judge Spero *rejected* the plaintiff's contention that his

UCL/equitable relief claim was less rigorous than his contract/damages claim, stating as follows:

"the factual predicate and the theory underlying his [UCL] claim of unfair conduct appear to be

essentially the same as his breach of contract claim."  *Shuman v. SquareTrade Inc.*, No. 20-cv-

02725-JCS, 2021 U.S. Dist. LEXIS 212879, at *32 (N.D. Cal. Nov. 3, 2021).  Here, the same

seems true as well – *i.e.*, the reason *why* Defendants have been unjustly enriched (as alleged) is

that they have engaged in the same anticompetitive conduct underlying the antitrust/damages

claim.[8]  *See, e.g.*, BCBS Fla. Compl. ¶¶ 541, 547 (alleging that "Defendants have benefited from

artificially high prices in the sale of HIV cART drugs resulting from the unlawful and inequitable

acts alleged throughout this Complaint" and that "[t]he economic benefits derived by Defendants

rightfully belongs to Florida Blue, as it paid anticompetitive and monopolistic prices during the

relevant period, benefiting Defendants").

 The Court therefore dismisses the unjust enrichment claim to the extent it is based on the

laws of states that have repealed *Illinois Brick*.  The Court notes, however, that the dismissal is

without prejudice.  If, as the case progresses, the IHPPs find that a legal remedy is not adequate,

then they may move for leave to amend.

 2. Underline States Following *Illinois Brick*

 If a state follows *Illinois Brick* (*i.e.*, has *not* repealed it), then an indirect purchaser (such as

the IHPPs) *cannot* get damages as a remedy for an antitrust violation.  That being the case, then

the IHPPs do have room to argue that they have *no* adequate remedy at law.  This is bolstered by

the IHPPs' allegations that it would be futile for them to seek damages as to the entities from

which they purchased the drugs at issue because those entities in the distribution chain did not

engage in any wrongdoing themselves.  *See* BCBS Fla. Compl. ¶ 545 ("It would be futile for

---

[8] In their opposition, the IHPPs also suggest that they lack an adequate remedy at law because "antitrust damages may not adequately protect against future injury to IHPPs" and thus they seek injunctive relief.  Opp'n at 10.  However, the IHPPs do not appear to have sought injunctive relief for their unjust enrichment claim.  *See, e.g.*, BCBS Fla. Compl. ¶¶ 549-50 (alleging that "Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff all unlawful or inequitable proceeds they received" and that "[a] constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants that are traceable to Plaintiff").  Nor is it clear that injunctive relief is a viable remedy for an unjust enrichment claim.

United States District Court
Northern District of California

1    Florida Blue to seek to exhaust any remedy against the immediate intermediary in the chain of

2    distribution from which it purchased HIV cART drugs, as any intermediary is not liable and would

3    not compensate Florida Blue for the impact of Defendants' unlawful conduct.").

4          The Brand Defendants' response is that the unjust enrichment claims should nevertheless

5    be dismissed because unjust enrichment cannot be used as an end run around *Illinois Brick*.

6    Courts are divided on this issue.  Most courts have held that "'indirect purchasers may not bring

7    state claims for unjust enrichment if they otherwise would be barred from bringing a claim under

8    that state's antitrust and consumer-protection statutes, absent a showing that the common law of

9    the state in question expressly allows for such recovery.'"   *In re Novartis & Par Antitrust Litig.*,

10   No. 18 Civ. 4361 (AKH), 2019 U.S. Dist. LEXIS 138133, at *21 (S.D.N.Y. Aug. 14, 2019).  *See,*

11   *e.g.*, *United Food*, 74 F. Supp. 3d at 1052; *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 763

12   (E.D. Pa. 2014); *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 232

13   (S.D.N.Y. 2012); *In re TFT-LCD Antitrust Litig.*, 599 F. Supp. 2d 1179 (N.D. Cal. 2009).  The

14   rationale is that, "where the applicable state law bars antitrust actions for damages by indirect

15   purchasers, or simply does not recognize a private cause of action for antitrust violations, a

16   plaintiff cannot circumvent the statutory framework by recasting an antitrust claim as one for

17   unjust enrichment."  *In re K-Dur Antitrust Litig.*, No. 01-1652 (JAG), 2008 U.S. Dist. LEXIS

18   71768, at *27-28 (D.N.J. Feb. 28, 2008); *see also Niaspan*, 42 F. Supp. 3d at 763 ("join[ing] this

19   majority of courts in concluding that 'allowing . . . unjust enrichment claims in those states that

20   explicitly disallow indirect purchasers from pursuing antitrust [and] consumer-protection claims . .

21   . would result in circumvention of the policies expressed by state legislatures through limitations

22   inherent in those laws.'").

23         But, as noted above, not all courts agree.  *See, e.g.*, *In re Generic Pharms. Pricing*

24   *Antitrust Litig.*, 368 F. Supp. 3d 814, 850 (E.D. Pa. 2019); *King Drug Co. of Florence, Inc. v.*

25   *Cephalon, Inc.*, 702 F. Supp. 2d 514, 539-40 (E.D. Pa. 2010); *In re G-fees Antitrust Litig.*, 584 F.

