PAUL J. RIEHLE (SBN 115199)
Paul.Riehle@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
Four Embarcadero Center, 27th Floor
San Francisco, CA 94111-4180
Telephone: (415) 591-7500
Facsimile: (415) 591-7510

*Attorneys for Defendants*
*JANSSEN R&D IRELAND,*
*JANSSEN PRODUCTS, L.P., and*
*JOHNSON & JOHNSON*

MICHAEL J. SHIPLEY
KIRKLAND & ELLIS LLP
555 South Flower Street
Suite 3700
Los Angeles, California 90071
Tel.: (213) 680-8400
michael.shipley@kirkland.com

*Attorney for Defendants Gilead Sciences,*
*Inc., Gilead Holdings, LLC, Gilead*
*Sciences, LLC, and Gilead Sciences*
*Ireland UC*

(Additional Counsel for Defendants Listed on
Signature Page)

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE HIV ANTITRUST LITIGATION | Case No. 3:19-cv-02573-EMC (lead case) |
| | **DEFENDANTS' TRIAL BRIEF WITH RESPECT TO PLAINTIFFS' COMPLERA® AND EVOTAZ® COLLABORATION-AGREEMENT CLAIMS** |
| THIS DOCUMENT RELATES TO: | |
| 19-cv-02573; 3:21-cv-09202; 3:21-cv-09621; 3:21-cv-09622; 3:21-cv-09634; 3:21-cv-09646; 3:21-cv-09647; 3:22-cv-02188; 3:22-cv-02197 | Trial: May 30, 2023 |
| | Time: 9:00 a.m. |
| | Ctrm: 5 – 17th Floor |
| | Judge: Honorable Edward M. Chen |

1

**TABLE OF CONTENTS**

2

Page

3

I.  PRELIMINARY STATEMENT ........................................................................... 1

4

II.  BACKGROUND ON THE TWO COLLABORATION AGREEMENTS ............................ 3

5

A.  Janssen and Gilead Collaborated to Create Complera ............................. 3

B.  BMS and Gilead Collaborated to Create Evotaz ...................................... 5

6

III.  DEFENDANTS' RULE OF REASON CASE AT TRIAL ............................................ 5

7

A.  Plaintiffs Cannot Establish Market Power with Respect to Either Complera or
Evotaz ...................................................................................................... 5

8

1.  Legal Standard ............................................................................ 5

9

2.  Key Evidence .............................................................................. 5

10

B.  Plaintiffs Cannot Meet Their Burden of Showing that the Non-Competes Had
Substantial Anticompetitive Effects ........................................................ 6

11

1.  Legal Standard ............................................................................ 7

12

2.  Key Evidence .............................................................................. 7

13

C.  The Non-Competes in the Complera and Evotaz Collaboration Agreements Had
Clear Procompetitive Benefits ................................................................ 8

14

1.  Legal Standard ............................................................................ 8

15

2.  Key Evidence ............................................................................ 10

16

D.  The Non-Competes Were Narrowly Drafted, and No Substantially Less Restrictive
Alternative Was Available. .................................................................... 12

17

1.  Legal Standard .......................................................................... 12

18

2.  Key Evidence ............................................................................ 13

19

E.  Plaintiffs' Damages Claims Are Unsustainable ..................................... 14

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 **Page(s)**

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
  2020 U.S. Dist. LEXIS 108757 (S.D. Cal. June 22, 2020), *aff'd*, 9 F.4th 1102
  (9th Cir. 2021) ................................................................................................................. 9

*Aya Healthcare Servs, Inc. v. AMN Healthcare, Inc.*,
  9 F.4th 1102 (9th Cir. 2021) ................................................................................... 1, 2, 8, 9

*Cataphote Corp. v. DeSoto Chem. Coatings, Inc.*,
  450 F.2d 769 (9th Cir. 1971) ......................................................................................... 7

*Coronavirus Rep. v. Apple Inc.*,
  2021 U.S. Dist. LEXIS 249564 (N.D. Cal. Nov. 30, 2021) (Chen, J.) ..................... 5

*E. Bement & Sons v. Nat'l Harrow Co.*,
  186 U.S. 70 (1902) ........................................................................................................ 7

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
  726 F.2d 1381 (9th Cir. 1984) ....................................................................................... 9

*Layne Christensen Co. v. Bro-Tech Corp.*,
  836 F. Supp. 2d 1203 (D. Kan. 2011) ........................................................................ 9

*Med Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*,
  922 F.3d 713 (6th Cir. 2019) ........................................................................................ 2

*Metro Indus. v. Sammi Corp.*,
  82 F.3d 839 (9th Cir. 1996) .......................................................................................... 9

*Mut. Pharm. Co. v. Bartlett*,
  570 U.S. 472 (2013) ...................................................................................................... 10

*NCAA v. Alston*,
  141 S. Ct. 2141 (2021) .......................................................................................... 9, 13

*Northrop Corp. v. McDonnell Douglas Corp.*,
  705 F.2d 1030 (9th Cir. 1983) ...................................................................................... 9

*O'Bannon v. NCAA*,
  802 F.3d 1049 (9th Cir. 2015) ............................................................................. 12, 13

*PLS.com, LLC v. Nat'l Ass'n of Realtors*,
  32 F.4th 824 (9th Cir. 2022) ......................................................................................... 5

*Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185 (7th Cir. 1985) ................... 2

ii

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986) ................................................................................. 2

*Safelite Glass Corp. v. Crawford*,
    25 Fed. App'x 613 (9th Cir. 2002) ........................................................................... 9

**Statutes, Rules & Regulations**

35 U.S.C. § 261 ................................................................................................................. 7

DEFENDANTS' TRIAL BRIEF WITH RESPECT TO PLAINTIFFS' COMPLERA AND EVOTAZ
COLLABORATION-AGREEMENT CLAIMS (CASE NO. 3:19-CV-02573-EMC) (LEAD)

1    Pursuant to the Joint Stipulation and Order Regarding Pretrial Schedule (ECF No. 1613),
2  and this Court's Civil Pretrial Instructions, Defendants Gilead Sciences, Inc., Gilead Holdings,
3  LLC, Gilead Sciences, LLC, and Gilead Sciences Ireland UC ("Gilead"); and Janssen R&D Ireland,
4  Janssen Products, L.P., and Johnson & Johnson ("Janssen") (collectively "Defendants") submit this
5  trial brief addressing their theory of the case, the key evidence, and the controlling issues of law
6  for the jury trial on Plaintiffs' collaboration-agreement claims.  *See* ECF No. 1629-3, Defendants'
7  Trial Structure Brief.  Consistent with the Court's rules, this trial brief is a summary of key concepts
8  and evidence that Defendants will prove at trial.  Defendants expressly reserve their right to present
9  further evidence and argument not summarized herein.

10  **I.    PRELIMINARY STATEMENT**

11    Plaintiffs challenge the non-compete provisions in collaboration agreements that made
12  possible the development and distribution of two life-saving HIV medications.  Both medications
13  are fixed-dose combination drugs ("FDCs") that reduce pill burden, improve drug adherence, and
14  thereby enable persons with HIV to lead normal lives.  One of the FDCs is Complera®, the result
15  of a collaboration between Janssen and Gilead; the other is Evotaz®, the result of a collaboration
16  between BMS and Gilead.  While Plaintiffs and their experts challenge the non-compete provisions
17  in the collaboration agreements, they do not dispute the benefits of these FDCs to HIV patients.  As
18  Defendants will show at trial, the FDCs that emerged from these collaboration agreements
19  represented groundbreaking innovations in HIV treatment and changed HIV from a death sentence
20  to a treatable disease without impacting normal life expectancy.

21    This Court entered summary judgment in favor of Defendants on three of the original five
22  at-issue FDCs—Prezcobix®, Odefsey® and Symtuza®—leaving for trial only the collaboration-
23  agreement claims for Complera and Evotaz.  In addition, the Court denied Plaintiffs' motion for
24  summary judgment on the "quick look" analysis, holding that the "rule of reason" applied to the
25  non-compete provisions in the remaining collaboration agreements at issue.  The legal framework
26  for trying the collaboration-agreement claims under the rule of reason is well-established.  *Aya*
27  *Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1111 (9th Cir. 2021).

28    At trial, Plaintiffs will have the burdens of proving market power and that, "but-for" the

non-compete provisions in the collaboration agreements, Janssen would have entered a relevant market with a generic version of Complera, and Gilead would have entered a relevant market with a generic version of Evotaz. Plaintiffs cannot meet those burdens. On the threshold issue of market power, Plaintiffs' case is wholly dependent on an untenable theory that the relevant market is limited to only the branded FDC and its AB-rated generic equivalent. Defendants' market definition expert, Dr. Lawrence Wu, will explain why such a narrowly defined market is contrary to patient switching data and inconsistent with business realities. Further, in response to Plaintiffs' theory of competitive effects, Defendants' fact witnesses will explain to the jury why, as brand manufacturers, entry here with a generic version of their own innovative medication would have been contrary to their independent business interests, and Defendants' expert witnesses will explain why, in the "but-for" world theorized by Plaintiffs, there would not have been an earlier entry of an AB-rated generic equivalent of either Complera or Evotaz.

Beyond Plaintiffs' failure of proof on those threshold issues, the evidence Defendants will present at trial will establish independent bases for a defense jury verdict. Their witnesses will describe for the jury the procompetitive benefits of the non-compete provisions. In the words the Ninth Circuit used to uphold the ancillary restraint in *Aya Healthcare*, the Defendants "would likely [have been] less willing or unwilling to deal" with each other absent the non-competes, and the non-competes "may [have] contribute[d] to the success of [the] cooperative venture." 9 F.4th at 1102. In particular, the non-competes avoided any free riding on the substantial investments made by each collaborator, and they protected know-how that was essential to the success of the collaborations. The legal precedent for upholding non-competes on these grounds is well-established. *See, e.g.*, *Med Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 730 (6th Cir. 2019) (joint venturers have a "legitimate interest" in preventing free riding through non-compete provision); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 223 (D.C. Cir. 1986); *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188 (7th Cir. 1985) ("It is necessary for people to cooperate in some respects before they may compete in others, and cooperation facilitates efficient production.") (cited by *Aya Healthcare*, 9 F.4th at 1110). Moreover, the non-competes included in the Complera and Evotaz collaboration agreements were

2

1   narrowly defined—*i.e.*, limited to an identical or near identical generic version of the branded

2   FDC—and they allowed the parties to vigorously compete with one another outside the

3   collaboration product.

