UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE HIV ANTITRUST LITIGATION | Case No.  19-cv-02573-EMC |
| | **ORDER RE TRIAL STRUCTURE & MOTIONS IN LIMINE** |
| | Docket Nos. 1615, 1626 |

The Court held a final pretrial conference in the case at bar on March 7, 2023. This order memorializes the rulings made by the Court at the conference. This order also provides rulings on some matters where the Court deems oral argument unnecessary. Finally, this order requires updates and/or supplemental briefing from the parties on certain issues. Updates and/or supplemental briefing shall be filed by March 28 or April 6, 2023, as described below.

## I.      TRIAL STRUCTURE

For the reasons stated on the record, the Court bifurcates this case into two trials: the first trial shall deal with the reverse payment claims; the second trial shall deal with the collaboration claims. There shall be different juries for the two trials. All parties agreed that this bifurcation makes sense and is reasonable.

On May 30, 2023, only the trial on the reverse payment claims shall proceed. The Court is not, at this time, setting a date for the trial of the collaboration claims. The parties agreed that it makes sense to take a "pause" in between the two trials, particularly because the bulk of the damages sought relate to the reverse payment claims and how the parties decide to proceed with the second trial may be informed by what takes place during the first trial.

With respect to the first trial on the reverse payment claims, for the reasons stated on the record, the Court **DENIES** the Retailer Plaintiffs' motion to bifurcate that trial into (1) an anticompetitive conduct phase and (2) an antitrust injury/damages phase, with the damages phase having two juries (one focused on the indirect purchasers' injury/damages and the other focused on the direct purchasers' injury/damages).[1]  *See* Docket No. 1626 (motion).  As the Court noted at the conference, bifurcation here would entail significant inefficiencies.  This includes the jury for the direct purchasers' injury/damages having to be reeducated in some fashion about the underlying antitrust violation.  In addition, the two juries for the injury/damages phase would both by presented with evidence about, *e.g.*, generic conversion rates.  Contrary to what the Retailer Plaintiffs argued, they will not be unfairly prejudiced by a single trial because the Court can instruct the jury – even before the closing instructions – that there are different plaintiffs, that they have different claims (federal claims v. state law claims), and that the law on damages for those claims differs.

Because the Court's focus is on the trial for the reverse payment claims, and not the trial on the collaboration claims, it **DEFERS** ruling on the EPPs' motion for voluntary dismissal of the Complera Class Damages claim.  *See* Docket No. 1615 (motion).  To be clear, however, there shall be a jury trial on the collaboration claims, and not a bench trial, because the IHPPs continue to seek damages for the collaboration claims, and Defendants have not waived their right to a jury trial on the damages claims.

## II.      DEFENDANTS' MOTIONS IN LIMINE

A.     MIL No. 1 (Docket No. 1630-3)

Defendants have moved to exclude evidence and argument related to TAF conduct.  The motion is **GRANTED** in part and **DENIED** in part.  There is no longer any TAF-based antitrust or consumer protection claim.  Therefore, Plaintiffs shall not offer evidence or argument that Gilead delayed in developing or commercializing TAF or that Gilead engaged in coercive or

---

[1] Under the Retailer Plaintiffs' proposal, the first phase would include the common issue of whether generic entry was delayed and, if so, what would the entry date have been in the absence of the anticompetitive conduct.

United States District Court
Northern District of California

otherwise improper product switching.[2]  Plaintiffs also shall not offer evidence or argument that TAF was part of some anticompetitive scheme designed by Gilead.  However, the Court shall not categorically bar any reference to TAF, in particular, neutral evidence of any market reality – *e.g.*, that TAF was the "new" tenofovir drug – since the existence of TAF seems to have affected Gilead's forecasting and may have impacted the relevant market and the price of the HIV drugs at issue (Truvada and Atripla which are TDF-based drugs).  The parties are ordered to meet and confer on the 6-10 documents that Plaintiffs referred to at the conference to see if they can reach agreement on redactions which would render any TAF-related dispute moot.  A joint update shall be filed by March 28, 2023.

To the extent Defendants argued at the conference that TAF-related evidence opens the door to evidence or argument that Plaintiffs were not injured because they would have bought a TAF-based drug instead of a drug containing generic TDF, the Court does not agree.  Plaintiffs are no longer asserting that TAF should have been sold earlier than it actually was (*i.e.*, that Gilead anticompetitively delayed introducing TAF into the market).

B.   MIL No. 3 (Docket No. 1630-5)[3]

The Court **DEFERS** ruling on the third motion in limine since it is relevant to the collaboration claims only, and not the reverse payment claims.

C.   MIL No. 4 (Docket No. 1630-6)

Defendants have moved to exclude most evidence or argument related to the TDF patent settlement agreement.  For the reasons stated on the record, the motion is **GRANTED** in part and **DENIED** in part.  The Court rejects Defendants' suggestion that evidence related to the TDF patent settlement agreement is not relevant.  There is evidence suggesting that negotiations related to the TDF patent settlement agreement informed what happened during negotiations related to the FTC patent settlement agreement.

---

[2] At the conference, Plaintiffs represented that they will not seek to introduce evidence or argument on either of the above.  They also represented that they will not seek to introduce evidence or argument that Gilead withheld an HIV indication for TAF.

[3] The Court addresses Defendants' MIL No. 2 below, in its discussion of Plaintiffs' MIL No. 1.

United States District Court
Northern District of California

To be clear, however, the Court does not intend there to be a mini-trial on the TDF patent settlement agreement, which is no longer part of the reverse payment claims.  In addition, the Court will not permit evidence or argument related to whether the Federal Trade Commission did or did not "approve" the TDF patent settlement agreement.  The parties should meet and confer to determine whether they can reach agreement on a stipulation of fact related to the TDF patent settlement agreement – including the removal of the no-authorized generic provision from the settlement agreement.  A joint update shall be filed by March 28, 2023.

D.    MIL No. 5 (Docket No. 1630-7)

The Court finds oral argument on MIL No. 5 unnecessary.  Part of the motion may be **DEFERRED** because it relates solely to the collaboration claims (*i.e.*, whether evidence or argument related to the NGRs in the Prezcobix, Odefsey, and Symtuza Agreements is permitted).  The two remaining issues are addressed below.

1.    Other Lawsuits or Investigations

The first issue is whether evidence or argument related to other lawsuits or investigations involving Defendants should be excluded.  The Court **DEFERS** ruling on this issue as well because context will matter.  However, it gives the parties some general guidance here.

Plaintiffs have articulated reasons why some other lawsuits or investigations involving Defendants are relevant.  For example, there was foreign litigation related to FTC which seems to have informed Teva's views on its likelihood of success in the FTC patent infringement suit in the United States.  Also, the TDF patent settlement agreement, as discussed above, is relevant.  Finally, whether Teva would be delayed with going forward with a NTE containing FTC because other component drugs were subject to suits or settlements is a fair consideration for the jury.  The Court is inclined to permit such evidence so long as the evidence does not lead to mini-trials.

That being said, the Court has Rule 403 concerns about some of the other lawsuits or investigations identified by Plaintiffs.  For example, Plaintiffs argue that they are entitled to introduce evidence showing that "other third parties are responsible, in whole or in part, for Gilead's patents," and thus Gilead is not an innovator.  Opp'n at 4.  The probative value of this evidence is low, and it seems likely to be a waste of time and confusing to the jury.  Plaintiffs

4

remain free to argue that any patents Gilead owns are invalid because they do not protect any novel inventions. However, arguing who is the true inventor of a patent seems to be going off track. As another example, Plaintiffs seem to assert that they are entitled to introduce evidence related to other reverse payment claims made against Teva. If Plaintiffs want to introduce evidence that Teva (or Gilead) was generally aware of reverse payments potentially being anticompetitive, that may be reasonable. But dwelling on other reverse payment lawsuits or settlements raises the prospect of unfair prejudice and exclusion under Rule 403.

2.      Testimony of Ms. Julie

The second issue is related to Ms. Julie, who is Teva's Chief IFP Counsel. Defendants have expressed concern that Plaintiffs will ask Ms. Julie about another reverse payment case in which she provided testimony (*Nexium*) or that Plaintiffs will submit that testimony. In response, Plaintiffs state that they will not submit any evidence "includ[ing] discussions of the allegations in the *Nexium* case, its proceedings, or its result." Opp'n at 6. Rather, Plaintiffs just want to use her testimony about broad topics – "including, *inter alia*, her role in overseeing and managing patent litigation at Teva, Teva's process for evaluating patent strength, the value of exclusivity, and Teva expectations about brand lawsuits." Opp'n at 6. This is permissible. But given that Ms. Julie will be testifying at trial live, it is not clear that Plaintiffs will need to use that testimony from *Nexium* in the first place. However, Plaintiffs should be able to use any *Nexium* testimony to impeach Ms. Julie in this case.

Accordingly, the Court **DEFERS** ruling on this issue related to Ms. Julie but, based on the above, the parties have guidance as to how the Court is inclined to proceed.

E.      MIL No. 6 (Docket No. 1630-8)

Defendants move to exclude evidence or argument related to damages that Defendants claim Plaintiffs cannot recover as a matter of law. The motion is broken into three parts.

