UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE HIV ANTITRUST LITIGATION. | Case No. 19-cv-02573-EMC <br><br> **ORDER RE CHOICE OF LAW FOR UNITED'S CLAIMS** <br><br> Docket Nos. 1721, 1723 |

Currently pending before the Court is a dispute between Defendants and United as to which state's laws govern United's state law claims.[1] United asserts that its claims are governed by Minnesota law because it overpaid for the HIV drugs at issue from Minnesota where it is based – notwithstanding the fact that many of its insureds who requested the drugs, received the drugs, and used the drugs live outside of Minnesota, including in states that did not repeal *Illinois Brick*.[2] Defendants argue that Minnesota law does not apply across the board and that the law that governs is that of the state where a given insured lives. If Defendants are correct, then United could not seek damages where its claims are related to an insured who lives in a non-repealer state.

Having considered the parties' briefs and the oral argument of counsel, the Court finds United's position more persuasive and thus holds that United's claims are governed by the law of

---

[1] The Court addresses here only those claims that United brings as an indirect purchaser. United has been assigned some claims by direct purchasers.

[2] In *Illinois Brick Co. v. Illinois*, the Supreme Court held that only "the overcharged direct purchaser, and not others in the chain of manufacture or distribution" may bring an anticompetitive conduct claim under the Clayton Act. 431 U.S. 720, 729 (1977). Some states responded to *Illinois Brick* by passing so-called "repealer" statutes, which expressly permit indirect purchasers to recover under state law theories of anticompetitive conduct.

Minnesota.

## I. FACTUAL BACKGROUND

United is a multinational managed healthcare and insurance company headquartered in Minnesota. *See* United Compl. ¶ 20. United alleges that it was injured when it was made to pay overcharges related to HIV drugs that were caused by Defendants' anticompetitive conduct. *See id.* ¶ 19.

According to United, when one of its insured individuals (hereinafter, a "member") receives an HIV drug from a pharmacy, the member pays only their co–pay obligation. United pays for the remainder of the cost of the drug. Specifically, United receives an invoice from its Pharmacy Benefits Manager (PBM), a third–party intermediary responsible for processing prescription drug claims. United receives and then pays the invoice from its headquarters in Minnesota, regardless of where the member received the drug. *See id.* ¶ 332.

United seeks to recover damages under the Minnesota Antitrust Act which makes "[a] contract, combination, or conspiracy between two or more persons in unreasonable restraint of trade or commerce . . . unlawful," and applies to "any contract, combination, or conspiracy, wherever created, formed, or entered into, . . . whenever any of the foregoing affects the trade or commerce of [Minnesota]." Minn. Stat. § 325D.51; 325D.54(b). Crucially, Minnesota is a repealer state. That is, unlike federal antitrust law, Minnesota law provides that indirect purchasers may sue for damages under state law antitrust theories. *See* Minn. Stat. § 325D.57. United seeks to recover only damages from the overcharges it paid from its Minnesota headquarters. *See* United Brief at 1. It does not seek any recovery related to their members' co–pay obligations. *See id.*

## II. PROCEDURAL BACKGROUND

In their sixth motion in limine, Defendants moved to exclude evidence and argument related to damages which Defendants claimed Plaintiffs, including United, could not recover as a matter of law. *See* Mot. at 1. According to Defendants, United's damages claims are flawed because they are based on Minnesota law applying across the board – *i.e.*, even where United made a purchase for a member who lives outside the state of Minnesota. As noted, Defendants

2

contend United cannot sue as an indirect purchaser with respect to claims for drugs sent to members in non-repealer states.

