# Exhibit D

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---

PETER STALEY, et al.,

                Plaintiffs,

  v.

GILEAD SCIENCES, INC., et al.,

                Defendants.

Case No.: 3:19-cv-02573-EMC

---

**EXPERT REPORT OF PROFESSOR THOMAS G. MCGUIRE**

- Whether there are any potential procompetitive justifications for the acceleration clauses in the Agreement that outweigh the likely anticompetitive impacts.

3. Based on (i) my review of relevant published literature and materials in this matter, and (ii) my education, training, and experience in the areas of applied microeconomics and health economics, I have concluded to a reasonable degree of certainty in the areas of applied microeconomics and health economics the following regarding the Gilead-Teva Agreement:[8]

- The acceleration clauses in the Gilead-Teva Agreement constituted an anticompetitive reverse payment from Gilead to Teva, were anticompetitive, and likely to induce Teva to accept a later entry date than a reasonable generic in its position would have in a competitive agreement without a reverse payment.

- The expected value of the reverse payment, at the time it was made and from the standpoint of Gilead, consists of two components. The first component is the expected profit sacrifice Gilead made by failing to charge Teva royalties for the 180 days of protected sales created by the clauses. This first component of a reverse payment is estimated to be $264.9 million.

- The second component of the reverse payment consists of the risk Gilead assumed associated with the possible activation of the acceleration clauses. The expected value of this component is estimated to be at minimum $28.1 million.

- In total, Gilead's expected reverse payment, at the time it was made and from the standpoint of Gilead, of at least $293.0 million ($264.9 million + $28.1 million) greatly exceeded the anticipated future litigation costs a brand company in Gilead's position could reasonably anticipate avoiding in connection with settling its patent dispute with Teva (estimated avoided litigation costs amount to $0.5 million).

---

[8] The Agreement affected generic entry of Truvada and Atripla so I analyze the effect on both drugs together. My conclusions would not change if Truvada and Atripla are analyzed separately.

- The acceleration clauses also likely delayed entry of subsequent generics to March 2021, six months after Teva's entry date (which itself was delayed by the reverse payments in the Agreement). In the absence of the acceleration clauses, the economic incentives and circumstances faced by Gilead and the subsequent generics would have likely resulted in those generics receiving the same entry date as Teva. As a result of this additional six-month delay in competing generics' entry, projected Teva sales increased by $608.5 million in nominal value, which came at the expense primarily of purchasers ($425.6 million) and, to a lesser extent, profits of subsequent generics ($182.9 million).

- A reasonable company in Teva's position would have expected to earn at least $494.3 million more in net present value of profits from the Gilead-Teva Agreement containing the anticompetitive reverse payment than it would have expected if it was certain to win the patent litigation. The $494.3 million is therefore a minimum estimate of the profits created for Teva by the Agreement. The basic economics of bargaining implies that Teva's new profits from the Agreement would be matched and likely exceeded by new profits for Gilead. These new profits for Gilead derive from the two forms of delayed generic entry, by Teva, and by subsequent generics.

- The acceleration clauses in the Gilead-Teva Agreement likely delayed Teva's entry for Truvada and Atripla and then likely further delayed entry of subsequent generics for each of the two drugs.

- In the absence of the anticompetitive acceleration clauses in the Gilead-Teva Agreement, reasonable companies in the position of Gilead and Teva, acting competitively, likely would have compromised on a generic entry date in May 2019. The economic incentives and circumstances faced by Gilead and the subsequent generics would likely have resulted in them receiving a license from Gilead to enter on the same date. To make this calculation, I assume that, based

    on instruction from counsel, Teva's chance of winning the patent litigation was 62.6%. My economic analysis can accommodate other assumptions.

- The likely alternative settlement entry date for Teva and the other generic firms in May 2019 implies that the acceleration clauses in the Gilead-Teva Agreement caused approximately $2.7 billion in anticipated anticompetitive harm to purchasers. The expected value of the harm is even greater in the circumstances in which Gilead and Teva did not settle and Teva prevailed in the litigation.

