# Exhibit E

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| PETER STALEY, et al.,<br>    　　　　　　　　Plaintiffs,<br>  v.<br>GILEAD SCIENCES, INC., et al.,<br>    　　　　　　　　Defendants. | Case No.: 3:19-cv-02573-EMC |

### REBUTTAL REPORT OF PROFESSOR THOMAS G. MCGUIRE:
### GILEAD-TEVA AGREEMENT

HIGHLY CONFIDENTIAL:  ATTORNEYS' EYES ONLY

antitrust investigations for decades now,[96] so a lawyer in Ms. Julie's position certainly would have been aware of this potential. Teva has been involved in numerous pay-for-delay antitrust cases and Ms. Julie herself had her deposition taken in an antitrust case approximately six months before sending her email.[97]

60.  I am not in a position to determine which of these three possible interpretations is most likely. Neither are Defendants' economists.

61.  But economists do have tools to bring to bear on the issue. Commentators have pointed out that accepting a payment from the brand manufacturer gives the generic manufacturer an incentive to "change sides," from asserting that the patent was weak to asserting that it was strong. An agreed-upon date may look "early" and reduce antitrust risk if both the brand and generic express the view that the brand's patents were strong. Therefore "[s]ome kinds of evidence may also be suspect: once a brand and generic challenger settle, their incentives align in favor of arguing that the patent was stronger and more clearly infringed than it may have appeared at the time."[98]

62.  Commentators have also noted the "dangerous incentive" for firms that are negotiating a reverse payment to massage their negotiation record to create the impression that the payment did not alter the outcome.[99] Basing the but-for world on such a self-serving record would "fuse[] that dangerous incentive with an unfair result for the plaintiffs."[100]

63.  Similar comments apply to Ms. Julie's email assessing Teva's chances of winning on the emtracibine patents of 50%.[101] Originally, Teva was challenging the earlier expiring emtracibine

---

[96] See C. S. Hemphill, "An Aggregate Approach to Antitrust: Using New Data and Rulemaking to Preserve Drug Competition," *Columbia Law Review*, 109, 2009, footnote 25, citing consent decrees from as early as 2000.

[97] *In re Nexium (Esomeprazole Magnesium) Antitrust Litigation*, No. 1:12-md-02409-WGY, United States Court of the District of Massachusetts, ECF No. 1199, Ex. A.

[98] *In re Cipro Cases I & II*, 348 P.3d 845, 870 n 19, Supreme Court of California, May 7, 2015. M.A. Carrier, "Unsettling Drug Patent Settlements: A Framework for Presumptive Illegality," *Michigan Law Review*, 108(1), 2009, pp. 37-80 (after a reverse payment "the parties' interests become aligned" in asserting the patent's strength).

[99] K.B. Soter, "Causation in Reverse Payment Antitrust Claims," *Standford Law Review*, 70, 2018, pp. 1295-1342 at p. 1336.

[100] *Ibid*.

[101] STALEY-TEVA_0077203-04.

economists' attempts to insert consideration of the patent strength into the first question of violation is not based on sound economics.

66. For assessing the length of delay, the standard that I use—the rational, non-conspiring manufacturer[107]—is just a particular application of the more general standard used in economics to determine what would have happened in the but-for world. Economists refer to this approach as "comparative statics." A firm or consumer is assumed to maximize profit or utility, respectively, as economic conditions (*e.g.*, a tax on a product) changes. Throughout the analysis the agent is assumed to make choices in its own best interest (*i.e.*, be rational). The non-conspiring modifier is implicit in the analysis. In the context of potential collusion among firms, the more general standard is that economists determine what objective market conditions would have existed absent the antitrust violation. The issue is what result the market, unaffected by the violation, would have delivered. And the economic construct of the market necessarily assumes reasonable (rational) firms, viewed objectively.[108]

67. Economists' focus on incentives confirms the wisdom of the objective-market standard. First, one of the pillars of the *Actavis* analysis is the effect that a payment from the brand manufacturer has on the generic manufacturer's incentives to push in the settlement discussions for the earliest possible entry date. Without a payment, the generic firm's incentive is to get the earliest possible entry date – the only way for the generic to make money is by selling the product in the marketplace. The payment fundamentally alters the generic's incentives – now its incentive is to accept a later entry date in exchange for the payment. The brand manufacturer of course would also understand the payment's effect on the generic's incentives. In fact, the brand depends on it.

68. As discussed above, once the generic has accepted a settlement with a payment, it is aligned with the brand in wanting to show that the brand was likely to win the patent case. Basing the but-for world on the objective-market standard avoids the untoward incentives (of

---

[107] See my June 2022 Report, Section VIII.

[108] Soter, *op. cit.* (under the objective-market standard "[w]hat the parties subjectively would have agreed to is irrelevant").

both types – incentives that infected the generic's push for an entry date and incentives to massage the negotiation record) that result from making and accepting a reverse payment.

