# Exhibit G

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

PETER STALEY, et al.,          )
                               )
           Plaintiffs,         ) No. 3:19-cv-
                               ) 02573-EMC
       vs.                     )
                               )
GILEAD SCIENCES, INC., et al., )
                               )
           Defendant.          )
-------------------------------

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
REMOTE VIDEOTAPED DEPOSITION OF THOMAS McGUIRE
Tuesday, August 30, 2022

Reported by:
LISA M. MURACO
JOB NO. 215366

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

3        Tuesday, August 30, 2022
4            9:00 a.m. Eastern

7        REMOTE Deposition of THOMAS McGUIRE,
8   held VIA ZOOM, before LISA M. MURACO, a
9   Notary Public of the State of New York, New
10  Jersey, and Florida.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 66

1  reveal patterns that are inconsistent with the
2  hypothesis, and then one -- they go back to the
3  drawing board.
4       Q.   Okay.
5            Well, thank you, that's helpful.
6            I would like to turn now to talk
7  about your analysis in this case as we haven't
8  been doing all morning.
9       A.   I thought that might come up here.
10      Q.   Now, we spent some time at your last
11 deposition on your reverse-payment-related
12 opinions talking about Teva's expectations of
13 success in the FTC patent litigation and how
14 that plays a role and where it plays a role in
15 your economic perspective; correct?
16           MR. SHADOWEN:  Object to the
17      mischaracterization of the testimony.
18 BY MR. GANDESHA:
19      Q.   You can answer.
20      A.   I remember --
21      Q.   Sorry.
22      A.   I remember a conversation we had
23 about that.
24      Q.   Okay.
25           And -- and your analysis in this

Page 67

1  case employs as an input for one part of the
2  analysis assumptions about Teva's chance of
3  success in the FTC patent litigation; correct?
4           MR. SHADOWEN:  Object to the
5       mischaracterization of the report.
6       A.    The -- we're now talking about a
7  different part of my analysis than we've talked
8  about so far, clear.  And moving away from the
9  question of liability, if I can use that term,
10 and into the but-for-world-type questions.
11          And in that context, a patent
12 strength does play a role.  My inputs for
13 incorporating patent strength come from a --
14 from Mr. Lentz, who is taking the perspective
15 of an objective observer of what the likely
16 success of patent litigation would be.
17      Q.    Thanks.
18          I was going to go through all of
19 that, but you made it easier, which is very
20 helpful.
21          And the number that you use for the
22 aspect of your analysis that you just
23 referenced, that is drawn from Mr. Lentz's
24 opinion is 62.6 percent; is that correct?
25      A.    I have to go back and look at it,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 73

1  Q.    Okay.
2        So here we have a situation where
3  Mr. Lentz is offered an opinion that results in
4  a 62.6 percent chance that Teva would win on
5  all patents that are relevant here.
6        On the other side, we have Judge
7  O'Malley who disagrees with Mr. Lentz and
8  believes that Teva's -- Teva was not likely to
9  prevail on any of the patents.
10       Mr. Hoxie is of the same view as
11 Judge O'Malley.  And a third-party entity
12 called IPD Analytics that actively monitored
13 the FTC patent trial and concluded that Teva
14 was not likely to be able to enter before 2021,
15 but out of all of that available data and
16 potential inputs for your model you are going
17 with Mr. Lentz because you are basing that on
18 an instruction from counsel; is that correct?
19 A.    The analogy we talked about earlier
20 about revising hypothesis in relation to new
21 data is not what I did at all with respect to
22 patent strength.
23       It wasn't my original analysis that
24 the patent strength was 62.6 percent.  It was
25 Mr. Lentz's.  And he's in a position -- he has

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 74

1  the expertise to consider the evidence you are
2  referring to along with other evidence that he
3  considered to make a determination of if he
4  would like to revise that estimate.
5             Not my -- not my call at all.
6       Q.    And is that because this is not like
7  an empirical analysis that we were discussing
8  before that you might undertake in some of your
9  other research?
10      A.    No.  That's not the reason.  It's
11 simply not my empirical analysis.
12      Q.    Okay.
13            So you don't think there was any way
14 for you as an economist to be able to
15 incorporate into your economic perspective
16 these multiple views about patent merits?
17            MR. SHADOWEN:  Object to the form.
18      A.    It's possible.  My report considers
19 a sensitivity analysis, what would happen if
20 there were different probabilities.  It's
21 possible.
22      Q.    Right.  And --
23      A.    I don't have a basis to say it's
24 this instead of that.  That's another question.
25      Q.    You agree, then, that your analysis

