# Exhibit H

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| PETER STALEY, *et al.*,<br>　　　　　　　Plaintiffs,<br>　v.<br><br>GILEAD SCIENCES, INC., *et al.*,<br>　　　　　　　Defendants<br><br>THIS DOCUMENT RELATES TO: ALL ACTIONS | Case No. 3:19-cv-02573-EMC |

Expert Report of Celeste C. Saravia
**HIGHLY CONFIDENTIAL**
**OUTSIDE COUNSEL EYES ONLY**

July 22, 2022

expectation" of the patent strength.[304] In other words, Dr. McGuire's model does not consider Gilead's or Teva's expectations regarding the outcome of the patent litigation. According to Dr. McGuire, these beliefs must be "taken with a grain of salt" because the parties are (*by assumption*) conspiring.[305] In other words, Dr. McGuire assumes that a party's beliefs expressed in *internal, privileged* communications cannot be trusted or used in his modeling. Yet, Dr. McGuire admits (1) he has not conducted any analysis to determine whether Gilead's or Teva's beliefs are in fact biased,[306] and (2) that if the beliefs are biased, he has no economic basis that would allow him to determine the direction of the bias.[307]

123. This assumption by Dr. McGuire has profound implications. Consider the following illustrative example. For a patent expiring in 10 years, a generic manufacturer believes it has a 10 percent chance of succeeding in patent litigation against the brand. Under these expectations, if the brand and generic settled for an entry date that was seven years in the future, the generic firm would have considered it to be a favorable outcome, as its expectations indicated it would be willing to settle on a date as late as nine years in the future. However, if one were to claim that a "rational, non-conspiring" party would have assigned a 50 percent probability of litigation success—suggesting an expected settlement date that is five years in the future—then, under Dr. McGuire's assumptions, one could conclude that the settlement was anticompetitive, even if, as in the current case, it did not involve a transfer of funds from the brand manufacturer to the generic manufacturer. This example demonstrates the error in ignoring the negotiating party's beliefs when attempting to estimate what would happen in the "but-for" world.

124. Another flaw of using Dr. McGuire's assumed probability based on a "rational, non-conspiring" party, is that it requires that both parties have the same expectations regarding the probability of a generic manufacturer winning patent litigation. Specifically, Dr. McGuire's methodology assumes, based on instruction from counsel, that Teva would succeed in patent litigation against Gilead at the following probabilities: (1) FTC patents, 77.5 percent, (2) '397 combination patent, 85 percent, and (3) '185 combination patent, 95 percent.[308] However, as discussed above, Dr. McGuire has ignored information on Teva's expectations, and his assumed

---

[304] McGuire Deposition, 42:2–13.
[305] McGuire Deposition, 38:1–24, 82:6–11.
[306] McGuire Deposition, 42:14–43:13.
[307] McGuire Deposition, 43:23-44:10.
[308] McGuire Merits Report, ¶ 170, Attachment E.1; 2014 FDA Orange Book, pp. ADA 57, ADA 60; US Patent No. US 8,592,397 B2 for Truvada, November 26, 2013; US Patent No. US 8,598,185 B2 for Atripla, December 3, 2013.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

probabilities are inconsistent with case evidence on those expectations. Specifically, Teva internal emails demonstrate that Teva's in-house counsel estimated Teva would only have a 17.5 percent chance of successfully litigating all remaining Truvada and Atripla patents and be able to enter in February 2018 (after pediatric exclusivity associated with the TDF patents expire).[309] Separately, Teva estimated it would also have a 17.5 percent chance of entering in September 2021, after failing to invalidate the FTC patents but successfully litigating the newly issued patents (i.e. the '397 and '185 patents).[310] Finally, Teva estimated it had a 65 percent chance of failing to invalidate the newly issued patents, which implies a launch in January 2024, at the earliest.[311,312] See Exhibit 6.

---

[309] Email chain from Fred Killion [Teva] to Staci Julie [Teva], "Fw: Atripla and Truvada," February 13, 2014, STALEY-TEVA 0077203–4 at 3.

[310] Email chain from Fred Killion [Teva] to Staci Julie [Teva], "Fw: Atripla and Truvada," February 13, 2014, STALEY-TEVA 0077203–4 at 3. *See also* Julie Declaration, ¶¶ 4, 10.

[311] However, to conservatively interpret Teva's internal discussion of their likelihood of litigation success, I use a 35 percent likelihood of Teva winning litigation on the '397 patent and a 100 percent likelihood of Teva winning litigation on the '185 patent. *See* Email chain from Fred Killion [Teva] to Staci Julie [Teva], "Fw: Atripla and Truvada," February 13, 2014, STALEY-TEVA 0077203–4 at 3. These low estimates of Teva's chance of patent litigation success are consistent with the analysis of an independent third party, IPD Analytics, which concluded that Gilead was likely to succeed at trial, and appears to have given Teva only a 20 percent chance of success. IPD Analytics' assessment was included by Teva in some of its financial forecasts prepared around the time of the settlement negotiations. *See* IPD Analytics Report, "TRUVADA & ATRIPLA (GILD v. TEVA): HEADING INTO TRIAL, GILEAD APPEARS TO HAVE ADVANTAGE," STALEY-TEVA_0045873–80 at 73 ("Gilead appears to have the advantage heading into trial…Teva appears unlikely to demonstrate that the [FTC] patents are invalid."); Efavirenz-Emtricitabine-Tenofovir Tablets (Atripla).xlsx, August 7, 2013, STALEY-TEVA_0046046, tab "Notes," cells D12-D13 ("Probability of Earliest Possible Generic Launch: 20%"). I note that IPD Analytics' commentary that the probability of the "Earliest Possible Generic Launch" in early 2018 was present in a Teva forecast that was created in August 2013, before the '397 and '185 patents were granted to Gilead. Thus, this "20%" only applies to the FTC patent litigation. *See* Efavirenz-Emtricitabine-Tenofovir Tablets (Atripla).xlsx, August 7, 2013, STALEY-TEVA_0046046, Tab "Notes."

