Michael J. Shipley (SBN 233674)
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, California 90071
Tel: (213) 680-8400
michael.shipley@kirkland.com

Jay P. Lefkowitz, P.C. (*pro hac vice*)
Devora W. Allon, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Tel: (212) 446-4800
lefkowitz@kirkland.com
devora.allon@kirkland.com

Bart H. Williams (SBN 134900)
Susan L. Gutierrez (SBN 273980)
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, California 90067
Tel: (310) 557-2900
bwilliams@proskauer.com
sgutierrez@proskauer.com

*Attorneys for Defendants Gilead Sciences, Inc.,
Gilead Holdings, LLC, Gilead Sciences, LLC,
and Gilead Sciences Ireland UC*

Christopher T. Holding (*pro hac vice*)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, Massachusetts 02210
Telephone: (617) 570-1000
Email: cholding@goodwinlaw.com

*Attorney for Defendant Teva Pharmaceuticals
USA, Inc.*

*Additional Counsel for Defendants Listed on
Signature Page*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| IN RE HIV ANTITRUST LITIGATION | CASE NO. 3:19-cv-02573-EMC |
|---|---|
| This Document Relates To: | **DEFENDANTS' SECOND MOTION FOR JUDGMENT AS A MATTER OF LAW** |
| ALL ACTIONS | Judge:      Honorable Edward M. Chen<br>Courtroom:  5-17th Floor |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................................. 1

LEGAL STANDARD ...................................................................................................................... 1

ARGUMENT ................................................................................................................................... 2

I.    NO REASONABLE JURY COULD FIND THAT GILEAD HAD MARKET POWER .... 2

A.    Plaintiffs Failed to Provide Sufficient Indirect Evidence of Market Power. .......................... 2
    1.    Plaintiffs Failed to Establish a Relevant Market. ................................................................. 2
    2.    Plaintiffs Failed to Establish That Defendants Had Power Over any Market. ..................... 4

B.    Plaintiffs Failed to Provide Sufficient Direct Evidence of Market Power. ............................. 5

II.   NO REASONABLE JURY COULD FIND THAT THE MFEP CLAUSE WAS A
REVERSE PAYMENT. ......................................................................................................... 7

A.    Plaintiffs Failed to Provide Sufficient Evidence That the MFEP Clause Was a Large and
Unjustified Payment. ................................................................................................................ 8
    1.    No Reasonable Jury Could Find That Teva Received Contractual Exclusivity. ................... 8
    2.    Plaintiffs' Proof Depends on Unreliable Expert Testimony. .............................................. 10
    3.    Plaintiffs Failed to Provide Substantial Evidence That Gilead Made a Profit Sacrifice. .... 11

B.    Plaintiffs Have Failed to Provide Sufficient Evidence That Gilead Offered the MFEP to
Restore Teva's Forfeited Exclusivity. .................................................................................. 11

III.  NO REASONABLE JURY COULD FIND THAT THE MFE CLAUSE WAS A
REVERSE PAYMENT. ....................................................................................................... 13

IV.   NO REASONABLE JURY COULD FIND THAT THE MFE AND MFEP CLAUSES
WAS EXCHANGED FOR DELAY. .................................................................................... 13

V.    NO REASONABLE JURY COULD FIND AN ALTERNATIVE ENTRY DATE OF
FEBRUARY 2018. ............................................................................................................... 14

VI.   NO REASONABLE JURY COULD FIND THAT GILEAD AND TEVA WOULD HAVE
AGREED TO AN ENTRY DATE EARLIER THAN SEPTEMBER 2020. ........................ 17

A.    Plaintiffs' Alternative Settlement with an Earlier Entry Date Depends on Unreliable
Patent Strength Assumptions ................................................................................................. 17
    1.    Plaintiffs Have Failed to Provide Sufficient Evidence That Teva Would Have Invalidated the FTC Patents. .... 17
    2.    Plaintiffs Have Failed to Provide Sufficient Evidence That Teva Would Have Invalidated the Combination
Patents ................................................................................................................................. 19

B.    Dr. McGuire's Expert Testimony Is Unreliable .................................................................. 20

**VII.   NO REASONABLE JURY COULD FIND THAT THE GILEAD-TEVA SETTLEMENT DELAYED OTHER GENERICS' ENTRY**.......................................................... 21

**CONCLUSION** ......................................................................................................... 22

DEFENDANTS' SECOND MOTION  FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 3:19-CV-02573-EMC

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Actos End Payor Antitrust Litig.*,
  2015 WL 5610752 (S.D.N.Y Sept. 22, 2015), *rev'd on other grounds* 848 F.3d 89
  (2d Cir. 2017).............................................................................................................13, 21

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns,
  Inc.*,
  108 F.3d 1147 (9th Cir. 1997) ..................................................................................................5

*Bhan v. NME Hosps., Inc.*,
  929 F.2d 1404 (9th Cir. 1991) ..................................................................................................7

*California Computer Products, Inc. v. International Business Machines Corp.*,
  613 F.2d 727 (9th Cir. 1979) ....................................................................................................1

*In re Citric Acid Litig.*,
  191 F.3d 1090 (9th Cir. 1999) ..................................................................................................6

*Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*,
  689 F.3d 1368 (Fed. Cir. 2012)...............................................................................................18

*Flaa v. Hollywood Foreign Press Ass'n*,
  2021 WL 1399297 (C.D. Cal. Mar. 23, 2021), *aff'd*, 55 F.4th 680 (9th Cir. 2022) .................2

*Forsyth v. Humana, Inc.*,
  114 F.3d 1467 (9th Cir. 1997) .............................................................................................6, 7

*FTC v. Actavis*,
  570 U.S. 136 (2013).............................................................................................................7, 20

*Gray v. Hudson*,
  28 F.4th 87 (9th Cir. 2022) .......................................................................................................1

*Hicks v. PGA Tour, Inc.*,
  165 F. Supp. 3d 898 (N.D. Cal. 2016), *aff'd in relevant part*, 897 F.3d 1109 (9th
  Cir. 2018) ...............................................................................................................................5, 7

*Image Technical Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) ..................................................................................................5

*In re Intuniv Antitrust Litig.*,
  496 F. Supp. 3d 639 (D. Mass. 2020) .......................................................................................6

*Johnson v. Am. Honda Motor Co., Inc.*,
 923 F.Supp.2d 1269 (D. Mont. 2013) ....................................................................11

*Kaiser Found. v. Abbott*,
 2009 WL 3877513 (C.D. Cal. Oct. 8, 2009) ..............................................................6

*Kumho Tire Co., Ltd. v. Carmichael*,
 526 U.S. 137 (1999) ...............................................................................................11

*Meijer, Inc. v. Barr Pharms., Inc.*,
 572 F. Supp. 2d 38 (D.D.C. 2008) ...........................................................................6

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
 924 F.2d 1484 (9th Cir. 1991) ..................................................................................2

*Mylan Pharm., Inc. v. Warner Chilcott Pub. Ltd.*,
 838 F.3d 421 (3d Cir. 2016) ............................................................................2, 3, 4

*Pooshs v. Phillip Morris USA, Inc.*,
 287 F.R.D. 543 (N.D. Cal. 2012) ......................................................................10, 11

*Rebel Oil Co. v. Atl. Richfield Co.*,
 146 F.3d 1088 (9th Cir. 1998) ................................................................................11

*Rebel Oil Co. v. Atl. Richfield Co.*,
 51 F.3d 1421 (9th Cir. 1995) .........................................................................2, 4, 5, 6

*In re Remeron Direct Purchaser Antitrust Litig.*,
 367 F. Supp. 2d 675 (D.N.J. 2005) ...........................................................................6

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
 2018 WL 563144 .......................................................................................................6

*St. Louis Convention & Visitors Comm'n v. Nat'l Football League*,
 154 F.3d 851 (8th Cir. 1998) ....................................................................................1

*Stephens v. Union Pac. Railroad Co.*,
 935 F.3d 852 (9th Cir. 2019) ..................................................................................21

*Tripati v. McKay*,
 211 Fed. Appx. 552 (9th Cir. 2006) ...........................................................................1

*United States v. Syufy Enters.*,
 903 F.2d 659 (9th Cir. 1990) ....................................................................................5

*W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*,
 65 F. Supp. 2d 1052 (N.D. Cal. 1998), *aff'd*, 190 F.3d 974 (9th Cir. 1999) .............2

iv

*Weaving v. City of Hillsboro,*
    763 F.3d 1106 (9th Cir. 2014) ............................................................................1

*Weisgram v. Marley Co.,*
    528 U.S. 440 (2000)...........................................................................................11

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class,*
    868 F.3d 132 (3d Cir. 2017).......................................................................16, 22

**Rules**

Fed. R. Civ. P. Rule 50(a).............................................................................................1

**INTRODUCTION**

Plaintiffs have now rested their case after being fully heard on their antitrust claims challenging the 2014 Gilead-Teva settlement.  Because Plaintiffs failed to adduce sufficient evidence to support their reverse-payment theories, Defendants are entitled to judgment as a matter of law on all claims under Fed. R. Civ. P. Rule 50(a).

