UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE HIV ANTITRUST LITIGATION

Case No. 19-cv-02573-EMC

**CLOSING JURY INSTRUCTIONS**

**CLOSING JURY INSTRUCTIONS**

**JURY INSTRUCTION NO. 1**

Members of the jury: Now that you have heard all the evidence, it is my duty to instruct you on the law that applies to this case. A copy of these instructions will be sent to the jury room for you to consult during your deliberations.

It is your duty to weigh and to evaluate all the evidence received in the case and, in that process, to decide the facts. It is also your duty to apply the law as I give it to you to the facts as you find them, whether you agree with the law or not. You must decide the case solely on the evidence and the law. Do not allow personal likes or dislikes, opinions, prejudices, sympathy, or bias, including unconscious biases, influence you. Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention. Like conscious bias, unconscious bias, too, can affect how we evaluate information and make decisions. You should also not be influenced by any person's race, color, religion, national ancestry, or gender, sexual orientation, profession, occupation, celebrity, economic circumstances, or position in life or in the community. Do not be afraid to examine any assumptions you or other jurors have made which are not based on the evidence presented at trial. You will recall that you took an oath promising to do so at the beginning of the case.

You must follow all these instructions and not single out some and ignore others; they are all important. Please do not read into these instructions or into anything I may have said or done any suggestion as to what verdict you should return – that is a matter entirely up to you.

United States District Court
Northern District of California

**JURY INSTRUCTION NO. 2**

**BURDEN OF PROOF – PREPONDERANCE OF THE EVIDENCE**

When a party has the burden of proving any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

# JURY INSTRUCTION NO. 3

## WHAT IS EVIDENCE

The evidence you are to consider in deciding what the facts are consists of:

    (1) the sworn testimony of any witness;

    (2) the exhibits that are admitted into evidence;

    (3) any facts to which the lawyers have agreed; and

    (4) any facts that I have instructed you to accept as proved.

# JURY INSTRUCTION NO. 4

## WHAT IS NOT EVIDENCE

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

(1) Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

(2) Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

(3) Testimony that is excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered. In addition some evidence was received only for a limited purpose; when I have instructed you to consider certain evidence only for a limited purpose, you must do so and you may not consider that evidence for any other purpose.

(4) Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

United States District Court
Northern District of California

**JURY INSTRUCTION NO. 5**

**DIRECT AND CIRCUMSTANTIAL EVIDENCE**

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is proof of one or more facts from which you could find another fact.  You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

# JURY INSTRUCTION NO. 6

## CREDIBILITY OF WITNESSES

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

    (1) the opportunity and ability of the witness to see or hear or know the things testified to;

    (2) the witness's memory;

    (3) the witness's manner while testifying;

    (4) the witness's interest in the outcome of the case, if any;

    (5) the witness's bias or prejudice, if any;

    (6) whether other evidence contradicted or corroborated the witness's testimony;

    (7) the reasonableness of the witness's testimony in light of all the evidence; and

    (8) any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

Your evaluation of witness testimony should not be influenced by any prejudice or bias,

including unconscious bias.

The parties have agreed to certain facts (listed below). You must therefore treat these facts as having been proved.

1. In 1991 and 1992, Gilead entered into a license agreement with the Institute of Organic Chemistry and Biochemistry of the Academy of Sciences in Prague, Czechoslovakia, and the Rega Institute for Medical Research in Leuven, Belgium, under which Gilead was granted an exclusive license to a portfolio of acyclic nucleotide phosphonates, which included a license for tenofovir.

2. On January 23, 2003, Gilead acquired Triangle Pharmaceuticals, Inc., which had a portfolio of drugs in development that included emtricitabine ("FTC") and had exclusive licenses from Emory University, which owned the patents over FTC, to develop and manufacture pharmaceuticals that included FTC.

3. Gilead listed U.S. Patent No. 6,642,245 ("the '245 patent") and U.S. Patent No. 6,703,396 ("the '396 patent") in the FDA publication "Approved Drug Products with Therapeutic Equivalence Evaluations" (the Orange Book) as patents covering Truvada and Atripla.

4. The claims of the '245 and '396 patents cover, among other things, FTC, which is one of the active ingredients in Truvada and Atripla.

5. The '245 patent had an expiration date of November 4, 2020, which pediatric exclusivity associated with the patent extended to May 4, 2021.

6. The '396 patent had an expiration date of March 9, 2021, which pediatric exclusivity associated with the patent extended to September 9, 2021.