26   Supp. 2d 26, 46 (D.D.C. 2008); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 669

27   (E.D. Mich. 2000).  The general reasoning behind these decisions is as follows:

28         [T]he concerns that motivate *Illinois Brick* – the complexity

31

> associated with correctly apportioning recovery among direct purchasers, middlemen, and ultimate consumers, are not implicated in the context of unjust enrichment claims because "the very nature of such claims requires a focus on the gains of the defendants, not the losses of the plaintiffs."  "No reason or logic supports a conclusion that a state's adherence to the rule of *Illinois Brick* dispossesses a person not only of a statutory legal remedy for an antitrust violation, but also dispossesses the same person of his right to pursue a common law equitable remedy."  Therefore, *Illinois* Brick does not require dismissal of the unjust enrichment claims at this time.

*Generic Pharms.*, 368 F. Supp. 3d at 850; *see also G-fees*, 584 F. Supp. 2d at 46 (stating that

"'federal statutes should not be construed to displace a court's traditional equitable jurisdiction

absent "the clearest command or an inescapable inference to the contrary"'[;] [i]n addition, the

justification for *Illinois Brick*'s indirect purchaser bar was the difficulty of a fair measurement and

apportionment of damages – a problem not posed by this case").

   The Court finds the reasoning of the majority more persuasive.  As the *Novartis* court

pointed out, "[w]hile it is true that the gains to the defendant, rather than plaintiffs' losses, present

the *first* step in considering a claim for unjust enrichment, the [*Illinois Brick*] concern for double

recovery and the apportionment of claims remains."  *Novartis*, 2019 U.S. Dist. LEXIS 138133, at

*22 (emphasis added).  Even when the focus is confined to defendant's gain and not plaintiff's

loss (which may be complicated), the risks of multiple recovery against the defendant still obtains.

Furthermore, the approach of the majority allows an unjust enrichment plaintiff to demonstrate

that "the common law of the state in question expressly allows for such recovery."  *Id.* at *21.  In

other words, the majority approach simply establishes a rebuttable presumption – *i.e.*, because the

state legislature chose not to repeal *Illinois Brick*, that policy choice presumptively impacted the

ability of a plaintiff to proceed under an unjust enrichment theory.  But the IHPP's have made no

such specific showing (*e.g.*, as to any particular state here).

C.   <u>Antitrust Claim Under Puerto Rico Law</u>

   The Brand Defendants argue next that the IHPPs antitrust claims based on Puerto Rico law

should be dismissed.  They point out that, previously, the Court addressed the EPPs' claim

brought under the Puerto Rico Antitrust Act.  In its decision, the Court noted as follows:

> Title 10 of the Puerto Rico code deals with commerce, and Chapter

United States District Court
Northern District of California

1

2

3

4

> 13 within that title deals with monopolies and restraint of trade. See generally 10 L.P.R.A. §§ 251-276.  Unlike Illinois, Puerto Rico does not have an *Illinois Brick* repealer statute.  Section 268 of the code simply provides: "Any person who shall be injured in his business or property by any other person, by reason of acts or intended acts, forbidden or declared to be unlawful by the provisions of this chapter, except § 259 and 261 of this title, may sue therefor . . . ." *Id.* § 268.

5

6

> Similar to above, there is conflicting authority as to whether Puerto Rico allows for damages for indirect purchasers under Puerto Rico law.

7    *Staley*, 446 F. Supp. 3d at 626.  The Court ultimately agreed with Judge Orrick (and the majority

8    of cases) that indirect purchasers cannot bring claims under Puerto Rico law.  Defendants argue

9    that nothing has changed since the Court's decision in *Staley*.

10        In response, the IHPPs effectively argue that the Court should reconsider.  They first take

11   note of several pre-*Staley* cases that ruled in favor of the antitrust plaintiffs.  *See, e.g.*:

12        • *Gov't of Puerto Rico v. Carpenter Co.*, 442 F. Supp. 3d 464, 477-78 (D.P.R. 2020)

13            (Gelpi J.) (holding that indirect purchaser shave standing to sue under the Puerto

14            Rico antitrust statute).  This decision issued just a few days before the *Staley*

15            decision.  It was issued from the same judge who decided *Rivera-Muniz v. Horizon*

16            *Lines Inc.*, 737 F. Supp. 2d 57 (D.P.R. 2010) (Gelpi, J.), a case that this Court

17            expressly acknowledged in its *Staley* decision.  In *Rivera-Muniz*, the court stated

18            that "PRAA is modeled after antitrust statutes.  Although federal jurisprudence has

19            implied special standing requirements into private antitrust actions, Puerto Rico

20            explicitly rejects any such limitations." *Id.* at 61 (citing in support a 1994 decision

21            from the Puerto Rico Supreme Court, *Pressure Vessels*, which held that "'the

22            plaintiff need not establish anything beyond a factual causal relation between the

23            injury and the violation'").  In *Staley*, the Court implicitly agreed with Judge Orrick

24            that the *Rivera-Muniz* court's reliance on *Pressure Vessels* was not dispositive

25            because the *Pressure Vehicles* court did not address the standing of indirect

26            purchasers and did not discuss *Illinois Brick* or whether it had been repealed.  *See*

27            *Staley*, 466 F. Supp. 3d at 627.

28        • *In re Zetia (Ezetimibe) Antitrust Litig.*, 400 F. Supp. 3d 418, 433 (E.D. Va. 2019)

United States District Court
Northern District of California

33

(agreeing with *Rivera-Muniz*).