4           Finally, Plaintiffs' damages claims fail on multiple grounds.  Plaintiffs and their experts

5   have assumed a speculative timetable for generic entry in the "but-for" world absent the non-

6   compete provisions.  Their damages models have also assumed a narrow product market and entry

7   with AB-rated generic versions of Complera and Evotaz; only AB-rated generics would qualify for

8   automatic substitution at the pharmacy level, which Plaintiffs' experts have pointed to as the

9   catalyst for capturing market share.  The amount of Complera and Evotaz damages claimed by

10  Plaintiffs is also subject to sizable reductions, based on several corrections to the flawed

11  assumptions identified by Defendants' expert, Dr. Anupam Jena.

12          In the remaining sections of this trial brief, Defendants provide further background on both

13  the Complera and Evotaz collaboration agreements, followed by a discussion of the legal standards

14  and key evidence relevant to each element of their rule of reason case.

15  **II.      BACKGROUND ON THE TWO COLLABORATION AGREEMENTS**

16          **A.      Janssen and Gilead Collaborated to Create Complera**

17          On July 16, 2009, Gilead and Janssen entered into a license and collaboration agreement to

18  combine Janssen's RPV with Gilead's TDF and FTC (the "Complera Agreement").  The FDA

19  approved Complera in August 2011.

20          Complera is also referred to as a single tablet regimen ("STR") because one pill contains an

21  entire day's HIV treatment regimen.  As such, FDCs, and particularly STRs, offer significant

22  benefits, particularly increased medication adherence that leads to substantially improved treatment

23  outcomes. As another Janssen witness, Debi Watson (former VP Business Development), already

24  testified, and will explain at trial:  "If these medications are not taken precisely as prescribed,

25  [patients] face the real possibility of developing resistance and then, once again, they die."

26  Defendants' contemporaneous business records support Ms. Watson's testimony.  A Gilead slide

27  deck similarly described the adherence-promoting benefits of FDCs as including "Reduced pill

28  burden," "Less intimidating treatment," "Feel 'less sick,'" and "Greater feelings of control over the

3

DEFENDANTS' TRIAL BRIEF WITH RESPECT TO PLAINTIFFS' COMPLERA AND EVOTAZ
COLLABORATION-AGREEMENT CLAIMS (CASE NO. 3:19-CV-02573-EMC) (LEAD)

1    disease."

2        Neither Janssen nor Gilead could have developed Complera on its own, let alone on this

3    two-year timetable because each of the partners owned a blocking patent on an essential

4    component.  For instance, if it had not collaborated with Gilead on Complera, Janssen would have

5    had to wait until the patent for TDF expired in 2018, at which point both generic 3TC and generic

6    TDF became available for use in making an FDC that combined these medications with Janssen's

7    innovative rilpivirine (RPV).  The primary victims of that delay would have been persons with

8    HIV, who would have been deprived of an important new treatment for at least seven years.  As

9    explained by Dr. Paul Stoffels, Johnson & Johnson's former Chief Scientific Officer, "our teams

10   were looking at different possibilities to get to a combination pill.  Otherwise, rilpivirine was …

11   not viable for patients, and nor for the market."

12       The development of Complera and its RPV component also needed the collaborative efforts

13   of both Janssen and Gilead.  As Defendants' witnesses will describe to the jury, both collaborators

14   contributed financial capital, human resources and know-how toward the successful launch of

15   Complera.  For example, Gilead agreed to reimburse Janssen up to $100 million for costs associated

16   with developing RPV, which was in clinical trials and two years away from FDA approval when

17   the Complera Agreement was executed.  Janssen exclusively licensed its know-how, RPV patents,

18   and the Complera FDC patent to Gilead in the field of use for Complera.  To incentivize these

19   investments and to safeguard the success of the Complera collaboration, the parties agreed to a

20   narrow non-compete.

21       Specifically, the Complera Agreement provided that, during its term, neither Gilead nor

22   Janssen would introduce an identical version of Complera.  When Janssen and Gilead amended and

23   restated the Complera Agreement on December 23, 2014 to provide for the development of Odefsey

24   (the "Odefsey Agreement"), the parties agreed that neither Gilead nor Janssen would introduce a

25   close variation of either Complera or Odefsey that substitutes the FTC component with 3TC.[1]

26   _____

[1] As Defendants explain in their separately-filed Motion *in Limine* No. 3 (ECF No. 1630-5), the
27   Odefsey Agreement and the amended non-compete in it have no relevance to the remaining
     collaboration-agreement claims because Plaintiffs have defined their relevant market in terms of
28   the branded FDC and its AB-rated equivalent.  An FDC that substituted 3TC for FTC would not be
     an AB-rated generic equivalent of Complera and thus would fall outside of Plaintiffs' alleged

4

### B.     BMS and Gilead Collaborated to Create Evotaz

*Evotaz*:  Gilead and BMS entered into a license agreement to create Evotaz, a combination of BMS's ATV with Gilead's boosting agent, cobicistat (COBI), on October 25, 2011 (the "Evotaz Agreement").  The FDA approved Evotaz in January 2015.  Gilead licensed its know-how and COBI patents to BMS in the field of use for Evotaz.  The parties agreed not to separately introduce an identical version of Evotaz during the term of the agreement.