1.      Part 1: United and the IHPPs

United and the IHPPs are both TPPs – *i.e.*, indirect purchasers.[4]  Defendants argue that

---

[4] Technically, United also has direct purchaser claims which were assigned to it, but the issue here concerns only indirect purchasers who have to rely on *state* law for damages because, as indirect

United States District Court
Northern District of California

United and the IHPPs have problematic damages claims because their damages claims are based on *one* state's laws applying across the board. For United, that is Minnesota law. For the IHPPs, that is California law. Defendants argue that this Court rejected application of one state's law across the board in its class certification order addressing the EPPs/indirect purchasers. The class certification order did not directly address United's claims, or the IHPPs', since both have brought individual suits. Nevertheless, Defendants argue that the reasoning of the Court in the class certification order should apply to United and the IHPPs as well (*i.e.*, because they are indirect purchasers just like the EPPs). Thus, Defendants argue that United and the IHPPs should be precluded from introducing evidence of damages "that rest on a theory that a single state statute applies 'across the board.'" Mot. at 1.

As to United, United fairly argues that the Court's class certification order should not necessarily dictate how the Court should proceed because, in that order, the Court did a choice-of-law analysis under *California* law and, here, there should be a choice-of-law analysis under *Minnesota* law. *See Sarver v. Chartier*, 813 F.3d 891, 897 (9th Cir. 2016) ("Typically, 'a federal court sitting in diversity applies the conflict-of-law rules of the state in which it sits.' However, after a transfer under 28 U.S.C. § 1404 the choice-of-law rules of the transferor court apply."). The Minnesota choice-of-law issue has not been sufficiently briefed. Accordingly, the Court **DEFERS** ruling here and orders Defendants and United to file supplemental briefs addressing the choice-of-law issue. This should include discussion of whether Minnesota law should apply to purchases made for beneficiaries who live outside the state of Minnesota (or reimbursements made to the same). The parties should also address whether – assuming the Court rules in Defendants' favor on choice of law – United should be permitted to serve an expert rebuttal report covering alternative state law calculations. Supplemental briefs shall be filed by March 28, 2023. Each brief shall be no longer than seven (7) pages.

As for the IHPPs, the Court shall not reopen the choice-of-law issue because they, like the EPPs, took the position that California law should apply across the board and the Court rejected

_____

purchasers, they cannot bring federal antitrust claims.

that position.  Thus, the motion in limine is **GRANTED** with respect to the IHPPs.

There is, however, a new issue related to the IHPPs where the Court does seek supplemental briefing.  *See* Docket No. 1659 (joint statement regarding disputed legal issues).  Specifically, Defendants have argued that, if the laws of the various states do apply to the IHPPs' claims, then there are some state consumer protection laws that do not apply where there is only anticompetitive conduct at issue.  *See* Docket No. 1388 (Order at 27).  According to Defendants, the following states take this approach: Arkansas, Colorado, Idaho, Indiana, Louisiana, Pennsylvania, Virginia, and Wyoming.  The Court has already addressed Arkansas and Idaho in its class certification order.  The IHPPs' consumer protection claims based on the laws of those two states are dismissed.

This leaves Colorado, Louisiana, Pennsylvania, Virginia, and Wyoming.  The Court orders the IHPPs and Defendants to file supplemental briefs addressing whether these states' consumer protection laws cover anticompetitive conduct.  Supplemental briefs shall be filed by March 28, 2023.  Each brief shall be no longer than seven (7) pages.

    2.    <u>Part 2: Medicare</u>

Defendants next ask the Court to preclude Plaintiffs from recovering damages for costs they did not incur – in particular, if Medicare paid for part of the drugs, then Plaintiffs cannot include that as part of their damages.  The Court **DENIES** this part of the motion in limine.  Although Defendants have raised a fair argument that they are entitled to set-offs based on the Medicare payments, exclusion is not the proper remedy because the parties essentially dispute whether it is possible to allocate the Medicare payments to serve as a set-off.  *See also In re Namenda Indirect Purchaser Antitrust Litig.*, No. 115CV6549CMRWL, 2022 WL 3362429, at *11-12 (S.D.N.Y. Aug. 15, 2022) (concluding that "the measure of damages is the actual damage – the out-of-pocket cost – that is suffered by a [TPP] as a result of being overcharged for memantine," but "[w]hether Dr. Vogt has calculated that measure correctly in light of the various government reimbursement programs presents a question of fact for the trier of fact – not a ruling of law for the court to make"; likewise, "[w]hether aspects of what Plaintiffs characterize as 'premiums' operate to reduce the out-of-pocket cost of memantine to a [TPP] is also a question of

1    fact for the trier of fact – not a ruling of law for the court to make").

2        3.      Part 3: Duplication of Remedy

3        Finally, Defendants argue that Plaintiffs – United, in particular – should not introduce

4    "evidence of damages that create duplicative purchaser/payor recovery."  Mot. at 5.  Defendants

5    focus on United in particular because it is "bringing claims on behalf of two 'segments' of its

6    overall business: (i) the insurance business of United HealthCare Services ['UHS . . . and (ii)

7    OptumRx, a prescription drug business."  Mot. at 5.  In other words, United has both (i) indirect

8    purchaser claims and (ii) direct purchaser claims.  *See also* United Compl. ¶ 23 (alleging that UHS

9    is an affiliate of OptumRx, that Optum Rx makes direct purchases from Defendants, and that

10   Optum Rx has made an assignment of its rights to UHS).  According to Defendants,

> United's damages expert calculated damages separately for UHS
> and OptumRx, the result of which is that, if OptumRx dispensed
> drugs to a UHS member, United's expert calculated the damages for
> that single purchase *twice*: once when that transaction showed up in
> Optum Rx's claims data, and again when it showed up in UHS's
> claims data.  United's expert does not disagree that this is what he
> did, and in his rebuttal report provides "alternative damages
> calculations that account for this issue without offering an opinion
> as to whether it is necessary or appropriate."

16   Mot. at 5 (emphasis in original).

17       If UHS and OptumRx were two divisions within the same company, then Defendants'

18   position could have some merit.  However, it appears that, even though UHS and OptumRx are

19   *affiliated*, they are separate companies.  *See also* Opp'n at 7 (asserting that OptumRx and United

20   simply share "an ultimate corporate parent").  That being the case, the Court **DENIES** the request

21   to exclude.  The issue of a pass-on defense and/or duplication of remedies where there are both

22   direct and indirect purchasers is addressed in Plaintiffs' MIL No. 6.

23   F.    MIL No. 7 (Docket No. 1630-9)

24       In their final motion in limine, Defendants move to exclude (1) certain characterizations of

25   the pharmaceutical industry, (2) certain characterizations of Defendants' acts, (3) certain

26   characterizations of Plaintiffs' damages, and (4) certain characterizations of Gilead's innovation

27   record.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1.     Characterizations of the Pharmaceutical Industry

This part of the motion is essentially moot and thus it is **DENIED**.  Defendants have expressed concern about, *e.g.*, Plaintiffs referring to "Big Pharma" or encouraging jurors to "send a message."  But Plaintiffs state that they do not intend to go down that path – though they add (and fairly so) that it is "legitimate for them to refer to the price differences between branded and generic drugs.  And it is certainly legitimate for them to refer to the high and rising prices Defendants charged for drugs . . . and the effects that generic entry has had on those prices." Opp'n at 1.

2.     Characterizations of Defendants' Acts

Here, Defendants ask the Court to bar Plaintiffs from using allegedly pejorative or inflammatory terms – *e.g.*, NGRs, secret or private agreement, payoff, pay for delay, kickback, immoral, unethical, and so forth. *See* Mot. at 2.  In response, Plaintiffs argue that the Court should not be a censor or the word police.  They add that, in *Glumetza*, Judge Alsup basically allowed free rein when it came to closing argument at least.

The motion is **GRANTED** in part, **DENIED** in part, and **DEFERRED** in part.  The Court should not be the word police but it can give some guidance.  Certain terms should be off limits, including immoral, unethical, criminal, and so forth.  On the other hand, there is no prejudice in the use of such terms as payoff, pay for delay, or secret or private agreement.

As to the use of NGR (or No Generics Restraint).  Plaintiffs fairly point out that expert reports and depositions have used this term.  If the term comes up in that context, there is little that can be done.  As to its use at trial, the Court will not preclude its use but will, upon request, give a limiting instruction – *i.e.*, that it is being used as shorthand for the convenience of the jury but that the jury should not read that term as suggesting any conclusion about the operative effect or legality or illegality of Defendants' acts.

3.     Characterizations of Plaintiffs' Damages

Defendants emphasize that the only Plaintiffs seeking damages here are entities – TPPs or direct purchasers – and not any individual consumers.  Thus, Defendants argue that the Court should not allow evidence of injury to individual consumers, whether in the form of overcharges

or in the form of physical injury (*e.g.*, because the cost of drugs was too high). In response, Plaintiffs argue that Defendants are myopically looking at damages, leaving out of the picture that consumer harm is relevant to *liability*. *See also* Opp'n at 4 (arguing that "*[b]oth sides'* experts assess whether Defendants' conduct benefited or harmed consumers[;] this is no surprise because consumer harm is relevant [since] antitrust law seeks to protect consumers") (emphasis in original).