In its order on the in limine motions, the Court acknowledged that it had previously, for the EPPs, rejected application of one state's law across the board – *i.e.*, California. But, the Court explained, it had reached that conclusion based on a California choice-of-law analysis. "[H]ere, there should be a choice-of-law analysis under Minnesota law," Docket No. 1716 (Order at 6) (emphasis omitted), because United had initiated its lawsuit in Minnesota federal court prior to transfer of the action to this Court. *See Sarver v. Chartier*, 813 F.3d 891, 897 (9th Cir. 2016) ("Typically, 'a federal court sitting in diversity applies the conflict-of-law rules of the state in which it sits.' However, after a transfer under 28 U.S.C. § 1404 the choice-of-law rules of the transferor court apply."). The Court ordered supplemental briefing on what result should obtain under a Minnesota choice–of–law analysis.

### III.    LEGAL STANDARD

When conducting a conflict–of–laws analysis under Minnesota law, "a court must first determine whether there is an actual conflict between the legal rules of the two states." *Nodak Mut. Ins. Co. v. Am. Fam. Mut. Ins. Co.*, 590 N.W.2d 670, 672 (Minn. Ct. App. 1999), *aff'd*, 604 N.W.2d 91 (Minn. 2000).

If the court determines that there is a conflict, it next "must consider whether the rule of each state may be constitutionally applied." *Id.* "[F]or a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312–13 (1981).

Finally, if there is an actual conflict and the candidate states' laws can be constitutionally applied, courts evaluate five "choice influencing factors" to determine which substantive law to apply. *Jepson v. Gen. Cas. Co. of Wisconsin*, 513 N.W.2d 467, 470 (Minn. 1994). Those factors are:

(1) predictability of result;

(2) maintenance of interstate and international order;

1        (3) simplification of the judicial task;

2        (4) advancement of the forum's governmental interest; and

3        (5) application of the better rule of law.

*Id.* In delineating the "choice influencing factors," the Minnesota Supreme Court has stressed:

> These factors were not intended to spawn the evolution of set mechanical rules but instead to prompt courts to carefully and critically consider each new fact situation and explain in a straight–forward manner their choice of law. *See Choice–Influencing Considerations in Conflicts Law* at 281–82; *Conflicts Law: More on Choice–Influencing Considerations* at 1598. The lower courts need to wrestle with each situation anew. While prior opinions may be helpful to a court's deliberations, the court's obligation is to be true to the method rather than to seek superficial factual analogies between cases and import wholesale the choice of law analysis contained therein.

*Id.*

## IV. DISCUSSION

A. Existence of a Conflict of Law

In the instant case, the first step in the choice–of–law analysis is to determine whether there is an actual conflict between the law of Minnesota and the laws of the other states where United's members live. Under Minnesota law, "[a]n actual conflict exists if choosing the rule of one state or the other is 'outcome determinative.'" *Nodak*, 590 N.W.2d at 672 (quoting *Myers v. Government Employees Ins. Co.*, 225 N.W.2d 238, 241 (Minn.1974)). The parties have identified three potential conflicts of law. Those potential conflicts relate to *Illinois Brick*, enhanced damages, and statutes of limitations.

For purposes of this order, the Court need only consider the first potential conflict.[3] The parties agree that there is an actual conflict, not just a potential one, with respect to *Illinois Brick*. Minnesota is a repealer state, and thus if its laws were to apply, United (as an indirect purchaser)

---

[3] Although the Court addresses only the *Illinois Brick* conflict here, it notes that it did find conflicts in state law with respect to enhanced damages and statutes of limitation when doing a California choice–of–law analysis for the EPPs' claims. *See* Docket No. 1388 (Order at 21) (in considering only the laws of states that had repealed *Illinois Brick*, noting that there were conflicts with respect to "the length of the statute of limitations and the damages available (*e.g.*, whether enhanced damages are available and, if so, what showing must be made)"). There is no obvious reason why the same would not apply here.

4

1  could bring a claim for damages based on an alleged antitrust violation. In contrast, at least some
2  of the states where United's members live are not repealer states; if those states' laws were to
3  apply, then United (as an indirect purchaser) could not bring a claim for damages based on an
4  alleged antitrust violation. Clearly, choosing the law of Minnesota over the laws of the non-
5  repealer states would be outcome determinative.