- In comparison with the alternative entry date of May 2019, the reasonably anticipated net present value of profits increased by $498.5 million for Gilead and by $146.5 million for Teva from the delays in generic competition caused by the Gilead-Teva Agreement.

- At the time of the Gilead-Teva Agreement, there was some chance the acceleration clauses would be activated, accelerating Teva's entry and producing procompetitive benefits. However, empirical evaluation finds this potential procompetitive effect to be negligible compared to the massive anticompetitive harms from the acceleration clauses. There were no other procompetitive benefits of the acceleration clauses. On balance, consideration of procompetitive effects leaves a net harm to consumers in the billions of dollars.

4.    This Report explains how Gilead and Teva used the acceleration clauses to divide the markets for Truvada and Atripla and perpetuate massive profit flows to be shared between the two competitors. The textbox below "What Happened Here?" contains a thumbnail sketch of the economics of the Gilead-Teva Agreement.

basis, I calculate the expected cost to a firm in Gilead's position from activation of the MFE clause to be at least $351.2 million.[338]

170. In similar circumstances, where there was a settlement in place between a brand and a first filer that had forfeited its exclusivity, at least one later filer pursued the litigation through to a court decision in 12.8% of cases.[339] I have been instructed by counsel to assume that the probability of a generic win in litigation was 62.6%.[340] Thus, the likelihood of a subsequent generic pursuing its litigation with Gilead and winning was approximately 8.0% (12.8% * 62.6%).[341] The expected cost to Gilead from the possibility of the acceleration of generic entry by including the MFE clause is therefore $351.2 million * 8.0% = $28.1 million.

171. Regarding activation of the MFE+: if Teva's entry is accelerated by the MFE+ clause, the date of initial generic entry occurs earlier and the period of Gilead's brand sales without generic competition is shortened. Based on industry experience, an MFE+ clause can be triggered, but it does not happen frequently. Furthermore, in the one case I am aware of in which the MFE+ clause was activated, the advance in the selling generic's date was only three weeks.[342] Thus, although activation of the MFE+ clause can have major dire consequences for Gilead, I conservatively do not place a dollar value on this risk of lost profits.[343]

---

[338] This is calculated from Attachment C.10.T and Attachment C.10.A, which contain calculations of the NPV of Teva's profits from a launch in February 2018 through September 2020 (the month before Teva would otherwise be able to enter) based on the number of generic entrants. The total of the average of columns for 3 to 11 generics for Truvada and 2 to 6 for Atripla is $351.2 million. These calculations are summarized in Attachment C.11.

[339] This is the complementary probability to the 87.2% from ¶ 166 above.

[340] As explained below, 62.6% is the probability of a generic win on multiple patents. I have been instructed by counsel to assume that the probability of a win in patent litigation with Gilead was the same for all generics, including Teva. Furthermore, I am instructed that since the bases of the patent suits are essentially the same for all generics if a first-in-line generic challenger lost the litigation, a subsequent challenge would not succeed.

[341] There was also a chance Gilead would win the litigation. The MFE and MFE+ clauses would have no effect on this scenario.

[342] Drake and McGuire (2020), *op. cit.*, p. 214.

5[343] Although I do not attribute a value to the risk to Gilead from potential activation of the MFE+ clause, it could be estimated using industry experience. Using the Loestrin 24 case as a benchmark (*ibid*), it could be assumed that the likely period of acceleration is three weeks. The corresponding cost of acceleration to Gilead is approximately $68.4 million, which is the difference between Columns with October and September 2020 generic entry in

*Teva's Expected Profits Absent a Settlement*

191. Without a settlement, Gilead would have pursued patent infringement litigation against Teva which, as I understand from counsel, would likely have concluded before February 2018.[363] I understand from counsel that Gilead's chance of losing the patent litigation was approximately 62.6%.[364] In the event Teva won, as described above, Teva's expected NPV from launching in February 2018 is $11.4 million. If Teva lost with respect to at least one set of patents, its NPV would range between $0.0 and $9.5 million, depending on the outcome.[365] At the time the Agreement was reached, Teva could have expected no more than $0.5 million in future litigation costs. Teva's expected profits with a competitive agreement are much lower than those attained with the reverse-payment Agreement because in the absence of the MFE and MFE+ clauses in the Agreement, subsequent generic firms would enter along with Teva. Teva would be sharing the generic sales and making them at a lower price.