*Defendants' Economists Erroneously Rely on Selective Forecasts of Teva's "Latest Date" of Generic Entry*

69.     Dr. Saravia contends that "Teva's internal forecasts are also inconsistent with Dr. McGuire's claim that Teva's entry was delayed." She cites several Teva documents from June 2013 through January 2014 showing an anticipated launch in 2021 that was changed to 2020 after the Agreement was reached.[109] She claims that this indicates that before the Agreement Teva expected generic entry to occur in 2021.

70.     Dr. Saravia's interpretation of Teva's forecasts is not supported by Teva's documents when viewed in whole. In 2012 and 2013, Teva was forecasting the earliest possible generic entry dates as in 2013/2014 and the latest possible entry dates as in September 2021.[110] September 2021 corresponded to the expiration of the emtracibine patents. (The later issued patents were not issued yet so did not have expiration dates.) Teva's models of entry in September 2021 are simply forecasts of its "as late as" date, which at that time was the expiration of the emtracibine patents.[111]

71.     As time passed, and especially after the Viread settlement, the earliest possible entry dates Teva was forecasting in 2013/2014 were closed off.[112] Teva's forecasters considered modeling new launch dates, but ultimately decided to wait until after the imminent district court decision in the emtracibine patent litigation. For example, here is an email exhange between Teva employees in January 2014, just a few months before the Agreement was signed:

---

[109]   Saravia Report, ¶ 107.

[110]   STALEY-TEVA_0079273-278 at 273, an August 2012 email listing the "Early-as Entry Date" and "Late-as Entry Date" for Truvada and Atripla. STALEY-TEVA_0099082, slide 15, an August 2013 slide titled "Key Patent Expiries / Expected Generic Entry," listing "As Early As" dates in 2013-2014 and "As Late As" dates of September 2021 for Truvada and Atripla. STALEY-TEVA_0068694: "Atripla – litigation dependent – not this year…current earliest date is 2014 – but again Litigation dependent."

[111]   Also see STALEY-TEVA_0046152: "We are currently carrying an expected launch date of September 9, 2021, patent expiry."

[112]   See my June 2022 Report, ¶ 37. Also see STALEY-TEVA_0079273-278 at 273: "I understand from our internal US counsel that the US Truvada trial date is likely to extend beyond the 'early as date' that was sent."

### C. Teva's profits from the Agreement

129. I also found that "a reasonable company in Teva's position would have expected to earn at least $494.3 million more from the payment-containing Agreement than from winning the patent litigation."[214] I concluded that this comparison "indicates that the reverse-payment Gilead-Teva Agreement extinguished Teva's incentive to litigate and induced Teva to delay its generic entry."[215]

130. Dr. Saravia offers the same flawed criticism, that the MFE and MFE+ clauses did not create a 180-day exclusivity period for Teva because there were other potential outcomes.[216] At the time of the Agreement, Teva expected that it would have 180 days of protected sales. As described above, Teva's forecasts from 2014 assumed Teva would benefit from 180 days of exclusivity and Teva counsel agreed that the MFE+ provided "a form of contractual exclusivity."[217]

### V. RESPONSES TO MISTAKEN CRITICISMS OF MY CONCLUSION ABOUT THE TIMING OF TEVA GENERIC ENTRY IN A SETTLEMENT WITHOUT A REVERSE PAYMENT

131. In my June 2022 Report (Section VIII), I determined "whether it would have been in the economic interests of Gilead and Teva to reach an agreement that did not include reverse payments in the form of the MFE and MFE+ clauses" and identified "the potential entry dates that could have emerged in such a settlement."[218] I found that May 2019 was the likely entry date.[219] The likely entry date depends on the chances that Teva would win the patent litigation, which were provided to me by counsel. However, I also reported a range of likely entry dates

---

[214] My June 2022 Report, ¶ 183.

[215] My June 2022 Report, ¶ 183.

[216] Saravia Report, ¶¶ 101-103.

[217] See ¶ 78 of this Rebuttal, above.

[218] My June 2022 Report, ¶ 188 and generally, see Section VIII. In Section VIII of my June 2022 Report and in this Section of my Rebuttal Report, I sometimes refer to "Gilead's" and "Teva's" expectations as shorthand. To be clear, my approach is to assess actions of reasonable, non-conspiring companies in the positions of Gilead and Teva.

[219] My June 2022 Report, ¶ 204.

based on different probabilities and I described how the "model is set up to accommodate any probabilities of the chance of Teva winning on different patents."[220]

132. My calculations involved the following steps:

- I calculated the expected profits to reasonable companies in the positions of Gilead and Teva absent a settlement (*i.e.*, with litigation). These calculations rely on the probabilities that Teva would win the litigation with respect to different patents.[221]
- I calculated each party's expected profits from the Gilead-Teva Agreement.[222]
- I calculated each party's "gains" from the Agreement as expected profits from the Agreement less expected profits absent a settlement.[223]
- I calculated the "gain split" from the Agreement as each party's gain divided by the total gains.[224]
- I calculated each party's expected profits from alternative settlements without a payment.[225]
- I calculated each party's gains from each possible alternative settlement as expected profits from the settlement less expected profits absent a settlement.[226]
- I calculated the gain split from each of the alternative settlements.[227]
- Finally, I assumed the gain split in the alternative settlement would be the same as the actual Gilead-Teva Agreement to determine the likely date of generic entry in a settlement absent the MFE and MFE+ clauses.[228]