Page 93

1  there's -- specifically, in the second sentence
2  referring to a case evidence associated with
3  Staci Julie, my previous answer was more
4  general.
5       Q.   Thanks that clarification.
6            Now, you've had access to the case
7  evidence that you refer to in this section of
8  your report and that you just referenced in
9  your answer to my prior questions; correct?
10      A.   That's correct.
11      Q.   And when did you first have access
12 to that case evidence?
13           MR. SHADOWEN:  Object to the form.
14      A.   I had access to the record right
15 from the get-go.
16      Q.   Okay.
17           Now, you're aware, I assume, that
18 Teva waived privilege as to certain categories
19 of communications and documents at some point
20 in this litigation?
21      A.   Yes, yes, I am.
22      Q.   And is it your testimony that you've
23 had access to all case evidence throughout your
24 engagement here, such that when Teva produced
25 documents like the Staci Julie e-mails that you

1   refer to in your rebuttal report, you
2   essentially had access to those materials
3   immediately?
4           MR. SHADOWEN:  Object to the form.
5       A.   I'm not sure about the immediately,
6   but I had access to those in time for me to
7   prepare more reports.
8       Q.   Right.
9            So that includes your original
10  report in this case; correct?
11      A.   That's correct, yes.
12      Q.   So you had access to the Staci Julie
13  e-mails and other e-mails produced by Teva in
14  this case while you were preparing or before
15  you finalized your July 2022 expert report;
16  correct?
17      A.   That's correct.
18      Q.   Okay.
19           And I believe I understood you to
20  say that you criticize defendant's experts for
21  over-interpreting the case evidence, but is it
22  also fair to say that in your opening report
23  you didn't reference this case evidence at all?
24      A.   I could -- it's a compound question.
25  The -- I criticize the defendant's experts for

1  likely agreement would've been.
2      Q.   And your opinion as to the but-for
3  alternative settlement entry date rests on the
4  assumption that parties in the position of Teva
5  and Gilead reviewed the patent merits as a
6  rational nonconspiring pharmaceutical company
7  would view them; correct?
8      A.   That's correct.
9      Q.   And you obtained the input that you
10 use for those patent merits from Dr. Lentz?
11 I'm sorry -- Mr. Lentz's opinion, ultimately;
12 correct?
13     A.   That's correct.
14     Q.   And it's true, is it not, that you
15 have not calculated an expected alternative
16 settlement entry date where Teva's subjective
17 views of the patent merits are other than those
18 of rational generic company; correct?
19          MR. SHADOWEN:  Object to the form.
20     A.   What I've done is to consider
21 alternative patent strengths and estimate what
22 the likely agreed-upon date would be based on
23 rational nonconspiring companies at the time of
24 the agreement.  That -- full stop.
25     Q.   Okay.

Page 117

1           But I guess an implication of that
2   is that you didn't actually calculate an
3   alternative settlement entry date using Teva's
4   actual subjective views of patent merits;
5   correct?
6       A.    I -- calculated based on the ones
7   that I used, which I'm not sure what exactly
8   you mean by Teva's subjective.  But I think
9   it's clear what I did.
10      Q.    Right.
11          And I guess, I just want to make it
12  explicit so that we are all on the same page,
13  that you didn't calculate an expected
14  alternative settlement entry date using an
15  input for Teva's expected chances in the patent
16  litigation that differ from your understanding
17  of what a, you know, reasonable patent attorney
18  who is not involved in a conspiracy would've
19  believed?
20      A.    I believe that's correct.
21      Q.    Okay.
22          And I think this is true based on
23  what you said that you haven't calculated an
24  expected alternative settlement entry date
25  where the generic's expectations of patent

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 121

1  to the same documents. I would have to go back
2  and check. But there is case evidence more
3  consistent with Lentz.
4     Q.   And to calculate the May 2019
5  but-for settlement entry date, you assumed that
6  a reasonable company in the position of Gilead
7  and a reasonable company in the position of
8  Teva would've had the same expectations as to
9  patent merits; is that correct?
10    A.   I use one probability for both
11 companies. That's correct.
12    Q.   Okay.
13         Thank you. I think we can change
14 gears.
15         If we could go back to your
16 August 2022 rebuttal report to paragraph 23,
17 please.
18         Dr. --
19    A.   I'm there.
20    Q.   Okay. Thanks.
21         Dr. McGuire, this -- paragraph 23 is
22 the first paragraph in a section in which you
23 discuss a set of criticisms of defendant's
24 economists, focusing in large part on the MFE
25 provision; correct?