[312] Setting aside the numerous flaws in Dr. McGuire's model, I have been asked by counsel to determine the minimum probability of litigation success for Teva that results in Dr. McGuire's model producing an alternative settlement date that is earlier than September 30, 2020. To perform this exercise, I was asked to assume a probability of litigation success for the FTC patents at 50 percent (consistent with Teva's assessment) and 95 percent for the "Combo 2 Patents" (as Dr. McGuire uses), and then find the minimum probability of success on the "Combo 1 Patents." Under these conditions, I find that Dr. McGuire's model only estimates an earlier alternative settlement date, i.e., delayed generic entry, if the probability of Teva's success on the "Combo 1 Patents" litigation is 61 percent or greater, and that at a 61 percent likelihood Teva would only have been delayed by one month. Furthermore, at a 61 percent likelihood on the "Combo 1 Patents," Teva's overall probability of litigation success would be 29 percent (i.e., 50 percent x 61 percent x 95 percent = 29 percent). *See* Workpaper 2.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

**EXHIBIT 6**
*The Fact Record Indicates that Teva Thought Its Litigation Success Chances Were Low and by Litigating It Would Likely Not be Able to Enter until After 2024*



Source: STALEY-TEVA_0077203–4

125.    While I understand that materials related to Gilead's expectations are privileged, using Teva's documented expectations in Dr. McGuire's model—instead of the probabilities that Dr. McGuire obtains from Plaintiffs' counsel—demonstrates the unreliability of Dr. McGuire's assumption that both parties must have the same expected probabilities of litigation success. Setting aside the conceptual flaws discussed above, if I amend Dr. McGuire's model to input probabilities of litigation success that reflect Teva's assessment of its patent litigation chances, while keeping his incorrect assumption about the size of the alleged reverse payment, his model estimates that Gilead would have preferred litigating over settling with a September 2020 licensed entry date—a result clearly contradicted by the fact the parties did in fact settle in the

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY

actual world with a September 2020 licensed entry date.[313,314] This result further demonstrates the unreliability of Dr. McGuire's alternative settlement model and, at a minimum, that his assumption that the parties have common beliefs regarding the generic's litigation success is erroneous.

126. The case evidence around the actual FTC Agreement negotiations between Gilead and Teva also makes clear that Dr. McGuire's model simply assumes the existence of a delay without being tethered to any case evidence. As previously discussed, following the FTC trial, on January 28, 2014, Teva first proposed a licensed entry date of "Q3 2019"[315] and there is no indication that when Teva made this proposal it expected the agreement to include a six-month MFE+ clause. Thus, the proposal should not reflect any delay in entry related to the MFE or MFE+ clause. Yet this proposed date is *later* than May 2019, the alternative settlement date produced by Dr. McGuire's model.

127. Dr. McGuire offers no explanation as to why his model predicts that without an MFE or MFE+ clause, the parties would have negotiated a licensed entry date in May 2019 when Teva proposed to Gilead a date of Q3 2019 without any discussion of an MFE+ clause. Any "but-for" entry date before Q3 2019 is clearly inconsistent with the factual record in this regard and demonstrates the unreliability of Dr. McGuire's alternative settlement model, including his assumption that there was a reverse payment. Moreover, given that these were still early proposals, one could reasonably expect that after additional negotiations, a final agreement without the MFE+ clause would include a license date later than Q3 2019 and earlier than Gilead's initial proposal of March 2021.[316] This not only makes intuitive sense but it is also consistent with academic literature on bargaining.[317] This literature has shown that most

---

[313] Using the probabilities of success that Teva expected as inputs to Dr. McGuire's model results in Gilead being unwilling to settle for any date prior to September 2021. I reach this conclusion by implementing the following change to Dr. McGuire's model: in Attachment E.1, I adjust row [A] "FTC Patents expiring 10/2021 ('FTC Patents')" from 77.5 percent 50 percent, row [B] "TDF/FTC Combination Patents Expiring 1/2024 ('combo 1 patents')" from 85 percent to 35 percent and row [C] "TDF/FTC/EFV Combination Patents expiring 5/2029 ('combo 2 patents')" from 95 percent to 100 percent. *See* Workpaper 3.

[314] As noted above, Dr. McGuire's model is designed to predict only a delay. This is because—according to Dr. McGuire's model—as the parties' assessment of the patent litigation becomes less favorable to Teva, Gilead's implied NPV from the actual settlement becomes lower than Gilead's implied NPV from litigation.

[315] Email chain from David Hashmall [Goodwin Procter LLP, outside counsel to Teva] to Lauren Rabinovic [Teva] et al., "Re: Gilead ( emtricitibine )," February 6, 2014, STALEY-TEVA_0082003–5 at 5.

[316] Email chain from David Hashmall [Goodwin Procter LLP, outside counsel to Teva] to Lauren Rabinovic [Teva] et al., "Re: Gilead ( emtricitibine )," February 6, 2014, STALEY-TEVA_0082003–5 at 4.

[317] *See, e.g.,* Matthew Backus et al., "Sequential Bargaining in the Field: Evidence From Millions of Online Bargaining Interactions," *The Quarterly Journal of Economics* 135, no. 3, 2020, pp. 1319–1361 ("Backus et al. (2020)").