**LEGAL STANDARD**

Under Rule 50(a), judgment as a matter of law is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party[.]"  Fed. R. Civ., P. 50(a)(1).  To defeat a motion for judgment as a matter of law, Plaintiffs must present substantial evidence supporting a finding in their favor.  *California Computer Products, Inc. v. International Business Machines Corp.*, 613 F.2d 727, 734 (9th Cir. 1979).  "Substantial evidence," is "more than a mere scintilla" and consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*  Conclusory, self-serving, and speculative testimony is insufficient to defeat a motion for judgment as a matter of law.  *Tripati v. McKay*, 211 Fed. Appx. 552, 553 (9th Cir. 2006).  Further, the Court may also "give credence to [] evidence supporting [defendants] that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."  *Gray v. Hudson*, 28 F.4th 87, 96 (9th Cir. 2022) (internal citations omitted).

In cases involving expert testimony, "[a] jury may not rest its verdict on an expert's conclusion without some underlying facts and reasons, or a logical inferential process to support the expert's opinion." *St. Louis Convention & Visitors Comm'n v. Nat'l Football League*, 154 F.3d 851, 863 (8th Cir. 1998) (granting judgment as a matter of law in an antitrust case) (internal citations omitted).  "It is error to deny a judgment [as a matter of law] when it is clear that the evidence and its inferences cannot reasonably support a judgment in favor of the opposing party." *Weaving v. City of Hillsboro*, 763 F.3d 1106, 1111 (9th Cir. 2014) (quotations omitted) (reversing denial of judgment as a matter of law).

1

2

3          **ARGUMENT**

4    **I.    NO REASONABLE JURY COULD FIND THAT GILEAD HAD MARKET POWER**

5          **A.    Plaintiffs Failed to Provide Sufficient Indirect Evidence of Market Power.**

6          To demonstrate market power indirectly, Plaintiffs must initially define a relevant market and

7    show that Defendants have a dominant share of that market. *Rebel Oil Co. v. Atl. Richfield Co.*, 51

8    F.3d 1421, 1434 (9th Cir. 1995). Here, Plaintiffs allege two relevant markets: (1) Atripla and its AB-

9    rated generic versions; and (2) Truvada and its AB-rated generic versions. *See* Verdict Form, ECF

10   1898 at 3; Jury Instruction No. 13. Plaintiffs failed to establish market power in those markets for two

11   independent reasons: (1) there is insufficient evidence to support Plaintiffs' overly-narrow product

12   market; and (2) there is insufficient evidence that Gilead had power in Plaintiffs' narrow product

13   market.

14                 **1.    Plaintiffs Failed to Establish a Relevant Market.**

15         Plaintiffs failed to offer substantial evidence to support their overly narrow brand-generic

16   markets. *See Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1489-90 (9th Cir.

17   1991) (rejecting implausibly narrow market definition). A market definition cannot be unduly narrow

18   and must be "based on the commercial concern of the antitrust laws rather than the economic

19   convenience of the parties to a lawsuit." *Flaa v. Hollywood Foreign Press Ass'n*, 2021 WL 1399297,

20   at *6 (C.D. Cal. Mar. 23, 2021), *aff'd*, 55 F.4th 680 (9th Cir. 2022); *W. Parcel Exp. v. United Parcel

21   Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1059 (N.D. Cal. 1998), *aff'd*, 190 F.3d 974 (9th Cir. 1999)

22   (rejecting market definition as unduly narrow). Interchangeability is particularly important in

23   pharmaceutical cases, where a relevant market analysis must begin with an assessment of clinical

24   alternatives. *See Mylan Pharm., Inc. v. Warner Chilcott Pub. Ltd.,* 838 F.3d 421, 436-37 (3d Cir.

25   2016). As such, courts assessing a market limited to the brand and generic version of a drug—as

26   here—have rejected such markets as unduly narrow. *See, e.g.*, *id*. at 436.

27         The jury will be instructed to consider consumer behavior—*i.e.*, whether consumers "would

28   switch" from Atripla and Truvada. Jury Instruction Nos. 12, 15. If so, then the other brand products

consumers "would switch" to, from Atripla and Truvada, are part of the Atripla and Truvada markets.

DEFENDANTS' SECOND MOTION  FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 3:19-CV-02573-EMC

*Id.*  Plaintiffs did not address interchangeability in their case-in-chief.  Their expert, Dr. Thomas McGuire, testified that his market definition analysis was limited to a *pricing* analysis—not an assessment of clinical alternatives or product quality.  *See* Trial Tr. 1644:13-1645:5; 1701:3-13 (Dr. McGuire).  This hardly satisfies Plaintiffs' burden.  *See Mylan*, 838 F.3d at 436-37.  Dr. McGuire also conceded that he did not conduct "any sort of analysis…that people may have switched from [Truvada or Atripla] to another [drug]."  Trial Tr. 1711:8-18 (Dr. McGuire).  Still more, Dr. McGuire testified that "*the evidence in this case indicates that [switching] would sometimes have happened.*"  *Id.* (emphasis added). Dr. McGuire's oversight is particularly concerning given his admission that, when it comes to market power, "[t]here are considerations other than price," such as product quality, product variety, product service, and innovation.  *Id.* 1701:17-22.

Faced with evidence that "consumers would switch" from Atripla to Truvada to some other drug, the jury "*must conclude* that the other [HIV] products are in the product market."  *See* Jury Instruction No. 15 (emphasis added).  Plaintiffs' silence on non-price effects and interchangeability is fatal to their claims because such evidence remains unrebutted in the trial record.  For instance, Dr. Craig Gibbs testified that, as of 2009, over 25 different HIV therapies were available to consumers.  Trial Tr. 567:3-11 (Dr. Gibbs); *see also* TX 307.  And most of those HIV therapies were developed by Gilead's competitors.  *See* Trial Tr. at 567:3-568:18 (Dr. Gibbs).

Plaintiffs' own corporate representatives also confirmed the broader universe of clinical alternatives available in the market.  Ms. Kim Le, Kaiser's representative, admitted that Truvada and Atripla were not the only HIV treatments available to people living with HIV.  Trial Tr. 495:24-496:2 (K. Le).  Dr. Mark Godwin of United testified that United actually *covered* other therapeutically equivalent drugs, including at least 10 different therapies, and that it was *common* for people living with HIV to switch to other HIV therapies.  *See* Trial Tr. 1504:18-1505:3; 1526:22-1527:7; 1532:6-17; 1536:18-1537:1; 1541:14-1542:8 (Dr. Godwin).  Dr. Godwin also admitted that United "determined Atripla to be therapeutically equivalent to [another HIV treatment] Symfi."  Trial Tr. 1540:2-1541:1 (Dr. Godwin); *see also* TX 3178.  And Mr. John Coleman of Florida Blue also testified that there are therapeutic alternatives to Atripla and Truvada.  *See* Trial Tr. 1964:23-1965:2; TX 3313.

DEFENDANTS' SECOND MOTION  FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 3:19-CV-02573-EMC

Plaintiffs' and their expert did not consider whether people living with HIV switched from Atripla and Truvada to one of the many other brand alternatives, which is a failure of proof.  *See Mylan*, 838 F.3d at 436-37.