7. Teva filed an ANDA for a generic version of Truvada containing Paragraph IV certifications on or about September 26, 2008.

8. Gilead filed patent infringement litigation against Teva under 35 U.S.C. §271(e) alleging that Teva's ANDAs for a generic version of Truvada and a generic version of Atripla infringed the '245 patent and the '396 patent, among others.

9. Gilead's patent litigation asserting the '245 and '396 patents against Teva triggered

1    a 30-month stay before the FDA could grant final approval for Teva's ANDAs for a generic

2    version of Truvada and a generic version of Atripla.

3        10.    In Gilead's lawsuit asserting the '245 and '396 patents, Teva stipulated that its

4    generic version of Truvada and generic version of Atripla infringe claims of the '245 and '396

5    patents, if those claims are valid.

6        11.    On October 7, 2013, the U.S. Patent and Trademark Office issued a notice of

7    allowance for the application that became U.S. Patent No. 8,592,397 ("the '397 patent"). The

8    expiration date for the '397 patent is January 13, 2024.

9        12.    The '397 patent, and other patents that were later granted to Gilead, included

10    claims covering, among other things, the formulation of active and inactive ingredients for

11    Truvada and/or Atripla and the stability of this formulation over time.

12        13.    Gilead listed the '397 patent and other patents with claims covering the

13    formulation of active and inactive ingredients of Truvada and Atripla in the Orange Book for those

14    drugs.

15        14.    The trial over the '245 and '396 patents occurred in October 2013, post-trial

16    briefing occurred thereafter, and the closing arguments were scheduled to be held in February

17    2014.

18        15.    In early February 2014, before closing argument occurred and before the District

19    Court ruled on the validity of the '245 and '396 patents, Gilead and Teva negotiated an agreement

20    in principle that settled Gilead's ongoing patent litigation with Teva about the '245 and '396

21    patents and included a limited license to other patents, including the '397 patent.

22        16.    The Gilead-Teva settlement and license agreement provided Teva with a license to

23    these patents with a license effective date ("LED") that permitted Teva to start selling its generic

24    version of Truvada and generic version of Atripla in the United States no later than September 30,

25    2020.

26        17.    Teva failed to obtain tentative FDA approval of its generic Truvada ANDA within

27    thirty (30) months of the date its ANDA was filed.

28        18.    Teva forfeited its 180 days of regulatory exclusivity for its generic Truvada

product.

18a.    Teva failed to obtain tentative FDA approval of its generic Atripla ANDA within thirty (30) months of the date its ANDA was filed.

19.    Teva forfeited its 180 days of regulatory exclusivity for its generic Atripla product.

20.    Teva has stipulated that, at the time of the 2014 Atripla and Truvada settlement, Teva did not have a reasonable basis to believe that Teva's failure to obtain tentative approval within 30 months was related to the filing of a citizen petition or caused by a change in or review of the requirements for approval imposed after the date on which Teva's Atripla and Truvada ANDAs were filed.

21.    Teva has stipulated that, between January 1, 2018 and September 30, 2020, Teva possessed and/or would have had access to sufficient raw materials, equipment, and facilities to manufacture sufficient launch quantities of its generic version of Truvada and generic version of Atripla to supply the United States market.

22.    Teva has stipulated that, between January 1, 2018 and September 30, 2020, Teva would have had the ability to manufacture sufficient launch quantities of its generic version of Truvada and generic version of Atripla to supply the United States market.

23.    Before any court ruled on the validity of any of the challenged Truvada and Atripla patents, all litigation between Gilead and generic manufacturers seeking to introduce generic versions of Atripla or Truvada was settled.

## JURY INSTRUCTION NO. 8

### CHARTS AND SUMMARIES RECEIVED AND NOT RECEIVED IN EVIDENCE

During trial, certain charts and summaries were shown to you to help explain the contents of books, records, documents, or other evidence in the case. Some of those charts or summaries came into evidence, while others did not. Charts and summaries are only as good as the underlying evidence that supports them. You should, therefore, give them only such weight as you think the underlying evidence deserves.

# JURY INSTRUCTION NO. 9

## EVIDENCE IN ELECTRONIC FORMAT

Those exhibits received in evidence that are capable of being displayed electronically will be provided to you in that form, and you will be able to view them in the jury room. A computer, projector, printer and accessory equipment will be available to you in the jury room.