- *In re Flonase Antitrust Litig.*, 610 F. Supp. 2d 409, 414 (E.D. Pa. 2009) (relying on a decision from the Iowa Supreme Court holding that Puerto Rico has a statute explicitly authorizing indirect purchasers to bring an antitrust suit).

The IHPPs also cite several post-*Staley* decisions that issued in favor of the antitrust plaintiff. *See, e.g.*:

- *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, No. 20-MD-02966-LHK, 2021 U.S. Dist. LEXIS 153343, at *43 (N.D. Cal. Aug. 13, 2021). Judge Koh found that *Pressure Vehicles* did, in fact, address *Illinois Brick*. According to Judge Koh, "[e]ven though the *Pressure Vessels* Court did not cite *Illinois Brick* itself, it did cite and criticize four United States Supreme Court cases that explicitly applied *Illinois Brick*. In *UtiliCorp.*, for instance, the U.S. Supreme Court strictly barred indirect purchaser suits 'even assuming that any economic assumptions underlying the *Illinois Brick* rule might be *disproved* in a specific case.' Thus, the Puerto Rico Supreme Court was almost certainly aware of *Illinois Brick* when the Puerto Rico Supreme Court held – contrary to *Illinois Brick* – that an antitrust plaintiff 'need not establish anything beyond a factual causal relations between the injury and the violation.'" *Id.* at *142-43. Judge Koh added that, "even if the correct reading of *Pressure Vehicles* is unclear, what is clear is that the Court owes 'deference to the local district judges of Puerto Rico on matters of Puerto Rican law.'" *Id.* at *143 (citing First Circuit case from 1984[9]). Thus, Judge Koh deferred to Judge Gelpi's decision in *Rivera-Muniz*. *See id.* (adding that Judge Gelpi is presently a nominee

---

[9] *See Rodriguez v. Escambron Dev. Corp.*, 740 F.2d 92, 96 (1st Cir. 1984) ("Because of our usual deference to the local district judges of Puerto Rico on matters of Puerto Rican law, we are naturally inclined re affirm."); *see also Gual Morales v. Hernandez Vega*, 604 F.2d 730, 732 (1st Cir. 1979) ("When we are faced with a question involving the proper construction of Puerto Rico law, we give considerable deference to the district judges who are citizens of Puerto Rico and well versed in the Spanish underpinnings of Puerto Rico law. We recognize, however, that even among those who are fully conversant with a particular legal system there may be legitimate differences as to the correct interpretation of a particular rule and its application in new circumstances.").

United States District Court
Northern District of California

to the First Circuit).  (Judge Gelpi is now a First Circuit judge.)

- *In re Port Antitrust Litig.*, 495 F. Supp. 3d 753, 800-01 (D. Minn. 2020) (agreeing with Puerto Rico district court decision *Rivera-Muniz* (discussed below)).

The main issue here is whether Judge Orrick (with whom this Court agreed) or Judge Koh was right on the reading of *Pressure Vehicles*.

Below is the relevant excerpt from *Pressure Vehicles*:

> . . . [I]t bears noting that the plaintiffs seek relief under sec. 12 of Act 77 (10 L.P.R.A. § 268), which is equivalent, in general terms, to Clayton Act sec. 4 (15 U.S.C.A. § 15).  Said section provides for a private treble damage suit to those injured by acts in violation of our statute:
>
>> (a) Any person who shall be injured in his business or property by any other person, by reason of acts or intended acts, forbidden or declared to be unlawful by the provisions of this [Law], except sections 259 and 261 . . . may sue therefor in the Superior Court and shall recover threefold the damages by him sustained, plus costs, including a reasonable amount for attorney's fees.
>
> A simple reading of the text of this provision shows that it establishes three requirements in order to entitle a person to seek compensation: (1) the person must be injured in his business or property (2) by reason of (3) acts or attempted acts forbidden by our Law (unless it concerns conduct violating its third or fifth section).  *See*, *Antitrust Law Developments*, *supra*, at 386, 393.
>
> In the past two decades the second requirement, that, pursuant to the text of the provision, only requires a factual causal nexus between the injury established and the unlawful acts, has been the object of complex and novel interpretation in the federal sphere.  **Under Clayton Act sec. 4, equivalent to our sec. 12, federal case law has found it necessary to require a sec. 4 plaintiff to establish antitrust injury as well as antitrust standing.   This doctrine has not had a consistent, uniform, and coherent application.  *Kansas v. Utilicorp United, Inc.*, 497 U.S. 199 (1990);** *Atlantic Richfield Co. v. USA Petroleum Co.*, *supra*; ***Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982);** ***Associated General Contractors v. Carpenters*, 459 U.S. 519 (1983)**; *Reiter v. Sonotone Corp.*, 442 U.S. 330, 337-338 (1979); ***Pfizer Inc. v. India*, 434 U.S. 308, 313-314 (1978)**; *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977); *Hawaii v. Standard Oil Co.*, 405 U.S. 251 (1972); *Zenith Corp. v. Hazeltine*, 395 U.S. 100, 114 n. 9 (1969); Antitrust Law Developments, supra, at 394, 399-402.  *See also*, Hart, *Standing Doctrine in Antitrust Damage Suits, 1890-1975[:] Statutory Exegesis, Innovation, and the Influence of Doctrinal History*, 59 Tenn. L. Rev. 19[w] (1992).