## III.     DEFENDANTS' RULE OF REASON CASE AT TRIAL

### A.     Plaintiffs Cannot Establish Market Power with Respect to Either Complera or Evotaz

Plaintiffs' liability theory is that the non-competes in the Complera and Evotaz collaboration agreements caused substantial anticompetitive harm by preventing the collaborators from introducing AB-rated generic equivalents in competition with their own branded FDC.  The first hurdle Plaintiffs must overcome under the rule of reason is to prove market power in a relevant antitrust market.

#### 1.     Legal Standard

Under the rule of reason, Plaintiffs' failure to prove a plausible relevant product market is dispositive of their collaboration agreement claims.  *See PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 832–34 (9th Cir. 2022); *Coronavirus Rep. v. Apple Inc.*, 2021 U.S. Dist. LEXIS 249564, at *16 (N.D. Cal. Nov. 30, 2021) (Chen, J.) ("Market definition is an essential predicate to the entire case, for without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition.") (cleaned up).  Here, Plaintiffs have proffered a product market limited to the brand HIV drug (Complera or Evotaz) and its respective AB-rated generic.  "It is an understatement to say that single-brand markets are disfavored."  *Coronavirus Rep.*, 2021 U.S. Dist. LEXIS 249564 at *25.

#### 2.     Key Evidence

In an attempt to substantiate their extraordinarily narrow product market, Plaintiffs and their

market.  It would also not qualify for automatic substitution at the pharmacy, which is a critical assumption made by Plaintiffs' damages experts.

5

experts have simply assumed reasonable substitutes do not exist for branded Complera or Evotaz other than an AB-rated generic version of those products.  In making this assumption, neither of Plaintiffs' experts (Dr. Lamb and Dr. McGuire) calculates cross-price elasticities of demand.  In fact, Dr. Lamb characterizes this exercise as "perilous" and "difficult to do for all sorts of reasons."

At trial, Defendants will introduce ordinary course documents, empirical analyses, and expert testimony that refute these assumptions.  The latter includes testimony from Plaintiffs' own medical experts admitting that other drugs can be used to treat HIV.

For *Complera*, the empirical analysis of patient-level switching data by Defendants' market definition expert, Dr. Wu, demonstrates that in 2015, over 57% of patients who switched off of Complera turned to Triumeq® and Stribild®.  In 2018, the year Plaintiffs allege generic entry by Janssen would have occurred, close to 70% of patients leaving Complera switched to Odefsey, and one year later, over 36% of such patients switched to Biktarvy®.  Since 2015, sales of Complera have declined by over 90%.  Plainly, a plausible product market involving Complera must also include at least Triumeq, Stribild, Odefsey, and Biktarvy.

For *Evotaz*, the evidence at trial will demonstrate that Evotaz is generally used ***as part of a multi-tablet HIV regimen***.  Dr. Wu analyzed claims data and determined that the two most prevalent HIV regimens that include Evotaz are combinations with Truvada or with Descovy. Patients switching off of one of those combinations switched to Biktarvy, Symtuza, and, in the case of the Truvada-Evotaz combination, to the Descovy-Evotaz combination.

### B.    Plaintiffs Cannot Meet Their Burden of Showing that the Non-Competes Had Substantial Anticompetitive Effects

Even if they were able to prove a relevant market, Plaintiffs still cannot meet their additional burden of establishing substantial anticompetitive effects absent the non-competes for two separate reasons: (1) entry by one of the collaborators with a generic version of Complera and Evotaz is blocked by lawful licensing provisions in the collaboration agreements; and (2) neither Janssen nor Gilead had any independent business interest in marketing an AB-rated generic in competition with their own branded medications.

**1.      Legal Standard**

The Patent Act expressly authorizes exclusive licenses, providing that a patentee may "grant and convey an exclusive right under his application for patent, or patents." 35 U.S.C. § 261. As such, "[a] patentee has the untrammeled right to suppress his patent or to grant an exclusive or nonexclusive license." *Cataphote Corp. v. DeSoto Chem. Coatings, Inc*., 450 F.2d 769, 774 (9th Cir. 1971) (citing *E. Bement & Sons v. Nat'l Harrow Co.*, 186 U.S. 70, 94 (1902).

Janssen had the statutory right to license its RPV patents (expiring in 2025) for all fields of use, or—as it did in the Complera Agreement—to license those patents to Gilead for the limited field of use for making Complera, or to not license them at all. Likewise, Gilead, on the same statutory basis, had the right to license its COBI patents (expiring in 2032) to BMS for the limited field of use of making Evotaz, and to make that license exclusive even as to Gilead—*i.e.*, agree that Gilead will not practice its patent in the field of use. Such lawful exercises by Janssen and Gilead of their statutory patent licensing rights do not run afoul of the antitrust laws, particularly since their patented components are complements, not substitutes, to those of their respective licensees. *See* DOJ/FTC Antitrust Guidelines for IP Licensing, at 13-14 (January 2017) (recognizing procompetitive benefit of "combining complementary R&D assets in such a way as to make successful innovation more likely, or to bring it about sooner").