Plaintiffs are not barred from arguing that competition is beneficial to consumers (*e.g.*, it can affect price and/or quality of goods). However, Plaintiffs should not argue outright that individual consumers have been overcharged. Also, under both Rule 402 and 403, evidence of consumer physical injury shall be excluded.

This part of the motion is therefore **GRANTED** in part and **DENIED** in part.

4.      Characterizations of Gilead's Innovation Record

Finally, Defendants ask that Plaintiffs be barred from making mischaracterizations about Gilead's innovation record. It is fair for Plaintiffs to argue that one of the harms to competition is Gilead's lack of an incentive to innovate and that Gilead did not innovate. However, just because Gilead may buy patents does not mean that it does not innovate, and any such assertion takes things off track and will not be permitted. Extensive focus on this issue may implicate Rule 403.

This part of the motion is **GRANTED** in part and **DENIED** in part.

### III.      PLAINTIFFS' MOTIONS IN LIMINE

A.      MIL No. 1 (Docket No. 1632-3)

Plaintiffs argue that the Court should exclude or, in the alternative, limit the use of evidence of Teva's subjective beliefs regarding its probability of prevailing on Gilead's FTC patents (including the follow-on patents). The motion is **GRANTED** in part and **DENIED** in part. The Court shall not exclude evidence of Teva's subjective beliefs. However, it is fair for Plaintiffs to be able to comment that there is not evidence of Gilead's subjective beliefs because, unlike Teva, Gilead did not waive its attorney-client privilege. Plaintiffs, however, may not argue to the jury that there should be an adverse inference from Gilead's failure to waive the attorney-client privilege. In essence, the Court follows the approach of Judge Alsup in *In re Glumetza Antitrust*

United States District Court
Northern District of California

10

1   *Litig.*, No. C 19-05822 WHA (N.D. Cal.) (Docket No. 653) (Tr. at 48-51).

2       The Court's resolution of this motion in limine also resolves Defendants' MIL No. 2.

3   B.   MIL No. 2 (Docket No. 1632-4)

4       Plaintiffs characterize their second motion in limine as one seeking preclusion of defenses

5   "contrary to law." There are three different defenses that Plaintiffs argue are contrary to law.

6       1.   Defense No. 1

7       First, Plaintiffs argue that Defendants should be precluded from offering evidence or

8   argument that government entities (*e.g.*, the Federal Trade Commission and the New York

9   Attorney General's Office) decided not to take action after being advised of the FTC patent

10  settlement agreement (at issue in the reverse payment claims). The Court has already addressed

11  this issue in the context of Plaintiffs' *Daubert* motion challenging Wright. *See* Docket No. 1401-3

12  (*Daubert* motion). This part of the motion in limine is **GRANTED**. However, if Plaintiffs argue

13  that the settlement agreement was secret or otherwise concealed, then they will open the door to

14  Defendants arguing that the agreement was not secret as they were required to submit it to the

15  FTC.

16      2.   Defense No. 2

17      Next, Plaintiffs argue that the Court exclude evidence or argument regarding: "(1) the

18  general 'societal' and 'economic benefits' of HIV therapies, and (2) the average costs and

19  development time for new drugs." Mot. at 3. This part of the motion is **GRANTED** in part and

20  **DENIED** in part.

21      As Plaintiffs note, there is overlap between this motion and their *Daubert* motion on Dr.

22  Jena. *See* Docket No. 1400-3 (*Daubert* motion). The Court finds Plaintiffs' position on (1)

23  persuasive because such testimony does not *directly* address Defendants' position that they have

24  engaged in innovation in the HIV treatment space. And to the extent Defendants argue that there

25  are benefits to their innovation, there is no real dispute that innovation provides benefits, and it

26  would be a waste of time to go down that avenue. Such testimony could also mislead the jury into

27  focusing on the benefits of innovation rather than whether there has *been* innovation.

28      The Court's ruling, however, does not bar Defendants from talking about what the drugs at

United States District Court
Northern District of California

11

United States District Court
Northern District of California

issue *do*.  *See* Opp'n at 4 (suggesting that Defendants should be able to provide evidence about the health benefits of Atripla, Truvada, Complera, and Evotaz, the four drugs at issue, because a jury must be able to "understand what these products do").  The ruling also does not bar Defendants from arguing that patents are issued where there is something innovative.  *See* Opp'n at 4 (arguing that "jurors must . . . understand what patents do: reward inventors of beneficial new products with exclusive sales periods").  Nor would it bar evidence as to how these particular drugs innovate.

As for (2), the Court favors Defendants' position.  Plaintiffs' complaint is that there should not be evidence about development costs *generally* (instead of evidence about development costs for the *specific* drugs at issue).  But so long as the evidence about development costs generally is relatively concise, the Court does not see a Rule 402 or 403 problem (such as danger of confusion to the jury or undue prejudice to Plaintiffs).

      3.    <u>Defense No. 3</u>

Finally, Plaintiffs argue that Defendants should be barred from offering evidence or arguing that

> Gilead's reverse payment was not sufficiently 'large' compared to any metric or benchmark other than Gilead's avoided litigation costs in the patent litigation.  For example, the Court should exclude arguments that the reverse payment was not 'large' compared to Gilead's revenues or profits on Truvada or Atripla, or the size of the total HIV pharmaceutical market.

Mot. at 5.

As noted by one district court, "*Actavis* did not identify any specific formula for determining whether a reverse payment is sufficiently large."  *King Drug Co. of Florence v. Cephalon, Inc.*, 88 F. Supp. 3d 402, 416-17 (E.D. Pa. 2015).

However, to the extent Plaintiffs argue that the *only* benchmark for whether a reverse payment is large is Gilead's avoided litigation costs, they are incorrect.  *Actavis* on its face recognized that there may be other benchmarks.  *See FTC v. Actavis, Inc.*, 570 U.S. 136, 156 (2013) (stating that "[t]he reverse payment, for example, may amount to no more than a rough approximation of the litigation expenses saved through the settlement" or "may reflect compensation for other services that the generic has promised to perform . . . [;] *[t]here may be*

1    *other justifications*") (emphasis added).[5]

2         Plaintiffs' main concern, however, seems to be that it would not be proper (or fair) for

3    Gilead to say that a payment might seem large on its face but, in fact, is not that large, or is a fair

4    payment, given the profits that Gilead was making from the FTC patents.  Both sides have cited

5    authorities to support their respective positions.  *Compare, e.g.*, *King Drug*, 88 F. Supp. 3d at 416

6    (rejecting the defendants' position that "the appropriate consideration [for whether a reverse

7    payment is sufficiently large] is whether the unexplained portion of the payment is large in

8    comparison to the brand manufacturer's expected monopoly profits in the absence of generic

9    competition"), *with* Kelly Decl., Ex. L (order in *In re Namenda Direct Purchaser Antitrust*

10   *Litigation*, No. C-15-7488 CM-RWL (S.D.N.Y.) noting as follows: "I will not preclude

11   Defendants from introducing evidence in support of their position that the reverse payment to

12   Mylan [was] in fact not a large payment.  I will not prohibit Defendants from arguing that the

13   value of their patented drug franchise is a legitimate benchmark for evaluating whether the $34.5

14   million reverse payment to Mylan was 'large'").

15        Unfortunately, the respective authorities cited by the parties do not provide much

16   reasoning as to why it is permissible or impermissible for a brand manufacturer to claim that a

17   reverse payment is not large when its profits (or the value of its patents) are taken into account.

18   Implicitly, Plaintiffs' position is that it would be improper – or unfair – for Defendants to make

19   this assertion because the profits Gilead was making were *monopoly* profits.  In other words,

20   Gilead was able to make a payment of the size it did because of its large monopoly profits.  *See*

21   *Actavis*, 570 U.S. at 156 ("Where a reverse payment reflects traditional settlement considerations,

22   such as avoided litigation costs or fair value for services, there is not the same concern that a

23   patentee is *using its monopoly profits* to avoid the risk of patent invalidation or a finding of

24   noninfringement.") (emphasis added).  But that position seems to put the cart before the horse –

25   *i.e.*, that essentially assumes that Gilead's monopoly profits were not based on a lawful monopoly

26   arising from the patent but rather based on an unlawful monopoly because the patent is either

27

28   ─────────────────
     [5] Admittedly, "large" and "unjustified" are distinct concepts.  But the justification for a reverse
     payment may also shed light on whether a payment should be considered large.

United States District Court
Northern District of California

1    invalid or not infringed.

2        Furthermore, there is language in *Actavis* that suggests Gilead's profits from the FTC

3    patents may be considered in determining whether the size of a reverse payment is large.  *See id.* at

4    157-58 (noting that "[t]he owner of a *particularly valuable patent* might contend . . . that even a

5    small risk of invalidity justifies a large payment[;] [b]ut, be that as it may, the payment (if

6    otherwise unexplained) likely seeks to prevent the risk of competition") (emphasis added).

7        Accordingly, the Court finds in favor of Defendants on this issue and **DENIES** this part of

8    the motion in limine.  The Court's ruling here does not bar Plaintiffs from still asserting that the

9    reverse payment was not justified because it was a payoff to protect an invalid or noninfringed

10   patent.