B.  Constitutionality of Applying the Potential Laws

For the second step in the choice–of–law analysis, the parties seem to have no dispute as to "whether the rule of each state [at issue] may be constitutionally applied." *Nodak*, 590 N.W.2d at 672. Indeed, it would be constitutionally permissible for Minnesota law to apply given that United has a significant contact with Minnesota: it resides in the state and made the overcharge payments from the state. Likewise, it would be constitutionally permissible to apply the laws of the states where United's members live. United's members received the HIV drugs in those states, which then ultimately gave rise to the overcharges. In short, the connection between the conduct that gave rise to the injury in this case and each candidate state is sufficiently strong "such that choice of [that state's] law is neither arbitrary nor fundamentally unfair." *Allstate*, 449 U.S. 302 at 312–13. The analysis, therefore, turns on the "choice influencing factors." *Jepson*, 513 N.W.2d at 470.

C.  Choice Influencing Factors

The parties agree that the first, third, and fifth choice influencing factors are irrelevant in this case. *See* United Brief at 4–7; Def. Brief at 1–2. The first factor, predictability of results, "applies primarily to consensual transactions where the parties desire advance notice of which state law will govern in future disputes." *Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438, 454 (Minn. Ct. App. 2001). "It is intended to protect the justified expectations of the parties to the transaction." *Id.* (internal quotation marks omitted). There is no contractual relationship in this case that stipulated, in advance, the forum in which disputes arising out of that relationship are to be adjudicated.

The third factor, simplification of the judicial task, "is often considered insignificant because courts can as easily apply another state's laws as their own." *Id.* at 455. United offers a passing argument that it would be simpler for this Court to apply only the law of Minnesota

5

instead of the laws of dozens of states. *See* United Brief at 5. On the other hand, it may be argued that "the judicial task is obviously simplified when [the court in a particular state] applies [that state's own] law." *Medtronic*, 630 N.W.2d at 455 (internal quotation marks omitted). Ultimately, the third factor weighs slightly in favor of applying Minnesota law uniformly.

The fifth factor, application of the better rule of law, has fallen out of favor in Minnesota law. *See In re Baycol Prod. Litig.*, 218 F.R.D. 197, 207 (D. Minn. 2003) (noting twenty years ago that, then, "the Minnesota courts ha[d] not placed any emphasis on the fifth factor for nearly twenty years"); *Gruenwald v. Toro Co.*, 2019 WL 6524894 at *2 (D. Minn. Dec. 4, 2019) (same); *Nodak*, 590 N.W.2d at 673 (omitting the fifth factor when listing the "choice influencing factors"). The Court follows the lead of Minnesota courts and ignores the fifth factor. This leaves the second and fourth factors to consider in more detail.

        1.       <u>Factor Two: Maintenance of Interstate and International Order</u>

In applying the second factor, maintenance of interstate and international order, the Supreme Court of Minnesota has explained as follows:

> [W]e are primarily concerned with whether the application of Minnesota law would manifest disrespect for [another state's] sovereignty or impede the interstate movement of people and goods. An aspect of this concern is to maintain a coherent legal system in which the courts of different states strive to sustain, rather than subvert, each other's interests in areas where their own interests are less strong. Robert A. Leflar, *Choice–Influencing Considerations in Conflicts Law*, 41 N.Y.U. L. REV. 267, 285–87 (1966). By approaching choice of law questions with these considerations in mind, the opportunities for forum shopping may be kept within reasonable bounds.