192. Teva's NPV from litigation is a weighted average of winning and losing the litigation. With a 62.6% chance of winning the patent litigation, Teva's expected NPV from litigation was $8.6 million.[366]

*Gilead's Expected Profits Absent a Settlement*

193. I use Gilead's financial forecast to estimate expected profits from Truvada and Atripla in the absence of a settlement for a reasonable company in Gilead's position. The date of first generic sales of Truvada and Atripla affects Gilead's profits from sales of these two drugs, and it also affects Gilead's profits by influencing Gilead's ability to switch patients from the TDF-based Truvada and Atripla to Gilead's TAF-based line extensions, including Genvoya, Descovy,

---

[363] I understand that litigation with respect to the FTC patents and two sets of combination patents likely would have concluded before February 2018.

[364] Based on instructions from counsel, three probabilities for three different sets of patents are listed in Attachment E.1 and 62.6% is the product of these three probabilities.

[365] See Attachment E.1. Consistent with Teva's models, I calculate Teva's profit through the year 2023.

[366] See Attachment E.1 for details. This calculation includes chances that Teva wins on some patents but not others and associated expected profits.

199. The gain split from the actual anticompetitive Agreement with a payment can be determined as follows. Teva's expected NPV in the payment-containing Gilead-Teva Agreement was $524.3 million. As described above, assuming Teva's chance of winning the litigation was 62.6%, its expected NPV of profit from litigation was $8.6 million. Thus, the NPV of profit to Teva created by the Gilead-Teva Agreement with a payment was $524.3 million – $8.6 million = $515.7 million.[373]

200. Using Gilead's profit forecasts, I determine that Gilead's expected NPV from the Agreement was $6,642.1 million. As described above, its NPV of profit from litigation was $4,371.3 million. Thus, the NPV of profit to Gilead created by the Agreement with a payment was $6,642.1 million - $4,371.3 million = $2,270.8 million.

201. The expected gains in joint profits from the Teva Agreement total $515.7 million + $2,270.8 million = $2,786.5 million. Teva's share of the joint gains is $515.7 million / $2,786.5 million = 18.5% and Gilead's share is $2,270.8 million / $2,786.5 million = 81.5%.[374] Applying a gain split favoring the brand is conservative in this context. If the gain split in a competitive

---

[373] This additional profit to Teva exceeds the $494.3 million reported above because the $494.3 million figure is the profit exceeding a certain win in litigation and does not account for Teva's litigation costs. Here the gain is larger because Teva is given only a 62.6% chance of a win.

[374] These calculations are also in Attachment E.4. Recognizing that Gilead gains profits from additional upward-pricing pressure on its other HIV drugs when it sells Truvada and Atripla without generic competition for a longer period of time will have only a very small effect on the date for an alternative settlement with the same profit division in the actual settlement. There are three principal reasons with compounding effects. First, any price elevation on other Gilead products from upward-pricing pressure due to the presence of brand Truvada and Atripla will be small over the relevant time periods. Table 6 from my Market Power report shows that the share of Truvada and Atripla units sold fell from 15.0% to 3.0% between 2018 to 2020. Based on these percentages alone, the TDF-based Truvada and Atripla were unlikely to recapture for Gilead sales lost from TAF-based products that were becoming predominant in these years. Second, profits from upward-pricing pressure would be present in both the actual settlement and the counterfactual competitive settlement; in fact, they would be identical up through the earlier date for the competitive settlement, and only differ between the counterfactual and actual dates. This means that while Gilead's share of joint profits in the actual agreement is slightly understated by not counting the incremental profits from upward-pricing pressure, it is also slightly understated in a compensating way in the counterfactual agreement. Third, in the range of 81.5% of the profit share to Gilead, a change in the level of Gilead profit has very little effect on the share of gains to Gilead. Increasing Gilead profit by 1% increases Gilead's share of profits only by 0.18 percent. (If Gilead's profit gains is 81.5 and Teva's is 18.5, the difference between a 81.5 share and the share with a 1% share increase of 81.5 to 82.3 is 82.3/(82.3+18.5) = 81.6% is 0.1%).