133. It is important to emphasize that the sections of my June 2022 Report discussed so far in this Rebuttal assessed whether the MFE and MFE+ clauses in the Agreement constituted an anticompetitive pay-for-delay. Those analyses did not rely on an assumption about Teva's

---

[220] My June 2022 Report, Table 3 and footnote 381.
[221] My June 2022 Report, ¶¶ 190-195.
[222] My June 2022 Report, ¶¶ 196-201.
[223] My June 2022 Report, ¶¶ 196-201.
[224] My June 2022 Report, ¶¶ 196-201.
[225] My June 2022 Report, ¶ 203.
[226] My June 2022 Report, ¶ 203.
[227] My June 2022 Report, ¶ 203.
[228] My June 2022 Report, ¶ 204.

entry at patent expiration, the authors must allow unlimited brand-to-generic cash transfers, which is not realistic in light of current antitrust policy.[234]

139. The authors then argue that if cash payments were not permitted, the parties would have to bargain about a date, and the outcome of bargaining would be different because the tradeoff between brand and generic profits is different when negotiation is about a date than when negotiation is about the level of the cash transfer.[235] This comparison is, however, irrelevant because the analysis about unlimited cash transfers proceeds from the wrong starting point.

140. The right starting point, the one applicable to the current setting and to all real-world reverse payment analyses, is to assume that bargaining in the actual world *does include negotiation about a date* (as it actually does). It is more realistic to say that the level of the payment is determined by some payment clause (*e.g.*, an MFE+ clause worth some hundreds of millions to the generic), that large cash transfers are not permitted, and that the marginal negotiation is about a date. The implication of this correction is that in negotiations that include agreement about a date, the tradeoff of gains for the two parties is exactly the same as before. In the authors' model terms, the tradeoff between profits for the brand and profits for the generic as the date moves back and forth is exactly the same in the but-for and the real worlds and, counter to Saravia's mistaken interpretation, there is no reason to think that taking away a payment in the form of an accelerator clause changes the gain split between the parties.

C. Dr. Saravia's "case evidence"

141. As summarized above, my calculation of the parties' expected profits relies on assumptions of the probabilities of Teva winning on certain patents that were provided to me by counsel. Dr. Saravia disagrees with the probabilities that counsel provided me.

---

[234] The days when brands can write a check of tens or even hundreds of millions of dollars to generics to stay out of the market are long gone. For example, in October 1995, Glaxo paid Genpharm $132.5 million in cash in connection with an agreement about a date of entry for Glaxo's Zantac. Although the exact size of the payment was not publicly disclosed, Hemphill used an FTC study to infer the payment size. See C.S. Hemphill, "Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem," *New York University Law Review*, 81, 2006, pp. 1553-1623 at p. 1569. I discuss antitrust scrutiny and the evolution of the form of payments from brands to generics in response in my June 2022 Report, ¶¶ 107-116.

[235] Ecer, Montes, and Weiskopf, *op. cit.*, pp. 140-143.

142.    Specifically, Dr. Saravia relies on a specific email where Teva's lawyer states that it has only a 17.5% chance of "successfully litigating all remaining Truvada and Atripla patents and be able to enter in February 2018."[236]  (This is the same email, discussed above, indicating that Teva's chance of winning on the later issued combination patent was only 30-40%.)  As discussed above, the evidence regarding the strength of the different patents is contested.  Neither Dr. Saravia nor I is in a position to independently evaluate it.

143.    Dr. Saravia applies her favored probabilities to my model to show that Gilead rationally would have litigated instead of entering the Gilead-Teva Agreement.[237]  She argues this "case evidence" shows my model is unreliable because Gilead did in fact accept the terms of the Agreement.  I interpret this differently:  It is economic evidence that at least Gilead had different views of the strength of its patents than Dr. Saravia proposes.

144.    Dr. Saravia also argues again that the "case evidence" surrounding the negotiations negates the existence of a delay.[238]  As described above, I disagree that the documents and testimony do any such thing.

### D.    Dr. Saravia's criticisms regarding modeling assumptions about TAF line extensions

145.    My calculations of Gilead's potential profits and gains in different scenarios assume that the decline in Truvada and Atripla sales would largely be recaptured by TAF-containing Gilead products until generic entry occurred.[239]  Dr. Saravia criticizes these assumptions, contending that the expected decline was primarily due to generic entry of Viread and not to product switches to other Gilead products.

146.    As described in my June 2022 Report, Gilead's forecasts indicated that the expected decline in its Truvada and Atripla sales was largely due to switching to line extensions.[240]  And there is evidence from before the Agreement was signed that Gilead had "revised" its thinking

---

[236] Saravia Report, ¶¶ 122-124 citing STALEY-TEVA_0077203-04.

[237] Saravia Report, ¶ 125.

[238] Saravia Report, ¶¶ 126-127.

[239] Saravia Report, ¶¶ 130-131.  Also see my June 2022 Report, ¶¶ 103-106, where I explained that this is how the industry works.

[240] See my June 2022 Report, Attachment C, ¶ 3.