Here, *Mylan Pharmaceutical v. Warner Chilcott* is particularly instructive.  *See* 838 F.3d 421. In *Mylan*, as here, the plaintiff alleged that "the relevant market consist[ed] of generic Doryx and name-brand Doryx and that, within [that] market, [the] [d]efendants allegedly maintained 100% of sales until generics entered."  *Id.* at 436.  The record in that case revealed that "health insurers and other managed care providers encouraged the widespread substitution of numerous other oral tetracyclines for Doryx," which made it apparent that other brands "were fully substitutable for Doryx."  *Id.*  The plaintiff also left unrebutted the fact that brand Doryx lost market share and sales before generic entry.  *See id.* at 437.  The Third Circuit was forced to accept the undisputed evidence at summary judgment—the existence of clinical brand alternatives and the loss of market share—and ultimately rejected the plaintiff's overly narrow brand-generic market.  *See id.*

The trial record in this case is similarly unrebutted on both the existence of brand alternatives and loss of market share.  A panoply of witnesses—both Plaintiffs corporate representatives and adverse fact witnesses that Plaintiffs chose to call in their case-in-chief—confirm that Atripla and Truvada had dozens of clinical alternatives.  And, as in *Mylan*, Dr. McGuire testified that Atripla and Truvada lost a significant amount of market share before generic entry—*over 90% loss of market share*.  Trial Tr. 1708:7-1710:4 (Dr. McGuire).  The unrebutted fact testimony in this case compels a similar conclusion.  The Court should reject Plaintiffs' unduly narrow brand-generic markets.

### 2. Plaintiffs Failed to Establish That Defendants Had Power Over any Market.

As a threshold matter, Dr. McGuire's market share calculations—that Gilead controlled 100% of the Atripla and Truvada brand-generic markets—are irrelevant because they are based on an unsupported market definition.  *See Rebel Oil*, 51 F.3d at 1434.  With a more realistic market definition, Gilead's market share is entirely inconsistent with market power.  For example, Dr. McGuire conceded that Gilead lost over 90% of market share for Atripla and Truvada prior to generic entry.  *See* Trial Tr. 1708:7-1710:4 (Dr. McGuire).

In evaluating market power, "it is not market share that counts, but the *ability to maintain market share.*" *See United States v. Syufy Enters.*, 903 F.2d 659, 665-66 (9th Cir. 1990) (emphasis added). In *Syufy*, the court held the decline of a defendant's market share from 93% to 75% in about three years evidenced lack of monopoly power. *Id.* Here, no matter what relevant market definition is used, Gilead's market share decline has been much more dramatic than in *Syufy*. *See* Trial Tr. (McGuire) 1708:7-1710:4. This is plainly inconsistent with market power.

Lastly, "[e]ven if [Defendants] ha[ve] a high market share, neither monopoly power nor a dangerous probability of achieving monopoly power can exist absent evidence of barriers to new entry or expansion." *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1154 (9th Cir. 1997); *see also Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997). "The ability to control output and prices—the essence of market power—depends largely on the ability of existing firms to quickly increase their own output in response to a contraction by the defendant. . . . [I]f rivals have idle plants and can quickly respond to any predator's attempt to raise prices above competitive levels, the predator will suffer an immediate loss of market share to competitors. In that instance, the predator does not have market power." *Rebel Oil*, 51 F.3d at 1441.

Plaintiffs did not provide any evidence that Gilead created barriers to new entry in the HIV therapies market. To the contrary, several witnesses testified that dozens of HIV therapies launched prior to generic entry. It is thus undisputed that new competitors have entered prior to generic entry, and Plaintiffs made no effort to rebut this evidence. *See supra* 4-5. The Court should find for Defendants as a matter of law that Plaintiffs have failed to prove market power by indirect evidence.

**B.  Plaintiffs Failed to Provide Sufficient Direct Evidence of Market Power.**

Plaintiffs also failed to offer sufficient *direct* evidence that Gilead had market power. To establish market power by direct evidence, Plaintiffs must establish that Gilead had "the ability to profitably raise or maintain prices, for a sustained period of time, above those that would be charged in a competitive market." Jury Instruction No. 13; *see, e.g., Hicks v. PGA Tour, Inc.*, 165 F. Supp. 3d 898, 908 (N.D. Cal. 2016), *aff'd in relevant part*, 897 F.3d 1109 (9th Cir. 2018) (antitrust laws are

implicated only if seller can "charge artificially high prices in a scenario where consumers have no reasonable opportunity to turn to another product").

Direct evidence is "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re Citric Acid Litig.*, 191 F.3d 1090, 1094 (9th Cir. 1999). Direct evidence of market power—*i.e.*, evidence that is explicit and requires no inference—is evidence that the defendant actually restricted output and raised prices above competitive levels. *Rebel Oil Co.*, 51 F.3d at 1434 ("If the plaintiff puts forth *evidence of restricted output and supracompetitive prices*, *that is direct proof* of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power.") (emphasis added); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1475 (9th Cir. 1997) ("Direct proof of market power may be shown by evidence of restricted output and supracompetitive prices. Such a showing is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power.") (quotation and citation omitted).

Plaintiffs failed to prove that Gilead priced drugs supra-competitively, or at an artificially high level. Dr. McGuire testified that he assumed the generic price of Atripla and Truvada is the competitive price for the purposes of market power. Trial Tr. 1610:6-18 (Dr. McGuire). As such, Dr. McGuire necessarily concludes that a brand company will always have market power before generic entry. But, at most, this evidence only suggests that brand drugs are priced higher than generic drugs, which is insufficient as a matter of law to prove market power. *See In re Intuniv Antitrust Litig.*, 496 F. Supp. 3d 639, 659 (D. Mass. 2020) (treating evidence of brand prices that are higher than generic prices "as sufficient to establish market power would result in finding that all pharmaceutical companies exercised monopoly power"); *Kaiser Found. v. Abbott*, 2009 WL 3877513, at *9 (C.D. Cal. Oct. 8, 2009) (similar); *Meijer, Inc. v. Barr Pharms., Inc.*, 572 F. Supp. 2d 38, 55–56 (D.D.C. 2008) (same); *In re Remeron Direct Purchaser Antitrust Litig.*, 367 F. Supp. 2d 675, 683–84 (D.N.J. 2005) (same).

Additionally, Dr. McGuire's testimony concerning Gilead's gross margins is insufficient direct evidence of market power as well. *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2018

WL 563144, at *12 ("Plaintiffs' evidence of high margins is insufficient direct evidence as a matter of law to demonstrate market power."); *Hicks*, 165 F. Supp. 3d at 908 (antitrust laws implicated only if seller can "charge artificially high prices in a scenario where consumers have no reasonable opportunity to turn to another product"). Indeed, even Dr. McGuire agreed that, as true here, there is "nothing wrong" with high gross margins drawn from a legitimate patent. Trial Tr. 1714:14-19 (Dr. McGuire).

Moreover, Plaintiffs never proved that Gilead restricted output in any market. If anything, the trial record shows the opposite. Defendants' witness, Mr. Gibbs, and Plaintiffs' corporate representatives testified that the HIV market was more expansive than just brand Atripla and Truvada. Many other brands were available to patients, and patients often switched from Atripla and Truvada to those drugs. The trial record is completely silent on restricted output. Absent proof of "higher prices" and an "accompanying showing of restricted output," there is no direct evidence of market power. *Forsyth*, 114 F.3d at 1476, 1478.

No reasonable jury could find for Plaintiffs on the threshold issue of market power, and Defendants are entitled to judgment as a matter of law on Plaintiffs' antitrust claims.

## II.    NO REASONABLE JURY COULD FIND THAT THE MFEP CLAUSE WAS A REVERSE PAYMENT.

Under the first step of the rule of reason, Plaintiffs also had the burden of showing that the Gilead-Teva settlement "produced significant anticompetitive effects." Jury Instruction No. 16. Such anticompetitive effects must "be of significant magnitude," meaning that they must "impair competition significantly." *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991). To meet that considerable burden, Plaintiffs advanced a reverse-payment theory whereby the settlement included a payment from Gilead to Teva to induce Teva to delay its entry into the market, thereby allowing Gilead to avoid generic competition. Jury Instruction Nos. 13, 16 ; *FTC v. Actavis*, 570 U.S. 136, 154, 156, 158 (2013). If Plaintiffs fail, the analysis stops here, and the jury must render a complete defense verdict. Verdict Form Question No. 2, ECF No. 1898. No reasonable jury could conclude that the MFEP clause amounted to a "reverse payment," and the Court should render judgment as a matter of law in Defendants' favor.