A court technician will show you how to operate the computer and other equipment; how to locate and view the exhibits on the computer; and how to print the exhibits. You will also be provided with a paper list of all exhibits received in evidence. You may request a paper copy of any exhibit received in evidence by sending a note through the clerk.) If you need additional equipment or supplies or if you have questions about how to operate the computer or other equipment, you may send a note to the clerk, signed by your foreperson or by one or more members of the jury. Do not refer to or discuss any exhibit you were attempting to view.

If a technical problem or question requires hands-on maintenance or instruction, a court technician may enter the jury room with the clerk present for the sole purpose of assuring that the only matter that is discussed is the technical problem. When the court technician or any nonjuror is in the jury room, the jury shall not deliberate. No juror may say anything to the court technician or any nonjuror other than to describe the technical problem or to seek information about operation of the equipment. Do not discuss any exhibit or any aspect of the case.

The sole purpose of providing the computer in the jury room is to enable jurors to view the exhibits received in evidence in this case. You may not use the computer for any other purpose. At my direction, technicians have taken steps to ensure that the computer does not permit access to the Internet or to any "outside" website, database, directory, game, or other material. Do not attempt to alter the computer to obtain access to such materials. If you discover that the computer provides or allows access to such materials, you must inform the court immediately and refrain from viewing such materials. Do not remove the computer or any electronic data [disk] from the jury room, and do not copy any such data.

# JURY INSTRUCTION NO. 10

## FEDERAL ANTITRUST LAW, STATE ANTITRUST LAW, AND STATE CONSUMER PROTECTION LAW

The plaintiffs have brought federal antitrust claims, state law antitrust claims, and/or state law consumer protection claims.

- The plaintiffs that are indirect purchasers – *i.e.*, the EPPs, United, and the IHPPs – have asserted state law antitrust claims and state law consumer protection claims.
- To the extent United has been assigned direct purchaser claims, those claims are based on federal antitrust law.

United's federal antitrust claims are based on the Sherman Act, § 1 which prohibits agreements that unreasonably restrain competition. The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace. The Sherman Act rests on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

The indirect purchasers' state law antitrust claims and state law consumer protection claims are either modeled after federal antitrust law or are similar to federal antitrust claims. Therefore, I will instruct you on the requirements of federal antitrust law, but those same requirements apply to the state law antitrust claims and the state law consumer protection claims. Please note that there is similarity between federal and state law only with respect to liability – *i.e.*, did a defendant violate the law. There are differences between federal and state law when it comes to damages.

14

**JURY INSTRUCTION NO. 10A**

**WHAT A PATENT IS, HOW ONE IS OBTAINED, AND CHALLENGING THE**

**VALIDITY OF A PATENT**

The plaintiffs have brought federal antitrust claims, state law antitrust claims, and/or state law consumer protection claims, those claims are based on a patent settlement agreement between Gilead and Teva. Therefore, it may be helpful to have some general background information on patents.

To obtain a patent, one must file an application with the United States Patent & Trademark Office (abbreviated "PTO"). The process of obtaining a patent is called "patent prosecution." The PTO is an agency of the federal government and employs trained patent examiners who review applications for patents. The application includes what is called a "specification," which must contain a written description of the claimed invention telling what the invention is, how it works, how to make it and how to use it so others skilled in the field will know how to make or use it. The application also includes the patent "claims." The claims define the boundaries of the patent's protection and give notice to the public of those boundaries.

After the applicant files the application, a PTO patent examiner reviews the patent application to determine whether the claims are patentable and whether the specification adequately describes the invention claimed. In examining a patent application, the patent examiner reviews, among other things, information about the state of the technology at the time the application was filed. That information is called "prior art." The patent examiner considers, among other things, whether each claim defines an invention that is new, useful, and not obvious in view of the prior art, and whether there is double-patenting in view of earlier-expiring patents. A patent lists the prior art that the examiner considered; this list is called the "cited references."

It is common for there to be back-and-forth communications between the examiner and the applicant on whether the claims are patentable, and thus allowed. The papers generated during this time of communicating back and forth between the patent examiner and the applicant make up what is called the "prosecution history." All of this material becomes available to the public no later than the date when the patent issues.

After a patent issues, a patentee may bring a patent infringement suit if it believes that someone infringes on its patent. The patentee has the burden to prove infringement of its patent(s) by a preponderance of the evidence.