United States District Court
Northern District of California

**When our antitrust statute was enacted in 1964, there was ambiguity as to these doctrines under federal law because the United States Supreme Court had not taken a clear-cut stance on the matter and lower court rulings were conflicting.  *Hart, supra*, at 192-197, 229-259.  Nonetheless, the federal Supreme Court had expressed itself on behalf of a liberal standing theory under Clayton Act sec. 4.**  *Radovich v. Nat. Football League, supra*, at 453-454; *Radiant Burners v. Peoples Gas Co.*, 364 U.S. 656, 659-660 (1961); *Mandeville Farms v. Sugar Co.*, 334 U.S. 219, 236 (1948). *See*, Hart, *supra*, at 249-254. The following statements of the federal Supreme Court are persuasive:

> In sum, in the absence of some articulable consideration of statutory policy suggesting a contrary conclusion in a particular factual setting, [§ 4 of the Clayton Act should be applied] in accordance with its plain language and its broad remedial and deterrent objectives.  *Blue Shield of Virginia v. McCready*, *supra*, at 473; *see* Hart, *supra*, at 257.

We hold that the plaintiff need not establish anything beyond a factual causal relation between the injury and the violation to meet the "by reason of" requirement; that is, it suffices that the plaintiff has been injured as a result of the statutory violation.

*Vessels v. Empire Gas de P.R.*, 137 P.R. Dec. 497 (1994) (emphasis added).

The four Supreme Court cases bolded above are those that Judge Koh identified as explicitly applying Illinois Brick.  Of those four cases, only three really turn on the indirect purchaser issue in *Illinois Brick* or have that issue from *Illinois Brick* as an important consideration: *Utilicorp*, *Blue Shield*, and *Associated General Contractors*.  *Pfizer* simply cited *Illinois Brick* for the proposition that "§ 4 has two purposes: to deter violators and deprive them of "'the fruits of their illegality,'" and 'to compensate victims of antitrust violations for their injuries.'"  *Pfizer v. Gov't of India*, 434 U.S. 308, 314 (1978).

Given that only three of the nine cases touched on the indirect purchaser issue in *Illinois Brick*, it is questionable whether the Puerto Rico Supreme Court was making a ruling one way or the other on *Illinois Brick* for purposes of the Puerto Rico antitrust statute.  This is particularly true given that the plaintiffs in *Pressure Vessels* do not appear to have been indirect purchasers.  The plaintiffs in *Pressure Vessels* were "a corporation engaged in the manufacture and repair of propane gas cylinders, and some of its shareholders, directors, and officers[.]  [They] filed a complaint against certain corporations engaged in the import and sale of propane gas cylinders, and in the sale of propane gas."  *Pressure Vessels*, 137 P.R. Decl. at 497.

United States District Court
Northern District of California

Arguably, a contention could still be made that, in *Pressure Vessels*, the Puerto Rico

Supreme Court (1) still recognized that the United States Supreme Court had adopted the no

indirect purchaser standing rule but (2) declined to adopt it for Puerto Rico's antitrust statute

because, at the time that the Puerto Rico law was adopted in 1964, the United States Supreme

Court had not made any clear ruling on direct purchaser standing.  (*Illinois Brick* was decided in

1977.  A related case *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968),

was decided almost a decade earlier.)  A district court in Illinois, however, has rejected this

argument:

> Puerto Rico points out that a federal district court in Puerto Rico has
> interpreted *Pressure Vessels* to stand for the proposition that the
> PRAA rejects *Illinois Brick* and permits damages claims by indirect
> purchasers.  *See Rivera-Muñiz v. Horizon Lines Inc.*, 737 F. Supp.
> 2d 57 (D.P.R. 2010).  Even though *Pressure Vessels* does not
> mention *Illinois Brick*, *Rivera-Muñiz* relied on *Pressure Vessels*'s
> historical analysis of the development of federal antitrust standing
> doctrine to find that the PRAA rejects *Illinois Brick* because that
> case was issued in 1977, thirteen years after the PRAA was enacted.
> *See Rivera-Muñiz*, 737 F. Supp. 2d at 61 ("Because Puerto Rico
> liberally construes its standing requirements in private antitrust
> cases, it is immaterial whether Plaintiffs are direct or indirect
> purchasers[.]").  And for that reason, *Rivera-Muñiz* found that
> indirect purchasers have standing under the PRAA.
>
> But *Pressure Vessels*'s analysis of the state of antitrust case law at
> the time the PRAA was enacted is flawed.  True, *Illinois Brick* was
> not issued until 1977, whereas the PRAA was enacted in 1964.  But
> as one of the sources relied on by the court in Pressure Vessels
> notes, by the 1950s, courts "began to subscribe to [the] direct-injury
> standing requirement," and by 1960 it "had become commonplace in
> antitrust standing doctrine."  John F. Hart, *Standing Doctrine in
> Antitrust Damage Suits, 1890-1975: Statutory Exegesis, Innovation,
> and the Influence of Doctrinal History*, 59 Tenn. L. Rev. 19[2], 229
> (1992) (cited by *Pressure Vessels*, 137 DPR at 519).  Indeed, as
> early as 1918, the Supreme Court had already held that:
>
>> The general tendency of the law, in regard to
>> damages at least, is not to go beyond the first step.
>> As it does not attribute remote consequences to a
>> defendant so it holds him liable if proximately the
>> plaintiff has suffered a loss. . . . The [defendant]
>> ought not to be allowed to retain his illegal profit, and
>> the *only* one who can take it from him is the one that
>> alone was in relation with him, and from whom the
>> carrier took the sum.
>
> *S. Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 534, 38
> S. Ct. 186, 62 L. Ed. 451 (1918) (emphases added).  Relying in part