**2.      Key Evidence**

In the Complera and Evotaz collaboration agreements, Janssen and Gilead, respectively, exclusively licensed patents to their co-collaborator within a field of use limited to the collaboration product. The restraints in the non-competes were, thus, not materially broader than these exclusive licenses. For example, in terms of substantive licensing rights, Gilead could not introduce a generic version of Evotaz (ATV/COBI) without practicing the same COBI patents in the field of use that it exclusively licensed to BMS; nor could Janssen introduce a generic version of Complera (TDF/FTC/RPV) without practicing the RPV patents it exclusively licensed to Gilead in the field of use for Complera.

Further, Defendants' witnesses will explain that, by structuring the collaborations as they did, Janssen and Gilead guaranteed that there would be at least as much competition as would have

7

1   been available under the parties' patent rights, and in most cases *more* competition. For example,

2   Janssen's patent rights covering RPV expire in 2025. Janssen could have chosen to practice those

3   patents itself by introducing an FDC therapeutically equivalent to Complera, consisting of

4   TDF/3TC/RPV, but it would have had to wait until Gilead's TDF patents expired in 2018. Instead,

5   Janssen licensed those same RPV patents exclusively to Gilead, allowing Gilead to introduce

6   Complera in 2011, seven years earlier than Janssen could have on its own.

7     ***In addition***, Plaintiffs' theory of anticompetitive effects rests on an unsubstantiated

8   allegation of generic entry by Janssen and Gilead that is purely speculative and ignores business

9   realities in the branded pharmaceutical industry. Indeed, there is a natural experiment that

10   completely debunks Plaintiffs' theory. Multiple Janssen witnesses will testify at trial that Janssen

11   *very briefly* considered a generic version of Complera and for multiple reasons flatly rejected that

12   idea based on its independent business considerations. This sworn testimony is corroborated by

13   contemporaneous Janssen business records.

14     This generic product—referred to as "Product P"—would have used RPV, 3TC, and TDF.

15   Within the month of November 2013, Janssen assessed the advantages and disadvantages of the

16   product and rejected the idea. Among the disadvantages and risks identified in Janssen's business

17   documents were that there was no product clinical differentiation and Janssen risked serious

18   reputation loss as a medical innovator. As Defendants' witnesses will explain, Janssen prides itself

19   on investing in *innovation*. And, as evidenced by Janssen's contemporaneous business records, by

20   the end of November 2013, Janssen abandoned any consideration of developing Product P.

21    **C.**  **The Non-Competes in the Complera and Evotaz Collaboration Agreements**
22       **Had Clear Procompetitive Benefits**

23      **1.**  **Legal Standard**

24     Courts have long recognized the value of ancillary restraints, such as the non-competes here,

25   in facilitating collaborations and creating new products. *See, e.g.*, *Aya Healthcare*, 9 F.4th at 1110

26   ("Without the restraint, AMN 'would likely be less willing or unwilling to deal with other agencies

27   to supply travel nurses to hospitals ... "); *id.* (restraint enabled party to "collaborate with its

28   competitor … without 'cutting [its] own throat.'"); *Metro Indus., Inc. v. Sammi Corp.*, 82 F.3d 839,

8

DEFENDANTS' TRIAL BRIEF WITH RESPECT TO PLAINTIFFS' COMPLERA AND EVOTAZ
COLLABORATION-AGREEMENT CLAIMS (CASE NO. 3:19-CV-02573-EMC) (LEAD)

844 (9th Cir. 1996) (restraint that "encourage[d] manufacturers to develop and produce new products, knowing that they would have the exclusive right to export a particular design for a limited period of time" was procompetitive); *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1037, 1052–53 (9th Cir. 1983); *see also L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1395 (9th Cir. 1984) ("[T]he doctrine teaches that some agreements which restrain competition may be valid if they are 'subordinate and collateral to another legitimate transaction and necessary to make that transaction effective.'").

When an agreement requires sharing proprietary information, trade secrets and know-how, a non-compete is particularly important. *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 2020 U.S. Dist. LEXIS 108757, at *24 (S.D. Cal. June 22, 2020), *aff'd*, 9 F.4th 1102 (9th Cir. 2021) (restraint helped "guard against the risks associated with competitor collaborations, such as free-riding and misappropriation of proprietary information"); *Safelite Glass Corp. v. Crawford*, 25 Fed. App'x 613, 614 (9th Cir. 2002) (restrictive covenants protect interest in "prevent[ing] competitive use, for a time, of information or relationships which pertain peculiarly to the employer"). "A restraint is ancillary when it *may* contribute to the success of a cooperative venture that promises greater productivity and output." *Polk Bros.*, 776 F.2d at 189 (emphasis added) (cited extensively by Ninth Circuit in *Aya Healthcare*, 9 F.4th at 1110). As the court in *Layne Christensen Co. v. Bro-Tech Corp.*, 836 F. Supp. 2d 1203 (D. Kan. 2011), concluded, "if the right to compete could not be contracted away [with non-competes], companies would be discouraged from licensing their technology to other companies." *Id.* at 1226 ("Purolite was not prohibited from competing with Layne altogether—it only had to forego competition using the intellectual property gained as a result of a contract that included benefits for Purolite and that Purolite willingly entered into.").