11   C.    MIL No. 3 (Docket No. 1632-5)

12       For the reverse payment claims, Plaintiffs argue that the Court should preclude Defendants

13   from asserting – in conjunction with a rule-of-reason analysis – that certain "procompetitive

14   effects" justify their conduct.

15       The rule of reason has a "three-step, burden shifting framework."  *Ohio v. Am. Express*

16   *Co.*, 138 S. Ct. 2274, 2284 (2018).

17           (1) The plaintiff has "'the initial burden of showing that the restraint produces

18               significant anticompetitive effects within a relevant market.'"  *In re NCAA Ath.*

19               *Grant-In-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1256 (9th Cir. 2020).

20           (2) If the plaintiff meets that burden, the defendant must then "'come forward with

21               evidence of the restraint's procompetitive effects.'"  *Id.*

22           (3) If the defendant makes that showing, then the burden shifts back to the plaintiff to

23               "'show that any legitimate objectives [*i.e.*, procompetitive effects] can be achieved

24               in a substantially less restrictive manner.'"  *Id.*

25   Plaintiffs' motion in limine focuses on the second step – *i.e.*, a defendant coming forward with

26   evidence of the procompetitive effects of the restraint.

27       Before getting into the specifics of Plaintiffs' motion, however, the Court finds it worth

28   going over how the rule of reason applies in a reverse payment case.

14

United States District Court
Northern District of California

First, the Court rejects Defendants' position that a large and unjustified payment is a threshold showing that Plaintiffs must make *before* the rule of reason is applied.  Although there is some authority to support Defendants' position, the Court finds other authority more persuasive: whether a payment is large and unjustified is *part* of the rule-of-reason analysis – specifically, the first step.  For example, if a payment is large and unjustified, that may indicate anticompetitive effects.  *See, e.g.*, *King Drug*, 88 F. Supp. 3d at 413-15; *cf. Actavis*, 570 U.S. at 158 (stating that "a reverse payment, where large and unjustified, can bring with it the risk of significant anticompetitive effects").

Second, the Court notes that there is a difference between whether a payment is "large and unjustified" for purposes of step one and whether a defendant's conduct has procompetitive benefits for purposes of step two.  There may be some confusion here because the term "procompetitive justification" is sometimes used in discussing step two of the rule of reason.  To be sure, it may be possible for a justification for a large payment to be procompetitive.  However, the defendant does not necessarily have to justify a large payment as procompetitive.  In *Actavis*, the Supreme Court explained that a large payment could be justified if it reflected avoided litigation costs.  *See Actavis*, 570 U.S. at 156 ("Where a reverse payment reflects traditional settlement considerations, such as avoided litigation costs or fair value for services, there is not the same concern that a patentee is using its monopoly profits to avoid the risk of patent invalidation or a finding of noninfringement.").  Such a justification would not be procompetitive in the sense that the only ones who might benefit from the payment would be the contracting parties; in other words, broadly speaking, competition is not benefitted.  *Cf. In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2018 U.S. Dist. LEXIS 227750, at *55 (N.D. Cal. Feb. 7, 2018) ("Defendants may not argue that the Settlement in and of itself was procompetitive by removing litigation uncertainty *for defendants*.  Defendants' justifications (providing certainty and fewer distractions) . . . may, at most, be relevant to whether the reverse payments were 'large and unexplained,' but cannot be argued as procompetitive.") (emphasis in original).

### 1.   Procompetitive Benefits of the FTC Patent Settlement Agreement

Plaintiffs' first argument is that, at step two, Defendants can only talk about the

United States District Court
Northern District of California

United States District Court
Northern District of California

procompetitive effects of the restraint at issue in this case – *i.e.*, the reverse payment – and *cannot* talk about the procompetitive effects of the broader settlement agreement of which the reverse payment is a part. This is too restrictive. One such alleged benefit is that the settlement agreement here purportedly gives Teva a broad license to make new FTC products. (The parties have a dispute about how the license provision should be interpreted. The Court addressed this issue in the *Daubert* motion related to Dr. Saravia. *See* Docket No. 1404-3 (motion).)

The Court rejects Plaintiffs' position and thus **DENIES** this part of the motion in limine. Even if the Court were to follow the approach of the Federal Trade Commission in *In re Impax Labs., Inc.*, No. 9373, 2019 FTC LEXIS 25 (Fed. Trade Comm'n March 28, 2019), that decision does not favor Plaintiffs given the circumstances of this case. If Teva did agree, under the FTC patent settlement agreement, to delay its entry into the market, then the finder of fact must consider what benefits Teva received in exchange. This would be not only the reverse payment (as alleged by Plaintiffs) but also the broad license to use FTC (as alleged by Defendants). This was the basic analysis of Judge Alsup in *In re Glumetza Antitrust Litig.*, No. C 19-05822 WHA, 2021 U.S. Dist. LEXIS 161066 (N.D. Cal. Aug. 25, 2021):

> This order agrees with defendants that the Supreme Court's language [in *Actavis*], in context, contemplated a broader review of the agreement than solely the no-AG term in isolation. Regarding the nexus argument in plaintiffs' reply, plaintiffs' expert Professor McGuire also acknowledges a connection between the reverse payment and the marketing provisions when he states that "the commitment to a minimum level of promotion expenditures is also a form of pay from the Brand Defendants" (McGuire Rep. ¶ 101 n. 168, Dkt. No. 440-19). *If both the no-AG provision and the marketing provisions in the agreement constitute forms of payment to Lupin, then a nexus between the no-AG provision and reverse payment would include (or at least be affected by) the marketing provisions with their alleged procompetitive effects.*

*Id.* at *35-36 (emphasis added).

2.   Procompetitive Benefits of Patent Litigation Settlements Generally

According to Plaintiffs, even if Defendants are permitted to talk about the procompetitive benefits of the FTC patent settlement agreement specifically (see above), Defendants still should be barred from discussing the procompetitive benefits of patent litigation settlements generally –

*e.g.*, that "settlements reduce uncertainty, free up the time of management personnel, and save litigation costs."  Mot. at 2.

The Court finds this part of the motion effectively moot – and thus **DENIES** relief to Plaintiffs – because Plaintiffs seem to be confusing here the issue of procompetitive benefits (at step two of the rule of reason) with justification for a large payment (at step one of the rule of reason).  To the extent there is any substance that needs to be addressed, the Court does so below as this part of the motion in limine overlaps with Part III.C.5 *infra*.

3.     Procompetitive Benefit of Generic Entry Prior to Expiration of the Patent

Plaintiffs argue next that Defendants should not be able to claim as a procompetitive benefit of the FTC patent settlement agreement the fact that Teva was allowed to enter the market before the expiration date of the FTC patents.  *See* Opp'n at 4 (noting that the FTC patent settlement agreement "gave Teva licenses to enter no later than September 2020, a year before the expiration of the FTC patents and more than three years before the expiry of the [follow-on] combination patents").

The Court does not find Plaintiffs' position persuasive and thus **DENIES** them relief. Plaintiffs' position is predicated on the Supreme Court rejecting the "scope of the patent" test in *Actavis*.  "The scope of the patent test insulates from antitrust scrutiny virtually any agreement that restrains trade no more than the patent itself would have, if valid."  *In re Cipro Cases I & II*, 61 Cal. 4th 116, 145 (2015).  In *Actavis*, the Supreme Court rejected the Eleventh Circuit's conclusion that "a reverse payment settlement agreement generally is 'immune from antitrust attack so long as its anticompetitive effects fall within the scope of the exclusionary potential of the patent.'"  *Actavis*, 570 U.S. at 141; *see also id.* at 145 (noting that, in the reverse payment case under consideration, the generic manufacturer agreed that "it would not bring its generic to market until . . . 65 months before [the brand's] patent expired (unless someone else marketed a generic sooner)").  The reason why is that an entry date before patent expiration could be anticompetitive if the generic could have obtained an even earlier entry date if there were no reverse payment.  *See King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*, 791 F.3d 388, 408 (3d Cir. 2015) ("Notwithstanding such 'early entry,' the antitrust problem was that, as the [*Actavis*] Court

United States District Court
Northern District of California

1    inferred, entry might have been earlier, and/or the risk of competition not eliminated, had the

2    reverse payment not been tendered.").

3         To the extent Plaintiffs assert that an entry date prior to patent expiration is not *dispositive*,

4    the Court agrees.  But that does not mean that a defendant therefore cannot claim as a

5    procompetitive benefit entry before the patent expiration date.  It is up to Plaintiffs to show that

6    the entry date agreed to by Defendants is *later* than it should have been.  That is a matter for the

7    jury to decide.

8         4.    Procompetitive Benefit of Broad License Given to Teva Under the Settlement

9                Agreement)

10        Plaintiffs also argue that Defendants will try to claim, as a procompetitive benefit of the

11   settlement agreement, that Teva was given a broad license to use the FTC patents – *e.g.*, so that

12   Teva could make new FTC products.  As an initial matter, Plaintiffs dispute that Teva was in fact

13   given such a broad license.  That was the subject of the *Daubert* motion challenging Defendants'

14   expert Dr. Saravia.  *See* Docket No. 1404-3 (motion); *see also* Mot. at 5 n.1.  The Court found that

15   there was ambiguity as to the scope of Teva's license such that extrinsic evidence on the matter

16   would need to be considered.