*Jepson*, 513 N.W.2d at 471. United argues that applying Minnesota would not "manifest disrespect for [any other state's] sovereignty" for three reasons. *Id.* First, it stresses that Minnesota has "beyond sufficient contacts to the facts and issues" in this case because "United is a Minnesota resident seeking recovery for injury it suffered in Minnesota as the party responsible for paying the relevant overcharges." United Brief at 5. Second, United emphasizes that Minnesota has expressed a legislative preference for "providing a damages right to redress such anticompetitive harm that 'affect the trade or commerce of [Minnesota].'" *Id.* (quoting Minn. Stat. §§ 325D.54, 57). This, United argues, counsels in favor of applying Minnesota law because

6

applying the law of a non–repealer state would subvert, rather than sustain, Minnesota's well–expressed desire to provide a damages remedy to Minnesota residents in antitrust actions. *See Jepson*, 513 N.W.2d at 471. Finally, United points out that its claims are not against any individual pharmacies, so applying Minnesota law would not offend the sovereignty of any of the states in which the pharmacies are located. No party in a non-repealer state would bear any direct economic cost were Minnesota antitrust law to apply.

Defendants offer two arguments in response. First, they contend that, just as Minnesota has expressed a legislative preference for compensating those impacted by anticompetitive conduct, non–repealer jurisdictions "can be understood as choosing to run the risk of under–deterring antitrust violators over overcompensating plaintiffs and complicating antitrust enforcement." *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1072 (9th Cir. 2021). This, according to Defendants, is an equally legitimate policy choice that Minnesota law ought to "sustain, rather than subvert." *Jepson*, 513 N.W.2d at 471. Second, Defendants argue that United conceives of the injury too narrowly. Whereas United conceptualizes the injury as only the overcharge payments that they were forced to make, Defendants claim that "in antitrust 'the relevant interests are not simply about the benefit or harm to resident consumers or liability to resident antitrust defendants; rather the relevant interests are about harm to the competitive process and in–state business activity.'" Def. Brief at 3 (quoting *Stromberg*, 14 F.4th at 1072 (also stating that "[n]on-repealer states' *Illinois Brick* laws are designed to regulate antitrust enforcement by allocating recoverable antitrust damages in a way those states think best promotes market competition")). Therefore, they argue, the laws of the states in which the transactions actually took place (*i.e.*, where United members received the drugs) should be shown special solicitude. *See id.*

Although a close call, the Court finds that the second factor weighs slightly in favor of applying Minnesota law. As an initial matter, the Court takes into account that, as indicated above, factor (2) is designed to "maintain a coherent legal system in which the courts of different states strive to sustain, rather than subvert, each other's interests in areas where their own interests are less strong." *Jepson*, 513 N.W.2d at 471. Here, Minnesota has a strong interest in having its law apply. The crucial event which produced United's injury, United's payment of the

7

1    overcharges, happened in Minnesota.  The economic harm to United of the alleged antitrust

2    violations is felt directly within Minnesota.  It is true, as Defendants argue, that much of the

3    preceding conduct (the alleged anticompetitive conduct, the distribution of the drugs, the payment

4    of the member's co–pay) happened outside of Minnesota, but because United is not suing

5    derivatively on behalf of its members, United did not sustain a legally cognizable injury unless

6    and until it paid the invoice from its headquarters in Minnesota.

7    Several courts have emphasized this very point in concluding that the law of the insurer's

8    home state should apply (although, admittedly, these cases do not involve a choice–of–law

9    analysis under Minnesota law).  In *In re K–Dur Antitrust Litig.*, for example, two TPPs (third-

10   party payors) that provided healthcare benefits to members brought an antitrust action against

11   manufacturers of potassium supplements.  2008 WL 2660783 (D.N.J. March 19, 2008).  The

12   district court conducted a choice–of–law analysis under New Jersey principles, explaining:

> The [TPPs] are not suing derivatively for alleged injury to their members—they are asserting claims on their own behalf for the damages they allegedly suffered. Under these circumstances, neither the residence of TPP participants nor the location of their purchases is determinative of the law governing the claims asserted by a TPP on its own behalf. On the contrary . . . **the state with the greatest interest in a TPP's claims brought on its own behalf is the state where the TPP has its principal place of business and from which it presumably paid the allegedly supracompetitive prices**. . . Accordingly, I conclude that the claims of the [TPPs] arise under and are governed by New York and Michigan law, respectively.