settlement. I do the same for Teva's generic profits from Truvada and Atripla using its financial forecasts. These calculations assume the competitive agreement consists of a compromise about a date of Teva entry only, with no forms of value transfer between the parties. These calculations factor in the 12.8% chance of subsequent generic litigation;[379] otherwise, subsequent generics are assumed to settle for the same date as Teva based on the analysis in Section VI. For each alternative settlement date of generic entry, I calculate the gain split of profits from the settlement (compared to litigation) that Gilead and Teva would receive.

204.    Using the observed gain split as a guide, in a competitive agreement, with Teva's chance of winning the litigation at 62.6% on all patents, reasonable parties likely would have agreed to a generic entry date in May 2019.[380] This calculation includes the assumption that Teva's chance of winning the litigation on the FTC patents was 77.5%. For example, as shown in Table 3, if I alternatively assume that Teva's chance of winning on the FTC patents was only 50%, then reasonable parties likely would have agreed to a generic entry date in April 2020.[381]

---

[379] I conduct sensitivity analyses with this probability in Attachment F.

[380] See Attachment E.4 for details.

[381] These results were created by modifying row [A] of Attachment E.1. The model is set up to accommodate any probabilities of the chance of Teva winning on different patents. Sensitivity analyses reported in Attachment F indicate that these findings are robust to reasonable modifications of the assumptions. For example, if alternative Gilead or Teva forecasts are used, the resulting entry date is similar or earlier.

219. The broad license is not a procompetitive benefit of the MFE and MFE+ clauses in the Agreement for the simple reason that a competitive Gilead-Teva agreement without the clauses compromising a date of entry for Teva could just as well include a broad license for Teva. From the standpoint of economics, the right methodology to assess potential procompetitive effects is to conduct a *ceterus paribus* (other conditions remaining the same) analysis eliminating the challenged conduct, without rewriting other aspects of the agreement. This is textbook analysis in economics, referred to as comparative statics: change one parameter (here, the payment from Gilead to Teva) and examine the effect on a firm's behavior or an equilibrium (here, the agreement about a generic entry date).[391] The *ceterus paribus* approach from economics fits with my understanding of what is called for from a legal perspective—that a defendant must justify *the restraint*.

220. Even if the ability to sell despite future patents were somehow considered a procompetitive benefit of the MFE and MFE+ clauses, any benefit is unlikely to outweigh the massive harm from these clauses. Inclusion of a broad license in the Teva Agreement may have had little effect on the prospects for Teva's product development. First, the patents were unlikely to be found valid and infringed.[392] Second, entry of the products Teva was considering may have been limited by other, stronger patents with later expiration dates, which would undermine the value of the broad license in the Agreement.[393] Third, Teva had options for its NTE products which would not rely on the broad license. For example, in 2014, Teva planned to launch a combination product in 2019 called Quatera that combined TDF and 3TC.[394] 3TC was not a Gilead product so this combination was irrelevant to Gilead's Agreement with Teva.

---

[391] T.J. Kehoe, "Comparative statics," *The New Palgrave: A Dictionary of Economics*, volume 1, 1987, pp. 517–520.

[392] Attachment E.1 includes probabilities that Teva would win with respect to the different sets of patents that were provided to me by counsel.

[393] For example, in October 2014, Teva planned to launch Tetrada, a combination product that included TDF and FTC (as well as other components), which could hypothetically be subject to Gilead's patents licensed to Teva under the Agreement. However, assuming the license under the Agreement covered such a product, Teva didn't plan to launch the product until 2024, years after the license under the Agreement otherwise permitted launch and after the patents listed in the Orange Book for Truvada expired. See STALEY-TEVA-0093795, slide 19.

[394] STALEY-TEVA-0093795, slide 19.