**A.     Plaintiffs Failed to Provide Sufficient Evidence That the MFEP Clause Was a Large and Unjustified Payment.**

According to Plaintiffs' opening statements to the jury, the MFEP clause constituted a large and unjustified payment from Gilead to Teva because it created contractual exclusivity worth hundreds of millions of dollars for Teva.  Trial Tr. at 269:9-270:12 (Sobol Opening) ("The settlement agreement explicitly says in it that Teva's date will be the earliest of September 30th, 2020, or six months before Gilead permitted anyone else, any other generic competitors, to sell.  The evidence will show that this grant of exclusivity payoff to Teva was hugely valuable to Teva.  And, in fact, worth the $600 million I've already spoken to you about.").   Plaintiffs' proof, however, is insufficient to support their allegations.

**1.     No Reasonable Jury Could Find That Teva Received Contractual Exclusivity.**

Plaintiffs surmised that Gilead's reverse-payment came in the form of the MFEP that allegedly created a 6-month period of valuable generic exclusivity for Teva and that delayed other generics' entries.  Joint Pretrial Conference Statement, ECF 1636 at 8.  But *all* witnesses questioned on the subject confirmed that the MFEP created no true exclusivity and left open many pathways for other generics to enter at the same time as Teva or even earlier.  At most, the settlement agreement gave Teva a "nonexclusive license," as emphasized by Mr. Pletcher.   Trial Tr. 777:23-25; *see also* TX2000.0007 (settlement grants a "non-exclusive license" to Teva).

Gilead's Former General Counsel Brett Pletcher, Teva's SVP and Chief IP Counsel Ms. Staci Julie, and Dr. McGuire actually disproved Plaintiffs' exclusivity theory by showing the multiple ways through which other generic manufacturers could circumvent the acceleration clause. *See, e.g.*, Trial Tr. at 718:20-23 (B. Pletcher) (settlement "did not have a provision [] that would block all ways for a generic to get on to the market").  First, the acceleration clause did not prevent other generic companies from litigating against Gilead to invalidate the FTC and Combination Patents.  For example, if Mylan (which continued to litigate after Teva settled) had invalidated Gilead's Patents, then all the other generics could have entered on the day of the final court decision invalidating the Patents, and Teva's

DEFENDANTS' SECOND MOTION  FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 3:19-CV-02573-EMC

entry would have been accelerated to that day.[1]   Dr. McGuire himself acknowledged that this eventuality represent "procompetitive benefits." Trial Tr. 1605:5-16.  Worse for Plaintiffs' exclusivity theory is the lack of at-risk launch accelerator in the Gilead-Teva settlement, which opened the door for any other generic to launch at risk *before* Teva's scheduled September 2020 entry.[2]   If other generics had launched at risk, Teva would have been "stuck waiting until September 30th of 2020," looking at those other generics taking over the entire generic market for themselves and leaving Teva crumb-sized market shares.   Trial Tr. 1752:16-18 (Dr. McGuire).[3]   Finally, notwithstanding the acceleration provision, Gilead had full right to license "multiple authorized generics."   Trial Tr. 1744:21-23 (Dr. McGuire) ("none of the terms in the agreement stopped Gilead from licensing multiple authorized generics").  In that case, Teva would not have entered earlier but *at the same time* as these authorized generics.[4]

Moreover, Plaintiffs' conflation between statutory and contractual exclusivity has been debunked in this trial.  Mr. Pletcher testified that Gilead cannot offer statutory exclusivity: only the FDA has that power.  Trial Tr. at 718:15-17; 734:2-5; 735:3-7.  He further explained, "The FDA has the ability to keep all generics from being able to come onto the market. . . . I, as Gilead, don't have the ability to create absolute exclusivity because there are ways that generic companies can come onto the market that I have no control over."  Trial Tr. 779:23-780:3.  Even Dr. McGuire conceded that point.  Trial Tr. 1756:2-7; 1745:20-21.

---

[1]   TX 2000.0003-4; Trial Tr. 721:23-722:2 (B. Pletcher) ("if somebody else invalidates the relevant patents, then Teva can come in earlier"); Trial Tr. 1569:13-15 (Dr. McGuire) ("[w]hat this clause means is that if Mylan were to win, Teva can move up and begin selling at the same time as Mylan").

[2]   TX 2000.0003-4; Trial Tr. 1020:4-8 (S. Julie) ("another generic could choose to litigate and launch the product before Teva would be able to get on market."); Trial Tr. 790:1-4 (B. Pletcher) (the "potential effect on the entry date for the at-risk launching generic" is that "That generic could be any time, long before or around the same time").

[3]   Notably, Plaintiffs consciously decided not to examine their regulatory expert Mr. Todd Clark about his opinions that at-risk launches are not a realistic option.

[4]   TX 2000.0003-0004; Trial Tr. 723:14-22 (B. Pletcher) ("Gilead might be able to give a license for a so-called authorized generic. If it does, Teva at least gets to come on the market at the same time as the authorized generic"); Trial Tr. 1750:11-13 (Dr. McGuire) (if Gilead licensed authorized generics, "the entry date could have been Teva and others at the same time").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 2.      Plaintiffs' Proof Depends on Unreliable Expert Testimony.

Even assuming Plaintiffs have presented sufficient evidence of contractual exclusivity, Plaintiffs have not established that such exclusivity was a large and unjustified payment.  Plaintiffs relied on their economic expert, Dr. McGuire, to quantify the value to Teva of the so-called contractual exclusivity, who testified to the jury that the contractual exclusivity was worth over $600 million. Trial Tr. 1588:9-11 (Dr. McGuire).  Expert testimony, however, must reflect "scientific knowledge," meaning that the findings must be "derived by the scientific method." *Pooshs v. Phillip Morris USA, Inc.*, 287 F.R.D. 543, 549 (N.D. Cal. 2012).  Dr. McGuire's testimony was not.

To value the MFEP, Dr. McGuire explained to the jury that he "used business documents from Gilead and Teva to forecast the value to Teva and came up with an evaluation of over $600 million." Trial Tr. 1588:9-11 (Dr. McGuire).  According to his testimony, he found that Teva forecasted $1.375 billion in revenue for 2020 and 2021 combined, during which Teva allegedly had contractual exclusivity for a 180-day period.  PDX 16.12; TX 5233; Trial Tr. 1580:15-1581:13 (Dr. McGuire). And he found that Teva forecasted $130 million in revenue for 2022 and 2023 combined, during which other generics entered the market.  *Id.*  And based on those two numbers alone, he testified that his methodology was "to infer that the value of the agreement to Teva was to move profits around that amount to around that amount."  Trial Tr. 1581:8-12 (Dr. McGuire).  And based on "mov[ing] profits around that amount to around that amount," Dr. McGuire concluded "$600 million is a—I think a reasonable estimate of what the contractual exclusivity does for Teva."  Trial Tr. 1581:8-12 (Dr. McGuire).

Not only that, Dr. McGuire admitted that the value this methodology (if it could be called one) did not acknowledge any probability of alternative paths for subsequent generics to enter the market at the same time as or earlier than Teva.  Trial Tr. 1581:13-1582:1 (Dr. McGuire).  That was because, according to Dr. McGuire, the possibility of other scenarios didn't warrant acknowledgment.  Trial Tr. 1582:22-24 (Dr. McGuire) ("If they're almost—almost certain to get it, or very likely to get it, then those are—that's a big deal for Teva in terms of expected profits.").

10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dr. McGuire's testimony is based on unreliable methodologies and fails to address contrary facts. *Pooshs*, 287 F.R.D at 549 (finding expert testimony that "did not use any generally accepted criteria or methodology to select which financial statistics to include or not include in his calculations" unreliable). Because Dr. McGuire's testimony that the MFEP created over $600 million in value to Teva is unreliable, Plaintiffs have failed to provide sufficient evidence that the Gilead-Teva settlement contained a large and unjustified payment. *See Weisgram v. Marley Co.*, 528 U.S. 440, 453 (2000) ("Inadmissible evidence contributes nothing to a 'legally sufficient evidentiary basis.'") (quotations omitted); *Johnson v. Am. Honda Motor Co., Inc.*, 923 F.Supp.2d 1269 (D. Mont. 2013) (striking unreliable expert testimony and granting defendant's judgment as a matter of law); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (recognizing that an expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").