The fact that the PTO grants a patent does not necessarily mean that any invention claimed in the patent, in fact, deserves the protection of a patent. A person accused of infringement has the right to argue in federal court that a claimed invention in the patent is invalid because it does not meet the requirements for a patent. Once a patent is issued by the PTO, the party challenging the validity must prove invalidity by clear and convincing evidence, which means highly probable. A patent may be invalid for a number of reasons, including because the invention claimed by the patent was obvious in view of the prior art, the patent failed to disclose how to make and use the claimed invention, or there is double-patenting (if what is claimed by the patent was patentably indistinct from what was already claimed by one or more earlier-expiring patents). A later patent is patentably indistinct from an earlier patent claim if the later claim is obvious over, or anticipated by, the earlier claim.

The question of invalidity of a patent is determined from the perspective of a person of ordinary skill in the art (abbreviated "POSA") in the field of the asserted invention as of the priority date of the patent.

**JURY INSTRUCTION NO. 11**

**FEDERAL ANTITRUST LAW – SHERMAN ACT, § 1**

The plaintiffs challenge the defendants' conduct under § 1 of the Sherman Act.  Section 1 prohibits contracts, combinations, and conspiracies that unreasonably restrain trade.  To establish a violation of Section 1 of the Sherman Act, the plaintiffs must prove the following:

(1) the existence of a contract, combination, or conspiracy between the defendants that unreasonably restrained trade; and

(2) that the restraint caused the plaintiffs to suffer an injury to their business or property.

Element (1) asks you to determine whether the defendants engaged in **anticompetitive conduct**.  You will determine whether there was an unreasonable restraint on trade using a standard called "the rule of reason."

Element (2) asks you to determine whether any anticompetitive conduct caused injury or harm to the plaintiffs.  This is sometimes referred to as "**antitrust injury**."

United States District Court
Northern District of California

# JURY INSTRUCTION NO. 12

## FEDERAL ANTITRUST LAW – SHERMAN ACT, § 1 –

## ELEMENT (1): ANTICOMPETITIVE CONDUCT –

## RULE OF REASON

The rule of reason has a three-step, burden-shifting framework.

**First**, the plaintiffs have the initial burden of showing that the defendants' conduct produced significant anticompetitive effects (as defined in later Instructions No. 13-16) within a relevant market.

**Second,** if the plaintiffs meet that burden, the defendants must then come forward with evidence that their conduct had procompetitive effects.

**Third**, if the defendants make that showing, then the burden shifts back to the plaintiffs to rebut those claimed procompetitive effects or to show that any procompetitive benefits could have been reasonably achieved in a substantially less restrictive manner. At the third step, if the plaintiffs prove that the procompetitive benefits could have been reasonably achieved in a substantially less restrictive manner, then the plaintiffs will have met their burden to show that the challenged conduct was unreasonable.

However, if you find that the challenged conduct was reasonably necessary to achieve the procompetitive benefits, then you must balance those procompetitive benefits against the competitive harm resulting from the same conduct. If the competitive harm substantially outweighed the procompetitive benefits, then the challenged conduct was unreasonable. If the competitive harm did not substantially outweigh the procompetitive benefits, then the challenged conduct was reasonable. The plaintiffs bear the burden of proving that the anticompetitive effect of the conduct substantially outweighed its procompetitive benefits.

**JURY INSTRUCTION NO. 13**

**FEDERAL ANTITRUST LAW – SHERMAN ACT, § 1 –**

**ELEMENT (1): ANTICOMPETITIVE CONDUCT –**

**RULE OF REASON –**

**FIRST STEP – SIGNIFICANT ANTICOMPETITIVE EFFECTS**

As I noted, at the first step of the rule of reason, the plaintiffs have the initial burden of showing that the defendants' conduct produced significant anticompetitive effects within a relevant market. According to the plaintiffs, the defendants' conduct produced significant anticompetitive effects when, as alleged, Gilead made to Teva what is sometimes called a "reverse payment" since it is a payment from the patent holder to the alleged infringer, the reverse of the more typical settlement where the infringer makes a payment to the patent holder.

For a reverse payment to have an anticompetitive effect, the plaintiffs have the burden of proving the following:

    (1) Gilead had market power; and

    (2) The patent settlement agreement between Gilead and Teva included a payment from Gilead to Teva so that Teva would delay its entry into the market and Gilead could thereby avoid the risk of generic competition.

**JURY INSTRUCTION NO. 14**

**FEDERAL ANTITRUST LAW – SHERMAN ACT, § 1 –**

**ELEMENT (1): ANTICOMPETITIVE CONDUCT –**

**RULE OF REASON –**

**FIRST STEP – SIGNIFICANT ANTICOMPETITIVE EFFECTS – MARKET**

**POWER**

Market power is the ability to profitably raise or maintain prices, for a sustained period of time, above those that would be charged in a competitive market. A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power. The ability to charge higher prices for better products or services, however, is in itself not market power.