on this holding, the Supreme Court later expressly prohibited the defense that a direct purchaser had passed on higher prices to indirect purchasers. *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 490 n.8, 88 S. Ct. 2224, 20 L. Ed. 2d 1231 (1968). And in "parity" with *Hanover Shoe*, the Supreme Court in *Illinois Brick* barred indirect purchasers from bringing claims. *See Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481 (7th Cir. 2002) ("By parity of reasoning, the Court decided in *Illinois Brick* that the persons authorized to sue under the antitrust laws in this type of case were the direct purchasers.").

In sum, *Pressure Vessels* is an insufficient authority to find that the PRAA rejects *Illinois Brick*, if only because *Pressure Vessels* is not about claims by indirect purchasers. Furthermore, to the extent *Pressure Vessels*'s general historical analysis of "antitrust standing" is relevant to whether the PRAA permits claims by indirect purchasers, the analysis is flawed. This Court joins the majority of courts and finds *Rivera-Muñiz*'s reliance on *Pressure Vessels* as an *Illinois Brick* repealer unpersuasive. Therefore, the Court finds that the PRAA does not permit claims by indirect purchasers.

*In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2020 U.S. Dist. LEXIS 124591, at *51-54 (N.D. Ill. July 15, 2020).

Though arguably a close call, the Court adheres to its earlier ruling in *Staley* and thus bars an indirect purchaser claim under Puerto Rico law.

D.   <u>Statute of Limitations – Equitable Tolling/Fraudulent Concealment</u>

The Brand Defendants further argue that the statute of limitations puts certain restrictions on the IHPPs' claims. The Brand Defendants note that the longest statute of limitations for any of the IHPPs' claims is four years. The IHPPs filed suit on December 13, 2021. That means, ordinarily, the IHPPs could wrap in only alleged misconduct starting on **December 13, 2017** (four years earlier). The Brand Defendants argue that this date is clearly applicable as to Teva. Teva joins in that argument. As to themselves, the Brand Defendants concede that the IHPPs can reach back further – specifically, to **May 14, 2015**, because that is the limitations period covered by the EPPs' *Staley* case (*i.e.*, the EPPs filed suit on May 14, 2019).[10] However, the IHPPs invoke equitable tolling to wrap in conduct that took place prior to these two dates – back to at least November 2014. The equitable tolling theory on which the IHPPs rely is fraudulent concealment. Defendants maintain that the fraudulent concealment theory is not plausible.

_____

[10] The Court has previously held that the date 5/14/2015 cannot apply to Teva because Teva was not a named defendant in the EPPs' suit.

United States District Court
Northern District of California

Representative allegations regarding the fraudulent concealment are as follows:

> 332.   Florida Blue is also entitled to recover damages on purchases made from at least **as early as November 2014** to the present because Gilead and Teva fraudulently concealed that their settlement agreement contained an unlawful reverse payment, and Florida Blue could not have discovered the existence of Defendants' and Gilead's other co-conspirators' unlawful conduct through the exercise of reasonable diligence prior to **December 15, 2017**, thereby tolling the relevant statute of limitations.  **Gilead's payment to Teva in the form of a secret No-AG agreement was not discoverable until after Teva launched its generic Viread on December 15, 2017, and Gilead did not launch an authorized generic.**

> 333.   Gilead and Teva's scheme was self-concealing, in that, by its nature and design, it was incapable of being detected.  In addition, Gilead and Teva actively concealed the terms of their agreement to avoid detection.  For example, Gilead and Teva specifically represented to the court in the underlying patent litigation that their Viread settlement did not contain a No-AG agreement.

> 334.   Because Florida Blue was not aware of Gilead and Teva's secret, unlawful reverse payment agreement, it could not have been aware that Defendants' other conduct was also part of Defendants' monopolistic and anticompetitive scheme and the antitrust violations alleged herein [*e.g.*, the No-Generics Restraints, the MFE/MFEP provisions, etc.].

BCBS Fla. Compl. ¶¶ 332-33 (emphasis added).

As a preliminary matter, the Court notes that this fraudulent concealment theory only has application to a *part* of the patent settlement agreements between Gilead and Teva.  In particular, the Viread (TDF) settlement agreement from 2013 is alleged to have contained a secret agreement related to authorized generics ("AGs").  As alleged in the IHPPs' complaints:

- In February 2013, Gilead and Teva reached a settlement agreement related to Viread (TDF).  *See* BCBS Fla. Compl. ¶ 126.

- In June 2013, the FTC sent a letter to Gilead and TDF that expressed concern about the settlement agreement because of a term related to AGs.  *See* BCBS Fla. Compl. ¶ 129.