Courts are also rightly sensitive to the risk of substituting their views of what is reasonably necessary for that of the parties who face day-to-day business realities. "[M]istaken condemnations of legitimate business arrangements are 'especially costly, because they chill the very' procompetitive conduct 'the antitrust laws are designed to protect.'" *NCAA v. Alston*, 141 S. Ct. 2141, 2161 (2021). Defendants' experts will point to use of a non-compete in the development of Pfizer's COVID-19 vaccine, among other collaborations; the very real prospect of chilling

9

1    development of drugs used to combat HIV as well as future pandemics has life and death

2    consequences that cannot be ignored.

3        **2.    Key Evidence**

4        New drug development is expensive and risky.  *See Mut. Pharm. Co. v. Bartlett*, 570 U.S.

5    472, 476–77 (2013) ("[t]he process of submitting an NDA is both onerous and lengthy," and a

6    "typical NDA spans thousands of pages and is based on clinical trials conducted over several

7    years").  The collaborations for Complera and Evotaz epitomized this.  For example, Gilead

8    invested $100 million towards the development of Janssen's RPV for use in Complera, in addition

9    to funding "formulation and development work" and "commercialization activities" for Complera.

10   In 2009, when it entered into the Complera Agreement with Janssen, Gilead was a relatively small

11   company that could ill afford to allocate $100 million on a product that its larger competitor could

12   simply copy.  Given the risks, Gilead sought to protect itself by insisting on a non-compete

13   provision.  John Milligan (former Gilead President & CEO) explained at his deposition that "we, a

14   small company, are making a hundred million dollar investment on behalf of a much larger

15   company, and I am sure they were trying to do the most they could to protect the company …."

16       Investment and risk were not limited to out-of-pocket investments.  Each collaboration

17   demanded that the parties invest substantial human resources and expend opportunity costs in

18   seeking clinical development of, formulating, and obtaining FDA approval of the joint product.  As

19   Janssen's Debi Watson (former Janssen VP Business Development) explained, for instance, the

20   collaboration involved bringing together multiple different drug components, each of which comes

21   with its own data package, manufacturing package, and technical feasibility package.  Clinicians

22   needed to determine how to combine each of these components into a single, readily digestible pill.

23   The complexity of this development process demanded countless hours of labor on top of the

24   financial outlay.  Janssen's witness, Debi Watson, will testify to what is involved:

25           In a collaboration where you are developing a fixed-dose combination and in the
             examples we talked about today, you are bringing together two assets, four assets;
26           and each individual asset comes with its own data package, manufacturing package,
             technical feasibility package. And then you layer that and combine that all together.
27           So, it's an extremely complex undertaking, and the investment is significant. We
             talked today a lot about financial investment, but the investment in time of people
28           is tremendous to solve some of the complexity. These are complex for a reason.

DEFENDANTS' TRIAL BRIEF WITH RESPECT TO PLAINTIFFS' COMPLERA AND EVOTAZ
COLLABORATION-AGREEMENT CLAIMS (CASE NO. 3:19-CV-02573-EMC) (LEAD)

1

2

> There is a ton of complexity here and the human element of having to figure out all this complexity is significant.

Ms. Watson and other Janssen witnesses will also testify that risk took other forms, too:

3

4

5

6

7

8

> There was product risk, there was investment risk, there was development risk and there was also relationship risk …. [T]he relationship risk is that we were opening up knowledge and know-how to a direct competitor in the field, and we needed to protect that. There was investment risk, where we were putting money against assets and fixed-dose combinations when there was uncertainty we would actually be successful in developing them. There was technical risk in the product and the ability to actually co-formulate FDC's [sic], to manufacture them in a pill that was small enough that a patient could swallow. And there was the technical risk of development as to whether or not we would get the data that would ultimately allow us to be approved and also have a regulatory strategy that the regulatory authorities would support in approval.

9

10

11

12

The non-competes, therefore, had a clear procompetitive rationale by encouraging the collaborators to make these substantial investments and to exchange their know-how without fear that they were signing away their investment. The collaborators' willingness to work together ultimately led to the delivery of beneficial FDC products to people living with HIV.

13

14

15

16

17

18

19

20

Defendants' trial witnesses will describe each company's need to protect its financial contribution to the collaboration. Janssen's witnesses will testify to the importance of protecting Janssen's investment and the necessity of the non-competes in securing that protection. They will also testify that Janssen would not have entered into the same collaboration agreements without the non-competes. Gilead's witnesses will similarly describe the importance of the non-competes in reaching an agreement, including Gilead's concern about "the investments Gilead would need to make financially and in resources and time in developing R/F/TAF being subverted by our partner on that drug developing a direct competitor containing these components."

21

22

23

24

25

26

Janssen and Gilead thus viewed non-compete provisions as an integral element of each collaboration. As Janssen's Debi Watson testified, "[the non-compete] was to make sure that each party did not take the advantage of collaborating and use it in a way that would disadvantage the company that was making the investment." Similarly, James Meyers (Gilead's former Executive Vice President) testified that "in the absence of the non-competes, the agreements wouldn't have been completed and Gilead would have invested its resources elsewhere."