17        But putting that aside, Plaintiffs contend that Defendants cannot invoke the procompetitive

18   effects of the alleged broad license because "Gilead's reverse payment to Teva cannot be

19   explained by its *further* grant of license benefits."  Mot. at 5 (emphasis added).  But this seems to

20   misread Defendants' position.  Defendants are not relying on the broad license to *justify* the

21   reverse payment (rather, they are contending that the broad license was *another* benefit given to

22   Teva).

23        Plaintiffs protest still that "any procompetitive benefits of the broad license are not

24   cognizable because they do not flow from the restraint."  Mot. at 5.  But the alleged restraint here

25   is Teva's agreement to delay entry into the market.  In exchange for delay, Teva was given

26   multiple benefits – *i.e.*, not just the reverse payment but also the broad license.  So there is an

27   asserted tie between the restraint and the license that Teva was given to make FTC products.

28   Again, this raises a factual issue for the jury.

United States District Court
Northern District of California

1   This part of the motion in limine is **DENIED**.

2        5.     <u>Procompetitive Benefit of Averting Risk</u>

3        Plaintiffs contend that both Gilead and Teva should be precluded from arguing that the

4   reverse payment was justified "because Gilead or Teva [was] risk averse or the payment allowed

5   [a] defendant[] to avoid the risk of litigation." Mot. at 5. Plaintiffs maintain that *Actavis* bars such

6   an argument.

7

8                 The Supreme Court [in *Actavis*] expressly rejected the idea that risk
              aversion might justify a reverse payment: "The owner of a
9                 particularly valuable patent might contend, of course, that even a
              small risk of invalidity justifies a large payment. But, be that as it
10                may, the payment (if otherwise unexplained) likely seeks to prevent
              *the risk of competition*. And, as we have said, *that consequence
11                constitutes the relevant anticompetitive harm*." *Actavis*, 570 U.S. at
              157.

12  Mot. at 4-5 (emphasis in original); *see also* Kelley Decl., Ex. F (Order at 5) (in *In re Loestrin 24*

13  *Fe Antitrust Litigation*, No. 13-md-2472 WES (D.R.I.), stating that "Defendants are permitted to

14  introduce evidence of business reasons for settlement, including the broad spectrum of costs and

15  expenses associated with litigation," but "the jury will be instructed, as directed by *Actavis*, that

16  settlement to avoid the specific risk of a finding of patent invalidity may be anticompetitive").

17       While Gilead cannot assert litigation risk as a means of justifying a large payment –

18  specifically, the risk that, through litigation, its patents could be found invalid – Teva may claim

19  litigation risk as a reason to settle. *See King Drug Co. of Florence, Inc. v. SmithKline Beecham*

20  *Corp.*, 791 F.3d 388, 404 (3d Cir. 2015) ("[T]he [*Actavis*] Court reasoned that 'even a small risk

21  of invalidity' may not justify a 'large payment' (presumably enabled by 'patent-generated

22  monopoly profits') that 'likely seeks to prevent the risk of competition.' And, the Court reiterated,

23  it is the prevention of that risk of competition – eliminating 'the risk of patent invalidation or a

24  finding of noninfringement' by 'paying a challenger to stay out' of the market (for longer than the

25  patent's strength would otherwise allow) – that 'constitutes the relevant anticompetitive harm,'

26  which must then be analyzed under the rule of reason."); *id.* at 411 ("[T]he District Court thought

27  the no-AG agreement was 'justified' because, although the settlement amount was likely greater

28  than litigation costs, 'the consideration which the parties exchanged in the settlement [wa]s

reasonably related to the removal of the uncertainty created by the dispute.' That conclusion is in tension with *Actavis* in that, without proper justification, the brand cannot pay the generic simply to eliminate the risk of competition."); *In re Namenda Direct Purchaser Antitrust Litig.*, 2019 U.S. Dist. LEXIS 204827, at *28 (S.D.N.Y. Aug. 2, 2019) ("With respect to 'litigation risk' or 'risk aversion,' Forest may offer evidence of its ostensible business reasons, including 'business uncertainty' or 'litigation risk,' for settling the patent litigation. *Actavis* itself provides that a reverse payment can be justified by 'traditional settlement considerations, such as avoided litigation costs,' or 'may amount to no more than a rough approximation of the litigation expenses saved through the settlement.'"); *id.* at *29 ("[But] 'litigation risk' is very different from 'competition risk,' which the U.S. Supreme Court (accurately) has labeled the 'relevant anticompetitive harm' in reverse payment cases such as these. By definition, 'competition risk' can never justify, 'offset[],' or 'redeem[]' the anticompetitive consequences of a reverse payment. It is the very evil the antitrust laws seek to prevent."); *King Drug Co. of Florence v. Cephalon, Inc.*, No. 2:06-cv-1797, 2015 U.S. Dist. LEXIS 135264, at *47 (E.D. Pa. Oct. 5, 2015) ("The *Actavis* opinion supports the determination that a patent holder's litigation uncertainty cannot justify a reverse payment."); *id.* at *47-48 ("Although I conclude that evidence of Cephalon's litigation uncertainty cannot be offered to explain or justify the terms of the settlement agreements and the associated payments, this does not mean that other procompetitive justifications for the reverse payment, such as 'avoided litigation costs or fair value for services' are inadmissible. *Actavis* approves of these potential justifications because, unlike a patent-holder's avoidance of litigation risk, they do not raise the same 'concern that a patentee is using its monopoly profits to avoid the risk of patent invalidation or a finding of noninfringement.' [¶] My conclusion regarding Cephalon's litigation uncertainty does not, however, extend to the Generic Defendants. Unlike Cephalon, the litigation uncertainty that the Generic Defendants faced in the underlying infringement litigation was the potential of the RE '516 patent being upheld as valid and infringed. Thus, the 'risk' to be avoided for the Generic Defendants was being kept off of the market for the duration of the RE '516 patent or owing money damages for an at-risk launch. As these considerations do not implicate anticompetitive motivations, they may be introduced by the

Generic Defendants.").

6.    Procompetitive Benefit of Actual Generic Entry Before Teva's Alleged Subjective Belief re Generic Entry

Finally, Plaintiffs argue that "defendants should be precluded from arguing to the jury that the reverse payment was justified or procompetitive because Teva's entry date was purportedly earlier than its 'expected date [based on its subjective beliefs].'"  Mot. at 6.

Plaintiffs' argument here is not entirely clear.  To the extent Plaintiffs suggest evidence is lacking that "the same settlement could not be reached without the reverse payment," that is a step-three inquiry under the rule of reason, not a step-two inquiry.

To the extent Plaintiffs argue that it is the brand manufacturer's belief that is important here, and not the generic's, because the brand is the one making the reverse payment, that is somewhat beside the point since the generic should be able to argue that there was a procompetitive effect since actual generic entry was earlier than what it believed it should be.

This part of the motion in limine is **DENIED**.

D.    MIL No. 4 (Docket No. 1632-6)

Plaintiffs' fourth motion in limine relates to Defendants expert, Kathleen O'Malley, who is a retired federal judge.

First, Plaintiffs ask that Ms. O'Malley not be referred to as "Judge" or "Your Honor" because the jury would likely give her testimony undue weight as a result (and use of such an honorific would also violate ethical rules applicable to judges).  This is a reasonable request. Defendants do not disagree.  *See* Opp'n at 1 n.1. (indicating that Defendants would stipulate to such).  However, Defendants should still be able to ask Ms. O'Malley about her qualifications – *i.e.*, the fact that she was a federal judge.  This is consistent with the district court's ruling in *In re Namenda Indirect Purchaser Antitrust Litigation*, No. 1:15-cv-6549 (CM) (RWL), 2022 U.S. Dist. LEXIS 149561, at *7 (S.D.N.Y. Aug. 15, 2022):

> Plaintiffs move in limine for an order prohibiting Defendants' expert, Sue Robinson, from being referred to as Judge Robinson. (*See* Docket No. 748).  The rule in my courtroom is that there is only one judge, and it is I.  Therefore, the motion is granted; the

United States District Court
Northern District of California

> witness will be addressed as Ms. Robinson during her testimony. However, the fact that she was at one time a judge is a basis for her proffered expertise, and that fact will not be kept secret from the jury; it will be revealed when her credentials are discussed at the outset of her testimony, and it may come up in her answers to specific questions. Nothing in this ruling is meant to suggest that Ms. Robinson's prior career is irrelevant to her testimony; nothing could be further from the truth.

*Id.* at *7.

To the extent Plaintiffs suggest that even going over Ms. O'Malley's qualifications would be prejudicial, any potential prejudice could be alleviated by the Court giving an instruction that Ms. O'Malley's testimony should be assessed the same as any other witness. Defendants note that there is a Ninth Circuit model instruction that already addresses expert testimony:

> You [have heard] [are about to hear] testimony from [name] who [testified] [will testify] to opinions and the reasons for [his] [her] opinions. This opinion testimony is allowed, because of the education or experience of this witness.
>
> Such opinion testimony should be judged like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

9th Cir. Model Civil Jury Instruction No. 2.13. But Defendants fail to explain why it would be prejudicial for them to have this instruction read at the time Ms. O'Malley testifies. The general practice of the Court is to do so when requested.