19   *Id.* at *5; *see also In re Rezulin Prod. Liab. Litig.*, 392 F. Supp. 2d 597, 611 n.85 (S.D.N.Y. 2005)

20   (in applying New York choice–of–law principles, emphasizing that because a TPP was "not suing

21   derivatively for injury to its members" that "only injury asserted here—namely the loss [the TPP]

22   allegedly suffered when it overpaid for diabetes drugs—occurred in New York," the location of

23   the TPP).

24   To be sure, there is also authority that reaches the opposite conclusion on which state has

25   the greatest interest.  *See, e.g.*, *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,

26   335 F.R.D. 1, 35 (E.D.N.Y. 2020) (in applying the choice–of–law rules of California, New York,

27   and Texas, stating that "the consumer's antitrust injury or consumer protection injury takes place

28   in the state where the drug is purchased, and, *without a consumer's purchase in that state, the TPP*

8

*would not be injured* . . . [so] the state that would be most impaired if its laws were not applied, the state with the greatest contacts, and the state with the most significant interest in preventing antitrust and consumer protection violations is the state in which a TPP's insured consumer purchased [the drug]"); *In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. 126, 135 (E.D. Pa. 2011) ("The place of purchase is where the relationship between the parties is centered; it is where the transaction with the alleged overcharge actually occurs. A place-of-purchase rule protects justified expectations because an in-state transaction will be governed by the antitrust laws and/or consumer protection laws of that state and not by the chance location of the TPP's principal place of business, the location of the TPP's PBM, or an individual purchaser's residence.").

But those cases are largely inapposite, particularly because Minnesota choice–of–law analysis is somewhat unique. Although factor (2) does take into consideration which state has the strongest interest, the Minnesota Supreme Court has emphasized that, for this factor, "we are *primarily* concerned with whether the application of Minnesota law would manifest disrespect for [another state's] sovereignty or impede the interstate movement of people and goods." *Jepson*, 513 N.W.2d at 471 (emphasis added). Absent such "manifest disrespect," deference is afforded to Minnesota law; these is not the same kind of neutral balancing of competing sovereign interests as obtains under more traditional conflict of law analysis. In the case at bar, applying Minnesota law would not constitute a manifest disrespect of the sovereignty of the other states because Minnesota does have a strong interest in having its law apply and there would be no direct interference with the law of non-repealer states where United's members happen to live.

Defendants argue that applying Minnesota law would "manifest disrespect" for the sovereignty of other states because doing so would effectively subvert the legislative decision of those other states not to allow indirect purchasers to bring suit in antitrust actions. For this proposition, Defendants rely on the Ninth Circuit's decision in *Stromberg v. Qualcomm Inc.* 14 F.4th 1059 (9th Cir. 2021). In *Stromberg*, the Ninth Circuit explained that applying the law of a single state (there, California) to transactions that occurred in non-repealer states would undermine the legislative choice of those states "to run the risk of under-deterring antitrust violators over overcompensating plaintiffs and complicating antitrust enforcement." 14 F.4th at 1072. In effect,

California would be permitted to "set antitrust enforcement policy for the entire country." *Id.* at 1074.