**ATTACHMENT E**

Attachment E.1.  Calculation of Gilead and Teva NPVs from Litigation ($ millions)

|  | Gilead | Teva |
|---|---:|---:|
| *Chance of Teva Winning Litigation* | | |
| [A] FTC Patents expiring 10/2021 ("FTC Patents") | 77.5% | 77.5% |
| [B] TDF/FTC Combination Patents Expiring 1/2024 ("combo 1 patents") | 85.0% | 85.0% |
| [C] TDF/FTC/EFV Combination Patents expiring 5/2029 ("combo 2 patents") | 95.0% | 95.0% |
| | | |
| *Teva wins on FTC patents, combo 1 patents, and combo 2 patents* | | |
| [D] NPV from Truvada and Atripla entry 2/2018 | 1,953.3 | 11.4 |
| [E] Chance of outcome | 62.6% | 62.6% |
| | | |
| *Teva wins on FTC patents and combo 1 patents, loses on combo 2 patents* | | |
| [F] NPV from Truvada entry 2/2018 and Atripla entry 5/2029 | 6383.2 | 5.4 |
| [G] Chance of outcome | 3.3% | 3.3% |
| | | |
| *Teva wins or loses on FTC patents, loses on combo 1 patents, and wins on combo 2 patents* | | |
| [H] NPV from Truvada and Atripla entry 1/2024 | 9,316.2 | 0.0 |
| [I] Chance of outcome | 14.3% | 14.3% |
| | | |
| *Teva wins or loses on FTC patents, loses on combo 1 patents, and loses on combo 2 patents* | | |
| [J] NPV from Truvada entry 1/2024 and Atripla entry 5/2029 | 9316.2 | 0.0 |
| [K] Chance of outcome | 0.8% | 0.8% |
| | | |
| *Teva loses on FTC patents, wins on combo 1 patents, and wins on combo 2 patents* | | |
| [L] NPV from Truvada and Atripla entry 10/2021 | 8009.3 | 9.5 |
| [M] Chance of outcome | 18.2% | 18.2% |
| | | |
| *Teva loses on FTC patents, wins on combo 1 patents, and loses on combo 2 patents* | | |
| [N] NPV from Truvada entry 10/2021 and Atripla entry 5/2029 | 9050.6 | 4.9 |
| [O] Chance of outcome | 1.0% | 1.0% |
| | | |
| [P] Litigation costs | 0.5 | 0.5 |
| [Q] NPV from litigation | 4,371.3 | 8.6 |

Notes:
- [A] - [C]  See main text of Report
- [D]  Gilead:  = C.5.T (February 2018 column) + C.5.A (February 2018 column)
  - Teva:  = D.4.T.i (February 2018 column) + D.4.A.i (February 2018 column)
- [E]  = [A] * [B] * [C]
- [F]  Gilead:  = C.5.T (February 2018 column) + C.5.A (After Dec-2023 column)
  - Teva:  = D.4.T.i (February 2018 column)
- [G]  = [A] * [B] * (100% - [C])
- [H]  Gilead:  = C.5.T (After Dec-2023 column) + C.5.A (After Dec-2023 column)
  - Teva:  = 0
- [I]  = (100% - [B]) * [C]
- [J]  Gilead:  = C.5.T (After Dec-2023 column) + C.5.A (After Dec-2023 column)
  - Teva:  = 0
- [K]  = (100% - [B]) * (100% - [C])
- [L]  Gilead:  = C.5.T (October 2021 column) + C.5.A (October 2021 column)
  - Teva:  = D.4.T.i (October 2021 column) + D.4.A.i (October 2021 column)
- [M]  = (100% - [A]) * [B] * [C]
- [N]  Gilead:  = C.5.T (October 2021 column) + C.5.A (After Dec-2023 column)
  - Teva:  = D.4.T.i (October 2021 column)
- [O]  = (100% - [A]) * [B] * (100% - [C])
- [P]  See main text of Report
- [Q]  = [D] * [E] + [F] * [G] + [H] * [I] + [J] * [K] + [L] * [M] + [N] * [O] - [P]