3.    <strong>Plaintiffs Failed to Provide Substantial Evidence That Gilead Made a Profit Sacrifice.</strong>

Plaintiffs further failed to demonstrate that Gilead made a reverse-payment by foregoing royalties. Summary Judgment Order at 66 (setting out Plaintiffs' reverse-payment theories.[5] Mr. Pletcher confirmed that Gilead "didn't charge Teva anything" for the license. Trial Tr. 725:22-726:2. But Plaintiffs failed to elicit testimony from Mr. Pletcher to support the theory that Gilead sacrificed profits. Because Plaintiffs failed to provide sufficient evidence that Gilead made a profit sacrifice for the challenged acceleration provision in the settlement, Defendants are entitled to judgment as a matter of law on the Plaintiffs' reverse-payment claim. *See Rebel Oil Co. v. Atl. Richfield Co.*, 146 F.3d 1088, 1095 (9th Cir. 1998) (a company's choice of the less-profitable option is not a sacrifice).

B.    <strong>Plaintiffs Have Failed to Provide Sufficient Evidence That Gilead Offered the MFEP to Restore Teva's Forfeited Exclusivity.</strong>

Plaintiffs speculate, without any supporting evidence, that Gilead knew that Teva had forfeited its first-filer 180-day exclusivity under the Hatch-Waxman Act and agreed to restore it contractually in exchange for delay. But Gilead cannot see the future. In 2014, at the time of the settlement, Gilead

---

[5] Defendants move on this issue to preserve the issue for appeal.

11

could not predict with certainty whether the FDA would, four years later, determine that Teva had forfeited or not its eligibility to exclusivity. Even Teva could not know for sure. Given Gilead's lack of knowledge, it made total sense for Gilead to include in the settlement a 6-month acceleration provision roughly equal to the length of the 180-day statutory exclusivity to which Teva remained eligible. None of this exhibits any intention from Gilead to make a reverse payment to Teva.

As an initial matter, it is the FDA not Gilead that "makes the final forfeiture determination," as Dr. McGuire admitted. Trial Tr. 1757:23-1758-4. This makes sense. Determining forfeiture requires more than merely calculating 30 months from the date of a Paragraph IV certification. The FDA needs to assess whether any of the exceptions to forfeiture applies, and only then can the FDA make a determination. Trial Tr. 1758:5-13 (Dr. McGuire); 1899:23-1900:16 (T. Clark). And there was a potential exception here in need of FDA resolution. Plaintiffs' regulatory expert Todd Clark explained that one such exception to forfeiture occurs when there is a change in the brand company's label, requiring the generic company to refile a conforming label with the FDA. Trial Tr. 1901:10-14. He further confirmed that, because Gilead actually did make a change to its label of Truvada and Atripla, Teva would have been required to make a change in its label as well. Trial Tr. 1902:12-18, 1903:15-18, 1905:12-15 (T. Clark). But any delay caused by such submission from Teva to the FDA would not have been information available to Gilead, and so Gilead could not known whether Teva's submission could have excused Teva's failure to obtain tentative approval within 30 months. *Id.*

Because forfeiture has to wait until the FDA's formal determination, "[no]body really know[s] if there's been a forfeiture event until FDA decides there has been." Chopskie Dep. Tr. at 33:12-22. This included Gilead. Although Mr. Pletcher alluded that Gilead thought Teva "*may* have lost its 180 day exclusivity," Trial Tr. 738:21-739:1, he explained that Gilead had no actual insight into the discussions between the FDA and Teva. Trial Tr. 793:4-7. Gilead did not know for sure until 2018 when the FDA formally determined that Teva forfeited, *i.e.*, "approximately four years after [Gilead] settled the Teva litigation." Trial Tr. 793:23-24 (B. Pletcher).[6] Indeed, when the FDA issued its final

---

[6]   Mr. Pletcher's account is also corroborated by Ms. Julie, who testified that Teva did not initially know whether it had lost its first-filer status, and in any event, would not have shared this confidential information outside Teva. Trial Tr. 985:20-986:25.

approval for Teva's ANDA related to Truvada in 2017, the FDA specifically said that "[t]he Agency is not . . . making a formal determination at this time of Teva's eligibility for 180-day generic drug exclusivity."  TX 8002.0002.  The first definitive sign that the FDA had made a forfeiture decision only came on April 9, 2018, when the FDA granted final approval for Mylan's ANDA related to Truvada—a step it would not have taken had Teva maintained its exclusivity.  TX 1109.  But it was not until November 8, 2018, in the FDA's final approval letter for Teva's ANDA related to Atripla, that the FDA finally informed Teva, "[t]he Agency has determined . . . that Teva has forfeited its eligibility for 180-day exclusivity."  TX 5213.0002.

## III.   NO REASONABLE JURY COULD FIND THAT THE MFE CLAUSE WAS A REVERSE PAYMENT.

Although Dr. McGuire discussed the operation of the MFE provision, he did not testify that the MFE provision was a reverse payment.  Trial Tr. 1570:21-24 (Dr. McGuire) ("So that's a problem with the litigation option [referring to the hypothetical of Mylan litigating] whether or not this clause [referring to the MFE] exists.  Now, this clause definitely makes it worse, but it's not as if it's a great option in the first place.").  Nor did Dr. McGuire quantify the alleged anticompetitive effect of the MFE provision—in fact, Dr. McGuire testified that the MFE was pro-competitive.  Trial Tr. 1605:8-20 (Dr. McGuire) ("The potential procompetitive benefits is if Mylan proceeds to litigate and win, the provision allows Teva to come up earlier. . . . And that has a procompetitive effect.").  Plaintiffs have offered insufficient evidence that the MFE provision was a reverse payment, and Defendants are entitled to judgment as a matter of law on this issue.[7]

## IV.   NO REASONABLE JURY COULD FIND THAT THE MFE AND MFEP CLAUSES WAS EXCHANGED FOR DELAY.

Plaintiffs try to draw a causal connection between the MFE and MFEP clauses and Teva's approval of the September 30, 2020 entry date.  But they have presented no evidence to suggest that Teva was willing to accept a later September 2020 entry date as a quid pro quo for the acceleration

---

[7]   Like the MFEP, the MFE is an acceleration clause that allows for earlier entry, and thus cannot be a reverse payment as a matter of law.  *See, e.g.*, *In re Actos End Payor Antitrust Litig.*, 2015 WL 5610752, at *15 (S.D.N.Y Sept. 22, 2015), *rev'd on other grounds* 848 F.3d 89 (2d Cir. 2017) (dismissing challenge to acceleration provision).

provisions.  Instead, the trial testimony establishes that Gilead and Teva reached agreement on the acceleration provisions *only after* definitively agreeing on an entry date, and therefore agreed to the September 2020 entry date independently of the acceleration provisions.

For Gilead, Mr. Pletcher testified that "Gilead had no discussions with Teva, prior to agreeing on a date, as to what terms beyond the date it would be[.]"  Trial Tr. 727:10-14.  Rather, Mr. Pletcher insisted that Gilead and Teva "agreed on a date, and *then* we started talking about what the specific provisions of the rest of the agreement would be."[8]  Likewise, Teva viewed the settlement as a favorable resolution for the company based on its view of the strength of Gilead's patents and was ready to accept it regardless of the acceleration provisions.  Indeed, Teva's senior leadership, including its CEO, approved the decision to settle for an entry date of September 30, 2020, without conditioning approval on any acceleration provision.  TX 3258, TX 7471, TX 7929.  Additionally, Ms. Julie confirmed that the parties had no discussions about the "contractual exclusivity provision" before it was "put into the agreement," Trial Tr. 1184:25-1185:7, and that Gilead did not "promise anything in exchange for [Teva's] agreement to a 2020 settlement date," Trial Tr. 977:10-11.  Thus, she explained, "[w]hen we got the term sheet, we were pleasantly surprised."  Trial Tr. 1185:6-7.  No reasonable jury could conclude that Plaintiffs met their burden to demonstrate that Gilead exchanged the acceleration provision for a later entry date when there was *no* evidence of a connection between the two.