Market power may be demonstrated through either direct evidence or indirect evidence.

There is direct evidence of market power where there is evidence that a firm has charged supracompetitive prices for a significant period of time. A supracompetitive price is a price above the price that would be charged in a competitive market. If a firm attempted to maintain prices above competitive levels, but lost so much business to other competitors that the price increase was unprofitable and had to be withdrawn, then the firm did not have market power. For example, if a firm attempted to maintain prices above competitive levels, but new competitors entered the relevant market or existing competitors expanded their sales and took so much business that the price increase became unprofitable and had to be withdrawn, then the firm did not have market power. On the other hand, if the firm is able to keep prices substantially above competitive levels for a significant period of time without losing substantial business to competitors, it has market power.

There is indirect evidence of market power where there is evidence that a firm has a dominant share of the relevant market, there are significant barriers to entry into that market, and existing competitors lack the capacity to increase their output in the short run.

**JURY INSTRUCTION NO. 15**

**FEDERAL ANTITRUST LAW – SHERMAN ACT, § 1 –**

**ELEMENT (1): ANTICOMPETITIVE CONDUCT –**

**RULE OF REASON –**

**FIRST STEP – SIGNIFICANT ANTICOMPETITIVE EFFECTS – MARKET**

**POWER – RELEVANT MARKET**

To determine whether Gilead had market power, you must have some understanding of what the relevant market is – *i.e.*, what is the market in which Gilead had power. If, however, the plaintiffs prove, through direct evidence, that Gilead had market power, then the plaintiffs are not required to precisely define the relevant market; they need only demonstrate the rough contours of the relevant market.

There are two aspects to a relevant market. The first aspect is known as the relevant product market. The second aspect is known as the relevant geographic market.

In this case, there is no dispute about the relevant geographic market, and you will not need to decide that issue.

As for product market, a relevant product market is defined as the product at issue and economic substitutes for that product. A product is an economic substitute for the product at issue if the sales of the other product could substantially constrain the ability of the manufacturer of the product at issue to increase the price of the product. In making that determination you should consider whether the two products are reasonably interchangeable in terms of use or whether consumers will change their consumption of one product in response to a price change in another.

For example, you may consider whether a small but significant and non-transitory increase in the price of one product, from the competitive level, would result in enough customers switching from that product to another product such that the price increase would not be profitable. In other words, would customers accept the price increase or would so many switch to alternative products that the price increase would be withdrawn? Generally speaking, a small but significant and non-transitory increase in price is approximately a 5 percent increase in price not due to cost factors but you may conclude in this case that some other percentage is more

applicable to the product at issue. If you find that customers would switch and that the price increase would not be profitable, then you may conclude that the other products are in the product market. If, on the other hand, you find that customers would not switch, and the price increase would be profitable, then you may conclude that the products are not in the product market.

In evaluating whether various products are economic substitutes for each other, you may also consider:

- Consumers' views on whether the products are interchangeable;
- the relationship between the price of one product and sales of another;
- the presence or absence of specialized vendors;
- the perceptions of either industry or the public as to whether the products are in separate markets;
- the views of plaintiff and defendant regarding who their respective competitors are; and
- the existence or absence of different customer groups or distribution channels.

**JURY INSTRUCTION NO. 16**

**FEDERAL ANTITRUST LAW – SHERMAN ACT, § 1 –**

**ELEMENT (1): ANTICOMPETITIVE CONDUCT –**

**RULE OF REASON – FIRST STEP –**

**SIGNIFICANT ANTICOMPETITIVE EFFECTS – PAYMENT**

It is anticompetitive for a brand manufacturer and generic manufacturer to settle a patent infringement dispute by having the brand manufacturer pay, in any form, the generic manufacturer to delay entry into the market, thereby allowing the brand manufacturer to avoid the risk of generic competition.

If the brand manufacturer's payment to the generic manufacturer is large and unjustified, then you may infer that the brand and generic manufacturers agreed that the brand manufacturer would pay the generic manufacturer to delay the generic manufacturer's entry into the market and thereby avoid the risk of generic competition.