- In August 2013, the trial court in the patent litigation between Gilead and Teva held a status conference at which point the FTC's objection was discussed.  Gilead

United States District Court
Northern District of California

noted that the parties' settlement agreement had "'a provision in which Gilead agreed that if it were to independently and unilaterally determine that it would launch a generic, an authorized generic of its own, it would do so but only if it gave Teva [a] six weeks['] head start on the Gilead authorized generic.  This so-called, in the [FTC's] view, "no authorized generic clause," they have now tried to analogize, in our case and others, to a reverse payment.'"  BCBS Fla. Compl. ¶ 130 (emphasis omitted).  Gilead then represented to the trial court that the parties had agreed to remove that provision from their settlement agreement – *i.e.*, the No-AG agreement had been eliminated.  *See* BCBS Fla. Compl. ¶ 132.

- But "Gilead and Teva did not disclose . . . they still had an agreement preventing Gilead from launching an AG at the point of Teva's delayed generic entry.  That secret agreement did not become apparent until Gilead did ***not*** launch a competing AG when Teva launched its generic on December 15, 2017, and Teva issued a press release announcing its 'exclusive' generic Viread launch."  BCBS Fla. Compl. ¶ 133 (emphasis in original).

- "Gilead's decision not to launch a competing AG defies rational business logic, as such a move could have offset the expected generic erosion."  BCBS Fla. Compl. ¶ 138.

Because the fraudulent concealment theory is related to an alleged secret agreement between Gilead and Teva, the IHPPs do not have a basis to extend the limitations period as to either BMS or Janssen.  This is especially true since the Court has already rejected the EPPs' theory that there was an overarching conspiracy of which all the Brand Defendants were knowledgeable.

The fraudulent concealment theory, therefore, applies at most to Gilead and Teva.  As to Gilead, any conduct prior to May 14, 2015 would also be part of the broader claim that Gilead took action in multiple ways to restrain competition (*i.e.*, not only the patent settlement agreements with Teva but also the use of No-Generics Restraints in agreements with other brand companies and the commercialization/development of TAF).

As to the merits of the fraudulent concealment theory, the Court first takes into account that, in one of its prior orders in the DPP class action, the Court commented on the issue of fraudulent concealment.[11]  *See* Docket No. 555 (order).  For example, it indicated that, for a fraudulent concealment theory to be viable, a plaintiff must plead *affirmative* concealment, and not just *passive* concealment (which would include passive silence).  *See* Docket No. 555 (Order at 27).  The Court also indicated that a defendant's acts cannot be deemed fraudulent concealment just because they are by nature self-concealing – again, there must be *affirmative* conduct by the defendant.  Docket No. 555 (Order at 28) (noting that the Ninth Circuit has stated that "'[a] plaintiff alleging fraudulent concealment must establish that its failure to have notice of its claim was the result of affirmative conduct by the defendant'").

The parties disagree as to whether Gilead and Teva engaged in affirmative concealment.  Here, the IHPPs have the better position.  Implicitly, they are asserting that Gilead and Teva was obligated to disclose the secret No-AG agreement *because* they had represented to the trial court in the patent litigation that they were removing the No-AG provision from the settlement agreement.  *See Conmar Corp. v. Mitsui & Co.,* 858 F.2d 499, 505 (9th Cir. 1988) (noting that "[p]assive concealment of information is not enough to toll the statute of limitations *unless* the defendant had a fiduciary duty to disclose information to the plaintiff") (emphasis added); *In re Glumetza Antitrust Litig.,* No. C 19-05822 WHA, 2020 U.S. Dist. LEXIS 39649, at *29 (N.D. Cal. Mar. 5, 2020) (stating that "'[h]alf-truths – representations that state the truth only so far as it goes, while omitting critical qualifying information – can be actionable misrepresentations'"); *cf. In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 268 (2d Cir. 1993) (in securities law context, stating that "one circumstance creating a duty to disclose arises when disclosure is necessary to make prior statements not misleading").  In other words, this was not just a matter of passive silence, or even a "mere 'failure to own up to illegal conduct' in response to an inquiry about whether the defendant engaged in illegal antitrust activity."  *Ryan v. Microsoft Corp.,* 147 F. Supp. 3d 868, 886 (N.D. Cal. 2015) (explaining that such a failure "is not sufficient for fraudulent

---

[11] In the same order, the Court held that the discovery rule was not applicable.

United States District Court
Northern District of California

concealment" as that "otherwise 'would effectively nullify the statute of limitations in these cases'"); *see also Conmar*, 858 F.2d at 505 (noting that "[a]n affirmative act of denial . . . is enough" to toll the statute of limitations under a fraudulent concealment theory).

But the Brand Defendants fairly point that, even if the Court accepts such, there is nothing in the IHPPs' complaints to indicate that they were aware of this representation before the trial court and relied on it.  *See* Reply at 11 (arguing that the "IHPPs have not alleged that they were even aware of the alleged 'misrepresentation,' let alone that they relied on it in delaying their suit").  That being the case, the Court must reject the IHPPs' fraudulent concealment theory.  *See Conmar*, 858 F.2d at 505 (stating that "[a] plaintiff alleging fraudulent concealment must establish that its failure to have notice of its claim was the *result* of affirmative conduct by the defendant"; also noting that "[a]n affirmative act of denial" can toll the statute of limitations "if the circumstances make the plaintiff's *reliance* on the denial reasonable") (emphasis added).  Contrary to what the IHPPs suggested at the hearing, the court in *Glumetza*, 2020 U.S. Dist. LEXIS 39649, did not expressly hold that a fraudulent concealment theory is viable simply because a representation is made to the market, and, even if it did, that would be contrary to *Conmar*, which is binding Ninth Circuit precedent.  *See also Santa Maria v. Pac. Bell*, 202 F.3d 1170, 1173 (9th Cir. 2000) (in ADA case, "hold[ing] that a plaintiff's reasonable reliance on fraudulent concealment is required for application of the doctrine of equitable estoppel"), *overruled on other grounds by Socop-Gonzalez v. INS*, 272 F.3d 1176 (9th Cir. 2001) (en banc).