27

28

The non-competes also facilitated the necessary exchange of know-how. The Complera

11

and Evotaz collaborations required joint participation between the parties in the clinical development, regulatory approval, and manufacturing of each FDC.  Janssen and Gilead witnesses will describe the heavy investment they put into ensuring that the development program would succeed and the efforts both sides took to ensure they worked as closely and amicably with each other as possible.  They will also point out the numerous instances of exchange of know-how, documents, procedures, and technical assistance that formed the necessary foundation to develop innovative HIV drugs.  For instance, Janssen's Debi Watson will testify that "we were also investing heavily in the development program and working together, by the way, on that development program, which is very different from taking an exclusive license, paying an upfront in milestones and the partners never doing anything together."  The parties needed the assurance that their exchange of confidential know-how would not give their collaboration partner an advantage.  Several witnesses will testify about their concerns regarding the misuse of this know-how, even if the parties signed a confidentiality agreement.

The non-competes not only made the necessary exchange of confidential information between the parties palatable, they enhanced the pace and effectiveness of the collaborations.  Janssen's witnesses will point out that the terms of the collaboration agreement gave the development teams peace of mind and prevented information hoarding.  This sort of behavior could have had deleterious effects on not only the time it took to create a drug, but also on the successful launch of the medication.  For example, John Trott (Janssen's Lead of Global Marketing HIV) has testified:  "There was a tremendous amount of learned knowledge, know-how, if you will, and we felt that on both sides, [the non-compete] was necessary in order to move the products forward as quickly as possible."

### D.    The Non-Competes Were Narrowly Drafted, and No Substantially Less Restrictive Alternative Was Available

#### 1.    Legal Standard

When ancillary restraints have a procompetitive rationale, the burden shifts back to Plaintiffs to show that there were "substantially less restrictive alternatives" available.  *O'Bannon v. NCAA*, 802 F.3d 1049, 1074 (9th Cir. 2015).  In evaluating any proposed alternatives, "antitrust

12

1   courts must give wide berth to business judgments before finding liability." *Alston*, 141 S. Ct. at

2   2163.  Plaintiffs must prove that the non-competes in the Complera and Evotaz agreements were

3   "*patently and inexplicably* stricter than is necessary."  *O'Bannon*, 802 F.3d at 1075 (emphasis in

4   original).

## 2.   Key Evidence

6          Contrary to Plaintiffs' misleading label "no-generics restraints," the non-competes

7   restrained only the parties to the collaboration; they have no effect on third-party generic

8   manufacturers.  Defendants' witnesses and contemporaneous business records will establish that

9   nothing in the agreements prevented generic manufacturers from developing and commercializing

10  those combinations once the components became generic.  In other words, once the relevant patents

11  and exclusivities expired, generic manufacturers were free to enter in competition with the branded

12  FDC, which is what happened with Atripla.

13         At the same time, Gilead and Janssen were able to compete against each other to create

14  other HIV treatments, including FDCs and STRs—which they repeatedly did, both independently

15  and with other brand manufacturers.  In fact, Janssen touted that it "owns a broad portfolio that has

16  been enriched with several deals with Gilead & ViiV."  These collaborations with Gilead and with

17  non-party and Gilead rival ViiV Healthcare ("ViiV"), majority owned by GlaxoSmithKline, were

18  key to innovating and addressing HIV patient needs.  When Gilead offered to purchase the

19  exclusive rights to RPV for $1 billion in 2013, Janssen declined, in part because that offer would

20  have blocked Janssen from working with other companies on other FDCs involving RPV.  For

21  example, on May 7, 2014, Janssen entered a collaboration agreement with ViiV to combine its

22  INSTI dolutegravir with Janssen's RPV to make ***Juluca***®.  That STR, the "first once daily, NRTI-

23  and booster-free switch option for patients," competed directly with NRTI-based regimens such as

24  Odefsey.  As another example, Janssen and ViiV entered an additional collaboration agreement on

25  December 23, 2015, to develop ***Cabenuva***®, approved in 2021, which was the first long-acting

26  injectable.  It combines RPV and ViiV's INSTI cabotegravir and is administered monthly or every

27  other month.

28         Likewise, in December 2022, Gilead received FDA approval for lenacapavir, a first-in-

1   class, long-acting therapy for the treatment of HIV, administered at six-month intervals.  Gilead

2   also developed its own best-in-class INSTI, bictegravir ("BIC"), for use in FDCs.  **Biktarvy**®, an

3   STR comprised of BIC, FTC, and TAF, was approved by the FDA in 2018.

4          At trial, Plaintiffs are expected to point to the confidentiality provisions in the agreements

5   as an alternative to the non-competes, but those provisions would not address the legitimate

6   concerns about possible free-riding on the collaboration.  Moreover, a confidentiality provision has

7   limitations in terms of protecting know-how, which Plaintiffs fail to controvert with evidence.

8   Defendants do not dispute that the confidentiality provisions provide *some* protection, but it is

9   impossible to account for all of the information that ought to be considered confidential.  Janssen

10  witnesses will testify about their uneasiness with relying solely on confidentiality provisions,

11  particularly in situations where, as here, there was a free exchange of scientific ideas and it might

12  not have been possible to determine who first came up with the winning one.

13         Confidentiality provisions simply do not provide the same level of protection as a non-

14  compete does.  As even Plaintiffs' expert admits, disputes can arise about compliance, whether

15  information is covered by the provision, and whether information was used without permission,

16  and such disputes can lead to litigation that can go on for years.  Confidentiality provisions, without

17  the added benefit of non-competes, can thus inhibit the parties' exchange of information, to the

18  detriment of the collaborative efforts and, ultimately, to the detriment of patients.