Next, Plaintiffs request that Ms. O'Malley be barred from offering testimony about what Judge Sullivan (the judge who presided over the FTC patent infringement trial) thought. Plaintiffs argue this is improper state-of-mind testimony. This subject is already covered in one of Plaintiffs' motions in limine. *See* Docket No. 1402-3 (addressing state-of-mind testimony by multiple defense experts, including Ms. O'Malley); *cf.* Docket No. 1398-3 (addressing state-of-mind testimony by another defense expert, Mr. Berneman). The Court reiterates its guidance on the issue: (1) an expert cannot speculate about what someone else thought; (2) he or she can testify about what the factual record indicates; and (3) he or she can testify about what a rational person or entity would do.

Finally, Plaintiffs ask that the Court preclude Ms. O'Malley from "opining on the

credibility of witnesses" – whether those who testified in the FTC patent infringement trial or those who testified or will testify in this case (such as Plaintiffs' expert Mr. Lentz). Mot. at 2. It is undisputed that an expert cannot testify specifically to a witness's credibility (*i.e.*, that is a role for the jury). Ms. O'Malley may testify about what the factual record indicates, and she may challenge or otherwise criticize the opinions of Plaintiffs' expert Mr. Lentz.

Accordingly, for the reasons stated above, the motion is **GRANTED** in part and **DENIED** in part.

E.      MIL No. 5 (Docket No. 1632-7)

Plaintiffs ask the Court to exclude language "disparaging" Plaintiffs or their burden under the law. Plaintiffs have four specific requests which are addressed below.

1.      Request No. 1: But-for World

First, Plaintiffs ask that the Court bar Defendants from describing the but-for world "as 'imaginary,' 'made up,' 'merely hypothetical' or using any other disparaging or derogatory characterization. Such characterizations improperly criticize the plaintiffs for undertaking the analysis required by the law, mischaracterize the plaintiff's burden of proof, and are highly prejudicial." Mot. at 1; *see also* Mot. at 2 ("It is precisely because of the defendants' illegal conduct that the litigants and the factfinder are left to hypothesize about what would have happened absent that conduct.").

This part of the motion is **DENIED** as it is essentially moot. As an initial matter, Defendants expressly state in their opposition that they "do not intend to criticize Plaintiffs' causation theory merely because it requires proof of a but-for world." Opp'n at 1. Furthermore, Defendants do not seem to assert that they want to use "disparaging" terms such as "imaginary." *But see* Mot. at 1 n.1 (noting that, in a different case "involving some of the same counsel representing the defendants here, counsel argued to the jury that it should reject the alternative no-payment benchmark that the plaintiffs used to demonstrate causation because it was 'imaginary'").

However, Defendants do assert that they should not be constrained from arguing that the but-for world proposed by Plaintiffs is not supported or unreasonable: "Plaintiffs' but-for world is not immune from criticism simply because it is based on hypotheticals. The law is clear: courts

23

1   construct the but-for world not out of whole cloth, but as a matter of *reasoned* deviation from the

2   actual world.'" Opp'n at 1 (emphasis in original).

3       Here, the Court agree with Defendants. That is, Defendants should be able to argue that

4   Plaintiffs' but-for models are essentially "flawed." Opp'n at 1; *see also* Opp'n at 2 (noting as an

5   example that Defendants will argue that Dr. McGuire's models "are based on sheer speculation

6   and loaded with unreasonable assumptions about a large number of key variables").

7       2.   Request No. 2: Generic Drugs v. Brand Drugs

8       Second, Plaintiffs ask that Defendants be barred from "(i) denigrating generic drugs and

9   generic drug makers, including the use of pejoratives such as 'me too' drugs, 'piggy-backing' or

10  'free riders' or . . . (ii) touting the quality or benefits of brand versions of drugs, including with

11  self-serving descriptors such as 'innovator.'" Mot. at 4. Plaintiffs emphasize that generic drugs

12  are therapeutically equivalent to their counterpart brand drugs.

13      For this motion, the Court takes a practical approach. Calling generic drugs "me too"

14  drugs or "copycats" is pejorative. On the other hand, that does not mean that Defendants should

15  be barred from saying that generic drugs are "copies" of brand drugs and that, under the regulatory

16  scheme, generic drugs are allowed to "piggy back" or "free ride" on brand drugs. Notably, the

17  Supreme Court has even used the term "piggy back." *See FTC v. Actavis, Inc.*, 570 U.S. 136, 142

18  (2013) (noting that "[t]he Hatch-Waxman Act permits a generic manufacturer to file an

19  Abbreviated New Drug Application specifying that the generic has the 'same active ingredients

20  as,' and is 'biologically equivalent' to, the already-approved brand-name drug"; that, "[i]n this

21  way the generic manufacturer can obtain approval while avoiding the 'costly and time-consuming

22  studies' needed to obtain approval 'for a pioneer drug'"; and that the act thereby "allow[s] the

23  generic to piggyback on the pioneer's approval efforts," which "'speed[s] the introduction of low-

24  cost generic drugs to market'"). Similarly, Defendants should be able to claim "innovation" with

25  respect to brand drugs because innovation is why brand drugs are given patent protection and why

26  the R&D costs for brand drugs are significant. Using terms such as "piggy back" or "innovate"

27  does not suggest that generic drugs are not therapeutically equivalent to brand drugs, or that

28  generic drugs are otherwise inferior. *See In re Loestrin 24 FE Antitrust Litig.*, No. MDL No.

United States District Court
Northern District of California

2472, 2019 U.S. Dist. LEXIS 210600, at *30 (D.R.I. Dec. 6, 2019) ("Use of pejorative terms will not be permitted; however, occasional use of terms like 'innovation' and 'copycat' are not problematic in the proper context."); *see also Namenda*, 2022 U.S. Dist. LEXIS 149561, at *7 ("Plaintiffs move in limine to bar Defendants from introducing evidence or argument denigrating generic drugs or touting the qualify or benefits of brand drugs. The motion is denied for the reasons articulated in Forest's brief in opposition thereto.").

Finally, it is fair for Defendants to note they "must be free to explain to the jury why some doctors and patients prefer brand drugs over generic drugs to help the jury understand why some customers continue to purchase brand HIV drugs after generic entry and why brand companies do not always find it necessary to match generic pricing." Opp'n at 4 (referring to brand loyalists).

This part of the motion is therefore **GRANTED** in part and **DENIED** in part.

3.    Request No. 3: Financial Condition of Plaintiffs

Plaintiffs ask that the Court bar Defendants from offering at trial argument or evidence about "the relative wealth, financial condition, or size of the plaintiffs and/or absent class members, individually or in the aggregate." Mot. at 5. Plaintiffs argue that the information is not relevant to any issues in this case and, even if it were, it would be unfairly prejudicial. (Some of the indirect purchasers are large entities (*e.g.*, TPPs including health plans) as are some of the direct purchasers (*e.g.*, Walgreens and CVS).)

Defendants have the better position. With respect to relevance, Defendants have articulated a basis for such – *i.e.*, "plaintiff's size and financial condition can be relevant to that party's ability to influence prices [*i.e.*, bargaining power] and thus to mitigate damages." Opp'n at 6. The mitigation that Defendants are referring to here appears to be, *e.g.*, rebates and discounts. Defendants emphasize that Plaintiffs will characterize "Defendants as large pharmaceutical companies with market power to set prices however they want," but "Plaintiffs include some of the biggest and most profitable companies in the country, which negotiated prices from a position of strength, not weakness." Opp'n at 7.

Notably, even one of the authorities cited by Plaintiffs actually favors Defendants. *See In re Namenda Direct Purchaser Antitrust Litig.*, No. 15 Civ. 7488 (CM), 2019 U.S. Dist. LEXIS

United States District Court
Northern District of California

204827, at \*32 (S.D.N.Y. Aug. 2, 2019) ("Forest represents that it plans to use evidence of the DPPs' size and financial condition . . . to argue that some larger class members successfully mitigated damages by negotiating discounts and rebates. Forest concedes – as it must – that information about the size or relative financial condition of the DPPs has no relevance to liability. Accordingly, I GRANT the DPPs' motion with respect to the first phase of the trial ('pay to delay' liability). [¶] The issue of bargaining power, however, is relevant to damages. During the second phase of the trial, which includes both 'hard switch' liability and overall damages, the jury can and will be instructed about the limited relevance of the size and financial condition of the DPPs, and will be reminded that their size does not mean they cannot be injured in an antitrust sense.").

To the extent Plaintiffs raise the issue of unfair prejudice, the Court can ameliorate any prejudice by giving an instruction (consistent with *Namenda* above) that evidence of financial condition or size does not mean that a plaintiff cannot be injured per se but is relevant to the issue of a plaintiff's damages – *i.e.*, the plaintiff's bargaining power which would inform its ability to negotiate discounts or rebates. The Court will give such an instruction if requested.

This part of the motion is **DENIED**.