But *Stromberg* involved materially distinguishable facts. There, "the nationwide class consist[ed] of downstream consumers—individuals who bought cellphones [containing Qualcomm chips] from various retailers located throughout the fifty states." *Id.* at 1073. The class members alleged that the prices they paid for the cell phones were inflated as a result of Qualcomm's monopoly over the chips. *Id.* at 1064. Crucially, the transaction that gave rise to a plaintiff's injury (acquisition of the cell phone) and the plaintiff's actual injury (payment for that cell phone) occurred in the same state – typically, where the plaintiff lived. Thus, if the acquisition of and payment for the cell phone took place in a state other than California, application of California law to the plaintiff's claim would have had a direct impact on the plaintiff's state. Not so here; while the end-user of the HIV drug typically seeks and receives the drug in the state in which they reside, United's injury is its payment of the invoice, a step which takes place exclusively in Minnesota. Therefore, the Ninth Circuit's conclusion in *Stromberg* that "California's interest is attenuated where its law is applied to consumers purchasing cellphones in non-repealer states" is inapplicable. *Id.* at 1074. Again, United is seeking only its overcharge, not any overcharge claimed by individual consumer.

At oral argument, when the Court pressed Defendants on precisely what harm would be imposed on non-repealer states if Minnesota law were to apply to all of United's claim (citing antitrust law's concern with competition), Defendants argued that drug manufacturers may be deterred from doing business with United (and other insurance companies in Minnesota) because they do not want to be subject to Minnesota's repealer law in all fifty states, particularly the non-repealer states. *See* Oral Arg. Tr. at 26: 13–20. This, Defendants argued, would create a "constraint on supply in those other states" because fewer insurance companies would be available to provide coverage to end-users in those other states. *Id.* at 26:21–25.

The Court is unpersuaded by Defendants' arguments. The asserted harm to competition is indirect, unproven, and speculative. Defendants obviously knew that indirect purchasers bringing claims arising from sales to end-users in repealer states, including in Minnesota, could seek

10

damages, yet Defendants have not pointed to any evidence that they have backed away from doing business with end-users in those repealer states.

As a final point, the Court notes that, under factor (2), "[e]vidence of forum shopping or evidence that application of one state's law would promote forum shopping would be an attempt to evade and would indicate disrespect for [other states'] law." *Danielson v. Nat'l Supply Co.*, 670 N.W.2d 1, 7–8 (Minn. Ct. App. 2003). *Cf. Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386 (8th Cir. 1997) ("Minnesota law is more favorable to [plaintiff] than Texas law, a situation which could lead to forum shopping"). But there is no evidence of forum shopping here. United is headquartered in Minnesota, the original forum state. This is not a situation where Plaintiffs were possibly selected from certain states in order to bring suit in particular venues in order to obtain a favorable forum.

These considerations tip the second choice influencing factor in favor of United.

2. Factor Four: Advancement of the Forum's Governmental Interest

The fourth factor speaks to which law would "most effectively advance a 'significant interest of the forum' state." *Medtronic*, 630 N.W.2d at 455 (quoting *Jepson*, 513 N.W.2d at 472). Significantly, this factor is Minnesota-centric; it considers only which law would most advance the interests of *Minnesota*. *See In re Levaquin Prod. Liab. Litig.*, No. CIV., 2010 WL 7852346 at *9 (D. Minn. Nov. 9, 2010) ("[u]nlike the analyses adopted by other states, Minnesota choice of law analysis does not require a comparison between Minnesota's interest with the governmental interest of the other state"). As United argues, in most instances, this would inherently seem to favor application of Minnesota law. *Cf. Danielson*, 670 N.W.2d at 8 ("[t]his factor is designed to assure that Minnesota courts do not have to apply rules of law that are inconsistent with Minnesota's concept of fairness and equity") (internal quotation marks omitted). There have, however, been a few instances in which Minnesota's interests will be best advanced by application of a different state's law. *See SCM Corp. v. Deltak Corp.*, 702 F. Supp. 1428, 1431–32 (D. Minn. 1988) ("Generally, this factor will weigh towards application of Minnesota law, but in some cases the choice of another forum's law has been found to better advance Minnesota's interest") (citing *Bigelow v. Halloran*, 313 N.W.2d 10, 11–12 (Minn. 1981) (Minnesota's interest in seeing tort

11

victims fully compensated furthered by application of Iowa law); *Standal v. Armstrong Cork Co.*, 356 N.W.2d 380, 382 (Minn. Ct. App. 1984) (Minnesota's interest in providing compensation for resident tort victims furthered by application of Pennsylvania law)).