## V.    NO REASONABLE JURY COULD FIND AN ALTERNATIVE ENTRY DATE OF FEBRUARY 2018.

Even assuming the Plaintiffs have presented sufficient evidence for a reasonable jury to conclude that the acceleration clauses were a reverse payment (which they have not), Plaintiffs have presented no evidence at all to support an alternative entry date of February 2018.  In their opening statements, Plaintiffs represented to the jury that there are "two possibilities" in "a world where Gilead and Teva did not conspire and did not enter into this illegal scheme."  Trial Tr. at 302:4-10 (Poston Opening).  According to Plaintiffs, those two possibilities were (1) an alternative settlement without

---

[8]    Trial Tr. 730:4-6 (emphasis added); *see also* Trial Tr. 816:5-9 (confirming that "the parties, Gilead and Teva, agreed first and only to September 30, 2020, and, only after that, discussed and reached an agreement on the contractual exclusivity").

the alleged reverse payment, resulting in a May 2019 entry date, *see infra*, and (2) no settlement, with Teva winning the patent litigation and entering in February 2018 (along with other generics). Trial Tr. 302:21-25 (Poston Opening) ("So to complete the picture, in a law-abiding world, if the parties had continued their litigation through closing argument, Teva and the other generics could have entered in February of 2018.").[9] Plaintiffs even demonstrated this second, no-settlement alternative to the jury, and told the jury it would mean a delay of 32 months. Trial Tr. 303:1-3 (Poston Opening); IHPP Opening at 8.

Plaintiffs' proof, however, falls short. There is no evidence that would allow a reasonable jury to conclude that, in a world without the acceleration clauses, Teva would have litigated and successfully invalidated Gilead's patents in court, and thereby launch in February 2018.[10] Although Dr. McGuire opined in his expert report about a no-settlement scenario where Teva and other generics launch in February 2018, *see* McGuire Rep. ¶ 211 (June 23, 2022), he failed to offer any such testimony at trial. Instead, Dr. McGuire's testimony at trial rested solely on the theory of an alternative settlement, which he concludes results in an entry date of May 2019. Trial Tr. 1564:12-22 (Dr. McGuire) ("I conducted standard economic analysis of the positions of the parties in their bargaining, took away the payment in the form of contractual exclusivity, and asked what date would they have agreed on in this alternative. And the date was May 2019."). Dr. McGuire did not proffer any opinion on whether a rational company in Teva's shoes would have continued litigating against Gilead's patents, and he did not testify that Teva or any other generics would have entered in February 2018 but-for the acceleration clauses.[11]

---

[9]   Plaintiffs' statement is inaccurate, as testimony elicited during their case-in-chief demonstrates. In this no-settlement alternative, Teva would have needed to prevail in both the litigation over the FTC patents, as well as prevail in subsequent litigation over the combination patents (unless it opted for an at-risk launch). Trial Tr. 961:14-962:4 (S. Julie).

[10]   Indeed, Plaintiffs have offered no scientific expert testimony that the combination patents were invalid. *See infra.*

[11]   In fact, the only instances Dr. McGuire mentioned February 2018 at all were in the context of discussing a hypothetical litigation by Mylan, Trial Tr. 1568:10-16 (Dr. McGuire), and in the context of discussing rows in his alternative settlement model—which he concluded results in a May 2019 entry date, Trial Tr. 1678:13-16 (Dr. McGuire). Neither context is relevant to the no-

1

2              Nor did any of Plaintiffs' other witnesses so testify.  For example, Plaintiffs' regulatory

3    experts—Jon Clark and Todd Clark—testified only as to whether Teva and some other generics would

4    be able to obtain FDA approval and have the commercial capacity to launch by February 2018.  Trial

5    Tr. 1808:22-25 (J. Clark) ("I concluded that, yes, there were several generic applications that could

6    have—that had pathways to get approval as soon as January 26, 2018, provided they wanted to get

7    that approval."); Trial Tr. 1871:5-7 (T. Clark) ("I also looked at it to see whether the generic drugs

8    were able to go to market, which means were they capable of producing and distributing the products

9    at an earlier point.").  Neither independently arrived at the February 2018 date; they were instructed

10   by counsel to assume the date based on a but-for world where Teva litigates and prevails.  Trial Tr.

11   1809:1-4 (J. Clark) ("Q.  What is the significance of January 26, 2018?  A.  The significance to me,

12   personally was that counsel gave me that date.  But I also understand that it coincides with some patent

13   expirations."); Trial Tr. 1868:24-1869:5 (T. Clark) (similar).

14             In fact, the witness testimony shows the opposite.  Ms. Julie testified that an entry date of

15   September 2020 "was the best date that was possible to get under any circumstance," and that it

16   therefore made more sense to settle for that entry date than to continue litigating against Gilead's

17   Orange Book-listed patents.  Trial Tr. 1097:13-23.  Moreover, Dr. McGuire testified that, "for

18   September of 2020, the gains compared to litigation are positive for both parties."  Trial Tr. 1682:6-8.

19   Thus, Dr. McGuire's model itself shows that it would not have made sense for either party to continue

20   to litigate rather than to agree to a settlement.

21             Plaintiffs have not presented sufficient evidence to prove a no-settlement but-for world where

22   Teva would have litigated and successfully invalidated the FTC patents and the combination patents.

23   *See In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 167 (3d Cir. 2017).

24   Accordingly, Defendants are entitled to judgment as a matter of law with respect to any theory of delay

25   based on a February 2018 alternative entry date.  As a result, the Court should strike all testimony

26   provided by Plaintiffs' damages experts based on a February 2018 alternative entry date.

27
_____

28   settlement alternative, and in neither context did McGuire testify that Teva or any other generics
     would enter in February 2018.

1

2

## VI.    NO REASONABLE JURY COULD FIND THAT GILEAD AND TEVA WOULD HAVE AGREED TO AN ENTRY DATE EARLIER THAN SEPTEMBER 2020.

3

4

### A.    Plaintiffs' Alternative Settlement with an Earlier Entry Date Depends on Unreliable Patent Strength Assumptions.

5

6

Plaintiffs' theory that Gilead and Teva would have agreed to an alternative settlement with an

7

earlier entry date also suffers from a failure of proof.  Plaintiffs rely on the testimony of Dr. McGuire

8

to calculate an earlier alternative entry date in the "but-for" world involving an alternative settlement.

9

Dr. McGuire admits that his opinion about a May 2019 alternative entry date relies on Mr. Lentz's

10

testimony as to the strength of Gilead's patents.  Trial Tr. 1599:14-19 (McGuire Direct) ("Q.  And in

11

reaching that conclusion, what did you assume as to the strength of the patents?  A.  With respect to

12

the strength of the patents, I assumed that the jury, after hearing all the evidence, would decide that

13

the strength of the patents were as concluded by Mr. Lentz.").  Mr. Lentz's testimony—and the

14

strength he assigns to Gilead's patents—is unreliable and inconsistent with case facts.[12]

### 1.    Plaintiffs Have Failed to Provide Sufficient Evidence That Teva Would Have Invalidated the FTC Patents.

15

Mr. Lentz admitted that Gilead's issued patents were presumed valid and Teva had to

16

overcome that presumption with clear and convincing evidence.  Trial Tr. 1346:25-1347:18.  Mr.

17

Lentz further testified that "[g]iven what the examiner's understanding was, the examiner was right to

18

allow those cases to go to issuance, the '245 and the '396," Trial Tr. 1346:3-19, and Plaintiffs failed

19

to adduce any evidence that "the examiner's understanding" in issuing the FTC patents was factually

20

or legally wrong.  Mr. Lentz admitted that, at the FTC trial, Teva's only defense was its argument that

21

the FTC patents were invalid for non-statutory double patenting.  Trial Tr. 1349:22-25.  But Plaintiffs

22

failed to offer any evidence that would enable the jury to conclude that Teva would have carried its

23

non-statutory double patenting defense with clear and convincing evidence.  In fact, Mr. Lentz could

24

25

26

27

28

---

[12]    Documentary evidence shows that Teva's in-house legal team advised Teva executives about the wisdom of a potential settlement in light of Teva's low odds of overcoming both the FTC Patents and the Combination Patents.  TX 3258; 7462.  Ms. Julie testified that Fred Killion—who at the time was Teva's head of generic medicine legal support—calculated that Teva had only a 17.5% chance of overcoming both sets of patents.  Trial Tr. 899:11-14, 1083:1-16.  She explained that Mr. Killion's calculation assumed a 50% chance of overcoming the FTC Patents, multiplied by a 30-40% (or 35%) chance of overcoming the Combination Patents.  Trial Tr. 1083:10-17.