**JURY INSTRUCTION NO. 17**

**FEDERAL ANTITRUST LAW – SHERMAN ACT, § 1 –**

**ELEMENT (1): ANTICOMPETITIVE CONDUCT –**

**RULE OF REASON – SECOND STEP**

If you find that the plaintiffs met their burden at the first step of the rule of reason, then the burden shifts to the defendants to show that their conduct had procompetitive effects. Examples of procompetitive benefits include, but are not limited to, the creation of greater efficiencies and/or enhanced consumer choice.

**JURY INSTRUCTION NO. 18**

**FEDERAL ANTITRUST LAW – SHERMAN ACT, § 1 –**

**ELEMENT (1): ANTICOMPETITIVE CONDUCT –**

**RULE OF REASON – THIRD STEP**

If you find that the defendants met their burden at the second step of the rule of reason, then the burden shifts back to the plaintiffs to rebut the claimed procompetitive effects or to show that any procompetitive benefits could have been reasonably achieved in a substantially less restrictive manner. At the third step, if the plaintiffs prove that the procompetitive benefits could have been reasonably achieved in a substantially less restrictive manner, then the plaintiffs will have met their burden to show that the challenged conduct was unreasonable.

However, if you find that the challenged conduct was reasonably necessary to achieve the procompetitive benefits, then you must balance those procompetitive benefits against the competitive harm resulting from the same conduct. If the competitive harm substantially outweighed the procompetitive benefits, then the challenged conduct was unreasonable. If the competitive harm did not substantially outweigh the procompetitive benefits, then the challenged conduct was reasonable. The plaintiffs bear the burden of proving that the anticompetitive effect of the conduct substantially outweighed its procompetitive benefits.

# JURY INSTRUCTION NO. 19

## FEDERAL ANTITRUST LAW – SHERMAN ACT, § 1 –

## ELEMENT (2): ANTITRUST INJURY

If the plaintiffs prove that the defendants unreasonably restrained trade (*i.e.*, engaged in anticompetitive conduct, the first element of a Sherman Act, § 1 claim), then you must consider the issue of antitrust injury – *i.e.*, whether any anticompetitive conduct caused injury or harm to the plaintiffs. You may have heard the parties refer to this issue as one of "causation." Only if you find that the defendants' anticompetitive conduct caused injury to the plaintiffs do you then consider the amount of damages that should be awarded to the plaintiffs.

The plaintiffs are entitled to recover damages for an injury to their business or property if they can establish three elements of injury and causation:

(1) the plaintiffs were in fact injured as a result of the defendants' alleged violation of the antitrust laws;

(2) the defendants' alleged illegal conduct was a material cause of the plaintiffs' injury; and

(3) the plaintiffs' injury is an injury of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For the plaintiffs to establish that they are entitled to recover damages, they must prove that they were injured as a result of the defendants' alleged violation of the antitrust laws. Proving the fact of damage does not require the plaintiffs to prove the dollar value of their injury. It requires only that the plaintiffs prove that they were in fact injured by the defendants' alleged antitrust violation.

In considering whether the plaintiffs were injured, you are to consider what would have happened in the "but-for world." In other words, in a world free of the alleged anticompetitive conduct, what would have happened? In answering this question, you must focus on what law-abiding, rational companies in the defendants' position would have done absent the reverse payment. According to the plaintiffs, in a world free of the alleged anticompetitive conduct, generic competition would have taken place earlier than it actually did in the real world, and

therefore, the plaintiffs overpaid for the HIV drugs in the real world because of the delayed entry of generics into the market. According to the defendants, in a world free of the alleged anticompetitive conduct, generic entry would not have occurred earlier than it actually did in the real world, and thus there was no antitrust injury.

Second, the plaintiffs must offer evidence that establishes by a preponderance of the evidence that the defendants alleged illegal conduct was a material cause of the plaintiffs' injury. This means that the plaintiffs must have proved that some damage occurred to them as a result of the defendants' alleged antitrust violation, and not some other cause. The plaintiffs are not required to prove that the defendants' alleged antitrust violation was the sole cause of their injury; nor need the plaintiffs eliminate all other possible causes of injury. It is enough if the plaintiffs have proved that the alleged antitrust violation was a material cause of their injury.

Finally, the plaintiffs must establish that their injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If the plaintiffs' injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then the plaintiffs' injuries are antitrust injuries. On the other hand, if the plaintiffs' injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then the plaintiffs' injuries are not antitrust injuries and the plaintiffs may not recover damages for those injuries under the antitrust laws.