Accordingly, the Court grants the motion to dismiss claims against Teva based on conduct prior to December 13, 2017, and claims based against the Brand Defendants prior to May 14, 2015.  The dismissal is without prejudice.  The IHPPs may amend their complaints with respect to the fraudulent concealment theory if they can allege in good faith and consistent with their Rule 11 obligations that they knew about the representation made regarding the No-AG provision and relied on it.[12]

---

[12] Because of the Court's ruling here, it need not address at this time Defendants' argument that the IHPPs must plead that they were reasonably diligent after the secret No-AG agreement "bec[a]me apparent [when] Gilead did not launch a competing AG when Teva launched its generic on December 15, 2017."  BCBS Fla. Compl. ¶ 133.  If the IHPPs wish to include allegations about

E.      Assignors

        In their final argument, the Brand Defendants contend that the IHPPs' claims are problematic to the extent the IHPPs are bringing claims on the behalf of third parties.  These third parties seem to fall into two categories: (1) affiliates/subsidiaries of the IHPPs and (2) plans for whom the IHPPs provide "Administrative Services Only" ("ASO") services.  According to Brand Defendants, the IHPPs have not adequately identified these third parties or the scope of their authority to act for the third parties, and, therefore, the IHPPs lack standing to bring the claims. *See* Mot. at 21-22 (arguing that the IHPPs should provide the who, what, and when of any assignment).  As context, below are some representative allegations:

        **Affiliates/subsidiaries of the IHPPs:**

- "Centene and its subsidiaries are providers of healthcare related services, including insuring risk for prescription drug costs for more than 15.2 million insureds in all 50 States, the District of Columbia, and Puerto Rico.  At all times relevant to this Complaint, Centene and its subsidiaries were (and are) contractually responsible under various prescription drug benefit plans for making payments for branded and generic HIV cART drugs dispensed to their members across the United States and, as a result, spent billions of dollars on these drugs.  Centene seeks recovery of all overcharges incurred in connection with those purchases."  Centene Compl. ¶ 32.

- "Humana and its subsidiaries are providers of healthcare related services, including insuring risk for prescription drug costs for more than 8 million members in all 50 States, the District of Columbia, and Puerto Rico. . . . Humana operates its insurance business through a variety of health plans and other subsidiaries, all of which have assigned their relevant claims in this action to Humana."  Humana Compl. ¶ 32; *see also* Humana Compl. at 8 n.2 (listing "[s]ome of the subsidiaries, health plan[s] and otherwise, through which Humana conducts insurance business

---

reasonable diligence post-December 2017 they may do so (as the Court is already giving leave to amend), although the Court notes that it is not making any legal ruling at this juncture on the applicability of *Smith v. Davis*, 953 F.3d 582 (9th Cir. 2020) (en banc) (in habeas case, rejecting the stop-clock method of equitable tolling).

United States District Court
Northern District of California

1    and incurs expenses related to HIV cART drugs").

2    • "Triple-S Salud, Inc. through itself and its subsidiaries (all of whom have assigned

3    claims to Triple-S Salud, Inc. in this action) provides a full spectrum of health care

4    plans and services, including prescription drug benefits, to over one million

5    members. At all times relevant to this Complaint, when any of Triple-S Salud,

6    Inc.'s members filled a prescription of HIV drugs at a third-party pharmacy, Triple-

7    S Salud, Inc. has paid a large share of the cost of those drugs. For instance, over

8    the relevant time period, Triple-S Salud, Inc. paid a substantial amount to third-

9    party pharmacies for HIV cART drugs dispensed to its members." Triple-S Compl.

10   ¶ 34.

11   **ASO plans.**

12   • "Florida Blue is also authorized to bring claims for purchases it makes on behalf of

13   services it offers to other health plans. More specifically, Florida Blue offers

14   "Administrative Services Only" ("ASO") services to self-funded health plans.

15   Under these ASO agreements, Florida Blue serves as a third-party administrator to

16   self-funded health plans for purposes of claims processing and other services."

17   BCBS Fla. Compl. ¶ 36.

18   • "Humana also offers 'Administrative Services Only' ('ASO') services to self-

19   funded health plans across the United States. Under these ASO agreements,

20   Humana's subsidiaries serve as a third-party administrator to self-funded health

21   plans for purposes of claims processing and other services." Humana Compl ¶ 33.

22   • "Triple-S Salud, Inc. is also authorized to bring claims for purchases it makes on

23   behalf of services it offers to other health plans. More specifically, Triple-S Salud,

24   Inc. offers 'Administrative Services Only' ('ASO') services to self-funded health

25   plans. Under these ASO agreements, Triple-S Salud, Inc. serves as a third-party

26   administrator to self-funded health plans for purposes of claims processing and

27   other services." Triple-S Compl. ¶ 35.