19         **E.     Plaintiffs' Damages Claims Are Unsustainable**

20         The EPPs, the IHPPs and United[2] currently have damages claims for purchases of

21  Complera; the IHPPs also have damages claims for purchases of Evotaz.  All of these damages

22  claims are deeply flawed for multiple reasons.

23         The Complera damages claims are based on an unsubstantiated assumption that "but for"

24  the non-compete provision, Janssen would have launched a generic version of Complera in either

25  February 2018 or May 2019.  Substituting a "but-for" entry date of October 2020, when Truvava®

26  _____

27  [2] The EPPs have moved to dismiss their Complera damages claims without prejudice, and United
     has indicated its willingness to voluntarily dismiss its Complera damages claims if they are not
     maintained by other Plaintiffs.  Defendants oppose the EPPs' motion for a without prejudice
28  dismissal, and the IHPPs continue to seek Complera damages.

1  went generic, alone reduces the Complera damages claim by the EPPs to under $10 million and

2  likewise reduces the other Plaintiffs' Complera damages to even smaller seven-figure amounts.

3  Each of Plaintiffs' Complera damages claims also assumes that any entry by Janssen in the "but-

4  for" world would be with an AB-rated version of the medication; that assumption is a necessary

5  predicate to their damages claims, because Plaintiffs and their expert have defined the alleged

6  relevant market in terms of the brand and its AB-equivalent and, also, because only an AB-rated

7  generic would capture the estimated market share by qualifying for automatic substitution at the

8  pharmacy.  A hypothetical entry by Janssen with a non-AB-rated version of Complera, including a

9  medication that substituted 3TC for FTC, would not support any of Plaintiffs' damages claims.

10      Finally, each of Plaintiffs' damages claims, including the small amount claimed by the

11 IHPPs against Gilead for Evotaz, are subject to additional corrections identified by Defendants'

12 expert, Dr. Anupam Jena.  The cumulative effect of applying Dr. Jena's corrections is to reduce

13 Plaintiffs' Complera and Evotaz damages claims to zero.

14

15 Dated: February 9, 2023                    RESPECTFULLY SUBMITTED,

16                                            FAEGRE DRINKER BIDDLE & REATH LLP

17

18                                            By : */s/ Paul J. Riehle*

19                                            PAUL J. RIEHLE (SBN 115199)
                                              Paul.Riehle@faegredrinker.com
20                                            FAEGRE DRINKER BIDDLE & REATH LLP
                                              Four Embarcadero Center, 27th Floor
21                                            San Francisco, CA 94111-4180
                                              Telephone: (415) 591-7500
22                                            Facsimile: (415) 591-7510

23                                            PAUL H. SAINT-ANTOINE (*pro hac vice*)
                                              Paul.Saint-Antoine@faegredrinker.com
24                                            JOANNE C. LEWERS (*pro hac vice*)
                                              Joanne.Lewers@faegredrinker.com
25                                            FAEGRE DRINKER BIDDLE & REATH LLP
                                              One Logan Square, Ste. 2000
26                                            Philadelphia, PA 19103
                                              Telephone: (215) 988-2990

27                                            *Attorneys for Defendants JANSSEN R&D*
                                              *IRELAND, JANSSEN PRODUCTS, LP, and*
28                                            *JOHNSON & JOHNSON*

15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KIRKLAND & ELLIS LLP

*/s/ Jay P. Lefkowitz*

Jay P. Lefkowitz, P.C. (*pro hac vice*)
Devora W. Allon, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Tel.: (212) 446-4800
lefkowitz@kirkland.com
devora.allon@kirkland.com

James F. Hurst, P.C. (*pro hac vice*)
Kevin T. Van Wart, P.C. (*pro hac vice*)
Kevin M. Jonke (*pro hac vice*)
Nick Wasdin (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Tel.: (312) 862-2000
james.hurst@kirkland.com
kevin.vanwart@kirkland.com
kevin.jonke@kirkland.com
nick.wasdin@kirkland.com

Michael J. Shipley (SBN 233674)
KIRKLAND & ELLIS LLP
555 South Flower Street
Suite 3700
Los Angeles, California 90071
Tel.: (213) 680-8400
michael.shipley@kirkland.com

*Attorneys for Defendants*
*Gilead Sciences, Inc., Gilead Holdings, LLC,*
*Gilead Sciences, LLC, and Gilead Sciences*
*Ireland UC*

DEFENDANTS' TRIAL BRIEF WITH RESPECT TO PLAINTIFFS' COMPLERA AND EVOTAZ
COLLABORATION-AGREEMENT CLAIMS (CASE NO. 3:19-CV-02573-EMC) (LEAD)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### **FILER'S ATTESTATION**

Pursuant to Civil L.R. 5-1(h)(3), regarding signatures, I, Paul J. Riehle, attest that concurrence in the filing of this document has been obtained.

Executed:  February 9, 2023                                   */s/  Paul J. Riehle*
                                                                                        Paul J. Riehle

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 9, 2023, the within document was filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to the attorneys of record in this case.

Executed:  February 9, 2023                      */s/  Paul J. Riehle*
                                                                          Paul J. Riehle