4.    Request No. 4: Other Lawsuits or Investigations

Plaintiffs ask the Court to preclude Defendants from referring to (1) unrelated lawsuits in which "[a] number of the named plaintiffs in this litigation have been parties to . .. , including other antitrust lawsuits involving the delay of unrelated generic drugs," and (2) unrelated investigations or suits involving the named plaintiffs (*e.g.*, "investigations into or lawsuits against Humana related to formulary tiering of HIV drugs" and "investigations and lawsuits related to Centene's pharmacy benefit management practices"). Mot. at 7 & n.4. Plaintiffs argue that the unrelated lawsuits are irrelevant and, even if they were relevant, Rule 403 still mandates exclusion of the evidence.

This part of the motion is essentially moot and thus it is **DENIED**. In their opposition brief, Defendants state that they "do not anticipate presenting evidence about other reverse payment lawsuits involving named Plaintiffs or the other investigations or lawsuits listed in their brief, unless Plaintiffs inject those issues into the case." Opp'n at 7.

F.      MIL No. 6 (Docket No. 1632-8)

        In their final motion in limine, Plaintiffs move to exclude certain evidence related to their injury and/or damages.  There are four specific requests, each of which is addressed below.

        1.      Request No. 1: Pass-On of Overcharge

        Plaintiffs ask first that Defendants be barred from offering evidence or argument that any Plaintiff "passed on" overcharges incurred as a result of Defendants' conduct.

        Plaintiffs are correct that, for direct purchasers, passing on is irrelevant for purposes of federal antitrust law.  *See Ill. Brick Co. v. Ill.*, 431 U.S. 720, 724-25 (1977) (stating that "a direct purchaser suing for treble damages under § 4 of the Clayton Act is injured within the meaning of § 4 by the full amount of the overcharge paid by it"; "the antitrust defendant is not permitted to introduce evidence that indirect purchasers were in fact injured by the illegal overcharge," *i.e.*, the overcharge was passed on to them).  But this case also involves indirect purchasers who have sued under state law.  Defendants have pointed out that at least some states' laws do allow for a defendant to assert a pass-on defense against an indirect purchaser.  *See, e.g.*, D.C. Code § 28-4509(b) ("In actions where both direct and indirect purchasers are involved, a defendant shall be entitled to prove as a partial or complete defense to a claim for damages that the illegal overcharge has been passed on to others who are themselves entitled to recover so as to avoid duplication of recovery of damages."); Neb. Rev. Stat. § 59-821.01(1) ("A defendant may prove, as a partial or complete defense to a claim for damages under sections 59-801 to 59-831 and this section, that the illegal overcharge or undercharge has been passed on to others who are themselves entitled to recover so as to avoid duplication of recovery of such damages.").

        Plaintiffs suggest that, as to indirect purchasers, there should be no evidence of passing on an overcharge.  Plaintiffs emphasize that the indirect purchasers seeking damages are all TPPs (*e.g.*, health plans) who are at the very end of the distribution chain and do not resell drugs to anyone else.  The Court **DEFERS** ruling on this part of the motion because it is not clear whether Defendants will argue that TPPs do pass on overcharges.  *See In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2018 U.S. Dist. LEXIS 227750, at *43 (N.D. Cal. Feb. 7, 2018) (indicating that defendants argued TPPs were able to pass or recoup some of their damages "through raising

premium prices to members" of the health plans; "the Court has repeatedly denied EPPs' motions to exclude testimony from actuary John Fritz regarding how EPPs actually set premiums," and "Fritz's opinions can be attacked at trial").  *But see In re Lipitor Antitrust Litig.*, MDL No. 2332, 2020 U.S. Dist. LEXIS 173522 (D.N.J. Sep. 22, 2020) (stating that "our sister courts have routinely found that insurance premiums are not relevant to a pass-on defense 'because insurance premiums are set by anticipating future projected costs, not to recover money that insurers paid in the past'").  The Court will take oral argument on this part of the motion at the final pretrial conference on April 10, 2023.

The Court also defers ruling here because the issue of duplicative recovery would benefit from oral argument.  On the one hand, there is case law noting that "'[s]tates . . . which have repealed *Illinois Brick* and allowed indirect purchasers to sue for antitrust violations[] have necessarily made the policy decision that duplicative recovery may occur.  Duplicative recovery is, in many if not all cases alleging a nationwide conspiracy with both direct and indirect purchaser classes, a necessary consequence that flows from indirect purchaser recovery.'"  *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1156 (N.D. Cal. 2009); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 11-5765, 2013 WL 257148, at *1 (N.D. Cal. Jan. 23, 2013).  On the other hand, Defendants have pointed to at least one state's statute that indicates a payment to a direct purchaser should be used as a set-off against a payment to an indirect purchaser so as to avoid duplication of recovery.  *See* Utah Code § 76-10-3109(6) ("In an action by indirect purchasers, any damages or settlement amounts paid to direct purchasers for the same alleged antitrust violations shall constitute a defense in the amount paid on a claim by indirect purchasers under this chapter so as to avoid duplication of recovery of damages.").  Defendants have also taken note of some state statutes that discuss the ability of a court to, *e.g.*, apportion damages to avoid duplication of recovery.  *See, e.g.*, D.C. Code § § 28-4509(c) ("In any case in which claims are asserted by both direct purchasers and indirect purchasers, the court may transfer and consolidate cases, apportion damages and delay disbursement of damages to avoid multiplicity of suits and duplication of recovery of damages, and to obtain substantial fairness."); Haw. Rev. Stat. § § 480-13(c)(5) ("In any lawsuit or lawsuits in which claims are asserted by both direct

28

purchasers and indirect purchasers, the court is authorized to exercise its discretion in the apportionment of damages, and in the transfer and consolidation of cases to avoid the duplication of the recovery of damages and the multiplicity of suits, and in other respects to obtain substantial fairness."); Neb. Rev. Stat. § 59-821.01 ("The court may transfer and consolidate such claims, apportion damages, and delay disbursement of damages to avoid multiplicity of suits and duplication of recovery of damages and to obtain substantial fairness.").

The parties may file supplemental briefs on these issues by March 28, 2023.  Each brief shall be no longer than ten (10) pages.  If necessary, the parties should address the issues on a state-by-state basis (if possible, whether states can be grouped).

2.    Request No. 2: Mitigation of Damages

Plaintiffs next ask the Court to exclude evidence related to any failure to mitigate damages on their part.  In particular, Plaintiffs want to bar Defendants from arguing that Plaintiffs could have mitigated their damages by buying other drugs that were cheaper.  *See* Mot. at 5.  According to Plaintiffs, "[D]efendants did not develop this issue in their expert report or otherwise, and so it is waived.  In any event, the failure to mitigate damages is not a defense to any of the plaintiffs' claims" – *i.e.*, "there is no 'mitigation' defense against damages arising from a horizontal agreement restricting price or output, principally because victims of such a conspiracy have no option of 'finding another supplier' for the product at issue."  Mot. at 4-5.

In their response, Defendants do not argue that a mitigation defense is viable or that they did not waive a mitigation defense.  Rather, they argue that Plaintiffs are trying to "use this motion as a backdoor attempt to improperly exclude evidence that is directly relevant to" the question of what is the relevant product market – *i.e.*, what are economic substitutes for the drugs at issue.  Opp'n at 5; *see also* Opp'n at 6 (arguing that, "regardless of any questions about damage mitigation, the clear relevance of the same evidence for defining the relevant market defeats any attempt to exclude it").  *See, e.g.*, Kelley Decl., Ex. M (in *In re Solodyn*, No. 14-md-02503-DJC (D. Mass.) (denying plaintiffs' motion to preclude failure-to-mitigate defense; "[i]t appears that Plaintiffs are seeking to preclude evidence about Plaintiffs' ability to purchase substitutes for Solodyn or generic Solodyn" but "[i]t is not clear that this is mitigation evidence as opposed to an

issue about interchangeability as it bears about the relevant market here").

Defendants' point is well taken. Furthermore, there is some overlap here with Plaintiffs' fifth motion in limine – *i.e.*, where Defendants have argued that a plaintiff's size and financial condition can be relevant to their ability to influence prices, *i.e.*, bargaining power (which is relevant to damages since a plaintiff's bargaining power would inform its ability to negotiate discounts and rebates). As noted above, the Court will give an instruction if requested, informing the jury that evidence of financial condition or size does not mean that a plaintiff cannot be injured per se but is relevant to the issue of a plaintiff's damages.

This part of the motion is **DENIED**.

### 3. Request No. 3: Large Damages Award

In their third request, Plaintiffs ask that the Court exclude evidence or argument that "a large judgment will negatively impact their current businesses and the businesses of their distributors or resellers, for example, by requiring the defendants to adjust their prices to distributors or resellers of HIV medications." Mot. at 5. Plaintiffs assert that such evidence is both irrelevant and unfairly prejudicial.

In response, Defendants state that they "do not intend to introduce evidence or argument about the effect of an adverse verdict in this case on them." Opp'n at 6. However, they add that their position would change if Plaintiffs were to open the door – *e.g.*, "by suggesting that Defendants are large companies that could easily absorb a large damage award, or by suggesting that Defendants were so desperate for profits that they were incentivized to violate the antitrust laws." Opp'n at 6. The Court finds the motion moot in light of the above and therefore **DENIES** Plaintiffs relief. The Court does not preclude Defendants from contending, during trial, that Plaintiffs have opened the door to such evidence, although it is skeptical that an assertion by Plaintiffs that "Defendants were so desperate for profits" that they violated the antitrust laws would be enough to open the door.