"One interest which Minnesota courts have often invoked in choice of law decisions is the state's interest as a 'justice administering state.'" *SCM*, 702 F. Supp. At 1432 (citing *Hime v. State Farm Fire & Cas. Co.*, 284 N.W.2d 829, 833–34 (Minn. 1979); *Myers v. Gov't Emp. Ins. Co.*, 302 Minn. 359, 225 N.W.2d 238, 243 (1974); *Milkovich v. Saari*, 203 N.W.2d 408, 417 (1973)). "This interest is defined as the forum's interest in not having its courts 'called upon to determine issues under rules which, however accepted they may be in other states, are inconsistent with our own concept of fairness and equity.'" *Id.* (quoting *Milkovich*, 203 N.W.2d at 417). Here Minnesota made a considered policy choice. Minnesota's repealer statute reflects a considered judgment by the Minnesota legislature that indirect purchasers should be able to bring an antitrust suit for seeking damages. The legislature has chosen this scheme as the best reflection of "Minnesota's concept of fairness and equity." *SCM*, 702 F. Supp. At 1431–32. The Ninth Circuit in *Stromberg* was unquestionably correct when it explained that a legislature's decision not to repeal *Illinois Brick* is an equally valid policy choice, but "however accepted [that policy] may be in other states," Minnesota has clearly made a different choice. *Id.*

While Defendants acknowledge that the fourth choice influencing factor asks courts to focus on Minnesota's interests, they attempt to minimize the focus on Minnesota's interests by arguing that "Minnesota's second and fourth factors, viewed together, require the same analysis as California's governmental–interest approach." Def. Brief at 2. That argument is unpersuasive. Compare California's governmental–interest approach as succinctly laid out by the Ninth Circuit in *Stromberg*:

> "[I]f there is a difference [in substantive law], *the court examines each jurisdiction's interest in the application of its own law* under the circumstances of the particular case to determine whether a true conflict exists." *Id.*, 249 Cal.Rptr.3d 594, 444 P.3d at 730–31 (citations omitted). Finally, "if the court finds that there is a true conflict, *it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state*, and then

> ultimately applies the law of the state whose interest would be the more impaired if its law were not applied." *Id.*, 249 Cal.Rptr.3d 594, 444 P.3d at 731 (internal quotation marks and citations omitted).

14 F. 4th at 1068 (emphasis added). While the California test and the second factor of the Minnesota test both broadly ask courts to evaluate whether a state's legitimate interest would be subverted by application of a different state's law, California's test does not place the thumb on the scale in favor of the forum state that is embodied in the fourth factor of the Minnesota test. Defendants offer no reason why applying the laws of various other states would further Minnesota's interests as required under the fourth factor. Rather, at bottom, their argument is that "Minnesota's second factor (interstate order) outweighs the fourth (the forum interest)." Def. Brief at 3. Because the fourth factor clearly weighs in United's favor, and the second at least marginally so, the Court holds that the choice–of–law analysis under Minnesota law leads to the application of Minnesota law for United's claims.

## V. CONCLUSION

For the foregoing reasons, the Court holds that Minnesota law applies across the board to United's claims, even if those claims are based on HIV drugs United purchased for members who live in non-repealer states. The Court notes that, given this ruling, some of the IHPPs – in particular, Kaiser (which is based in California) – may be inclined to seek reconsideration of the Court's ruling that California law does not apply across the board to the IHPPs' claims. The IHPPs, however, would face an uphill battle because the Court's ruling on United is predicated on the specific choice-of-law analysis required by Minnesota law which, as indicated above, differs materially from that required by California law.

**IT IS SO ORDERED**.

Dated: April 20, 2023

_____
EDWARD M. CHEN
United States District Judge