17

not think of even one "enantiomer case" where a patent challenger carried its burden and where "the patent was invalidated in a United States litigation." Trial Tr. 1461:17-20.

To win on a non-statutory double patenting defense, a patent challenger must show that the *claims* of the later patents are not patentability distinct from the *claims* of the earlier patent. *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 689 F.3d 1368, 1376-77 (Fed. Cir. 2012). Mr. Lentz provided no such claim-by-claim analysis. Instead, he blurred the lines between the claims and the specification of the earlier patent, offering only a simplistic analogy to a pair of gloves. *See* Trial Tr. 1296:7-10. But Mr. Lentz admitted that his demonstrative image of gloves showed the gloves already separated, whereas a racemic mixture is just that—a "mix of 50 percent of each" of the negative and positive enantiomers. Trial Tr. 1434:4-20. Mr. Lentz further admitted that his gloves analogy "does not reflect any purity limitations," and indeed that it is "not a perfect analogy." Trial Tr. 1436:1-4. Critically, though, Mr. Lentz did not provide any evidence *beyond* his gloves analogy—any claim-by-claim comparison of the reference patents against the FTC patents—upon which the jury could rely to conclude that Teva would have invalidated the FTC patents on double patenting grounds.[13]

Moreover, Mr. Lentz admitted that in an opinion that issued during the FTC litigation, the *Teva Neurosciences* case, Teva took factual and scientific positions contradictory to the positions they were asserting before Judge Sullivan. Trial Tr. 1448:20-1449:7. Mr. Lentz admitted that a reasonable party in Teva's shoes would have considered the *Teva Neurosciences* case as a negative factor in Teva's chances of success in the FTC litigation. Trial Tr. 1451:23-1452:4 ("If I were the trial lawyer for counsel in the Teva case, representing Teva, I would rather not have had this case come down at

---

[13] The testimony of Ms. Julie showed that—upon assessment of the completed FTC trial—Teva believed its odds of prevailing in the FTC litigation were *at most* 50%. Trial Tr. 971:4-973:14. Ms. Julie testified that she did not recommend "rolling the dice" on continued litigation of the FTC patents. Trial Tr. 1011:25-1012:13.

The Plaintiffs here also failed to undermine the strength of Gilead's expert witnesses' testimony in the FTC litigation. Dr. Caldwell, Plaintiffs' expert in pharmacology and stereochemistry, testified that Dr. Davies, Gilead's expert chemist in the underlying litigation, "is a scientist of considerable repute" who has "most certainly" "contributed a great deal to the field." Trial Tr. 1230:21-23, 1231:7-10. Dr. Caldwell also testified—and there is no dispute that—Judge Sullivan would have needed to consider Dr. Davies' testimony in the FTC litigation. Trial Tr. 1232:25-1233:6.

DEFENDANTS' SECOND MOTION  FOR JUDGMENT AS A MATTER OF LAW
CASE NO. 3:19-CV-02573-EMC

that time."). Mr. Lentz's opinions about the FTC Patents are flawed and cannot constitute reliable expert testimony.

### 2. Plaintiffs Have Failed to Provide Sufficient Evidence That Teva Would Have Invalidated the Combination Patents.

Plaintiffs failed to present evidence to support Mr. Lentz's assumptions about the strength of the Combination Patents. The Combination Patents were presumptively valid, Trial Tr. 1346:25-1347:18 (E. Lentz), and they would have prevented Teva from launching a generic version of Truvada until 2024, unless Teva was willing to launch at-risk, Trial Tr. 961:14-962:4 (S. Julie). Rather than addressing the science behind pharmaceutical combinations head on, Plaintiffs sidestepped all scientific issues in their case-in-chief. Notably, Plaintiffs consciously decided not to call Dr. Raj Suryanarayanan—their scientific expert in the field of pharmaceutical combinations—who was on their final witness list. ECF No. 1864 at 20.

Instead, Plaintiffs exclusively relied on Mr. Lentz's testimony to prove that the Combination Patents were invalid. As Mr. Lentz testified, whether a patent is obvious based on prior art and whether patent claims are enabled are questions assessed from the perspective of the person of ordinary skill in the art. Trial Tr. 1280:13-16; 1339:16-24. However, Mr. Lentz is no scientific expert. Indeed, Mr. Lentz admitted that he does not even have the relevant knowledge to opine on whether the Combination Patents were obvious or enabled; nor does he even qualify as a person of ordinary skill in the art. Trial Tr. 1276:12-16. Mr. Lentz also failed to consult any "scientific experts whatsoever" that could have provided any credence to "[his] opinion about the Combination Patents." Trial Tr. 1366:18-1367:4; 1425:1-10. He further failed to review any patent claims covering generic versions of Atripla—"the invention of the combination of efavirenz, emtricitabine, and TDF"—and thus could not offer an opinion on the validity of those claims. Trial Tr. 1430:4-9.[14] Mr. Lentz's opinions about the Combination Patents, which is both flawed and lacks scientific support, cannot constitute reliable

---

[14] Ms. Julie, on the other hand, testified that she believed Teva's odds of defeating the Combination Patents were only 30-40%. Trial Tr. 961:14-22; 973:15-975:12. She reasoned that the Patent Office considered the same prior art that Teva would have relied upon to challenge the Combination Patents in subsequent litigation, rejected that prior art, and ultimately issued the Patents with narrower claims that sufficiently differentiated them from their European equivalents that were invalidated by the European Patent Office. Trial Tr. 974:15-21; 1021:23-1024:18.

expert testimony.  And because Dr. McGuire offered no opinion about an alternative entry date if Mr. Lentz's testimony about the strength of the Combination Patents is wrong,[=] no reasonable jury can find that the Gilead and Teva would have agreed to an alternative entry date earlier than September 2020.  Trial Tr. 1670:21-24 (Dr. McGuire) ("Q.  You made no changes in your Excel sheet to the odds he gave you concerning the combination patents, the 85 percent and the 95 percent; correct?  A.  Correct.").

### B. Dr. McGuire's Expert Testimony Is Unreliable.

Beyond just the unreliable inputs from Mr. Lentz,[15]  Dr. McGuire's testimony to the jury about his alternative settlement model is also unreliable.[16]  Dr. McGuire told the jury that he "created an Excel spreadsheet and used that to characterize the profits to companies in the position of Teva and Gilead, with alternative entry dates, and found the date that they would share the profits in the same fashion as they shared in the actual world."  Trial Tr. 1598:17-21 (Dr. McGuire).  But Dr. McGuire never presented the Excel spreadsheet—containing 60 tabs—to the jury during his direct examination.  Trial Tr. 1668:9-19 (Dr. McGuire) ("Q.  Okay. And you did not show any of those -- the underlying data or the spreadsheets during your testimony on direct; right?  A. I did not.").  In fact, the jury only ever saw two snapshots of his excel model, one showing inputs he assumed directly from Mr. Lentz and the other showing the output of his model.  Trial Tr. 1664:1-7 (Dr. McGuire) (showing Attachment E.1); Trial Tr. 1771:11-22 (Dr. McGuire) (showing Attachment E.4).  Dr. McGuire never explained to the jury the steps in between, such as how he "characterize[d]" the profits to companies in Teva and Gilead's positions," *see* McGuire Rep. Att. E.2, E.3, or any of the other numerous tabs that constituted his Excel model.

Nor did Dr. McGuire explain, during his direct examination, how he concluded that May 2019 was the appropriate alternative entry date—indeed, he even admitted as much.  Trial Tr. 1668:20-

---

[15]  Relatedly, Dr. McGuire offered no opinion about an alternative entry date if Teva's chances of success reflected Ms. Julie's testimony, and so his testimony is unreliable because it conflicts with case evidence.

[16]  To the extent Dr. McGuire relies on an inference that any reverse payment results in a delay, Trial Tr. 1564:7-11, such an inference is inconsistent with *Actavis*.  *See* ECF 1704, at 9.