In summary, if the plaintiffs can establish that they were in fact injured by the defendants' conduct, that the defendants' conduct was a material cause of the plaintiffs' injury, and that the plaintiffs' injury was the type that the antitrust laws were intended to prevent, then the plaintiffs are entitled to recover damages for the injury to their business or property.

**JURY INSTRUCTION NO. 20**

**FEDERAL ANTITRUST LAW – SHERMAN ACT, § 1 –**

**ELEMENT (2): ANTITRUST INJURY –**

**BUT-FOR WORLD**

As noted above, the plaintiffs contend that, in a world free of the alleged anticompetitive conduct, generic competition would have taken place earlier than it actually did in the real world; in other words, in the real world, generic entry was delayed. This issue of causation is necessarily hypothetical.

The plaintiffs have two theories as to how generic entry was delayed: (1) in the but-for world, a reasonable, law-abiding generic manufacturer in Teva's position would have continued to litigate the patent infringement suit relating to the FTC 2021 patents (*i.e.*, the '245 and '396 patents) and against any lawsuit commenced by Gilead with respect to the Combination 2024 patents (*i.e.*, the '264 and '397 patents), in the event Gilead sued Teva on those patents, and it would have prevailed, which would have allowed for earlier generic entry; or (2) in the but-for world, a reasonable, law-abiding brand manufacturer in Gilead's position and a reasonable, law-abiding generic manufacturer in Teva's position would have continued to discuss settlement, and they would have reached a settlement that (a) did not include an alleged payment and (b) did include a license provision allowing for generic entry earlier than September 30, 2020.

A generic drug manufacturer cannot lawfully sell a generic drug if the sale of the generic drug infringes a valid patent, or the manufacturer does not have a license from the patent owner. Thus, to establish that a delay in generic entry was caused by the defendants, the plaintiffs must prove, by a preponderance of the evidence, that either:

(1) the court in the patent litigation related to the FTC 2021 patents, and in any subsequent patent lawsuit with respect to the Combination 2024 patents, in the event Gilead sued on those patents, would have found that the sale of generic Truvada and Atripla prior to September 30, 2020, would not have infringed any valid Gilead patent, or

(2) the sale of generic Truvada and Atripla prior to September 30, 2020, would have

been permitted under the terms of a license from Gilead.  The plaintiffs do not have to prove both theories; they can establish delayed generic entry by proving either one of the two theories.

If you find that (1) the court in a patent litigation would have found that the sale of generic Truvada or Atripla prior to September 30, 2020, would have infringed a valid Gilead patent and that (2) Gilead would not have granted a license for such sale, then that patent acted as a legal barrier to earlier generic entry, and the patent agreement could not have caused a delay in generic entry.

**JURY INSTRUCTION NO. 21**

**DAMAGES – PROOF**

If you find that the defendants caused the plaintiffs injury or harm, then you must consider the issue of damages.

It is the duty of the Court to instruct you about the measure of damages. By instructing you on damages, the Court does not mean to suggest for which party your verdict should be rendered.

If you find for the plaintiffs, you must determine the plaintiffs' damages. The plaintiffs have the burden of proving damages by a preponderance of the evidence. Damages means the amount of money that will reasonably and fairly compensate the plaintiffs for any injury you find was caused by the defendants.

It is for you to determine what damages, if any, have been proved.

You are permitted to make just and reasonable estimates in calculating the plaintiffs' damages, including damages based on class claims. You are not required to calculate damages with mathematical certainty or precision. However, your award must be based upon evidence and not upon speculation, guesswork or conjecture.

**JURY INSTRUCTION NO. 22**

**DAMAGES – MEASURE OF DAMAGES**

As I noted, the plaintiffs assert that they were injured because, in a world free of the alleged anticompetitive conduct (the "but-for world"), generic competition would have taken place earlier than it did in the real world, and therefore, the plaintiffs overpaid for the HIV drugs in the real world. In other words, the plaintiffs claim that they were overcharged. This claim is made by both the plaintiffs who have class claims and the plaintiffs who have individual claims.

An overcharge is measured by the difference between (1) the price a plaintiff actually paid for the HIV drug in the real world and (2) the price the plaintiff would have paid if the antitrust violation had not occurred (*i.e.*, in the but-for world).

The plaintiffs' claimed damages are calculated based on the entry date that you determine for generic competition in the but-for world and the number of generic manufacturers that could and would have sold generic Truvada and generic Atripla at that time.