28   The Brand Defendants argue the lack of specificity creates not only a standing problem but

44

1   also a violation of Civil Local Rule 3-15.  Civil Local Rule 3-15 provides in relevant part that a

2   party has an obligation to "disclose any persons, associations of persons, firms, partnerships,

3   corporations (including parent corporations), or other entities other than the parties themselves

4   known by the party to have either (i) a financial interest of any kind in the subject matter in

5   controversy or in a party to the proceeding; or (ii) any other kind of interest that could be

6   substantially affected by the outcome of the proceeding."  Civ. L.R. 3-15(a)(1).

7            Regarding IHPP affiliates/subsidiaries, the Court holds that more specificity is not

8   required, either as a matter or pleading (for standing) or Civil Local Rule 3-15.  The fact that there

9   is a close relationship with the IHPPs makes any lack of specificity less of a concern.

10           As for ASO plans, here, the Brand Defendants are on stronger ground – *i.e.*, without

11  knowing who the specific self-funded plans are, the Brand Defendants are not on any kind of

12  notice.  Implicitly recognizing such, the IHPPs have argued that they are *not* actually bringing

13  claims on behalf of the self-funded plans; rather, they are bringing claims on their *own* behalf

14  because they paid the overcharges as an initial matter and thus were injured, even if those injuries

15  were later offset.  This essentially raises the issue the Court considered in conjunction with the

16  motion to dismiss BCBSA's claims – *i.e.*, where a company provides only ASO services, is it

17  simply a financial intermediary?  At this juncture, the IHPPs' complaints do not clearly allege that

18  they paid the overcharges themselves as an initial matter.  Accordingly, the Court dismisses the

19  claims based on the ASO plans but without prejudice.  The IHPPs may amend their complaints to

20  clarify that they are filings claims on their own behalf because, in providing ASO to the plans, the

21  IHPPs paid out of pocket in the first instance.

22           As a final point, the Court takes note that, in its complaint, Humana also makes the

23  following allegation: "As a Part D sponsor, Humana is obligated both to recoup overcharges for

24  prescription drugs and to return a portion of such recoupments to the Centers for Medicare &

25  Medicaid Services ('CMS')."  Humana Compl. ¶ 32.  It is not clear whether the Brand Defendants

26  are moving to dismiss for lack of standing based on this allegation.  *See* Mot. at 21 (referring to

27  this allegation but not clearly articulating an argument related to the allegation).  Because the

28  IHPPs are already amending their complaints, the Court orders Humana to clarify in its amended

United States District Court
Northern District of California

45

pleading whether its claims for relief are based, in part, on its status as a Part D sponsor.  If so, Humana shall also clarify its basis for standing to pursue these claims.

F.      Summary

For the Brand Defendants' motion to dismiss (which has been joined by Teva), the Court rules as follows:

- Based on the allegations in the IHPPs' complaints, the IHPPs have adequately alleged standing for their state law claims (antitrust, consumer protection, and unjust enrichment).  It can reasonably be inferred from the complaints that the IHPPs are implicating the laws of the states where they reimbursed their members for purchases of the drugs at issue.

- The state law unjust enrichment claim (Count XVI) is dismissed, in part without prejudice and in part with prejudice.  The dismissal is without prejudice to the extent the IHPPs' claim is based on states that have repealed *Illinois Brick*.  The dismissal is with prejudice to the extent the IHPPs' claim is based on states that follow *Illinois Brick*.  At this time, the IHPPs do not have leave to amend the unjust enrichment claim.

- The antitrust claim under Puerto Rico law is dismissed with prejudice.

- The IHPPs' fraudulent concealment theory (for purposes of tolling the statute of limitations) is not viable as pled.  Even though the IHPPs have alleged an affirmative concealment, they have not shown that they were aware of the misleading representation regarding the Gilead-Teva settlement agreement (related to Viread (TDF)) or that they relied on it.  Because the fraudulent concealment theory is not viable at this juncture, the IHPPs' claims are limited to conduct that took place (1) on or after December 13, 2017, for Teva and (2) on or after May 15, 2014, for the Brand Defendants.  The IHPPs have leave to amend.

- The IHPPs have adequately alleged standing to the extent they were assigned claims by their affiliates/subsidiaries.  However, to the extent the IHPPs claim that they were assigned claims by self-funded plans for whom the IHPPs provide ASO,

the IHPPs have not sufficiently alleged standing.  The IHPPs have leave to amend to clarify that they are not bringing claims on behalf of the ASO plans but rather are bringing claims on their *own* behalf because they paid the overcharges as an initial matter and thus were injured (even if those injuries were later offset). Humana also has leave to amend to clarify whether it is bringing claims based on its status as a Part D sponsor and, if so, the basis for its standing.

## IV.     CONCLUSION

For the foregoing reasons, the motions to dismiss are granted in part and denied in part. Where the IHPPs are permitted to amend, the amended pleading shall be filed by **May 11, 2022**.

The Court provisionally files the entirety of this order under seal.  The parties are ordered to meet and confer to determine which portions of the order need to be sealed.  A joint stipulation on sealing shall be filed within **April 27, 2022**.

This order disposes of Docket Nos. 889 and 891.


**IT IS SO ORDERED**.


Dated: April 20, 2022

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California