### 4. Request No. 4: Treble Damages and Attorneys' Fees and Costs

Finally, Plaintiffs ask the Court to exclude evidence or argument that Plaintiffs are able to recover treble damages and attorneys' fees and costs under federal law. Plaintiffs maintain that

United States District Court
Northern District of California

such evidence is irrelevant and unfairly prejudicial.

In response, Defendants state that they do not intend to refer to the recoverability of these damages for the *direct purchasers* who have federal claims – "unless Plaintiffs somehow open the door." Opp'n at 7. However, Defendants argue that the situation is different for *indirect purchasers* who have state law claims. According to Defendants, "[u]nder the laws of several states, the *jury* determines whether to apply a damage multiplier, and potentially how large of a multiplier it is. As a result, the issue must be presented to the jury – unless Plaintiffs waive their rights to recover those categories of damages." Opp'n at 7. Defendants point to the antitrust laws of four states. (It is not clear if there are any others.)

- Arizona (Ariz. Rev. Stat. § 44-1401 *et seq.*). Section 44-1408(B) provides as follows: "A person threatened with injury or injured in his business or property by a violation of this article [the Uniform State Antitrust Act] may bring an action for appropriate injunctive or other equitable relief, damages sustained and, as determined by the court, taxable costs and reasonable attorney's fees. *If the trier of fact finds that the violation is flagrant*, it shall increase recovery to an amount not in excess of three times the damages sustained." Ariz. Rev. Stat. § 44-1408(B) (emphasis added).

- Michigan (Mich. Comp. Laws Ann. § 445.771 *et seq.*). Section 445.778(2) is similar to the Arizona statute above. It provides: "Any other person threatened with injury or injured directly or indirectly in his or her business or property by a violation of this act may bring an action for appropriate injunctive or other equitable relief against immediate irreparable harm, actual damages sustained by reason of a violation of this act, and, as determined by the court, interest on the damages from the date of the complaint, taxable costs, and reasonable attorney's fees. *If the trier of fact finds that the violation is flagrant*, it may increase recovery to an amount not in excess of 3 times the actual damages sustained by reason of a violation of this act." Mich. Comp. Laws Ann. § 445.778(2) (emphasis added).

- North Dakota (N.D. Cent. Code § 51-08.1-01 *et seq.*). Section 51-08.1-08(3) is

similar to the Arizona and Michigan statutes above.  It provides: "A person threatened with injury or injured in that person's business or property by a violation of this chapter may bring an action for appropriate injunctive or other equitable relief, damages sustained and, as determined by the court, taxable costs and reasonable attorney's fees.  *If the trier of fact finds that the violation is flagrant*, it may increase recovery to an amount not in excess of three times the damages sustained."  N.D. Cent. Code § 51-08.1-08(3) (emphasis added).

- New Mexico (N.M. Stat. Ann. § 57-1-1 *et seq.*).  The New Mexico statute is somewhat different, providing as follows: "[A]ny person threatened with injury or injured in his business or property, directly or indirectly, by a violation of Section 57-1-1 or 57-1-2 NMSA 1978 may bring an action for appropriate injunctive relief, up to threefold the damages sustained and costs and reasonable attorneys' fees.  If the trier of fact finds that the facts so justify, damages may be awarded in an amount less than that requested, but not less than the damages actually sustained."  N.M. Stat. Ann. § 57-1-3(A).

In light of the above, Defendants' position has merit.  *See also Namenda*, 2022 U.S. Dist. LEXIS 149561, at *19-20 (S.D.N.Y. Aug. 15, 2022) ("If there are claims brought under state laws pursuant to which the jury enhances damages, then the jury must be allowed to know that it has the right to enhance damages and be given an opportunity to enhance damages.").  The Court therefore **DENIES** this part of the motion.

## IV.    WITNESS LISTS & DEPOSITION DESIGNATIONS

Given the rulings that the Court has made on the motions in limine (including, *e.g.*, its ruling on Defendants' MIL No. 1 which concerns TAF-related evidence and argument), the Court expects that the parties will be able to significantly narrow their witness lists as well as their deposition designations.  (The parties need only focus on the reverse payment claims at this juncture.)

By March 28, 2023, the parties shall file their revised witness lists.  The lists shall:

- state whether a witness will testify live or by deposition[6];
- differentiate whom the parties expect to call (*i.e.*, likely will call) and whom the parties may call;
- include summaries of the testimony that each witness is expected to provide; and
- provide time estimates – *i.e.*, how much time a witness is expected to testify on direct and cross.

The parties should meet and confer to see if they can reach agreement such that custodians of record need not testify.

With respect to deposition designations, the Court expects revised designations and objections to be filed by April 6, 2023.  The Court's expectation is that objections will be made in good faith and only where there is a true objection to admissibility.  Foundation-type objections are not helpful unless there is a real concern – *e.g.*, that a witness does not have even some limited personal knowledge to provide testimony.  The parties should also bear in mind that relevance is not a high bar; comparatively, Rule 403 is (*i.e.*, requiring that probative value be "substantially outweighed").  The parties shall meet and confer to see if they can reach agreement on a special master who will rule on objections.  Plaintiffs and Defendants shall each pay for 50% of the cost of the special master.  The special master will track his or her time spent on objections and determine how much of that time will be charged against each side's trial time (with the understanding that the party that "loses" on an objection will be charged).

## V.  EXHIBIT LISTS, BELLWETHERS & WRITTEN DISCOVERY DESIGNATIONS

Given the rulings that the Court has made on the motions in limine (including, *e.g.*, its ruling on Defendants' MIL No. 1 which concerns TAF-related evidence and argument), the Court expects that the parties will be also able to significantly narrow their exhibit lists and written discovery designations.  (The parties need only focus on the reverse payment claims at this

---

[6] The parties should meet and confer so that they are on the same page.  Although a party may affirmatively use deposition testimony of a party-opponent witness even where the witness testifies live, *see* Fed. R. Civ. P. 32(a)(1) (providing that, at a trial, a "deposition may be used against a party" on certain conditions), the Court strongly encourages the parties to limit such use of deposition testimony; instead, deposition testimony for live witnesses is better used for impeachment purposes.

United States District Court
Northern District of California

1    juncture.)

2           The Court expects revised exhibit lists and objections, as well as revised written discovery

3    designations and objections, to be filed by April 6, 2023.  As above, Court's expectation is that

4    objections will be made in good faith and only where there is a true objection to admissibility.  For

5    exhibits, the parties should be able to stipulate to authenticity in most, if not all, instances.  The

6    Court reserves the right to deduct trial time if it is forced to spend inordinate time on objections

7    (as above, the losing party will be charged).

8           Because the exhibit lists will be revised, the Court shall allow the parties to identify new

9    bellwethers (15 per side) by April 6, 2023.  The parties are permitted to reassert their original

10   bellwether designations.

## VI.     <u>VERDICT FORM</u>

12          Defendants have raised an issue related to the verdict form (as well as jury instructions):

> [T]he EPPs and IHPPs bring claims under the antitrust and
> consumer protection laws of over 30 different states, and those
> states' laws have various procedural differences – including
> different statutes of limitations (2-4 years), and different available
> damages (i.e., single, double or treble damages, based on different
> factual showings) – that may materially impact the calculation of
> recoverable overcharges in any particular state. Plaintiffs' jury
> instructions and verdict form propose that the jury make only
> aggregate damages findings, with no additional findings (such as
> time or location) that would allow the parties to determine whether
> and how the underlying state laws impact those aggregate findings.

20   Docket No. 1659 (St. at 3); *see also* Docket No. 1632-8 (Opp'n at 7 n.10) (Defendants stating that

21   they have asked Plaintiffs to "provide a proposed plan for managing the differing damages and

22   standards across the various states for which they have brought claims"; "if Plaintiffs continue to

23   pursue multiple damages state-by-state, a verdict form breaking out the individualized issues will

24   be necessary").  The Court asks the parties to be prepared to discuss this issue at the next final

25   pretrial conference on April 10, 2023.  The Court also orders the parties to file supplemental briefs

26   on what the differences are among the states on statutes of limitation and enhanced damages.  If

27   necessary, the parties should address these issues on a state-by-state basis (if possible, whether

28   states may be grouped).  Supplemental briefs shall be filed by March 28, 2023. Each brief shall be

United States District Court
Northern District of California

no longer than ten (10) pages.

## VII.    JURY INSTRUCTIONS

The Court has reviewed the parties' proposed jury instructions and intends to give the parties its own proposed version.  The parties will have an opportunity to comment on the Court's proposed version.  When commenting on the Court's version, the parties should bear in mind that the Court, for the most part, finds the parties' proposals problematic because they are, quite simply, too long and detailed.  They provide too much information – often overly one-sided and repetitive – and it will be too much for the jury to process.

**IT IS SO ORDERED**.

Dated: March 19, 2023

_____
EDWARD M. CHEN
United States District Judge