1669:1 (Dr. McGuire) ("Q. Okay. So, basically, what you did is you said, 'I've got a spreadsheet, I've done this analysis, and that spreadsheet leads me to the but-for entry date that would have been May of 2019 if one were to plug in Mr. Lentz's assessment of Teva's chances of success.' Do I have that accurate? A. That's okay."). And only upon redirect—when Plaintiffs' counsel asked Dr. McGuire to "assume that the parties would split the gains from settlement in the alternative bargaining without the payment in the same way that they split them . . . in the actual world"—did Dr. McGuire offer that "you get the same proportional split between Gilead and Teva at May 2019." Trial Tr. 1773:18-24 (Dr. McGuire). Dr. McGuire neither offered the assumption about a constant gain-split as his opinion, nor did he ever provide the jury any basis for this assumption that was proffered by Plaintiffs' counsel. *See Stephens v. Union Pac. Railroad Co.*, 935 F.3d 852 (9th Cir. 2019) ("Expert testimony cannot create a genuine issue of material fact if it rests on assumptions that are not supported by evidence.").[17] Because Dr. McGuire's model is unreliable, Plaintiffs have failed to provide sufficient evidence that Teva would have entered in May 2019 (or any earlier date) in the "but-for" world.

## VII. NO REASONABLE JURY COULD FIND THAT THE GILEAD-TEVA SETTLEMENT DELAYED OTHER GENERICS' ENTRY.

In the real world, the Gilead-Teva settlement facilitated *earlier* entry by incentivizing other generic companies to convert their patent certifications from Paragraph III to Paragraph IV, to litigate against Gilead, and to secure earlier entry dates rather than wait out until patent expiry in 2024 as they had initially intended to do by filing Paragraph III certifications.[18] These other generic manufacturers

---

[17] Moreover, Dr. McGuire agreed that in the "but-for" world, his model shows that both Gilead's and Teva's gains compared to litigation are positive for a September 2020 entry date. Trial Tr. 1680:1-6 (Dr. McGuire). His only explanation for why rational parties would not settle for a September 2020 entry date, even without the alleged reverse payment, was that "if you take out the payment, Gilead is going to be willing to go earlier and Teva is going to want to go earlier." Trial Tr. 1772:11-17 (Dr. McGuire). That explanation is entirely conclusory, and McGuire has failed to present any reliable methodology to show that September 2020 is not a possible alternative entry date. Without such proof, McGuire cannot show that the alleged reverse payment actually delayed Teva's entry, as September 2020 is also the entry date in the actual settlement.

[18] Trial Tr. 804:8-25 (B. Pletcher) (other generics converted to Paragraph IV because they saw "that others are going to get in before the patent expires, and they want[ed] to get in before the patent expires as well"); *see Actos*, 2015 WL 5610752, at *48-49 (declining to treat an acceleration clause as potentially anticompetitive in part because a later generic challenger had continued to litigate against the patents owners after the first-filer settlement).

were free to refuse Gilead's proposed settlement and seek early entry by launching at risk before or after invalidating Gilead's patents. Trial Tr. 740:10-16 (B. Pletcher) ("Cipla lawyers . . . could see that there would be other paths to get there").[19] And nothing in the Gilead-Teva settlement prevented Gilead from offering dates that were within less than six months after Teva's scheduled September 2020 entry date. TX 2000.

Plaintiffs attempt to establish antitrust injury by proving that other generic manufacturers would have obtained earlier license entry dates in a but-for world without the alleged reverse payment. Jury Instruction No. 19; *see Wellbutrin*, 868 F.3d at 143. Plaintiffs' evidence that Gilead would have offered the other generics a license with the same alternative entry date as Teva depends on Dr. McGuire's testimony. Dr. McGuire testified that "it's not that big a deal to offer them the same date, because Teva is already in there, the generic waterfall has already started, so why not give them the same date." Trial Tr. 1603:12-14 (Dr. McGuire). That assumption ignores case evidence showing that some generics never planned to litigate against Gilead, and thus had different bargaining positions than Teva. TX 2028.0003 ("We are certainly eager to settle the case as quickly as possible. At this point of time at least, we do not intend to go for litigation or file an IPR with respect to the relevant patents for the products being herein disuccsed [sic]."). Plaintiffs have not offered sufficient evidence to show that other generics would have been offered the same entry date as Teva in the but-for world, and thus no reasonable jury could find that those other generics were delayed by the Gilead-Teva settlement. *see Wellbutrin*, 868 F.3d at 143.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' motion for judgment as a matter of law.

---

[19] "Not all generics are willing to settle," and this is something Gilead does not "control." Trial Tr. 724:21-22, 17-18, 21-22 (B. Pletcher). Many generics are actually "quite aggressive, and so it would be very difficult [for Gilead], while . . . litigating with these companies, to know what they're ultimately going to do." Trial Tr. 781:8-16 (B. Pletcher). Indeed, Mr. Patel of Cipla testified he could "think of examples where even after the first filer settles [with an acceleration clause], Cipla continues to litigate." Patel Dep. Tr. 162:25-163:3.

1

2

3    Dated: June 20, 2023                          **KIRKLAND & ELLIS LLP**

4                                        By:    _/s/ Devora W. Allon_
5                                              Jay P. Lefkowitz, P.C. (*pro hac vice*)
                                               Devora W. Allon, P.C. (*pro hac vice*)
6                                              KIRKLAND & ELLIS LLP
                                               601 Lexington Avenue
7                                              New York, New York 10022
                                               Tel: (212) 446-4800
8                                              lefkowitz@kirkland.com
                                               devora.allon@kirkland.com
9
                                               James F. Hurst, P.C. (*pro hac vice*)
10                                             Kevin T. Van Wart, P.C. (*pro hac vice*)
                                               Kevin M. Jonke (*pro hac vice*)
11                                             KIRKLAND & ELLIS LLP
                                               300 North LaSalle
12                                             Chicago, Illinois 60654
                                               Tel: (312) 862-2000
13                                             james.hurst@kirkland.com
                                               kevinvanwart@kirkland.com
14                                             kevin.jonke@kirkland.com

15                                             Michael J. Shipley (SBN 233674)
16                                             KIRKLAND & ELLIS LLP
                                               555 South Flower Street
17                                             Suite 3700
                                               Los Angeles, California 90071
18                                             Tel: (213) 680-8400
                                               michael.shipley@kirkland.com
19
20                                             Bart H. Williams (SBN 134900)
                                               Susan L. Gutierrez (SBN 273980)
21                                             Christina Maria Assi (SBN 311992)
                                               PROSKAUER ROSE LLP
22                                             2029 Century Park East, Suite 2400
                                               Los Angeles, California 90067
23                                             Tel: (310) 557-2900
                                               bwilliams@proskauer.com
24                                             sgutierrez@proskauer.com
                                               cassi@proskauer.com
25
26                                             *Counsel for Defendants*
                                               *Gilead Sciences, Inc., Gilead Holdings, LLC, Gilead*
27                                             *Sciences, LLC, and Gilead Sciences Ireland UC*

28

Dated: June 20, 2023                By:   **GOODWIN PROCTER LLP**

*/s/ Christopher T. Holding*
CHRISTOPHER T. HOLDING (pro hac vice)
CHolding@goodwinlaw.com
DARYL L. WIESEN (pro hac vice)
DWiesen@goodwinlaw.com
JOSEPH ROCKERS (pro hac vice)
jrockers@goodwinlaw.com
MOLLY R. GRAMMEL (pro hac vice)
MGrammel@goodwinlaw.com
TUCKER DEVOE (pro hac vice)
TDeVoe@goodwinlaw.com
JORDAN BOCK (SBN 321477)
JBock@goodwinlaw.com
100 Northern Avenue
Boston, MA 02210
Telephone: (617) 570-1000
Facsimile:  (617) 523-1231

BRIAN T. BURGESS (pro hac vice)
BBurgess@goodwinlaw.com
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
Telephone: (202) 346-4000
Facsimile:  (617) 523-1231

ARIEL ROGERS
ARogers@goodwinlaw.com
GOODWIN PROCTER LLP
601 Marshall Street
Redwood City, CA 94063
Telephone: (650) 752-3100
Facsimile: (650) 853-1038

*Attorneys for Defendant*
*Teva Pharmaceuticals USA, Inc.*

## **FILER'S ATTESTATION**

Pursuant to Civil L.R. 5-1(h)(3), regarding signatures, I, Devora W. Allon, attest that concurrence in the filing of this document has been obtained.

*/s/ Devora W. Allon*
Devora W. Allon

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

On June 20, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all persons registered for ECF.  All copies of documents required to be served by Fed. R. Civ. P. 5(a) and L.R. 5-1 have been so served.

*/s/ Devora W. Allon*_____
Devora W. Allon