**JURY INSTRUCTION NO. 23**

**DAMAGES – PASS-ON OF OVERCHARGE**

The ability of a plaintiff to pass on an overcharge to another entity/person down the chain of distribution is irrelevant and must not be considered in determining the damages to be awarded.

**JURY INSTRUCTION NO. 23A**

**DAMAGES – STATE-BY-STATE CALCULATIONS**

You have heard testimony from some witnesses regarding calculation of damages on a state-by-state basis.  That was the result of the Court's legal rulings in this case. For United, there are no state-by-state restrictions that apply to its claims.  For the EPPs and IHPPs, a list of the applicable states is provided on the verdict form.

**JURY INSTRUCTION NO. 24**

**DAMAGES – "FLAGRANT" VIOLATION**

If you find that the defendants violated § 1 of the Sherman Act by unreasonably restraining trade which caused injury to the plaintiffs, *see* Instruction No. 11, then you may be separately asked to determine whether the defendants' antitrust violation was flagrant.

"Flagrant" means shocking, outrageous, or conspicuously or outstandingly bad. The plaintiffs have the burden of proving that there was a flagrant violation by a preponderance of the evidence.

**JURY INSTRUCTION NO. 25**

**DAMAGES – "WILLFUL" VIOLATION**

If you find that the defendants violated § 1 of the Sherman Act by unreasonably restraining trade which caused injury to the plaintiffs, *see* Instruction No. 11, then you may be separately asked to determine whether the defendants' antitrust violation was willful.

Where applicable, the plaintiffs have the burden of proving that there was a willful violation by a preponderance of the evidence. "Willful" means intentional.

# JURY INSTRUCTION NO. 26

## DUTY TO DELIBERATE

When you begin your deliberations, elect one member of the jury as your foreperson who will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so. Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Perform these duties fairly and impartially. Do not allow personal likes or dislikes, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases, to influence you. You should also not be influenced by any person's race, color, religion, national ancestry, or gender, sexual orientation, profession, occupation, celebrity, economic circumstances, or position in life or in the community.

Do not be afraid to examine any assumptions you or other jurors have made which are not based on the evidence presented at trial. Please do not take anything I may say or do during the trial as indicating what I think of the evidence or what your verdict should be – that is entirely up to you.

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement if you can do so. During your deliberations, you should not hesitate to reexamine your own views and change your opinion if you become persuaded that it is wrong.

# JURY INSTRUCTION NO. 27

## CONSIDERATION OF EVIDENCE – CONDUCT OF THE JURY

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves. Except for discussing the case with your fellow jurors during your deliberations:

> Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone, tablet, computer, or any other means, via email, via text messaging, or any internet chat room, blog, website or application, including but not limited to Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat, TikTok, or any other forms of social media. This applies to communicating with your family members, your employer, the media or press, and the people involved in the trial. If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court.

> Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it, although I have no information that there will be news reports about this case; do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own. Do not visit or view any place discussed in this case, and do not use Internet programs or other devices to search for or view any place discussed during the trial. Also, do not do any research about

this case, the law, or the people involved – including the parties, the witnesses or the lawyers – until you have been excused as jurors. If you happen to read or hear anything touching on this case in the media, turn away and report it to me as soon as possible.

These rules protect each party's right to have this case decided only on evidence that has been presented here in court. Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process. If you do any research or investigation outside the courtroom, or gain any information through improper communications, then your verdict may be influenced by inaccurate, incomplete or misleading information that has not been tested by the trial process. Each of the parties is entitled to a fair trial by an impartial jury, and if you decide the case based on information not presented in court, you will have denied the parties a fair trial. Remember, you have taken an oath to follow the rules, and it is very important that you follow these rules.

A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over. If any juror is exposed to any outside information, please notify the court immediately.

## JURY INSTRUCTION NO. 28

## COMMUNICATION WITH COURT

If it becomes necessary during your deliberations to communicate with me, you may send a note through the Courtroom Deputy, signed by your presiding juror or by one or more members of the jury. No member of the jury should ever attempt to communicate with me except by a signed writing; I will communicate with any member of the jury on anything concerning the case only in writing, or here in open court. If you send out a question, I will consult with the parties before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone – including me – how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged. Do not disclose any vote count in any note to the court.

**JURY INSTRUCTION NO. 29**

**RETURN OF VERDICT**

A verdict form has been prepared for you. After you have reached unanimous agreement on a verdict, your presiding juror should complete the verdict form according to your deliberations, sign and date it, and advise the Courtroom Deputy that you are ready to return to the courtroom.